FILED

2021 Nov-19  PM 03:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil No. 2:20-cv-01971-RDP |
| | ) | |
| STATE OF ALABAMA and | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

1.　　THE UNITED STATES OF AMERICA brings this action against the State of Alabama

and Alabama Department of Corrections pursuant to the Civil Rights of Institutionalized

Persons Act (CRIPA), 42 U.S.C. § 1997, to enforce the Eighth and Fourteenth

Amendment rights of men housed in 13 Alabama state prisons (Alabama's Prisons for

Men).  Defendants violate the Eighth and Fourteenth Amendment rights of these

prisoners by failing to prevent prisoner-on-prisoner violence, by failing to prevent

prisoner-on-prisoner sexual abuse, by failing to protect prisoners from the use of

excessive force by security staff,[1] and by failing to provide safe physical conditions of

confinement in violation of the Constitution.

---

[1] As used in this Complaint, the term "security staff" includes ADOC supervisory correctional
officers (such as sergeants, lieutenants, captains, wardens), correctional officers, basic
correctional officers, and cube correctional officers.

2.      On April 2, 2019, the U.S. Department of Justice's Civil Rights Division, Special

Litigation Section, and the three U.S. Attorney's Offices for the State of Alabama (the

United States) notified the State of Alabama of its findings that, in violation of the

Constitution, prisoners housed in Alabama's Prisons for Men are at serious risk of death,

physical violence, and sexual abuse at the hands of other prisoners, and are housed in

unsafe and unsanitary conditions.

3.      The United States engaged in multiple rounds of negotiations with the State beginning in

the spring of 2019.  Since the United States notified the State of its findings, the State of

Alabama has failed or refused to correct the above unconstitutional conditions in

Alabama's Prisons for Men.

4.      On July 23, 2020, the United States notified the State of Alabama of its findings that, in

violation of the Constitution, security staff frequently use excessive force on prisoners

housed in all Alabama's major correctional facilities for men, except for the Hamilton

Aged & Infirmed Correctional Facility.

5.      Alabama's Prisons for Men remain extremely overcrowded, prisoner-on-prisoner

homicides have increased, other forms of prisoner-on-prisoner violence including sexual

abuse remains unabated, the physical facilities remain inadequate, use of excessive force

by security staff is common, and staffing rates remain critically and dangerously low.

6.      In the two and a half years following the United States' original notification to the State

of Alabama of unconstitutional conditions of confinement, prisoners at Alabama's

Prisons for Men have continued daily to endure a high risk of death, physical violence,

and sexual abuse at the hands of other prisoners.

7.     The unconstitutional conditions are pervasive and systemic across all 13 Alabama's Prisons for Men covered by this Complaint, as indicated by facility-level data and as illustrated by examples of the violence, sexual abuse, excessive force, and unsafe physical conditions.

8.      Defendants are deliberately indifferent to each of the serious and systemic constitutional problems present in Alabama's Prisons for Men concerning prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, use of excessive force by security staff, and unsafe physical facilities

9.     The United States has determined that constitutional compliance cannot be secured by voluntary means.  Judicial action is, therefore, necessary to remedy the violations of law identified in the United States' findings reports and to vindicate the rights of the individuals incarcerated in Alabama's Prisons for Men.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

11.    The United States is authorized to initiate this action pursuant to 42 U.S.C. § 1997a(a).

12.    The Attorney General has certified that all pre-filing requirements specified in 42 U.S.C. § 1997b have been met.  The Certificate of the Attorney General is appended to this Complaint as Attachment A and is incorporated herein.

13.    Venue in the United States District Court for the Northern District of Alabama is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

14.    Plaintiff is the United States of America.

15.    Defendants are the State of Alabama and Alabama Department of Corrections (ADOC).

3

16.  Defendants are responsible for the safety, care, custody, and control of individuals incarcerated in Alabama's Prisons for Men, as well as for the actions of the ADOC staff and for the actions of any entity or individual contracting and providing services at Alabama's Prisons for Men.

17.  As used in this Complaint, the term "Alabama's Prisons for Men" means Bibb Correctional Facility; Bullock Correctional Facility; Donaldson Correctional Facility; Draper Correctional Facility, Easterling Correctional Facility; Elmore Correctional Facility; Fountain Correctional Facility; Holman Correctional Facility; Kilby Correctional Facility; Limestone Correctional Facility; St. Clair Correctional Facility; Staton Correctional Facility; and Ventress Correctional Facility.  The term does not include the Hamilton Aged & Infirmed Correctional Facility.

## FACTS

18.  Bibb Correctional Facility is a medium-security, or Security Level IV, prison for men in Brent, Alabama with a designed capacity of approximately 918 men.

19.  Bullock Correctional Facility is a medium-security, or Security Level IV, prison for men in Union Springs, Alabama with a designed capacity of approximately 919 men.

20.  Donaldson Correctional Facility is a close-security, or Security Level V, prison for men in Bessemer, Alabama with a designed capacity of approximately 968 men, with an additional approximately 24 spaces designated for death row.

21.  Draper Correctional Facility is a medium-security, or Security Level IV, prison for men in Elmore, Alabama with a designed capacity of approximately 600 men.  In late 2017 and early 2018, following the United States' on-site review of the prison, ADOC decommissioned Draper Correctional Facility.  ADOC reopened the facility in a limited

capacity in April 2020.

22. Easterling Correctional Facility is a medium-security, or Security Level IV, prison for men in Clio, Alabama with a designed capacity of approximately 652 men.

23. Elmore Correctional Facility is a medium-security or Security Level IV, prison for men in Elmore, Alabama with a designed capacity of approximately 600 men.

24. Fountain Correctional Facility is a medium-security or Security Level IV, prison for men in Atmore, Alabama with a designed capacity of approximately 831 men.

25. Holman Correctional Facility is a close-security, or Security Level V, prison for men in Atmore, Alabama with a designed capacity of approximately 581 men, with an additional approximately 56 spaces designated for death row.  In January 2020, ADOC decommissioned most of the Holman facility, but continued to hold 307 men at Holman as of September 2021.

26. Kilby Correctional Facility is a close-security, or Security Level V, prison for men in Mt. Meigs, Alabama with a designed capacity of approximately 440 men.

27. Limestone Correctional Facility is a close-security, or Security Level V, prison for men in Harvest, Alabama with a designed capacity of approximately 1628 men.

28. St. Clair Correctional Facility is a close-security, or Security Level V, prison for men in Springville, Alabama with a designed capacity of approximately 984 men.

29. Staton Correctional Facility is a medium-security, or Security Level IV, prison for men in Elmore, Alabama with a designed capacity of approximately 508 men.

30. Ventress Correctional Facility is a medium-security, or Security Level IV, prison for men in Clayton, Alabama with a designed capacity of approximately 650 men.

31.     Bibb, Bullock, Donaldson, Draper, Easterling, Elmore, Fountain, Holman, Kilby, Limestone, St. Clair, Staton, and Ventress Correctional Facilities, Alabama's Prisons for Men, are institutions within the meaning of 42 U.S.C. § 1997(1).

32.     In 2016, the United States notified Defendants that it had opened an investigation, pursuant to CRIPA, into whether the conditions in Alabama's major correctional facilities for men violate the Eighth Amendment of the United States Constitution.

33.     The United States investigated whether ADOC (1) adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners; (2) adequately protects prisoners from use of excessive force and staff sexual abuse by security staff; and (3) provides prisoners with sanitary, secure, and safe living conditions.

34.     In April 2019, the United States notified the State of Alabama and ADOC that the United States had reasonable cause to believe that the Defendants were violating the Eighth Amendment rights of prisoners housed in Alabama's major correctional facilities for men prisons by failing to protect prisoners from physical harm and sexual abuse at the hands of other prisoners and by failing to provide safe physical conditions.

35.     In July 2020, the United States notified the State of Alabama and ADOC that the United States had reasonable cause to believe that Defendants were violating the Eighth Amendment by failing to protect prisoners from excessive force by security staff in Alabama's Prisons for Men.

36.     The United States' findings were outlined in its April 2019 and July 2020 findings reports.[2]

---

[2] The United States notified Defendants of its conclusions after a lengthy investigation. Document production responsive to the requests made during the investigation concluded in

**(1)** *Defendants Fail to Protect Prisoners from Prisoner-on-Prisoner Violence at Alabama's Prisons for Men*

37.    Defendants engage in a pattern or practice of failing to protect prisoners in all 13 of Alabama's Prisons for Men from serious harm and a substantial risk of serious harm at the hands of other prisoners, including serious injury and death.

38.    There have been dozens of homicides across Alabama's Prisons for Men in the last several years.  The following chart illustrates the prisoner-on-prisoner homicides publicly reported by ADOC.



*Chart 1: Facility-by-Facility Homicides Reported for Fiscal Years 2015-2021[3]*

39.    Because ADOC does not include deaths that are "pending investigation" in its Monthly Statistical Reports, the number of homicides in Alabama's Prisons for Men is likely higher than listed in Chart 1.  ADOC's Monthly Statistical Reports for 2021 show no homicides in calendar year 2021.  However, at least 10 prisoner-on-prisoner homicides in

early 2018.   Publicly available documents demonstrate that the unconstitutional conditions identified during the investigation continue.

[3] In October 2018, ADOC stopped reporting statistical data from Draper in its monthly reports. *See* http://www.doc.state.al.us/docs/MonthlyRpts/2018-10.pdf [https://perma.cc/6LLM-W4LL]. As a result, Draper is not included on Chart 1.

Alabama's Prisons for Men have been reported by the media and advocates in calendar year 2021.

