1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ALABAMA
2    SOUTHERN DIVISION

3    UNITED STATES OF AMERICA,    |    CASE NO.:  2:20-cv-1971-RDP
                                  |
4           Plaintiff,            |
                                  |
5    v.                           |
                                  |
6    STATE OF ALABAMA, et al.,    |
                                  |
7           Defendants.           |

8                   *  *  *  *  *  *  *  *  *

9              **TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE**

10                  *  *  *  *  *  *  *  *  *

11

12         BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

13    DISTRICT JUDGE, at Birmingham, Alabama, on Tuesday, February

14    18, 2025, commencing at 4:00 p.m.

15

16    The proceedings were reported by a stenographic court reporter.

17    The transcript was produced using computer-aided transcription.

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   SPECIAL MASTER:              R. Bruce Barze, Jr.
     (Appearing telephonically)  BARZE TAYLOR NOLES LOWTHER, LLC
 3                               2204 Lakeshore Drive
                                 Suite 425
 4                               Birmingham, Alabama  35209

 5
     FOR THE PLAINTIFF:          Matthew J. Donnelly
 6   (Appearing telephonically)  UNITED STATES DEPARTMENT OF JUSTICE
                                 950 Pennsylvania Avenue, NW
 7                               Washington, DC  20530

 8
     FOR THE DEFENDANTS:         William R. Lunsford
 9   (Appearing telephonically)  Lynette E. Potter
                                 BUTLER SNOW, LLP
10                               200 West Side Square
                                 Suite 100
11                               Huntsville, Alabama  35801

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          (Proceedings commenced at 4:00 p.m. telephonically.)

 2          THE COURT:  All right.  So who's going to be speaking

 3   for the United States in this hearing on the number of

 4   interrogatories permitted?

 5          MR. DONNELLY:  Matt Donnelly for the United States,

 6   Your Honor.

 7          THE COURT:  All right.  Thank you.

 8          How about for the State defendants?  I hear a faint

 9   voice but it sounds like it's light years away.

10          MR. LUNSFORD:  Sorry.  Sorry, Your Honor.  This is

11   Bill Lunsford.  Can you hear me now?

12          THE COURT:  I can hear you now.

13          MR. LUNSFORD:  Okay.  Sorry about that.  Yes, I'll be

14   speaking on behalf of the State.

15          THE COURT:  All right.  So before we dig into Rule 33

16   and all the theories about how you count interrogatories, I

17   have a very practical question right up-front, and that is, it

18   seems to me that the 50 number was agreed to before anyone

19   contemplated the need to do contention interrogatories in lieu

20   of deposition -- depositions or a 30(b)(6) deposition on the

21   issue of the litigation contentions in the case.

22          Everybody agree just with that simple premise that the

23   50 number was agreed to before that development?

24          MR. DONNELLY:  Yes, Your Honor.

25          MR. LUNSFORD:  I would say yes in terms of we -- the

1  State obviously anticipated taking a 30(b)(6) deposition,

2  which the plaintiffs did -- were allowed and did take.  And so

3  the plaintiffs did conduct a 30(b)- -- so I would say it was

4  different for us in that --

5      THE COURT:  No.  Well, I'm not referring to your

6  30(b)(6) depositions, which everybody knew would be taken, or

7  their 30(b)(6), I should say.  I'm referring to your request

8  to take a 30(b)(6) deposition of Justice Department officials

9  on the issue of why they did X, Y, and Z in the litigation.

10      MR. LUNSFORD:  Correct.

11      THE COURT:  That issue -- you contemplate -- you, at

12  some point in time, determined that you would like to do that,

13  and I said no, I think that should be a more -- the more

14  appropriate way to address those things would be through

15  contention interrogatories, correct?

16      MR. LUNSFORD:  Yes.

17      THE COURT:  Okay.  So did that affect your number of

18  contention interrogatories, then -- I mean your number of

19  interrogatories?  Were you still able to stay under 50 doing

20  that?

21      MR. LUNSFORD:  I don't know that we've done -- Your

22  Honor, I haven't done a count of those.  I don't know.

23      THE COURT:  Yeah.  So have you sent those out?

24      MR. LUNSFORD:  We didn't send them out because the way

25  in which the order was written, we believed they were

1  automatically converted, and the Court gave a deadline in the

2  order, as I recall it, for a response.

