FILED

2025 Nov-24  PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-CV-1971-RDP** |
| | ) | |
| **STATE OF ALABAMA, and** | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **CORRECTIONS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SPECIAL MASTER REPORT AND RECOMMENDATION ON DEFENDANTS' REQUEST FOR ADDITIONAL TIME TO DEPOSE INVESTIGATOR WILLIAMS AND ORDER TO RESPOND TO QUESTIONING

This Report and Recommendation is respectfully submitted to the Honorable R. David Proctor, Chief Judge, pursuant to the Court's Order dated November 9, 2021 (Doc. 70).

## Proceedings

Before the Court is a continuing dispute related to the deposition of one of Plaintiff's litigation team members, Investigator Mark Williams ("Williams"). Earlier this year, the undersigned made a previous Report and Recommendation (Doc. 231) related to the Defendants' issuance of a subpoena, and corresponding request by the Plaintiff to quash that subpoena, seeking deposition testimony of Williams. Defendants sought to depose Williams on the basis that, because he verified Plaintiff's interrogatory responses and has worked as an investigator on Plaintiff's case, he possesses discoverable, non-privileged information supportive of Plaintiff's claims and allegations. Plaintiff, on the other hand, objected to the deposition altogether, arguing that, *inter alia,* the attempted deposition of Williams was an improper *de facto* contention deposition of Plaintiff's enforcement attorneys given the unique nature of this litigation, which is brought in

Plaintiff's enforcement capacity and without a separate agency client. As such, Plaintiff maintained that Williams could not provide testimony on the requested deposition topics that was not already protected by work product privilege, given his investigatory role within the litigation team.

After hearing from the Parties and considering their respective briefings, the undersigned recommended that the Parties move forward with the Williams deposition, but only as to the topics that would not "invade Plaintiff's work product, deliberative process, or other privilege." (Doc. 231). Williams possessed at least some personal knowledge as to facts giving rise to Plaintiff's claims given his role in answering the inmate reporting hotline and his interactions with family members and other acquaintances of inmates making reports of safety concerns or other conditions within ADOC facilities, and at least some of the information gleaned from these interactions was provided to Defendants via email. Therefore, in my view it was not appropriate to outright prevent Defendants from deposing Williams, at least as to his personal knowledge. My Report and Recommendation on this topic was adopted by the Court and allowed Defendants to depose Williams "regarding the facts underlying Plaintiff's interrogatory responses [], the facts supporting the parties' claims and defenses, and facts – like those in his emails – about which Williams has personal knowledge." (Doc. 247).

On April 8, 2025, the Defendants deposed Williams. *See* Ex. A. As is evident by the deposition transcript and the letter briefings that followed, the Parties were unable to reach a meeting of the minds prior to or during the deposition as how to balance Defendants' discovery efforts with the Court's limiting instructions. Defendants have, accordingly, requested the Court's input on how to address Plaintiff's privilege objections or, alternatively, to permit Defendants to file and brief a motion to compel Williams' deposition responses and permit Defendants additional time to further depose Williams.

*Background*

As summarized in the prior Report and Recommendation regarding the Williams deposition, on April 28, 2024, Defendants propounded their Second Set of Interrogatories to Plaintiff. On May 28, 2024, Plaintiff served its Objections and Reponses to those interrogatories, which Williams verified. Thereafter, on September 4, 2024, Defendants subpoenaed and noticed a deposition of Williams, to which the Plaintiff responded, objecting to the subpoena on the grounds that it sought privileged information. A series of correspondence was exchanged on the topic, culminating in an October 18, 2024 conference between the undersigned and Parties, subsequent briefing, and January 20, 2025 Report and Recommendation (Doc. 231), which was later adopted by the Court. Notably, that Recommendation provided the following:

> . . . the Williams emails demonstrate that he does possess first-hand knowledge of facts relevant to the parties' claims and defenses.

> Williams' knowledge of those facts – at least some of which he communicated to Defendants – coupled with his verification of the interrogatory response, makes his personal knowledge fair game in a deposition. Of course, Plaintiff's counsel may protect against the disclosure of work product or privileged information in the Williams deposition by interposing appropriate objections and giving instructions on a question-by-question basis. In other words, Defendants are not entitled to require the Plaintiff to tender Williams to testify about how the Plaintiff intended to marshal the facts because this would require Plaintiff to reveal its counsel's work product. Defendants' questions must be specifically tailored to discovering facts underpinning Plaintiff's allegations in the Amended Complaint and facts like those contained in Williams' emails sent to Defendants.

Doc. 231.

On April 8, 2025, the Parties deposed Williams. During the deposition, counsel for the Parties frequently disputed the appropriate scope of testimony elicited, application of the Court's prior Order to questions asked, and the appropriateness of Plaintiff's privilege objections. On May 8, 2025, counsel for Defendants wrote a letter to the Court requesting "guidance in an unresolved discovery dispute regarding the State's efforts to obtain clarification through a deposition of the

assertions made by Plaintiff in its interrogatory answers." Defendants assert that Plaintiff overly asserted privilege and inhibited Defendants' ability to gain meaningful disposition testimony on "basic factual matters." *Id.* at 2. The Court referred the dispute to the undersigned (*see* Doc. 258), and the undersigned invited the Parties to brief the issue for consideration.