40. The pattern of violence at Alabama's Prisons for Men is pervasive and systemic.

41. In 2018, at least 10 men were killed by other prisoners in Alabama's Prisons for Men.

42. In 2018, the homicide rate in Alabama's Prisons for Men was more than seven times the national average.

43. In 2019, at least 14 prisoners in Alabama's Prisons for Men were killed by other prisoners.

44. In 2020, at least 9 prisoners in Alabama's Prisons for Men were killed by other prisoners.

45. The presence of contraband, including cellphones and illicit substances, in Alabama's Prisons for Men has contributed to the level of prisoner-on-prisoner violence.

46. For example, two ADOC correctional officers were arrested in September 2021, and one was arrested in October 2021, for contraband-related crimes.

47. Toxicology results reveal that multiple prisoners who died as a result of prisoner-on-prisoner violence had the presence of illicit substances in their systems, including methamphetamine or synthetic cannabinoid.

48. The following homicides summarized in paragraphs 49-67 are illustrative examples of the pervasive pattern of homicides within Alabama's Prisons for Men and are not a comprehensive list of all homicides that have occurred within Alabama's Prisons for Men.

49. In October 2021, a 31-year-old prisoner was stabbed to death by another prisoner at Donaldson.

50. In October 2021, a 34-year-old prisoner was stabbed to death by another prisoner at Bibb.

51.     In July 2021, a 39-year-old prisoner was stabbed to death by another prisoner at Fountain.

52.     In June 2021, a 40-year-old prisoner was stabbed to death by another prisoner at Bullock.

53.     In May 2021, a 58-year-old prisoner was choked to death at Limestone.

54.     In February 2021, a 31-year-old prisoner was smothered to death at Donaldson.

55.     In January 2021, a 38-year-old prisoner was stabbed to death by another prisoner at St. Clair.

56.     In November 2020, a 48-year-old prisoner at Bullock died of blunt force trauma. Toxicology tests indicated the presence of synthetic cannabinoid in the decedent's blood.

57.     In September 2020, a 46-year-old prisoner at Fountain was stabbed to death in an open dormitory.

58.     In June 2020, a 67-year-old prisoner was beaten to death at Bullock.

59.     In June 2020, a 38-year-old prisoner died after being assaulted by another prisoner at Donaldson.  Toxicology reports also indicated the presence of methamphetamine in the prisoner's system.  The coroner was unable to determine whether the assault, drug use, or a combination of both was the cause of death.

60.     In May 2020, a 33-year-old prisoner died after being assaulted at Elmore.

61.     In April 2020, a 43-year-old prisoner was stabbed to death at Ventress.

62.     In December 2019, a 31-year-old prisoner at Bibb died after suffering a prisoner assault.

63.     In October 2019, a 52-year-old prisoner at Ventress died after being stabbed through the eye.

64.     In October 2019, a 53-year-old prisoner at Donaldson died after being strangled to death. A note was found on the prisoner indicating that he feared for his life because another prisoner had ordered a "hit" on him.

65.   In June 2019, a 52-year-old prisoner at Staton was discovered with stab wounds only after he had been stabbed multiple times in an open dormitory.  He was airlifted to an outside hospital where he later died.

66.   In June 2019, a 29-year-old prisoner died after being stabbed in the chest at Fountain.

67.   In March 2019, at Bibb, two prisoners were killed by other prisoners in two separate incidents in the span of three days.

68.   Over the last several years, Alabama's prisons have become even more deadly.

69.   Based on ADOC's most recent public data, the chart below highlights the trends in prisoner-on-prisoner homicides within Alabama's Prisons for Men from Fiscal Years 2015 to 2020.



*Chart 2: Systemwide Homicides for Fiscal Years 2015-2020*

70.   For Fiscal Year 2021, from October 2020 through September 2021, ADOC's statistical reports reflect only one homicide as a result of prisoner-on-prisoner violence in Alabama's Prisons for Men.  Namely, in October 2020, a 29-year-old prisoner at Easterling was stabbed to death in an open dormitory.  No security staff were present at the time of the stabbing.

10

71.     However, ADOC's statistical reports do not reflect all deaths from prisoner-on-prisoner homicide and do not report deaths that are pending investigation.  For example, in November 2020, a 48-year-old prisoner at Bullock was beaten and stabbed to death.  Additionally, in February 2021, a 38-year-old prisoner at St. Clair was stabbed to death in an open dormitory.  ADOC officials confirmed both deaths resulted from prisoner assaults in public news reporting, but they are not reflected in ADOC's Monthly Statistical Reports.

72.     ADOC does not accurately classify or identify the cause of every prisoner death.  By way of example, in February 2018, a prisoner died from multiple stab wounds to his head, abdomen, back, and arm sustained at Kilby.  ADOC classified the prisoner's death as "Natural" rather than "Homicide."  Similarly, in November 2017, an autopsy revealed a prisoner died from blunt force trauma to the head sustained at Elmore.  ADOC classified the death as "Natural."

73.     ADOC has publicly reported at least 159 total prisoner deaths in Alabama's Prisons for Men for Fiscal Year 2020 and 165 total prisoner deaths for Fiscal Year 2021.  ADOC has not identified the causes of some of these deaths.  Further, ADOC often fails to report a death while it is under investigation, a status which sometimes continues for years.

74.     The number of assaults within Alabama's Prisons for Men has consistently been high in recent years as demonstrated by the chart below.



*Chart 3: Prisoner-on-Prisoner Assaults for Fiscal Years 2015-2021*

75.    From October 2018 to September 2019 (Fiscal Year 2019), approximately 278 prisoners

in Alabama's Prisons for Men suffered serious injuries, defined as requiring transport to

outside hospitals, as the result of prisoner-on-prisoner assaults as detailed below.[4]

---

[4] Again, Draper is not included in this list because ADOC closed Draper in 2018 and stopped publicly reporting statistical data related to that facility in February 2018.  Even though ADOC partially reopened Draper in 2020, it has not resumed reporting data for Draper.  The last reported data shows that during the period that Draper was being decommissioned, from October 2017 through February 2018, there were four serious injuries as the result of assault.



*Chart 4: Prisoner-on-Prisoner Assaults with Serious Injury (FY 2019)*

76.    In October 2019, the Defendants stopped publicly reporting separate numbers each month for serious injuries caused by prisoner-on-prisoner violence.

77.    According to ADOC's publicly available data, there were over 1,100 prisoner-on-prisoner assaults in Alabama's Prisons for Men from October 2019 through September 2020 (Fiscal Year 2020).

78.    In the most recent Fiscal Year, each of Alabama's Prisons for Men has seen significant numbers of reported assaults relative to its population size as demonstrated by the chart below.



*Chart 5: Prisoner-on-Prisoner Assaults for Fiscal Year 2021[5]*

79. For Fiscal Year 2021, ADOC's Monthly Statistical Reports indicate that there were 901 reported assaults across Alabama's Prisons for Men and 1,016 reported fights.

80. Defendants, through their acts and omissions, fail to provide adequate supervision of prisoners housed within Alabama's Prisons for Men to prevent such violence.

81. One factor contributing to the violence is overcrowding in Alabama's Prisons for Men.

82. Alabama's Prisons for Men were designed to hold approximately 9,462 men.[6]

83. But in its September 2021 Monthly Statistical Report, ADOC reported that Alabama's Prisons for Men housed approximately 14,250 prisoners.

84. In the September 2021 Monthly Statistical Report, Alabama's Prisons for Men, with the exception of Holman and St. Clair, housed more men than intended by their design

---

[5] Beginning in October 2019, ADOC began reporting prisoner-on-prisoner assaults in a single figure. *See* http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2010%20October%202019PUB.pdf. Previously, ADOC provided subcategories of assaults including those resulting in serious injuries and those not resulting in a serious injury.

[6] These population numbers do not include Draper as ADOC stopped reporting capacity and population at Draper in 2018.

capacity.[7]  For example, Staton had a 265% occupancy rate, Bibb had a 193% occupancy rate, and Kilby had a 180% occupancy at the end of September 2021.  Bullock, Donaldson, Easterling, Elmore, Fountain, and Ventress all had occupancy rates of over 147%.

85.     The overcrowding in Alabama's Prisons for Men will be made worse when intake restrictions from local or county jails related to Covid-19 are lifted or eased.

86.     In August 2021, ADOC reported that thousands of prisoners are awaiting intake into ADOC custody from local or county jails.

87.     Another factor contributing to the violence is the dangerously low level of security staffing throughout Alabama's Prisons for Men.  A recent court filing confirmed that ADOC continues to have approximately half of its staff positions filled.

88.     As of the first quarter of 2021, ADOC had filled 1,365.5 of 3,124 authorized correctional officers for Alabama's Prisons for Men.[8]

89.     As of the first quarter of 2021, eight of Alabama's Prisons for Men have total staff vacancy rates in excess of 50%.

90.     Staffing vacancy rates at some facilities are even higher.  For example, Bullock has a vacancy rate of 60% and Donaldson has a vacancy rate of 58.1%.  *Braggs v. Dunn*, Case 2:14-cv-00601-MHT-JTA (M.D. Ala. Sept. 1, 2021), Doc. 3406.

---

[7] Out of all of Alabama's Prisons for Men, Holman is the only facility that does not house people beyond its total designed capacity.  In January 2020, most of Holman was decommissioned because of significant infrastructure issues at that facility.  ADOC does not publicly report Draper's population size.

[8] This number excludes the 79 Cubical Correctional Officers because they are not trained as correctional officers, work in secured areas, and have no direct contact with prisoners.  However, the number does include 422 Basic Correctional Officers, who are limited from transporting prisoners and working certain critical posts, and retired officers in part-time positions.