3          THE COURT:  Okay.

4          SPECIAL MASTER BARZE:  Judge, this is Bruce.  I think

5  what we essentially did was we converted the topics in the

6  30(b)(6) notice into interrogatories.

7          THE COURT:  Okay.

8          MR. DONNELLY:  And, Judge, from the United States, I

9  believe we answered those last week.

10          THE COURT:  All right.  Did anybody stop to count the

11  roses, so to speak?

12          MR. DONNELLY:  Well, Your Honor -- again, Matt

13  Donnelly from the United States -- I don't think we were

14  necessarily counting them against their number, but I can look

15  real quick at what their number was.

16          THE COURT:  Yeah.  Well, I'm just curious.  Like I

17  said, it was a practical question, not a -- not necessarily a

18  legal one.  So what I wondered, though, is if we're not in a

19  position where everybody might have, for various reasons --

20  might need to go back and revisit whether it's -- 50 is

21  appropriate in a case like this or -- because what I -- what I

22  understand is Bruce's view is this equals 70, not

23  2,488,000,987 like the plaintiffs, but not 50 like the

24  plaintiffs either.  I might have said that wrong.  By the --

25  like, the defendants versus the plaintiffs.  But -- all right.

1  So we can come back to that.

2       Second question:  Does anybody contend any of these

3  contention interrogatories or these interrogatories I'm

4  looking at in this most recent set or any of the previous ones

5  were -- sought irrelevant information or otherwise were

6  objectionable outside of the quantity involved?

7       MR. LUNSFORD:  Yes.

8       THE COURT:  All right.  Well, was that raised in your

9  papers?

10      MR. LUNSFORD:  Yes.

11      THE COURT:  Okay.  For example?

12      MR. LUNSFORD:  Your Honor -- sorry -- I'm scrolling

13  down to make sure I've got these covered.  Let me make sure

14  I'm in the right place.

15      For example -- Interrogatory No. 29 I will use as an

16  example.  Identify the primary facts broken down by facility

17  supporting ADOC's contention that Defendants are not

18  deliberately indifferent to ADOC's inadequate investigations

19  of, and then it goes through a category of things.  Please

20  include primary facts for any voluntary action by Defendants

21  to remedy these inadequate investigations alleged in the

22  second amended complaint.

23      And so, you know, that's just one example that I could

24  put my hands on quickly where we talked about the overbreadth

25  of it.  Just the impossibility of responding to this breadth

1    of a interrogatory over such a -- I mean, 13 facilities going

2    back to the time frame covered by the second amended complaint

3    would be nearly impossible for us to articulate all of the

4    things that we contend demonstrate that were not deliberately

5    indifferent as it pertains to investigations over all those

6    areas.

7         THE COURT:  All right.  Give us all the facts that

8    establish you did not beat your wife is what you're concerned

9    about?

10        MR. LUNSFORD:  It -- that's certainly one concern,

11   Your Honor.  It's almost like -- it's even further, which is

12   explain all the circumstances of why you didn't beat your wife

13   and why the -- your 13 best friends didn't beat their wife

14   either.

15        THE COURT:  Okay.  What does the United States have to

16   say about Interrogatory 29 in terms of its -- in terms of the

17   argument I just heard?  And then we're going to come back to

18   the numbers in a minute, but I just want to address that.

19        MR. DONNELLY:  Your Honor, the background is that we

20   basically patterned our contention interrogatories off theirs.

21   But what we did is we actually switched them up.  And so you

22   may be familiar with this from reading through some of the

23   other papers, but they ask one big, gigantic one, Give us the

24   primary fact, according to your contention, that we are

25   currently violating the constitution.

1           And rather than do that, we actually tried to make it

2    a little bit less blockbuster and so we used their own

3    language of "primary fact" and thought that that would be more

4    manageable.  And we answered their interrogatory, which

5    covered everything in the month that, you know, was originally

6    given to us for the interrogatory and then we just answered,

7    you know, similar, I would call, large written response

8    interrogatories to the 30(b)(6) that got converted.  And one

9    of those was, you know, the facts that are in the second

10   amended complaint.

11          And so the balance is, is that we thought when they

12   gave them to us, since they used the words "primary fact," we

13   thought that was arguably taking it out of the world of, you

14   know, a gigantic blockbuster kitchen-sink interrogatory and we

15   answered it that way.