Having considered the briefs of the Parties, as well as their arguments during conference, the undersigned makes the following Report and Recommendation to the Court.

*Defendants' Position*

Defendants seek additional time to depose Williams and an Order to respond to questions Plaintiff objected to during the Williams deposition and any subsequent follow up questions that may develop. In support of this position, Defendants argue that Plaintiff's objections were improper and ignore that Williams "possesses discoverable information due to his verification of Plaintiff's Interrogatory Responses." Defendants maintain that Williams, as the verifier of the interrogatory responses, was made aware of facts underlying the interrogatory answers in order to attest to the truth and accuracy of the responses, and that such a process does not create a privilege over such facts. Thus, Defendants dispute that Williams could only testify as to his personal knowledge and instead should have been permitted to testify to additional facts gleaned in the course of verifying the interrogatory responses. Defendants also seem to suggest that, to the extent Williams was not made aware of the facts underlying all interrogatory responses, then Williams improperly verified the responses. In other words, Defendants argue that, because the Court determined that "Williams' knowledge of the facts . . . coupled with his verification of the interrogatory response, makes his personal knowledge fair game in a deposition," Williams should have been permitted to provide testimony beyond his personal knowledge.

A list of categories of testimony sought to which Defendants maintain Plaintiff improperly objected is included below:

| Testimony Sought | Interrogatory Response |
|---|---|
| Asking Williams whether there are other facts he is aware of that demonstrate a pattern or practice of resistance to the rights, privileges, or immunities of incarcerated individuals in ADOC that are not included in a response to Interrogatory No. 18. (Williams Dep. at 102:13-104:18). | Interrogatory No. 18 sought "the primary facts" to which Plaintiff stated, "such facts include:" (Doc. 231-2 at 5-6). |
| Asking Williams to explain how the number of homicides in ADOC was unreasonable. (*Id.* at 122:11-124:4). | "Alabama Department of Corrections (ADOC) had an unreasonably high number of homicides of prisoners in the last several years in the Facilities." (*Id.*). |
| Asking Williams how ADOC does not accurately and consistently track prisoner deaths in the facilities. (*Id.* at 124:5-11). | "ADOC does not accurately and consistently track prisoner deaths in the Facilities." (*Id.*). |
| Asking Williams what the word "changes" means as used in the Interrogatory answers, as well as asking what types of changes are referenced. (*Id.* at 138:2-8). | "ADOC does not consistently, thoroughly, or effectively implement changes in response to prisoner deaths in the Facilities." (*Id.*). |
| Asking Williams which part of ADOC's tracking process is not consistent. (*Id.* at 161:7-12). | "ADOC does not accurately and consistently track prisoner-on-prisoner assaults in the Facilities." (*Id.*). |
| Asking Williams which part of ADOC's reporting process for prisoner-on-prisoner assaults was not accurate. (*Id.* at 161:13-18). | "ADOC does not accurately and consistently track prisoner-on-prisoner assaults in the Facilities." (*Id.*). |
| Asking Williams if there is a reason the words "thoroughly" "consistently" and "effectively" are in a different order in one sentence than the other sentences it can be found in the Interrogatory answer. (*Id.* at 162:20-163:2). | "ADOC does not respond thoroughly, consistently, or effectively to reported prisoner-on-prisoner assaults in the Facilities." (*Id.*). |
| Asking Williams whether the meaning of the words "thoroughly" "consistently" and "effectively" as used in a specific sentence mean anything different than when he defined them earlier in the deposition. (*Id.* at 163:3-9). | "ADOC does not respond thoroughly, consistently, or effectively to reported prisoner-on-prisoner assaults in the Facilities." (*Id.*). |
| Asking Williams how ADOC's response to prisoner-on-prisoner assaults has been less than | "ADOC does not respond thoroughly, consistently, or effectively to reported |