91.     Defendants, through their acts and omissions, have engaged in a pattern or practice that obscures the level of harm from prisoner violence in Alabama's Prisons for Men:

a.     ADOC does not, consistently and reliably, accurately classify the causes of deaths that occur within Alabama's Prisons for Men.

b.     ADOC has classified prisoners' deaths as occurring by "natural causes" when the death is caused by prisoner-on-prisoner violence.

c.     ADOC does not have a centralized system to track or review prisoner mortalities within Alabama's Prisons for Men, nor does ADOC maintain a unified repository or database for prisoner autopsies to track and identify patterns in causes of death.

92.     Defendants, through their acts and omissions, fail to protect prisoners from homicide even when ADOC officials have advance warning that certain prisoners are in danger from violence at the hands of other prisoners.

93.     Defendants, through their acts and omissions, fail to supervise prisoners properly in ADOC custody, which results in a failure to prevent serious injuries to prisoners. Because of Defendants' failure to supervise prisoners, there is a delay in security staff discovering life-threatening injuries to prisoners.

94.     Defendants, through their acts and omissions, fail to screen entrants to Alabama's Prisons for Men for contraband adequately.

95.     Defendants fail to adequately prevent the introduction of illegal contraband[9] into Alabama's Prisons for Men as demonstrated by the chart below.

---

[9] As used in this Complaint, the term "contraband" refers to prohibited materials which can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of Alabama's prison for men, including drugs, cell phones, and weapons.



*Chart 7: Contraband-Related Incidents (2015-2017)*

96.　The failure to prevent the introduction of illegal contraband leads to prisoner-on-prisoner violence.

97.　The use of illicit substances, including methamphetamines or Fentanyl and synthetic cannabinoids, is prevalent in Alabama's Prisons for Men.

98.　Prisoners using illicit substances often harm others or become indebted to other prisoners.

99.　The inability to pay drug debts leads to beatings, kidnappings, stabbings, sexual abuse, and homicides.

100.　Defendants' failure to prevent the introduction of illicit substances leads to deaths by overdose.

101.　In addition to the homicide deaths discussed above, there have been a number of recent overdose deaths at Alabama's Prisons for Men.  By way of example, in November 2020, a 58-year old prisoner at St. Clair died from an overdose.  Similarly, in February 2021, a 31-year old prisoner at Donaldson died from a likely overdose.  In yet another example, in March  2021, a 22-year old prisoner died from a likely overdose while in solitary

confinement at Donaldson.

102. ADOC does not accurately identify or classify every death caused by overdoses.  For example, in September 2017, a prisoner from Draper died and the autopsy stated that he died of "[s]ynthetic cannabinoid toxicity (5FADB)."  ADOC reported his cause of death as "Inmate Death – Natural."

103. Since March 2020, few visitors have been allowed into Alabama's Prisons for Men pursuant to COVID-19 restrictions.

104. Despite being inaccessible to most non-employees, contraband cellphones and illicit substances have continued to flow into Alabama's Prisons for Men during the COVID-19 pandemic.

105. ADOC fails to analyze and identify trends of where illicit substances are most problematic within Alabama's Prisons for Men.

106. Defendants, through their acts and omissions, fail to effectively control the introduction, manufacture, and use of weapons within Alabama's Prisons for Men.

107. Possession and use of weapons is widespread within Alabama's Prisons for Men.

108. The large number of weapons within Alabama's Prisons for Men contributes to the high rate of violence, sexual abuse, and death.

109. Defendants, through their acts and omissions, fail to respond properly to prisoner and staff reports of threats and violence so that management can properly discipline assailants and avert future violence.  For example, in February 2018, a prisoner was killed by another prisoner at Bullock—one day after expressing concern for his safety to prison officials.

110.    Defendants, through their acts and omissions, discourage victims from reporting incidents of violence or threats of violence including through their failure to establish a grievance system in Alabama's Prisons for Men, their retaliation against prisoners who report violence and threats of violence, and their imposition of discipline against prisoners who report violence or refuse to name individuals they fear may harm them.

111.    Defendants, through their acts and omissions, fail to prevent prisoners from extorting other prisoners and their family members, resulting in serious physical injuries and sexual abuse and presenting a risk of serious harm to Alabama prisoners.  For example, prisoners have been "kidnapped" by other prisoners and forcibly held, against their will, for multiple days while prisoner-captors extorted the hostage-prisoner's family and friends.

112.    ADOC staff have failed to intervene when alerted to potential extortion.

113.    Defendants, through their acts and omissions, fail to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should be kept separate.

114.    Defendants, through their acts and omissions, fail to prevent uncontrolled movement of prisoners, leading to prisoners roaming in unauthorized or unsupervised areas and leading to violence.  There were over 1,100 reports of prisoners being in unauthorized locations across Alabama's Prisons for Men in ADOC's 2017 incident report database.

115.    Defendants, through their acts and omissions, fail to provide adequate programming, education, or work opportunities.  The majority of ADOC prisoners receive no programming or employment.  This idle time combined with lack of adequate supervision of prisoners results in increased opportunities to perpetuate misconduct and

correspondingly increasing violence.

116.    The acts or omissions by Defendants described in paragraphs 68-115 stem from policies, procedures, and practices that are the regular practice throughout ADOC.  These policies, practices, and procedures are implemented in all 13 of Alabama's Prisons for Men.

117.    The incidents summarized in paragraphs 118-142 are illustrative examples of the pervasive pattern of life-threatening violence within Alabama's Prisons for Men and are not a comprehensive list of all violent incidents that have occurred within Alabama's Prisons for Men.

118.    In August 2021, prisoners at St. Clair were involved in an assault that involved a weapon. A correctional officer at St. Clair was arrested in September 2021 for obstructing a government investigation and tampering with evidence following the assault.

119.    In July 2021, a prisoner with a makeshift weapon stabbed a correctional officer at Fountain.

120.    In June 2021, a prisoner at Bibb was stabbed by another prisoner and transported to an outside hospital for treatment.

121.    In April 2021, a prisoner at Limestone was stabbed several times in the torso, arms, and legs. The prisoner was transported to an outside hospital for treatment.

122.    In February 2021, a prisoner at Easterling was stabbed multiple times by two other prisoners in the head, neck, and shoulders.  The prisoner was airlifted to an outside hospital for treatment.

123.    In January 2021, two correctional officers and two prisoners were injured during an altercation at Donaldson.  Several people were transported to an outside hospital for

treatment.  Following the incident, ADOC's Commissioner ordered all Donaldson supervisors to begin wearing body cameras while on duty.

124.    In December 2020, an inmate was stabbed multiple times in the early morning hours at Limestone and had to be transported to an outside hospital for treatment.

125.    In August 2020, a prisoner at Easterling was taken to an outside hospital with serious burn wounds when another prisoner microwaved a mixture of baby oil, shaving powder, and coffee granules and poured it on his face and body while he was sleeping.

126.    In August 2020, four prisoners at Limestone were involved in a knife fight that resulted in three being transported to an outside hospital for treatment.

127.    In January 2020, an officer was stabbed and hit in the head after attempting to break up a knife fight between two prisoners at Donaldson.

128.    In May 2018, a prisoner at Bibb reported that he had been held hostage in an open dormitory over the course of several days over a money debt and was severely beaten by several prisoners.

129.    In April 2018, a Bullock prisoner covered in blood, approached security staff and stated that he had been stabbed by several other prisoners.  He had to be airlifted to an outside hospital for treatment.

130.    In April 2018, an officer at Kilby noticed a crowd of prisoners gathered in the back of an open dormitory.  When the officer approached, he discovered a prisoner with a bleeding, partially detached ear.  He had been fighting with another prisoner who tried to bite off his ear.  The prisoner was ultimately taken to an outside hospital for treatment.

131.    In April 2018, at St. Clair, a captain was told that a prisoner feared for his safety because of debts he owed to gang members.  The prisoner who made the report was disciplined

for intentionally creating a security/safety/health hazard and placed in restricted housing

for admitting to having accrued a debt.

132. In March 2018, a prisoner at Kilby approached an officer with visible burns on his body.

The prisoner told the officer another prisoner had thrown shaving cream heated in a

microwave on him—hot enough to cause second degree chemical burns.  The prisoner

was taken to an outside emergency room.

133. In March 2018, a prisoner at Elmore reported that he was in fear for his life because he

owed money to four prisoners who were threatening him.  The reporting prisoner was

ordered to provide a urine sample and disciplined for intentionally creating a

security/safety/health hazard.

134. In February 2018, a Fountain prisoner was stabbed 10 times over his entire body by

another prisoner before being discovered by an officer.  He was airlifted to an outside

hospital.  A search recovered a homemade weapon that was approximately nine inches

long.

135. In February 2018, a Holman officer noticed a prisoner walking toward the front gate of

his open dormitory with blood on his clothes.  He had been stabbed 22 times by two other

prisoners, with wounds to his back and head, and had to be airlifted to an outside

hospital.

136. In February 2018, an officer noted a St. Clair prisoner running down the hallway and

stopped him.  The prisoner turned and showed the officer that he had an eight-inch, metal

homemade knife embedded in his head.

137. In February 2018, a prisoner at St. Clair was repeatedly physically and sexually assaulted

at night by his cell mate.  He eventually reported that his cell mate had been extorting

him to pay $1000 and was forcing him into sex and payment of four packs of tobacco each day until he satisfied the $1000 debt.

138.  In January 2018, the mother of a prisoner at Ventress reported that she and her son were being extorted for money to pay off an alleged $600 debt to another prisoner.  The prisoner's mother was texted photos of a prisoner's genitals from a cell phone.  Through texts, the extorting prisoner threatened to chop her son into pieces and rape him if she did not send $800.