16          And I believe that there's a little bit more context.

17   When we were talking about this with the Special Master, you

18   know, he essentially asked the United States, Are you willing

19   to just accept an answer, you know, akin to what you provided,

20   which isn't necessarily broken down by facility, and we

21   answered yes.

22          THE COURT:  Okay.  All right.

23          Well, it seems like both those contention

24   interrogatories going back and forth are, Tell us now what

25   you're going to say in your briefing to the Court or what

1    you're going to say at trial on these issues, right?

2           MR. DONNELLY:  Yes from the United States, Your Honor.

3    It's the major outline of what you're going to say at trial.

4           THE COURT:  Yeah.  Or on a dispositive motion, for

5    that -- before trial.  If you're going to argue there's not

6    sufficient evidence in the Rule 56 record to support a

7    deliberate indifference claim for whatever reason, tell us

8    what your factual basis for making that argument is now.

9           MR. LUNSFORD:  Your Honor, there's one distinction, if

10   I could offer, between the contention interrogatories that the

11   United States offered and the State's contention

12   interrogatories, if so converted by the Court.

13          THE COURT:  Say that one more time.

14          MR. LUNSFORD:  And this was part of our objection.

15   There's a distinction between the contention interrogatories

16   that the United States issued and the contention

17   interrogatories that the State was issuing after the Court

18   directed those to be issued in the way they were.  And the

19   major distinction is that we, the State, never had an

20   opportunity to sit down and question anyone about anything

21   related to the United States Plaintiff's allegations.  But

22   now, at the tail end of discovery, as Bruce pointed out, after

23   the United States has taken 75 depositions, 70-something

24   depositions, many of those -- they've taken as many as four to

25   five people from each of the institutions plus a 30(b)(6), and

1    so they're coming back after the fact, after they've taken 75

2    depositions of people at the institution level and after

3    they've taken 30(b)(6) and after they've taken statewide

4    representatives from every major department, whether it be

5    investigations to the commissioner, to the associate

6    commissioner over, you know, jail security operations,

7    whatever it is, they've taken all these people's depositions,

8    asking questions about these same topics that are addressed in

9    29, including the person who heads up investigations for the

10   Department of Corrections.  They've already asked deposition

11   questions for seven-plus hours of 75 -- 70-something people.

12   And so that goes to this idea that it's -- this is on top --

13   they're asking this at the tail end after they've already

14   conducted all the discovery.  The difference is the State has

15   yet to -- since -- prior to receiving the United States'

16   response to interrogatories, we've yet to have the opportunity

17   to question a single person about the United States'

18   allegations.

19          THE COURT:  Well, but we've gone over this, Bill.  The

20   reason that is true is because all the people made in the

21   allegations are lawyers in the Justice Department, not parties

22   in the traditional sense of --

23          MR. LUNSFORD:  I understand.

24          THE COURT:  -- of the way the discovery rules are set

25   up where you do discovery from a party.  You're asking the

1   United States, and in this case the United States is the

2   Justice Department and the lawyers at the Justice Department.

3        Now, look, all this talk about contention

4   interrogatories and timing, let me remind you of what Rule

5   33(a)(2) says, picking up with the second sentence, "An

6   interrogatory is not objectionable merely because it asks for

7   an opinion or contention that relates to fact or the

8   application of law to fact, but the Court may order that the

9   interrogatory need not be answered until designated discovery

10  is complete, or until a pretrial conference or some other

11  time."

12       And I'll be candid with you-all.  I've -- in practice,

13  before going on the bench and on the bench, I've traditionally

14  followed the rule that a contention interrogatory is a

15  question to a lawyer and it's best to have all the dust

16  settled before that question goes out.  And, really, what

17  you're wanting to do is you're just wanting to make sure that

18  you didn't miss something -- as you're doing your briefing,

19  that you didn't miss something and that you've got it

20  addressed by the time you get to writing a brief or presenting

21  your case or defenses at trial, correct?

22       MR. DONNELLY:  Well -- Matt Donnelly from the United

23  States, Your Honor.  Yes, that's certainly correct, but one of

24  the other reasons why we did these is we wanted to make sure

25  we had all the information for experts to make sure that there

1   wasn't some big remedy that we had missed because we -- as

2   Bill said, we asked a bunch of questions in depositions about

3   that and I don't know that we got all the answers.  And we

4   wanted to have a nice submission from the defendant that would

5   say these are the big improvements we've made, this is how

6   we've -- you know, we're claiming success, and so therefore we

7   would be able to have an expert comment on it.  And so that

8   was one of the reasons why we did a --

9           THE COURT:  Well, is there a -- is there a way to

10  accomplish those things for both sides that doesn't involve

11  multiple overlapping contention interrogatories?  So, for

12  example, what if I said, with respect to these contention

13  interrogatories, both sides have to sit down and reach certain

14  stipulations about what the fact issues are in the case, what

15  they agree and disagree about, and that gives you a chance to

16  flesh out those same things in advance of any summary judgment

17  briefing and/or trial.