| | |
|---|---|
| thorough. (*Id*. at 164:23-165:2). | prisoner-on-prisoner assaults in the Facilities." (*Id*.). |
| Asking Williams how ADOC's response to prisoner-on-prisoner assaults has been inconsistent. (*Id*. at 165:3-7). | "ADOC does not respond thoroughly, consistently, or effectively to reported prisoner-on-prisoner assaults in the Facilities." (*Id*.). |
| Asking Williams what the difference is, as used in the Interrogatory answer, between a response and a change. (*Id*. at 171:21-172:8). | "ADOC does not respond thoroughly, consistently, or effectively to reported prisoner-on-prisoner assaults in the Facilities." (*Id*.).<br><br>"ADOC does not consistently, thoroughly, or effectively implement changes in response to reported prisoner-on-prisoner assaults in Facilities." (*Id*.). |
| Asking Williams whether it is important to Plaintiff that ADOC correctly classify gang members. (*Id*. at 177:13-16). | "ADOC does not consistently, thoroughly, or effectively apply practices regarding the housing of security threat groups (STGs) in the Facilities." (*Id*. at 7). |
| Asking Williams what the word "ensure" means as used in the Interrogatory answer. (*Id*. at 179:7-13). | "ADOC does not consistently, thoroughly, or effectively ensure prisoners are in their assigned dorms in the Facilities." (*Id*. at 6). |
| Asking Williams if he can provide an explanation as to which type of count conducted by ADOC is not "consistently, thoroughly or effectively[.]" (*Id*. at 196:11-16). | "ADOC does not consistently, thoroughly, or effectively count prisoners to ensure prisoners are in their assigned dorms in the Facilities." (*Id*.). |
| Asking Williams the meaning of "disciplinary action" as used in the Interrogatory answer. (*Id*. at 208:3-13). | "ADOC does not consistently, thoroughly, or effectively enforce disciplinary action for prisoners who commit prisoner-on-prisoner assaults in the Facilities." (*Id*. at 7). |
| Asking Williams what "practices" Plaintiff refers to in the Interrogatory answer as it relates to the housing of STGs. (*Id*. at 209:5-9). | "ADOC does not consistently, thoroughly, or effectively apply practices regarding the housing of security threat groups (STGs) in the Facilities." (*Id*.). |
| Asking Williams whether he is contending that ADOC should house all members of the same gang in the same location. (*Id*. at 209:10-14). | "ADOC does not consistently, thoroughly, or effectively apply practices regarding the housing of security threat groups (STGs) in the Facilities." (*Id*.). |
| Asking Williams what is wrong about the manner in which ADOC is assigning STG affiliates to housing units. (*Id*. at 210:18-22). | "ADOC does not consistently, thoroughly, or effectively apply practices regarding the housing of security threat groups (STGs) in the Facilities." (*Id*.). |
| Asking Williams of the 75 times the phrase "consistently, thoroughly, or effectively" is used throughout the Interrogatory answer, whether he ever found one instance where | This question encompasses each instance where Plaintiff specifically stated "ADOC does not consistently, thoroughly, or effectively …" take certain actions. (See, |

| | |
|---|---|
| ADOC was doing something consistently, but they were not doing it thoroughly or effectively. (*Id.* at 211:22-212:7). | e.g., *id.* at 6) ("ADOC does not accurately, thoroughly, or effectively implement changes in response to prisoner deaths in the Facilities"); (*id.* at 7) ("ADOC does not consistently, thoroughly, or effectively apply practices regarding the housing of security threat groups (STGs) in the Facilities"); (*id.* at 8) ("ADOC does not consistently, thoroughly, or effectively investigate allegations of prisoner-on-prisoner sexual abuse in the Facilities"); (*id.* at 9) ("ADOC does not consistently, thoroughly, or effectively implement measures to protect victims who report sexual abuse from further harm in the Facilities"). |
| Asking Williams, if he is not aware of the communications regarding STG affiliations shared between facility staff and Central Office, how does he know that the sharing of information is not done consistently, thoroughly, or effectively. (*Id.* at 212:16-213:5). | "ADOC does not consistently, thoroughly, or effectively gather information on STGs and share intelligence between Facility staff and the Central Office to manage STGs." (*Id.* at 7). |
| Asking Williams whether the phrase "consistently, thoroughly, or effectively" has the same meaning as it relates to the amount of canteen items as Williams defined it earlier in the deposition. (*Id.* at 221:10-223:7). | "ADOC fails to consistently, thoroughly, or effectively limit the amount of canteen items purchased by individual prisoners in the Facilities." (*Id.*). |
| Asking Williams whether he considered the nature of the underlying complaint in forming allegations of inadequate investigations of LESD. (*Id.* at 233:7-14). | "ADOC Law Enforcement Services Division (LESD) fails to pursue investigations in the Facilities if a victim does not wish to prosecute or fails to name the alleged perpetrator." (*Id.*). |
| Asking Williams what is ineffective or inconsistent about the manner in which LESD interviews prisoners. (*Id.* at 243:9-13). | "LESD investigators do not thoroughly, consistently, or effectively interview prisoner witnesses, correctional officers assigned to the location of the incident, or other staff who may have witnessed the incident in the Facilities." (*Id.*). |
| Asking Williams what is not thorough, consistent or effective about the way LESD investigates correctional officers. (*Id.* at 243:14-18). | "LESD investigators do not thoroughly, consistently, or effectively interview prisoner witnesses, correctional officers assigned to the location of the incident, or other staff who may have witnessed the incident in the Facilities." (*Id.*). |