139.  In October 2017, a prisoner at Bibb entered the health care unit bleeding from stab, bite, and scratch wounds.  Because the prisoner declined to name the person who had assaulted him, he was given a disciplinary for intentionally creating a security/safety/health hazard.

140.  In September 2017, a prisoner at Draper assaulted another prisoner with a lock tied to a string while high on Suboxone.  While drugged, he also was stabbed, had bleach poured on him, and was beaten with a broken mop handle.

141.  In April 2017, a Bibb prisoner was stabbed multiple times while sleeping.  His attacker stated that the victim owed him a drug debt, so he "got it in blood."

142.  In February 2017, a prisoner at Elmore died after being beaten to death over a failed drug transaction.

143.  Unless restrained by this Court, Defendants' pattern or practice of failing to protect prisoners from violence at the hands of other prisoners will continue.

### (2) *Defendants Fail to Protect Prisoners at Alabama's Prisons for Men from Prisoner-on-Prisoner Sexual Abuse*

144.  Defendants engage in a pattern or practice of failing to protect prisoners at all 13 of Alabama's Prisons for Men from sexual abuse by other prisoners.

145.    Between 2015 and 2017, the number of reported prisoner-on-prisoner sexual assaults

        increased dramatically throughout Alabama's prisons as illustrated by the chart below.



*Chart 8: Total Number of Reported Sexual Assaults (2015-2017)*

146.    Defendants, through their acts and omissions, fail to take reasonable measures to keep

        prisoners safe from sexual abuse.

147.    From late 2016 through April 2018, ADOC documented over 600 incidents classified as

        "Sexual Assault – Inmate-on-Inmate" at Alabama's Prisons for Men.

148.    These numbers do not capture the full extent of the pattern of sexual abuse at Alabama's

        Prisons for Men because many prisoners do not report sexual abuse when it occurs, if at

        all.

149.    Even the under-inclusive number of reported sexual assaults illustrates the pervasiveness

        of sexual abuse across Alabama's Prisons for Men.  Reports of sexual assaults by facility

        are illustrated by the chart below.



*Chart 9: Number of Reported Sexual Assaults by Facility (2015-2017)*

150. The pattern of sexual abuse continues unabated since the United States' investigation concluded.  The Alabama Department of Corrections Annual PREA Report for 2019 reported a doubling of reported incidents of prisoner-on-prisoner sexual abuse from 2017 to 2019.  ADOC has not published an Annual PREA Report for 2020.

151. Insufficient staffing leads to inadequate supervision, which in turn allows prisoner-on-prisoner sexual abuse to occur.

152. The physical plant designs of the facilities, combined with understaffing, makes visibility difficult and creates opportunity for prisoner-on-prisoner sexual abuse to occur unobserved.

153. Because of ADOC's failure to supervise prisoners and enforce classification and housing assignments, sexual predators are able to move from unit to unit without intervention, which results in sexual abuse.

154. Defendants, through their acts and omissions, fail to prevent the introduction of contraband, which leads to sexual abuse.  For example, prisoners routinely subject other

prisoners to sexual abuse when the victim fails to pay a debt related to drug trafficking or other prisoner contraband exchanges.  Prisoners also report suffering sexual abuse after being drugged, becoming incapacitated by drugs, or when the assailant was under the influence.

155.   Defendants, through their acts and omissions, fail to employ adequate screening, classification, and housing of prisoners to prevent sexual abuse pursuant to the National Standards to Prevent, Detect, and Respond to Prison Rape, 28 C.F.R. § 115 *et seq*. Sexual predators are often commingled with victims in housing units, which results in foreseeable sexual abuse.

156.   Defendants, through their acts and omissions, fail to conduct adequate investigations of sexual abuse.  ADOC declares many allegations of sexual abuse "unsubstantiated" based solely on the victim's decision not to press criminal charges or otherwise cooperate with the investigation. Defendants also dismiss alleged sexual abuse as "homosexual activity", implying the sexual act is consensual.  Further, Defendants disregard sexual abuse that occurs as the result of a drug debt that has been incurred.

157.   Defendants, through their acts and omissions, discourage reporting of sexual abuse.

158.   Defendants, through their acts and omissions, improperly subject victims of sexual abuse to segregation, which isolates them from others and subjects them to restricted privileges and out-of-cell time, often because ADOC lacks appropriate and safe housing.

159.   Defendants, through their acts and omissions, fail to prevent prisoners from being sexually abused by other prisoners in retaliation for reporting sexual abuse.

160.   Defendants, through their acts and omissions, fail to conduct adequate reviews of incidents of sexual abuse to identify and remedy the flawed practices that contribute to

the substantial risk of serious harm, which enables further abuse to continue.

161.    The acts or omissions by Defendants described in paragraphs 146-160 stem from policies, procedures, and practices that are the regular practice throughout ADOC. These policies, practices, and procedures are implemented in all 13 of Alabama's Prisons for Men.

162.    The following incidents summarized in paragraphs 163-190 are illustrative examples of the pervasive pattern of sexual abuse within Alabama's Prisons for Men and are not a comprehensive list of all sexual assaults that have occurred within Alabama's Prisons for Men.

163.    In October 2021, a prisoner was sexually assaulted by multiple prisoners in a dormitory in Staton due to a drug debt he owed.

164.    In September 2021, a prisoner was sexually assaulted by multiple prisoners in a dormitory in Bibb. He was taken to an outside hospital for treatment. Another prisoner reported that ADOC staff dismissed the incident as a standard prison occurrence.

165.    In September 2021, a prisoner was sexually assaulted in a dormitory at Elmore. The victim was transferred to another prison. The victim reported that an ADOC supervisor encouraged him to drop the charges against the prisoner who had assaulted him.

166.    In July 2021, a Fountain prisoner reported that an officer related that there were so many rape victims in the hospital, that the Second Shift officers were required to work the Third Shift as well, in order to accommodate all the hospital transfers.

167.    In 2021, a prisoner's mother called Staton to report that a group of prisoners held down her son while another prisoner sexually assaulted him. Despite her report to the facility,

ADOC did not take reasonable action to protect her son.  He suffered frequent beatings following the sexual assault, which continued until his release three months later.

168.    In 2021, a prisoner was moved from general population to a suicide cell after he was drugged and sexually assaulted, suffered multiple physical assaults, and was subjected to extortion at Bullock.  When officers informed him he would be moved back to general population, he cut himself out of fear for his safety.  He was moved back to general population nonetheless.

169.    In May 2021, a prisoner was found in the middle of the night in a bathroom at Fountain after a violent sexual and physical assault.  After receiving medical care, the victim was reportedly returned to his same dormitory instead of placement in protective custody or other alternate housing.

170.    In April 2021, three prisoners from another housing unit entered a prisoner's dormitory at Donaldson and attempted to sexually assault him.  He escaped from his assailants and used a razor blade to cut his arm and neck in order to get officers' attention and obtain a transfer to a safer unit.

171.    A prisoner at Bullock reported being sexually assaulted in January 2021.  In June 2021, he was sexually assaulted again at the same facility.

172.    In late 2020, a prisoner was sexually assaulted at knifepoint by three other prisoners in a dormitory shower at Easterling.  The assailants were not assigned to the victim's dormitory.  The victim reported the assault, but ADOC did not take reasonable actions to protect him or respond to the abuse.

173.    In April 2018, ADOC security staff interviewed a prisoner at Elmore after his mother called to report that he had been sexually abused.  The prisoner stated that he had been

raped at knifepoint because he owed his assailant $250.  The incident report notes that the alleged assailant "submitted a written statement and was allowed to return back to population without incident."  There is no mention of a search for the weapon.

174.    In April 2018, a prisoner at Ventress reported that he had been forced at knifepoint to perform oral sex on another prisoner.  The incident report does not mention a search for weapons.  The incident report does note that a previous PREA-related allegation had been made against the assailant.

175.    In March 2018, a prisoner at Holman reported that he had been raped after he had passed out from smoking "flakka."  He awoke to one prisoner punching him in the eye and then four or five prisoners put a partition around his bed and took turns raping him.

176.    In March 2018, a severely injured prisoner at Donaldson called for help and collapsed in his unit.  The responding Sergeant found a prisoner so seriously injured he could not speak.  After he was transported to the hospital for treatment, medical staff conducted emergency surgery to remove a broomstick from his rectum.

177.    In March 2018, a prisoner at Fountain reported to staff that another prisoner had been sexually assaulted.  When he was located back in the dormitory, the prisoner identified two assailants, one of whom confirmed that the prisoner was raped after all three prisoners smoked a joint.

178.    In February 2018, a prisoner at Fountain reported that he had been sexually assaulted.  When staff asked him about the incident, he reported that he had been assaulted every day since his arrival at Fountain.  A medical assessment found scratches and bruising on his arms, legs, and back.

179.    In February 2018, a prisoner at Bibb reported to a mental health professional that he had

        been raped.  At approximately 1:00 a.m. in a dormitory unit, an unidentified prisoner

        propositioned him to smoke a marijuana cigarette.  While smoking, the victim "became

        incoherent" and awoke with the unidentified prisoner penetrating him from the rear.

180.    In February 2018, a prisoner at Bibb notified the facility PREA Compliance Manager that

        he had been "forcibly sexually assaulted" two days prior and that he had not bathed, so

        the perpetrator's semen was still inside him.  The prisoner was examined by the facility

        nurse and upon completion of the medical examination, the prison physician advised that

        the prisoner should be transported to an outside hospital for a Sexual Assault Kit.

        Although the prisoner named his rapist, the incident report confirms that upon conclusion

        of the investigation, the victim "stated that he did not desire to prosecute and signed a

        waiver of prosecution.  Therefore, this allegation is unsubstantiated."