18          So, for example, on Interrogatory 29, which, as the

19  Special Master characterized it -- and I think this is

20  probably a fair characterization -- the primary question is

21  directed to ADOC's contention regarding deliberate

22  indifference about inadequacy of investigations, and the

23  secondary questions ask for facts and information regarding

24  that contention.

25          So it seems to me what you-all really need to do is

1    take these various areas and -- and by the way, I think the --

2    I think the United States is entitled to get this information

3    before it wages and wades into expert disclosures, putting

4    experts up for depositions, going through the swing of the

5    battle-ax of summary judgment and/or trial.  So I'm just

6    wondering, though, if there's not a more efficient way to do

7    this rather than arguing over contention interrogatories.

8         You know, quite frankly, what I could have done, Bill,

9    is said, yeah, those 50 interrogatories deal with fact

10   discovery, now we're in contention discovery at pretrial,

11   answer these 20 additional interrogatories.  Been perfectly

12   consistent with Rule 33(a)(2), right?

13        MR. LUNSFORD:  In terms of contention interrogatories,

14   yes, sir, it would.

15        THE COURT:  Okay.  Well, and these -- what you're

16   arguing about is largely contention interrogatories, right?

17        MR. LUNSFORD:  Well, our biggest argument is that it's

18   impossible.  I mean, that's really what I was -- it wasn't as

19   much that I was saying it was improper that they were

20   contention interrogatories.  I'm simply saying what the United

21   States is -- and again, as an officer of the Court, Your

22   Honor, we can't -- they want us, in 30 days, to outline every

23   fact as to why they're wrong about seven to 12 constitutional

24   defects they allege at 13 different facilities over the last,

25   basically -- they're alleging, basically, over a ten-year

1    period.  And I just -- Your Honor, I have no idea how to

2    gather that amount of facts and put it into a written

3    document.

4         THE COURT:  So I think that's a legitimate concern.  I

5    get it.  But what do you think about my suggestion that I

6    think the better course of conduct would be that we make you

7    all sit down and hammer out the factual issues that can be

8    agreed to, what is in disagreement, and get each side's

9    position on those?

10        MR. LUNSFORD:  Your Honor, that process makes perfect

11   sense to me.

12        THE COURT:  All right.  How about Matt, what do you

13   think of that?

14        MR. DONNELLY:  I think that sounds fine, Your Honor.

15   I -- and, of course, I'm going to make sure I understand it,

16   but this is a let's go through the interrogatories the United

17   States served and see if we can find a better way to do it,

18   maybe streamline them so everybody gets the information they

19   need, but --

20        THE COURT:  Yeah.

21        MR. DONNELLY:  -- you know, for instance, cut down on

22   the years -- I mean, I think, you know, we have generally, in

23   this case, limited discovery that's relevant to 2019 onward.

24   And, you know, I'll reiterate that we had sort of cut off the

25   part about you have to break this down by facility so we can

1    do that, too.  But if, essentially, Your Honor is saying why

2    don't you two get together and see if we can hammer out

3    something that's a little more feasible, that is -- that

4    sounds fine to the United States, again, with -- and I believe

5    you said this, Your Honor -- the expert report's something I

6    would like to have this answer to beforehand and that's a

7    scheduling issue.  So at some point I'll probably bring that

8    up later on in this call, but that generally sounds good.

9            THE COURT:  Right.

10           Bruce, do you think you could supervise a process

11   where we're working through these contentions in terms of a

12   statement of disputed and undisputed facts?

13           SPECIAL MASTER BARZE:  Yeah, I guess, Judge -- yes.  I

14   guess, as I understand it.  Are you familiar with the process

15   that Judge England uses when he resolves discovery speech

16   where they kind of come up with a joint document, something

17   like that?