| | |
|---|---|
| Following Williams testifying he did not know whether LESD investigators ever review the incident reporting database, asking Williams how did he conclude that LESD investigators do not consistently review the incident reporting database. (*Id*. at 245:21-25). | "LESD investigators do not consistently review the incident report database or prior LESD investigations related to certain perpetrators or victims for incidents in the Facilities" (*Id*. at 7-8). |
| Asking Williams how did he determine that LESD investigators do not consistently review prior LESD investigations related to certain perpetrators or victims. (*Id*. at 246:1-6). | "LESD investigators do not consistently review the incident report database or prior LESD investigations related to certain perpetrators or victims for incidents in the Facilities" (*Id*.). |
| Asking Williams whether ADOC should track which prisoners have been the victims of physical violence. (*Id*. at 256:11-22). | "ADOC, including LESD, does not consistently, thoroughly, or effectively track which prisoners in the Facilities have been physically or sexually assaulted by other prisoners." (*Id*. at 8). |
| Asking Williams to clarify the meaning of Plaintiff's statement, "ADOC does not consistently, thoroughly, or effectively document requests for restrictive housing by prisoners based on a fear of physical or sexual harm." (*Id*. at 256:23-257:6). | "ADOC does not consistently, thoroughly, or effectively document requests for restrictive housing by prisoners based on a fear of physical or sexual harm." (*Id*.). |
| Asking Williams what is a corrective action. (*Id*. at 257:24-258:1). | "ADOC does not consistently thoroughly, or effectively recommend and implement corrective actions to address security and safety deficiencies revealed by LESD investigations." (*Id*.). |
| Asking Williams what types of security or safety deficiencies would be revealed by an LESD investigation. (*Id*. at 258:2-6). | "ADOC does not consistently thoroughly, or effectively recommend and implement corrective actions to address security and safety deficiencies revealed by LESD investigations." (*Id*.). |
| When discussing the "high number of sexual assaults," asking Williams how he determined whether it was an actual sexual assault or just an allegation of a sexual assault. (*Id*. at 258:23-259:8). | "ADOC had an unreasonably high number of prisoner-on-prisoner sexual assaults in the last several years in the Facilities." (*Id*.). |
| Asking Williams whether the "unreasonably high number of sexual assaults" includes allegations of assaults that were never substantiated. (*Id*. at 259:9-14). | "ADOC had an unreasonably high number of prisoner-on-prisoner sexual assaults in the last several years in the Facilities." (*Id*.). |
| Asking Williams what is inconsistent about LESD's investigations of sexual abuse in the facilities. (*Id*. at 262:22-263:20). | "ADOC does not consistently, thoroughly, or effectively investigate allegations of prisoner-on-prisoner sexual abuse in the Facilities." (*Id*.). |

| | |
|---|---|
| For each instance where Plaintiff stated "consistently, thoroughly, or effectively," asking Williams whether he is simply saying ADOC does these things, they just don't do them adequately, they don't do them good enough, or they need to do them better. (*Id.* at 268:9-19). | This question encompasses each instance where Plaintiff specifically stated "ADOC does not consistently, thoroughly, or effectively …" take certain actions. (*See, e.g.*, *id.*) ("ADOC does not consistently, thoroughly, or effectively investigate allegations of prisoner-on-prisoner sexual abuse in the Facilities."). |
| Asking Williams who the classification staff is as referenced in the Interrogatory answer. (*Id.* at 273:24-274:7). | "ADOC classification staff do not have input or authority on which housing units prisoners are placed at ADOC Facilities." (*Id.*). |
| Asking Williams what authority ADOC gives to its classification staff in terms of the assignment of prisoners to housing units. (*Id.* at 274:8-12). | "ADOC classification staff do not have input or authority on which housing units prisoners are placed at ADOC Facilities." (*Id.*). |
| Asking Williams, based on his review of documents and information, how he reached the decision that "consistently" was the appropriate word as used in the Interrogatory answer. (*Id.* at 282:22-283:2). | "ADOC does not consistently ensure that sexual predators are properly disciplined for allegations of sexual abuse." (*Id.* at 9). |
| Asking Williams why he personally has not identified the individuals that he contends are serial predators to ADOC. (*Id.* at 288:22-289:9). | "ADOC does not consistently, thoroughly, or effectively ensure that serial predators are prevented from committing sexual abuse against multiple victims at multiple Facilities." (*Id.*). |
| Asking Williams what his definition of "a timely manner" is as referenced in the Interrogatory answer. (*Id.* at 289:24-290:2). | "ADOC does not consistently, thoroughly, or effectively ensure that victims of sexual abuse are transferred for Sexual Abuse Nurse Examinations in a timely manner from the Facilities." (*Id.*). |
| Asking Williams how he knows evidence is not being tested timely if he does not know the exact parameters of how quickly tests are supposed to be run. (*Id.* at 293:21-294:7). | "ADOC does not consistently, thoroughly, or effectively ensure that evidence collected in Sexual Abuse Nurse Examinations is tested in a timely manner after victims report sexual abuse at the Facilities." (*Id.*). |
| Asking Williams that if a test is not run within 72 hours, is it fair to assume that means it is not done within a timely manner. (*Id.* at 295:7-12). | "ADOC does not consistently, thoroughly, or effectively ensure that evidence collected in Sexual Abuse Nurse Examinations is tested in a timely manner after victims report sexual abuse at the Facilities." (*Id.*). |
| Asking Williams what is wrong with the Special Investigators or the IPCMs reporting to the wardens. (*Id.* at 296:14-18). | "At some point in 2023, the Special Investigator IPCMs in the Facilities began reporting to the ADOC PREA Director and now the wardens claim no supervision, oversight, or insight into sexual abuse |