181.    In February 2018, a prisoner at Limestone reported that while he was working in the

        upholstery room, another prisoner grabbed his genitals and he responded by hitting the

        other prisoner in the face.  The facility review of the incident revealed that prisoners did

        not need access to the space where the reported assault occurred.

182.    In February 2018, a prisoner at St Clair reported that he was assaulted and forced to

        perform unwanted sex acts.  After an initial evaluation, he was transported for assessment

        at a Sexual Assault Nurse Examiner's Center.

183.    In February 2018, a prisoner at Staton reported that another prisoner put his penis in the

        reporting prisoner's mouth while two others held knives to his back.  The reporting

        prisoner was placed in a holding cell and the others remained in general population.

184.   In February 2018, a prisoner at Draper was raped by another man in his housing unit who had a sheet hanging over the bunk.  When he reported the rape to staff, he also reported feeling suicidal after the attack and was placed on acute suicide watch.

185.   In January 2018, a prisoner at Staton reported that he had been beaten and sexually assaulted by another prisoner in his dorm.  The prisoner who reported the abuse was placed in a holding cell and the other prisoner remained in general population.

186.   In January 2018, a prisoner at Bullock resorted to cutting his wrist after an attempted sexual assault and physical assault "because he feared being in population and needed to be placed in a single cell."  He reported that two nights prior, two prisoners had attempted to rape him but were unable to penetrate him because he defecated during the assault. The prisoners then poured hot water on him, causing burn marks to his buttocks and the back of his head.  ADOC placed the victim in segregation and allowed the perpetrators to remain in general population.  The incident report notes that the perpetrators would receive "disciplinary actions for assault," and that no further action would be taken.

187.   In January 2018, a prisoner at Donaldson cut his wrist with a razor and when staff responded to his injury, he reported that he had been sexually assaulted in the bathroom of the housing unit the previous night.

188.   In December 2017, a prisoner at Easterling reported that he passed out under the influence of drugs and when he woke up his pants were down and his rectum was hurting, so he believed he had been sexually assaulted.  After he was assessed by medical personnel, the prisoner was placed in segregation because he feared for his safety.

189.   In December 2017, a prisoner at Kilby reported that he was threatened with a knife and submitted to a rape for fear of being stabbed.  His clothes were collected as evidence, but

the incident report does not indicate that he was assessed by a Sexual Assault Nurse Examiner's Center.

190.    In January 2017, a prisoner at Draper reported that he had voluntarily used methamphetamine and blacked out.  When he regained consciousness, he was experiencing anal pains and other prisoners indicated that he had been sexually assaulted.

191.    Unless restrained by this Court, Defendants' pattern or practice of failing to protect prisoners from sexual abuse at the hands of other prisoners will continue.

### (3) *Defendants Fail to Protect Prisoners from Excessive Force at Alabama's Prisons for Men*

192.    Defendants engage in a pattern or practice of failing to protect prisoners from ADOC security staff's use of excessive force at all 13 of Alabama's Prisons for Men.

193.    Since at least 2016, ADOC security staff at Alabama's Prisons for Men have engaged in a pervasive pattern or practice of using excessive force on prisoners.

194.    Defendants, through their acts and omissions, have engaged in a pattern or practice of conduct by security staff of using excessive force against prisoners.  The use of excessive force at Alabama's Prisons for Men includes:

a.    use of force disproportionate to the amount of resistance encountered, including use of force against restrained or compliant prisoners;

b.    use of force to punish or retaliate against prisoners;

c.    use of chemical spray or other chemical agents that are inappropriate;

d.    use of weapons, such as batons, in an inappropriate and excessive manner;

e.    use of actions that deliberately provoke physical confrontations with prisoners and cause unnecessary use of force; and

      f.     use of force when security staff attempts to de-escalate confrontations with prisoners would be feasible, appropriate, and result in less or no use of force.

195.    Security staff facilitate their excessive use of force at Alabama's Prisons for Men through several practices that are aimed at masking or evoking excessive uses of force.

196.    For example, security staff have a practice of using force on prisoners and then placing those prisoners in segregation or restricted housing until any injuries can heal unobserved and undocumented.

197.    Security staff have a practice of failing to document or report uses of force to supervisors.

198.    Security staff have a practice of falsifying incident documentation related to uses of force.

199.    Security staff have a practice of verbally antagonizing and provoking prisoners, leading to an escalation of tensions and unnecessary uses of force.

200.    Defendants are aware of security staff's pervasive use of excessive force at Alabama's Prisons for Men and are aware of staff's use of practices to facilitate their excessive use of force.

201.    Defendants, through their acts and omissions, have engaged in a pattern or practice of systemic deficiencies that resulted in the pattern or practice by ADOC security staff of uses of excessive force.  These systemic deficiencies at Alabama's Prisons for Men include:

      a.     failure to implement and enforce policies, procedures, and practices regarding use of force that appropriately guide and monitor the actions of individual security staff;

      b.     failure to ensure that prison facilities' operating procedures are consistent with

ADOC regulations or from prison-to-prison;

c.    deficient use of force reporting and review;

d.    failure to adequately investigate incidents in which security staff uses force;

e.    failure to adequately or appropriately discipline security staff who engage in misconduct;

f.    failure to adequately monitor security staff who engage in or may be likely to engage in misconduct;

g.    inadequate use of video surveillance; and

h.    failure to implement policies and procedures whereby complaints and other allegations of security staff misconduct are adequately received and investigated.

202.    Defendants, through their acts and omissions, have failed to implement meaningful accountability measures whenever uses of force occur in Alabama's Prisons for Men. These systemic deficiencies at Alabama's Prisons for Men include:

a.    failure by supervisory staff to conduct thorough institutional-level investigations;

b.    providing too much discretion to each prison's head warden to determine which use of force matters should receive further review by ADOC's Law Enforcement Services Division (LESD)[10];

c.    failure by LESD to conduct thorough institutional-level investigations;

d.    failure by LESD supervisors to document why investigations are closed or referred back to an institution;

e.    failure by LESD to conduct administrative reviews of uses of force, when matters do not necessarily rise to criminal conduct;

---

[10]  Prior to 2020, LESD was referred to as the Investigations & Intelligence Division, or I&I.

f.      failure to discipline security staff who are found to have used excessive force;

g.      improperly closing use of force investigations when security staff refuses to cooperate, a prisoner refuses to cooperate, or when a prisoner is no longer in custody; and

h.      failure to implement tracking or periodic review systems to identify security staff who use a disproportionate amount of force or to identify problematic places where uses of force frequently occur.

203.  Defendants' overcrowding and understaffing of Alabama's Prisons for Men causes use of excessive force.  Overworked security staff in the overcrowded prisons lack sufficient backup and support to manage prison security, which results officers' increased fear of prisoner threats and excessive force.

204.  Defendants have repeatedly failed to take reasonable measures to prevent correctional staff from inflicting serious harm on prisoners at Alabama's Prisons for Men, even in the face of the obvious and substantial risk that staff will inflict such harm and the multiple occasions on which staff have in fact inflicted such harm.

205.  The acts or omissions by Defendants described in paragraphs 192-204 stem from policies, procedures, and practices that are the regular practice throughout ADOC.  These policies, practices, and procedures are implemented in all 13 of Alabama's Prisons for Men.

206.  The following incident summarized in paragraphs 207-232 are illustrative examples of the pervasive pattern of excessive force on prisoners in Alabama's Prisons for Men and are not a comprehensive list of all uses of excessive force that have occurred within Alabama's Prisons for Men.

207. In June 2021, an officer at Bibb was arrested on 2nd-degree assault charges for beating a prisoner with a belt.

208. In April 2021, multiple officers at Bullock kicked, punched, and hit with batons a handcuffed prisoner after the officers had already forced him to a face down position on the ground.

209. In March 2021, a federal grand jury indicted two security staff, including a supervisor, for assaulting a prisoner at Staton. Security staff struck the prisoner with their feet and a baton, and one walked on the prisoner. The security staff subsequently made false statements in an attempt to cover up the assault.

210. In March 2021, multiple officers, without provocation, maced with chemical spray and assaulted a prisoner at Donaldson, causing the prisoner's bruised eye to swell shut.

211. In January 2021, an officer assaulted a non-combative prisoner in a wheelchair at Bullock. The officer chemical sprayed the prisoner and beat the prisoner with a baton, knocking the prisoner unconscious.

212. In January 2021, multiple officers assaulted a prisoner at Donaldson. The officers beat the prisoner unconscious and broke several of his bones, including his jaw. The prisoner's injuries required outside hospitalization.

213. In January 2021, an officer assaulted a prisoner at Fountain causing the fracture of the prisoner's knee cap.

214. In October 2020, an officer used a baton to strike three compliant prisoners in the Draper intake area. The strikes broke one prisoner's arm. Another officer witnessed the assaults and failed to intervene.

215. In September 2020, multiple officers beat a prisoner at Kilby during a contraband

shakedown.  After the prisoner questioned what the officers were doing, the officers

grabbed the unresisting prisoner by the neck and threw him to the ground, and kicked,

punched, and hit the prisoner with batons.

216.    In August 2020, an officer grabbed a prisoner at Bullock by the neck, choked him, and

threw the prisoner into a metal bed, which caused a cut to the prisoner's head.  After the

prisoner attempted to report the incident, the officer threatened another more severe

assault if the prisoner reported on the officer.

217.    In August 2020, multiple officers assaulted a prisoner at Elmore.  After a confrontation

with other prisoners, an officer maced the prisoner with chemical spray and handcuffed

the prisoner.  While walking the maced and handcuffed prisoner to another area, the

officer struck the back of the prisoner's head and knocked the prisoner to the ground.