18           THE COURT:  Yeah, I am somewhat familiar with that.

19   And that may be kind of a first cousin of what I'm thinking

20   about here.  What I'm thinking about here is if we were to go

21   to trial, I would make both sides sit down and say, with

22   respect to each witness you're going to call, what are the

23   disputed and undisputed facts that they're going to be

24   testifying about.  And you know what?  I'd -- since it's a

25   bench trial, I would sit up there and that would help me with

1   my Rule 52 findings of fact and conclusions of law.  I'd sit

2   there and just check off what boxes you hit, what boxes you

3   missed, what boxes you might have gotten partially right.  But

4   I think that's going to help us move toward dispositive

5   motions and trial because it would set the framework for

6   presenting to the Bench at a bench trial what's agreed to,

7   what's disagreed to, and what are the material issues of fact

8   I'd have to decide.

9          And, you know, my pretrial order has something in here

10  about when it's a bench trial, requires the parties to do

11  something like that, even in a simple, Hey, my car ran into

12  your car at the corner of Main and Elm.

13         So how about we -- instead of arguing about whether

14  this is a square peg or a round hole, why don't we just

15  construct a whole different paradigm of that's how we're going

16  to handle and make sure nobody gets surprised with expert

17  disclosures and/or Rule 56 motions and/or trial presentation

18  and go back to the drawing board with that.  And I'd be glad

19  to, once Bruce gets you started on that, when you run into

20  questions along the way, save up your questions and we'll just

21  have a status conference and we'll address those to kind of

22  keep things streamlined and moving.

23         MR. LUNSFORD:  Understood.

24         MR. DONNELLY:  Yes, Your Honor.  And I want to bring

25  up something that you spoke about and I sort of hinted at.  We

1  have expert reports that are due on March 21st, which is

2  basically a month.  And like I said before, we're really

3  looking for this information before we submit our expert

4  reports.

5          THE COURT:  I think it makes sense to push those

6  deadlines back a little bit and let you get this information

7  rather than -- because otherwise -- look, and -- but there's

8  going to be a reciprocal promise you have to make to me, then,

9  that you're really going to run herd on both sides on your

10 experts and make sure the reports are only addressing material

11 issues and you're going to give me an executive summary of

12 each of the expert reports before you -- I need to have an

13 executive summary of the report that accompanies the report

14 itself so that I know what I'm looking for when I dig into a

15 report.

16         MR. DONNELLY:  Yes, Your Honor.

17         THE COURT:  Okay.  So, Bruce, can you also superintend

18 the process where we're moving toward some deadlines --

19 extending some deadlines to make sense to allow this process

20 on the stipulations of disputed/undisputed facts to get worked

21 into the litigation track?  And I think --

22         SPECIAL MASTER BARZE:  Yes, Your Honor.

23         THE COURT:  -- that we're going to ultimately save

24 time that way.  I mean, even though we're pushing some

25 deadlines back, we'll get to the finish line sooner because

1    we're going to do more meaningful work on the front end that

2    makes things efficient -- more efficient on the back end.  At

3    least that's what I'm telling myself.

4          SPECIAL MASTER BARZE:  Well, it sounds right to me.

5          THE COURT:  Okay.

6          SPECIAL MASTER BARZE:  There had already been some

7    discussion about -- there had already been some discussion

8    about pushing the expert deadlines anyway, so that kind of

9    dovetails with that conversation that's ongoing.

10          THE COURT:  Yeah.  Never let it be said I'm not a

11    reasonable judge who practiced law once upon a time myself.

12    So I know this is -- I know this is not easy for either side.

13          Okay.  What else do we need to take up for today?

14    This way -- there's another huge advantage of this, if you

15    think about it.  You don't have to have a Carson-Newman

16    linebacker who got a BA in individual directions doing your

17    math for you.

18          SPECIAL MASTER BARZE:  Judge, there is one other thing

19    that it might make some sense for me to bring up and that is

20    there are still a few questions related to Staffing Day.

21          THE COURT:  Yeah.

22          SPECIAL MASTER BARZE:  And that's coming up around the

23    corner.

24          Lynnette, if I'm not just putting you on the spot --

25          THE COURT:  No, you're not.

1    SPECIAL MASTER BARZE:  -- we had -- I think the State

2    had a few questions that would probably be helpful to get some

3    responses from you on, Judge, as they get ready to prepare to

4    make that as effective as possible.

5    THE COURT:  All right.  That sounds good.

6    SPECIAL MASTER BARZE:  And, Lynnette, I can go through

7    these or you can, either way.