| | practices at the Facilities." (*Id*.). |
|---|---|
| Asking Williams what the increase in allegations of prisoner-on-prisoner sexual abuse is attributable to. (*Id*. at 297:1-298:1). | "ADOC's allegations of prisoner-on-prisoner sexual abuse increased from 2020 to 2021 and again in 2022." (*Id*. at 10). |
| Asking Williams why he wouldn't refer to 2023 numbers in the Interrogatory answer since Plaintiff answered the Interrogatories in 2024. (*Id*. at 298:15-22). | "ADOC's allegations of prisoner-on-prisoner sexual abuse increased from 2020 to 2021 and again in 2022." (*Id*.). |
| Asking Williams whether he can personally swear under oath that prisoner-on-prisoner sexual abuse increased from 2020 to 2021. (*Id*. at 299:3-7). | "ADOC's allegations of prisoner-on-prisoner sexual abuse increased from 2020 to 2021 and again in 2022." (*Id*.). |
| Asking Williams when he used the phrase "unreasonably high number" whether he could provide any specific numbers or analysis he did to conclude that the instances occurred with a certain number of frequency. (*Id*. at 300:22-301:6). | "ADOC had an unreasonably high number of uses of excessive force by correctional staff in the last several years in the Facilities." (*Id*.). |
| Asking Williams what he means by an "unreasonably high number of uses of excessive force." (*Id*. at 301:7-11). | "ADOC had an unreasonably high number of uses of excessive force by correctional staff in the last several years in the Facilities." (*Id*.). |
| Asking Williams whether the numbers he utilized in answering the Interrogatory included appropriate uses of force. (*Id*. at 301:12-17). | "ADOC had an unreasonably high number of uses of excessive force by correctional staff in the last several years in the Facilities." (*Id*.). |
| Asking Williams how he defines excessive use of force. (*Id*. at 301:18-21). | "ADOC had an unreasonably high number of uses of excessive force by correctional staff in the last several years in the Facilities." (*Id*.). |
| Asking Williams whether there is such a thing as an appropriate use of force. (*Id*. at 301:22-25). | "ADOC had an unreasonably high number of uses of excessive force by correctional staff in the last several years in the Facilities." (*Id*.). |
| Asking Williams what he means in the Interrogatory where it says, "ADOC staff in the facilities use force against prisoners as punishment." (*Id*. at 302:21-25). | "ADOC staff in the Facilities use force against prisoners as punishment." (*Id*. at 11). |
| Asking Williams which part of ADOC's use of force policy does ADOC not consistently apply or enforce. (*Id*. at 305:9-12). | "ADOC does not consistently, thoroughly, or effectively ensure that all correctional staff, including wardens, are familiar with use of force policies in the Facilities." (*Id*.). |
| Asking Williams which part of ADOC's use of force policy ADOC does not thoroughly enforce. (*Id*. at 305:13-17). | "ADOC does not consistently, thoroughly, or effectively ensure that all correctional staff, including wardens, are familiar with |

| | use of force policies in the Facilities." (*Id*.). |
|---|---|
| Asking Williams which part of ADOC's use of force policy ADOC does not effectively enforce. (*Id*. at 305:18-22). | "ADOC does not consistently, thoroughly, or effectively ensure that all correctional staff, including wardens, are familiar with use of force policies in the Facilities." (*Id*.). |
| Asking Williams whether his section on contraband refers primarily to weapons, drugs, and cell phones. (*Id*. at 310:17-21). | "ADOC, including LESD, does not consistently, thoroughly, or effectively track where knives, drugs, cellphones, or other contraband are found or consistently communicate relevant information on contraband to Facility leadership." (*Id*.). <br><br> "ADOC Facilities have an unreasonably large amount of contraband, including but not limited to weapons, drugs, and cellphones." (*Id*.). |
| Asking Williams what an appropriate number or reasonable number of cell phones to find at an ADOC facility would be. (*Id*. at 316:16-21). | "ADOC Facilities have an unreasonably large amount of contraband, including but not limited to weapons, drugs, and cellphones." (*Id*.). |
| Asking Williams what would be an appropriate amount of inmate-fashioned weapons in a facility in a year. (*Id*. at 316:22-317:1). | "ADOC Facilities have an unreasonably large amount of contraband, including but not limited to weapons, drugs, and cellphones." (*Id*.). |
| Asking Williams what would be a reasonable amount of marijuana to seize in a given year in a prison in Alabama. (*Id*. at 317:2-6). | "ADOC Facilities have an unreasonably large amount of contraband, including but not limited to weapons, drugs, and cellphones." (*Id*.). |
| Asking Williams what would be a reasonable amount of cocaine to seize in a given year in Alabama. (*Id*. at 317:7-11). | "ADOC Facilities have an unreasonably large amount of contraband, including but not limited to weapons, drugs, and cellphones." (*Id*.). |
| Asking Williams what would be a reasonable number of deaths from overdoses in an Alabama prison. (*Id*. at 317:12-16). | "ADOC had an unreasonably high number of deaths by overdose of prisoners in the last several years in the Facilities." (*Id*.). |
| Asking Williams if, in concluding that ADOC has an unreasonably high rate of overdose deaths, whether he relied on ADOC's own numbers. (*Id*. at 322:9-16). | "ADOC had an unreasonably high number of deaths by overdose of prisoners in the last several years in the Facilities." (*Id*.). |
| Asking Williams if he knows whether anyone evaluated whether ADOC has vacant critical posts on any given shift. (*Id*. at 323:14-18). | "ADOC does not consistently staff all critical posts in the Facilities." (*Id*. at 12). |
| Asking Williams what are alternative means of staffing as used in the Interrogatory answer. (*Id*. at 331:10-13). | "ADOC does not consistently, thoroughly, or effectively pursue alternative means of staffing in the Facilities." (*Id*. at 13). |