Multiple officers then slammed the prisoner's head on the ground, kicked him, and

dragged him across the pavement.  The prisoner's injuries required staples in his head in

multiple places.

218.    In June 2020, an officer hit a prisoner at St. Clair in the face.  The officer's blow knocked

the prisoner unconscious and the prisoner went to an outside hospital for fractures to his

face.

219.    In May 2020, an officer broke a prisoner's arm with a baton at Donaldson.  As part of a

verbal attempt to get medication attention, the prisoner was signaling the officer by

putting his hands out his cell door.  The officer maced the prisoner and then struck his

arm multiple times with his baton.  The officer's baton strikes caused multiple breaks in

the arm, which required metal inserts to repair.

220.   In May 2020, an officer broke a prisoner's leg with a baton at Staton.  The prisoner was attempting to comply with the officer's order to face the fence when the officer beat the prisoner with his baton.  The prisoner required surgery to repair broken bone and torn ligaments in his leg.

221.   In March 2020, an officer assaulted an unresisting prisoner in Ventress.  The officer punched the prisoner multiple times in the head, and struck the prisoner's body multiple times with a baton.  The prisoner's injuries required him to wear a sling for his arm.

222.   In December 2019, security staff's excessive use of force resulted in the death of a prisoner at Ventress.  The autopsy revealed that the prisoner died from blunt force trauma to the head.  The excessive use of force to the head also resulted in intracranial bleeding, bone fractures, and multiple knocked out teeth.

223.   In October 2019, security staff's use of excessive force resulted in the death of a prisoner at Donaldson.  The excessive force included multiple strikes to the head that caused skull fractures.

224.   In April 2019, a correctional staff supervisor pleaded guilty to federal charges for assaulting two unresisting, handcuffed prisoners at Elmore by striking them repeatedly with his hands and feet, and with with a baton.  Two other security staff pleaded guilty to federal charges for witnessing the assault and failing to intervene to stop the abuse.  In July 2021, a supervisor of the assaulting officer was convicted of a federal charge because he failed to intervene.

225.   In November 2018, an officer struck a prisoner at Bullock in the arm and back with a baton simply because the prisoner disregarded the officer's order to leave the kitchen

dining area.  The prisoner was not demonstrating violent or threatening behavior at the time.

226.    In September 2018, an officer at Bibb kicked and punched a prisoner, and struck the prisoner multiple times with a baton, all while the unthreatening prisoner was curled up in a fetal position on the ground and already surrounded by multiple officers.  In October 2021, the officer pleaded guilty to a federal charge of willfully using excessive force against a prisoner.

227.    In July 2018, an officer at St. Clair was suspended for three days for using excessive force against a prisoner, failing to document the incident, and initially denying that the use of force occurred.

228.    In August 2017, an officer used a chemical spray on a Limestone prisoner by spraying the chemical into the prisoner's cell tray and then closing the tray.  While security staff were taking the handcuffed prisoner to medical, the officer pushed the handcuffed prisoner and struck him several times.

229.    In August 2017, an officer at Holman administered a chemical agent through the tray door to a prisoner's cell even though the prisoner posed no threat.  The officer sprayed the prisoner's genital area with the chemical agent.

230.    In July 2017, two security staff at Kilby observed a prisoner working in the kitchen give some leftover chicken to another prisoner.  In response, the security staff forced the prisoner to attempt to eat all the leftover chicken and slapped the prisoner multiple times when the prisoner could not finish the force-fed chicken.

231.   In May 2017, a supervisory security officer at Easterling took a handcuffed prisoner to the ground face down.  The use of excessive force resulted in the prisoner's transfer to a hospital for a broken hip.

232.   In March 2017, an officer at Donaldson sprayed a chemical agent into a prisoner's closed cell.  The officer then, despite the presence of other security staff to control the prisoner, assaulted the prisoner multiple times with a baton, which inflicted open wounds on the prisoner's back.  The officer continued to work at Donaldson for years after the assault.

233.   Unless restrained by this Court, Defendants' pattern or practice of using excessive force will continue.

### (4) *Defendants Fail to Provide Safe and Sanitary Conditions at Alabama's Prisons for Men.*

234.   Defendants engage in a pattern or practice of failing to provide safe and sanitary conditions for prisoners in all 13 of Alabama's Prisons for Men.

235.   During the course of the United States' investigation, ADOC's Commissioner Jefferson S. Dunn has admitted that ADOC's "buildings are falling apart" and Alabama's Prisons for Men have "crumbling infrastructure."  In January of 2020, Commissioner Dunn acknowledged the "pervasive and extreme dilapidation crippling facilities throughout the correctional system."

236.   ADOC's medical provider for all 13 of Alabama's Prisons for Men, Wexford Health Sources, Inc., recently informed Defendants that the "physical work conditions inside the various Alabama prisons—including an intermittent lack of running water and other utilities; the absence of heat due to broken HVAC systems; and a general level of disrepair" negatively impacts Wexford's ability to provide health care to prisoners.

237.   In a recent letter published in Correctional News, Governor Kay Ivey stated that

Alabama's "prisons are structurally failing," "the condition of Alabama's prison buildings has grown increasingly worse, year-over-year, for many decades," and that "these outdated facilities were never designed to house the people currently incarcerated in Alabama."

238.  Defendants' systemwide policies, procedures, and practices related to maintenance, safety measures, personal hygiene, and sanitation are not sufficient to provide safe or sanitary conditions at each of the 13 Alabama's Prisons for Men.  These policies, practices, and procedures are implemented in all 13 of Alabama's Prisons for Men.

   a.  For example, Defendants do not have a preventative maintenance plan for each of the 13 Alabama's Prisons for Men.

   b.  Not one of the 13 Alabama's Prisons for Men has a functional fire alarm system.

   c.  The 13 Alabama's Prisons for Men all suffer from serious plumbing, HVAC, and electrical issues.

239.  All 13 of Alabama's Prisons for Men are overcrowded and operating in excess of design capacity.

   a.  As a result, Alabama's Prisons for Men do not have adequate space and facilities, including operable toilets, showers, and sinks, for the number of prisoners it houses.

   b.  Overcrowding, coupled with the lack of adequate plumbing, heightens tensions within Alabama's Prisons for Men, which results in prisoner-on-prisoner violence.

   c.  Overcrowding, combined with the inadequate use of surveillance cameras and the lack of maintenance of broken or damaged locks throughout Alabama's Prisons

for Men, results in prisoners leaving secure areas, obtaining contraband, improperly associating with and/or assaulting other prisoners.

240.    Conditions at Bibb are not safe or sanitary.  The conditions at Bibb expose prisoners to a risk of serious harm.

    a.    The physical plant conditions at Bibb are overcrowded, exceeding design capacity by approximately 191 percent.  This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

    b.    At Bibb, there is a large chain link fence separating the facility that can only be opened and closed with a physical key, creating serious safety risks.

        i.    For example, victims of stabbings, while bleeding profusely, have had to wait for staff to search and find the key to open the gate.

    c.    Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Bibb are not sufficient to provide healthy, humane, or safe conditions.  For example:

        i.    There is exposed insulation hanging from ceilings in the dormitories. Mold and mildew are visible on the exposed insulation.

        ii.    Prisoners report inadequate pest control measures resulting in frequent problems with rats and cockroaches.

        iii.    The concrete floors within the facility are cracked and degraded.

        iv.    The door or gate locking devices in the housing units are in poor condition.

    d.    Understaffing at Bibb, coupled with the lack of visibility in large dormitories and

defective locks, allows prisoners to leave secure areas, obtain contraband, and improperly associate with or assault other prisoners.

e.     Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

241.   The conditions at Bullock are not safe or sanitary.  The conditions at Bullock expose prisoners to a risk of serious harm.

a.     The physical plant conditions at Bullock are overcrowded, exceeding design capacity by approximately 151 percent.  This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

b.     Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Bullock are not sufficient to provide healthy, humane, or safe conditions.  For example:

i.     A recent video from prisoners at Bullock shows water standing on the concrete floor from rain leaking in through windows, holes in the tile floor of the shower area, and metal sinks that do not appear to be working.

ii.    Prisoners have reported discolored water, leaking toilets, and insufficient hot water.

iii.   There is exposed electrical wiring located throughout the facility.

iv.    Flooding within the facility is common, leading to the growth of mold, mildew, and cracked floors.

        v.    The concrete floors in the kitchen are in extremely poor condition with large exposed holes and pooling water due to leaking pipes.

   c.   Understaffing at Bullock, coupled with the lack of visibility in large dormitories, allows prisoners to obtain contraband and/or assault other prisoners.

   d.   Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

242.   Conditions at Donaldson are not safe or sanitary.  The conditions at Donaldson expose prisoners to a risk of serious harm.

   a.   The physical plant conditions at Donaldson are overcrowded, exceeding design capacity by approximately 149 percent.  This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

   b.   Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Donaldson are not sufficient to healthy, humane, or safe conditions.  For example:

        i.    In December 2020, a prisoner at Donaldson died from hyperthermia. When he was discovered in his cell, his faced was pressed against the window in an apparent effort to get air.  His body temperature was recorded at 109 degrees and his cell has a recorded tempertature of 101-104 degrees.

        ii.    In addition to excessive heat, prisoners currently report lack of heat and light in some cells.

iii.    There is exposed electrical wiring and missing light fixtures throughout the housing units.

iv.    Ceilings are leaking, leading to presence of mold and mildew throughout the facility.  Standing water on floors is common.

v.    In one dormitory, windows are covered with cardboard and chicken wire, rather than glass.

i.    Prisoners report inadequate pest control measures resulting in frequent problems with rats.