8    MR. LUNSFORD:  I know Lynnette's off-site, Bruce, but

9    if you want to go through them, that's fine, because I think

10   we all agree those were the ones -- I don't have them right in

11   front of me, but I do agree that that would be helpful.

12   SPECIAL MASTER BARZE:  I've got them.

13   Your order provides that attendance will be limited,

14   and the question was, is there a limitation on how many

15   attorneys for each party may attend and is there going to be a

16   Zoom link available for others to attend virtually.

17   THE COURT:  We can make a Zoom link available.  And I

18   -- I guess the -- what I'd want to do is just make sure,

19   though, that whoever is attending isn't -- I don't want to --

20   I don't want to have somebody up there at the podium who says,

21   I need to -- I can't answer that question until I go consult

22   somebody behind me and slowing things down that way.  That was

23   one of the main concerns there is just making sure that we are

24   equipping people to move things along and be well-versed in

25   what we're presenting.

1          So if you have somebody who is the leader of the pack

2     but maybe isn't as familiar with the details, then they can

3     come, but they probably need to sit and smile and give

4     feedback on breaks.

5          SPECIAL MASTER BARZE:  All right.

6          THE COURT:  As far as -- you know, I've got a pretty

7     big courtroom, so -- and I think it's available for that two

8     days.  They're going to be done with our little fun

9     redistricting case that's going on right now by then.  So we

10    can fit a lot of people in my courtroom.  If you need us to

11    have an overflow room, we might could set that up, too.  But

12    I'd need to know about that pretty well in advance to get my

13    IT people cracking on it.

14         SPECIAL MASTER BARZE:  All right.  Are you, Judge,

15    looking for the same attendees on days one and two?

16         THE COURT:  Well, if you're a presenter, I would

17    expect you to be available on days one and two.

18         SPECIAL MASTER BARZE:  Yeah.

19         THE COURT:  Yeah.

20         SPECIAL MASTER BARZE:  Okay.  I think just for

21    planning as much as anything else.

22         THE COURT:  Yeah.

23         MR. BARZE:  Are you going to have any sort of agenda

24    or order of discussion that you want to have beforehand?  Or

25    do you have any thoughts on the order of presentation?

1          THE COURT:  Yeah, Bruce, I thought you would give me

2    -- I thought you would get together with the two sides and

3    give me a proposed agenda you and I can discuss that.

4          SPECIAL MASTER BARZE:  We can do that.  And if you

5    have any thoughts on a particular order of the presentations,

6    you and I can talk about that and we can build that into the

7    agenda.

8          THE COURT:  Well, again, keep in mind I am the pupil.

9    This is a tutorial.  A lot of this is "I don't know what I

10   don't know."  Now, full disclosure, there will be --

11   definitely be a link available because I'm -- at this point I

12   expect Judge Watkins is coming to this.  He may or may not be

13   bringing Judge Thompson, but if he -- if Judge Thompson isn't

14   able to make it, I told him we would have a link available for

15   him to watch the proceedings.

16         MR. LUNSFORD:  Oh.

17         THE COURT:  Just wanted to drop that little cherry

18   bomb on everybody.

19         SPECIAL MASTER BARZE:  Were you -- did you mean Judge

20   Ott or Judge Watkins?

21         THE COURT:  Judge Watkins.  Judge Ott has told me he

22   cannot make it.  He has a conflict and it's a very good

23   reason.  I don't recall the specifics, but he told me what it

24   was.  And I told him we'll be glad to download the summary for

25   him, that Bruce could do that or I could do that.

1          MR. LUNSFORD:  Could I ask a question in that regard?

2    I just -- this was obviously new information.  So, Judge, I'm

3    just trying to make sure I understand, how -- since we are

4    currently under an injunction issued by Judge Thompson and

5    this information was, as I understood it, to be confidential,

6    what would prevent Judge Thompson from using anything said

7    during this conference?

8          THE COURT:  It's all tutorial for him, too.  No, it's

9    all tutorial for them, too.

10         MR. LUNSFORD:  Oh.

11         THE COURT:  It can't be used in the litigation is what

12   -- the point you're concerned about, I would think.

13         MR. LUNSFORD:  I guess -- I guess my concern is --

14   okay.  We'll have -- we'll think through that and let you know

15   if we have -- that creates some -- I mean, obviously, that

16   creates some immediate concerns since there's a pending

17   injunction, and the only order that we're aware of is yours.