| | |
|---|---|
| Asking Williams to clarify the meaning of Plaintiff's statement, "ADOC has not taken advantage of all potential appropriated funding for correctional staff hiring." (*Id*. at 332:21-333:1). | "ADOC has not taken advantage of all potential appropriated funding for correctional staff hiring." (*Id*.). |
| Asking Williams what would be the source of the potential appropriated funding as referenced in the Interrogatory answer. (*Id*. at 333:12-15). | "ADOC has not taken advantage of all potential appropriated funding for correctional staff hiring." (*Id*.). |
| Asking Williams whether he means 51% of prisoners don't have access to programming based on the Interrogatory answer saying "majority." (*Id*. at 338:25-339:4). | "ADOC does not provide programs for the majority of prisoners in the Facilities." (*Id*.). |
| Asking Williams what is enough yard time. (*Id*. at 339:24-340:1). | "ADOC does not provide enough yard time for prisoners in the Facilities." (*Id*.). |
| Asking Williams whether an hour is enough yard time. (*Id*. at 340:2-5). | "ADOC does not provide enough yard time for prisoners in the Facilities." (*Id*.). |
| Asking Williams whether 12 hours is enough yard time. (*Id*. at 340:6-9). | "ADOC does not provide enough yard time for prisoners in the Facilities." (*Id*.). |
| Asking Williams whether he gained an understanding of the definition of "design capacity" by reading the definition in a deposition. (*Id*. at 341:2-23). | "Nearly all of the Facilities are holding more prisoners than the design capacity of the prison." (*Id*. at 14). |
| Asking Williams whether he is saying ADOC has no heating unit installed at all or that it is not functioning. (*Id*. at 345:23-346:1). | "Many ADOC Facilities lack heating." (*Id*.). |
| Asking Williams whether he can provide any more clarity about additional financial resources that Plaintiff claims is available to the State of Alabama. (*Id*. at 358:7-12). | "ADOC has not taken advantage of all potential appropriated funding for correctional staff hiring." (*Id*.). |
| Asking Williams what ADOC's "structural problems" are that are referenced in the Interrogatory answer. (*Id*. at 361:13-18). | "ADOC has been aware of the conditions and structural problems inside its Facilities for the last several years." (*Id*.). |
| Asking Williams what is a "major condition" as referenced in the Interrogatory answer regarding ADOC's alleged failure to address "major conditions or structural problems." (*Id*. at 362:15-21). | "ADOC takes years or fails to address major condition and structural problems inside the Facilities." (*Id*.). |

Defendants argue that the nearly seven-hour deposition of Williams (resulting in a 370-page transcript) did not seek the mental impressions of Plaintiff's counsel but rather sought "clarity as to the meaning behind terms used in Plaintiff's Interrogatory Responses (*e.g.*, "consistently," "thoroughly," "effectively," "alternative means of staffing," "potential appropriated funding") or

the facts that support Plaintiff's contention (*e.g.*, what about ADOC's process or practices are not consistent, thorough, or effective)." As such, Defendants say Plaintiff's objections were overly asserted, frustrated the deposition purpose, and wasted the Parties' time.

*Plaintiff's Position*

Plaintiff has objected to Defendants' request, asserting that Defendants' questions often violated the Court's Order (Doc. 247) by seeking privileged information developed in the course of Plaintiff's litigation team's investigation and analyses. Plaintiff maintains that it was not obstructing the deposition but protecting its work product. As such, questions about legal standards and conclusions were off-limits.

Additionally, Plaintiff disputes that Williams could testify on anything beyond his limited personal knowledge, which was provided in the deposition without privilege objections. Pointing to my earlier Report and Recommendation, Plaintiff notes that "Defendants [were] not entitled to require the Plaintiff to tender Williams to testify about how the Plaintiff intends to marshal the facts because this would require Plaintiff to reveal its counsel's work product. . . Defendants' questions must be specifically tailored to discovering facts underpinning Plaintiff's allegations in the Amended Complaint and facts like those contained in Williams' emails sent to Defendants." (Doc. 247). Plaintiff maintains that Defendants did not adhere to this and instead sought information as to Plaintiff's internal processes and how and why Plaintiff answered interrogatories in the way it did.

*Analysis*

Having reviewed the deposition transcript, the Parties' submissions, and the applicable legal standards, it is **respectfully recommended** that this Court deny Defendants' request for

additional time to depose Williams or for an Order requiring Williams to respond further to questioning.

## I.    Time Already Allotted

As an initial matter, the undersigned is not inclined to grant Defendants' request for additional time to depose Williams, given the amount of time already spent deposing Williams. Under Rule 30(d)(1) of the Federal Rules of Civil Procedure, a deposition is limited to one day of seven hours, unless otherwise stipulated or ordered by the Court. Defendants had nearly seven hours to question Williams and were given ample opportunity to explore facts within the scope allowed – namely his direct interactions with inmates via the inmate reporting hotline. Defendants' purported inability to extract the information sought during that time does not automatically entitle Defendants to an extension, particularly where the transcript reflects that significant time was spent on topics beyond the permissible scope, including questions calling for legal conclusions, probing into areas protected by privilege, or inquiries into areas beyond Williams' personal knowledge.