ii.    A recent photograph shows overflowing piles of trash heaped against the walls of the facility.

iii.    The concrete floors in the showers are in a state of deterioration with holes and areas that are crumbling.

iv.    Prisoners report that they regularly go several days without access to showers.

v.    ADOC does not provide adequate supplies to clean housing units.

vi.    There are broken or damaged locks throughout the facility.

c.    Understaffing at Donaldson, coupled with the lack of visibility in large dormitories and broken and defective locks, allows prisoners to leave secure areas, obtain contraband, and improperly associate with or assault other prisoners.

d.    Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

243.    Conditions at Draper are not safe or sanitary.  The conditions at Draper expose prisoners to a risk of serious harm.

a.    Conditions at Draper were so dangerous that one month after the United States'
      site visit, ADOC announced the closure of the facility.  Engineering experts hired
      by ADOC had concluded that the facility was "no longer suitable to house
      inmates, or to be used as a correctional facility."  During the United States' site
      visit, a prisoner reported that feces would intermittently flow from the bathroom
      floor drains due to constant flooding.  Another reported that the showers were
      often broken and contained mold.

b.    Defendants' policies, procedures, and practices for maintenance, personal
      hygiene, and life safety at Draper are not sufficient to healthy, humane, or safe
      conditions.

c.    For example, in April 2020, ADOC reopened Draper for use as a quarantine
      facility for prisoners who received a positive COVID-19 diagnosis, yet prisoners
      report that there are no sinks with hot water and no working toilets at the facility.

d.    Exposure to the cumulative effect of these conditions poses a serious risk to
      prisoner safety and health.

244.    Conditions at Easterling are not safe or sanitary.  The conditions at Easterling expose
prisoners to a risk of serious harm.

a.    The physical plant conditions at Easterling are overcrowded, exceeding design
      capacity by approximately 158 percent.  This overcrowding, combined with lack
      of maintenance, results in inadequate space and facilities, which leads to
      heightened prisoner tensions and violence.

b.    The overcrowding at Easterling has been exacerbated by the closure of
      dormitories, leading to more prisoners being housed in the remaining open

dormitories at the facility.

c.  Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Easterling are not sufficient to healthy, humane, or safe conditions.  For example:

  i.  Prisoners report having to constantly move beds around to avoid water leaking through the ceiling and floor.

  ii.  Exterior wall panels are rusted along the perimeter of the facility due to water damage, leading to gaps at the floor edges.  This allows water to enter the building along the floor slab.

  iii.  There is exposed electrical wiring throughout the facility.

  iv.  Large sections of the tile floor in the showers are missing, cracked, or damaged.

d.  Understaffing at Easterling, coupled with the lack of visibility and overcrowding in large dormitories, allows prisoners to obtain contraband and improperly associate with or assault other prisoners.

e.  Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

245.  Conditions at Elmore are not safe or sanitary.  The conditions at Elmore expose prisoners to a risk of serious harm.

a.  The physical plant conditions at Elmore are overcrowded, exceeding design capacity by approximately 162 percent. This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

    b.    Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Elmore are not sufficient to healthy, humane, or safe conditions.  For example:

        i.    When it rains the roof and ceilings leak and lead to flooding and standing water within the facility.

        ii.    Prisoners report that they have to move their beds around to avoid leaks and/or standing water.

        iii.    Tiled walls and the floors in shower areas are cracked, broken, or completely missing in large areas.  Mortar is missing throughout.

        iv.    Prisoners report inadequate pest control measures resulting in frequent problems with rats and cockroaches.

    c.    Understaffing at Elmore, coupled with the lack of visibility in large dormitories, allows prisoners to obtain contraband and improperly associate with or assault other prisoners.

    d.    Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

246.    Conditions at Fountain are not safe or sanitary.  The conditions at Fountain expose prisoners to a risk of serious harm.

    a.    The physical plant conditions at Fountain are overcrowded, exceeding design capacity by approximately 145 percent.  This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

b.     Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Fountain are not sufficient to healthy, humane, or safe conditions.  For example:

   i.    There are layers of mold in the shower areas.

   ii.   The water is discolored and raw sewage improperly drains and backs up in the pipes.

   iii.  Many dormitory windows are missing glass and have not been repaired.

   iv.   There is exposed electrical wiring throughout the housing units.

   v.    Prisoners report inadequate pest control measures, leading to frequent problems with rats and cockroaches.

   vi.   The concrete floors in the dormitories are cracked or worn, with large exposed areas.

   vii.  Ceilings are stained or damaged with moisture, or missing in areas, exposing rusted or damaged bar joints.

c.     Understaffing at Fountain, coupled with the lack of visibility in large dormitories and the degradation of the facility, allows prisoners to obtain contraband, and improperly associate with or assault other prisoners.

d.     Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

247.  Conditions at Holman are not safe or sanitary.  The conditions at Holman expose prisoners to a risk of serious harm.

a.   ADOC decommissioned the main facility at Holman in January 2020, citing the unsustainable daily interventions required to maintain the facility's deteriorating underground sewer and electrical systems.

b.   When Defendants closed Holman, they admitted their inability to safely provide water, electricity, and sewage service due to the hazards in a tunnel that houses the utilities.

c.   Despite these problems, ADOC continues to house prisoners on death row and low risk prisoners at Holman's restrictive housing unit and E-dorm.

d.   Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

248.   Conditions at Kilby are not healthy, safe, or humane.  The conditions at Kilby expose prisoners to a risk of serious harm.

a.   The physical plant conditions at Kilby are overcrowded, exceeding design capacity by approximately 195 percent. This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

b.   Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Kilby are not sufficient to healthy, humane, or safe conditions.  For example:

   i.   There are extensive amounts of mold and mildew in shower areas.

   ii.   When it rains, the ceiling leaks and there is standing water on floors throughout the facility.

   iii.   The tiled floors and walls of the shower areas are cracked and

damaged.

    iv.    There is mold in the shower areas.

    v.    Prisoners report inadequate pest control measures resulting in frequent problems with rats and cockroaches.

c.    Understaffing at Kilby, coupled with the lack of visibility in large dormitories, allows prisoners to obtain contraband, and improperly associate with or assault other prisoners.

d.    Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

249.    Conditions at Limestone are not safe or sanitary.  The conditions at Limestone expose prisoners to a risk of serious harm.

a.    The physical plant conditions at Limestone are overcrowded, exceeding design capacity by approximately 117 percent.  This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

b.    Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Limestone are not sufficient to healthy, humane, or safe conditions.  For example:

    i.    There are leaking roofs and ceilings throughout the facility.

    ii.    Leaking pipes have caused extensive damage to the kitchen floor.

    iii.    Outbreaks of scabies have occurred within the facility.

    iv.    Doorframes and windows throughout the housing units are rusted and damaged with visible holes.

      v.     ADOC does not provide adequate supplies to clean housing units.

      vi.     There is mold in the shower areas.

      vii.     The locking mechanisms on individual cells were insecure, which lead to Defendants adding manual slide bolt locks to ensure the doors lock securely.  This, however, prevents the facility from opening the doors through the control unit, which is a violation of safety codes and presents a risk of serious harm.

c.     Understaffing at Limestone, coupled with the lack of visibility in large dormitories and/or damaged or insufficient locks, allows prisoners to obtain contraband, and improperly associate with or assault other prisoners.

d.     Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

250.     Conditions at Staton are not safe or sanitary.  The conditions at Staton expose prisoners to a risk of serious harm.

a.     The physical plant conditions at Staton are overcrowded, exceeding design capacity by approximately 262 percent. This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

b.     Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Staton are not sufficient to healthy, humane, or safe conditions.  For example:

      i.     There are leaking roofs and ceilings throughout the dormitories.

      ii.     There is standing water in the bathrooms and shower areas.

      iii.    There is exposed electrical wiring, plumbing, and ductwork.

      iv.    The doors leading to several of the open dormitories are not operable due to damaged locks or warped frames.

c.    Understaffing at Staton, coupled with the lack of visibility in large dormitories and broken or damaged locks, allows prisoners to obtain contraband, and improperly associate with or assault other prisoners.

d.    Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

251.    Conditions at St. Clair are not healthy, safe, or humane.  The conditions at St. Clair expose prisoners to a risk of serious harm.

a.    Currently, there is no significant overcrowding at St. Clair because of population limitations previously put in place related to private litigation.  It is unclear whether this status will continue.

b.    Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at St. Clair are not sufficient to healthy, humane, or safe conditions.  For example:

      i.    There is extensive amounts of mold and mildew on the walls and floors of shower areas.

      ii.    There is standing water due to leaky pipes.

      iii.    Standing water in the shower areas of the dormitories has led to the concrete floors deteriorating with large areas of aggregate exposed.

      iv.    Prisoners have reported broken windows and standing waters in the cells.

        v.     Prisoners have also reported lack of toilet paper.  One prisoner was forced to use his boxers for over a week to clean himself.

        vi.     Prisoners report that they regularly go several days without access to showers.

        vii.     Many of the cells have damaged or broken locks.

c.     Understaffing at St. Clair, combined with a lack of operable locks, allows prisoners to obtain contraband, and improperly associate with or assault other prisoners.

d.     Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

252.     Conditions at Ventress are not safe or sanitary.  The conditions at Ventress expose prisoners to a risk of serious harm.

a.     The physical plant conditions at Ventress are overcrowded, exceeding design capacity by approximately 161 percent. This overcrowding, combined with lack of maintenance, results in inadequate space and facilities, which leads to heightened prisoner tensions and violence.

b.     Defendants' policies, procedures, and practices for maintenance, personal hygiene, and life safety at Ventress are not sufficient to healthy, humane, or safe conditions.  For example:

        i.     Prisoners reported that, at one point, there was a problem with buzzards infesting the facility's water tank to feed off drowned rats and birds floating in the tank.

        ii.     The ceiling in shower areas is damaged and falling in places due to

moisture and poor ventilation.

    iii.    There is exposed wiring throughout the facility.

    iv.    When it rains, the ceiling leaks and there is standing water on floors throughout the facility.

    v.    In 2018, there was an outbreak of the bacteria that causes meningitis, the first outbreak in a correctional setting since 1989.

    vi.    There are broken or damaged locks on cell doors.

    c.    Understaffing at Ventress, coupled with the lack of visibility in large dormitories and broken or damaged locks, allows prisoners to obtain contraband, and improperly associate with or assault other prisoners.

    d.    Exposure to the cumulative effect of these conditions poses a serious risk to prisoner safety and health.