18         Is there -- was there any contemplation of Judge

19   Thompson entering a similar order?

20         THE COURT:  Order about what?

21         MR. LUNSFORD:  About the confidentiality of this.

22         THE COURT:  Well, I think my order covers you.  If

23   somebody tries to introduce something -- first of all, Judge

24   Thompson's well aware and Judge Watkins is well aware that

25   this is tutorial and not for litigation purposes.  So I don't

1    think you're going to have any issues there.  If some rogue

2    group comes in and tries to hijack this, then if -- then I

3    might be entering a show cause order and have them come

4    explain to me what they're up to.

5         MR. LUNSFORD:  Yes, sir.  Understood.

6         THE COURT:  Yeah.  So I don't -- I don't see that

7    being a concern.  Now, look, this is all tutorial.  It's not

8    for purposes of litigation.  You're not going to say any --

9    what would you educate whatever judge you're in front of on

10   these similar issues -- and look, staffing is an issue in

11   cases before Judge Watkins, it's an issue in cases before

12   Judge Thompson, it's an issue in cases before Judge Axon and

13   others in our court, right?  So all we're going to be doing

14   is --

15        MR. LUNSFORD:  Your Honor, if -- I understand.

16        THE COURT:  All you're doing is educating us about,

17   all right, what is -- what goes into staffing questions?  What

18   -- how do we approach staffing?  What's the question?  How do

19   we -- how do we try to solve problems in the staffing area?

20        This is not going to be, We're entitled to win this

21   lawsuit because of "X."  And I warned you-all, don't come in

22   here being advocates.  That's not what this is about.

23        SPECIAL MASTER BARZE:  Judge, on -- next question is,

24   is there any specific information, other than the agenda that

25   we will put together, that you want to see through the

1    pre-Staffing Day submissions?

2         THE COURT:  Well, so, for example, I'm interested in

3    hearing about what are -- just educate me on the efforts that

4    you've made to increase staffing, the challenges that may be

5    beyond your control.  Maybe the United States may disagree

6    with that characterization, but what are the challenges of

7    staffing?

8         What -- you know, some of these are, I think, a little

9    intuitive.  It's hard to get people really excited about going

10   and working in a prison population and keeping law and order

11   and security and other things in that.  I think I've quipped

12   at one of these hearings before to the United States, Any

13   volunteers from any of you people to go in there and do all

14   these things you said that the prison system should have been

15   doing?  Probably not a lot of hands went up when I asked that

16   question.  But I'm just interested in knowing, okay, what do I

17   not know about the staffing problems that I need to know?

18        SPECIAL MASTER BARZE:  All right.  And how -- in what

19   format do you want that, the submissions?  Because we probably

20   don't want to file them.  What's the best way for those to be

21   provided to the Court?

22        THE COURT:  In camera.

23        SPECIAL MASTER BARZE:  Okay.

24        THE COURT:  Yeah.

25        SPECIAL MASTER BARZE:  So we'll collect -- all right.

1    I can --

2             THE COURT:  Since the transcript is --

3             SPECIAL MASTER BARZE:  I can gather them and --

4             THE COURT:  Yeah, we can just -- why don't we just

5    submit them through the Special Master?

6             Now, look, I think it's fair for both sides to see

7    that -- there's no such thing as an in-camera submission to --

8    only to the Court.  You're going to have to share it with the

9    other side, but it's not going to be part of the Court docket.

10   It's not going to be publicly accessible.  It's not going to

11   be publicly discoverable.  I think we can just have it go to

12   the Special Master.  And quite frankly, you could give me a

13   hard copy and/or a thumb drive digital copy and just have

14   slide -- for example, if you're going to use PowerPoints,

15   maybe a separate document on that, put it in a notebook and

16   give it to me.  I'm pretty good about -- I'm still a little

17   old school.  I can look at my laptop, but sometimes I'd rather

18   have a notebook that I can write little notes in the margins

19   on PowerPoint slides.