I am further persuaded that additional time to depose Williams is inappropriate due to the amount of time and opportunities Defendants had to prepare for the deposition. Defendants first noticed the Williams deposition on September 4, 2024 and the deposition occurred on April 8, 2025. During the interim between those dates, the Parties and the undersigned, through the first iteration of this discovery dispute, were focused on Williams, the interrogatory responses he verified, the appropriate scope of testimony to be sought, and applicable privilege(s). Even after the undersigned's earlier Report and Recommendation (Doc. 231) and Court Order adopting the same (Doc. 247), Defendants were given sufficient time to prepare for the Williams deposition and anticipate Plaintiff's objections. I am, therefore, not inclined to provide additional time on the Williams deposition merely based on the fact that Defendants were already given the opportunity

to properly prepare for and question Williams about facts he investigated during this litigation over the course of a nearly seven-hour deposition.

## II.    Inappropriate Lines of Questioning and Limited Utility in Further Deposing Williams

As an additional matter, the deposition transcript reflects repeated attempts by Defendants to elicit legal conclusions, interpretation of legal jargon, or strategic reasoning, rather than focusing on Williams' personal knowledge of facts supporting the claims and verified interrogatory responses. The following is a sample of such:

Q:          How did you determine – how did you evaluate whether this fact demonstrated deliberate indifference on the part of ADOC?

Counsel:    Object on privilege grounds. That is work product, and I will instruct him not to answer that question as asked.

            [. . .]

Q:          But when you said the word facilities here, you're referring – you refer us to the Second Amendment complaint, correct?

A:          I am not the person that drafted this.

Q:          No, you just swore to the direct truth of it.

            [. . .]

Q:          Help me understand this. Help me – I'm trying to understand is how you reached a conclusion that the number of homicides was unreasonably high, okay. And here's, I'm going to give you a hypothetical. If we had ten homicides in a single system, you would agree that you would have to assess the size of the system in terms of the number of facilities and the number of inmates, correct?

Counsel:    Object. The question as asked is work product. You asked him to reach a conclusion. Any conclusions reached in the interrogatories is work product, so I'm instructing him not to answer.

            [. . .]

Q:          Now, you testified earlier about your understanding of these three words, thoroughly, consistently, or effectively. But you put them in

|  | [a] different order here. It's thoroughly and consistently now, and effectively. Is there a reason why the order was different here? |
|---|---|
| Counsel: | Object to form. That's work product. Do not answer. |
| Q: | Do the meanings of these three words, are they any different here than they were when you defined them earlier? |
| Counsel: | Object to form and object to privilege as well. That's work product do not answer. |
|  | [. . .] |
| Q: | Okay. It says here that "ADOC does not ensure prisoners are in their assigned dorms in the facility." You see the word "ensure?" |
| A: | I do. |
| Q: | What does that mean? |
| Counsel: | Object. Work product. Do not answer. |

(Ex. A, pp. 101:18-25; 110:5-10; 122:11-25; 162:20-163:9; 179:7-13).

A deposition is not a forum to be used to demand answers to legal theories or internal deliberations of counsel or litigation team members. *See Covey v. Colonial Pipeline Co.*, 336 F.R.D. 514, 520 (N.D. Ala. 2020) (Proctor, J.) (explaining the near "absolute immunity" from discovery of "attorney's opinion work product—that is, materials containing the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation" (quotation marks and citation omitted)); *see also Lott v. Seaboard Systems R.R, Inc.*, 109 F.R.D. 554, 557-58 (S.D. Ga. 1985) (holding "[q]uestions seeking information about the underlying facts of this action would be permissible. However, questions seeking information about a lawyer's mental impressions and legal theories, as well as the mental impressions and subjective evaluations of the claims agent would be impermissible."); *Phoenix Nat. Corp. v. Bowater United Kingdom Paper Ltd.*, 98 F.R.D. 669, 671 (N.D. Ga. 1983) (rejecting

assertion that work product doctrine did not cover information obtained by investigator and determining that "questions posed to the deponents in this case [were] designed to elicit information which goes beyond the underlying facts").

Plaintiff properly raised objections based on the work product doctrine, legal conclusions, and deliberative process privilege. The undersigned declines to second-guess counsel's contemporaneous assertions of privilege absent a more concrete and substantiated showing that the withheld information falls outside those protections. Rule 26(b)(3) continues to safeguard against compelled disclosure of material "prepared in anticipation of litigation," particularly when sought through the deposition of a litigation team member.

Furthermore, it is my understanding that that much of the factual material underpinning Plaintiff's claims has been derived from documents and reports produced by Defendants. The Parties dispute whether the evidence supports the conclusions drawn from that evidence and whether the reports mirror that which has been reported to Williams from inmates calling the hotline he manages. For example:

Q:    You can look at the prior sentence above, ADOC does not accurately and consistently track prisoner-on-prisoner assaults in the facilities. . . Does ADOC track prisoner-on-prisoner assaults?

A:    They have a policy and procedure and a method of doing so. Yes, so as I understand it.

Q:    Have you reviewed the policy?

A:    I don't think I've review the policy, but I've reviewed the results of what is the tracking, whether the incident reports or other things that are similar.

Q:    Does ADOC compile those incident reports on a monthly basis?

A:    I believe they do.

Q:    Does ADOC review the incidents of prisoner-on-prisoner assaults that occur at each facility?