253.    Unless restrained by this Court, Defendants' pattern or practice of failing to provide safe and sanitary conditions in their facilities will continue.

### (5) Defendants Are Deliberately Indifferent to the Serious Risk of Substantial Harm

254.    Defendants are deliberately indifferent to the serious risk of substantial harm in all 13 of Alabama's Prisons for Men.

255.    Defendants are aware of their failure to protect prisoners at Alabama's Prisons for Men from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, ADOC staffs' excessive use of force, and unsafe and unsanitary conditions.

256.    Defendants have been aware of the dangerous conditions in Alabama's Prisons for Men for many years, as evidenced by numerous statements by Alabama officials.  By way of example:

a. In ADOC's Annual Report for Fiscal Year 2017, Commissioner Dunn emphasized that "the Department's major challenges continue to be critical shortages in correctional officer staffing, and crumbling infrastructure."

b. In ADOC's Annual Report for Fiscal Year 2018, Commissioner Dunn continued to highlight "critical shortages in correctional officer staffing" as a major challenge.

c. In February 2019, during an address to the Legislature, Commissioner Dunn explained that "there is a direct correlation between the shortage of officers in our prisons and the increase in violence," noting that the current level of violence was "unacceptably high."

d. In an op-ed published on February 12, 2019, Governor Ivey stated that "issues of violence, poor living conditions and mental illness persist within our system. These issues, and others, are exacerbated by a crowded inmate population, correctional and health care staffing challenges, and aging prison infrastructure – each piece compounding the others."

e. In an op-ed published on August 12, 2020, Commissioner Dunn stated that "[o]ur facilities are crowded, and our buildings are falling apart. Living and working conditions are, unquestionably, not sustainable. We face staffing shortages. Instances of violence among our inmate population pose a real challenge."

257. Since the United States opened its investigation in October 2016, Alabama's Prisons for Men have remained extremely overcrowded.

258. Alabama's Prisons for Men are still critically and dangerously understaffed.

259. By the first quarter of 2021, most of Alabama's prisons had correctional staff vacancy rates of over 50% as demonstrated by the charts below.



*Chart 10: Correctional Staffing as of March 31, 2021*

260. Since the United States released its findings report on April 2, 2019, notifying Alabama that it was violating the Eighth Amendment by failing to prevent prisoner-on-prisoner

violence and sexual abuse, the rate of violence in Alabama's Prisons for Men has remained unacceptably and dangerously high.

261.    Violence and sexual abuse in Alabama's Prisons for Men are still widespread.

262.    ADOC's publicly-available reports continue to reflect that injuries, deaths, and fighting are a systemic problem in Alabama's Prisons for Men.

263.    Despite being on notice of the dangerous and deficient conditions in Alabama's Prisons for Men, the State of Alabama and ADOC failed or refused to eliminate the unconstitutional conditions.

**COUNT ONE**
**VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS:**
**FAILURE TO PROTECT FROM PRISONER-ON-PRISONER VIOLENCE**

264.    Defendants have subjected prisoners in all 13 of Alabama's Prisons for Men to a pattern or practice of  failing to protect prisoners from prisoner-on-prisoner violence that deprives them of rights, privileges, and immunities secured and protected by the Eighth and Fourteenth Amendments to the United States Constitution causing such prisoners to suffer grievous harm, as described in paragraphs 37-142.

265.    Defendants have exhibited deliberate indifference to the serious risk of substantial harm caused by prisoner-on-prisoner violence in all 13 of Alabama's Prisons for Men, as described in paragraphs 37-142, and 254-263, depriving prisoners of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

266.    Unless this Court orders Defendants to comply with the Eighth and Fourteenth Amendments to the United States Constitution, Defendants will continue to engage in the acts and omissions, as described in paragraphs 37-142, that deprive persons confined in Alabama's Prisons for Men of privileges or immunities secured or protected by the

Eighth and Fourteenth Amendments.

## COUNT TWO
### VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS: FAILURE TO PROTECT FROM PRISONER-ON-PRISONER SEXUAL ABUSE

267.    Defendants have subjected prisoners in all 13 of Alabama's Prisons for Men to a pattern or practice of failing to protect prisoners from prisoner-on-prisoner sexual abuse that deprives them of rights, privileges, and immunities secured and protected by the Eighth and Fourteenth Amendments to the United States Constitution, causing such prisoners to suffer grievous harm, as described in paragraphs 144-190.

268.    Defendants have exhibited deliberate indifference to the serious risk of substantial harm caused by prisoner-on-prisoner sexual abuse in all 13 of Alabama's Prisons for Men, as described in paragraphs 144-190 and 254-263, depriving prisoners of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

269.    Unless this Court orders Defendants to comply with the Eighth and Fourteenth Amendments to the United States Constitution, Defendants will continue to engage in the acts and omissions, as described in paragraphs 144-190, that deprive persons confined in Alabama's Prisons for Men of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

## COUNT THREE
### VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS: FAILURE TO PROTECT FROM USE OF EXCESSIVE FORCE

270.    Defendants have subjected prisoners in all 13 of Alabama's Prisons for Men to a pattern or practice of failing to protect prisoners from use of excessive force that deprives them of rights, privileges, and immunities secured and protected by the Eighth and Fourteenth Amendments to the United States Constitution, causing such prisoners to suffer grievous

harm, as described in paragraphs 192-232.

271.    Defendants have exhibited deliberate indifference to the serious risk of substantial harm caused by use of excessive force in all 13 of Alabama's Prisons for Men, as described in paragraphs 192-232 and 254-263, depriving prisoners of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

272.    Unless this Court orders Defendants to comply with the Eighth and Fourteenth Amendments to the United States Constitution, Defendants will continue to engage in the acts and omissions, as described in paragraphs 192-232, that deprive persons confined in Alabama's Prisons for Men of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

**COUNT FOUR**
**VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS:**
**FAILURE TO PROVIDE SAFE CONDITIONS**

273.    Defendants have subjected prisoners in each of the 13 Alabama's Prisons for Men to a pattern or practice of failing to provide safe conditions of confinement that deprives them of rights, privileges, and immunities secured and protected by the Eighth and Fourteenth Amendments to the United States Constitution, causing such prisoners to suffer grievous harm, as described in paragraphs 234-252.

274.    Defendants have exhibited deliberate indifference to the serious risk of substantial harm caused by unsafe conditions of confinement in each of the 13 Alabama's Prisons for Men, as described in paragraphs 234-252, and 254-263, depriving prisoners of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

275.    Unless this Court orders Defendants to comply with the Eighth and Fourteenth Amendments to the United States Constitution, Defendants will continue to engage in the

acts and omissions, as described in paragraphs 234-252, that deprive persons confined in Alabama's Prisons for Men of privileges or immunities secured or protected by the Eighth and Fourteenth Amendments.

## PRAYER FOR RELIEF

276. The Attorney General is authorized under 42 U.S.C. § 1997a to seek appropriate equitable relief.

277. WHEREFORE, the United States prays that this Court enter an order:

a. declaring that the acts, omissions, and practices of Defendants set forth in paragraphs 18 through 263 above constitute a pattern or practice of conduct that deprives prisoners confined in Alabama's Prisons for Men of rights, privileges, or immunities secured or protected by the Constitution of the United States and that those acts, omissions, and practices violate the Eighth and Fourteenth Amendments to the Constitution of the United States;

b. permanently enjoining Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participation with them from continuing the illegal acts, omissions, and practices set forth in paragraphs 18 through 263 above.

c. requiring Defendants, their officers, agents, employees, subordinates, successors in office, to take such actions as will ensure constitutional conditions of confinement are afforded to prisoners in Alabama's Prisons for Men; and

d. granting such other and further equitable relief as it may deem just and proper.

Dated:  November 18th , 2021

Respectfully submitted,

FOR THE UNITED STATES:

MERRICK GARLAND
Attorney General
United States of America

*/s/ Kristen Clarke*
KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division


*/s/ William R. Chamber, Jr.*
WILLIAM R. CHAMBERS, JR.
Acting United States Attorney
Northern District of Alabama


*/s/ Sandra J. Stewart*
SANDRA J. STEWART
Acting United States Attorney
Middle District of Alabama


*/s/ Sean P. Costello*
SEAN P. COSTELLO
United States Attorney
Southern District of Alabama


*/s/ Steven H. Rosenbaum*
STEVEN H. ROSENBAUM
Chief
Special Litigation Section


*/s/ Kerry K. Dean*
KERRY K. DEAN
Deputy Chief

GEORGE EPPSTEINER
CURTIS HARRIS
MATTHEW J. DONNELLY
Attorneys
Special Litigation Section

63

***/s/ Carla C. Ward***
LANE H. WOODKE
Civil Chief
JASON R. CHEEK
Deputy Civil Chief

CARLA C. WARD
Assistant United States Attorney
United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203
(205) 244-2185
(205) 244-2181 (fax)
carla.ward@usdoj.gov