20            SPECIAL MASTER BARZE:  Okay.

21            THE COURT:  Are you-all having fun yet?

22            SPECIAL MASTER BARZE:  Any thoughts on time limits or

23   how long -- I guess it's hard to know in advance, Judge, if

24   you don't know what you don't know, but do you have any

25   thought on sort of how long a presentation should go?

```
 1          THE COURT:  I would think you'd major on the majors.

 2   So you've got two days to do your presentation, get it done in

 3   two days.  I don't --

 4          MS. WAUDBY:  There's some criminal stuff scheduled in

 5   the afternoon on Thursday --

 6          THE COURT:  Okay.  Let me go back to my calendar here.

 7          MS. WAUDBY:  -- we said -- but we're also going onto

 8   Friday.

 9          THE COURT:  Yeah, we might need to move those

10   revocation hearings on Thursday.

11          THE COURTROOM DEPUTY:  What date?

12          MS. WAUDBY:  March 6th.

13          THE COURT:  March 6th.  I'm looking at this and --

14   now, I'll say this:  We're not going to be here late on

15   Friday.  I've got to be in Homewood by 4:30 on Friday, so take

16   that into account.

17          SPECIAL MASTER BARZE:  I'm guessing you're not going

18   to get a lot of pushback on that one, Judge.

19          THE COURT:  I would think not.  I think all our folks

20   would like to get it done in plenty of time to catch a direct

21   flight that American offers back to DC.

22          SPECIAL MASTER BARZE:  The last bullet point I have

23   here -- and I think this kind of applies equally to both

24   parties -- do you -- does your order envision that attendees

25   should not be sharing information that they learn during the
```

1    Staffing Day with other people in their own organizations, for

2    example, back at ADOC or back at DOJ and/or with any related

3    parties with whom they claim a common interest, like Braggs

4    plaintiffs?

5         THE COURT:  Yeah, this is not for purposes of any

6    other case other than this one.

7         SPECIAL MASTER BARZE:  All right.

8         THE COURT:  So I would frown upon somebody leaking

9    what they learned in this in such a way, because there's only

10   one reason that another group of lawyers want to know this and

11   that is they want to use it for the State or against the

12   State.  That is antithetical to the purpose of these -- of

13   this tutorial.

14        SPECIAL MASTER BARZE:  That's all the questions that I

15   had from the State, Your Honor, but if any of the other

16   parties have any while we're talking about this, this seems

17   like a good time to ask.

18        MR. DONNELLY:  I do, Your Honor, and there's just a

19   bit of a follow-up on some of those questions you asked.

20        Is there -- and we were thinking there would be sort

21   of limited participation, like each party would get to bring

22   two presenters.  We didn't want to have it be a huge, you

23   know, mismatch of, you know, one party brings two and the

24   other party brings ten.

25        Do you have any thoughts on your expectations on

1    limits on the presenters for each party?

2          THE COURT:  Yeah.  I think you ought to get with

3    Bruce, tell him what you're expecting, and let him balance

4    things out for you.  And he can run it by me if he's got

5    questions about how to balance it.

6          MR. DONNELLY:  And then my second follow-up was on the

7    pre-Staffing Day submissions, which are, my understanding, due

8    on or before February 28th.  We already talked about how they

9    would be submitted to Bruce and in camera and everyone will

10   just see them.

11         Is it your understanding that those are more of a

12   summary type of document and aren't necessarily the PowerPoint

13   that we would necessarily use in full for the next -- comes a

14   week later and that would be submitted, you know, with the

15   presenter?

16         THE COURT:  I'm perfectly fine with that format, just

17   giving me the outline of things and then, if you need extra

18   time to polish up a PowerPoint that you want to work on, just

19   getting that to me in camera as well before the presentation

20   begins.

21         MR. DONNELLY:  Thank you, Your Honor.

22         THE COURT:  Okay.  Well, folks, if there's nothing

23   else, I've got the next thing to go to here.

24         MR. DONNELLY:  Thank you, Judge.

25         SPECIAL MASTER BARZE:  Thank you, Your Honor.

1    THE COURT:  I think we saved some time with the

2  solution we came up with on -- that I came up with on

3  contention interrogatories, but I think it also means we're

4  going to save time down the road.

5    So let's do this, Bruce.  You kind of -- I think you

6  kind of have my vision of this, but please don't hesitate to

7  reach out when the devil in the details starts rearing its

8  head.

9    SPECIAL MASTER BARZE:  Okay.

10    THE COURT:  Okay.  Thank you all.

11    (Adjourned accordingly at 4:42 p.m.)

1                  C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5                       Dated:  June 9, 2025

6

7

8    *Pamela G. Weyant*
     Pamela G. Weyant, RDR, CRR, CCR
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25