A:    What do you mean by that?

Q:    Do they review the results of –

A:    What does who at ADOC review the results?

Q:    Anyone.

A:    I don't have personal knowledge of that. But I am assuming in the course of normal business that he would review that.

      [. . .]

Q:    Okay. Have you taken that information [described in inmate hotline calls] and compared it to actual incident reports?

A:    I've done comparison more with the monthly reports that ADOC produces.

Q:    Have you done a comparison with the incident reports to see if incident reports reflect the incidents you've received reports of?

A:    In other words, you're asking me if the incidents that the inmates are telling me that are not reported, in fact then do get reported. Is that what you're saying?

Q:    Correct.

A:    Well, to give you a better sense of all of this, frequently if the inmates are talking about the number of incidents that occurred that are not reported, it's because no staff member ever arrives, or the inmates in fact hide the injury and never leave the dorm. So, there would be very little profit in trying to figure out if it ever did get reported, since it's clear that there's no one there to document it.

Q:    Still not my question. Have you taken your list of information about these incidents that you say have not been reported to or by ADOC, and searched the incident reports to see if those ever occurred? Or were they ever documented?

A:    Many of the incidents that were reported to me do not have all the details – names, the exact times, exact injuries, to the point where I would then be able to simply do a search through the incident reports. The key thing would be always the name of the inmate, and that is usually one of the hardest things to get. But the report of the incident, the evidence of the incident that the inmates are aware of, either through directly seeing it themselves, or

> seeing the aftermath of it, that I note, but that is not something you can then cross-reference with ADOC's statistical reports or incident reports.
>
> [. . .]
>
> Q:    Have you compared the information you've received from inmates about alleged incidents that were not reported to or by ADOC, have you taken that information and compared it to the incident reports to see if in fact an incident report has been generated?
>
> A:    I usually did not have enough information to look at incident reports in such a way that would have brought these two incidents together.

(Ex. A, pp. 147:14- 148:18; 155:7-156:23; 157:16-25). I am not persuaded that reopening the deposition will yield meaningful or new factual information.

## III.    Proportionality and Case Management Concerns

As an additional matter, under Rule 26(b)(1), discovery must be "proportional to the needs of the case." Given the extensive discovery already conducted and the narrow factual issues at stake in this particular deposition, the burden and expense of reopening the deposition outweigh any likely benefit. The Court has already expended significant time managing discovery disputes between the Parties and, in my opinion, it is not a wise use of resources to continue indulging micro-litigation over this deposition, as it is neither necessary nor productive. *See, e.g., Perez v. Miami-Dade Cnty.*, 297 F.3d 1255, 1263 (11th Cir. 2002) (a district court is "entitled to broad discretion in managing pretrial discovery matters"); *Jordan v. Comm'r, MS Dept. of Corr.*, 947 F.3d 1322, 1329-30 (11th Cir. 2020) (courts have discretion to manage discovery in a manner that avoids undue burden or expense); *Gulledge v. DePuy Orthopaedics, Inc.*, 699 F. Supp. 3d 1261, 1265 (S.D. Ala. 2023) ("Rule 26 requires that discovery be "proportional to the needs of the case. . . A court must weigh the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery

outweighs its likely benefit.' 'Where a significant amount of discovery has been obtained, and it appears that further discovery would not be helpful in resolving the issues, a request for further discovery is properly denied.'") (internal citations omitted).

Furthermore, it is worth noting that this case is scheduled for a bench trial, not a jury trial. That distinction is meaningful in the context of discovery management and evidentiary presentation. As the Parties are no doubt aware, in bench trials, the trial judge can rely on his or her own legal training and ability to disregard irrelevant or inadmissible evidence, thereby reducing the need for extensive discovery designed to protect against jury confusion or prejudice. Accordingly, the Defendant's justification for extending the deposition – namely, to probe the factual bases for claims and legal theories asserted by Plaintiff – carries less weight here. The Court, as the ultimate factfinder, is already in possession of the verified interrogatory responses and has sufficient tools to evaluate the reliability, completeness, and weight of the evidence to be presented at trial. There is no risk that a jury will be misled or confused in the absence of additional deposition testimony from Williams, nor is there a need to further burden the discovery process with cumulative testimony where the Court can directly assess and scrutinize the evidentiary record in its final form.

### RECOMMENDATION

IT THEREFORE IS RESPECTFULLY RECOMMENDED that this Court DENY Defendants' request for additional time to depose Williams or an Order to respond to questions Plaintiff objected to during the April 8, 2025 Williams deposition.

Pursuant to Section 4(a) of this Court's November 9, 2021 Order, objections to this Report and Recommendation are due seven days after the issuance of the Report and Recommendation.

Briefs in support of the Report and Recommendation are due seven days after the objection. Replies are due five days after the brief in support.

Respectfully recommended on November 24, 2025.


/s/ R. Bruce Barze, Jr.
Special Master

R. Bruce Barze, Jr.
BARZE TAYLOR NOLES LOWTHER LLC
Lakeshore Park Plaza
2204 Lakeshore Drive, Suite 425
Birmingham, Alabama 35209
(205) 872-1015
bbarze@btnllaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of November, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

*/s/ R. Bruce Barze, Jr.*
Special Master