FILED

2025 Nov-24  PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit B

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
 2               SOUTHERN DIVISION
 3                          + + + + +
 4        _____
                                         :
 5        IN THE MATTER OF:              :
                                         :
 6        UNITED STATES OF AMERICA,      :
                                         :
 7                   Plaintiff,          :
                                         :
 8           v.                          :   Civil Action No.
                                         :   2:20-cv-01971-RDP
 9                                       :
         STATE OF ALABAMA, et al.,       :
10                                       :
                     Defendants.         :
11                                       :
         _____:
12
                         Tuesday,
13                       April 8, 2025
14                       Washington, D.C.
15
         DEPOSITION OF:
16
                         MARK WILLIAMS
17
         called for examination by Counsel for the
18       Defendants, pursuant to Notice of Subpoena, at
         the United States Department of Justice, located
19       at 150 M Street NE, when were present on behalf
         of the respective parties:
20
21
22
23
24
25
```

Page 2

1 APPEARANCES:
2
   On Behalf of Plaintiff:
3
   CARLA C. WARD, ESQ.
4  United States Attorney's Office
   1801 4th Avenue North
5  Birmingham, Alabama 35203-2101
   205-603-3599
6  carla.ward@usdoj.gov
7  KERRY K. DEAN, ESQ.
   United States Department of Justice
8  950 Pennsylvania Avenue NW
   Washington, D.C. 20530
9  202-258-3036
   kerry.k.dean@usdoj.gov
10
11 On Behalf of Defendants:
12 WILLIAM (R. LUNSFORD, ESQ.
   LYNETTE E. POTTER, ESQ.
13 Butler Snow LLP
   200 West Side Square
14 Suite 100
   Huntsville, Alabama 35801
15 256-936-5650 (Lunsford)
   256-936-5615 (Potter)
16 bill.lunsford@butlersnow.com
   lynette.potter@butlersnow.com
17
18 ALSO PRESENT:
19 AUSTIN HUANG, Paralegal, Department of Justice
   NATALIE LITTLE, Intern, Department of Justice
20 KRISTI SIMPSON, Paralegal, Butler Snow
21
22
23
24
25

Page 3

1                CONTENTS
2  WITNESS       DIRECT CROSS REDIRECT RECROSS
3  Mark Williams      5    366
4
5  EXHIBIT NO.                        PAGE
6  Exhibit 1 Subpoena to Testify at a Deposition    94
              in a Civil Action
7  Exhibit 2 The United States Objections and      95
              Responses to Defendant's Second Set
8             of Interrogatories
   Exhibit 3 Alabama Department of Correction      235
9             Incident Report ELMCF-24-00494
   Exhibit 4 State of Alabama Department of         255
10            Corrections Administrative
              Regulation Number 440 Inmate Drug
11            Screening dated June 30, 2023
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              P-R-O-C-E-E-D-I-N-G-S
2                  9:04 a.m.
3          VIDEOGRAPHER:  Time on the record is
4  9:04 a.m. Eastern Time.  Today's date is April
5  8th, 2025.  This is the video deposition of Mark
6  Williams taken by the defendant in the matter of
7  United States of America versus State of Alabama
8  filed in the United States District Court for the
9  Northern District of Alabama, Southern Division,
10 case number 2:20-cv-01971-RDP.
11         The location of our where -- excuse
12 me.  The location of the deposition is the United
13 States Department of Justice Civil Division in
14 Washington, D.C.  My name is Robert Leonard.  I'm
15 the video specialist.  I represent Veritext.  The
16 court reporter is Margaret Vanni.  She also
17 represents Veritext.
18         Will counsel please identify
19 themselves verbally and state who they represent?
20 And Counsel, please add the -- add your
21 colleagues as you're identifying yourself,
22 starting with the taking attorney.
23         MR. LUNSFORD:  I'm Bill Lunsford, and
24 Lynette Potter for the State of Alabama.
25         MS. WARD:  Carla Ward and Kerry Dean

Page 5

1  for the United States.
2          VIDEOGRAPHER:  Will the court reporter
3  please swear in the witness?
4  WHEREUPON,
5              MARK WILLIAMS
6  was called for examination by Counsel for the
7  Defendant, having been first duly sworn, was
8  examined and testified as follows:
9            DIRECT EXAMINATION
10   BY MR. LUNSFORD:
11   Q    Good morning, Mr. Williams.
12   A    Good morning.
13   Q    Mr. Williams, would you please state
14 your full legal name?
15   A    Mark Alexander Williams.
16   Q    Mr. Williams, how long is it -- have
17 you been employed by the United States Department
18 of Justice?
19   A    As a federal employee, I have been
20 with the Department of Justice since January the
21 3rd of 2022.  Prior to that, I was employed in
22 the same location, but as a contractor.  That
23 roughly was from May of '17 to the point at which
24 I became a federal employee.
25          I was also a federal employee for four

2 (Pages 2 - 5)

Page 6

1  years prior to the contracting job from sometime
2  in February of 2013 to February of 2017 in the
3  Department of Justice's Criminal Division, so
4  that constitutes my entire federal-related
5  employment.
6      Q    During the period of time when you
7  were a contractor for the Department of Justice,
8  were you directly employed by another entity that
9  had a contract?
10     A    Correct, CACI, C-A-C-I, is the entity.
11     Q    Where is CACI based out of?
12     A    Well, they're in the DMV area, so I
13  think they have a headquarters somewhere in
14  Virginia, Northern Virginia.
15     Q    What is your current title?
16     A    The exact title is equal opportunity
17  investigator.
18     Q    As an -- can you just briefly describe
19  for the court what functions you fulfill as an
20  equal opportunity investigator for the Department
21  of Justice?
22     A    Well, I work, I'm assigned to the
23  Special Litigation Section within the Civil
24  Rights Division, and specifically I work within
25  the Correctional Practice Group, so that is

Page 7

1  essentially -- I function as an investigator for
2  our prison investigations and all of that.
3  There's a variety of things that that entails.
4      Q    How long has your work been primarily
5  focused on the operations of a correctional
6  facility such as a jail or a prison?
7      A    More or less since I arrived as a
8  contractor in February of, excuse me, May of '17,
9  perhaps with a few months' delays for the
10  orientation period, but more or less sometime in
11  mid to late 2017.
12     Q    Prior to May of 2017, had you ever
13  visited a jail or a prison?
14     A    No, I had not.
15     Q    Okay.  Have you ever worked full-time
16  at a jail or a prison?
17     A    I have not.
18     Q    Do you know, since May of 2017, how
19  many different investigations you've been
20  involved in?
21     A    Well, one gets assigned to
22  investigations and when one first arrives, so
23  one's involvement with some of those might be
24  minimal.  They might be at a later stage, but I
25  have had on my docket, as we refer to it,

Page 8

1  approximately maybe ten different matters, one of
2  which was not a correctional matter.  It was in a
3  different practice group of the Special
4  Litigation Section.
5      Q    What type of matter was that?
6      A    That was a disability rights case out
7  of Mississippi.
8      Q    Involving what type of institution or
9  agency?
10         MS. WARD:  Objection, just before we
11  get into any other investigations that he's been
12  a part of, I would like to note that he can't
13  talk about any other investigations under the law
14  enforcement investigatory privilege and --
15         MR. LUNSFORD:  A disability rights
16  case?  A public investigation?  He can't say --
17  he can't identify that he's been involved?
18         MS. WARD:  He hasn't said it's public.
19         BY MR. LUNSFORD:
20     Q    Is it a public investigation?
21     A    It is.
22         MS. WARD:  He can describe it
23  generally, but we can't go into details of all
24  the matters he's worked on.
25         MR. LUNSFORD:  I haven't asked a

Page 9

1  single detail, Carla.  All that is is an
2  unnecessary disruption to this deposition.
3         MS. WARD:  No, there will be --
4         MR. LUNSFORD:  What entity --
5         MS. WARD:  Bill?
6         MR. LUNSFORD:  -- or agency was --
7         MS. WARD:  Hey, Bill, can I --
8         MR. LUNSFORD:  Let me finish the
9  question and then you can decide whether you
10  object.
11         BY MR. LUNSFORD:
12     Q    What entity or agency of the State of
13  Mississippi was under investigation for this
14  alleged disability rights violation?
15         MS. WARD:  You can answer.
16         THE WITNESS:  Okay.  That would have
17  been, I'm not going to remember the exact title
18  of this government agency, but essentially the
19  agency that oversees mental illness, so it might
20  have been the Department of Public Health or
21  Department --
22         I'm not going to remember it right
23  now, but it involved a case where people with
24  serious mental illnesses were being
25  institutionalized in the state hospitals, and the

3 (Pages 6 - 9)

Page 10

1  case was about the Americans with Disabilities
2  Act, the ADA, and so it related to suing them,
3  and this was a long investigation. I came in at
4  the tail end when it went to trial, related to
5  the fact that people were being over-
6  institutionalized.
7       BY MR. LUNSFORD:
8       Q   So, this case, which your counsel
9  object to, previously as being subject to some
10 kind of investigative privilege actually went to
11 trial?
12      A   It went to trial and it -- a judgment
13 was made. It went on appeal. Defendants won on
14 appeal.
15      Q   How long was the trial?
16      A   I'm going to say about a month.
17      Q   Where was it tried?
18      A   Jackson, Mississippi.
19      Q   Did you attend the trial?
20      A   I did.
21      Q   Who was the presiding district court
22 judge?
23      A   Forget his first name, but it's
24 Reeves.
25      Q   Did you testify at trial?

Page 11

1       A   No.
2       Q   Do you recall who from Main Justice
3  tried that case?
4       A   It was a large team, so it's a whole
5  slew of attorneys, probably the bulk of which are
6  no longer here.
7       Q   So after DOJ lost that case on appeal,
8  what happened with the case?
9       A   I could not tell you at this time. It
10 did not go any further than the loss on appeal in
11 the courts. That much, I provided, is correct.
12      Q   The nine other investigations that you
13 have been assigned to or have been on your
14 docket, it seems to me you were saying earlier,
15 please correct me if I'm wrong, that those all
16 involved some form of correctional facility or
17 agency?
18      A   If it is nine. That's not an exact
19 number. That was an estimate. I'm not counting
20 them up in my head. I probably don't remember
21 one or two early on, but that would be correct.
22      Q   And prior to May of '17, you had not
23 investigated any jail or prison?
24      A   I had not.
25      Q   Okay. Are all of the other

Page 12

1  investigations of a jail, or a prison, or
2  multiple facilities that you've been assigned to,
3  are all of those public?
4       A   No.
5       Q   How many are not public?
6       A   Oh, excuse me, what do you mean by
7  public?
8       Q   Has a notice of investigation been
9  publicly issued?
10      A   Okay, yes, they are public.
11      Q   Okay. Could you just walk me through
12 each of those investigations in terms of the
13 identity of the entity or agency being
14 investigated?
15      A   The Georgia Department of Corrections,
16 Trousdale Turner, that's T-R-O-U-S-D-A-L-E Turner
17 Correctional Facility, I believe, which is a
18 CoreCivic facility in Tennessee, the Mississippi
19 Department of Corrections, Manson Youth Facility,
20 I may not be getting the name correct a hundred
21 percent, but that is in the State of Connecticut,
22 the State of Connecticut.
23         I'm sorry, I will have to correct
24 myself. One of the cases I've been assigned to
25 was actually what we call a RLUIPA matter.

Page 13

1  That's an acronym --
2       Q   Sure, yeah.
3       A   R-L-U-I-P-A, or is it U-I-P-A? I
4  forget. That's also in the State of Connecticut,
5  so that's the one other one.
6          The State of Massachusetts Department
7  of Corrections, Meridian, the City of Meridian in
8  Mississippi. I don't remember the exact entity,
9  but it also related to youth facilities,
10 correctional facilities. I may be missing one
11 right now, but I cannot think of it at the
12 moment. I'm sorry.
13      Q   No, that's fine. So, I've got a total
14 of seven here. Let me just run through.
15      A   Seven corrections or seven total?
16      Q   Seven total cases that you just
17 mentioned from Georgia to the City of Meridian.
18      A   And I didn't mention Alabama.
19      Q   And Alabama, right. Of those now
20 eight matters that you've mentioned, were you
21 involved in each of those investigations from the
22 inception of the case or matter?
23      A   No, and I need to clarify the Georgia
24 Department of Corrections one because there was
25 an earlier version of it that was the Georgia

Page 14

1  Department of Corrections, but it was based on
2  the LGBTI rights of -- LGBTI community, and that
3  was, that remained open technically, and then it
4  was folded into a larger investigation, then we
5  opened that in 2021, so I was assigned to that.
6  You could argue that that was maybe a separate
7  one. So, your question is, sorry, again? Can
8  you repeat the question that I interrupted you
9  on?
10      Q    No, you're fine. Did you participate
11  in all of these eight investigations from
12  inception?
13      A    No, I did not.
14      Q    Which ones, which of these matters
15  were you involved in in terms of the, from
16  beginning to, I guess, current status, whatever
17  that might be?
18      A    I sometimes was on cases from the
19  beginning, but I am no longer on those cases, so
20  do you need me to distinguish that as well?
21      Q    That'd be helpful.
22      A    All right, so I was on the Mississippi
23  matter from the beginning, but I am no longer on
24  the Mississippi matter. I was on the Georgia
25  Department of Corrections matter that opened in

Page 15

1  2021 from the beginning and I am still on that
2  matter.
3          I was on the Trousdale Turner
4  investigation from the beginning and I am still
5  on that matter. The -- I think that concludes
6  all of the ones that I was in on from the so-
7  called inception.
8      Q    Let's just run through those.
9  Obviously, the investigation of the Georgia
10  Department of Corrections involves many issues
11  similar to the investigations in the State of
12  Alabama, is that correct?
13      A    Yes, it does.
14      Q    Okay, so, for example, issues related
15  to inmate on inmate violence, whether that be
16  physical violence or sexual violence, is an issue
17  in Georgia, isn't it?
18      A    Correct.
19      Q    Also issues with respect to the
20  classification -- and the treatment of LGBTQI
21  individuals is also an issue in that case,
22  correct?
23      A    But it is not explicitly an issue in
24  Alabama, LGBTI.
25      Q    That's right. How many facilities

Page 16

1  were investigated in Georgia?
2      A    Well, it involved all medium and
3  closed security facilities or facilities that
4  housed medium and closed security inmates. That
5  was not the totality of the state's facilities,
6  but we -- I think we announced the investigation
7  to include 30, something like 37, 38 different
8  prisons, but if you're asking how many we
9  visited, that's a different question.
10      Q    How many did you visit?
11      A    Me personally or the team?
12      Q    You personally. I know at least of
13  seven.
14      A    It might be seven or eight. I don't
15  have an exact number. I'd have to start counting
16  it up. I haven't --
17      Q    Okay.
18      A    But it's -- I was at roughly half the
19  investigations.
20      Q    Okay, and we --
21      A    Tours, excuse me.
22      Q    We attended some of those site tours
23  together, right?
24      A    Yes, we did.
25      Q    Okay. Do you know of another

Page 17

1  investigation instituted by the United States
2  Department of Justice against a correctional
3  agency that covered more facilities than the
4  Georgia case?
5          MS. WARD: Objection, I just want to
6  make sure the parameters are set. You can only
7  say that if you do know and if it's public
8  information.
9          MR. LUNSFORD: Can I say that that's
10  not appropriate?
11          MS. WARD: How is it not appropriate?
12          MR. LUNSFORD: So, the rule says that
13  depositions should proceed as if we were sitting
14  in a courtroom, and the only objection you have
15  is objection to the form, but you can't sit there
16  and say you should only answer this question if X
17  is true.
18          You couldn't do that in court and you
19  can't do it here, it's not appropriate and I
20  don't appreciate the coaching of the witness.
21  So, if you have an objection, you can say
22  objection to the form.
23          If it's a privilege objection, then
24  you're entitled to articulate the privilege, but
25  you're not entitled to these narrative objections

5 (Pages 14 - 17)

1  which we have not done throughout the hundred and
2  something depositions we've done with you guys.
3      MS. WARD:  Well, in this case, this is
4  a unique deposition in which we have --
5      MR. LUNSFORD:  The rules have not been
6  suspended.
7      MS. WARD:  Bill, may I finish my
8  objection, which is to put on the record this is
9  a unique deposition in which we have a very
10  specific court order that was provided related to
11  this deposition, and in that order, the court
12  says Plaintiff's counsel may protect against the
13  disclosure of work product or privileged
14  information in the Williams deposition by
15  interposing appropriate objections and giving
16  instructions on a question by question basis, and
17  the court says that on page 14 of Document 231.
18      It's court order related specifically
19  to the Mark Williams deposition in which the
20  court acknowledge there were unique privileges
21  and concerns related to Mr. Williams' deposition
22  that's not present in other cases because he is
23  an employee of the Department of Justice.  So I
24  will continue to make objections on a question by
25  question basis and direct him to answer or not

1  answer based on those privileges.
2      BY MR. LUNSFORD:
3      Q    Mr. Williams, are you aware of an
4  investigation by the United States Department of
5  Justice of a correctional agency that is larger
6  in terms of the number of facilities or the
7  number of incarcerated individuals covered by the
8  investigation than the State of Georgia?
9      MS. WARD:  And if I may object and say
10  that anything that is not public would be covered
11  by privilege.
12      BY MR. LUNSFORD:
13      Q    I'm just asking, are you aware?
14      A    Can I get a clarification?  Are you
15  meaning throughout history or at the moment?
16      Q    Throughout history.
17      A    That, I would not be able to answer.
18  At the moment, I believe the Georgia prison
19  investigation is the largest correctional
20  investigation that we have launched in my time
21  being here.
22      Q    Are you aware of the statutory
23  authority that DOJ operates under in terms of
24  investigating jails or prisons?
25      A    Are you referring to CRIPA?

1      Q    Yes.
2      A    Yes, I am.
3      Q    Do you know what CRIPA stands for?
4      A    I always forget the exact order in
5  which, but yes, it's an institutionalized persons
6  act under which we are able to do these
7  investigations and have various other powers that
8  allow for that, and I am not, obviously, as you
9  know, a lawyer, but, and I haven't read the act
10  from top to bottom, but it informs our work, so I
11  have a broad and at times more specific
12  understanding of what CRIPA is.
13      Q    Would you agree that most of the cases
14  that you've been, you've participated in have
15  involved a single facility?
16      MS. WARD:  Object to form.
17      THE WITNESS:  Have most of them?
18      MR. LUNSFORD:  Yes.
19      THE WITNESS:  Do you mean by most
20  simply the majority?
21      MR. LUNSFORD:  Yes.
22      THE WITNESS:  Well, I mentioned -- no,
23  I would not agree because Georgia, Alabama,
24  Mississippi, Massachusetts, Connecticut RLUIPA,
25  if we're including that, all include, I think

1  included the entire system or close to the entire
2  system, certainly not single facilities.
3      BY MR. LUNSFORD:
4      Q    Do you know how many facilities were
5  covered under the Massachusetts matter?
6      A    Offhand, I don't remember.  I'm sorry.
7      Q    What was the issue in the
8  Massachusetts investigation?
9      A    My time on that was brief, so I am not
10  as versed in my memory on that one, but there was
11  issues related to people being kept in
12  restrictive housing, self-harming, so there was a
13  strong and serious mental illness component to
14  it, and I think that was it.  I can't remember if
15  we filed that under the 8th or 14th Amendment as
16  I sit here today.
17      Q    What's the current status of the
18  Massachusetts investigation?
19      A    I have not been on it for quite a
20  while.  My time on that team was maybe six
21  months, maybe a little more than that, but not
22  much more than that.  I believe we came to some
23  sort of agreement with the state, and I don't
24  know if it's been all finalized and signed off
25  on.  I haven't kept up with it.

Page 22

1    Q    Did you attend site visits in
2  Massachusetts?
3    A    I did, yes.
4    Q    Who attended site visits with you?
5        MS. WARD: Object, form. This
6  information is not necessarily public --
7        MR. LUNSFORD: Sure, it is.
8        MS. WARD: -- the decisions of who
9  attended site visits, who was present.
10        MR. LUNSFORD: I mean, I can -- you
11  can go find out who walked into the prison that
12  say. Sure, that's public.
13        MS. WARD: How is it public?
14        MR. LUNSFORD: I mean, it was written
15  in a log somewhere you walked publicly into the
16  prison. I mean, it could have been observed from
17  the street that you walked in, so that's --
18        MS. WARD: I don't think decisions --
19        MR. LUNSFORD: Are you instructing him
20  not to answer?
21        MS. WARD: I am instructing him not to
22  answer.
23        MR. LUNSFORD: Okay.
24        BY MR. LUNSFORD:
25    Q    How many site visits did you attend?

Page 23

1    A    I'm not going to remember this
2  exactly, but I think I attended three.
3        MR. LUNSFORD: Okay. Mr. Williams,
4  just to be fair with you, we'll -- if -- you're
5  free to follow the attorney's instructions. We
6  reserve the right to ask you all of these
7  questions, so we're probably going to have to end
8  up back in court to go through these matters.
9        BY MR. LUNSFORD:
10    Q    Can you tell me how many people
11  attended the site visits in Massachusetts with
12  you?
13    A    From DOJ you mean?
14    Q    Just, no, how many total?
15    A    I don't understand the difference.
16    Q    Who did DOJ bring with it to the site
17  visits?
18        MS. WARD: Object to privilege.
19        MR. LUNSFORD: Privilege?
20        MS. WARD: Who did DOJ bring to the
21  site visits?
22        MR. LUNSFORD: Yeah, you don't think
23  the State of Massachusetts knew who you all
24  brought?
25        MS. WARD: Yeah, but you don't know,

Page 24

1  and that's part of --
2        MR. LUNSFORD: That's not a privilege,
3  though.
4        MS. WARD: -- the investigation. It
5  is. It's an investigatory privilege.
6        MR. LUNSFORD: The party Massachusetts
7  knows you brought, but nobody else can know? The
8  inmates knew in Massachusetts.
9        MS. WARD: I don't know whether
10  Massachusetts has revealed that information,
11  everyone who attended. So, this is part of DOJ's
12  investigatory process, case investigation
13  decisions, including who attended the tours as
14  part of the investigation, so I'm going to
15  instruct him not to answer.
16        BY MR. LUNSFORD:
17    Q    Did you retain -- did you work with a
18  consultant in Massachusetts?
19    A    Did I or the team?
20    Q    Either.
21    A    I believe we had some consultants,
22  correct.
23    Q    Who were the consultants?
24        MS. WARD: Object, this is not public
25  information necessarily. There were no expert

Page 25

1  disclosures that I know of and who were the
2  expert consultants related to Massachusetts'
3  privileged information, so I'm going to instruct
4  him not to answer.
5        BY MR. LUNSFORD:
6    Q    On DOJ's website, there's a designated
7  qualified expert baseline report from April of
8  2023, and September of '23, and March of 2024 and
9  September of '24. Do you know who issued the
10  publicly released baseline reports?
11    A    I was not involved with the case at
12  that time.
13    Q    Okay. In your experience, Mr.
14  Williams, does DOJ typically publish privileged
15  information on its website?
16    A    No.
17        MR. LUNSFORD: Okay.
18        MS. WARD: And Bill, if I may
19  interject, those reports are monitoring reports
20  which are public, but who were expert consultants
21  on the investigative stage is not public, so it
22  would be privileged.
23        MR. LUNSFORD: Okay. I guess we'll
24  get to deal with that along the way too.
25        BY MR. LUNSFORD:

Page 26

1     Q    Were you -- so, are you aware of how
2   the Massachusetts investigation was resolved?
3         MS. WARD:  And Mark, you may answer
4   only if that is publicly available information.
5   If it was resolved in any private settlement
6   that's not public, you cannot reveal that.
7         THE WITNESS:  I believe it's a public
8   settlement, but I don't have the details.
9         BY MR. LUNSFORD:
10    Q    My only question was were you involved
11  in the settlement itself?
12    A    No, no, as I indicated earlier, I was
13  on it for a brief period of time, and so by the
14  time you get to that stage, I was no longer on
15  the case.
16        All right, let's go back.  What is the
17  current status of the investigation in the State
18  of Georgia?
19    A    Well, I think you know to a certain
20  degree.
21    Q    I can't testify, unfortunately.
22    A    All right, well, we concluded our
23  investigative phase that involves the publishing
24  of a findings report or letter that was published
25  on October 1 of last year, and the parties are

Page 27

1   engaged in talks would be the simplest way of
2   describing where we are at the moment.
3     Q    When you say talks, you mean
4   settlement negotiations are ongoing right now?
5     A    I suppose.  I don't know if they're
6   called that officially, but yes.
7     Q    Okay, on the Massachusetts matter, did
8   DOJ believe that the State of Massachusetts was
9   violating individuals' constitutional rights?
10    A    If you open an investigation, you open
11  them on the basis of a belief or a sense based on
12  research that you have done or things --
13  information that has come to you that there is
14  cause to investigate.
15        In other words, there's concerns about
16  that, but I was not involved with the case at the
17  stage where a final, you know, a final moment, as
18  it were, in the investigation was arrived at, so,
19  I can't speak to that.
20    Q    Okay.  Would it be fair to say that
21  DOJ issued a notice of investigation letter to
22  the State of Massachusetts based on a sense or
23  belief, to use your term, that there was cause to
24  investigate?
25        MS. WARD:  Object to form.

Page 28

1         THE WITNESS:  Yes.
2         MR. LUNSFORD:  Okay.
3         THE WITNESS:  That is the case with
4   every single case that we do.
5         BY MR. LUNSFORD:
6     Q    In the Massachusetts case, did you
7   believe that or did you observe conditions that
8   you believe violated an individual's
9   constitutional rights?
10        MS. WARD:  Object to form.
11        THE WITNESS:  Well, that wasn't -- I
12  don't think I was able to form completely at that
13  time what I thought.  There were issues there
14  clearly that we had identified and that I
15  witnessed personally when I was in the prison.
16        The conclusion that you're asking
17  about is partially legal and I certainly didn't
18  have the qualifications as such to make a
19  determination if they rose to those legal
20  standards, but, and I didn't stay on the case for
21  more than, you know, a brief period of time.
22        I wasn't involved in the writing up of
23  a lot of stuff.  So, I didn't fully formulate an
24  opinion in that fashion other than to note that
25  some of the things that I witnessed there were

Page 29

1   troubling.
2         BY MR. LUNSFORD:
3     Q    Can you give me an example of
4   something you witnessed that was troubling?
5         MS. WARD:  Object, I just -- I'm going
6   to have to object to this whole line of questions
7   as privileged.  His work on that, it's part of
8   the investigation and as an employee of the
9   Department of Justice is privileged.
10        So, the public reporting on behalf of
11  the team of investigators is public information,
12  and any monitoring reports on the website is
13  public information, but he is here in this
14  capacity as a government employee, not in his
15  personal capacity, and his personal opinions and
16  things he witnessed as part of the case team, as
17  part of the investigation is privileged, so I'm
18  going to instruct him not to answer.
19        MR. LUNSFORD:  We're entitled to ask
20  things that are of his personal knowledge and the
21  order clearly says that.
22        MS. WARD:  So the order says questions
23  must be specifically tailored --
24        MR. LUNSFORD:  I --
25        MS. WARD:  -- to discovering --

8 (Pages 26 - 29)

Page 30

1      MR. LUNSFORD: We don't have to read
2  the order.
3      MS. WARD: Well, I'm just going to --
4  (Simultaneous speaking.)
5      MR. LUNSFORD: No, no, here's the
6  thing.
7      MS. WARD: Bill, I --
8      MR. LUNSFORD: It seems like the goal
9  for you is to sit on the record and just take up
10 time so I can't answer him questions -- ask him
11 questions, so let me say this. What I'm going to
12 start doing is I'm going to start counting the
13 minutes, because we've already been -- you've
14 been on the record, I believe, six minutes so far
15 with one objection that proved to be frivolous, a
16 second one in which you instructed him not to
17 answer, which I am moving on past, and now you're
18 reading out of the order.
19     I don't know if this is a tactic of
20 some kind, but it's inappropriate for you to
21 prevent me from asking the next question. If you
22 have an objection, state the objection succinctly
23 and let me move on and question this witness
24 rather than interfering with my deposition,
25 please.

Page 31

1      MS. WARD: So, I will be allowed to
2  state my objections on the record and provide
3  instructions as ordered by the court, and on page
4  14 of the court's order, document number 231 in
5  this case, the court specifically says
6  defendant's questions must be specifically
7  tailored to discovering facts under pending
8  Plaintiff's allegations in the amended complaint
9  and facts like those contained in Williams'
10 emails sent to defendants.
11     There is nothing that says you are
12 allowed to ask questions about his other work as
13 part of an investigator of the Department of
14 Justice. Frankly, that seems inappropriate and
15 not relevant to this deposition.
16     You are welcome to move for that
17 information and go to the court and explain why
18 you believe you need that information, which is
19 part of the Department of Justice investigatory
20 process, but I am allowed to make the objections
21 no matter how long it takes. I can sit here and
22 make those objections as many times as I want and
23 as long as I want because that is what the court
24 stated I was allowed to do.
25     MR. LUNSFORD: Okay, we'll be asking

Page 32

1  for more time as long as you continue these long
2  narratives.
3      MS. WARD: You are welcome to.
4  BY MR. LUNSFORD:
5  Q    What is the current status of the
6  Trousdale Turner Correctional Facility
7  investigation?
8      MS. WARD: And Mark, just for all of
9  these questions, you may only answer with
10 publicly available information. If any of this
11 information is known only to the Department of
12 Justice and the correctional facility and is not
13 public, do not answer.
14     THE WITNESS: It is an open
15 investigation.
16 BY MR. LUNSFORD:
17 Q    Is it public?
18 A    No. I mean, it's public in that it
19 was announced, but, that, you know, initial
20 letter to the entity and the state, but that's --
21 so it would be on the website, I am assuming.
22 Q    According to the notice of
23 investigation, what were the areas of
24 investigation?
25 A    Similar to Alabama and Georgia.

Page 33

1  Q    And the Turner Correctional Facility
2  is simply one facility under investigation, is
3  that correct?
4  A    Correct.
5  Q    Okay. Moving on to Mississippi, how
6  many facilities are under investigation in
7  Mississippi?
8  A    I believe it's four.
9  Q    And what are the issues involved in
10 the investigation in Mississippi?
11 A    Similar to Alabama and Georgia and
12 Trousdale Turner.
13 Q    Except that Mississippi also involves
14 mental healthcare, doesn't it?
15 A    Correct.
16 Q    And what's the current status of the
17 Mississippi investigation?
18 A    I am not on it. I have not been on it
19 in several years. It's my understanding it's in
20 settlement talks.
21 Q    Okay. What is the current status of
22 the Manson Youth investigation in Connecticut?
23 A    That's in the monitor phase.
24 Q    Are you still involved in that matter?
25 A    I am only recently involved to begin

9 (Pages 30 - 33)

Page 34

1  with, so I was never involved from the, you know,
2  from its original stage. I've only been on the
3  case in the monitor phase and it's still in the
4  monitor phase.
5      Q    Is there a consent decree in that
6  case?
7      A    I believe there is, yes.
8      Q    Who is the monitor?
9      A    There's -- I forget his name. His
10  name is Dempsey, I think. There's a team of
11  monitors, but he's the lead.
12      Q    Who are the other monitors?
13      A    I don't remember their names, but it's
14  about four people in all.
15      Q    How long has that case been under
16  monitoring?
17      A    I do not know.
18      Q    What's the current status of the
19  RLUIPA investigation into the State of
20  Connecticut?
21      A    Also under a court-appointed, or
22  court-agreed monitor, consent phase.
23      Q    Do you know how long it's been
24  monitored?
25      A    I don't have that information, not for

Page 35

1  certain.
2      Q    Are you involved in the monitoring of
3  the RLUIPA matter?
4      A    I am at this point on the case, so
5  given that it's in the monitoring phase, I am
6  involved, yes.
7      Q    Have you attended site visits recently
8  in Connecticut?
9      A    Yes, I have.
10      Q    When was the last time you attended a
11  site visit in Connecticut?
12      A    On the RLUIPA matter?
13      Q    Yes.
14      A    I attended several site visits in the
15  fall of '24.
16      Q    Who are the monitoring persons in that
17  case?
18      A    There is one monitor, and I apologize,
19  I don't remember his name right now.
20      Q    Do you know his background?
21      A    I know that he worked for BOP for many
22  years.
23      Q    Do you know how long the RLUIPA matter
24  in Connecticut has been under monitoring?
25      A    I thought you asked that already, but

Page 36

1  I don't know.
2      Q    Okay. You also mentioned that you
3  were involved in the investigation of a youth
4  facility in the City of Meridian, Mississippi, is
5  that correct?
6      A    That is correct, but it was very
7  minimal.
8      Q    What's the status of that
9  investigation?
10      A    I am not a hundred percent certain,
11  but that's quite a bit, an older investigation,
12  and I think it was close to getting closed. So,
13  it was under, I believe it was under a consent
14  decree, but I wasn't on that case very long and I
15  was not on that case in a phase where I did any
16  tours or anything like that.
17      Q    But you said you believe it's under
18  monitoring?
19      A    I think it was, and I think it's very
20  close if not completely closed, but I, you know,
21  I don't have that information as something
22  that's, you can rely on. Let's put it that way.
23      Q    Let's go back. Could you just begin
24  with your graduation from high school and give me
25  your educational background?

Page 37

1      A    I attended, well, I have a bachelor's
2  degree from the University of Washington in
3  Seattle with a specialization on international
4  studies. I have a master's degree from the
5  American University in Washington, D.C. with a
6  specialization on international relations and
7  European affairs.
8      Q    What year did you receive your
9  master's?
10      A    1994, I think. I'm trying to forget.
11  I think it was four, '94.
12      Q    So, can you walk me through your
13  employment history after you received your
14  master's?
15      A    To the best I can -- some of this will
16  be sort of generalized, but I was employed for
17  many years as sort of like a research assistant
18  at the universities in Washington, D.C. Then at
19  some point around 2001 or '02, I started my first
20  employment in a law firm, and I worked as an
21  immigration paralegal initially.
22          Then years later, at a different firm,
23  I morphed into just sort of a general litigation
24  paralegal, and then we get to my employment with
25  the government.

10 (Pages 34 - 37)

1    Q    Where were you first employed with a
2  law firm? Which law firm?
3    A    I think it was K&L Gates, actually.
4    Q    Did you receive any formal training as
5  a paralegal?
6    A    No, I did it on the job. I had a
7  connection with someone who said I could do this.
8  They trained me and that was all she wrote.
9    Q    Okay, and then what was the next law
10  firm you worked for?
11    A    They no longer exist, if I'm not
12  mistaken, and I don't remember the name of all of
13  the partners, but it was Hamilton, Altman,
14  something. They had a regional firm in the
15  District, Bethesda and somewhere in Northern
16  Virginia. I think they had two, maybe three
17  offices in all and did litigation work, usually
18  for defendants.
19    Q    What type of litigation work?
20    A    A variety. They did insurance
21  litigation. They had one practice that was heavy
22  on asbestos litigation. They defended medical
23  malpractice cases, I believe.
24    Q    Then how did it come about that you
25  first took a job with the Department of Justice?

1    A    I applied.
2    Q    What position did you apply for?
3    A    Well, the number one is the one I got
4  was the paralegal specialist within the criminal
5  section, and specifically I was in the securities
6  and financial fraud section.
7    Q    How long did you hold that position?
8    A    Four years.
9    Q    Can you give me the timeframe for
10  that?
11    A    As I stated earlier originally, from
12  February of '13 to February of '17.
13    Q    So, that was in a paralegal role?
14    A    Paralegal specialist role, yes, as
15  they define it.
16    Q    Okay. Were you doing any type of
17  investigative work in that role?
18    A    I think all paralegals do
19  investigative work, but yes.
20    Q    And what was your role, or what were
21  your duties and responsibilities in that first
22  position?
23    A    Well, it's to the section where I was
24  working in, so it has to do with the litigation
25  or investigations that they're involved with.

1  There was a range of things. There was medical,
2  Medicare fraud cases. There were just -- there's
3  a lot of fraud cases out of that section, and
4  then there was a large case involving Volkswagen.
5    Q    Okay. So at that point then in 2017,
6  you pivot from the Criminal Division to the Civil
7  Rights Division?
8    A    Well, I pivot to a contractor and then
9  I was assigned to Civil Rights.
10    Q    Okay. So, the movement to contractor
11  and to the Civil Rights Division happened at the
12  very same time?
13    A    Practically. There was a couple
14  months where they had to clear something up
15  before I was able to start. So, from February
16  '17 to May of '17, effectively I was unemployed.
17    Q    Okay. Did your -- your title
18  obviously changed when you moved to a contractor,
19  correct?
20    A    No, it did not.
21    Q    And what was --
22    A    Well, first of all, it's not the same
23  employer --
24    Q    Right.
25    A    -- so it's not necessarily the same

1  title as such. I went from government to
2  contractor, right?
3    Q    And what was your title in 2017 when
4  you moved into the contractor role?
5    A    It's very similar to paralegal
6  specialist. I mean, it's just paralegal work.
7    Q    Okay.
8    A    But the work is different in the Civil
9  Rights Division in the Special Litigation Section
10  than it would have been in my first go around
11  under the Criminal Division.
12    Q    Did you receive any specialized
13  training in terms of the investigation of prisons
14  or jails by the Civil Rights Division of the
15  Department of Justice?
16    A    No, it's learning on the job.
17    Q    So, have you ever, during the entirety
18  of your time with the Civil Rights Division, ever
19  attended any type of classes pertaining to the
20  operation of a jail or prison?
21    A    I have not.
22    Q    Have you ever attended any conferences
23  that relate to, you know, jail operations, or
24  prison management, anything like that?
25    A    I have not attended any conferences.

11 (Pages 38 - 41)

Page 42

1 I have, I believe, watched videos at times of
2 such conferences or conferences in which prison
3 matters are discussed, but that sort of was some
4 of my self-education, you could say.
5     Q    You mentioned self-education. Have
6 you read any books or reviewed any published
7 standards pertaining to the operations of jails
8 or prisons?
9     A    Mostly I have learned on the job. I
10 don't think I've read any books as such,
11 specifically in the manner in which you're
12 asking. Most of my education has been on the job
13 learning from the colleagues and also from
14 contractors.
15     Q    Have you ever had a copy of any jail
16 or prison standards such as the NCCHC guidelines
17 for the provision of medical or mental
18 healthcare?
19     A    I have not.
20     Q    Have you ever reviewed those
21 standards?
22     A    I have not.
23     Q    Have you ever reviewed the standards
24 promulgated by the American Correctional
25 Association?

Page 43

1     A    Standards generally or something
2 specific?
3     Q    Either.
4     A    I have reviewed various things from
5 the ACA, I don't remember exactly what, part of
6 my self-education as it were, just to see what,
7 how they frame things, how things are written
8 down, but I don't remember exactly what it was.
9     Q    In your current position with Civil
10 Rights, is -- are part of your duties and
11 responsibilities doing legal research? I'm not
12 asking you in the particular topics, but do you
13 actually get onto a legal research service and
14 research cases and decisions?
15     A    No, I do not.
16     Q    Have you ever served in the military?
17     A    No, I haven't.
18     Q    Okay. Are there any other positions
19 of employment that you feel that you have not
20 told me about after you received your master's?
21     A    No, I've told you everything.
22     Q    Okay. Other than -- let's eliminate
23 kind of summer jobs or seasonal employment
24 positions. Other than your prior employment as a
25 paralegal or researcher or investigator, have you

Page 44

1 held any other type of full-time employment?
2     A    I think I did -- never full-time,
3 never full-time.
4     Q    Okay.
5     A    I was a student.
6     Q    Okay.
7     A    So, part-time, but never full-time.
8     Q    Let's talk a little bit about the case
9 that we're here about today. When were you first
10 assigned to the Alabama case?
11     A    I don't have an exact date, but I was
12 technically assigned to it the moment I arrived
13 in May of '17.
14     Q    Do you recall the status of the case
15 when you arrived in May of 2017?
16     A    We were in the investigative phase.
17 There may or may not have already been one tour
18 or more, but we were gearing up to do more tours
19 in the investigative phase.
20     Q    During the investigation and prior to
21 the issuance of the first findings letter, how
22 many facilities did you visit?
23     A    I believe I visited two.
24     Q    Which were those?
25     A    Draper and Holman.

Page 45

1     Q    Do you remember who attended those
2 site visits with you?
3     A    More or less, yes.
4     Q    Who was that?
5     A    Well, some people that are still on
6 the team, Carla Ward, Jason Cheek out of the
7 Northern District, Chuck Regan, who was the
8 investigator out of the Northern District. From
9 Main Justice, I can't remember right now if Judy
10 Preston was at Draper. I know she was at Holman.
11 We had a different team back then than we do at
12 the moment from Main Justice.
13         We had, I think Aaron Fleischer may
14 have been there. Also, the paralegal from the
15 Northern District, Julie Gold, was there, and at
16 the moment, I can't remember what other attorneys
17 from our team, but, for the times that I went.
18     Q    On those first site visits -- well,
19 see you said you attended, and I can't remember,
20 Draper --
21     A    Draper and Holman.
22     Q    Holman.
23     A    In that order.
24     Q    And that would have been in
25 approximately 2000?

12 (Pages 42 - 45)

Page 46

1    A    I can't remember the exact date, but
2 I think it was '18.
3    Q    Was Holman fully populated at the
4 time?
5    A    I don't know what that means.
6    Q    Are you aware that Holman has been
7 depopulated in terms of most of its housing
8 units?
9    A    Yes.  Yes, I am aware, but I think at
10 the time, it was, if that's the basis of your --
11    Q    Yes.
12    A    -- phrasing, yeah.
13    Q    And did basically the same teams
14 attend both sets of site visits?
15    A    I want to say yes, but I don't have a
16 specific recollection of Judy Preston at Draper.
17 I may be wrong.
18    Q    Was your experience visiting Draper
19 and Holman different than your experience
20 visiting other prisons in your experience as an
21 investigator with Civil Rights?
22    A    Are you talking about my other prison
23 visits in Alabama --
24    Q    Anywhere.
25    A    -- alone?

Page 47

1    Q    Anywhere.  I'm just asking were those
2 visits different in any way from your visits to
3 other --
4    A    Well, all of my visits to Alabama have
5 been different --
6    Q    In what way?
7    A    -- from all the other prisons.
8 Because I have not been allowed into the dorms.
9    Q    What do you mean?
10    A    I've only been in rooms where there
11 were interviews conducted.
12    Q    Were you not allowed in the dorms at
13 the time -- I don't know because I wasn't
14 involved at the time of Draper.  I was -- I
15 actually remember you all being there, but were
16 you not allowed in the housing units at Draper?
17    A    I personally was left behind, correct.
18    Q    Was anyone allowed in the housing
19 units?
20    A    Oh, yes, the team was, but not me.
21    Q    Do you know why you weren't allowed in
22 the housing units?
23    A    A decision was made, as far as I
24 understand it, at the time.  I'm not privy to
25 those discussions from back then, but essentially

Page 48

1 ADOC wanted to limit the amount of people that
2 were a part of the party walking through the
3 dorms.
4         And I was relatively new anyway, so it
5 was natural for me to stay behind with Julie
6 Gold, I believe, and I don't remember if Chuck
7 Regan, the investigator from the Northern
8 District, was allowed to walk.  Right now, I
9 don't remember, but it would have been the
10 attorneys and I think we had one or two
11 consultants along for those trips.
12    Q    Do you remember who the consultants
13 were on those trips?
14    A    I can see their faces.  I remember two
15 of them were from Colorado, if I'm not mistaken,
16 Jeanie something and I forget the other guy's
17 name, and then we also had a third individual
18 whose name I'm not going to remember, a medical
19 doctor type of specialist.  I think he was
20 supposed to function sort of as someone who was
21 looking into the conditions component of the
22 investigation.
23    Q    Are any of those three individuals
24 still on the case?
25    A    No, they are not.

Page 49

1    Q    Do you know why they left?
2         MS. WARD:  Object, that would be
3 privileged.  Do not answer.
4         BY MR. LUNSFORD:
5    Q    Okay.  But it's safe to say the three
6 consultants who were involved in the original
7 investigation of the Alabama prison system are no
8 longer on the case, are they?
9    A    And to clarify, I don't know if all
10 three were involved throughout the entire phase
11 of the investigation, but those three from those
12 trips that I went to are no longer involved.  I
13 don't know when they stopped being involved is
14 what I'm getting at, so I can't make that
15 statement.
16    Q    Do you recall that the Department of
17 Justice was allowed to bring copiers or scanners
18 into the facilities during the investigation and
19 scan documents they selected?
20    A    I remember that we did that at Draper.
21 There was a more open room for doing that at
22 Holman, vaguely, but I wasn't specifically
23 involved in it, but I know that we did do that,
24 yes.
25    Q    At some point in time during the

13 (Pages 46 - 49)

Page 50

1  pendency of this case, DOJ established some form
2  of hotline, is that accurate?
3      A   I became aware of it at some point in
4  time, so that must obviously be the case.  I
5  don't remember exactly when it started.  I was
6  not working on the hotline when it, when I first
7  arrived.
8      Q   Have you ever worked on the hotline?
9      A   Yes, I have.
10     Q   Okay, the hotline is essentially an
11  800 number that individuals who are incarcerated
12  in Alabama can call from a phone inside the
13  prison system, correct?
14     A   Correct.
15     Q   Have you -- you said this in a way
16  that made me think it's a thing.  You said you
17  hadn't worked the hotline.  What does that mean,
18  to work the hotline?
19     A   I was being colloquial, but
20  essentially you're answering phone calls,
21  answering phone calls and listening to what's on
22  the call with the inmate.
23     Q   Have you done that during the pendency
24  of the case?
25     A   Oh, yes.

Page 51

1      Q   Do you all keep a record of the phone
2  calls you received from inmates in Alabama?
3      A   Yes.
4      Q   How is that maintained?
5          MS. WARD:  Object, that is privileged,
6  so do not answer.
7          BY MR. LUNSFORD:
8      Q   How many phone calls has DOJ received?
9      A   That is not an easy thing to guess or
10  estimate.  Specifically on the hotline alone
11  you're asking?
12     Q   Yes.
13     A   Over the course of the entire
14  investigation --
15     Q   Yes.
16     A   -- or ever since that line, hotline
17  has been open, I would have to guess over 10,000
18  calls.
19     Q   And when DOJ receives a call from an
20  inmate, what happens next?
21     A   Well, there's interaction with the
22  inmate as to what the inmate is calling about.
23     Q   Okay, while you've been working these
24  phone calls, have -- what kinds of complaints
25  have you received from inmates?

Page 52

1      A   Well --
2      Q   Well, let me back up real quick before
3  I get there.  Can you explain to me how this
4  works, like, how often are you answering the
5  phone for the hotline?
6      A   On a daily basis.
7      Q   Does it only ring to your office or
8  are there other people that can answer as well?
9      A   In theory, other people can answer.
10  In practice at the moment, it is only me.
11     Q   How long have you been in that role?
12     A   Since roughly the summer of '21.
13     Q   Okay.  Is the hotline open seven days
14  a week, 24 hours a day?
15     A   No.
16     Q   When is it open?
17     A   It's open, but it's not answered seven
18  days a week.
19     Q   Okay.  Is there a voicemail service?
20     A   There is not.
21     Q   Has there ever been a voicemail
22  service?
23     A   As far as I know, I don't think so.
24     Q   What are the business hours for the
25  hotline?

Page 53

1      A   Well, there are no official business
2  hours.  It's possible to answer after hours if
3  one wanted to, but practically speaking, it's
4  when the person who is answering the phones is
5  working.
6          So, and the phones in Alabama don't
7  come on in the prisons until 9:00 a.m., so it's
8  never earlier than that, and then, you know,
9  normally it's an eight-hour day.  It could be
10  longer than that on occasion for whatever reason.
11     Q   Are there inmates who contact you
12  separately from than through the hotline?
13     A   I don't understand by separately.
14  They're all contacting me by the hotline.
15     Q   I understand.
16     Q   What do you mean by separately?
17     Q   I mean, do they ever contact you via
18  another number?  Have you ever given --
19     A   Like my direct phone number?
20     Q   Yes.
21     A   No.
22     Q   Have you ever given an inmate another
23  number for them to call other than the hotline?
24     A   No, not that I'm aware of.
25     Q   Have you received phone calls -- well,

14 (Pages 50 - 53)

Page 54

1 when you receive a phone call from the State of
2 Alabama, do you have caller ID where you can see
3 the number?
4    A   I do.
5    Q   Have you received calls from inmates
6 who are using a cell phone?
7    A   Yes.
8    Q   Of the calls that you have received
9 from the State of Alabama, inmates in the State
10 of Alabama, what percentage of those would you
11 estimate are from a cell phone?
12    A   It's been a handful of times because
13 -- yeah, it's been a handful of times, and that's
14 -- and that usually, as far as I remember, it was
15 many, many years ago, like, at the very beginning
16 of my phase of answering these phone calls.
17    Q   When's the last time that an inmate
18 called you on a cell phone as far as you can
19 remember?
20    A   I couldn't tell you.  Pure guesswork
21 on my part, but sometime in '21 I'm guessing.
22    Q   Do you have any estimation or judgment
23 as to why inmates stopped calling you on cell
24 phones in '21?
25    A   Well, no, I don't necessarily.  I

Page 55

1 think generally, the people with cell phones in
2 the prison system are not using it to call DOJ.
3 They're using it for other purposes.  So, it's a
4 rare person that would be motivated to call DOJ
5 when they can do it on a wall phone and use a
6 cell phone instead.
7    So, I just don't think the profile
8 matches up.  The demographics, if you will,
9 doesn't match up.  The type of people that are
10 calling me to report things are not usually the
11 people with cell phones, so it's -- those
12 numbers, therefore, and going to be much less,
13 and so what motivated those people to call me on
14 their phone as opposed to the wall phone at the
15 time, I couldn't tell you.
16    Q   Yeah, I like -- this is helpful in
17 terms of understanding your perspective on this.
18 What's the profile of the person who typically
19 calls you?
20    A   Persons can -- well, it's a mixture of
21 people.  They're usually, the bulk of my calls
22 are to report about issues, either generally or
23 that affect them, and that's the most generic way
24 I can put it.  It's to report if they're in
25 danger, but those are people that are calling

Page 56

1 usually for --
2    Sometimes it's their first time
3 calling.  They got the number from someone else.
4 Call DOJ if you're, you know, this is what's
5 happening to you.  There's people who have from
6 the very beginning wanted to be part of our
7 lawsuit, as it were, to contribute information
8 that they felt needed to be, that we needed to be
9 aware of.
10    So they're reporting on conditions,
11 they're reporting on incidents, they're reporting
12 on everything that effectively, I think, we have
13 written about in our complaints and so on that
14 led us to file the lawsuit more or less.
15    Sometimes you have people with medical
16 issues.  Sometimes some people call and it's not
17 related to our case.  It might be, you know, they
18 just took my good time away, or I thought I was
19 supposed to have a parole date on such and such
20 date, or they actually want to talk about their
21 criminal case, that happens too.
22    Q   What percentage of the calls that you
23 receive do you think don't address issues
24 involved in this lawsuit?
25    A   Very low number, because if I indicate

Page 57

1 to the people that I can't help you with your
2 criminal case, I can't help you with parole and
3 so on, that sort of ends that conversation, but
4 usually it's substantive material that I'm
5 discussing with people that would be directly
6 related to -- or directly relevant to our case.
7    Q   Are there individuals who you speak to
8 on a routine basis or regular basis?
9    A   Yeah, there are.
10    Q   Who are those individuals?
11    A   Routine, let's say like once a week
12 kind of thing?  I'm not going to remember them
13 all, and it goes up and down, and some people
14 have left prison and so on.  Joey Wilhite was one
15 of those people, but he's out of prison, Richard
16 Yeager, Reed Knight, and that's R-E-E-D, Knight
17 with a K.
18    Some of the ones I'm thinking of right
19 now that are more recent callers. I've had more -
20 - I've had others in the past and they're not
21 coming to mind right now.  It's been a long time
22 doing this, so.
23    Q   Do you do anything to vet the voracity
24 of the person who's calling you?
25    A   Well, when a person -- I mean, yes,

15 (Pages 54 - 57)

Page 58

1  there's a basic thing that I think anyone has as
2  a human being, which is being able to assess
3  whether someone that's talking to you is
4  believable.  If you're not very good at that,
5  then you don't end up being an investigator.
6          If someone is calling me who I feel is
7  unreliable then there's a grain of salt that is
8  involved.  There's a grain of salt that's
9  involved with that phone call, but for a lot of
10  guys, if not the vast majority of all these
11  calls, they usually are of an immediate nature to
12  where you can tell that voracity is basically --
13  it doesn't even need to be discussed as such
14  because it's pretty much, this just happened,
15  this is going on.  There's a believability that
16  is there almost instantly.
17          Now, if you're getting into details
18  relating to, you know, say if this was a criminal
19  investigation and I had to establish facts and
20  all that kind of stuff, that's a slightly
21  different matter.
22      Q    What do you mean by that?
23      A    Well, then you have to develop time,
24  date and everything which I do my best at times
25  to do, but if someone is calling me to tell me

Page 59

1  that there's holes in the tile in the floor or
2  there's mold on the wall in the bathroom or this
3  morning we had about 10 to 15 ODs that went to
4  the healthcare unit, I note that, but it's not
5  something that I need to develop a complete set
6  of facts as it were.  It's a statement of
7  observation from their environment and no one
8  else is going to be able to tell me better than
9  those guys that are on the phone.
10      Q    We have received a number of emails
11  from you related to particular concerns or
12  complaints of inmates.  And when I say we, I mean
13  lawyers on our particular team.  You're aware of
14  those emails obviously, right?
15      A    Yes, I am.
16      Q    How many of those emails came or arose
17  out of a conversation you had via this hotline
18  number?
19      A    The vast majority.
20      Q    Have you done anything to --
21      A    Let me ask something.  Sometimes, as
22  you know from those emails, it also involved
23  family members and they would call me as well, so
24  sometimes it's the family members alone or it's
25  the family members in combination with the

Page 60

1  inmates of the family members or loved ones
2  whatever.
3      Q    Of the phone calls that you've
4  received via the hotline, what percentage would
5  you say are family members, relatives or loved
6  ones or acquaintances?
7      A    Well, that's five to ten percent,
8  maybe as much as that roughly.
9      Q    Smaller number?
10      A    Of course, yes.
11      Q    Okay.  After you've sent us an email
12  about an inmate's particular concern or
13  complaint, have you done anything to investigate
14  or review the actual circumstances involving that
15  inmate?
16      A    Well, I try to follow up to see what
17  happens with that inmate -- do I have your
18  attention?
19      Q    Yeah, sorry.
20      A    All right.  So, first of all, if
21  there's an inmate that's calling me to say that
22  he's in immediate danger of harm, imminent risk
23  of harm and you've gotten those emails, I try to
24  keep on top of what's going on with that inmate.
25  I want to know that that inmate is going to have

Page 61

1  his situation improved.
2          So, I follow up with that, but you're
3  asking me if I can verify that the person has
4  been raped or stabbed or beaten.  Is that what
5  you're asking me?
6      Q    Right.
7      A    Well, usually --
8      Q    I think that's a fair clarification.
9      A    Okay, but the problem with that
10  normally is, is that I don't have documents from
11  the day prior from ADOC.  I don't have documents
12  from the week prior.  I won't have access to all
13  the things that have happened to this individual
14  in the immediate period leading up to the phone
15  call.  I won't have that until months down the
16  line, maybe over a year down the line.
17          The best I can do is look up that
18  inmate and see what other kinds of things they
19  have been involved with as far as ADOC records
20  have indicated, but there's not the ability for
21  me to access any information that would verify
22  that he was stabbed the week prior.
23      Q    Understand, but you have reported
24  incidents and then months later received incident
25  reports and documentation reflecting the incident

16 (Pages 58 - 61)

1   that may be in question, correct?
2       A    Potentially.
3       Q    And I guess my question is have you
4   ever gone and evaluated what you were told by an
5   inmate and you emailed us about?
6       A    I have. I have on a few occasions,
7   yes.
8       Q    And --
9       A    I don't remember it at all. I'm going
10  to tell you point blank I don't remember which
11  ones those were, but I have on a few occasions.
12      Q    Have you seen instances in the
13  documentation when, as a result of your email,
14  ADOC took steps to alter a person's living
15  conditions or do something in order to change
16  their status or provide protection or address
17  their concern?
18      A    I'm not aware of documents -- and I'm
19  not the person who has reviewed all the documents
20  as to the fullest degree. I have reviewed some
21  documents but I'm not necessarily a hundred
22  percent versed on the full universe of documents
23  produced, but I'm not generally aware of
24  documents that ADOC has produced that reveal
25  their responsiveness to either my emails or let's

1   say, if I'm never even involved, it might just be
2   a family member calling down to a prison and
3   speaks to the warden to have their son moved or
4   whatever. I'm not aware of documents that are in
5   the production that would show that. So, I've
6   never seen that.
7       Q    Have you ever received a phone call
8   back from an inmate who said ADOC did this in
9   response to my calling you?
10      A    Yes.
11      Q    Can you give me an instance when that
12  occurred? And you don't necessarily have to
13  remember names, I'm --
14      A    Yeah, I'm not going to remember names,
15  but, you know, the most common scenario is for a
16  guy to get moved out of a situation in a
17  particular dorm and then put into safety. So,
18  that either is going to be, he's going to be put
19  into SEG lockup, or he's going to be transferred,
20  if they do anything.
21          So, I've had that where they have been
22  moved. I've also had it where nothing's
23  happened.
24      Q    Do you ask permission from the inmate
25  to share their concerns with us?

1       A    Yes.
2       Q    Have you had instances when they said
3   no?
4       A    I've had instances where the inmates
5   were afraid to basically pull that trigger of
6   letting staff know that they have called DOJ and
7   they need help because they're worried about
8   retaliation from both staff and inmates inside
9   the dorms.
10      Q    Okay and when inmates tell you not to
11  report that to us, do you proceed and report it
12  anyway?
13      A    No, I've never done that.
14      Q    Why not?
15      A    I'm not going against the wishes of
16  the inmates. It's that inmate's call if he fears
17  something, I will not put that inmate in jeopardy
18  against his will.
19      Q    Of the times that -- if we took just
20  the rough number of times that you've emailed us
21  about an inmate's concern, would you say there
22  would be an equal or greater number of times that
23  inmates have called you with concerns or
24  complaints and said you cannot mention this to
25  ADOC?

1       A    No, I don't think you have a thousand
2   emails from me on these subjects, so it's been a
3   limited universe. Every one of them agreed with
4   some exceptions, there was, I think, an
5   individual once where he told me he was suicidal,
6   homicidal and then I informed you guys about it
7   out of an abundance of caution. I think there
8   was one other abundance of caution email at some
9   point that I have a vague recollection of.
10          Then, there's occasionally the emails
11  earlier on where they included things related to
12  conditions, whether it was something that, you
13  know -- a medical thing we used to write once in
14  a while or I think there was something related to
15  ADA issues in a particular bathroom where there
16  were a lot of older inmates, something like that.
17  So, that was not really -- you know, they weren't
18  calling for me to specifically address it, I just
19  made the call to do that at that point in time.
20          But when it comes to safety issues,
21  concerns for imminent harm, these inmates have
22  been calling to essentially try -- they don't
23  know that I have necessarily the ability to do
24  this when they call, but they're looking for help
25  when they call DOJ.

17 (Pages 62 - 65)

Page 66

1    Q    Are there inmates that you know have
2  a propensity to be dishonest or inaccurate in
3  reporting things to you?
4    A    I think they sometimes withhold
5  material.  Overall, the inmates that have a drug
6  addiction issue are in a perpetual cycle of
7  dealing with the outcomes of that drug addiction
8  which results in a lot of bodily harm to them
9  frequently.  And not knowing exactly what their
10  approach is going to be from moment to moment on
11  how they're going to be physically safe.
12        And I'm extrapolating from my years of
13  doing this that essentially these inmates don't
14  know to get out of the situation, so they may
15  withhold something.  They may claim something
16  that wasn't a hundred percent correct.  At the
17  time, I'm not necessarily able to verify that.
18  There's no way I can know fully.  My main goal is
19  usually to assess how realistic does the threat
20  against them sound over the phone.  I have gotten
21  better at this.
22        I'm more experienced now and having an
23  understanding of what goes on in these dorms and
24  understanding the life inside the dorms, the
25  likelihood of they being correct based on the

Page 67

1  gangs, based on all of the dynamics, based on the
2  lack of willingness by staff sometimes to help
3  them, so then I make that call.  And at that
4  point, those issues relating to whether or not
5  they may be withholding something or exaggerating
6  something or whatever, is secondary for me and my
7  consideration at that time.
8    Q    I guess my question is have you had
9  instances when you outright knew the inmate
10  wasn't being honest with you?
11    A    Yes, but those don't result in emails
12  to you.
13    Q    Yes and do you have any judgment as to
14  how many times the reports you receive are false?
15    A    Reports -- so, I get a lot of reports,
16  right?
17    Q    Right.
18    A    So --
19    Q    I'm just asking do you have any
20  judgment as to --
21        (Simultaneous speaking.)
22    A    If a guy's reporting I have cancer and
23  I haven't seen a doctor in three weeks or three
24  months, I've no way of judging that or a lot of
25  stuff is rumor.  I heard there was 15 overdoses

Page 68

1  this morning, maybe it was 12, maybe three of
2  them weren't overdoses or I heard a helicopter
3  come, saw blood on the walls or on the sidewalk,
4  something bad happened, but they may not know
5  exactly what.  They may say we heard two guys got
6  stabbed, three guys got stabbed.  They may be
7  wrong, it may be four, it might be one.  Those
8  kinds of things is just part and parcel.
9    Q    In a given day currently, how many
10  phone calls do you receive?
11    A    Well, I'm not able to answer all the
12  ones I receive, okay, for starters.  So, I can
13  answer as many, probably as 15 in a day if I want
14  to, it depends on my overall workload.  Sometimes
15  I have to put the phone away to deal with stuff
16  that I need to deal with.  It varies.  Let's say
17  an average is eight to ten that I answer or pick
18  up.
19    Q    Are there facilities that you more
20  frequently receive phone calls from?
21    A    At the moment, yes, but that ebbs and
22  flows all the time, you know.
23    Q    Where do you receive the most calls
24  from currently?
25    A    It's a guess, but I'm going to say

Page 69

1  it's a mixture of Limestone and then people
2  measure, let's say, Kilby, Bibb, Staton, and
3  Fountain.
4    Q    Have you done anything to track
5  violence at any of those facilities in terms of
6  the numbers or statistics?
7    A    Well, you mean have I created my own
8  statistics?
9    Q    Or, mechanism of monitoring the levels
10  of violence at those facilities.
11    A    I have surveyed my inmate callers for
12  an assessment of the level of violence in their
13  prisons.  And I have asked them at times to guess
14  roughly, let's say on a daily or weekly basis,
15  the amounts of assaults that they are aware of or
16  see in their dorms or that they know about in
17  their prison overall to the degree that they're
18  able to.  It's harder at some prisons than in
19  other cases.
20    Q    Are there facilities that you haven't
21  received a phone call from an inmate in a very
22  long time?
23    A    No, I wouldn't say that.  Generally
24  speaking, St. Clair and Holman don't call as
25  often as the other prisons.

18 (Pages 66 - 69)

1    Q    Do you know why?
2    A    There's very few people at Holman
3  comparatively.  At St. Clair, probably because
4  they're calling EJI.
5    Q    You said you received a lot of calls
6  from Kilby?
7    A    Yes.
8    Q    Of the calls that you receive from
9  Kilby, are those mostly individuals who are new
10  to the prison system?
11    A    Not at all.
12    Q    Based on these phone calls alone, has
13  violence gone up at any particular facility in
14  recent years?
15    A    Limestone definitely, a hundred
16  percent, more than a hundred percent.  The others
17  seem more or less at the levels they have always
18  been.  You can ask one week or one month and then
19  a couple months later, the answer slightly
20  changes.  What doesn't change is the sense that
21  the inmates relay to me that at any moment, any
22  time it can flare up.
23    Q    I want to go back to this question
24  because I'm not sure I got a clear answer and I
25  want to make sure I'm clear.  So, if we look at

1  the total number of times you've emailed us about
2  an inmate's complaint or concern that you
3  received, how does that number compare to the
4  number of times that you've been told by an
5  inmate of a complaint or concern and they've told
6  you but don't mention it to ADOC?
7    A    It's not a question of mention and
8  don't mention to ADOC, they frame it as --
9  they're more concerned about the dynamic inside
10  the dorm via the staff and the inmates.  So, that
11  has happened, I don't know, a couple dozen times,
12  maybe a little bit more.
13    Q    Okay.  Are there facilities where you
14  believe the level of violence has decreased
15  during the course of the investigation to now?
16    A    Well, it's a long period of time that
17  we're talking about, so it might not be a
18  statistically relevant way of looking at it.  In
19  general, I cannot say anywhere that it has
20  significantly gone down based on the reports I
21  receive from the inmates and I'm just talking
22  about violence overall as opposed to documented
23  homicides and things of that nature.
24    Q    So, is it your belief that the levels
25  of violence inside ADOC facilities have remained

1  unchanged, if not increased, since the
2  investigation started?
3    A    It's certainly not decreased.  It's
4  definitely maintained and the system has moved
5  its populations around in the last two or three
6  years and changed the characters of certain
7  prisons and attempted to find some kind of
8  formula, it seems to me, by which they can deal
9  with problematic -- their violent populations.
10         So, as stated before, Limestone has
11  become exceptionally violent whereas at the
12  beginning of the investigatory phase, it was not
13  considered as such.  Bibb is less violent in the
14  days in which its nickname was Bloody Bibb, but I
15  hear about the violent episodes at just about all
16  the places.  Holman is perhaps one, one could say
17  okay that one has gone down, but then again,
18  they've also significantly altered the nature of
19  Holman, so, and it's much smaller.
20    Q    Did the levels of violence inside the
21  institutions decrease during COVID?
22    A    I don't recall making a particular
23  note of that.  What I know for a fact is that the
24  staffing went down significantly during that
25  period and the bottom started to drop out even

1  more and not just because people weren't showing
2  up because they were sick.  Right now, I'm
3  guessing as to what might have been the level of
4  violence during that period of what we would call
5  COVID and where that period would begin anyway.
6  It's hard to make a guess, you know, when does
7  COVID begin and when does it end, but '21, '22,
8  that's COVID period more or less or 2021, excuse
9  me.  I don't remember specifically noting in my
10  head less, more at the time.
11    Q    Other than these inmate telephone
12  calls, have you done anything else to try to
13  track the levels of violence inside any
14  particular institution?
15    A    Well, I look at the statistics that
16  you guys produce or that ADOC publishes on its
17  website, the reports, the monthly, the
18  quarterlies and so on.  I think that's broadly
19  about it really.
20    Q    Okay.  Of your time currently, how
21  much of your time is devoted to ADOC -- the
22  investigation of Alabama?
23    A    Well, leading up to this deposition
24  it's gone up a little bit, but at the moment, I
25  would say I'm doing about two-thirds of my time

19 (Pages 70 - 73)

Page 74

1  on it.
2      Q    Since you brought it up, I assume that
3  you met with counsel in preparation for today's
4  deposition?
5      A    Yes, I did.
6      Q    How many times did you meet with
7  counsel?
8      A    In person or overall?  Because some of
9  it was --
10     Q    Either in person, by telephone or Zoom
11 or?
12     A    I think three times.
13     Q    And can you give me just the duration
14 of time?  I don't want you to tell me what was
15 said, but just the duration of time for each of
16 those meetings.
17     A    One hour roughly each time on the
18 first two times and about three hours on the
19 third time.
20     Q    Okay.  Do you have an understanding of
21 why you're being deposed today?
22     A    Yes.
23     Q    Have you ever been deposed before?
24     A    No.
25     Q    Are you aware of any investigator or

Page 75

1  paralegal with the Civil Rights Division that's
2  ever been deposed?
3      A    I am not aware of that.
4      Q    Have you ever testified in court?
5      A    I have not.
6      Q    Were there any documents you reviewed
7  in preparation for today?
8      A    I reviewed, I think, all of the emails
9  that I emailed you guys.  That's mostly it.  I
10 think I might have poked my head in on a couple
11 of inmate letters, but not really, not with any
12 depth or whatever.
13     Q    Do you also receive letters from
14 inmates?
15     A    It's not that common.  Most of the
16 correspondence, physical correspondence, goes to
17 the Northern District of Alabama.  So, it passes
18 their desk and then eventually makes its way onto
19 our shared database, but I don't commonly look at
20 them too much.  In the past, originally, I was
21 getting some addressed to me personally at the
22 location here and I looked at those, but it's
23 been a long time, I think, since anyone has
24 written me with physical mail.
25     Q    Do you receive emails from inmates?

Page 76

1      A    No, I don't.
2      Q    Do you receive text messages from
3  inmates?
4      A    No, I don't.
5      Q    What about from inmates' families?
6      A    No, I don't.
7      Q    Are there any particular Alabama
8  facilities that you believe are safer than the
9  other facilities?
10     A    Of the state prisons, right?
11     Q    Yes.
12     A    It's not the facilities, it's the dorm
13 that you're in.
14     Q    I'm sorry?
15     A    It's the dorm that you're in, it has
16 nothing to do with the facility.
17     Q    Help me understand that.
18     A    Some dorms are structured dorms.  You
19 understand I'm pretty sure, but there are dorms
20 that are safe and there's dorms that are not
21 safe.  There's dorms where there's a lot of
22 violence and gang activity and every single
23 prison has those dorms.  Holman might be a slight
24 exception, although they had a flare up of gang
25 violence not too long ago, but by and large, all

Page 77

1  the others that are in this investigation, there
2  are dorms that are very dangerous on a constant
3  basis.
4      Q    Have you identified any common
5  characteristics among those dorms that you say
6  are dangerous?
7      A    Common characteristics to the dorm,
8  the life inside the dorm you mean?
9      Q    Just anything -- I mean a dorm,
10 obviously, inside a prison is made up of several
11 different components.  There's a physical
12 structure.  There's the physical makeup.  There's
13 the type of individual that's housed there.
14 There's the type of staffing.  There's the type
15 of facility.  There's all kinds of
16 characteristics inside of a single housing unit.
17        My question to you is based on your
18 review of this and in light of your testimony,
19 what do you think are the common characteristics
20 of those particular dorms that make them
21 dangerous?
22     A    They're dangerous for a variety of
23 reasons that merge into the overall experience of
24 being there, the overall life.  They're dangerous
25 by virtue of being virtually un -- there's no

20 (Pages 74 - 77)

Page 78

1  direct supervision. So, the inmates inside these
2  dorms effectively are living alone for the vast
3  majority of every single day that they're in
4  there.
5        There are dorms that have no
6  structure. There are dorms that are usually
7  physically disgusting because they are run down
8  and just, you know, the facilities are bad. They
9  are usually really crowded, really, really
10  overcrowded. The line of sight from the cube
11  through the rest of the dorm is severely
12  hampered. Being able to walk through certain
13  cuts is probably very difficult for staff. I
14  think those are components that make it easier
15  for violence to happen in areas that cannot be
16  seen easily unless you are right inside the dorm,
17  living in the dorm or monitoring the dorm.
18        And then of course, there is usually
19  a certain proportion of inmates who are engaged
20  in activity that is going to lead violence,
21  whether it's gang members and the drug trade, the
22  contraband trade. There might be a certain
23  percentage of people who are drug addicts at the
24  same time, you know, predator and prey in the
25  same little jungle essentially and the ability to

Page 79

1  stash weapons and contraband.
2        Those are the common characteristics
3  but that pretty much describes the totality of
4  any dorm that you have there with the exception
5  of the structured dorms. The honor dorms and the
6  faith dorms, but even there you see drugs. And
7  usually they're younger people, usually.
8    Q    Have you done anything to analyze the
9  makeup of the inmates in the more dangerous
10  dorms?
11    A    It's not possible for me to do a
12  demographic analysis that is detailed enough
13  because I don't have that information.
14    Q    You don't have what?
15    A    I don't have that information. I
16  wouldn't be --
17    Q    You don't have which information?
18    A    Information on the demographics in the
19  dorm to the point where I could tell you what all
20  200 individuals are in there for, what their gang
21  affiliation is, how old they are, what their
22  attitude is. You know, I don't have that ability
23  to have that level of survey that would be
24  required for that.
25        But generally, I'm able to assess

Page 80

1  based on the type of violence that's reported out
2  of a dorm that that's a dangerous dorm or the
3  inmates make statements basically saying that
4  dorm, that dorm, that dorm, you don't want to end
5  up in that dorm because it increases your risk of
6  getting badly hurt.
7    Q    Are there dorms that -- or is there a
8  particular facility that you are sufficiently
9  familiar with where you could say A Dorm is
10  dangerous, B Dorm is not as dangerous as A Dorm
11  and C Dorm is pretty safe?
12    A    I have tried to basically get to a
13  point where I could say that about a lot of them,
14  but that information sometimes I can't remember
15  all of it and sometimes ADOC then will change a
16  character of a dorm at some point and it gets a
17  little bit jumbled up. Right now, for example, I
18  could say that about several prisons and give you
19  a sense of where some of the bad dorms are. I
20  can tell you where they are in Limestone, Kilby
21  --
22    Q    Well, let's --
23    A    They're --
24    Q    -- walk through Limestone.
25    A    Well, basically all the dorms in the

Page 81

1  big yard, so I, J, K and L plus G Dorm, the
2  custody dorm that's pretty much bedlam right now.
3  It's also not safe frequently inside some of the
4  segregation dorms, C and E. Contraband is
5  introduced there constantly. Weapons are
6  obtainable in there.
7        At Bibb, A and C Dorms on the east
8  side are dangerous dorms still to this day from
9  the standpoint of violence. At Staton, pretty
10  much any dorm that's not A or B is dangerous at
11  Staton. At Easterling and Ventress, very similar
12  patterns and since they're designed the same way,
13  it can be dangerous in any of the dorms frankly
14  that are not the honor dorms or the warden's
15  dorms.
16        At Kilby, there's a variety of dorms
17  that are dangerous. They have dorms where --
18  first of all, that prison is over 300 percent
19  over design capacity, so they have -- they're
20  mixing a lot of people from county with people
21  who are there longer term, so they've got a
22  mixture of Level 1 custody people and Level 5
23  custody people and that creates a danger to it.
24  So, there's a lot of different dorms there as
25  well that are very dangerous.

21 (Pages 78 - 81)

Page 82

1        At Fountain, F, E, D the step-down
2   dorm.  Donaldson, is really, really dangerous.  I
3   can't remember all of those places right now.
4   And Holman, I have less information on, but it's
5   less violent.
6        Q    Would you say Kilby is more violent
7   than Donaldson?
8        A    No, not in terms of, I guess, the pure
9   number of assaults, but I think the -- well, let
10  me put it this way, I think Donaldson is a place
11  you're more likely to get killed.
12       Q    So, what would you say is the worst
13  dorm at Kilby?
14       A    Right now, that one's blurring for me
15  because I'm talking about the other ones too
16  much.  I forget which dorm it is, but it's where
17  they have a -- they house all their Level 5s,
18  whatever one that is, I forget if it's M or the
19  other one.  I don't remember right now.
20       Q    I can tell you it's not M Dorm.
21       A    Okay.
22       Q    It's either J or A.
23       A    Okay, I think it's A actually.
24       Q    Okay.
25       A    I think, I think.

Page 83

1        Q    Okay.  Do you know how many
2   individuals are held in A Dorm at Kilby?
3        A    Off the top of my head, I don't.
4        Q    Okay.  What would you say is the most
5   violent dorm at Donaldson?
6        A    I don't know right now because I can't
7   remember all of the dorm names, but I think the
8   last homicide that was there is that dorm, that
9   you had the last homicide in there as the one I'm
10  mainly thinking of, but there are several dorms
11  that are very violent at Donaldson.
12       Q    You said there are several dorms?
13       A    Yes.
14       Q    Would you have a judgment as to the
15  number?
16       A    At least two, maybe three, maybe more.
17       Q    But there's dorms at Donaldson that
18  practically have no violence, right?
19       A    I wouldn't be able to say that.
20       Q    What do you mean?
21       A    I don't know.
22       Q    So, for example, if I told you over
23  the last five years, there had only been two
24  incidents in P Dorm and there had been zero
25  incidents in P Dorm over the last four years --

Page 84

1        A    What is P Dorm?
2        Q    Off hand I don't know.
3        A    Well --
4        Q    But let me finish --
5        A    And you're reading from what?
6        Q    Well, no, I'm reading from a document
7   I have.
8        A    Okay, can I see it?
9        Q    No.  Sorry.
10       A    Is it publicly available?
11       Q    The information that I derived this
12  from was the incident reports that we've produced
13  to you.
14       A    Okay, fair enough.
15       Q    You receive a roll up of incidents on
16  an annual and monthly basis I believe.
17       A    Okay.
18       Q    What do you consider -- when you say
19  that a dorm is violent, what types of incidents
20  would you say count toward being a violent
21  incident?
22       A    Well --
23       Q    Let me give you an example.  Okay?
24  If, for example, someone has a contraband cell
25  phone, I don't know if you consider that to be a

Page 85

1   violent act or not.  I understand that fighting
2   with a weapon certainly would be violent, but
3   could you give me some judgment based on the
4   types of different incidents that ADOC reports --
5        A    Physical violence.
6        Q    Okay.  Would that include threats?
7        A    Well, where there's threats, there's
8   eventually violence but it's not the threat in
9   and of itself.
10       Q    Is a suicide considered violence?
11       A    I would not consider that violence in
12  an isolated incident as such, but it's possible
13  that the suicide was related to violence if that
14  individual had been suffering prior to that.  It
15  would be something I would take a look at as a
16  concern from the standpoint of the conditions the
17  individual was living under.
18       Q    If an inmate assaults a staff member,
19  is that considered violence?
20       A    It's violence, but it's not inmate on
21  inmate violence.
22       Q    Okay.
23       A    And it certainly is an indicator that
24  there is violence in that dorm.
25       Q    What would you say are the most common

22 (Pages 82 - 85)

Page 86

1  types of violent incidents inside the dorms that
2  you see?
3      A    It's not a question of what I see,
4  it's what I'm told when I talk to inmates, but I
5  also have seen your reports, although they don't
6  always go into detail because normally you guys
7  are -- your staff are reacting after the fact.
8  But beatings are the most common ones since most
9  of the violence doesn't result in a homicide.
10  There are beatings that, you know, people having
11  been physically attacked with kicks, punches,
12  sticks, broomsticks, locks in socks, stabbings
13  are less common than those kinds of acts of
14  violence that are beatings.  Stabbing would be
15  the other thing and that really is the majority
16  of it.
17          Fights, as such, if they're fist
18  fights, I don't always hear about those, but I
19  understand they also take place.  Since they don't
20  rise to the level of someone being badly hurt, I
21  don't usually hear about them as much.
22      Q    Are you aware that if you compare the
23  numbers at Donaldson between 2020 and 2024,
24  across the spectrum of whether it be assault
25  inmate on inmate with non-serious injury, assault

Page 87

1  inmate on inmate with a weapon, fighting inmate
2  on inmate without a weapon, fighting with a
3  weapon, that if you look at all those categories
4  of violence that they're all -- well, all but
5  one, is down?
6          MS. WARD:  Object to form.  You can
7  answer.
8          THE WITNESS:  So, again, you're
9  looking at a document based on a compilation that
10  you told me of incident reports that --
11          (Simultaneous speaking.)
12          MR. LUNSFORD:  I'm just looking -- I'm
13  looking at the roll up data we give you.
14          THE WITNESS:  I understand, so I don't
15  get -- when I'm on the phone, I'm dealing with
16  inmates describing their world, so it's not a
17  statistic that I am being given when I talk to
18  the inmates.  I don't operate in a vacuum of
19  course, so I'm aware of -- or I try to be aware
20  of whatever statistics you guys produce related
21  to violence and I look at staffing sometimes too.
22          From 2024, if you have documented that
23  it's less violent based on incidents noted, I
24  have no -- I am not going to contest those
25  numbers as such, because I don't -- I'm not there

Page 88

1  to document what is and what is not reported.
2  What I can tell you is that inmates tell me that
3  the vast majority of the violence does not see
4  documentation.  As much as maybe 80 percent more
5  violence takes place than is documented on what
6  your staff at ADOC write reports for.
7          BY MR. LUNSFORD:
8      Q    How do you know that?
9      A    That's what they told me.  I have
10  asked.  I've gotten a sense, I think we went into
11  question earlier in terms of when I survey
12  inmates about what's going on.  Can you tell me
13  what's going on in your dorm?  What do you know
14  about this dorm?  And so on, and I have
15  consistently done that in my time in talking to
16  the inmates.
17      Q    So, let me ask this, you're alleging
18  that ADOC doesn't document, in your allegation,
19  80 percent of the incidents that have occurred?
20      A    I --
21          MS. WARD:  Object.
22          MR. LUNSFORD:  Did I understand that
23  correctly?
24          MS. WARD:  Object to format, that
25  mischaracterizes the testimony.

Page 89

1          THE WITNESS:  Well, she's right
2  because what I said was that the inmates tell me,
3  so it's not my opinion.  It's not for me to
4  allege as such, it's for me to tell you that that
5  is what the inmates tell me.
6          MR. LUNSFORD:  Okay.  So, have you
7  investigated that allegation?
8          THE WITNESS:  Well, the invest --
9  there is -- I cannot prove that, you know, I
10  don't have access to the cameras to watch it 24/7
11  to determine how much of that is correct or not
12  correct.
13          BY MR. LUNSFORD:
14      Q    Have you attempted to confirm it?
15      A    Again, it's not something I can
16  confirm with any resource that I could access,
17  but I am talking to individuals that are there
18  24/7 and that understand prison life, understand
19  what goes on in there and they can tell me.  Now,
20  I do my best to try to get them to focus on, you
21  know, on the question at hand and not exaggerate
22  and not engage in too much conjecture, but I
23  think it's roughly 80 percent.
24      Q    Well --
25      A    It might vary from prison, it might

23 (Pages 86 - 89)

Page 90

1  vary in dorms, but --
2      Q    So, that's your testimony?  You can
3  swear under oath that it's 80 percent of the time
4  incidents are occurring?
5          MS. WARD:  Object to form.
6          MR. LUNSFORD:  But you just said I
7  think it's 80 percent, I heard you.
8          THE WITNESS:  Yes, but you understand
9  the premise to what I said was based on my
10 conversations with inmates.
11         BY MR. LUNSFORD:
12     Q    No, that -- well, you thinking it's 80
13 percent and being told it's 80 percent, you
14 understand those are different facts?
15     A    Me interpreting what the inmates tell
16 me is one thing and one thing alone.
17     Q    You believing something and you being
18 told something is different, correct?
19     A    I'm not sure how you're
20 differentiating.
21     Q    Okay, well, let me ask this, have you
22 ever seen an incident that was reported to you by
23 an incident and it did not show up in an incident
24 report?
25     A    Have I ever seen an incident?  I have

Page 91

1  been told by inmates of something that happened
2  to them or someone else that maybe if they -- it
3  was something that happened in the past far
4  enough back to where at that moment in time that
5  I got the phone call that I had access to ADOC
6  documents from that period of time, I have come
7  across situations where I did not find the
8  document.  That doesn't mean it didn't exist,
9  but, you know, I can't verify let's say if an
10 inmate tells me last month -- and I'm making this
11 up as an example, but I can't verify if an inmate
12 tells me that last month we had X amount of
13 assaults, violent assaults in this dorm that I
14 live in.  I have no way of accessing any
15 materials that would confirm that one way or
16 another.
17     Q    Do you know how many different
18 incident reports ADOC has produced to the
19 Department of Justice for the last five years?
20     A    How many different ones or --
21     Q    Yes.
22     A    -- different types?
23     Q    Different incident reports.
24     A    I know it's a large number.
25     Q    Would you disagree that ADOC has

Page 92

1  produced 785 incident reports for Kilby over the
2  last five years?
3      A    I have no reason to be able to
4  disagree with that one way or the other.
5      Q    What about do you have any reason to
6  dispute that ADOC produced 1,861 incident reports
7  for Limestone?
8      A    I do not.
9      Q    Do you dispute that ADOC produced
10 1,542 incident reports for Bibb Correctional
11 Facility?
12     A    I do not.
13     Q    Would you dispute that ADOC produced
14 1,657 incident reports for Donaldson?
15     A    I do not.
16         THE VIDEOGRAPHER:  Counsel, this is
17 the videographer, you've gone over an hour and 44
18 minutes.  I'll need to change my file soon.
19         MR. LUNSFORD:  Do you want to stop
20 now?
21         THE VIDEOGRAPHER:  It's up to you,
22 sir.
23         MR. LUNSFORD:  Yeah, we'll stop now,
24 that's fine.
25         THE VIDEOGRAPHER:  We're going off the

Page 93

1  record at 10:48 a.m. Eastern Time.
2          (Whereupon, the above-entitled matter
3  went off the record at 10:48 a.m. and resumed at
4  11:12 a.m.)
5          VIDEOGRAPHER:  This is video file
6  number two.  Back on the record at 11:12 a.m.
7  Eastern Time.
8          MR. LUNSFORD:  Mr. Williams, during
9  the break, did you review any documents?
10         THE WITNESS:  I did not.
11         BY MR. LUNSFORD:
12     Q    I'd asked you a question about emails,
13 and I want to make sure I'm clear.  You have not
14 received any emails from any family members of
15 any inmates?
16     A    If I said that, I didn't mean to say
17 that.  I have received emails from family
18 members, yes, I have.
19     Q    Are there any other emails from any
20 other sources that you received related to this
21 case that are not from -- I don't want to include
22 your consultants or counsel.
23     A    Well, there are activists, for lack of
24 a more precise way of putting it, that are
25 functioning in Alabama and maybe throughout the

24 (Pages 90 - 93)

Page 94

1  nation that have a focus on emailing Alabama
2  about things going on in the prisons.
3      I think in the last year, year and a
4  half or so roughly, that has kind of taken off,
5  and they do really large emails, meaning the
6  recipient list is exceptionally large and
7  includes a lot of ADOC personnel.  It includes
8  Alabama legislators, it includes Judge Proctor in
9  some cases.  And then I'll be on those emails.
10     Q    Any other sources that you received
11  emails from?
12     A    I think that's broadly -- sorry, I
13  need to get my glasses.
14         MR. LUNSFORD:  Okay.  I place before
15  you what's been marked as Defense Exhibit 1, do
16  you recognize that?
17         (Whereupon, the above-referred to
18  document was marked as Defense Exhibit No. 1 for
19  identification.)
20         THE WITNESS:  Yeah.
21         BY MR. LUNSFORD:
22     Q    Okay, this is the subpoena that was
23  issued to you by the State of Alabama to appear
24  for today's deposition, is that correct?
25     A    That is correct.

Page 95

1      Q    Okay. Did you happen to bring any
2  documents with you today that were requested in
3  the subpoena?
4      A    No, I did not.
5         MS. WARD:  And before we go into this,
6  can I just place in the record that we objected
7  to the entire document request attached to the
8  subpoena as work product, and the Special Master
9  agreed with us?  And the court adopted that
10  recommendation.
11         MR. LUNSFORD:  Just asking if he
12  brought any documents with him.
13         MS. WARD:  No, I know, I'm just making
14  sure on the record before you ask about the
15  documents that it is clear that any documents
16  request related to this deposition is submitted
17  pursuant to subpoena order -- considered work
18  product.
19         MR. LUNSFORD:  Mr. Williams, I've
20  placed before you what's been marked as
21  Defendant's Exhibit 2.
22         (Whereupon, the above-referred to
23  document was marked as Defense Exhibit No. 2 for
24  identification.)
25         MR. LUNSFORD:  Do you recognize that?

Page 96

1         THE WITNESS:  Yes, I do.
2         BY MR. LUNSFORD:
3      Q    What is Defendant's Exhibit 2?
4      A    It's the U.S. objections and responses
5  to Defendant's second set of interrogatories,
6  which I signed on May the 28th of 2024.
7      Q    Let's go to the last page.  There on
8  page 17, is that your signature?
9      A    Correct.
10     Q    And did you understand that you were
11  signing this under oath, under penalty of
12  perjury?
13     A    Yes, I did.
14     Q    And that you were attesting that the
15  information included in these interrogatory
16  responses were true and accurate?
17     A    Correct. Yes, I did.
18     Q    Did you review this document before
19  you signed it?
20     A    Yes, I did.
21     Q    How many times did you review this
22  document before you signed it?
23     A    I don't recall.  I gave it a thorough
24  read, if I recall.  I may have looked at it
25  slightly more than that, but I couldn't say that

Page 97

1  it was twice, three times, and so on.
2      Q    Were you confused by any of the words
3  or terminology used in this document?
4      A    I don't remember that I was, no.
5      Q    Do you recall any concerns you had as
6  to the accuracy of any information included in
7  here?
8      A    No, I think everything that I read in
9  this response was consistent with what my own
10  knowledge of the case and the facts were.
11     Q    Did you have any concerns about
12  signing these interrogatories under oath?
13     A    I was first -- I think I was curious
14  why it was me as opposed to someone else.  But at
15  the end, in the end, I had no concerns, no.
16     Q    Is there someone in the Department of
17  Justice you thought had more knowledge about
18  these matters than you did?
19     A    I did not know if that would be the
20  case, and if that would have been a person that
21  could have signed them.
22     Q    Okay.  Let me turn our attention to
23  interrogatory 18 on page 5.
24     A    Gotten there.
25     Q    So interrogatory number 18 asked for

25 (Pages 94 - 97)

Page 98

1　DOJ to identify the primary facts underlying
2　Plaintiff's determination that ADOC and, or, the
3　state continued to demonstrate a pattern or
4　practice of resistance to the rights, privileges,
5　or immunities of incarcerated individuals within
6　the ADOC facilities, as secured or protected by
7　the Eighth Amendment to the United States
8　Constitution.
9　　　　Do you see that?
10　A　I do.
11　Q　Okay. And once we get past the
12　objections, then the United States provides
13　further information beginning on page 6, is that
14　correct?
15　A　Correct.
16　Q　Before we get into that information,
17　I want to ask you, you understand that the United
18　States has sued the State of Alabama, alleging
19　that it has violated individuals' rights under
20　the Eighth Amendment. Is that correct?
21　A　I do understand that.
22　Q　And do you have an understanding about
23　the elements of a claim asserted under the Eighth
24　Amendment?
25　　　　MS. WARD: Object to form.

Page 99

1　　　　THE WITNESS: Will you specify that a
2　little bit more --
3　　　　MR. LUNSFORD: Do you know what --
4　　　　THE WITNESS: -- what you mean by
5　elements of a claim?
6　　　　MR. LUNSFORD: Yeah, do you know what
7　the Department of Justice must prove in order to
8　demonstrate that the State of Alabama did in fact
9　violate individuals' rights under the Eighth
10　Amendment?
11　　　　MS. WARD: Object to form.
12　　　　THE WITNESS: Well, there -- I'm aware
13　of the fact that there's also a concept of
14　deliberate indifference that's applicable. So in
15　my non-lawyer, being your own lawyer capacity,
16　over the time I've understood that the law
17　devolves. Sometimes constitutional amendments
18　are interpreted slightly differently over time
19　than they were previously.
20　　　　But that we're dealing with, in the
21　case of the Eighth Amendment, it's a, among other
22　things, the prohibition of cruel and unusual
23　punishment in the context of prisons.
24　　　　That then becomes I guess a somewhat
25　subjective concept for some. But it relates to

Page 100

1　the overall condition being such that there's a
2　risk of harm to the people that are residing
3　therein.
4　　　　MR. LUNSFORD: Is it your
5　understanding that ADOC must prevent all harm
6　that might come to the incarcerated population?
7　　　　MS. WARD: Object to form.
8　　　　THE WITNESS: I don't believe it's all
9　harm, no.
10　　　　MR. LUNSFORD: Okay, if it's not all
11　harm, then what types of harm do you think -- do
12　you understand ADOC must prevent under the law?
13　　　　MS. WARD: Object to form. Also going
14　to object on privilege. This is getting into --
15　so he's testifying as an employee of the
16　Department of Justice, not in his personal
17　capacity and his personal opinion are -- and the
18　questions must be specifically tailored to
19　discovering facts underpinning Plaintiff's
20　allegation.
21　　　　We are not required to tender him to
22　testify how we intend to marshal the facts that
23　prove our legal case. So if you're intending to
24　ask legal arguments and how we intend to legally
25　prove our case, that is opinion work product, and

Page 101

1　I will instruct him not to answer.
2　　　　MR. LUNSFORD: You understand and you
3　swore under oath as to certain facts that the
4　United States had relied upon in determining that
5　ADOC had allegedly violated the rights of
6　individuals, correct?
7　　　　MS. WARD: Object to form.
8　　　　MR. LUNSFORD: Is that correct?
9　　　　THE WITNESS: That is correct, yes.
10　　　　MR. LUNSFORD: Okay. And you were
11　asked to attest to all the facts, and those facts
12　were related to an alleged Eighth Amendment
13　violation, correct?
14　　　　MS. WARD: Object to form.
15　　　　MR. LUNSFORD: So here's my -- is that
16　correct?
17　　　　THE WITNESS: Correct.
18　　　　MR. LUNSFORD: How did you determine
19　-- how did you evaluate whether this fact
20　demonstrated deliberate indifference on the part
21　of ADOC?
22　　　　MS. WARD: Object on privilege
23　grounds. That is work product, and I will
24　instruct him not to answer that question as
25　asked.

26 (Pages 98 - 101)

Page 102

1      MR. LUNSFORD: Okay. Did you decide
2  which facts were included in interrogatory number
3  18?
4      MS. WARD: Object to form. That is
5  work product, and I will instruct him not to
6  answer.
7      MR. LUNSFORD: Did you add any facts
8  to interrogatory number 18?
9      MS. WARD: Object to form. That is
10 work -- or sorry, and object on privilege. That
11 is work product and I will instruct him not to
12 answer.
13      MR. LUNSFORD: Are there other facts
14 that you're aware of that demonstrate a pattern
15 or practice of resistance to the rights,
16 privileges, or immunities of incarcerated
17 individuals within the ADOC facilities that are
18 not included in a response to interrogatory
19 number 18?
20      MS. WARD: Object on privilege
21 grounds. That is work product, do not answer.
22      MR. LUNSFORD: Wait, I said is he
23 personally aware of facts. You're not listening
24 to the question, Carla. Is he personally aware
25 of facts that are not included in interrogatory

Page 103

1  number 18 that, again, demonstrate a pattern or
2  practice of resistance to the rights, privileges,
3  or immunities of incarcerated individuals.
4      How's that privileged?
5      MS. WARD: You're asking him to prove
6  legally --
7      MR. LUNSFORD: No, I'm not proving.
8      MS. WARD: -- based on a legal
9  standard. You're asking him to apply facts to
10 the legal standard, and that is a leading
11 question.
12      MR. LUNSFORD: Which the court said we
13 could -- no, I'm saying are aware of any other
14 facts that you believe constitute cruel and
15 unusual punishment on the part of the State of
16 Alabama that are not included in a response to
17 interrogatory number 18.
18      MS. WARD: I would object to form.
19 And you can answer if you're aware of any facts -
20 -
21      MR. LUNSFORD: That's so coaching.
22 Gosh, you can coach, it's amazing.
23      MS. WARD: The court said we --
24      MR. LUNSFORD: Why are you so afraid
25 of him testifying?

Page 104

1      MS. WARD: I'm abiding by what the
2  court held was proper in this deposition in the
3  court order. And we are not afraid of anything,
4  except not waving any of our privileges that we
5  have as the Department of Justice.
6      You can question him about facts
7  underpinning our allegations in the admitted
8  complaint, facts underpinning our allegations,
9  and facts contained in the emails and calls he
10 received. Any facts he has personal knowledge
11 of.
12      But if you're going to ask him to
13 apply facts to legal standards, that is the work
14 product of the team of which he is a part, and he
15 works for the attorneys in this case. So there
16 is a line here. And as long as you stay on one
17 side of the line, pursuant to the court's order
18 in this case, you can ask him those questions.
19      MR. LUNSFORD: Mr. Williams, let's
20 turn to page 6. You testified under oath that
21 Alabama Department of Corrections had an
22 unreasonably high number of homicides of
23 prisoners in the last several years in the
24 facilities. Do you see that?
25      THE WITNESS: Yes, I do.

Page 105

1      BY MR. LUNSFORD:
2      Q    Can you give me -- what years
3  reference the last several years?
4      A    It's my understanding at the time that
5  I was assigned this in May of '24 that we were
6  including data that we had through 2022, possibly
7  some of 2023. But I don't have -- I don't recall
8  if we had all of 2023's information at the time.
9      Q    So it's your contention that ADOC had
10 an unreasonably high number of homicides of
11 prisoners since roughly 2022, 2023 in the
12 facilities, is that correct?
13      A    Well, it's not my contention. I am a
14 part of the team, so this is a team, this is the
15 work of the team overall.
16      Q    But you're testifying to this under
17 oath.
18      A    Right now I am responding to your
19 questions. But I'm clarifying your question and
20 what I'm able to say.
21      Q    So my question is how many homicides
22 occurred during that period of time?
23      A    I don't remember off the top of my
24 head at this time. It's a couple years ago.
25      Q    And we're going back to 2022, is that

27 (Pages 102 - 105)

1 correct?
2    A    At the time, I think we were looking
3 -- the sentence indicates last several years,
4 right?
5    Q    Yeah, but I don't know what last
6 several years means.
7    A    Well, I'm about to clarify, if you let
8 me.
9    Q    Okay.
10    A    I think that is going back to a period
11 of basically since we had filed the complaint,
12 but don't -- I don't know if -- I don't know if
13 we cut if off, if we included 2020 at this time
14 that I sit here.
15    Q    When you say homicide of a prisoner,
16 are you referring -- are you including suicides
17 in homicides?
18    A    No, we are -- I am not, no.
19    Q    Are you including every time someone
20 dies as a result of an altercation?
21    A    If it's deemed a homicide by the
22 appropriate authorities and we have documentation
23 of that, that would be a homicide.
24    Q    Who would be the proper authorities to
25 determine whether?

1    A    Authorities that we would rely on
2 would include also documentation from ADOC.  If
3 you classify it as a homicide, I don't think we
4 have any reason to doubt that.  But there's also
5 coroners at times that substantiate a homicide.
6    Q    Okay.
7    A    Through manner of death.
8        MR. LUNSFORD:  And you're saying that
9 there was an unreasonably high number of
10 homicides at every single institution in this --
11 in this case, correct?
12        MS. WARD:  Object to form.
13        MR. LUNSFORD:  Is that correct?
14        THE WITNESS:  It days ADOC, so it's
15 all the facilities combined.  So as a system, not
16 focused on any particular facility as such.
17        BY MR. LUNSFORD:
18    Q    How is the facilities defined?
19    A    I'm sorry?
20    Q    Look at -- look at the footnote that
21 you swore to and attested to.  I thought this
22 said is limited to the ADOC prisons identified in
23 the Second Amendment compliant.  That should be a
24 Second Amendment complaint.
25    A    All I -- the way you phrased your

1 question initially on this topic, I thought you
2 were trying to ask me in such a way as to -- as
3 if I had information if the homicide rate was too
4 high at each individual prison.
5        But the data relates to homicides
6 throughout the entire system at ADOC, so there
7 may be some prisons that have less, there may be
8 some that have more.  So that's the distinction I
9 was trying to make in my response to you.
10        MR. LUNSFORD:  Well, is it -- was
11 there an unreasonably high number of homicides of
12 prisoners in the last several years at Kilby?
13        MS. WARD:  Object to form.
14        THE WITNESS:  I don't recall the
15 figures from then, but overall I think Kilby
16 tends to not have very many homicides.
17        MR. LUNSFORD:  So wait, what's the
18 objection to form?
19        MS. WARD:  Hm?
20        MR. LUNSFORD:  What's the objection to
21 form?
22        MS. WARD:  You want read back the
23 question and I can tell you?
24        MR. LUNSFORD:  You don't remember?
25        MS. WARD:  Do you remember --

1        MR. LUNSFORD:  Yeah, no, I said -- I
2 said -- I said was there an unreasonably high
3 number of homicides of prisoners in the last
4 several years at Kilby.
5        MS. WARD:  Well, a lot of those terms
6 are vague.
7        MR. LUNSFORD:  I'm reading off of your
8 interrogatory response.
9        MS. WARD:  Actually, our interrogatory
10 response says ADOC had an unreasonably high
11 number of homicides of prisoners in the last
12 several years.  It's unclear whether you're using
13 the same terminology.
14        MR. LUNSFORD:  Okay, let me ask the
15 question again.
16        Was there an -- and I'm quoting here
17 from your interrogatory response -- an
18 unreasonably high number of homicides of
19 prisoners in the last several years, close quote,
20 at Kilby?
21        THE WITNESS:  So you're rephrasing the
22 statement to focus on Kilby alone, is that
23 correct?
24        MR. LUNSFORD:  Correct.
25        THE WITNESS:  And as I said initially,

1  it's my understanding from the facts that I'm
2  aware of that Kilby generally is not a place
3  where there's homicides as often.
4        BY MR. LUNSFORD:
5     Q    But when you said the word facilities
6  here, you're referring -- you refer us to the
7  Second Amendment complaint, correct?
8     A    I am not the person that drafted this.
9     Q    No, you just swore to the direct truth
10  of it.
11     A    But I signed it --
12        MS. WARD:  Object to form as
13  harassing.
14        THE WITNESS:  Well, listen --
15        MS. WARD:  So -- if I --
16        MR. LUNSFORD:  Please -- please don't,
17  please don't.  I mean, we're getting on the phone
18  with Bruce if this continues.
19        MS. WARD:  We can.
20        MR. LUNSFORD:  We're headed that way
21  very quickly.
22        MS. WARD:  Okay, and we can.  But
23  Bill, may I clarify something?
24        MR. LUNSFORD:  No, you may not
25  testify.

1        MS. WARD:  Yes, I'm not testifying.
2        MR. LUNSFORD:  No, you are testifying.
3        MS. WARD:  I'm not testifying.
4        MR. LUNSFORD:  This is not a license
5  for you just to spiel over the record.  It is my
6  question.
7        MS. WARD:  Bill, Bill, you have to let
8  me answer.  And if that process --
9        MR. LUNSFORD:  I don't actually.
10        MS. WARD:  You do, you do.
11        MR. LUNSFORD:  You're going to --
12  okay, go ahead and --
13        MS. WARD:  I have the ability to place
14  objections on the record.
15        MR. LUNSFORD:  This is not an
16  objection.
17        MS. WARD:  Yeah, I think we would have
18  -- you would have to call the court.
19        MR. LUNSFORD:  We'll call Bruce first.
20        MS. WARD:  Okay.  So you are claiming
21  that he is doing something inappropriate by not -
22  -
23        MR. LUNSFORD:  No, I'm not.
24        MS. WARD:  Knowing every single fact
25  perfectly in the interrogatory responses.  But

1  Bruce himself in his report and recommendation
2  said that he agreed that the mere fact Williams
3  verified the interrogatory responses does not
4  itself equate to possession of personal knowledge
5  of every response.
6        And Rule 33(b) expressly permits a
7  representative of a government entity to verify
8  the government's answers without personal
9  knowledge of every response by furnishing such
10  information as is available to the party.
11        MR. LUNSFORD:  Okay.
12        MS. WARD:  So you can ask him --
13        MR. LUNSFORD:  That's not an
14  objection.
15        MS. WARD:  No --
16        MR. LUNSFORD:  You're done.
17        MS. WARD:  No, I'm not, Bill.
18        MR. LUNSFORD:  Here's my next
19  question.
20        MS. WARD:  No, Bill --
21        MR. LUNSFORD:  So Mr. Williams.
22        MS. WARD:  Bill, you have to let me
23  finish my question.
24        MR. LUNSFORD:  Let me ask this: when
25  you -- you're --

1        MS. WARD:  Yes, Bill.
2        MR. LUNSFORD:  You said it was an
3  objection and now you said it was a question.
4        MS. WARD:  No, sorry, my objection.
5  You have to let me finish my objection.
6        MR. LUNSFORD:  This is not an
7  objection, you're just --
8        MS. WARD:  This is an objection,
9  you're not letting me finish.  My objection is to
10  questions that ask him for things in his personal
11  knowledge that are outside the scope of the
12  interrogatories.
13        You can ask him about facts that are
14  in the interrogatories, but the interrogatory
15  speaks about the Alabama Department of
16  Corrections and you are --
17        MR. LUNSFORD:  You're coaching him
18  now.
19        MS. WARD:  No, I'm not.
20        MR. LUNSFORD:  Yes, you are, please
21  stop.
22        MS. WARD:  No, I'm not, you're
23  rephrasing it.
24        MR. LUNSFORD:  Okay.  No, you're
25  coaching him as to how to answer the next

1 question.
2         MS. WARD: You are crossing a line --
3         MR. LUNSFORD: I got your objection.
4         MS. WARD: You're crossing a line into
5 work product.
6         MR. LUNSFORD: You're --
7         MS. WARD: And you're outside the
8 scope of what this deposition is supposed to be.
9         MR. LUNSFORD: All right, let's go
10 back for a minute. Mr. Williams, I'm looking at
11 a sentence. ADOC had an unreasonably high number
12 of homicides of prisoners in the last several
13 years in the facilities, okay. Let me ask this
14 very simply. Which facilities are you referring
15 to?
16         THE WITNESS: All the facilities in
17 the investigation as an entity, but the homicides
18 as an entity, a number, may be such that it's not
19 spread out to every single facility.
20         BY MR. LUNSFORD:
21     Q    So would it be accurate for me to read
22 -- so when you say that the unreasonably high
23 number of homicides, you're looking statewide.
24     A    At the system entirely.
25     Q    Okay.

1     A    Of state prisons.
2     Q    Did you analyze the number of
3 homicides at Kilby?
4     A    Would have analyzed all the homicides
5 period.
6     Q    And did Kilby have an unreasonably
7 high number of homicides?
8     A    As I indicated earlier when you asked
9 about Kilby initially, I don't recall that Kilby
10 had homicides in that period. And generally
11 speaking, it doesn't have as many homicides as
12 the other prisons.
13     Q    Would one homicide a year at a
14 facility be unreasonably high, in your
15 perspective?
16     A    In Alabama or anywhere?
17     Q    Anywhere.
18     A    If I was doing an investigation purely
19 about a single prison, the context would have to
20 matter. Probably not. At -- if it was a single
21 prison.
22     Q    With a thousand inmates? A thousand
23 inmates and one homicide a year, would that be
24 unreasonably high?
25     A    Depends on the circumstances of where

1 you're at, but on its own, one homicide a year,
2 if it's -- if it's more of an isolated incident
3 and is not related to all the other factors that
4 lead to the violence, in other words, you can
5 tell that it truly was more isolated. That
6 there's not a pattern and practice of violence
7 throughout the system and all these other factors
8 that lead to it, then it would be truly more
9 isolated.
10         But when all these other factors
11 combine with the homicide, then you start to
12 sense there's a problem.
13     Q    Okay. When you referred to facilities
14 in your response that ADOC had an unreasonably
15 high number of homicides of prisoners in the last
16 several years in the facilities, does the term
17 facilities include the correctional facility?
18     A    It includes all of the prisons in the
19 --
20     Q    No, I didn't ask did it include all,
21 I said does it include the correctional facility.
22     A    Well, when I say all, that means Bibb
23 as well.
24     Q    Okay.
25     A    So yes.

1     Q    Did Bibb Correctional Facility have an
2 unreasonably high number of homicides of
3 prisoners in the last several years?
4     A    At the time of this writing, my answer
5 is going to repeat itself if we're going to
6 isolate by facility to facility, if this is where
7 you're going. To help you save some time or us,
8 it's not going to change from the answer I gave
9 to Kilby.
10         There are prisons where there's going
11 to be more homicides, and it evolves, it changes
12 from time to time as the population maybe
13 changes, due to what ADOC might do. But by and
14 large, in combination with all the other factors
15 that we see in the system in Alabama, the
16 homicide rate is of a -- is of a piece of all of
17 that.
18         So it's a part of a context, it's not
19 a purist analysis of the numbers alone, other
20 than for the entire system combined, facilities,
21 plural --
22     Q    So how many -- how many --
23     A    Twelve prisons. I'll finish, all
24 right?
25     Q    Okay.

30 (Pages 114 - 117)

1     A     The entire system, combined, that many
2  homicides that ADOC was experiencing is too high.
3     Q     Okay, what -- how high was it, what
4  was the number of homicides?
5     A     I think I said earlier I don't
6  remember exactly for '22 and '21 and '20, those
7  numbers, but it was high.
8     Q     If there had been ten less homicides,
9  would that have been reasonable number of
10  homicides?
11     A     It's hard to quantify it.  You know,
12  from -- as you're looking back in time throughout
13  the last few years, you can't say that at that
14  point it would have been reasonable or whatever.
15  Again, with all the other factors combined, it
16  was too high.
17          But I think a ten -- if you had ten
18  homicides less, that would be a significant
19  decrease in the violence.  And you would also see
20  a significant decrease in stabbings and beatings,
21  and I'm guessing other factors would have had to
22  improve to get to those ten fewer homicides.
23     Q     Bibb had zero homicides the year you
24  signed this.  Would that be --
25     A     2024 you mean?

1     Q     Yes.  Would that be unreasonably high?
2     A     Well, it is not high, it's zero.
3     Q     I'm -- serious question.  Is zero
4  homicides at Bibb unreasonably high?
5     A     By definition there is no homicide, so
6  you can't say it's unquestionably high.
7     Q     Okay.
8     A     For Bibb.
9     Q     There were zero homicides at Bibb in
10  2023.  Is that unreasonably high?
11     A     Same answer as before.
12     Q     There was one homicide at Bibb in
13  2022.  Is that unreasonably high?
14     A     Again, going back to my initial answer
15  about Kilby, and this -- and this fact that I
16  signed off on essentially, this is based on the
17  entire system as a whole.  The system ebbs and
18  flows.
19          At one point in time Bibb had a lot of
20  homicides and then they lessened.  You see them
21  increase in other places.  So the -- so you're
22  looking at the entire system.
23          If you can control Bibb or Kilby
24  better from one year to the next, good.  If you
25  manage to do it at all the prisons, even better.

1  But what we're seeing is that you can't manage
2  all the prisons at all the times, and so it goes
3  back and forth.
4     Q     When did Bibb have a lot of homicides?
5     A     Well, homicides and violence.
6     Q     No, you said homicides.  Bibb --
7     A     Okay, well --
8     Q     You testified under oath that Bibb had
9  a lot of homicides previously.  When was that?
10     A     I will retract that.  I will say that
11  Bibb had the reputation for being extremely
12  violent.
13     Q     How many homicides did Bibb have in
14  2020?
15     A     I'm not going to be able to say.
16     Q     Zero.
17     A     Okay.
18     Q     Zero homicides in 2020, is that
19  unreasonably high?
20     A     Same answer as before, zero is not a
21  number you can assess as being high or low.
22     Q     Do you know the largest number of
23  homicides that occurred in a single year over the
24  last, say, five years at Donaldson?
25     A     The most they've had in a single year,

1  is that what you're asking?
2     Q     Yes.
3     A     I don't remember.  Possibly two or
4  three.
5     Q     No, it's actually six.
6     A     Okay.
7     Q     They had -- Donaldson had six
8  homicides in one year, which was 2022.
9     A     Okay.
10     Q     Is that unreasonably high?
11     A     Well, Donaldson has definitely always
12  been one of the most violent prisons in ADOC.  So
13  whether it's unreasonably high or not, and I
14  think it is, it's clearly a place where that type
15  of violence at that point in time was endemic.
16     Q     My question was a little bit
17  different.  I'm just asking a pretty simple
18  question, which is, is six homicides in a given
19  year at Bibb unreasonably high?
20     A     It's a simple question but it can't
21  have a simple answer, because as framed, it
22  doesn't work.  My first answer stays the same.
23     Q     If Bibb had -- or if Donaldson had had
24  four homicides in a single year, would that be
25  unreasonably high?

Page 122

1    A    Again, I will rely on the answers that
2    I've given all along. Whether it's zero at Kilby
3    or four at Donaldson or six at Donaldson, look,
4    viewed as a whole, the homicides are reflective
5    of the violence that we see reported.
6        And they're of a piece of a lot other
7    things that come together to produce those levels
8    of violence, and then homicides are a reflection
9    of violence. It's a smoke leading to fire
10   dynamic essentially.
11       MR. LUNSFORD:  Help me understand
12   this. Help me -- I'm trying to understand is how
13   you reached a conclusion that the number of
14   homicides was unreasonably high, okay. And
15   here's, I'm going to give you a hypothetical.
16       If we had ten homicides in a single
17   system, you would agree that you would have to
18   assess the size of the system in terms of the
19   number of facilities and the number of inmates,
20   correct?
21       MS. WARD:  Object. The question as
22   asked is work product. You asked him to reach a
23   conclusion. Any conclusion reached in the
24   interrogatories is work product, so I'm
25   instructing him not to answer.

Page 123

1        MR. LUNSFORD:  Well, you said, you
2    actually called them facts. You said this is a
3    fact. So you -- your words are that such facts
4    include, colon, the following. So you called
5    these facts, not conclusions.
6        So my question is how did you define
7    what an unreasonable of homicides --
8        MS. WARD:  Object to form.
9    Unreasonable is a conclusion reached by the
10   litigation team, which is work product, and I'm
11   instructing him not to answer.
12       MR. LUNSFORD:  Okay. We're
13   definitely, I mean, I don't see this getting
14   resolved. We're going to move to compel all of
15   this. And we're going to request to come back
16   here and depose it. We can't ask about
17   adjectives in his sworn answers.
18       MS. WARD:  You are welcome to do that.
19   You can ask him about his knowledge of the facts,
20   his knowledge of how many homicides occurred.
21   But you can't --
22       MR. LUNSFORD:  He has no knowledge, he
23   just said that. He says he doesn't know how many
24   homicides occurred.
25       MS. WARD:  Okay, then that's his

Page 124

1    answer.
2        MR. LUNSFORD:  Okay.
3        MS. WARD:  But you can allow him to
4    answer that.
5        MR. LUNSFORD:  So let's go to the next
6    sentence. ADOC does not accurately and
7    consistently track prisoner deaths in the
8    facilities. How did you reach that conclusion?
9        MS. WARD:  Object to form. How you
10   reached that conclusion is privileged, and you
11   cannot answer that question as asked.
12       MR. LUNSFORD:  How does ADOC track
13   prisoner deaths in the facilities?
14       THE WITNESS:  I am not privy to
15   exactly how they track it.
16   BY MR. LUNSFORD:
17   Q    Does ADOC track prisoner deaths at all
18   in the facilities?
19   A    It's my understanding they do. They
20   have statistics on that, so yes.
21   Q    Okay, so if an inmate dies in any of
22   the facilities, does ADOC have a policy that
23   addressed what should occur at that moment?
24   A    I am not versed in all the ADOC
25   policies, but I have to assume that they do.

Page 125

1    Q    Okay, but have you reviewed the
2    policy?
3    A    I don't believe I have reviewed that
4    specific policy.
5    Q    Do you know who's charged with
6    responsibilities at the facility level when
7    there's an inmate death?
8    A    I am not going to be able to give you
9    an answer that is necessarily correct and
10   specific, but I imagine the warden's involved and
11   some other folks.
12   Q    Just so you know, I don't want you to
13   guess, and your counsel is probably going to tell
14   you that during the break.
15   A    That's fine.
16   Q    Which is don't guess. I don't want
17   you to imagine, I don't want you to assume. I
18   just want you to tell me what you know, that's
19   what I'm trying to get to --
20   A    Okay.
21   Q    -- is what's your personal
22   understanding of facts. Have you reviewed any
23   reports of prisoner deaths?
24   A    I believe I have. And you mean ADOC
25   reports?

32 (Pages 122 - 125)

Page 126

1    Q    Yes.
2    A    And by that you mean LESD
3  investigations of those deaths?
4    Q    I mean any reports.
5    A    Okay, yes, then I have.
6    Q    And have you found anything in the
7  reports that are inaccurate?
8    A    Well, those are long reports
9  invariably.  I don't know that I would be able to
10  establish inaccuracy as such in the reports
11  written.
12    Q    As you sit here today, could you --
13  could you identify a single report of death
14  submitted in ADOC that was inaccurate?
15    A    As I sit here today, I don't recall
16  specifically that one that I remember.
17    Q    Do you know who -- well, after an
18  inmate dies, do you know if there's a report of
19  inmate death that's given to the Central Office?
20    A    The Central Office in Montgomery, you
21  mean?
22    Q    Yes.
23    A    I am not sure that I know that one way
24  or the other.
25    Q    Do you know who at the ADOC Central

Page 127

1  Office monitors instances when inmates die?
2    A    I believe I've seen documentation from
3  ADOC where various people are included on emails
4  in such an occasion.  And I recall possibly the
5  LESD Director being involved if it's a homicide.
6  Sometimes the Commissioner, depending.  But I
7  don't -- I'm not going to be able to list any of
8  the others necessarily.
9    Q    Does LESD investigate the deaths of
10  inmates that occur inside ADOC facilities, as
11  defined in your interrogatory?
12    A    It's my understanding that they do.
13    Q    Have you ever seen a death occur
14  inside an ADOC facility that was not
15  investigated?
16    A    I'm not aware of one that was not
17  investigated.
18    Q    Okay.  Have you ever seen a homicide
19  that occurred inside of an ADOC facility that was
20  not investigated?
21    A    Well, the question would be if it was
22  investigated as a homicide from the beginning as
23  opposed to what the determination was at the end
24  of an investigation.  But if it was clear from
25  the get-go that we were dealing with a homicide,

Page 128

1  then the answer would be no.
2    Q    Are you aware of instances when ADOC
3  has referred for prosecution inmates who have
4  killed other inmates in the facilities?
5    A    I don't recall them but I believe I
6  have seen documentation that resulted in that.
7  Either it's on the LESD investigative reports or
8  there's been things that have been produced that
9  indicate things went to a grand jury.
10    Q    Did you conduct any analysis to
11  identify whether there were any prisoner deaths
12  inside ADOC facilities that had not been
13  accurately tracked?
14    A    That information would be consistent
15  with things that I had seen in my -- or
16  information I had come across during the course
17  of the investigation.  But that was something
18  that the team would have come across.  So did I
19  do a specific, personal investigation, or
20  analysis as you put it?  The answer is no.
21        MR. LUNSFORD:  What does it mean, you
22  used the word track prisoner deaths, what does it
23  mean to track a death?
24        MS. WARD:  Object to form.
25        MR. LUNSFORD:  What's wrong with the

Page 129

1  form of that?
2        MS. WARD:  You're asking him for what
3  that means as he's in the interrogatories.  Like,
4  he can answer if he knows, but --
5        MR. LUNSFORD:  So, he swore to
6  something he doesn't know?
7        MS. WARD:  Well, you can ask him.
8        MR. LUNSFORD:  He swore to
9  something -- wow.
10        MS. WARD:  Well, you should ask him if
11  he knows.
12        MR. LUNSFORD:  We just really are
13  interesting -- so, do you know what it means to
14  track prisoner deaths?
15        THE WITNESS:  In other words, for ADOC
16  to track prisoner deaths.
17        MR. LUNSFORD:  Yes.
18        THE WITNESS:  Yes.  It would mean to
19  accurately keep a database, or wherever you keep
20  your statistics that you've been duty-bound to
21  produce and have, and through the investigative
22  process are able to substantiate in some form
23  that is available.
24        BY MR. LUNSFORD:
25    Q    Have you identified a single inmate

Page 130

1  who died in ADOC custody, who's death didn't show
2  up on a statistical report?
3      A    I don't believe I have been able to
4  identify someone that didn't show up on any death
5  report. But I don't know that -- yeah, I don't
6  think I have.
7      Q    Explain to me what you mean by the
8  sentence ADOC does not accurately and
9  consistently track prisoner deaths in the
10  facilities. Explain that to me. What does that
11  mean?
12         MS. WARD: Object to form. You said,
13  what do you mean. Are you asking him what his
14  understanding is when he attested to it? Or,
15  like, the meaning as you spiked at the litigation
16  team.
17         (Simultaneous speaking.)
18         MR. LUNSFORD: Gosh, you are coaching
19  him left and right.
20         MS. WARD: I'm trying to understand so
21  I can make a proper objection. Because we want
22  to make sure we don't reveal work product and
23  waive any privileges.
24         MR. LUNSFORD: When I ask you what
25  anything in here means, Mr. Williams, I'm asking

Page 131

1  you what are you swearing to. What did you say
2  to the court, I hold up my right hand and I swear
3  under oath, Judge, this is a true fact. And you
4  can, under penalty of perjury, I can swear
5  personally I know this to be a fact, true, and I
6  will take the stand and testify to it.
7         MS. WARD: Object to form. That's not
8  what he's doing.
9         MR. LUNSFORD: And my question -- my
10  question is this.
11         MS. WARD: You're mischaracterizing
12  what he's doing when signing the interrogatories.
13  And that's important for the questions he's
14  answering.
15         BY MR. LUNSFORD:
16      Q    ADOC does not accurately and
17  consistently track prisoner deaths in the
18  facilities. What does that mean?
19      A    I mean, on its face it's we've
20  established what you think -- and what I know
21  track means. And so, on its face this sentence
22  means exactly that.
23      Q    Can you identify one single death that
24  ADOC did not accurately track?
25      A    In the course of our investigation --

Page 132

1  and I don't remember the names of the
2  individuals -- we came across examples like that.
3      Q    Can you name one?
4      A    I just said I can't remember the
5  names. It's been a --
6      Q    Examples. How many examples?
7      A    Several.
8      Q    What -- I don't know how many. Is
9  that two? Three?
10      A    It might be two or three at least.
11  But this is with the combined work with the team.
12  So, it was consistent with what my information
13  was when I was doing my own investigative work as
14  part of the team.
15      Q    What percentage of total deaths were
16  not accurately and consistently tracked?
17      A    I don't have that data.
18      Q    In the next sentence you use this
19  phrase, consistently, thoroughly, or
20  effectively --
21         MS. WARD: Object to form.
22         MR. LUNSFORD: You see that phrase?
23         THE WITNESS: Yes, I do.
24         MR. LUNSFORD: I want to talk to you
25  a lot about this phrase, because this phrase

Page 133

1  obviously is important.
2         BY MR. LUNSFORD:
3      Q    Explain to me your understanding of
4  the word consistently.
5      A    In the context of this sentence, or
6  generally?
7      Q    In the context of your responses to
8  this interrogatory.
9         MS. WARD: Object to form. He didn't
10  respond to this interrogatory, the United States
11  of America responded to this interrogatory. He
12  verified them.
13         BY MR. LUNSFORD:
14      Q    Explain to me what you mean by
15  consistently.
16         MS. WARD: Object to form.
17         THE WITNESS: Consistently would be
18  without fail, almost.
19         MR. LUNSFORD: Without fail? Okay.
20         THE WITNESS: Yes.
21         MR. LUNSFORD: What about thoroughly?
22         THE WITNESS: That would mean -- hold
23  on. Well, this relates to implementing changes
24  in response to prisoner deaths, right?
25         MR. LUNSFORD: Well, this phrase

34 (Pages 130 - 133)

Page 134

1  appears seventy-five times.
2          THE WITNESS: That's fine, but --
3          (Simultaneous speaking.)
4          MR. LUNSFORD: -- in four pages.
5          THE WITNESS: -- I think this is a
6  U.S. case.
7          MR. LUNSFORD: Okay. And it's in the
8  same order, consistently, thoroughly, or
9  effectively. And so --
10         THE WITNESS: Okay. Well, at the
11  moment I'm not looking at all the others, but if
12  all the other examples are similar in the way
13  they set up the sentence, and that we're talking
14  about ADOC not implementing a change if it
15  follows in that context, thoroughly would be
16  implementing a change that is thorough from top
17  to bottom, so that implementing the change was in
18  fact done in response. And in this case, to
19  prisoner deaths in the facilities.
20         MR. LUNSFORD: Okay.
21         BY MR. LUNSFORD:
22  Q    Any other way you can explain to me
23  what thoroughly changing something means in this
24  context, as you used it in this first -- the
25  first usage of the phrase in Defendant's

Page 135

1  Exhibit 2 --
2          MS. WARD: Object to form.
3          THE WITNESS: It's in the context of
4  implementing changes. So, if you're implementing
5  changes, you have to do them thoroughly, so that
6  they're fully changed.
7          BY MR. LUNSFORD:
8  Q    Can you give me an instance or an
9  example where ADOC did not consistently implement
10  a change in response to a prisoner death in the
11  facility?
12  A    Off the top of my head, I can't right
13  now.
14  Q    Can you give me an example where ADOC
15  did not thoroughly implement a change in response
16  to a prisoner death in a facility?
17  A    Again, off the top of my head I
18  cannot.
19  Q    Can you give me a single instance when
20  ADOC did not effectively implement a change in
21  response to a prisoner death?
22  A    Again, I cannot think of one at this
23  time.
24  Q    What about the word effectively? How
25  is effectively different than consistently, or,

Page 136

1  you say, without fail, thoroughly, which means
2  from top to bottom? And then you say, or
3  effectively. So, what does effectively mean?
4  A    It means the change has to be
5  effective.
6  Q    It means it has to work?
7  A    Correct.
8  Q    How do you determine whether a change
9  in response to a prisoner death was effective?
10         MS. WARD: Object to form.
11         THE WITNESS: Well, in this case it
12  has to do with the tracking of prisoner deaths,
13  so that --
14         MR. LUNSFORD: No, it doesn't.
15         THE WITNESS: Were we not on that?
16         MR. LUNSFORD: No. This is a totally
17  different sense.
18         THE WITNESS: I'm sorry, it's in the
19  implementing changes in response to prisoner
20  deaths. Well, there are a lot of things that are
21  involved in dealing with the deaths if you wish
22  to prevent them, so it's a pretty broad range of
23  possibilities that are involved to reach a level
24  where it's effective.
25         BY MR. LUNSFORD:

Page 137

1  Q    Did you ever identify an instance when
2  ADOC did consistently, thoroughly, and
3  effectively implement a change in response to a
4  prisoner death?
5  A    I don't believe I've seen something
6  like that.
7  Q    Can you describe any instance when
8  ADOC made a change in response to a death?
9  A    Well, a change in policy, or a change
10  in operating procedure?
11  Q    I don't know. When you say change in
12  this response, are you referring to a change in
13  operation, or a change in policy?
14         MS. WARD: Object to form. And also,
15  object -- this line of questions is really towing
16  the line on getting into our work product,
17  because you're asking him, what do you mean by
18  your response here in the interrogatory.
19         This interrogatory response is on
20  behalf of the collective litigation team. He
21  verified it. You can ask him about what facts he
22  knows that support or deny, but what he means by
23  a response is a decision by the litigation team.
24         MR. LUNSFORD: Okay, I understand your
25  objection.

35 (Pages 134 - 137)

Page 138

1    BY MR. LUNSFORD:
2    Q    What do you mean by the word, changes?
3    Or what types of changes are you referring to in
4    response to Interrogatory No. 8?
5    MS. WARD:  Object.  That's work
6    product.  What do you mean?  That's what the
7    litigation team means.  So, I'm instructing him
8    not to answer.
9    BY MR. LUNSFORD:
10    Q    Have you reviewed policy changes made
11    by ADOC?
12    A    Very little.
13    Q    Do you know how many different
14    policies ADOC has modified over the last five
15    years?
16    A    I'm aware that they've done some, but
17    I don't know how many.
18    Q    Do you know if any of those changes
19    were made in response to a prisoner death?
20    A    Off the top of my head I'm not
21    thinking of one.  I think they've made some
22    changes in the situation with the harvested
23    organs came about in those deaths, but that's the
24    only thing that comes to mind at the moment.
25    Q    What are you referring to, harvested

Page 139

1    organs?
2    A    That was the situation in the news
3    where the accusation was that there were organs
4    being harvested by prisoners who died, and being
5    brought to UAB.
6    Q    Did you review that case?
7    A    No.
8    Q    Were you aware that ADOC was
9    immediately dismissed from that case because the
10    inmate arrived at the hospital with his organs?
11    A    You asked me about policy change.
12    Q    Yeah, I understand.  But --
13    A    So, in that part I was not involved --
14    Q    You just repeated an allegation.  I
15    want to make sure we're clear.
16    A    I did not repeat an allegation.  I
17    repeated a circumstance that may have resulted in
18    policy changes.  That's all I said.
19    Q    When you signed this interrogatory and
20    you swore under oath that ADOC does not
21    consistently, thoroughly, or effectively
22    implement changes, what did you understand
23    changes to mean?
24    A    Changes is going to be a lot of things
25    in a system where there's so many problems.  So,

Page 140

1    that's probably a broad palette of things.
2    Q    Did you independently evaluate whether
3    ADOC had made any changes in response to any
4    prisoner deaths, prior to signing this
5    interrogatory?
6    A    Can you repeat that?
7    Q    Sure.  Did you independently assess
8    whether ADOC had made any changes in response to
9    any prisoner death in any facility, prior to
10    signing these interrogatory responses?
11    A    I have been aware that if there's been
12    a death at times at the various prisons, or in
13    the various dorms in various prisons, that
14    perhaps there were inmates moved.  But I wouldn't
15    call those changes.  Those are more reactions.
16    Q    Beyond what you just testified, did
17    you do anything else to evaluate whether ADOC had
18    made any changes in response to any prisoner
19    death in any of the facilities?
20    A    As I sit here now, I don't recall that
21    I did.
22    Q    In the next sentence, you testified
23    that ADOC had an unreasonably high number of
24    assaults -- prisoner-on-prisoner assaults -- in
25    the last several years in the facilities.  Do you

Page 141

1    see that?
2    A    Yes, I do.
3    Q    Did I read that accurately?
4    A    I think you did.
5    Q    In the last several years, are we
6    still talking the 2022 forward time frame?
7    A    Yes.
8    MS. WARD:  Object to form.  I don't
9    know if he said 2022 forward for the last one.
10    MR. LUNSFORD:  He did.  He did.  He
11    said, 2022, 2023 forward --
12    MS. WARD:  No, he did not.  He said
13    2020.  Like the time that that complaint --
14    (Simultaneous speaking.)
15    MR. LUNSFORD:  That's an interesting
16    way to coach him up too.
17    MS. WARD:  I'm not coaching him.  It's
18    inaccurate.  We can go back and look.
19    MR. LUNSFORD:  You can go ahead.
20    THE WITNESS:  To clarify when we were
21    going back initially about what time period, at
22    the moment that I signed this we were dealing
23    with, going back to the very first sentence, I
24    said, to my understanding, we were dealing with
25    2022 and 2023, but possibly also 2021.  And I

Page 142

1  wasn't sure if we had -- I couldn't remember if
2  we had cut off 2020 entirely.
3      BY MR. LUNSFORD:
4      Q    Based on your understanding of these
5  interrogatories, let's assume Commissioner Hamm's
6  sitting right next to me. And he's looking at
7  this response and he says to you, I want to
8  reduce my number of prisoner-on-prisoner assaults
9  so that you think it's a reasonable number.
10  Could you tell him what number to target next
11  year?
12      MS. WARD: Object to form.
13      THE WITNESS: I would be willing to
14  have a conversation with him on how you go about
15  it.
16      MR. LUNSFORD: Yeah. No, but you're
17  focused on the number. It says an unreasonably
18  high number. And my question is -- again, you
19  want it to be effective, right? You want him to
20  show the results. Correct?
21      THE WITNESS: I do want it to be
22  effective.
23      MR. LUNSFORD: And effective means
24  that they have to show that whatever steps were
25  taken, results in a different outcome. Correct?

Page 143

1      THE WITNESS: Certainly an improved
2  outcome.
3      MR. LUNSFORD: Okay.
4      BY MR. LUNSFORD:
5      Q    So, what is a reasonable number of
6  prisoner-on-prisoner assaults?
7      MS. WARD: Object to form.
8      THE WITNESS: Well, you're focused on
9  that part of it. When I said initially that I
10  would have the conversation with him on the
11  measures needed, there's not necessarily a target
12  number that you throw out at that moment. You're
13  having a conversation about processes, and the
14  processes will lead to the improvements.
15      If you're asking me to have the
16  conversation with Commissioner Hamm, that would
17  be my approach.
18      MR. LUNSFORD: So, here's my question.
19      BY MR. LUNSFORD:
20      Q    In assessing what is unreasonable, did
21  you consider what a reasonable number would be?
22      A    Yes.
23      Q    Okay. And what was that?
24      A    But not a number, as such. As a
25  concept.

Page 144

1      (Simultaneous speaking.)
2      Q    So, conceptually explain to me what a
3  reasonable number would be. Conceptually.
4      A    Well, one that's not at a point where
5  you feel the constitutional violations are in
6  play.
7      Q    And at what point is that?
8      A    You assess on a case-by-case basis.
9  ADOC is a case.
10      Q    Were there an unreasonably high number
11  of prisoner-on-prisoner assaults at every
12  facility?
13      A    I can't remember if at this time
14  Hamilton Altman was included or not. But that
15  would be one that's not -- and I think we dropped
16  them. Yes, there are.
17      Q    Every single facility?
18      A    Every single facility in our
19  investigation.
20      Q    Including Bibb?
21      A    Including Bibb.
22      Q    Had any facility demonstrated a
23  reduction in the number of incidents?
24      A    At what time?
25      Q    At any point in time. Or in the last

Page 145

1  several years.
2      A    Well, experiencing reduction is never
3  a useful concept, because you can say, I've
4  experienced a reduction this week. If we're
5  looking at a broad pattern, the answer is no.
6      Q    Would it be improvement if Bibb
7  Correctional Facility reduced the number of
8  inmate-on-inmate assaults with non-serious
9  injuries by fifty percent?
10      A    It's an improvement for the people
11  living at Bibb at a certain period in time. But
12  you're looking at the system as a whole, and we
13  have not seen the assaults go down. And also, as
14  I indicated, I think maybe at some point earlier
15  before we took a break, the sense I have from the
16  inmates who talk to me all the time, is that the
17  numbers are higher than reported, and they have
18  always been higher than reported. And they
19  continue to be as high.
20      Q    Can you identify for me one prisoner-
21  on-prisoner assault that did not result in an
22  incident report?
23      A    I don't have a specific one that I can
24  recall at this time.
25      Q    Okay. Have you ever been part of an

37 (Pages 142 - 145)

1  investigation initiated by the Department of
2  Justice that didn't result in either a settlement
3  agreement or litigation?
4         MS. WARD:  Object on work product.  Do
5  not answer that.
6         BY MR. LUNSFORD:
7     Q    Have you ever been part of a public
8  investigation that did not result in a settlement
9  agreement or a lawsuit?
10    A    You mean a non-DOJ.
11    Q    No, a public investigation by DOJ.
12  Have you ever been part of a public investigation
13  by DOJ that didn't result in a settlement
14  agreement or a lawsuit?
15    A    Yes.
16    Q    In which case?
17         MS. WARD:  Object to form.  The
18  investigation in that case may be public, but the
19  results may not be, in why it ended up that way.
20  You can answer if you've ever been part of that,
21  but you can't identify it.
22         THE WITNESS:  Well, I think in the
23  cases that I'm having in mind at the point in
24  which it may have gone that route, I was not on
25  those cases.  So, I don't have anything to

1  relate.
2         BY MR. LUNSFORD:
3     Q    So, all the cases in which you have
4  been involved either went to litigation or
5  settled.  Is that correct?
6     A    No.  I mean, that's not what I said.
7  What I said was there's been cases that I've been
8  involved with where I was no longer on the case
9  at the time that it would have gone to something
10  less than what you indicated.
11    Q    In the next sentence, it follows the
12  same formula.  In fact, it looks like a cut-and-
13  paste job.  You can look at the prior sentence
14  above, ADOC does not accurately and consistently
15  track prisoner deaths in the facilities.  And
16  then same thing, ADOC does not accurately and
17  consistently track prisoner-on-prisoner assaults
18  in the facilities.  And there's an additional
19  clause at the end.
20         But here's my question.  Does ADOC
21  track prisoner-on-prisoner assaults?
22    A    They have a policy and a procedure,
23  and a method of doing so.  Yes, so as I
24  understand it.
25    Q    Have you reviewed the policy?

1     A    I don't think I've reviewed the
2  policy, but I've reviewed the results of what is
3  the tracking, whether the incident reports or
4  other things that are similar.
5     Q    Does ADOC compile those incident
6  reports on a monthly basis?
7     A    I believe they do.
8     Q    Does ADOC review the incidents of
9  prisoner-on-prisoner assaults that occur at each
10  facility?
11    A    What do you mean by that?
12    Q    Do they review the results of --
13    A    What does who at ADOC review the
14  results?
15    Q    Anyone.
16    A    I don't have personal knowledge of
17  that.  But I am assuming in the course of normal
18  business that he would review that.
19    Q    Do the wardens review that
20  information?
21    A    I don't know if they do or not, but I
22  am -- you told me not to guess, but that would be
23  my guess.
24    Q    Does the ADOC commissioner and his
25  operations team review that data?

1     A    I don't know if the commissioner
2  personally reviews it.  And I would have -- I'm
3  guessing again, but I'm assuming someone in
4  that -- that individual at Montgomery, would be
5  doing that.
6     Q    Can you identify any particular
7  instance when ADOC inaccurately tracked a
8  prisoner-on-prisoner assault?
9     A    I can't identify any single incident
10  at this time, as I sit here.
11    Q    Can you identify any incident when
12  ADOC, or any particular facility, that didn't
13  consistently track prisoner assaults?
14    A    They all do not track, or simply fail
15  to track, all of the assaults.  It's based on the
16  information that I have through my work.
17    Q    You're just basing that solely off
18  what inmates told you.
19    A    That is one way of doing it, but that
20  isn't a huge portion of it.
21    Q    Okay.  Is there any other evidence
22  that you have that you're aware of, that
23  indicates that ADOC does not consistently track
24  prisoner-on-prisoner assaults?
25    A    I think at times family members have

38 (Pages 146 - 149)

Page 150

1  indicated that a family member was assaulted and
2  they had evidence of that, whether they had
3  gotten photos of him, and that there was nothing
4  reported.
5         They would call a prison and whoever
6  answered said they didn't know what they were
7  talking about, there's nothing in the system.
8         But I don't remember exact examples of
9  that. But those kinds of phone calls and
10  conversations have not been an irregular
11  occurrence.
12     Q    Do you have any judgment at a
13  particular facility, how many prisoner-on-
14  prisoner assaults have not been documented?
15     A    My judgment, as I indicated earlier,
16  based on conversations I have with inmates, is
17  that a significant portion of the assaults that
18  occur on a daily basis in most of the dorms
19  inside the prisons, are not reported because
20  they're not even seen. Sometimes they're seen
21  and still not reported.
22     Q    Do you know if there's a single prison
23  in the world that documents every single fight
24  between inmates?
25     A    I would not know that that's the case

Page 151

1  or not. And I did not say fights. I'm talking
2  about assaults.
3     Q    How do you determine the difference?
4     A    When there's an injury that is
5  relatively significant.
6     Q    Do you know if ADOC tracks assaults
7  without injuries?
8     A    I think they do.
9     Q    Well, you just said an assault must
10  have a serious injury. So, what happens when
11  there's an assault without an injury?
12     A    I did not say an assault must have an
13  injury. I was referring to the assaults that
14  frequently have injuries that may not be
15  reported.
16     Q    But you can't, as you sit here today,
17  tell me about a single fight or assault or
18  altercation between two inmates that didn't
19  result in documentation.
20     A    I do not have one at the tip of my
21  tongue. But I can tell you that it is a very
22  regular thing for me to hear about.
23     Q    I understood you heard about it from
24  inmates. Do you know if inmates have access to
25  ADOC's incident reporting database?

Page 152

1     A    I don't think they do.
2     Q    So, how many times have you heard --
3  and you can estimate here or approximate -- how
4  many times have you heard inmate say, this
5  incident happened and there's going to be no
6  incident report about it?
7     A    Too many to count.
8     Q    Okay.
9     A    In my head.
10     Q    You haven't tracked them.
11     A    I have not tracked them, as in writing
12  down to create a database about it. No, I've
13  not.
14     Q    Okay. So, at the time that you
15  receive this call, you know the name of the
16  inmate. Correct? Who's reporting it to you.
17     A    Oh yes.
18     Q    You know the name of the witness who's
19  reporting this incident to you, you know the date
20  or time frame when the incident -- you can find
21  out the date or time frame when the incident
22  occurred, right?
23     A    Well, where I see you going with this
24  is a lot of assumptions that I'm going to have to
25  reduce once you finish with this part.

Page 153

1     Q    But you could ask the inmate the date
2  or time of the incident that occurred, right?
3     A    I can get information best I can if
4  the inmate has all of that information.
5     Q    Listen to my question very carefully.
6  You can ask the inmate for information about the
7  date and time of the incident, can't you?
8     A    I can ask them, yes.
9     Q    Yes. You might not get it but you can
10  ask, right?
11     A    Correct.
12     Q    And you can ask them where the
13  location of the incident, can't you?
14     A    I can.
15     Q    You can ask them how many people
16  participated in the incident, right?
17     A    I can.
18     Q    You can ask them whether a weapon was
19  involved, can't you?
20     A    I can.
21     Q    You can ask them whether somebody was
22  seriously injured or not, right?
23     A    I can.
24     Q    You can ask them for the identity of
25  the inmates who were involved in that incident,

39 (Pages 150 - 153)

Page 154

1  right?
2     A    I can.
3     Q    And then you could take all that
4  information if you could get it, and you could
5  compare it to ADOC's incident database to see if
6  there's an incident report, right?
7     A    In theory, I could.
8     Q    Have you tracked all that information,
9  as you've received all these phone calls?
10    A    I have tracked it in the sense that I
11 have noted it, and --
12    Q    No, no.  Let me ask the question
13 again.  Have you tracked all of this information
14 about date, time, location, reporting inmate,
15 other inmates involved, injuries?  Have you
16 tracked all that information for all these
17 alleged incidents you say haven't been
18 documented?
19    A    Given the definition of tracking that
20 we came up with earlier -- that I came up with
21 earlier -- which would be a systematic tracking
22 procedure --
23    Q    Yeah.
24    A    -- where it's a searchable, and then
25 you could run statistics on it --

Page 155

1     Q    I don't even want that.  You just have
2  a notation of all this information.  Have you
3  kept track of all that information?
4     A    Yes.
5     Q    You have all that information?
6     A    Yes.
7     Q    Okay.  Have you taken that information
8  and compared it to actual incident reports?
9     A    I've done comparison more with the
10 monthly reports that ADOC produces.
11    Q    Have you done a comparison with the
12 incident reports to see if incident reports
13 reflect the incidents you've received reports of?
14    A    In other words, you're asking me if
15 the incidents that the inmates are telling me
16 that are not reported, in fact then do get
17 reported.  Is that what you're saying?
18    Q    Correct.
19    A    Well, to give you a better sense of
20 all of this, frequently if the inmates are
21 talking about the number of incidents that
22 occurred that are not reported, it's because no
23 staff member ever arrives, or the inmates in fact
24 hide the injury and never leave the dorm.
25         So, there would be very little profit

Page 156

1  in trying to figure that out if it ever did get
2  reported, since it's clear that there's no one
3  there to document it.
4     Q    Still not my question.  Have you taken
5  your list of information about these incidents
6  that you say have not been reported to or by
7  ADOC, and searched the incident reports to see if
8  those ever occurred?  Or were they ever
9  documented?
10    A    Many of the incidents that were
11 reported to me do not have all the details --
12 names, the exact times, exact injuries, to the
13 point where I would then be able to simply do a
14 search through the incident reports.
15         The key thing would be always the name
16 of the inmate, and that is usually one of the
17 hardest things to get.  But the report of the
18 incident, the evidence of the incident that the
19 inmates are aware of, either through merely
20 seeing it themselves, or seeing the aftermath of
21 it, that I note, but that is not something you
22 can then cross-reference with ADOC's statistical
23 reports or incident reports.
24    Q    So, are you saying you don't have
25 enough information from these inmates to go then

Page 157

1  search the incident reports to see if in fact
2  what these inmates are telling you is true?
3         MS. WARD:  Object to form.
4         MR. LUNSFORD:  Is that what you're
5  saying?
6         MS. WARD:  Object to form.
7         THE WITNESS:  If I am saying that the
8  inmate is telling me about an incident that was
9  not reported, that already tells me I'm not
10 likely to find it in there.  So, I had not gone
11 back to do it.
12         MR. LUNSFORD:  Let me ask the question
13 again, just for clarity on the record.
14         THE WITNESS:  Sure.
15         BY MR. LUNSFORD:
16    Q    Have you compared the information
17 you've received from inmates about alleged
18 incidents that were not reported to or by ADOC,
19 have you taken that information and compared it
20 to the incident reports to see if in fact an
21 incident report had been generated?
22    A    I usually did not have enough
23 information to look at incident reports in such a
24 way that would have brought those two incidents
25 together.

40 (Pages 154 - 157)

Page 158

1    Incidents where there was -- let's say
2 I got information of something that definitely
3 did get reported, I would sometimes look at that.
4 But that's not the stuff that we're talking
5 about. We're talking about the stuff that
6 inmates indicate are never reported and are never
7 documented.
8    Q    Have you ever seen a report of a
9 prisoner-on-prisoner assault that wasn't
10 accurate?
11    A    They're worded in such a way to where
12 they're very simply worded. If we mean
13 inaccurate because there's a lot of stuff that
14 might be missing, I'd had the sense of that. But
15 it's just sort of time and date and location, I
16 can't say that I've seen them be inaccurate on
17 the basis of those simple facts.
18    Q    So, help me understand this. What
19 information has the State of Alabama produced
20 that reflects the number of prisoner-on-prisoner
21 assaults?
22    A    A number of things, I think. Things
23 that they produce to us and things that they've
24 also produced publicly.
25    Q    Okay. So, there's information that

Page 159

1 ADOC produces publicly, pertaining to inmate-on-
2 inmate assaults. Correct?
3    A    That is correct.
4    Q    And then in addition to that, the
5 State of Alabama has produced to the Department
6 of Justice a volume of documents that document
7 inmate-on-inmate assaults. Correct?
8    A    Correct.
9    Q    Okay. You would agree with me -- this
10 may sound crazy, but I just want to make sure
11 we're on the same page -- ADOC hasn't reported to
12 DOJ about incidents that it's completely unaware
13 of, has it?
14    A    It would follow that they have not.
15    Q    I mean, that seems impossible, doesn't
16 it? To report something that you don't know
17 about?
18    A    Correct.
19    Q    Okay. And based on the information
20 that we've provided to you, DOJ has concluded
21 that the number of prisoner-on-prisoner assaults
22 is unreasonably high.
23    A    Correct.
24    Q    In other words, we have too many.
25    A    Correct.

Page 160

1    Q    So, you would agree with me that
2 there's a process in place for identifying and
3 reporting incidents of prisoner-on-prisoner
4 assaults. Correct?
5        MS. WARD: Object to form.
6        THE WITNESS: I'm sorry, repeat that.
7    BY MR. LUNSFORD:
8    Q    You would agree that ADOC has a
9 process for identifying inmate-on-inmate
10 assaults. Correct?
11        MS. WARD: Object to form.
12        THE WITNESS: Yes, they have a
13 process.
14        BY MR. LUNSFORD:
15    Q    And you've relied on that process to
16 evaluate the number of assaults, haven't you?
17        MS. WARD: Object to form.
18        THE WITNESS: I've relied on more than
19 that process.
20        MR. LUNSFORD: But you've relied on
21 part on the number -- I'm just using your word --
22 high number of prisoner-on-prisoner assaults.
23        THE WITNESS: Mm-hmm.
24        MR. LUNSFORD: And that number came
25 from ADOC's tracking process that --

Page 161

1        MS. WARD: Object to form.
2        THE WITNESS: What was produced,
3 either publicly or to DOJ, was reliant on that
4 process.
5        MR. LUNSFORD: Okay.
6        BY MR. LUNSFORD:
7    Q    So, my question is, tell me which part
8 of ADOC's tracking process is not consistent.
9        MS. WARD: Object on privilege.
10 That's work product. That's an opinion testimony
11 about proving our case, not a fact underlying our
12 case, so I'm going to instruct him not to answer.
13        BY MR. LUNSFORD:
14    Q    Which part of ADOC's reporting process
15 for prisoner-on-prisoner assaults is not
16 accurate?
17        MS. WARD: Object on work product.
18 I'm going to instruct him not to answer.
19        BY MR. LUNSFORD:
20    Q    So, we see the second time this phrase
21 appears, thoroughly, consistently, or
22 effectively, in this next sentence where you say,
23 ADOC does not respond thoroughly, consistently,
24 or effectively, to reported prisoner-on-prisoner
25 assaults in the facilities. Do you see that?

1     A    Are we in the middle of the page?
2     Q    Yes.
3          MS. WARD: And I'm going to object to
4    form.
5          THE WITNESS: Yes, I see it.
6          MR. LUNSFORD: Let me ask this,
7    because there's great consternation over with me
8    reading your interrogatory.
9          MS. WARD: Object to form. That's not
10   his interrogatory.
11         BY MR. LUNSFORD:
12    Q    ADOC does not respond thoroughly,
13   consistently, or effectively, to reported
14   prisoner-on-prisoner assaults in the facilities.
15   Did I read that correctly?
16    A    You did.
17    Q    And you attested to the truthfulness
18   of that statement, didn't you?
19    A    I did.
20    Q    Now, you testified earlier about your
21   understanding of these three words, thoroughly,
22   consistently, or effectively. But you put them
23   in different order here. It's thoroughly and
24   consistently now, and effectively. Is there a
25   reason why the order was different here?

1          MS. WARD: Object to form. That's
2    work product. Do not answer.
3          BY MR. LUNSFORD:
4     Q    Do the meanings of these three words,
5    are they any different here than they were when
6    you defined them earlier?
7          MR. LUNSFORD: Object to form and
8    object to privilege as well. That's work
9    product. Do not answer.
10         BY MR. LUNSFORD:
11    Q    What did you understand thoroughly to
12   mean when you signed these interrogatories, in
13   this sentence? Anything different than what
14   you've already testified to?
15    A    No.
16    Q    Was your understanding as to the words
17   "consistently" or "effectively," any different as
18   to this second time those batch of words appear
19   in your interrogatory responses?
20    A    No.
21    Q    What is your understanding -- well,
22   what portion of ADOC's response to reported
23   prisoner-on-prisoner assaults in the facilities,
24   has been less than thorough?
25         MS. WARD: Object to form.

1          MR. LUNSFORD: Or how has ADOC's
2    response to prisoner-on-prisoner assaults been
3    less than thorough?
4          THE WITNESS: Reporting to me from the
5    inmates and families indicates a consistent
6    pattern at all the prisons, that if an inmate has
7    been assaulted and wants protection, or is
8    looking to avoid being assaulted, that the
9    response from staff has been essentially -- not
10   always, but very frequently -- such that they
11   were not willing to help the inmates out of their
12   situation. And then therefore, the risk of
13   assault remained, and/or then occurred.
14         MR. LUNSFORD: But this is not talking
15   about a response to a potential assault.
16         THE WITNESS: Okay.
17         MR. LUNSFORD: Is it?
18         THE WITNESS: Is it? I see. Hold on.
19   Yes, you're right, it's to an actual assault.
20   Reported assault. So, I'm sorry, repeat the
21   question. "How -- ?"
22         BY MR. LUNSFORD:
23    Q    How has ADOC's response to reported
24   prisoner-on-prisoner assaults been less than
25   thorough?

1          MS. WARD: Object. Work product. Do
2    not answer.
3          BY MR. LUNSFORD:
4     Q    How has ADOC's response to prisoner-
5    on-prisoner assaults been inconsistent?
6          MS. WARD: Object. Work product.
7    Don't answer.
8          BY MR. LUNSFORD:
9     Q    Have you seen instances personally,
10   when ADOC has thoroughly, consistently, and
11   effectively responded to prisoner-on-prisoner
12   assaults?
13    A    The full range of their responses is
14   not going to be something that I'm privy to, to
15   the point where I could then check off those
16   boxes.
17    Q    I'm just saying, have you seen
18   instances when there was a thorough, consistent,
19   and effective response to a prisoner-on-prisoner
20   assault?
21    A    Off the top of my head I don't know
22   that I've seen that.
23    Q    Have you evaluated ADOC's response to
24   any prisoner-on-prisoner assault?
25    A    Well, I have not been able to see the

42 (Pages 162 - 165)

1  full response, so I can't evaluate all of it.
2      Q    So, how do you know that it's not been
3  thorough, consistent, or effective, if you
4  haven't reviewed the response?
5      A    I wasn't finished.  There have been
6  many responses that I'm aware of, where it was
7  none of those things.
8      Q    Can you tell me why?
9      A    Not off the top of my head.  It's been
10  quite a few.  I don't remember any right now.
11      Q    Can you tell me at which facility it
12  occurred?
13      A    Just about all of them, I think.
14      Q    Just about.  But not all of them?
15      A    I pretty much think it was all of
16  them.  Yes.
17      Q    Was it just about all of them, or was
18  it all of them?
19      A    All right, we'll make it definitive.
20  It was all of them.
21      Q    Every single facility had an instance
22  when you say there was not a thorough,
23  consistent, or effective response to a prisoner-
24  on-prisoner assault?
25      A    Correct.

1      Q    But you don't have access to the full
2  information related to responses?
3      A    I don't have access to what full
4  information?
5      Q    That's what you said.  I'm just
6  referring to what you said earlier.
7      A    I mean, after-the-fact, I don't know
8  everything that ADOC did.  But to the degree that
9  we look at what would be the response, that is
10  what I've seen.
11      (Simultaneous speaking.)
12      A    It's consistent with everything that
13  I've been doing and hearing.
14      Q    Have you ever looked at a single
15  incident of purported prisoner-on-prisoner
16  assaults and interviewed the inmates involved in
17  the assault?
18      A    Usually, it's the victim, and maybe
19  also a witness who was not directly involved.
20      Q    Not my question.  Have you ever
21  interviewed both the assailant and the victim?
22      A    It's happened maybe one or two times,
23  but it's not very common.  Usually, it's the
24  victim.
25      Q    Did you ever interview both the victim

1  and the assailant and asked them how ADOC
2  responded to the incident?
3      A    Yes, I usually ask.  Well, it starts
4  with the staff around, when did staff come?  What
5  happened thereafter?  What did you tell them?
6  What did you ask for?  If you asked for
7  protection or something along those lines.
8      Did you go to the shift office?  What
9  was the conversation like there?  There's a wide
10  range of things that I normally go after to get -
11  - to find out what happened.
12      Q    Did you discuss with the warden what
13  response was made of the incident?
14      A    I've never talked to the warden.
15      Q    Okay.  Just asking.  That's easy.  The
16  no.  The answer is simply, no.  You can say yes
17  or no.  That's an okay answer.
18      MS. WARD:  Object to form.  That is
19  harassing.
20      MR. LUNSFORD:  No, it's not.  It's
21  just --
22      MS. WARD:  It is.
23      MR. LUNSFORD:  -- I'm just saying, he
24  can say yes or no.  It's fine.  I'm just trying
25  to move through the questions.

1      BY MR. LUNSFORD:
2      Q    Did you speak to the shift commander?
3      A    I have never spoken to the shift
4  commander.
5      Q    You can say no.
6      MS. WARD:  Object to form.  That's
7  harassing.  He's allowed to give the answer he
8  wants to give in response to your question.
9      BY MR. LUNSFORD:
10      Q    Did you speak to the unit officer who
11  was overseeing the unit, about the incident?  Do
12  you know, for any particular incident, from the
13  warden, shift commander, or the unit officer, of
14  what actions were taken in response to any
15  particular act of prisoner-on-prisoner assault?
16      A    The actions that I would know about
17  are what the inmates tell me happened to them
18  thereafter.  So, it usually involves a situation
19  of where they need to be moved for safety
20  reasons, transferred, whatever the case may be,
21  and it's a combination of reaction of every
22  single staff member that they're interacting with
23  in the context of that.
24      So, it may start first with someone
25  who responds first, then maybe potentially all

1  the way up to the warden.
2         So, they'll tell me essentially what
3  their interaction was with them, and then from
4  that I am able to determine what sort of response
5  took place.
6      Q    Are you aware of reported prisoner-on-
7  prisoner assaults where inmates are moved and
8  separated?
9      A    Afterwards, you mean?
10     Q    Yes.
11     A    Yes.
12     Q    Are you aware of incidents when the
13  assailant is placed in restricted housing?
14     A    Yeah.  Yes.
15     Q    Have you ever seen an occasion when an
16  assailant for a reported prisoner-on-prisoner
17  assault was not placed in restrictive housing?
18     A    Off the top of my head I can't think
19  of an incident to reflect upon right now.  But
20  through my conversations with the inmates,
21  consistently one of the themes has been the
22  number of times -- consistent number of times --
23  that assailants never suffer any repercussions.
24     Q    Do you know if those assailants have
25  a serious mental illness?

1      A    In each given incidence I do not know.
2      Q    Do you know that there are limitations
3  on the actions ADOC can take against inmates with
4  serious mental illnesses, in terms of
5  disciplinary actions?
6      A    I don't have specific awareness of
7  that, but if those inmates are in all the really
8  rough dorms in all the various prisons, then I
9  guess ADOC has a big problem with that.
10     Q    In considering whether ADOC's response
11  was -- well, let me ask this differently.  Are
12  you aware of the Braggs litigation in Alabama?
13     A    I am.
14     Q    Do you know what restrictions the
15  Braggs litigation places on ADOC?
16     A    Restrictions relating to mental
17  health, you mean?
18     Q    Just restrictions in terms of
19  operations.
20     A    Not specifically, I don't think I do.
21     Q    Let me ask this.  Can you explain to
22  me the difference between the response that you
23  referred to in the sense we've just been talking
24  about -- "ADOC does not respond thoroughly,
25  consistently, or effectively to reported

1  prisoner-on-prisoner assaults" -- and the next
2  sentence, "ADOC does not consistently,
3  thoroughly, or effectively implement changes in
4  response."  What's the difference between those,
5  what's the difference between a response and a
6  change?
7         MS. WARD:  Object on work product.  Do
8  not answer that.
9         MR. LUNSFORD:  Let me ask this.
10        BY MR. LUNSFORD:
11     Q    At the time you signed this
12  interrogatory, did you read those two sentences?
13     A    I read all of the sentences.
14     Q    What was your understanding as to how
15  those two sentences -- what is the different -- I
16  don't understand the differences between those
17  two sentences.  And did you read them as
18  different or the same?
19     A    So, we're talking about the act of
20  inconsistently tracking?
21     Q    No.
22     A    No, sorry.  I'm sorry.  Does not
23  respond thoroughly, effectively -- well, all
24  right.  So, I guess there's stages in the
25  reaction before you get to the part where you

1  implement a change.
2         So, there's the initial reaction,
3  normally, which is separation, or the placement
4  of a plaintiff or series of plaintiffs into
5  wherever restrictive housing -- something that
6  does an immediate thing to alleviate the
7  violence -- and then the next phase is then to do
8  something more thorough with policy change.
9      Q    What policy change should ADOC have
10  made in response to a reported prisoner-on-
11  prisoner assault in the facilities, that it
12  didn't make?
13     A    I would say, I was thinking about the
14  policy change.  I mean, well listen.
15     Q    I asked him about -- I mean, you just
16  said a policy change.  What other types of
17  changes would there be?
18     A    Well, I wanted to get back to the
19  phrasing on the sentence, if you don't mind.
20  "Effectively implement changes in response to
21  prisoner-on-prisoner assaults."
22         It's initial response to an assault or
23  an incident, and then the changes that you would
24  implement to address sort of what causes those
25  assaults to begin with.

44 (Pages 170 - 173)

1      So, you have situations that repeat
2  themselves constantly, of, let's say gang members
3  attacking someone in a given dorm, or over
4  whatever it is that they do habitually.
5      If they're not being punished, that's
6  the immediate -- if you don't take everybody
7  that's involved in an incident and immediately
8  punish them, there's that.
9      Then there's policy changes that
10  you're going to have to do to respond to it in a
11  larger sense.
12      (Simultaneous speaking.)
13  A   So, there's the immediate response --
14  Q   What type of policy change?
15  A   Well, you're going to have to figure
16  out how to improve the safety in that dorm.
17  Whatever you need to do.
18  Q   Can you give me any specific instance
19  when ADOC should have implemented a policy in
20  response to a prisoner-on-prisoner assault?
21  A   I would define policy as more than
22  just what's written. It's what effectively done
23  in all the camps. What the staff culture has in
24  place.
25      So, in some places they will

1  challenge, let's say the gangs in the dorm, and
2  other places they won't. So that --
3  Q   Tell me a place where they'll
4  challenge a gang in a dorm.
5  A   Well, it depends.
6  Q   You said there were places they would.
7  Tell me one.
8  A   Yeah, it's in a situation where you
9  maybe have the gang member that is isolated on a
10  dorm. But if it's more difficult for them when
11  they have a lot of gang members in a particular
12  dorm and they're younger and more out of control.
13  Q   Does ADOC have a process for
14  identifying individuals who are a member of what
15  we call a strategic threat group, or gang, as you
16  call it?
17  A   Yeah, the STGs. Yeah, I believe they
18  do have a procedure, or process.
19  Q   Do you know how they're identified?
20  A   I don't have intimate knowledge. I
21  know it's usually based on a variety of things.
22  You look at tattoos they have.
23      LESD I think has some people that know
24  about the background of the individual before
25  they come into prison, whether it's claimed from

1  county jail or wherever.
2      They might listen in to phone calls
3  and gather information from that. There's a
4  variety of ways in which they might know, and
5  then they list that down.
6  Q   They list it down where?
7  A   I think ADOC has an internal list of
8  some sort that the people who work on this know
9  to access.
10  Q   Is ADOC's internal list of STG
11  affiliations accurate?
12  A   I believe I would be guessing. But
13  I've had inmates tell me that they've been
14  incorrectly classified, for whatever reason. So,
15  I think there might be some inaccuracies on that.
16  Q   Do you know how many different gangs
17  work inside ADOC prisons?
18  A   Depends on how you split them up. If
19  you were only dealing with the major groups, as
20  opposed to all the splinter groups within a major
21  group, it's more than I can remember.
22  Q   Have you ever communicated to us when
23  an inmate indicated that they were inaccurately
24  classified with an STG affiliation? Have you
25  ever told us that information?

1  A   I think the most I've sent to you was
2  an inmate who indicated he was a former gang
3  member of a particular gang and he was being
4  targeted for his former gang work. And that's
5  the only one I can think of.
6  Q   So, only one instance.
7  A   It's the only one I can think of right
8  now.
9  Q   How many times have you been told that
10  we, ADOC, had a gang member incorrectly
11  classified?
12  A   I don't recall offhand.
13  Q   Is it important to DOJ that we
14  correctly classify gang members?
15      MS. WARD: Object. Work product.
16  Don't answer.
17      BY MR. LUNSFORD:
18  Q   Have you ever, other than this one
19  instance, have you ever told us, ADOC, anybody in
20  this room, emailed us, that this particular
21  inmate was incorrectly classified?
22  A   Well, first of all, I didn't tell you
23  he was incorrectly classified. I told you he was
24  formerly a gang member, and therefore he was
25  being targeted. So, that was the degree to which

45 (Pages 174 - 177)

1  I let you know something along those lines.
2      Q    You said you've been told by
3  inmates -- plural -- that they were incorrectly
4  classified with an STG affiliation that was not
5  right.
6      A    Mm-hmm.
7      Q    Other than this one instance, have you
8  ever told us about any of those others?
9      A    I'm not aware that I have.  No.
10     Q    Why not?
11     A    I'm answering the phone calls, dealing
12 with the inmates on their issues, there's no need
13 at that time to refer to that.  We're letting you
14 know of instances where there's a risk of harm.
15     Q    So, there's no risk of harm if an STG
16 affiliation is incorrect?  Is that what you're
17 saying?
18     A    There may be a risk of harm for a
19 number of reasons.  But that, in and of itself,
20 does not carry with it an innate risk of harm.
21     Q    So, in the next sentence, "ADOC does
22 not consistently, thoroughly, or effectively
23 ensure prisoners are in their assigned dorms in
24 the facilities."  You see that allegation?
25     A    Hold on a second, let me move it

1  around.  Yes, I do.
2      Q    The three words that are used seventy-
3  five times throughout this interrogatory, any
4  different definition here, as opposed to what
5  you've told me already?
6      A    No.
7      Q    Okay.  It says here that "ADOC does
8  not ensure prisoners are in their assigned dorms
9  in the facility."  You see the word "ensure?"
10     A    I do.
11     Q    What does that mean?
12         MS. WARD:  Object.  Work product.  Do
13 not answer.
14         MR. LUNSFORD:  Well, let me ask this.
15         BY MR. LUNSFORD:
16     Q    If I go look up -- and I'm doing it
17 right now, I'll tell you -- I'm going to look up
18 the definition of ensure, Merriam-Webster.  It
19 says, "to make certain of something."  Okay?
20         So, you're saying that we're supposed
21 to -- that ADOC should make certain,
22 consistently, thoroughly, or effectively, that
23 prisoners are in their assigned dorms.  Is that
24 correct?
25     A    Correct.

1      Q    Is there ever an appropriate reason
2  for an ADOC inmate not to be in his assigned
3  dorm?
4          MS. WARD:  Object to form.
5          THE WITNESS:  An appropriate reason
6  from the standpoint of how ADOC's running their
7  facilities?
8          MR. LUNSFORD:  I'm just saying in
9  terms of normal operations of a prison.
10         THE WITNESS:  I can't say with
11 certainty if they are allowing for that in
12 certain instances.  But by and large, there's not
13 supposed to be intermingling of dorms to the
14 point where a person from one dorm can simply
15 walk into another dorm.  That is my
16 understanding, based on what inmates tell me.
17         MR. LUNSFORD:  My question was very
18 different.
19         THE WITNESS:  Okay.
20         BY MR. LUNSFORD:
21     Q    Is there ever a scenario when it's
22 acceptable for an inmate to be outside of his
23 assigned dorm?
24         MS. WARD:  Object to form.
25         THE WITNESS:  If an inmate is on the

1  yard, if an inmate is a worker in some capacity,
2  if an inmate is going to trade school, if an
3  inmate is going to chapel, if an inmate is going
4  to pill call, KOP, those are scenarios where
5  they're not in their dorm.  So, that is
6  appropriate.
7          BY MR. LUNSFORD:
8      Q    Would it be accurate to say this isn't
9  suggesting that inmates should be in their
10 assigned dorms 24/7?
11     A    No, that's not what this is
12 suggesting.
13     Q    Does ADOC discipline inmates if they
14 are found in dorms to which they're not assigned?
15         MS. WARD:  Object to form.
16         THE WITNESS:  I believe they have a
17 process for that.  I don't know if they
18 consistently do so.
19         MR. LUNSFORD:  What's the objection?
20         MS. WARD:  How is supposed to know
21 what ADOC does all the time?  He's not ADOC.
22         (Simultaneous speaking.)
23         MR. LUNSFORD:  He's saying under oath,
24 we don't do this.  And so --
25         MS. WARD:  He is verifying the

Page 182

1  collective knowledge of the attorneys under it.
2  So, you can ask him if he has any personal
3  knowledge of facts that are consistent or
4  inconsistent with this, but -- according to the
5  order, that is what you can ask him.
6          BY MR. LUNSFORD:
7      Q   Let's just talk about St. Clair.
8  You've been to St. Clair, right?
9      A   I don't think I have.
10     Q   You have not?
11     A   I don't recall.  I don't think I have.
12 Wait a minute.  No, during the investigative
13 phase maybe I was, yes. I can't remember.
14     Q   Do you know what changes were made at
15 St. Clair to limit inmate movement?
16     A   As a result of litigation, the Braggs,
17 or anything?
18     Q   No.  No.
19     A   No, I do not.
20     Q   Do you know what changes were made to
21 operations at Donaldson in order to limit inmate
22 movement?
23     A   I do not know what changes were made
24 on paper.  No, I do not.
25     Q   Do you know what changes were made in

Page 183

1  practice?
2      A   I do not know what changes were made
3  in practice, but from discussions with inmates,
4  whatever was in practice was not always reality.
5      Q   Is your knowledge based almost
6  exclusively off interviews with inmates and
7  family members?
8      A   A significant portion of my knowledge
9  base is based on extensive discussions with
10 inmates on a daily basis, what is going on inside
11 the prisons.
12     Q   Do you know of any facility where ADOC
13 has effectively prevented inmates from entering
14 other dorms to which they're not assigned?
15     A   I think nowadays, at Easterling and
16 Ventress, for example, which have a design with a
17 large sort of baseball field in the middle, and
18 then the dorms ring around that, they are
19 implementing something that sort of creates
20 fenced-in paths per dorm, so that there would not
21 be commingling when they're outside.
22         Whether that prevents them from
23 getting into other dorms, I'm not a hundred
24 percent clear.  Usually, if those in prisons
25 getting into the segregation dorms is very

Page 184

1  difficult, all of said segregation units are
2  supposed to be difficult to get into.
3          Limestone's a PC unit, we can't just
4  go into from the outside.  Honored dorms and face
5  dorms are supposed to be inaccessible, but aren't
6  consistently, to inmates from other dorms.
7      Q   Is that true in every outer dorm?
8      A   At the moment what I can think of off
9  the top of my head, when I speak to these guys,
10 it's always possible, they're telling me at some
11 point, if someone really wants to, there will be
12 a moment where they can get it.
13     Q   Did you do any analysis before
14 answering these interrogatories, to determine how
15 often prisoners are entering dorms to which
16 they're not assigned?
17     A   There's not an analysis with
18 statistics, but it was a consistent reporting.
19     Q   From other inmates?
20     A   Correct.
21     Q   Did you ever notify ADOC of any of the
22 individuals who were reporting this?
23     A   No, I did not.  There may have been an
24 email at some point in time where I talked about
25 one scenario, but right now I'm not remembering

Page 185

1  off the top of my head.
2      Q   In the next sentence you talk about,
3  again, ensuring that prisoners have a bed
4  assignment and sleep in their assigned bed.  And
5  we see that again, the often-repeated phrase,
6  "consistently, thoroughly, or effectively."  The
7  prior definition that you described for me, is
8  that still applicable here?
9      A   Yes, it is.
10     Q   Have you ever seen an instance when an
11 inmate was assigned to a facility and was not
12 assigned to a bed?
13     A   I don't think I've seen them never
14 having an assigned bed.
15     Q   Have you ever seen an instance when a
16 prisoner was assigned to sleep on a floor?
17     A   No, I have not seen that.
18     Q   Have you ever seen an instance when
19 inmates were housed three inmates to a cell?
20     A   Assigned?
21     Q   Yes.
22     A   Generally, the answer is no.  The
23 possible exception to that would be some of the
24 infirmary cells in some of the prisons, where
25 people have been piled in as many as six to a

47 (Pages 182 - 185)

Page 186

1  two-man cell.
2      Q    But some of them are infirmary rooms
3  that are larger than an average cell, correct?
4      A    The examples I'm thinking of, all I
5  can tell you is three or more people had to sleep
6  on the floor.
7          MS. WARD:  I think now may be a good
8  time to take a break.
9          MR. LUNSFORD:  Okay.  How long do you
10 want to take?
11         MS. WARD:  Are we going to go maybe
12 grab some food?
13         (Simultaneous speaking.)
14         MR. LUNSFORD:  If we can move quickly.
15 Yeah, we'll just keep going.  We weren't planning
16 on breaking for a long lunch.
17         THE WITNESS:  Half-hour's fine.
18         MS. WARD:  A half-an-hour, yeah.
19         THE WITNESS:  Is that all right?
20         MS. WARD:  If he's going to keep
21 going, he needs to eat.
22         VIDEOGRAPHER:  Are we going off the
23 record?
24         MR. LUNSFORD:  That's fine.
25         (Whereupon, the above-entitled matter

Page 187

1  went off the record at 12:52 p.m. and resumed at
2  1:31 p.m.)
3          THE VIDEOGRAPHER:  Back on the record
4  at 1:31 p.m. Eastern time.
5          BY MR. LUNSFORD:
6      Q    Mr. Williams, are there any facilities
7  that you have not visited?
8      A    In Alabama?
9      Q    Yes.
10     A    Yes.
11     Q    You understand, I want to clarify
12 this, you understand today that you're under oath
13 to testify on your personal knowledge today,
14 right?
15     A    Yes.
16     Q    I want to differentiate, I hear
17 something else from Counsel, you understand,
18 we're not asking you to testify about what
19 somebody else knows or what the, I think Ms. Ward
20 said something about the collective team
21 knowledge, which I don't even understand, but
22 we're not asking you to testify as to any
23 collective team knowledge just your personal
24 knowledge, right?
25     A    You're telling me that's what you're

Page 188

1  asking me?
2      Q    You understand that?
3      A    I understand the distinction.
4      Q    Okay.  But going back to my other
5  question, how many facilities have you not
6  visited in Alabama that are the subject to this
7  litigation?
8      A    I can list them off --
9      Q    Sure.
10     A    -- is that easier?
11     Q    Yes.
12     A    Limestone.  Kilby.  Fountain.  I think
13 that's it.  I visited Holman, Draper, Easterling,
14 Ventress, Bibb, St. Clair.  So if I'm missing one
15 it's in the category of, that I didn't visit it.
16     Q    Have you visited any ADOC facility
17 multiple times?
18     A    No.
19     Q    Going back to the interrogatory
20 response, Page 6 of Defendant's Exhibit 2, it
21 says, ADOC does not consistently, thoroughly or
22 effectively control the flow of prisoners into
23 unauthorized areas in the facilities.  Do you see
24 that?
25     A    I do.

Page 189

1      Q    What is an unauthorized area?
2      A    In the facilities it could -- in the
3  prisons there is a number of areas that are
4  unauthorized.  I don't know that I can list them
5  all because I don't, I'm not privy to that
6  information.  But I understand they're not
7  supposed to be on their own without supervision
8  in most locations.  So there is, an unauthorized
9  area would also be potentially, could potentially
10 be interpreted as another dorm, but frequently
11 we're talking about places like, you know, it's
12 wherever the machine tools are kept, wherever
13 access to the shift office without supervision.
14         There is a number of areas in all the
15 prisons that are supposed to be, you're supposed
16 to have access to only if you're supervised with
17 a staff member.
18     Q    So let me, are you saying that an
19 unauthorized area is an area where an inmate is
20 unsupervised or are you saying it's specified
21 areas where inmates are not permitted?
22     A    I believe there is probably both.
23 There is specifically areas where inmates should
24 not be allowed.  I image they should not be
25 allowed in cubicles that are work spaces for

Page 190

1  staff, for example.
2       And then there is some gray area that
3  sometimes occurs, for example, when the tablets
4  came onboard.  I know that there was usually a
5  room very close to the cube where they would be
6  charged at and it may be that staff gave
7  permission for an inmate, or inmates, to go into
8  that room, but not for the entire dorm.  Yet
9  there might have been a breaking of that secure
10  area by people who are not supposed to be in
11  there.
12      Q    The instance that you just described
13  about the tablets and inmates breaking into an
14  area of the prison, did that actually occur?
15      A    I have been told a number of times
16  with inmates, on phone calls, that there were
17  areas that should have been locked or that an
18  officer goes into and is not supposed to allow an
19  inmate to go in there with them, but that that
20  has occurred.
21      Q    I'm not -- I don't want to generally
22  -- the instance you just said where there was a
23  room where tablets are being charged and someone
24  broke into the room, an inmate, did that actually
25  occur?

Page 191

1      A    I was not speaking, if I spoke and
2  indicated it was a single incident then I
3  misspoke.  I was speaking in terms of things that
4  I have been told happened and could have happened
5  more than once.  So I'm not thinking of a
6  singular incident.
7      Q    Just so we're clear, I don't want to
8  talk about what might have happened, what
9  possibly happened, I want to talk about actual
10  facts.  Your Counsel has mentioned that several
11  times, and I think we can agree that we're here
12  to collect facts.  And so when you start going
13  into what could have happened you're not talking
14  about facts anymore.
15      Are you aware of any instance when an
16  inmate was allowed access to a closet without
17  authorization where tablets are being charged?
18      A    I have been on a number of phone calls
19  where that statement has been made to me by
20  inmates who were reporting on the fact that that
21  happened.
22      Q    Do you know if anyone was injured as
23  a result of that incident?
24      A    It was not an incident that would have
25  involved injury, it was simply that, something

Page 192

1  that was being done surreptitiously, if you will.
2  So there was no violence involved in those
3  incidents --
4      Q    What do you mean --
5      (Simultaneous speaking.)
6      Q    -- surreptitiously?
7      A    In other words, it wasn't supposed to
8  happen so it was done when no one was looking, or
9  whatever the case may be.  It was done in a
10  manner that indicated that they knew they weren't
11  supposed to be doing it but were doing it anyway.
12      Q    Are you aware that in certain
13  vocational training programs inmates run or
14  operate, or manage the tool rooms?
15      A    I have heard that, so I don't know the
16  specific cases.  But I am aware of that
17  generally.
18      Q    Are you aware that happens in other
19  prison systems too?
20      A    That they have access to tool kits as
21  part of some kind of vocational program?
22      Q    Yes.
23      A    I have not looked at it extensively in
24  other systems but -- so I can't respond
25  specifically, but it would not surprise me.

Page 193

1      Q    Are inmates authorized to be in the
2  tool rooms at any particular facility in Alabama?
3      A    I don't know that for a fact if they
4  are or not.  I believe people who are on
5  maintenance crews have access to certain tools.
6  And they're supposed to be locked up when they're
7  finished using them.  That's my basic
8  understanding --
9      Q    Can you identify for me --
10      (Simultaneous speaking.)
11      MS. WARD:  Bill, just --
12      MR. LUNSFORD:  Sorry.
13      MS. WARD:  -- let him finish his --
14      MR. LUNSFORD:  I didn't -- sometimes
15  it's tough to hear, he drops off.  I thought he
16  was done.  You can finish.
17      THE WITNESS:  There was a couple words
18  I'm sure.  Did you get it?  Can you read back
19  what I read?  What I wrote up to the point when
20  you didn't hear it?  It was maybe three words.
21      COURT REPORTER:  I'm just going to
22  unplug my microphone.
23      (Whereupon, the record was read back.)
24      THE WITNESS:  All right, I'm sorry, I
25  can't reproduce it.  Couldn't hear it.

49 (Pages 190 - 193)

Page 194

1     BY MR. LUNSFORD:
2     Q    Can you identify any particular
3  instance when an inmate in fact entered an
4  unauthorized area?
5     A    Not --
6     Q    And --
7     A    -- off the top of my head.
8     Q    -- can you identify any particular
9  instance when an inmate in Alabama entered an
10  unauthorized area and did not receive a
11  disciplinary from being in an unauthorized area?
12     A    Not off the top of my head.
13     Q    Do you know what measures ADOC has
14  employed to attempt to monitor and control inmate
15  movement within its facilities?
16     A    I don't have the specific details on
17  that.
18     Q    Did you consider which facilities are
19  using arm bands?
20     A    I'm aware of the arm bands but I'm
21  not, I don't have enough specifics on the use of
22  the arm bands and how they function.  But I know
23  there is access you gain to certain areas and not
24  other areas.
25     Q    Has the United States provided any

Page 195

1  proposals to the State of Alabama as to how to
2  eliminate inmates entering unauthorized areas?
3     A    I am not aware, as I sit here right
4  now, of what specific proposals we have made
5  regarding that.
6     Q    Is there one facility that does a
7  better job in terms of preventing inmates from
8  entering unauthorized areas as opposed to another
9  facility?
10     A    I could not, at this moment, identify
11  a particular facility that is better than others.
12     Q    Do you know how many inmates have been
13  disciplined for entering an unauthorized area?
14     A    I do not.
15     Q    Next sentence says, ADOC does not
16  consistently, thoroughly or effectively count
17  prisoners to ensure prisoners are in their
18  assigned dorms.  Do you see that?
19     A    I do.
20     Q    Again, the three word phrase appears,
21  consistently, thoroughly or effectively.  Is
22  there anything you'd like to add to the
23  definition that you've provided me earlier?
24     A    No.
25     Q    Is it the same definition here?

Page 196

1     A    Yes.  Yes, it is.
2     Q    How many times a day -- well first of
3  all, does ADOC have a policy that pertains to the
4  counting of inmates?
5     A    It's my understanding that they do.
6     Q    Are there also facility specific SOPs
7  pertaining to counting inmates?
8     A    It's my understanding that there are.
9     Q    Are there different types of counts?
10     A    I believe that there are.
11     Q    Can you provide any explanation to me
12  as to how the United States contends that, which
13  count conducted by ADOC is not consistently,
14  thoroughly or effectively?
15        MS. WARD: Object.  That is privileged
16  information.  Do not answer.
17        BY MR. LUNSFORD:
18     Q    Are you aware of a face count?
19     A    Do I know what a face count?  Yes.
20     Q    Yes.
21     A    Yes, I do.
22     Q    Okay.  And do you know what a bed
23  count is?
24     A    I do.  Do you mean, is that the same
25  as a bed roster count, is that what you're

Page 197

1  referring to?
2     Q    Some people call it bed counts, some
3  people call it bed roster count.  Yes.
4     A    Yes, I am.
5     Q    What are the differences, in your
6  understanding?
7     A    Well in the latter, the bed roster
8  count you have assigned beds on the roster and
9  you're looking to match up the name with the bed
10  per the roster.  And the face count you just are
11  looking to see that you have a number of inmates
12  that you're supposed to in the given dorm.  In
13  other words, you're counting heads or faces.
14  That's my understanding.
15     Q    Okay.  Have you ever observed count in
16  any facility?
17     A    I have not been there in a live moment
18  to observe count, no.
19     Q    Okay.  Are you aware of any occasion
20  when any Alabama prison has not conducted count
21  at the appointed time?
22     A    I am not aware of an individual
23  occasion, but based on many years of talking to
24  inmates about it, it has been a fairly regular
25  aspect of what the calls have indicated.  And if

Page 198

1  I, you know, it's not necessarily something that
2  the inmates call to volunteer up-front, as if
3  that's the big issue of the day for them, but
4  when asked that is usually the response.
5      Q   Have -- All right.  So you're telling
6  me inmates have said that, what about count, to
7  you?
8      A   A lot of things.  You want me to --
9      Q   Sure.
10     A   Okay.  So, bed roster counts are
11 infrequent.  And I'm giving you sort of a survey
12 of the combined answers as I have remembered
13 them.  They're infrequent.
14        That the headcount is usually what
15 they're after.  They don't always do as many
16 headcounts as they're supposed to.  That they
17 will ignore the people that are sleeping on the
18 floor, or they will acknowledge them in a
19 headcount.  And if it's X amount of people that
20 are sleeping on the floor, who are obviously not
21 on their assigned bed, either in that dorm or
22 from another roster, they make note of it.
23        So I think that they indicate that
24 ADOC staff is aware of how many people might be
25 in a given dorm from a headcount or a face count

Page 199

1  that are not supposed to be in there.
2  Essentially they will be over whatever is the
3  number of inmates that are supposed to be in a
4  given dorm.
5      Q   Have you reviewed count sheets?
6      A   I have not.  I have seen them, but I
7  have not reviewed them.
8      Q   Have you reviewed any video footage to
9  evaluate how often count is occurring in a
10 particular dorm?
11     A   Not to evaluate if they're doing
12 counts, how often they're doing counts or if
13 they're doing them at prescribed times or
14 whatever.
15     Q   Is the sole basis for your
16 understanding about how frequently or
17 infrequently ADOC does counts or how effectively
18 ADOC does counts, is your sole basis of
19 understanding on that based on your conversation
20 with inmates?
21     A   My personal understanding is largely
22 based on that, but it's consistent also with
23 what, other aspects of our investigation have
24 revealed.
25     Q   What other aspects?

Page 200

1      A   Well --
2          MS. WARD:  Object to form.  That's a
3  work product.
4          MR. LUNSFORD:  What other information
5  have you received during the course of this case
6  which supports your contention about ADOC not
7  effectively counting?
8          MS. WARD:  Object to form.  That's
9  privileged.  Sorry, I keep saying object to form,
10 but I assume you guys understand what I mean.
11 I'm objecting on the basis of privilege and
12 instructing him not to answer it.
13         MR. LUNSFORD:  Are you saying that the
14 information, the evidence that you have is
15 privileged?
16         MS. WARD:  What we're relying on to
17 prove our case is privileged.
18         MR. LUNSFORD:  Okay.
19         MS. WARD:  The specific allegations.
20         MR. LUNSFORD:  No, I'm talking about,
21 I'm not talking about allegations, I'm talking
22 about evidence.
23         MS. WARD:  I know.
24         MR. LUNSFORD:  I asked him for
25 evidence.

Page 201

1          MS. WARD:  Yes.
2          MR. LUNSFORD:  I said, what evidence
3  has been collected during the course of the
4  investigation that supports this contention that
5  we don't count prisoners.
6          MS. WARD:  And this contention was
7  made based on the collective knowledge of our
8  team.  So marshaling facts --
9          MR. LUNSFORD:  I'm not asking about
10 knowledge --
11         (Simultaneous speaking.)
12         MR. LUNSFORD:  -- I'm asking, I didn't
13 say, what does somebody else know, I said, what
14 evidence have you collected.  Which evidence is
15 not privilege.  Knowledge, his knowledge of
16 evidence is not privileged.  What evidence have
17 you identified during the course of the
18 investigation that substantiates this allegation?
19         MS. WARD:  And I believe what you said
20 was the United States.
21         MR. LUNSFORD:  I did.  I said, the
22 United States --
23         MS. WARD:  Yes.
24         MR. LUNSFORD:  -- yes.  I said --
25 still, I'm asking, all of this is on his personal

51 (Pages 198 - 201)

1  knowledge.  We've said this nine times.
2        MS. WARD:  Okay.  But you didn't ask
3  what evidence have you, Mark Williams, looked at
4  --
5        MR. LUNSFORD:  Dear Lord.
6        MS. WARD:  -- that makes you
7  comfortable verifying this interrogatory.  That's
8  not what you asked.
9        BY MR. LUNSFORD:
10       Q    Is there any other evidence that
11  you're aware of that justifies this statement
12  that ADOC does not consistently, thoroughly or
13  effectively count prisoners?
14       A    Yes.
15       Q    What is it?
16       (Off microphone comment.)
17       A    I'm sorry?
18       Q    Keep going.
19       MS. WARD:  Bill, it's not helpful for
20  asides under your breath during the course of the
21  deposition.
22       MR. LUNSFORD:  I was --
23       MS. WARD:  You're doing it, you're
24  doing it some more.  It's a sarcastic aside.
25       MR. LUNSFORD:  It's not.

1        MS. WARD:  It was.  And I just want to
2  make clear we're trying very hard to allow you to
3  ask questions that are in line with what the
4  court ordered, which are about the facts
5  underpinning the interrogatories and committing a
6  complaint that he has personal knowledge of, but
7  does not reveal work product.  Which the court
8  was very clear was not the purpose of this
9  deposition.  So that's all I'm trying to do.  And
10  if you could be understanding of that and not
11  offer sarcastic asides under your breath this
12  deposition would go a lot faster.
13       MR. LUNSFORD:  I was simply telling my
14  colleague how it was the same question.  And so
15  all I'm expressing is my great frustration over
16  the fact that your sole intent appears to be to
17  delay this deposition.  That's it.
18       MS. WARD:  That is not --
19       MR. LUNSFORD:  And so --
20       MS. WARD:  -- my sole intent.
21       MR. LUNSFORD:  -- let's go back to the
22  question.
23       BY MR. LUNSFORD:
24       Q    Are you aware of any evidence that
25  further supports this contention, and if you are

1  could you please identify that for me?
2        A    Further evidence beyond my talking to
3  inmates?
4        Q    Yes.
5        A    Yes, I am.
6        Q    What is that?
7        A    It's been based on a variety of
8  reviews and materials received from ADOC.
9        Q    What material?
10       A    Productions that we received.  Either
11  videos showing things of roster, I mean, duty
12  rosters, count checks.  Reviews by members of the
13  team of those documents.
14       Q    Any other documents you can
15  specifically identify?
16       A    Not off the top of my head at this
17  point.
18       Q    And if we go to the next page, Page 7,
19  the second sentence, ADOC does not, again,
20  consistently, thoroughly or effectively enforce
21  disciplinary action for prisoners who commit
22  prisoner-on-prisoner assaults in the facilities.
23  Do you see that?
24       A    I do.
25       Q    We see the repeated three word phrase

1  again, any change to your testimony as to the
2  meaning of those words?
3        A    No.
4        Q    Okay.  Those words have the same
5  application here?
6        A    They do.
7        Q    Can you identify for me a single
8  prisoner who's assaulted another prisoner and
9  didn't receive disciplinary action as a result of
10  it?
11       A    Not off the top of my head, no.
12       Q    Has a prisoner ever assaulted another
13  prisoner at Bibb and not received a disciplinary?
14       A    I couldn't give you a specific example
15  off the top of my head.
16       Q    At any facility?
17       A    No, I don't -- I'm afraid I can't
18  remember those kinds of details.
19       Q    Can you give me an anecdote of an
20  instance when there was an assault and no one
21  received a disciplinary?
22       A    No.  There would be a composite as
23  opposed to an anecdote.  An anecdote is what
24  actually happened.  It would be a composite of
25  the types of stories that I hear.

52 (Pages 202 - 205)

Page 206

1    Q    Well I don't want to hear a story, I
2  want to hear about a specific instance when there
3  was a prisoner-on-prisoner assault. Because you
4  say this happens consistently.
5    A    Yes.
6    Q    And so I'm just curious, you can't
7  give me one case where this occurred?
8    A    Well I can tell you that I've had
9  numerous, in numerous phone calls with inmates
10  where they indicate such a thing. Such a very
11  thing in fact happened.
12    Q    Did you obtain the name of the other
13  inmate?
14    A    If possible. But it wasn't always
15  possible.
16    Q    Did you investigate the disciplinary
17  file of that inmate?
18    A    Of the assaulting inmate or the victim
19  inmate?
20    Q    The assaulting inmate.
21    A    Usually I have the name of the victim
22  more so than the assaulter. So I think it's been
23  rare that I've been able to pursue whoever was
24  the assaulter.
25    Q    Is it always clear cut which inmate is

Page 207

1  the assailant and which one is the victim?
2        MS. WARD: Object to form.
3        THE WITNESS: Is it clear cut from
4  when I told about it or is it always clear cut
5  in general?
6        BY MR. LUNSFORD:
7    Q    When you review the matter.
8    A    Well I am not reviewing the matter
9  initially, I'm just taking the phone call. So
10  that then, you know, it's clear cut in the mind
11  of the person telling me what they're telling me
12  what happened. There may be other circumstances
13  involved in the incident that go prior to the
14  incident. There might be something from last
15  week, there might be something from the hour
16  prior. They may not have seen all of it.
17        But they're usually telling me about
18  a specific isolated moment in time. And then if
19  they wish to make any other comments that relate
20  to something that could be relevant to that, then
21  they do that as well.
22    Q    Have you, are you aware that ADOC does
23  take disciplinary action against assailants who
24  attack other inmates?
25        MS. WARD: Object to form.

Page 208

1        THE WITNESS: Yes, I am.
2        BY MR. LUNSFORD:
3    Q    Do you know how many inmates were
4  disciplined last year for assaulting other
5  inmates?
6    A    I do not know that number off the top
7  of my head.
8    Q    When you're referring here to
9  disciplinary action --
10    A    Yes.
11    Q    -- what does that mean?
12        MS. WARD: Object. That is privileged
13  information. Do not answer.
14        MR. LUNSFORD: Okay, next sentence.
15        BY MR. LUNSFORD:
16    Q    ADOC does not, and then is your phrase
17  consistently, thoroughly or effectively apply
18  practices regarding housing of security threat
19  groups in the facility. Do you see that?
20    A    Yes.
21    Q    Are there any -- do you know if ADOC
22  currently has any policies or practices regarding
23  the housing assignments of security threat groups
24  or members of security threat groups?
25    A    It's my understanding that they have

Page 209

1  policies related to security threat groups. The
2  specifics of that I'm not sure about because I
3  don't have, I don't remember it. Let's put it
4  that way.
5    Q    What -- what -- I don't understand
6  what this word practices mean. What practices
7  are you referring to here?
8        MS. WARD: Object. That's privileged.
9  Do not answer.
10        MR. LUNSFORD: Are you contending that
11  ADOC should house all the members of the same
12  gang in the same location?
13        MS. WARD: Object. Privileged. Do
14  not answer.
15        MR. LUNSFORD: Does ADOC account for
16  -- should ADOC account for security threat group
17  affiliations in making housing decisions?
18        MS. WARD: Object to form.
19        THE WITNESS: You're asking me for an
20  opinion now, right?
21        BY MR. LUNSFORD:
22    Q    I'm asking --
23    A    Because you said --
24    Q    -- for your --
25    A    -- should --

53 (Pages 206 - 209)

Page 210

1    Q    -- personal understanding.
2    A    You said should.
3    Q    Yes.
4    A    Understanding.  And you're asking for
5  my opinion, right?
6    Q    Yes.
7    A    Should.  Based on my work here in
8  prison investigations it's my understanding that
9  that is sound policy.
10    Q    Do classification specialists in
11  Alabama have access to that information?
12    A    I do not know that for a fact, but I
13  would assume they do.
14    Q    And -- okay.  So you don't know if STG
15  affiliation is considered in housing decisions in
16  Alabama?
17    A    I believe that it is.
18    Q    Okay.  I guess my question is, what's
19  wrong about the manner in which ADOC is assigning
20  STG affiliates to housing units?
21        MS. WARD:  Object.  That's privileged;
22  do not answer.
23        BY MR. LUNSFORD:
24    Q    How did you get to a point, Mr.
25  Williams, when you were comfortable signing this

Page 211

1  document to say that ADOC consistently doesn't do
2  all these things?  How did you reach a point when
3  you were comfortable saying it's not consistent?
4    A    Well that's the nature of our work
5  involves pattern of practice, right, as a
6  concept.  So, if you observing this for a number
7  of years and hearing testimony or information to
8  that effect, that then becomes the consistent
9  portion of it.
10    Q    So if you just hear enough of it then
11  it's not consistent?
12        MS. WARD:  Object.
13        MR. LUNSFORD:  If you hear enough
14  about a certain kind of problem you're going to
15  conclude it's inconsistent?
16        MS. WARD:  Object to form.
17        THE WITNESS:  Well, if you hear enough
18  about a certain problem you're certainly going to
19  take a closer look.  And then if everything else
20  lines up to support that, hearing about it as you
21  put it, then you've reached that level.
22        MR. LUNSFORD:  On each of these areas
23  that you have attested to in this interrogatory,
24  there is 75 different times that you say ADOC
25  didn't undertake a task consistently, thoroughly

Page 212

1  or effectively.  And my question is that, did you
2  never find one instances when you said, well
3  they're doing that consistently, they're just not
4  doing it thoroughly or effectively?
5        MS. WARD:  Object to the form.
6  Privileged, do not answer.  Or sorry, object.
7  Privileged, do not answer.
8        MR. LUNSFORD:  Okay.
9        BY MR. LUNSFORD:
10    Q    Next sentence.  ADOC does not
11  consistently, thoroughly or effectively gather
12  information on STGs and share intelligence
13  between facility staff and central office to
14  manage STGs.  Do you see that?
15    A    Yes, I do.
16    Q    What intelligence is shared between
17  facility staff and central office regarding STG
18  affiliations?
19    A    I am not specifically aware of the
20  exact communications they have with one another.
21    Q    Then how do you know that the sharing
22  of information is not done consistently,
23  thoroughly or effectively?
24        MS. WARD:  Object.  Privileged.  Do
25  not answer.  And I would again point you to Page

Page 213

1  11 of the reported recommendation that the mere
2  fact Williams verified interrogatory responses
3  does not itself equate to possession of personal
4  knowledge of every response.  And hopefully that
5  will help move this along.
6        BY MR. LUNSFORD:
7    Q    What information is gathered by ADOC
8  on STGs?
9    A    Well we talked earlier about how they
10  determine someone's STG status.  So it's in line
11  with that answer to that question.  They, I'm
12  assuming, gather information on their tattoos.
13  They have intelligence, perhaps, that they get
14  from the counties or from prior convictions.
15  They may listen in on phone calls and make some
16  determinations regarding that.  That's what I can
17  think of probably off of the top of my head.
18    Q    Which part of ADOC's information
19  gathering process pertaining to STG affiliation
20  is inconsistent?
21    A    Which part of ADOC is -- repeat
22  please.
23    Q    Which part of ADOC's information
24  gathering process for STG affiliation is
25  inconsistent?

54 (Pages 210 - 213)

Page 214

1     A    When incidents happen that are gang
2   violent, violence by gang members against an
3   individual. And there's a group of people that
4   are involved in a particular assault. And when
5   you look at the incident reports and you see that
6   for the people that are listed as assailants,
7   suspects, that not all of them are gang members.
8          That's an example of a moment where
9   you have the opportunity to determine why the
10  others joined in on real violence on another
11  individual. And people who have been listed as
12  having no affiliation, for example, that would be
13  an example of that.
14    Q    But are you aware of any instance --
15  but let me ask this. Who's role is it to review
16  incident reports related to gang activity?
17         MS. WARD: Object. That's privileged;
18  do not answer.
19         MR. LUNSFORD: Who within ADOC is
20  responsible for monitoring incident reports for
21  gang activity?
22         MS. WARD: Object to form.
23         MR. LUNSFORD: It's the same question.
24         MS. WARD: Yes.
25         THE WITNESS: I don't have thorough

Page 215

1   knowledge of all the individuals who are
2   responsible for reviewing that. Whether they
3   have primary responsibility or eventual
4   responsibility or involvement. But it's, I'm
5   sure it's a variety of people, both at a facility
6   level and beyond.
7         BY MR. LUNSFORD:
8     Q    The anecdote, or instance that you
9   just gave me, is that a real example or is that
10  just one you made up?
11    A    No. I see assaults all the time where
12  there is multiple gang members involved in the
13  assaults and then multiple other people that were
14  also involved in the assault that have no gang
15  affiliation indicated in the parens that normally
16  follow their name.
17    Q    And have you investigated whether
18  those individuals were ultimate assigned a gang
19  affiliation?
20    A    I have not.
21    Q    Have you ever spoken to any of those
22  unaffiliated individuals to determine if they
23  were in fact part of the gang?
24    A    I could not, as I've stated today,
25  know of a single incident or an individual where

Page 216

1   I may have figured that out or sought further
2   information.
3     Q    Is it possible for ADOC to identify
4   every person in its custody that is affiliated
5   with an STG?
6         MS. WARD: Object to form.
7         THE WITNESS: I do not know if it is
8   possible.
9         BY MR. LUNSFORD:
10    Q    The next sentence says, ADOC does not
11  consistently, thoroughly or effectively enforce
12  disciplinary action of prisoners bartering or
13  trading in the facilities, including of canteen
14  items. Do you see that?
15    A    I do.
16    Q    Is it against ADOC regulations for
17  inmates to barter or trade items?
18    A    Right now I can't remember when I read
19  that. I'm assuming I have, but I'm not a hundred
20  percent as I sit here today.
21    Q    Again, this three word phrase that you
22  use so often, consistently, thoroughly or
23  effectively, is -- anything like you'd like to
24  add or change about that definition as it applies
25  here?

Page 217

1     A    No.
2     Q    Does ADOC maintain a policy against
3   bartering or trading?
4     A    I believe it does but I don't recall
5   how it's worded or anything. I don't remember
6   when I last looked at it.
7     Q    Have you identified a single inmate
8   who was harmed because they engaged in bartering
9   or trading?
10    A    Well it's, the bartering or trading is
11  not the, is not the moment in which the harm or
12  the violence, if we were linking harm to
13  violence, it's not the moment in which it
14  happens. It's part of a system that then
15  develops debts and things of that nature where
16  there is the, at some point there is the
17  collection of a debt and then there is violence.
18    Q    Are you aware of any prison system in
19  the world that has prevented bartering or trading
20  among inmates?
21         MS. WARD: Object to form.
22         THE WITNESS: I am not.
23         MR. LUNSFORD: Have you see that in
24  other facilities you've visited in other states?
25         THE WITNESS: I have.

55 (Pages 214 - 217)

Page 218

1         MR. LUNSFORD: How would ADOC
2    discipline every prisoner who engaged in
3    bartering or trading?
4         MS. WARD: Object to form.
5         THE WITNESS: Well it's a complicated
6    question because the bartering that we're primary
7    talking about is a contraband items or items that
8    are available on the canteen to pay for
9    contraband items. So it's part of a larger
10   problem.
11        MR. LUNSFORD: So let's just go
12   through the scenario. Assailant attacks victim
13   and it becomes clear that victim owed assailant a
14   debt. Is it your contention that in that
15   particular scenario the victim of an assault
16   should be disciplined for bartering?
17        MS. WARD: Object to form.
18        THE WITNESS: Well it's not my, there
19   is no should involved here. It's not my policy
20   understand. Whether it's ADOC's policy to
21   discipline the person, in this case the victim
22   but who is also engaged in the bartering, I can't
23   remember but I think I have seen documents to
24   that affect where they have disciplined both
25   individuals because it was admitted, for example,

Page 219

1    that I owe him money for such and such.
2         BY MR. LUNSFORD:
3         Q    So you have seen instances of
4    disciplinary action being taken?
5         A    I have seen things like that, but I
6    will not be able to give you an example off the
7    top of my head.
8         Q    Have you done any analysis to
9    determine how many instances of bartering or
10   trading or discovered by ADOC without any form of
11   disciplinary action being taken?
12        A    I have not done that analysis, no.
13        Q    The next line says, ADOC fails to
14   consistently, thoroughly or effectively limit the
15   amount of canteen items purchased by individuals
16   in the facilities. Do you see that?
17        A    I do.
18        Q    What should the limit be on canteen
19   items?
20        MS. WARD: Object to form.
21        THE WITNESS: I cannot say from my
22   position, but what the role of that scenario is
23   and the overall problem with the bartering of
24   contraband is, it is a part of that process, that
25   economy.

Page 220

1         BY MR. LUNSFORD:
2         Q    This is canteen items.
3         A    Yes. But canteen items are used to
4    pay for the contraband.
5         Q    Do you know if ADOC has limits on the
6    purchase of canteen items in any housing units?
7         A    I believe that they have had limits,
8    and that they tweak those limits at times.
9         Q    What do you mean?
10        A    Meaning, they have increased or
11   decreased those limits.
12        Q    Why did they do that?
13        A    Well I can't speak for ADOC, but when
14   inmates talk about it, it's, they don't
15   necessarily know a hundred percent. But what
16   they glean is that this issue of using them for
17   paying, for paying for contraband is something
18   that ADOC at that time was maybe trying to get
19   ahead of.
20        Q    So you've seen evidence that ADOC has
21   attempted to limit canteen items in certain
22   facilities?
23        A    I have been told that that has taken
24   place. The same evidence that I use for
25   everything else, which is the inmates on the

Page 221

1    phone telling me that.
2         Q    I'm going to try to handle this in
3    short order, but you, again, in this section
4    related to the amount of canteen items refer to
5    this three word phrase, consistently, thoroughly
6    or effectively. I assume that has the same
7    application as you've referenced in the beginning
8    of your deposition?
9         A    Yes, it does.
10        Q    Okay. And is, in the remaining that
11   was actually instance number ten when it was
12   used. Actually eleven. The remaining 64 times
13   you used that phrase I assume there is no
14   different meaning those other 64 times is there?
15        A    Right.
16        MS. WARD: Object to form. I --
17        MR. LUNSFORD: I'll ask you --
18        MS. WARD: -- object --
19        MR. LUNSFORD: I'll ask you --
20        MS. WARD: I object on privilege.
21        MR. LUNSFORD: I've asked that
22   question --
23        MS. WARD: He can --
24        MR. LUNSFORD: -- nine times and you
25   have --

56 (Pages 218 - 221)

Page 222

1    MS. WARD: I know, but you -- but you
2  need to be clear, Bill. You're asking --
3    MR. LUNSFORD: Okay.
4    MS. WARD: We're asking him what his
5  understanding --
6    MR. LUNSFORD: Okay, let's just --
7    MS. WARD: -- was.
8    MR. LUNSFORD: Let's be very clear.
9  Let's go to this. So consistently, thoroughly or
10 effectively, if you'll follow with me, okay?
11 We're on line number, one, two, that's Line 8 of
12 Page 7. That's the 11th use, okay?
13   THE WITNESS: Yes.
14   MR. LUNSFORD: Let's be specific. The
15 12th use is five lines below, related to
16 investigations. The 13th is two lines below
17 that. Then you have to turn the page for the
18 14th. We're going to do this 65 times?
19   MS. WARD: Yes. But what I'm talking
20 about on specificity is clarifying that it's his
21 understanding of what that means so that he was
22 comfortable in signing it. And you were asking
23 what the meaning of it is in terms of what we
24 mean when we issued the interrogatory --
25   THE WITNESS: Yes.

Page 223

1    MS. WARD: -- which is work product.
2    MR. LUNSFORD: No.
3    MS. WARD: So we just need --
4    MR. LUNSFORD: Let's --
5    MS. WARD: -- to clarify the
6  difference between those two. And that was
7  unclear.
8    MR. LUNSFORD: Is your understanding,
9  or the definition that you applied to thorough,
10 consistently or effectively, which is used 75
11 times in response to this one interrogatory, is
12 it consistent throughout the entirety of every
13 sentence in which it's used in this interrogatory
14 response?
15   MS. WARD: And I will clarify that he
16 can answer what his understanding of it is the
17 same throughout this interrogatory response.
18   THE WITNESS: And the answer is yes.
19   BY MR. LUNSFORD:
20   Q   Do you know if ADOC still utilizes
21 living agreements?
22   A   It's my understanding that they do.
23   Q   Do you know how long living agreements
24 have been utilized?
25   A   Throughout the history of ADOC you

Page 224

1  mean?
2    Q   Yes.
3    A   I do not.
4    Q   Well, a living agreement is a
5  representation by two inmates that they can live
6  together, correct?
7    A   That they can peacefully exist in the
8  same living space.
9    Q   Yes. Should ADOC rely upon the things
10 that they're told by inmates as being truthful?
11   MS. WARD: Object to form.
12   THE WITNESS: And again, on the should
13 side of it I will say that in my personal opinion
14 staff have it difficult in terms of assessing
15 what might be going on in a different situation.
16 But if an inmate is indicating to them that
17 they're endanger, I believe they should take that
18 seriously.
19   MR. LUNSFORD: Okay. So in the same
20 fashion, if an inmate says they're not in danger
21 and that they can live safely with another
22 inmate, should ADOC rely on that?
23   MS. WARD: Object to form.
24   THE WITNESS: Each staff member in
25 these prisons knows that it's a complicated

Page 225

1  dynamic what might lead to a disagreement, which
2  is violent. So there are times where inmates who
3  are presenting to them as victims, or potential
4  victims, are afraid in the end to come out and
5  say it. Or as inmates have told me numerous of
6  times on the phone, staff frequently don't want
7  to deal with the issue and pressure the inmates
8  into signing those agreements.
9    BY MR. LUNSFORD:
10   Q   Have you don't anything to evaluate
11 whether, or how often, inmates who signing living
12 agreements have been victimized by the other
13 person who signs the living agreement?
14   A   Afterwards or --
15   Q   Yes.
16   A   -- prior?
17   Q   Afterwards.
18   A   I don't think I have done that. No.
19   Q   Do you know if it's more frequent than
20 not?
21   A   Meaning, that it happens more than it
22 doesn't happen?
23   Q   Yes.
24   A   Off the top of my head right now I
25 couldn't say.

57 (Pages 222 - 225)

1    Q    Just a curious question.  When you're
2  interviewing these inmates do you believe
3  everything they say?
4        MS. WARD:  Object to form.
5        MR. LUNSFORD:  What's wrong with the
6  form of that question?
7        MS. WARD:  It's harassing.
8        MR. LUNSFORD:  Any other problem with
9  the form?
10       MS. WARD:  No, just harassing.
11       MR. LUNSFORD:  Okay.
12       BY MR. LUNSFORD:
13   Q    Do you believe everything that an
14  inmate tells you?
15   A    I do not believe everything an inmate
16  tells me.  But depending on what the call is like
17  and what the information that is being shared is
18  all about, there is, more often than not, no
19  reason on my part to doubt it too much.  It may
20  be the information the inmate has is incomplete
21  so therefore you can't get a complete picture of
22  what the inmate is talking about.  And then
23  you're waiting to see if at some point in the
24  future you get more information about it.
25   Q    The next line says, ADOC law

1  enforcement services division fails to pursue
2  investigations in the facilities if the victim
3  does not wish to prosecute or fails to name the
4  alleged perpetrator.  Do you see that?
5    A    Yes, I do.
6    Q    Okay.  Have you ever been part of the
7  criminal prosecution?
8    A    Meaning, have I been prosecuted or
9  have --
10   Q    No.  Have you ever participated in the
11  prosecution of a criminal defendant?
12   A    I have been on -- I've been on the
13  trial side of it at the end of it, but not in the
14  prosecutorial phase.
15   Q    Sure.  How many cases have you taken
16  to criminal trial?
17   A    One.
18   Q    Okay.  What type of case was it?
19   A    It was fraud.
20   Q    Okay.  What type of fraud?
21   A    A U.S. citizen living overseas on an
22  air fort, near a military base was defrauding the
23  government with some information he provided
24  related to his housing so that he could receive
25  subsidies he was not in fact eligible for.

1    Q    Did someone from the government, who
2  was the victim in this case, testify?
3    A    There were many.  You mean like an
4  agent of the government?
5    Q    Yes.
6    A    Like an investigative agent?
7    Q    No.  Someone who testified about the
8  level of the fraud and its harm to the federal
9  government?
10   A    Yes.
11   Q    Okay.  Do you know --
12   A    And actually I'm sorry, I did two
13  cases not one.
14   Q    What was the other case?
15   A    It was a Medicare fraud case.
16   Q    Did someone testify from Medicare in
17  that particular case?
18   A    Yes.
19   Q    From the agency that was victimized by
20  the action?
21   A    Now I can't remember with certainty if
22  it was from the agency or not.
23   Q    Okay.
24   A    It might have just been an
25  investigative agent for the government overall.

1    Q    If a victim does not wish to prosecute
2  an allegation of criminal activity, how would
3  you, or how does the United States believe that
4  the State of Alabama should proceed in that
5  situation?
6    A    The thing --
7        MS. WARD:  Object to form.  Sorry.  Go
8  ahead.
9        THE WITNESS:  The thinking is, is that
10  you're dealing with an environment of violence.
11  And if you have scenarios that clearly indicate
12  that the violence is in the air, as it were,
13  either specifically then or generally, you have
14  in front of you at that moment in time an
15  opportunity to gain more information about what
16  is going on inside the dorm is to help prevent
17  violence.
18       MR. LUNSFORD:  So again, but what is
19  -- what would be appropriate, since you're saying
20  here that ADOC is, LESD is failing to do
21  something, what should they do instead?
22       MS. WARD:  Object to form.
23       THE WITNESS:  I would say it's not
24  purely LESD it's also at the facility level.
25       BY MR. LUNSFORD:

58 (Pages 226 - 229)

Page 230

1    Q    Well this only says LESD it doesn't
2  say --
3    A    Oh, is that one, right. Well, I am
4  now telling you it's also at the facility level.
5  In my opinion.
6    Q    And what should be done in that
7  instance?
8    A    Well --
9        MS. WARD: Object to form.
10        THE WITNESS: -- I had indicated
11  earlier, I don't know if you heard my answer
12  fully, but at that moment you have the
13  opportunity, you have information in front of you
14  regarding a situation that involves something
15  that could turn violent. It's invariably based
16  around contraband or other things. And so to
17  potentially defuse that violence then, or
18  violence in the future, you have the raw material
19  in front of you to do an investigation and gather
20  intelligence that helps you then potentially
21  defuse that violence.
22        MR. LUNSFORD: I don't understand how
23  the information defuses violence.
24        THE WITNESS: You use it to gather
25  more information to take whatever measures you

Page 231

1  think you need to take to help prevent violence.
2        MR. LUNSFORD: How is LESD to conduct
3  an investigation if the victim won't name the
4  perpetrator?
5        MS. WARD: Object to form.
6        THE WITNESS: I don't know what
7  procedures they have in place. If they're barred
8  from doing so or if they are not barred from
9  doing so and simply choose not to do so, if their
10  position is that they can only investigate it,
11  they can take it to a criminal charge, then I
12  understand that. But if you have a role as an
13  investigative agency that is beyond just
14  establishing criminal charges, then that is a
15  role that would assist in reducing violence then
16  you could do that.
17        MR. LUNSFORD: No. I'm saying you
18  have a victim over here and the victim won't name
19  the perpetrator what, it says LESD should
20  investigate that further. When the victim won't
21  name the perpetrator what should they do?
22        MS. WARD: Object to form.
23        THE WITNESS: If, so let's say it's an
24  active of violence at a given time, at a given
25  location. You can see for yourself, if you go

Page 232

1  back to the cameras or get other witnesses, what
2  happened. You don't always need a victim to
3  establish the act.
4        MR. LUNSFORD: Okay. So we get
5  cameras, anything -- pull cameras, what else?
6        THE WITNESS: Well I said witnesses.
7  You seek witnesses. I mean, I'm not going to
8  tell them how to do the basic investigation, it
9  seems pretty clear to me.
10        MR. LUNSFORD: Have you ever
11  investigated a crime inside a prison?
12        THE WITNESS: I have not.
13        MS. WARD: Object to form.
14        MR. LUNSFORD: Do you know how many
15  times a victim has refused to identify the
16  perpetrator and then suddenly a witness comes
17  forward to identify the perpetrator separate from
18  the victim?
19        MS. WARD: Object to form.
20        THE WITNESS: I am not aware of the
21  specific example where a witness comes forward,
22  as you put it, as such because it's dangerous to
23  do that. But it's -- when I have seen certain
24  LESD investigations of a very serious incident,
25  let's say a homicide, they have found witnesses,

Page 233

1  and I don't have a sense that these witnesses
2  simply volunteered, they have found them, located
3  them and then pulled them aside to talk to them.
4  Or they have analyzed phone calls after an event
5  and realized certain people did know things and
6  then they interviewed those individuals.
7        MR. LUNSFORD: In making this
8  allegation did you consider the nature of the
9  underlying complaint in terms of whether it was
10  something serious, such as a sexual assault, or
11  something less serious such a theft of a, you
12  know, Twinkies?
13        MS. WARD: Object on privilege, do not
14  answer.
15        MR. LUNSFORD: Okay. You talked
16  about, is it your understanding, personal
17  understanding, that it is never appropriate to
18  inmates to sign living agreements?
19        MS. WARD: Object to form.
20        THE WITNESS: No, that's not my
21  understanding.
22        MR. LUNSFORD: So when is it
23  appropriate for inmates to sign living
24  agreements?
25        MS. WARD: Object to form.

59 (Pages 230 - 233)

Page 234

1    THE WITNESS:  Well I would not phrase
2  it in terms of my opinion as to whether or not
3  it's appropriate.  It is the inmates personal
4  decision for them to do that.  I think in the
5  prison context if people are fighting but then
6  the fight sort of takes care of whatever beef
7  they have, people can make that determination
8  themselves.
9    BY MR. LUNSFORD:
10    Q    Would you consider fighting between
11  two inmates -- let me ask this.  Going back to
12  your living agreements then, it says, ADOC allows
13  prisoners involved in violent incidents in the
14  facilities to sign living agreements rather than
15  engage in the disciplinary process.  Do you see
16  that?
17    A    Yes.  I've read it before.
18    Q    Violent incidences, would that be
19  including fighting between two inmates?  A
20  physical altercation.
21    A    If there is the type of fight that is
22  meant to be, well, it's a question of seriousness
23  of a fight.
24    Q    Tell me what's a serious fight, and
25  not a serious fight?

Page 235

1    A    Well, a seriousness is if obviously
2  you seek to significantly bodily harm another
3  individual and you make threats related to that
4  for the moment or in the future as opposed to
5  some kind of fight where they duke it out or
6  whatever.  And then they say, okay fine, that
7  took care of it.  But if there is a fundamental
8  issue that is going to be, that someone only
9  wishes to resolve through violence, then that
10  would be a case of a serious, a serious moment.
11    Q    Let me ask you about this incident.
12  I'm handing you what's been marked as Defendant's
13  Exhibit 3.  This is a document in a series of
14  incident reports we have produced to you.  I'll
15  give you a minute to read.  I'll primarily be
16  asking you about Page 2 though.  I wanted you to
17  have the entire --
18    (Whereupon, the above-referred to
19  document was marked as Defense Exhibit No. 3 for
20  identification.)
21    A    So you want me to --
22    Q    -- report.
23    A    -- read Page 2?
24    Q    Page 2 is the narrative.
25    A    Okay.

Page 236

1    Q    So in this particular instance two
2  inmates fought over some french fries, right?
3    A    Effectively, yes.  Over the --
4    Q    And --
5    A    -- robbed.
6    Q    -- was it appropriate in this
7  circumstance to have the inmate sign a living
8  agreement?
9    A    I believe that would be an appropriate
10  use of a living agreement.  Yes.
11    Q    It would be an appropriate use?
12    A    And I notice it's also the C dorm at
13  Limestone, in which at this time, and I think now
14  as well, is essentially a dorm that is, I forget.
15  It's kind of like a, not quite a program dorm,
16  but it's not particularly a violent dorm in the
17  context of Limestone.
18    Q    In this particular incident report
19  there is a specific notation beside each of these
20  inmates as to whether they have a gang
21  affiliation or not isn't there?
22    A    Yes.  One guy was a GDE and I forget
23  who the other guy was.  He had none.
24    Q    Is this common for you to see an
25  incident report that ADOC references gang

Page 237

1  affiliations among the assailants and the
2  victims?
3    A    I am used to see that.  Yes.
4    Q    Have you ever seen an incident report
5  where an inmate is identified and it says STG
6  affiliation unknown?
7    A    I believe I have seen that.
8    Q    Is it frequent to see that?
9    A    That I can't say.
10    Q    So this Defense Exhibit 3 would be an
11  occasion when it was appropriate to have inmates
12  sign a living agreement, is that correct?
13    MS. WARD:  Object to form.
14    MR. LUNSFORD:  In your view?
15    MS. WARD:  Object to form.
16    THE WITNESS:  In my view I don't see
17  this as a problematic living agreement.
18    MS. WARD:  And before we move on I
19  just want to, I know this probably won't stop you
20  from asking these questions, but just so we can
21  save time and future litigation related to this
22  topic down the road, your questions related to
23  his opinion about things is completely irrelevant
24  to this case.  He is not an expert.  His opinion
25  is -- and is absolutely outside the scope of the

Page 238

1  definition allowed by the court.
2          The point of the deposition is to
3  obtain facts that he knows and is aware of that
4  support our allegations but is not to gain his
5  opinion about things, which is absolutely
6  irrelevant and we will not be relying on in any
7  way, shape or form.  So you can continue to ask
8  these absolutely irrelevant and pointless opinion
9  questions or you can shorten the deposition and
10 move on to just the facts of the case.
11         BY MR. LUNSFORD:
12    Q    ADOC, including LESD investigators, do
13 not thoroughly, consistently or effectively
14 conduct adequate investigations in the
15 facilities.  Do you see that sentence?
16    A    I'm sorry, are we still on 7?
17    Q    Yes, sir.
18    A    Repeat it.  I've lost track of where
19 we are.
20    Q    We're about two-thirds of the way
21 down.
22    A    Conduct adequate investigations of the
23 facilities including investigations, prisoner
24 deaths, et cetera.  That one?
25    Q    Yes.

Page 239

1     A    Finishing with contraband.  Yes.
2     Q    Have you reviewed all of the LESD
3  investigative files that we've produced?
4     A    I have not reviewed all of them.
5     Q    Have you reviewed any of them?
6     A    I have reviewed some portions.
7     Q    What portions of the LESD
8  investigative files have you reviewed?
9     A    I don't know the full universe of
10 numbers of reports from them that we have so I
11 can't make an honest guess on percentage.  But I
12 have reviewed probably multiple, several hundred.
13    Q    Have you found any investigations in
14 your review that you deemed adequate?
15    A    Well, if you're not working there you
16 can't fully know all of the aspects that you
17 might want to take a look at.  So I have seen
18 reports written of the investigations that an
19 agent did that seemed like they were thorough.
20 The ones that are shorter, it's always harder to
21 tell because we don't know to what degree the
22 investigator gave it short drift or didn't follow
23 all the leads.  Or if, you know, there is lots of
24 things that come into play that might give one a
25 different feel about how thorough a particular

Page 240

1  investigation, or a report documenting an
2  investigation was.
3     Q    Well let me ask this.  You would agree
4  with me that if there is a homicide and an
5  investigation is done and a conviction, either by
6  plea or by trial is obtained, that that would be
7  an effective and adequate investigation?
8          MS. WARD:  Object to form.
9          MR. LUNSFORD:  Right?
10         MS. WARD:  Object to form.
11         THE WITNESS:  If the purpose is to get
12 a conviction, yes.  If you want to get more out
13 of it to prevent future violence, that may be a
14 different story.
15         BY MR. LUNSFORD:
16    Q    I guess my question is, is it your
17 understanding that LESD is the only entity within
18 ADOC that reviews incidents?
19    A    I believe other, well you say entities
20 so you don't mean just individuals?
21    Q    Correct.
22    A    So an office with responsibility.  In
23 other words --
24    Q    Correct.
25    A    -- as opposed to a single one.

Page 241

1     Q    An individual or an entity within
2  ADOC.  Do you know if LESD is the only entity
3  that reviews incidences?
4     A    It's my understanding that the only
5  entity that can do criminal investigations, but
6  that other entities or individuals contribute to
7  the investigatory process.
8     Q    What's the purpose of a criminal
9  investigation?
10    A    It's to get a criminal, to see if
11 there is a criminal charge that can be brought.
12    Q    Okay.  And so again, going back to my
13 example, if LESD conducts an investigation,
14 because you said they're charged with
15 investigating crimes, or potential crimes, if
16 LESD investigates a potential crime, assists in
17 the prosecution of an individual and obtains a
18 conviction, either by plea or by conviction by a
19 jury, that would be an adequate investigation
20 wouldn't it?  From a criminal perspective, since
21 that's what they're charged with doing, according
22 to you.
23    A    I did not say that according to me
24 that they are charged with doing only criminal,
25 it would appear that way.  I don't know that for

Page 242

1  a fact. The issue at hand is, violence seems to
2  beget violence. So if you have the opportunity
3  with an investigative arm of your department of
4  corrections to get not only the perpetrator in a
5  particular incident but to try and figure out how
6  to prevent future incidents, that would be --
7      Q    According to ADOC --
8      A    -- where I think you should be.
9      Q    Sorry, but you stop sometimes I think
10  --
11     A    I know.
12     Q    -- you're done.
13     A    It's all right. It's all right. I'm
14  not --
15     Q    I'm not trying to interrupt you. But
16  according to ADOC policy, is LESD charged with
17  the administrative enforcement of policies and
18  procedures?
19     A    I don't recall correctly if they are
20  or not.
21     Q    So this section that I just read about
22  thoroughly, consistently or effectively
23  conducting adequate investigations, is that only
24  referring to LESD? And I guess we can, in their
25  criminal investigations or is it dealing with

Page 243

1  administrative investigations?
2      A    I believe it's the combined component.
3      Q    As you sit here today can you tell me
4  who at ADOC is charged with investigating
5  potential policy violations by ADOC staff or
6  inmates?
7      A    I don't know the individual or
8  individuals who are. No.
9      Q    Going on through the rest of this,
10  what's ineffective or inconsistent about the
11  manner in which LESD interviews prisoners?
12         MS. WARD: Object. Privilege. Do not
13  answer.
14         MR. LUNSFORD: What's not thoroughly,
15  consistently or effectively about the way LESD
16  investigates correctional officers?
17         MS. WARD: Object. Privilege. Do not
18  answer.
19         BY MR. LUNSFORD:
20     Q    So there is sometimes throughout here,
21  I haven't counted them up but I think it's about,
22  I think it's upwards of 20 you just use the word
23  consistently. LESD investigators do not
24  consistently request to review surveillance
25  footage of incidents. In your review of

Page 244

1  incidents and LESD investigative files have you
2  seen an LESD investigative file without any
3  surveillance footage?
4      A    That one is hard for me to answer
5  because I don't know if I've been looking at the
6  totality of the file.
7      Q    Are you aware of any LESD
8  investigation in which the investigator did not
9  request to review surveillance footage?
10     A    I am not.
11     Q    Does LESD investigators, do they ever
12  obtain written statements from correctional
13  officers?
14     A    I have seen such in the files, so I
15  believe that the answer is yes.
16     Q    Do you know how often LESD
17  investigators do not obtain written statements
18  from correctional officers?
19     A    I do not have a data point on that.
20     Q    Do you know where LESD can obtain
21  information related to an inmates prior
22  behaviors? For example, if they have prior
23  incidents or if they're involved in other
24  altercations?
25     A    I believe they have that available to

Page 245

1  them online somewhere.
2      Q    Do you know if there is multiple
3  locations where they can go to review that
4  information?
5      A    Multiple different physical locations
6  or locations online?
7      Q    Either.
8      A    I don't know that for a fact.
9      Q    Have you heard of ADOC's Office of
10  Inspector General?
11     A    I have.
12     Q    Do you know what responsibilities OIG
13  is charged with inside ADOC?
14     A    I am not going to be able to list that
15  off for you, but I have a general sense of it.
16     Q    Do you know if LESD investigators ever
17  review the incident reporting database regarding
18  prior incidents involving certain perpetrators or
19  victims?
20     A    I don't know that for a fact.
21     Q    How did you conclude that LESD
22  investigators do not consistently review the
23  incident reporting database?
24         MS. WARD: Object. Privileged. Do
25  not answer.

62 (Pages 242 - 245)

Page 246

1    MR. LUNSFORD: How did you determine
2 that LESD investigators do not consistently
3 review prior LESD investigations related to
4 certain perpetrators or victims?
5    MS. WARD: Object. Privilege. Do not
6 answer.
7    BY MR. LUNSFORD:
8    Q    Do you personally know whether LESD
9 investigators interview prisoner witnesses who
10 are involved in incidents inside the facilities?
11    A    I have seen documentation as to that
12 effect, so --
13    Q    Documentation that they do or do not?
14    A    Do.
15    Q    So you have seen documentation that
16 LESD investigators do interview prisoners?
17    A    Correct.
18    Q    Have you listened to any of the audio
19 tapes of interviews that prisoner witnesses
20 violate LESD?
21    A    I have.
22    Q    Have any of the, from your review,
23 have any of those interviews been too short, to
24 succinct, not of sufficient depth?
25    A    Yes.

Page 247

1    MS. WARD: Object to form. Object.
2    THE WITNESS: Yes.
3    MR. LUNSFORD: How many?
4    THE WITNESS: I couldn't put a number
5 on it right now, but over half a dozen that were
6 insufficient or whatever.
7    MR. LUNSFORD: Just to be clear, you
8 have received no formal training on conducting
9 any form of investigation have you?
10    MS. WARD: Object to form.
11    THE WITNESS: Well it depends on what
12 you call formal training.
13    MR. LUNSFORD: Have you ever attended
14 any class or received any certification in terms
15 of investigative techniques or investigative
16 activities?
17    MS. WARD: Object to form.
18    THE WITNESS: I have.
19    BY MR. LUNSFORD:
20    Q    And what are those, because I asked
21 you about those earlier and you didn't tell me
22 about those?
23    A    I don't remember what your question
24 was but I --
25    Q    Sure. I asked you about training you

Page 248

1 received, you didn't say anything about it.
2    A    I --
3    MS. WARD: Object to form.
4    THE WITNESS: All right. Well, I had,
5 there was one investigatory technique class that
6 I took at some point here. There was no
7 certification such as in-house thing.
8    BY MR. LUNSFORD:
9    Q    How many hours was that?
10    A    I don't recall how many hours, it was
11 multiple sessions. Somewhere around six to eight
12 hours. Something like that.
13    Q    Okay. So other than the six hour,
14 eight hour training class, have you ever been
15 post-certified or carried any kind of law
16 enforcement certification?
17    A    No, I --
18    MS. WARD: Object to form.
19    MR. LUNSFORD: You've never
20 investigated any, independently, on your own,
21 investigated any criminal allegation have you?
22    MS. WARD: Object to form.
23    THE WITNESS: Well independently, no.
24 I mean, I've always been a part of a team of
25 people doing that.

Page 249

1    MR. LUNSFORD: And that team of people
2 that you previously worked with had individuals
3 who were specially trained investigators on it,
4 right?
5    MS. WARD: Object to form.
6    THE WITNESS: Correct.
7    BY MR. LUNSFORD:
8    Q    Have you seen instances when LESD
9 staff interviewed correctional officers after the
10 incident?
11    A    You mean, am I aware of them?
12    Q    Yes.
13    A    Yes.
14    Q    And are you aware of instances when
15 LESD investigators have interviewed other inmates
16 who witnessed an incident?
17    A    Yes.
18    Q    As you sit here today can you identify
19 for me any particular investigation where LESD
20 did not obtain a written statement from the
21 correction officers involved?
22    A    No. Off the top of my head, no.
23    Q    ADOC, I'm at the top of Page 8. ADOC,
24 including LESD, does not consistently, thoroughly
25 or effectively track where prisoner-on-prisoner

63 (Pages 246 - 249)

1  fights, assaults or sexual assaults occur in the
2  facilities.  Do you see that?
3      A    Yes.
4      Q    Let me go back to what I've handed you
5  that was Exhibit 3.  I mean, all of the, you've
6  seen this form of incident report, such as the
7  one that's marked as Defendant's Exhibit 3, is
8  that correct?
9      A    Yes, I have.
10     Q    So my question to you is, there is --
11 well, there is a specific section of ADOC's
12 incident reporting form that says location of
13 incident, isn't there?
14     A    Yes.
15     Q    For example, on Defendant's Exhibit 3
16 it says, Housing Unit C-1 on the first page,
17 doesn't it?
18     A    Correct.
19     Q    Do you know how long ADOC's incident
20 reporting template has required officers to
21 report the location of an incident?
22     A    I do not know how long it is.  No, I
23 don't.
24     Q    Do you know how often, well first of
25 all, do you know if an officer can actually

1  complete this incident reporting form and save it
2  without imputing a location?
3      A    I'm not aware if that's the case or
4  not.
5      Q    Have you done any type of study to
6  determine how many incident reports don't include
7  a location?
8      A    I have not personally done that study.
9      Q    Have you ever seen an incident report
10 that didn't indicate, either on the first page of
11 the incident report form or in the narrative
12 where the incident occurred?
13     A    I have seen some reports where there
14 has been that kind of information has been
15 missing for whatever reason.
16     Q    You've seen some.
17     A    Yes.
18     Q    Do you have any judgment as to how
19 many?
20     A    I don't think it's been frequent, but
21 I have seen some.
22     Q    Would you agree that ADOC clearly
23 expects its personnel to record the location of
24 an incident?
25         MS. WARD:  Object to form.

1          THE WITNESS:  I would not have
2  personal knowledge of that, but if it's on the
3  form I'm gathering that would be the expectation.
4          MR. LUNSFORD:  Do you know how often
5  incidents occur where no location is listed?
6          THE WITNESS:  No, I don't.
7          MR. LUNSFORD:  Let's assume for a
8  minute that for the last five years we can tell
9  you how many fights with a weapon happen in every
10 single dorm across ADOC's facilities.  My
11 question to you is, what's an adequate, not
12 thorough or consistent about that process?
13         MS. WARD:  Object to form.
14         THE WITNESS:  I'm not fully
15 understanding.  What is adequate or inadequate
16 about what process?
17         MR. LUNSFORD:  Well, the allegation
18 here says that ADOC doesn't track where prisoner-
19 on-prisoner fights, assaults or sexual assaults
20 occur in the facilities.  And we've produced
21 documentation to you that shows you on a dorm-by-
22 dorm basis where incidents occur.  And so what is
23 inconsistent, not thorough or ineffective about
24 the information that we currently have?
25         MS. WARD:  Object to form.

1          THE WITNESS:  Well, it's consistent
2  with some information.  I mean, this is based on
3  the team's work and it's consistent with things
4  that I've heard through my phone calls, so I
5  don't think I can answer beyond that.
6          BY MR. LUNSFORD:
7      Q    I guess my question is, which part of
8  the process is inconsistent?
9      A    Which part of the process of reporting
10 where the incidents occur is inconsistent?
11     Q    Which part of tracking where prisoner-
12 on-prisoner fights, what's inconsistent about it?
13     A    Well -- it's a complicated question I
14 think because -- I need to read it again.
15         Inmates frequently report things that
16 happen to them.  And when things happen to them.
17 But they don't necessarily know where they happen
18 to them.  Meaning, the staff -- meaning the
19 reporting in the end does not understand where
20 exactly it happened.  And there has been a lot of
21 testimony, or rather phone calls relating to that
22 where things happen in a particular location
23 inside a dorm and the only time they're aware of
24 what had happened is when the inmate finally
25 makes it to the front of the dorm, but the

64 (Pages 250 - 253)

Page 254

1  location inside the dorm is basically not
2  documented or not established.  And that's part
3  of, the key part of that.
4      Q    Does ADOC maintain statistics showing
5  how many of these incidents occurred in
6  dormitories?
7          MS. WARD:  Object to form.
8          THE WITNESS:  They do.  Yes.
9          MR. LUNSFORD:  Does ADOC maintain
10 statistics showing how many of these incidents
11 occurred in the medical unit, the shift office,
12 the admin building or the exercise yard?
13         THE WITNESS:  I believe those are
14 areas that can be identified on the reporting.
15 Correct.
16         MR. LUNSFORD:  And as we sit here
17 today, you can't tell me, we've produced
18 gigabytes of data, including incident reports and
19 attachments, and you can't identify for me a
20 single incident report that doesn't explicitly
21 identify the location?
22         MS. WARD:  Object to form.
23         THE WITNESS:  Well you just used the
24 word explicitly, right?  So if it happened in the
25 middle of the room where you can see it or if it

Page 255

1  happens in a particular bunk or it happens in the
2  bathroom, or it happens in the closet, frequently
3  that explicitness is not found anywhere on the
4  documents.
5          MR. LUNSFORD:  There are times when
6  the bathroom is in fact identified, isn't there?
7          MS. WARD:  Object to form.
8          THE WITNESS:  That was a question,
9  right?
10         MR. LUNSFORD:  Yes.
11         THE WITNESS:  I don't recall offhand.
12 I think I might be correct, but I don't think
13 that's consistent.
14         MR. LUNSFORD:  And are you saying,
15 just because it doesn't happen a hundred percent
16 of the time it's inconsistent?
17         MS. WARD:  Object to form.
18         THE WITNESS:  Well, a numerical
19 definition of consistent is maybe not a hundred
20 percent, but it's close to it.
21         BY MR. LUNSFORD:
22     Q    Okay.  ADOC, including LESD, does not
23 consistently, thoroughly or effectively track
24 which prisoners in the facilities (sneezed) --
25     A    Gesundheit.

Page 256

1      Q    Thank you.  Have been physically or
2  sexually assaulted by other prisoners, do you see
3  that?
4      A    Yes, I do.
5      Q    Does ADOC maintain documentation
6  identifying those individuals who have been
7  victimized by others sexually?
8          MS. WARD:  Object to form.
9          THE WITNESS:  They do.  As far as I'm
10 aware.
11         MR. LUNSFORD:  Does ADOC also track
12 those individuals who have been identified as
13 potential sexual predators?
14         THE WITNESS:  I have seen that ADOC
15 has a designation for that, and keeps some sort
16 of a spreadsheet, or whatever, on those
17 individuals.  Yes.
18         MR. LUNSFORD:  And so you're saying
19 that ADOC here should track which prisoners have
20 been the victims of physical violence as well?
21         MS. WARD:  Object.  Privileged.  Do
22 not answer.
23         MR. LUNSFORD:  I didn't understand
24 this one, ADOC does not effectively thoroughly or
25 effectively document requests for restrictive

Page 257

1  housing by prisoners based on a fear of physical
2  or sexual harm.  Do you see that?
3          THE WITNESS:  Yeah.
4          MR. LUNSFORD:  What does that mean?
5          MS. WARD:  Object.  Privileged.  Do
6  not answer.
7          THE WITNESS:  Okay.
8          BY MR. LUNSFORD:
9      Q    The next statement is ADOC does not
10 consistently, thoroughly, or effectively
11 recommend and implement corrective actions to
12 address security and safety deficiencies revealed
13 by LESD in investigations.
14         Can you identify for me a deficiency
15 that was revealed by an LESD investigation?
16     A    As I sit here today I don't have a
17 specific example in mind.
18     Q    Well can you think of any example
19 where LESD didn't do something, or ADOC didn't do
20 something that was identified as a deficiency in
21 an investigation?
22     A    Right now I cannot remember a single
23 incident as I sit here.
24     Q    What is a corrective action?
25         MS. WARD:  Object.  Privileged.  Do

Page 258

1    not answer.
2        MR. LUNSFORD:  What types of security
3    or safety deficiencies would be revealed by an
4    LESD investigation?
5        MS. WARD:  Object.  Privileged.  Do
6    not answer.
7    BY MR. LUNSFORD:
8        Q    Okay, moving on to the next section,
9    which is sexual assaults.  Some of these areas
10   are going to be the same and I guess what I would
11   ask you, just with regard to the first sentence,
12   we have another reference to unreasonably high,
13   do you know the number of prisoner-on-prisoner
14   sexual assaults at any particular facility?
15       A    I don't have that number off the top
16   of my head.
17       Q    And, again, when we talk about this
18   first sentence on Page 8 under Sexual Assaults,
19   are you again referring to this on a statewide ,
20   that there was no reference to it on a facility-
21   by-facility basis?
22       A    Correct.
23       Q    Did you look at the number of sexual
24   assaults on a facility-by-facility basis?
25       A    I believe I did at one point in time,

Page 259

1    but, as I indicated, I don't remember the data as
2    I sit here today.
3        Q    When you say a high number of
4    prisoner-on-prisoner sexual assaults, how did you
5    determine whether it was an actual sexual assault
6    or just an allegation of a sexual assault?
7        MS. WARD:  Object.  Privileged.  Do
8    not answer.
9        MR. LUNSFORD:  Well does the
10   unreasonably high number of prisoner-on-prisoner
11   sexual assaults include allegations of assaults
12   that were never substantiated?
13       MS. WARD:  Object.  Privileged.  Do
14   not answer.
15       BY MR. LUNSFORD:
16       Q    Can you give me the timeframe
17   referenced here for in the last several years,
18   what timeframe does that refer to?
19       A    It would be a repeat of my response to
20   that question --
21       (Simultaneous speaking.)
22       Q    Can you just clarify that for me
23   because I am really not clear of what in the last
24   several years means?
25       A    So I signed this in May of 2024.

Page 260

1        Q    Correct.
2        A    The data that I think we were looking
3    at was included 2022 with certainty, some of 2023
4    possibly, or all of it.  It was based on data
5    produced to us in part from you guys, so we
6    weren't current up through May of 2024, and 2021,
7    potentially some of 2020.
8        Q    So when you signed this and you were
9    attesting to a high number of prisoner-on-
10   prisoner sexual assaults, what was your
11   understanding as to what types of assaults were
12   included in there?
13       A    Sexual assaults are -- There is a
14   variety of them.  Essentially it involves a
15   physical assault with a sexual component or
16   frequently it's also a violent assault that seeks
17   to punish or dehumanize or whatever an individual
18   with an act that can be construed as sexual, but
19   is, you know, a broom handle is used, without
20   getting too explicit, so it could be a component
21   of a violent intent essentially, not purely a
22   sexual intent.
23       Q    Was it your understanding at the time
24   you signed these interrogatories that prisoner-
25   on-prisoner sexual assaults as referenced here on

Page 261

1    Page 8 of Defendant's Exhibit 2 included
2    unsubstantiated allegations?
3        A    There may be some -- Well, the
4    majority of your investigations indicate
5    unsubstantiated, so, yes.
6        Q    So does it cause you any concern that
7    these prisoner-on-prisoner sexual assaults that
8    you are referring to such a high number of could
9    involve incidents that actually never occurred?
10       MS. WARD:  Object to form.
11       THE WITNESS:  Unsubstantiated does not
12   by definition mean they didn't occur.
13       MR. LUNSFORD:  Agreed, but is it a
14   concern of yours that this unreasonably high
15   number could be inflated?
16       MS. WARD:  Object to form.
17       THE WITNESS:  Well we -- That refers
18   to the assaults, not accusations of assaults, so
19   --
20       BY MR. LUNSFORD:
21       Q    Well you just said it included
22   unsubstantiated.
23       A    Well an accusation, again, is not the
24   same as the unsubstantiated, right.  So if it was
25   investigated as a sexual assault and determined

66 (Pages 258 - 261)

Page 262

1  LESD or the PREA individual that it was
2  unsubstantiated or unfounded that is, that's how
3  you guys document it.
4      Q    So did you derive -- I guess my
5  question is did you derive the high number of
6  prisoner-on-prisoner sexual assaults, was it your
7  understanding that that came of the incident
8  report number or off the investigation number?
9      A    It's more than just documentation from
10  you, from ADOC, it is also part of the
11  investigative process overall, things that I have
12  been told as well on the many phone calls by
13  inmates.
14          I think there has been a lot of sexual
15  assaults that I have been told about that have
16  never been reported, so that goes into this
17  calculation as well.
18      Q    The next sentence, ADOC does not
19  consistently, thoroughly, or effectively
20  investigate allegations of prisoner-on-prisoner
21  sexual abuse in the facilities.
22          At the time you signed this
23  interrogatory what was your understanding as to
24  how ADOC's investigations of these allegations
25  was inconsistent?

Page 263

1      A    Well it begins frequently with whoever
2  is the PREA officer at a particular facility.
3  There were many reports, multiple reports, of
4  that process being highly inconsistent, not
5  thorough, and never mind not effective.  So that
6  was the initial phase of it.
7          By the time it gets to LESD, if it did
8  get to LESD, there may not have been an
9  accumulation of evidence that you would have
10  normally needed to get to the point of
11  substantiating it or that you now have a
12  situation with an inmate who is not willing to
13  tell names and then it becomes unsubstantiated or
14  it's in a location where they can't access, where
15  there's no video footage and then they un-
16  substantiate it.
17      Q    I guess my question though is what is
18  inconsistent about the investigation?
19          MS. WARD:  Object.  Privileged.  Do
20  not answer.
21          BY MR. LUNSFORD:
22      Q    Well what's your understanding of how
23  the investigation is inconsistent?
24      A    Depending on who you get on that day,
25  it's going to be different from a case-by-case

Page 264

1  basis.  That is inconsistency defined.
2      Q    Okay.  Would you say the same in terms
3  of thoroughness?
4      A    Yes, absolutely.
5      Q    So did you -- Are you aware of
6  investigations that were completed of allegations
7  of sexual abuse in a consistent, thorough, and
8  effective manner?
9      A    I don't have the full information to
10  know if that was the case, so I am not aware of
11  them.
12      Q    How many PREA investigations have you
13  reviewed?
14      A    I don't have a solid number, but of
15  the many hundred LESD investigations that I've
16  reviewed, if that's what you're referring to as
17  opposed to the facility-level PREA investigation,
18  there were a certain percentage of PREA
19  investigations among those, so I couldn't say,
20  maybe 20 percent of those out of the totality.
21      Q    And the next one is "ADOC does not
22  consistently, thoroughly, or effectively
23  investigate allegations of extortion in the
24  facilities."
25          Did you see or are you aware of

Page 265

1  incident reports that reported incidences where
2  inmates were being extorted?
3      A    I have seen such incident reports or
4  LESD reports as well.
5      Q    So were -- I think we've covered this,
6  but just to go back, typically when an incident
7  occurs in Alabama it results in the formulation
8  of an incident report, correct?
9      A    I'm assuming, yes.
10      Q    And you have received copies of the
11  incident reports for the ADOC facilities involved
12  in this case, right?
13      A    Correct.
14      Q    And you have received, in fact, roll-
15  up data that's a spreadsheet that shows all of
16  the incidents that occur at a particular facility
17  in a particular timeframe, right?
18          MS. WARD:  Object to form.
19          THE WITNESS:  I believe that's
20  correct.
21          BY MR. LUNSFORD:
22      Q    And you've been able to sort those --
23  You can sort that spreadsheet that we send you of
24  incidents by facility or by incident type and by
25  location, can't you?

67 (Pages 262 - 265)

1    A    I believe there is that capability,
2  yes.
3    Q    Okay.  After the incident report is
4  formed related to say extortion, have you seen
5  instances when those allegations were
6  investigated?
7    A    I believe I have seen instances of
8  that, yes.
9    Q    Have you ever seen an instance when an
10 allegation of extortion was not investigated?
11   A    Well I have received numerous phone
12 calls from inmates and their family members,
13 because invariably it's the family members that
14 deal with the extortion firsthand and many of
15 those were not investigated as such as far as the
16 documentation that I can see or they report it
17 and are told at the facility level before it even
18 gets, and this is maybe more common than
19 anything, before it even gets to an LESD
20 individual, that there is nothing we can do and
21 it just stops right there.
22   Q    Were those instances of extortion that
23 you were told about on the telephone were they
24 reported to ADOC?
25   A    I believe that family members

1  invariably have always tried to reach ADOC either
2  directly at the facility or then over time they
3  learned to try to call people in Montgomery or
4  LESD.
5         So, many cases I believe that is the
6  case, but I can't verify that has been the case
7  100 percent of the time.
8    Q    Do you know if those instances when
9  family members have contacted ADOC whether it
10 resulted in a, an incident report being
11 initiated?
12   A    I don't know that.
13   Q    Do you know if an LESD investigation
14 has ever been initiated based on a family's
15 report of extortion?
16   A    I believe I've seen documentation
17 where, or, rather, yeah, an email let's say from
18 a warden to somewhere and then it goes to an
19 agent, will you look into this, and then whether
20 -- I'm assuming the agent then did.
21   Q    Okay.  Can you identify a single
22 inmate who has been the victim of extortion whose
23 allegations or concerns were raised with ADOC and
24 not investigated?
25   A    Not investigated entirely or not

1  investigated initially?
2    Q    Not investigated at all?
3    A    That I can't be certain of, but I
4  certainly had a lot of people that spoke to me
5  where for the longest time if, possibly if ever,
6  that it was never investigated.
7    Q    Would you agree with --
8    A    As far as they know.
9    Q    Let me ask this, every time we say,
10 you know, "consistently, thoroughly, or
11 effectively," we see that throughout here, a lot
12 of that is it's not that, if I understand, and
13 I'm summarizing here because I'm trying to cut to
14 the chase of some of this, are you simply saying
15 that ADOC does these things, they just don't do
16 them adequately, they don't do them good enough,
17 they need to do them better?
18        MS. WARD:  Object to form.  I mean,
19 I'm sorry, object to privileged.  Do not answer.
20        BY MR. LUNSFORD:
21   Q    The next line, "ADOC does not
22 consistently, thoroughly, or effectively ensure
23 prisoner beds are free of obstructive sheets in
24 the facilities," do you see that?
25   A    I'm sorry, where we at?  Are we still

1  above "Also --
2    Q    No.  We're right below extortion.
3    A    But, yeah, I'm familiar with that.
4  Okay, yes, I got it.
5    Q    Okay.  "ADOC does not consistently,
6  thoroughly, or effectively ensure prisoner beds
7  are free of obstructive sheets in the facility,"
8  do you see that?
9    A    I do, yes.
10   Q    So let me ask this, you've walked
11 through several ADOC facilities?
12   A    I have not.  I did not -- As I told
13 you, I did not go behind the walls.
14   Q    Well you've been other facilities
15 where inmates have used sheets to put up
16 curtains, right?
17        MS. WARD:  Object to form.
18        THE WITNESS:  I have not been in other
19 facilities that had these open dorms with double
20 bunks in that fashion.
21        BY MR. LUNSFORD:
22   Q    So is this statement related to
23 obstructive sheets only referencing open dorm
24 facilities, or open dorm settings?
25   A    It could be more than that, but that's

Page 270

1  the predominant location where this occurs and
2  you see that on the videos from all the
3  facilities.
4      Q    So you're talking about sheets hanging
5  from beds?
6      A    Over the beds to what the inmates call
7  the "hunk" to where you can't see what's going on
8  in the bed or if it's like a wall of bunk beds
9  with those sheets then you basically have a
10  blocked view from front to back.
11     Q    So you understand that inmates -- We
12  provide inmates with sheets for their beds,
13  correct?
14         MS. WARD:  Object to form.
15         THE WITNESS:  Yes.
16         MR. LUNSFORD:  You disagree with that
17  we provide sheets to beds, is that a disputed
18  issue?
19         MS. WARD:  I don't know why you're
20  asking him about what you guys do.
21         MR. LUNSFORD:  Because he's saying
22  what we don't do.
23         MS. WARD:  Are you asking if he knows
24  what you do?
25         BY MR. LUNSFORD:

Page 271

1      Q    You're aware that we give our inmates
2  sheets for their beds, right?
3      A    Inmates have told me that ADOC gives
4  them sheets.
5      Q    And you've seen videos where inmates
6  have sheets?
7      A    I've seen inmates where they have
8  sheets and I've also seen --
9         (Simultaneous speaking.)
10     Q    I just didn't realize that was such a
11  --
12         MS. WARD:  Sorry.  He is --
13         MR. LUNSFORD:  -- controversial issue.
14         THE WITNESS:  -- hanging over the beds
15  to where they --
16         MS. WARD:  You cut him off.
17         THE WITNESS:  -- where your vision is
18  blocked.
19         MR. LUNSFORD:  Is it your contention
20  that we shouldn't give inmates sheets anymore so
21  they don't make these tents out of them?
22         MS. WARD:  Object.  Object to form.
23         THE WITNESS:  Well, so this specific
24  thing right here relates to the fact that that
25  creates an unsafe environment and your staff has

Page 272

1  been sent through many times to remove those
2  sheets for that reason, but it's not consistent
3  and it continues to go on.
4         MR. LUNSFORD:  Because who puts them
5  back up?
6         MS. WARD:  Object to form.
7         THE WITNESS:  The inmates put them
8  back up.
9         MR. LUNSFORD:  I mean officers aren't
10  putting up these sheets, are they?
11         MS. WARD:  Object to form.
12         THE WITNESS:  No.
13         BY MR. LUNSFORD:
14     Q    Have you ever seen any evidence of an
15  ADOC officer putting up sheets?
16     A    No, I have not.
17     Q    So what is the solution to inmates
18  using the sheets we give them, once we take them
19  down and they put them back up, what's the
20  solution to that?
21         MS. WARD:  Object to form.
22         THE WITNESS:  There are many problems
23  in the ADOC system.  All of them come down to the
24  fact that there is no control, it's chaos, so the
25  sheets up is just one component of it.

Page 273

1         If you want to start talking about
2  solutions you have to talk about more than just
3  the sheets alone.  You're going to talk about a
4  lot of things.
5         BY MR. LUNSFORD:
6     Q    You're not answering my question.
7     A    I did answer your question.
8     Q    My question is how do we keep the
9  sheets -- how do we keep the inmates from using
10  the sheets we have to give them from making
11  tents?
12         MS. WARD:  Object to form.
13         THE WITNESS:  Well you have a process
14  for disciplinaries.  I am assuming that would be
15  a disciplinary.
16         MR. LUNSFORD:  Okay.  So we should be
17  giving disciplinaries out every time someone puts
18  up a sheet?
19         MS. WARD:  Object to form.
20         THE WITNESS:  It's part of a larger
21  program of trying to get control of your dorms,
22  so ADOC is responsible for figuring that out.
23         BY MR. LUNSFORD:
24     Q    "ADOC classification staff do not have
25  input or authority on which housing units

Veritext Legal Solutions
877-373-3660                                    800.808.4958

Page 274

1  prisoners are placed in at ADOC facilities beyond
2  program placements." Do you see that allegation?
3      A    Yes, I do.
4      Q    How are the ADOC classification staff
5  that you are referring to here?
6          MS. WARD: Object. Privileged. Do
7  not answer.
8          MR. LUNSFORD: What authority does
9  ADOC give to its classification staff in terms of
10  the assignment of prisoners to housing units?
11         MS. WARD: Object. Privileged. Do
12  not answer.
13         MR. LUNSFORD: Does ADOC
14  classification staff in the central office in
15  Montgomery have any role in deciding which
16  housing units inmates are placed in?
17         MS. WARD: Object to form.
18         THE WITNESS: I do not know if they
19  have any direct say over that. I imagine
20  anything you do with the classification of an
21  inmate has an impact on where they are housed,
22  but if they have a specific say in a specific
23  moment I don't know.
24         BY MR. LUNSFORD:
25      Q    Are there classification staff at each

Page 275

1  of the facilities?
2      A    It's my understanding there are.
3      Q    What are their jobs at the facility
4  level?
5          MS. WARD: Object to form.
6          THE WITNESS: I do not know from A to
7  Z what all of their roles are.
8          MR. LUNSFORD: Let me just ask this
9  real simple, Mr. Williams, can you swear under
10  oath, can you based on your personal knowledge
11  swear under oath that ADOC classification staff
12  have zero input or authority on which housing
13  units prisoners are placed in at ADOC facilities?
14         MS. WARD: Object.
15         MR. LUNSFORD: Can you personally
16  swear under oath to that?
17         MS. WARD: Object. I am going to
18  object and say he cannot answer that as a
19  harassing question. That is privileged. This is
20  not the statement that is made in this
21  interrogatory, "zero input or authority."
22         MR. LUNSFORD: Okay. Let me ask --
23  Fair enough. Let me go back.
24         BY MR. LUNSFORD:
25      Q    I am asking can you swear or attest to

Page 276

1  the truthfulness of this statement under oath,
2  "ADOC classification staff do not have input or
3  authority on which housing units prisoners are
4  placed in at ADOC facilities, beyond program
5  placements?"
6      A    So in my work with the phone calls
7  that I take on a daily basis I hear a lot about
8  what the classification interaction is like for
9  inmates and when inmates speak to their
10  classification officers, this is what they tell
11  me, if they're looking for a move or if they tell
12  their classification officer that they're having
13  trouble, they are told pretty much as a rule that
14  they have no say over that, that you're going to
15  have to go to the shift office and speak to the
16  shift commander, whatever.
17      Q    Okay. Do you have any other
18  information that you have learned or gleaned
19  during the course of this case which supports
20  that statement other than what you have been told
21  by inmates?
22      A    No, I do not.
23         THE VIDEOGRAPHER: Counsel, you've
24  gone an hour and 42 minutes. I will need a break
25  soon.

Page 277

1          MR. LUNSFORD: Okay. Give me five
2  minutes.
3          THE VIDEOGRAPHER: Sure.
4          MR. LUNSFORD: I'll mark it and we'll
5  take a break then.
6          BY MR. LUNSFORD:
7      Q    "The institutional PREA compliance
8  manager or equivalent, special investigator
9  position, is often vacant at the facilities." Do
10  you see that?
11     A    I do.
12     Q    Do you know what ADOC has done to fill
13  those positions when they become vacant?
14     A    I do not have knowledge of that.
15     Q    Do you know how many of those
16  positions are currently vacant?
17     A    I do not.
18     Q    Has there ever been a period of time
19  when all of those positions at the facilities
20  have been vacant?
21     A    I couldn't sit here and tell you that
22  I knew that.
23     Q    Has there ever been a period of time
24  when those positions at all the facilities have
25  been filled?

70 (Pages 274 - 277)

1    A    I also don't know that.
2    Q    The next sentence says "ADOC does not
3  consistently, thoroughly, or effectively ensure
4  that sexual predators are housed and kept
5  separate from prisoners vulnerable to sexual
6  abuse in the facilities."  Do you see that?
7    A    That leaks into the next page, right?
8    Q    Yes.
9    A    Yes, I see it.
10    Q    Before I get there let me go back, do
11  you know if there are backup institutional PREA
12  compliance managers?
13    A    I am not aware of that.
14    Q    Okay.  When there are vacancies in the
15  institutional PREA compliance manager position or
16  the special investigator position do you know if
17  those duties have been reassigned to other
18  individuals?
19    A    I do not know that for a fact, but I
20  know that being a PREA compliance officer there
21  is multiple people who have been that at a
22  particular prison is my understanding based on
23  what inmates tell me.
24    Q    What do you mean "there is multiple
25  people who have been that?"

1    A    Well if someone is it for a while and
2  then they're done and then someone else is
3  appointed to that position.
4    Q    Going back to the last statement on
5  Page 8 that carries over to Page 9 related to
6  sexual predators, my question is can, can an
7  individual under PREA be designated as a
8  predator, as a potential predator and a potential
9  victim?
10    MS. WARD:  Object to form.
11    THE WITNESS:  I am uncertain about
12  that, if they can be classified as both, but I
13  think I have actually seen that that sometimes is
14  the case.
15    MR. LUNSFORD:  So my question is if
16  somebody is considered both a sexual predator and
17  a sexual victim where do you house them?
18    MS. WARD:  Object to form.
19    THE WITNESS:  We would need to get
20  into some specifics.  My understanding, for
21  example, is that people who have committed a sex
22  offense on the street are sometimes classified as
23  predators, but the nature of those offenses that
24  lands them in prison makes them a victim in the
25  prison context.

1    BY MR. LUNSFORD:
2    Q    That didn't answer my question at all.
3    A    I thought it did.  Do you want to
4  repeat the question?
5    Q    What -- Where do you -- How do you
6  keep those individuals separate --
7    MS. WARD:  Object to form.
8    MR. LUNSFORD:  -- from sexual
9  predators or sexual victims?
10    MS. WARD:  Object to form.
11    THE WITNESS:  Well what I'm getting at
12  is that in the prison context you may have reason
13  to classify them one way or the other.
14    If they are -- If they have been shown
15  in the prison context to have engaged in a
16  predatorial act sexually then, of course, they
17  have shown that they are a sexual predator in the
18  prison, but if they were a sexual predator on the
19  street and are immediately victimized and become
20  a sexual victim in the prison then I think they
21  are sexual victims.
22    BY MR. LUNSFORD:
23    Q    Are you aware there are instances when
24  sexual victims have victimized other sexual,
25  potential sexual victims?

1    A    Yes, I am.
2    Q    Have you ever seen an instance when a
3  sexual predator was housed with a known sexual
4  victim?
5    A    I can't give you an example off the
6  top of my head, but I believe I have seen that or
7  it has been a case that the sexual predator had
8  access to the victim in a different dorm, was
9  able to access the dorm where the victim was in.
10    Q    That's not -- That's -- But it says,
11  it says here that they are housed, ensure that
12  sexual predators are housed and kept separate
13  from victims.
14    A    Yeah, and I'm saying it's sometimes
15  both.
16    Q    But you can't give me any number of
17  instances when this has occurred at any
18  particular facility, can you?
19    A    I don't have those numbers off the top
20  of my head.
21    Q    Do you have any data that you can
22  provide to me that substantiates this allegation
23  that predators are, housed and not
24  kept separate from prisoners who are vulnerable
25  to sexual abuse?

Page 282

1    A   Data?  Do I have data?
2    Q   Other than -- Yes.
3    A   I don't have data that I can show you.
4    Q   The next sentence at the top of Page
5    9, which is the first full sentence, says "ADOC
6    does not consistently ensure that sexual
7    predators are properly disciplined for
8    allegations of sexual abuse."  Do you see that?
9    A   I do.
10   Q   Again, are you aware of any sexual
11   predator who has engaged in sexual abuse of
12   another inmate who has not been disciplined?
13   A   Off the top of my head I can't give
14   you an example.
15   Q   What information did you rely upon in
16   agreeing to sign these interrogatories that
17   included this statement?
18   A   Information I gleaned from my own work
19   on the phones and some of my own review of
20   documents and it's also a combined effort of the
21   team.
22   Q   But you can't -- You can't -- Well,
23   based on your review of documents and information
24   how did you reach the decision that
25   "consistently" was the appropriate word?

Page 283

1        MS. WARD:  Object.  Privileged.  Do
2    not answer.
3        THE WITNESS:  I'd take that break now
4    if you're willing.
5        MR. LUNSFORD:  Okay.  Yeah, we'll take
6    it now.
7        THE VIDEOGRAPHER:  We're going off the
8    record at 3:20 p.m. Eastern Time.
9        (Whereupon, the above-entitled matter
10   went off the record at 3:20 p.m. and resumed at
11   3:33 p.m.)
12       THE VIDEOGRAPHER:  This is Video File
13   Number 4.  Back on the record at 3:34 p.m.
14   Eastern Time.
15       MR. LUNSFORD:  Mr. Williams, I just
16   want to refer you to the top of Page 9, the
17   fourth line down, it's an allegation, "ADOC does
18   not consistently transfer victims who report
19   sexual abuse out of the facility or even the
20   housing unit where abuse was reported in the
21   facilities."  Do you see that?
22       THE WITNESS:  I do.
23       BY MR. LUNSFORD:
24   Q   Does the ADOC consistently transfer
25   the individuals who are the alleged perpetrators

Page 284

1    of sexual abuse out of the facility or out of the
2    housing unit?
3        A   I can't say with certainty.  Then the
4    other question is how quickly they do it.
5        Q   Okay, but -- You -- Now let's -- I
6    have one question.
7        A   Okay.
8        Q   Does ADOC consistently move the
9    individuals who are the alleged perpetrators of
10   sexual violence out of their housing units and
11   separate them from the victims, the alleged
12   victims of sexual violence?
13       A   I cannot say if they consistently do
14   that.
15       Q   Is -- I'm just wondering, is there
16   something out there that I'm not aware of that
17   says you have to transfer the victim and you
18   can't transfer the perpetrator?
19       MS. WARD:  Object to form.
20       THE WITNESS:  Well, so a lot of the
21   sexual violence is related to not necessarily in
22   ICE, a sexual predator victimizing a sexual
23   victim, it can be a part of a debt, a complicated
24   set of dynamics involving of perceived debts or
25   alleged debts so that if the individual who was

Page 285

1    being assaulted stays there then they are still
2    in the same environment and around the other gang
3    members and potentially will suffer more
4    violence.
5        So that would be one example, and
6    that's a common example at least of how it's
7    relayed to me about why sexual assault occurs,
8    and then the fact that there is more than one
9    individual that -- there may be a suspect for the
10   act, but there is multiple suspects that are part
11   of what led to that.
12       MR. LUNSFORD:  So my question is do
13   you genuinely believe that you can transfer
14   someone in Alabama from one prison to another and
15   avoid exposing them to a gang member of the same
16   gang?
17       MS. WARD:  Object to form.
18       THE WITNESS:  There is danger at all
19   the prisons from the gangs, that is correct.
20       MR. LUNSFORD:  And wouldn't you agree
21   that moving a victim of an act of sexual violence
22   could be viewed as a retaliation against them for
23   having reported the sexual abuse?
24       MS. WARD:  Object to form.
25       THE WITNESS:  If you were to put -- As

72 (Pages 282 - 285)

1  inmates related to me most commonly, if they are
2  put in lockup after they've been victimized, and
3  this applies to more than just sexual assaults,
4  if they are put in lockup after being victimized
5  they sometimes view that as punishment.
6        In the case of a sexual assault, which
7  is very serious for a variety of reasons, if it's
8  also involving a debt component they -- The
9  inmates normally want to be placed somewhere
10 safe.
11       So the first idea of flight is to get
12 the hell out of there and get to another prison.
13 Once they're there then they have the second
14 issue, which is am I in another dorm where the
15 same gang members can get access to me.
16       So then you have the issue of, well,
17 maybe they need to be in a different dorm where
18 it's more protective than a regular general
19 population dorm.
20       MR. LUNSFORD:  Are you aware that ADOC
21 has faced inmates manipulating the PREA reporting
22 process in order to obtain movement to another
23 housing unit?
24       MS. WARD:  Object to form.
25       THE WITNESS:  I am aware that that

1  assertion is being made, yes.
2        MR. LUNSFORD:  Are you aware that the
3  Department of Justice at Tutwiler agrees that
4  it's essentially occurring?
5        MS. WARD:  Object to form.
6        BY MR. LUNSFORD:
7     Q    I just saw Chris Chang across the
8  hall.
9     A    Good.  Good.  Well Tutwiler is,
10 obviously, a different prison, and it being a
11 female prison system it has some different
12 dynamics, but to get to generally the issue that
13 you are prodding on here, I do believe inmates
14 manipulate that process from time to time.
15    Q    Would you just look with me about
16 seven lines down, there is a reference to "ADOC
17 does not consistently, thoroughly, or effectively
18 ensure that serial predators," should that be
19 sexual predators?
20       MS. WARD:  Object.  Privileged.  Do
21 not answer.
22       MR. LUNSFORD:  I'm just trying to fix
23 your typo, but okay.
24       BY MR. LUNSFORD:
25    Q    What's the difference between a serial

1  predator and a sexual predator?
2     A    The inference being "serial" is like
3  a serial rapist is someone who continuously does
4  that and is known for that.
5     Q    Do you know if there are serial
6  predators inside ADOC?
7     A    Based on my work of both talking to
8  inmates and also reviewing documents it's my
9  sense that there are many serial sexual
10 predators.
11    Q    Have you identified for ADOC through
12 your communications between counsel or whatever
13 the names of the individuals you believe are
14 serial predators who pose a risk to other
15 inmates?
16    A    In the communications that I have made
17 with ADOC regarding an individual situation who
18 may have been sexually assaulted if there was a
19 name that was given to me, that the inmate was
20 comfortable giving to me, I think I provided it,
21 but the more I think --
22    Q    No, I'm asking a different question.
23 Have you identified the individuals that you
24 contend are serial predators?
25    A    In sort of a separate communication

1  here is a list of --
2     Q    In any communication.
3     A    -- sexual predators?
4     Q    In any communication.
5     A    That I don't think I have done, no.
6     Q    Why not?
7     A    Um --
8        MS. WARD:  Object.  Privileged.  Do
9  not answer.
10       BY MR. LUNSFORD:
11    Q    Let me just say for the record, when
12 the client sees this transcript the question is
13 going to arise, which is if you guys are so
14 interested in preventing these things you say are
15 so terrible and happening, then why is
16 information not being provided to us.
17       Let me -- In the next sentence down,
18 "ADOC does not consistently, thoroughly, or
19 effectively ensure that victims of sexual abuse
20 are transferred for sexual abuse nurse
21 examinations in a timely manner."  Do you see
22 that?
23    A    I do.
24    Q    Tell me what is your definition of "a
25 timely manner?"

1    MS. WARD: Object. Privileged. Do
2  not answer.
3    BY MR. LUNSFORD:
4    Q   Do you have an understanding of what
5  it means to transfer someone in a timely manner?
6    A   In general or for a SANE exam?
7    Q   For -- Well, no, not in general. I
8  mean we're talking about the SANE examination
9  execution.
10   A   I do have a general understanding of
11 what is timely and for the purposes of a SANE
12 examination so that the SANE examination can bear
13 fruit, if there is any to bear.
14   Q   And what is that?
15   A   Right now I don't have the exact data
16 in front of me, but I know it's fairly soon
17 within a period of an alleged sexual assault.
18   Q   In order to -- it's within 72 hours
19 you have to transfer someone to a SANE clinic in
20 order for an evaluation, is that correct?
21    MS. WARD: Object to form.
22    THE WITNESS: I cannot verify that as
23 I sit here right now.
24    BY MR. LUNSFORD:
25   Q   Okay, fair enough. But you would

1  agree there is a timeframe within which a SANE
2  examination must occur, correct?
3    A   Correct.
4    Q   And outside of that timeframe the
5  likelihood of collecting any type of usable
6  evidence is very small, correct?
7    A   That is my understanding.
8    Q   And so if a complaint or allegation is
9  received outside of that timeframe you would
10 agree there is no purpose in transferring the
11 individual to a SANE clinic, correct?
12    MS. WARD: Object to form.
13    THE WITNESS: I can't be certain
14 because I think that if it's purely a question of
15 obtaining like seminal fluid that might be the
16 case, but you may have other evidence of the
17 sexual assault that can be determined in a SANE
18 examination.
19    MR. LUNSFORD: Will a SANE nurse even
20 do an examination if the assault occurred more
21 than 72 hours prior?
22    MS. WARD: Object to form.
23    THE WITNESS: I do not know.
24    BY MR. LUNSFORD:
25   Q   I'm going to ask this on several of

1  these, but do you know how many SANE examinations
2  were done in the State of Alabama last year?
3    A   I do not.
4    Q   Do you know how many allegations of
5  sexual abuse occurred without a SANE examination?
6    A   In ADOC facilities?
7    Q   Yes.
8    A   I do not.
9    Q   So in the next allegation, the next
10 allegation is very specific, "ADOC does not
11 consistently, thoroughly, or effectively ensure
12 that evidence collected in sexual abuse nurse
13 examinations is tested in a timely manner after
14 victims report sexual abuse at the facilities."
15    Let's go back to this. So this is
16 about, this statement is about testing, correct?
17   A   It's about collecting evidence.
18   Q   No, it says evidence collected --
19   A   Oh, sorry, excuse me, evidence
20 collected is tested in a timely manner, right.
21   Q   -- is tested?
22   A   Correct.
23   Q   This statement is about testing, isn't
24 it, Mr. Williams?
25   A   In a timely manner, yes.

1    Q   Okay. So my question to you is are
2  you saying in this sentence and when you signed
3  this was it your understanding that ADOC had
4  collected evidence and that there was a delay in
5  testing?
6    MS. WARD: Object to form.
7    THE WITNESS: I have received
8  information from inmates that indicate they had
9  information that a situation like that occurred,
10 yes, and that they were told as much.
11    MR. LUNSFORD: Who is responsible for
12 conducting those, the lab tests of evidence
13 collected?
14    MS. WARD: Object to form.
15    THE WITNESS: I'm not sure.
16    MR. LUNSFORD: Is it even an ADOC
17 employee?
18    MS. WARD: Object to form.
19    THE WITNESS: I am not sure.
20    BY MR. LUNSFORD:
21   Q   Do you know how soon after evidence is
22 collected that test results must be completed?
23   A   I don't know that sitting at, as I sit
24 here today.
25   Q   So you don't know how quickly the

74 (Pages 290 - 293)

Page 294

1  tests have to be run?
2      A    I don't have the exact parameters, so
3  I don't know what --
4      Q    Okay.  So my question is how do you
5  know it's not done timely then?
6          MS. WARD:  Object.  Privileged.  Do
7  not answer that question.
8          BY MR. LUNSFORD:
9      Q    Do you even know that there are --
10  Well, let me ask this, independently of anything
11  else, if someone told you we collected all of
12  this evidence from the SANE center and we tested
13  it within 24 hours, is that timely or not?
14      A    I believe that is.
15      Q    What about within 36 hours?
16      A    That's when I start to not be certain
17  about the details.
18      Q    What about 48 hours?  If it was tested
19  within 48 hours is that timely?
20      A    That's -- From my understanding you're
21  getting close to the edge here of when it's still
22  usable.
23      Q    What about within 72 hours?
24      A    I think there may be a cutoff there,
25  but I can't be certain as I sit here today.

Page 295

1      Q    In your experience working for DOJ
2  have you encountered any other system that tests
3  all SANE evidence within 48 hours?
4      A    I can't verify if that is the case or
5  not from the other systems that I have been
6  involved with.
7      Q    So when I read that you are alleging
8  that we don't test SANE samples within a timely
9  manner is it fair to assume that that means it's
10  not done within 72 hours?
11          MS. WARD:  Object.  Privileged.  Do
12  not answer.
13          MR. LUNSFORD:  What's the purpose of
14  ADOC's Sexual Abuse Incident Review Report?
15          MS. WARD:  Object to form.
16          THE WITNESS:  I'm sorry, where are
17  you?  Where are you?
18          MR. LUNSFORD:  I'm in the next
19  sentence.  What's the purpose of ADOC's Sexual
20  Abuse Incident Review Report?
21          MS. WARD:  Object to form.
22          THE WITNESS:  I don't know what ADOC
23  regards as the purpose of those reports are.
24          MR. LUNSFORD:  Are those reports
25  intended to be a location where recommendations

Page 296

1  are made?
2          MS. WARD:  Object to form.
3          THE WITNESS:  I don't have, as I sit
4  here today, a specific recollection of one that I
5  have read to be able to give you an answer that
6  would respond to that.
7          MR. LUNSFORD:  Well in the context of
8  a Sexual Abuse Incident Review Report is it
9  supposed to review the investigation itself?
10          MS. WARD:  Object to form.
11          THE WITNESS:  Again, I don't have
12  knowledge of what ADOC regards as the specific
13  purpose of the reports.
14          MR. LUNSFORD:  What is wrong with the
15  special investigators or the IPCMs reporting to
16  the wardens?
17          MS. WARD:  Object.  Privileged.  Do
18  not answer.
19          BY MR. LUNSFORD:
20      Q    Let me go to Page 10.  I want to go to
21  the next to last sentence,
22      A    Okay.
23      Q    It says "ADOC's allegations of prisoner-
24  on-prisoner sexual abuse increased from 2020 to
25  2021 and again in 2022."

Page 297

1          So let me ask you this, how many
2  allegations of prisoner-on-prisoner sexual abuse
3  were there in 2020?
4      A    I don't have that data as I sit here
5  today.  I don't remember the numbers.
6      Q    Okay.  Well what were they in 2021?
7      A    I don't remember those numbers.
8      Q    Then, Mr. Williams, how in the world
9  can you swear under oath that prisoner-on-
10  prisoner sexual abuse increased between 2020 and
11  2021?
12      A    I am talking about as I sit here today
13  I don't remember the numbers.  In May of 2024 I
14  would have looked at that.
15      Q    You just didn't, don't have the
16  numbers at all?
17      A    I don't --
18      Q    How much did they increase?
19      A    I don't have that number --
20          (Simultaneous speaking.)
21      Q    What is the increase attributable to?
22      A    Well that gets into a myriad of other
23  factors.
24      Q    Such as?
25          MS. WARD:  Objection.  Privileged.  Do

75 (Pages 294 - 297)

Page 298

1  not answer.
2  MR. LUNSFORD: Between 2020 and 2021
3  did ADOC increase awareness of sexual violence
4  and, therefore, received more complaints because
5  of more reporting by the inmate population?
6  MS. WARD: Object to form.
7  THE WITNESS: I don't know if that's
8  the case or not.
9  MR. LUNSFORD: But you have -- well,
10  let me ask this, what happened to allegations of
11  prisoner-on-prisoner sexual abuse in 2023?
12  MS. WARD: Object to form.
13  THE WITNESS: And as I sit here today
14  I don't know those numbers either.
15  BY MR. LUNSFORD:
16  Q   But why wouldn't you refer to 2023 in
17  these responses since you were responding to them
18  in 2024?
19  A   Why wouldn't I refer to them?
20  Q   Yeah. Why do you cut it off in 2023?
21  MS. WARD: Object. Privileged. Do
22  not answer.
23  BY MR. LUNSFORD:
24  Q   Did the number of prisoner-on-
25  prisoner, cases of prisoner-on-prisoner sexual

Page 299

1  abuse that were substantiated increase?
2  A   I don't have that data.
3  Q   Can you personally swear under oath
4  today that instances of prisoner-on-prisoner
5  sexual abuse increased from 2020 to 2021?
6  MS. WARD: Object. Privileged. Do
7  not answer.
8  BY MR. LUNSFORD:
9  Q   Can you testify under oath that
10  allegations of -- I'm sorry. Mr. Williams, can
11  you testify under oath today that prisoner-on-
12  prisoner sexual abuse increased between 2021 and
13  2022 inside ADOC?
14  A   As opposed to allegations?
15  Q   Yes.
16  A   I cannot -- I don't have the numbers
17  so I cannot say.
18  Q   Can you testify under oath that
19  prisoner-on-prisoner sexual abuse, not just
20  allegations, but the actual abuse increased from
21  2020 to 2021?
22  A   Same response.
23  Q   Are you aware of any instances of
24  sexual abuse that occurred while an officer was
25  observing and did not intervene?

Page 300

1  A   I am not aware of such incidents, no.
2  Q   Who has the authority inside ADOC to
3  make changes in security practices?
4  MS. WARD: Object to form.
5  THE WITNESS: I am not certain how
6  that fully functions, to what degree the warden
7  has free reign or if a captain can do certain
8  things, and lieutenants.
9  I think it probably doesn't go any
10  lower than the lieutenant level based on my
11  experience of talking to inmates, but then there
12  might be things that can't be done without the
13  blessing of Montgomery.
14  BY MR. LUNSFORD:
15  Q   Throughout your answer to this
16  interrogatory, we've already gone through it and
17  you'll see it again at the bottom of Page 10, Mr.
18  Williams, you say "unreasonably high number."
19  You remember we've already seen at
20  least two other instances of that?
21  A   Yes.
22  Q   My question to you is, I'm not going
23  to go through the whole litany of questions,
24  because, again -- but can you confirm it with me,
25  for me, when you use this phrase "unreasonably

Page 301

1  high number" you can't give me any specific
2  numbers around, or any specific analysis you did
3  to conclude that these instances occurred with a
4  certain number of frequency?
5  MS. WARD: Object. Privileged. It's
6  not his answer, so do not answer.
7  MR. LUNSFORD: Can you explain to me
8  what you mean by an unreasonably high number of
9  uses of force, of excessive force?
10  MS. WARD: Object. Privileged. Do
11  not answer.
12  MR. LUNSFORD: Does this first
13  sentence on Page 10 under "Use of Excessive
14  Force," do the numbers that you utilized there
15  does that include appropriate uses of force?
16  MS. WARD: Object. Privileged. Do
17  not answer.
18  MR. LUNSFORD: How do you define
19  excessive use of force?
20  MS. WARD: Object. Privileged. Do
21  not answer.
22  MR. LUNSFORD: Is there such thing as
23  an appropriate use of force?
24  MS. WARD: Object. Privileged. Do
25  not answer.

76 (Pages 298 - 301)

Page 302

1         BY MR. LUNSFORD:
2      Q    Does ADOC maintain a policy on use of
3   force?
4      A    It's my understanding that they do.
5      Q    Does that policy define the
6   appropriate levels of force to be used in various
7   circumstances?
8      A    Yes, based on my understanding.
9      Q    Do you know how excessive instances of
10  use of force that require investigation, do you
11  know how those are brought to the attention of
12  ADOC?
13     A    I'm sorry, can you repeat that?
14     Q    Yeah.  Do you know how investigations
15  come about involving claims of excessive force by
16  officers?
17     A    I don't have -- I don't know that
18  there is a single way that I am aware of.  It's
19  my sense that they can come to the attention of
20  ADOC through multiple channels.
21     Q    There is an allegation in here that
22  ADOC staff in the facilities use force against
23  prisoners as punishment.  What does that mean?
24         MS. WARD:  Object.  Privileged.  Do
25  not answer.

Page 303

1         BY MR. LUNSFORD:
2      Q    Can you name a single officer who has
3   used force against an inmate in a way that you
4   considered it punishment?
5      A    I have certainly gathered a lot of
6   information from inmates where based on the
7   presentation to me that appeared to be the case,
8   but as I sit here today I am not going to
9   necessarily be able to remember the name of those
10  officers.
11     Q    Has ADOC investigated some of its
12  officers for their uses of force?
13     A    I'm aware that they have done that,
14  yes.
15     Q    Has disciplinary action been taken
16  against any officers?
17     A    I am aware that there is disciplinary
18  action to be taken.  I am not always aware of
19  what that has resulted in.
20     Q    Are aware that the Department of
21  Justice has, in fact, prosecuted officers inside
22  Alabama prison systems for use of force?
23     A    Yes, I am.
24     Q    Do you know if there has been a single
25  incident of excessive force at Bibb in the last

Page 304

1   five years?
2         MS. WARD:  Object to form.
3         THE WITNESS:  One that has been
4   identified as such and investigated as such or if
5   there has just been an episode that I am aware
6   of?
7         BY MR. LUNSFORD:
8      Q    Any.  Any event of excessive force at
9   Bibb in the last five years.
10     A    Yes, I am aware of those, of more than
11  once such incident.
12     Q    When did those occur?
13     A    Again, unfortunately, I'm not going to
14  be able to remember them exactly, within the past
15  four years at some point in time.
16     Q    Can you tell me how many officers were
17  involved in any one of the incidents?
18     A    Well actually, if you go back to one
19  of the emails that I wrote to ADOC, it may have
20  been in the period prior to you being on the CC
21  list, but there was an incident from Bibb that
22  involved multiple officers that I actually
23  emailed to LESD about.
24     Q    Was that matter investigated?
25     A    I don't recall if I looked into if it

Page 305

1   was investigated or not.
2      Q    Was there any disciplinary action
3   taken against those officers?
4      A    I also don't know that.
5      Q    Do you know if ADOC was already
6   investigating that matter at the time that you
7   made the report?
8      A    I would not know that.
9      Q    Which part of ADOC's use of force
10  policy does it not consistently apply or enforce?
11         MS. WARD:  Object.  Privileged.  Do
12  not answer.
13         MR. LUNSFORD:  Which part of ADOC's
14  use of force policy does it not thoroughly
15  enforce?
16         MS. WARD:  Object.  Privileged.  Do
17  not answer.
18         MR. LUNSFORD:  Which part of ADOC's
19  use of force policy does it not effectively
20  enforce?
21         MS. WARD:  Object.  Privileged.  Do
22  not answer.
23         MR. LUNSFORD:  Does ADOC have a,
24  maintain a set of information where it keeps
25  track of officers who have been accused of

77 (Pages 302 - 305)

Page 306

1  excessive force?
2        MS. WARD:  Object to form.
3        THE WITNESS:  I am not aware of that
4  one way or the other.
5        BY MR. LUNSFORD:
6     Q    Are you aware that ADOC modified its
7  use of force policy?
8     A    When?
9     Q    Recently.
10    A    I am not aware of that.
11    Q    Are you aware that ADOC has
12  implemented use of force training at all of its
13  major facilities?
14    A    I am not specifically aware of that,
15  no.
16    Q    Would you view training as a positive
17  development in terms of the leadership and
18  oversight of correctional staff?
19        MS. WARD:  Object to form.
20        THE WITNESS:  I would view it as a
21  necessary component.
22        MR. LUNSFORD:  Are you aware that use
23  of force training occurs inside ADOC's training
24  academy?
25        MS. WARD:  Object to form.

Page 307

1        THE WITNESS:  I am not specifically
2  aware, but I would expect that to be a component
3  of it.
4        BY MR. LUNSFORD:
5     Q    Have you reviewed what training is
6  provided to ADOC officers?
7     A    I have not seen what that training
8  consists of.
9     Q    Can you identify for me one instance
10  when ADOC or its officers deviated from its use
11  of force policy?
12    A    I can identify probably more than one.
13    Q    Go.
14    A    Okay.  Well there is the one that I
15  mentioned to you already that I emailed the LESD
16  about.  I don't remember the date or the year.
17        There are incidences that happened at
18  a variety of prisons where the staff have
19  locations that they can go into that involve no
20  cameras, there are blind spots, and I hear about
21  those kinds of episodes frequently and it
22  involves the beating of inmates after they are
23  handcuffed and in some cases it gets to the point
24  where they are really badly beaten.
25        I know this has happened at Limestone,

Page 308

1  it happens maybe not as completely violent, but
2  regularly it happens at Kilby and it happens at
3  Donaldson.
4        This is all based on information that
5  I have received during my phone calls over the
6  years.
7     Q    This is all based on inmate statements
8  to you, correct?
9     A    That is correct.
10    Q    So when an inmate makes a statement to
11  you that they have been beaten or attacked or
12  assaulted by an officer do you report all of
13  those incidents to ADOC counsel, who you have
14  regularly communicated with on other matters?
15        MS. WARD:  Object to form.
16        THE WITNESS:  What I report to counsel
17  at this point is when an inmate feels a sense of
18  imminent harm.
19        At that point if the inmate has -- And
20  most of the reports that I get are reports about
21  people who have witnessed it, but who themselves
22  have not been the victims, and they may not know
23  the name of the victim.  They just know that it
24  happened or they witnessed it.
25        Inmates frequently don't know each

Page 309

1  other names.  That's essentially the -- I am not
2  able to provide something to you guys because the
3  inmate that was beaten is not in communication
4  with me at that point and --
5        (Simultaneous speaking.)
6        MR. LUNSFORD:  You just said the
7  inmate is beaten, so you accept everything you
8  are being told is true?
9        MS. WARD:  Object to form.
10        THE WITNESS:  I accept that the inmate
11  that is giving me the information is presenting
12  what he has to present and there may be multiple,
13  sometimes, calling me and that can attest to the
14  same incident and I assemble that information and
15  assess it for how accurate it feels.
16        And if I can, I try to then find a way
17  of communicating with the inmate who was the
18  victim, if they're able to locate him and get him
19  to call me.  Occasionally, that has happened, but
20  it's not always very easy to do that.
21        MR. LUNSFORD:  My question was very
22  different.  Do you communicate with us when you
23  receive reports about officers using excessive
24  force against inmates?
25        THE WITNESS:  If I can get enough of

78 (Pages 306 - 309)

Page 310

the information that would be required, it's potentially the case that I would communicate with our team and we would assess whether or not that actually requires --

MS. WARD: Object, privileged information.

MR. LUNSFORD: Other than the -- well, the anecdotes that you received from inmates when they call you, do you have any other information you received during your work in this case about instances of use of force that ADOC did not investigate?

THE WITNESS: I do not have any as I sit here right now.

MR. LUNSFORD: Let's talk a minute for about contraband.

Your section on contraband refers primarily to weapons, drugs, and cell phones as contraband, is that correct?

MS. WARD: Object, privilege. Do not answer.

MR. LUNSFORD: Well, are there other types of contraband inside the facilities that you've seen or heard from your inmate calls that you're concerned about?

Page 311

THE WITNESS: Well, what is written here is knives, drugs, cell phones. There have been episodes that involve pistols, I believe.

BY MR. LUNSFORD:

Q Okay, were those -- well, I said, weapons, drugs, and cell phones, but anything else out of those categories?

A Well, contraband is kind of a broad category, so it encapsulates a lot of things.

Q So, you get these calls from inmates about contraband coming into our facilities. Have you ever asked them how they're getting it into the facility?

A I ask all the time.

Q And what do they tell you?

A Most of it's staff.

Q Do they ever tell you anything else?

A There is sometimes a reference to them getting smuggled in through or over fences, that fences are cut to allow inmates to get access to them.

They -- if something is -- if there's an attempted smuggling through the visitation scenario, they don't usually have firsthand knowledge about it, but they have heard, you

Page 312

know, rumors to that effect.

But, I would say 90 percent of the answers are usually the staff.

Q Have they ever provided you with names of staff?

A They have suggested. Most people who have intimate knowledge of these things, meaning direct knowledge, as in they engage with the staff to do this, to arrange for this, they are not calling me.

But inmates in the dorms that see that it is going on, they have suspicions.

Q Now, I -- well, I don't want to go on --

A So, they --

Q -- rumor and suspicion, I want to know facts of like has an inmate identified for you a specific staff member who's bringing in contraband?

A They have identified staff members who they believe are doing it.

Q And have you provided those names to us?

A I have not.

MR. LUNSFORD: Why not?

Page 313

MS. WARD: Object, privileged. Do not answer.

MR. LUNSFORD: I mean, I'm -- let me just say on the record, I cannot believe you guys would not give us those names. That, to me, is just remarkable.

Help us out. If we have staff bringing in stuff and you know their names, tell us. Why would you not tell us?

MS. WARD: Well, Bill, on one hand, you're painting him as ridiculous for believing inmates. But on the other hand, you're painting us ridiculous for not providing information from inmates which you now say is God's truth.

So, which is it?

MR. LUNSFORD: Well, I think that's a great question that y'all have to resolve.

Either, A, you don't believe him and you're not going to give us the information.

Or you do believe him and you're going to give it to us.

But you've got to cut the cards on that.

MS. WARD: And we are, and that information is privileged and that is why we're

Page 314

1  not providing it today.
2        MR. LUNSFORD: Okay.
3        How often are perimeter checks
4  completed at Limestone Correctional Facility?
5        THE WITNESS: I don't know.
6        BY MR. LUNSFORD:
7    Q    What about at Bibb?
8    A    I don't know.
9        MR. LUNSFORD: Could you -- if you
10 were called to the stand to testify at trial,
11 could you testify whether ADOC was doing
12 perimeter checks or not at any facility?
13       MS. WARD: Object to form.
14       THE WITNESS: I would not have any
15 firsthand knowledge of that.
16       MR. LUNSFORD: Okay.
17       If you were called to testify at trial
18 that officers are bringing in contraband into a
19 facility, could you do that?
20       THE WITNESS: I could only testify to
21 the fact that I've been told this by inmates who
22 observe it through their daily lives.
23       BY MR. LUNSFORD:
24    Q    Okay.
25       As you sit here today, can you name a

Page 315

1  staff member who is bringing contraband into one
2  of our facilities?
3    A    It's a blur of names, so right now,
4  they're not coming to me on an individual basis.
5    Q    Do you know what equipment ADOC has
6  purchased to interdict contraband?
7    A    I'm not aware of the specific
8  equipment they have purchased, but I understand
9  that they have purchased various things.
10    Q    Have you done any type of numerical
11 analysis of the amount of contraband found at a
12 particular facility?
13    A    I have not done that personally, no.
14    Q    Do you ask inmates to call you for any
15 reason if they have any contraband?
16    A    It comes up frequently, usually as a
17 byproduct of the fact that, okay, today or
18 yesterday, we had a bunch of people overdose.
19 So, what happened? Well, a new batch of
20 something arrived and so, then we discuss it
21 again.
22       It's one of many topics, contraband.
23 The fact that there are people taking drugs and
24 getting high and falling out and/or dying is a
25 pretty constant topic on the phone calls.

Page 316

1    Q    Do inmates admit to you when they have
2  contraband?
3    A    Generally, the inmates that call me
4  are not calling me to say that they have
5  contraband. So, if they have it or not, is not
6  normally the subject of the phone call.
7        I have had inmates admit to me that
8  they have, you know, taken contraband, as in
9  consumed contraband, if it's drugs. I have had
10 inmates admit to me that they have had knives in
11 the past.
12       But that may not have been -- I don't
13 think it was a case of, right now, I'm holding a
14 knife and right now, I have some fentanyl
15 underneath my mattress, anything like that.
16       MR. LUNSFORD: What would be an
17 appropriate number or reasonable number of cell
18 phones to find at an ADOC facility in here?
19       MS. WARD: Object to the form,
20 privileged, or sorry, object, privileged. Do not
21 answer.
22       MR. LUNSFORD: What would be an
23 appropriate amount of inmate-fashioned weapons in
24 a facility in Alabama in a year?
25       MS. WARD: Objection, privilege. Do

Page 317

1  not answer.
2        MR. LUNSFORD: What would be a
3  reasonable amount of marijuana to seize in a
4  given years in a prison in Alabama?
5        MS. WARD: Objection, privileged. Do
6  not answer.
7        MR. LUNSFORD: What would be a
8  reasonable amount of cocaine to seize in a given
9  year in at an Alabama prison?
10       MS. WARD: Object, privileged. Do not
11 answer.
12       MR. LUNSFORD: What's a reasonable
13 number of deaths from overdose in an Alabama
14 prison?
15       MS. WARD: Object, privileged. Do not
16 answer.
17       MR. LUNSFORD: So, when you signed
18 this, I'm just curious, Mr. Williams, how do you
19 -- how did you analyze this that you're being
20 asked by the United States to attest to a
21 statement ADOC had an unreasonably high number of
22 deaths by overdose of prisoners in the last
23 several years?
24       How do you, when you were reading
25 this, how did you assess whether you could attest

Page 318

1  to the truthfulness of that statement?
2        THE WITNESS:  Since day one since I've
3  been involved in this investigation, overdose
4  deaths in Alabama were a prominent thing, and up
5  until the present, the increase -- the overdose
6  deaths have increased by significant numbers.
7        You can see lots of literature about
8  it, newspaper articles about it, and have a sense
9  that, in the case of Alabama and ADOC's prison
10 system, that you would be hard put to find
11 another prison system that has as much contraband
12 flowing into it and as many people dying from
13 overdose as ADOC by factors of -- by significant
14 factors.
15        BY MR. LUNSFORD:
16     Q    What other prison systems have you
17 looked at?
18     A    I can't list them all.  There's been
19 the ones that I've been involved with as
20 investigations, but I've also looked at numbers
21 of from around the country.
22     Q    Have the overdose death rate increased
23 or decreased during the pendency of this case?
24     A    Increased.
25     Q    Has -- you're not aware it decreased

Page 319

1  last year?
2     A    I'm sorry?
3     Q    You're not aware it decreased last
4  year?
5     A    Let's see, I looked at your own
6  numbers not too long ago, decreased from a
7  historical high, right?  So what was the decrease
8  exactly?
9     Q    Yes, it was 138 to 103.
10    A    Okay, well, 138 would have been sort
11 of rock bottom, and 108 is how much more than
12 2020 or 2019 or 2021?
13    Q    Yeah, but you wouldn't have actually
14 have known, I don't think, about the -- I don't
15 think you would have -- I don't know what year
16 that is.  Yeah.
17        Do you know what efforts ADOC has done
18 to address drug use inside of its prison system?
19    A    I know that they have programs related
20 to substance abuse.  I don't know how widespread
21 they are or how many people are in those
22 programs, let alone how effective they are or
23 well-attended they are.
24        If they are involved with such things
25 as like a Suboxone treatment program, I'm not

Page 320

1  sure to what degree they do that.  I can't give
2  you a solid answer of all the things that ADOC
3  might be doing.
4     Q    Does ADOC drug test its population?
5     A    I'm aware of the fact that they have
6  a drug testing program or option.  To what degree
7  they drug test people, I don't know.
8     Q    Do you know, if an inmate tests
9  positive after a drug test, what steps ADOC
10 takes?
11    A    I'm not aware of all the steps.  It's
12 possible that they get a disciplinary.  If
13 they're at a work release, for example, they
14 usually have to get sent back to a state prison.
15        I don't know if they lose good time or
16 any of -- all those kinds of factors.  I'm not
17 aware of the full repercussions.
18    Q    So let me go back to this, you're
19 opining about a high number, an unreasonably high
20 number of overdose deaths.  How do you know the
21 number of deaths inside ADOC facilities?
22    A    Overdose deaths?
23    Q    Yes.
24    A    You published it.
25    Q    Is that number reliable?

Page 321

1     A    I'm assuming it's not less than that.
2  It could be more.
3     Q    That's not my question though.  Is the
4  number reliable?
5     A    It's not reliable if it's more, but
6  it's reliable enough to where that is the
7  minimum.
8     Q    I'm not asking -- my question is, is
9  the number, in your perspective, reliable?
10        MS. WARD:  Object to form.
11        THE WITNESS:  It's my understanding
12 that to determine if it's an overdose death, it
13 has to be determined toxicologically.  So that is
14 based on some independent review of what was in
15 the person's system.  And thereby, you classify
16 it as an overdose death.  So I assume that those
17 are reliable figures.
18        MR. LUNSFORD:  Does ADOC conduct an
19 autopsy on every in custody death?
20        THE WITNESS:  I am assuming they do in
21 most cases.  I don't know if it's for the full
22 range of natural deaths, but I know for homicide,
23 suicides, or suspected overdoses or accidents, I
24 think that they probably do it.
25        BY MR. LUNSFORD:

81 (Pages 318 - 321)

Page 322

1    Q    And are toxicology results obtained on
2  all those cases?
3    A    I don't know if they're obtained for
4  all of them.  I think I've seen a toxicology
5  report for a homicide or a suicide as well as
6  overdose, obviously.  I don't know about natural
7  deaths.  They might do it for those as well.  I'm
8  not sure on --
9    Q    But just to be clear, in concluding
10 that -- or alleging that ADOC has an unreasonably
11 high rate of overdose deaths,  you relied on
12 ADOC's own numbers --
13       MS. WARD:  Object --
14       MR. LUNSFORD:  -- is that accurate?
15       MS. WARD:  Object, privilege.  Do not
16 answer.
17       THE WITNESS:  Okay.
18       MR. LUNSFORD:  Okay.  Let's move
19 forward to staffing.  What is a critical post?
20       MS. WARD:  Object to form.
21       THE WITNESS:  I can't give you a
22 technical definition, but it's my understanding
23 critical posts derive from staffing analyses and
24 they're post -- they're deemed or designated as
25 posts that have to be manned under all

Page 323

1  circumstances.
2        MR. LUNSFORD:  How many critical posts
3  are there in ADOC's facilities?
4        THE WITNESS:  I don't know that
5  number.
6        BY MR. LUNSFORD:
7    Q    How many critical posts have been left
8  vacant?
9    A    I don't know that number.
10   Q    Are critical posts ever left vacant?
11   A    I can't verify that they are because
12 I don't know fully which -- all of which posts
13 are critical.
14   Q    Do you know if anyone has evaluated
15 whether ADOC has vacant critical posts on any
16 given shift?
17       MS. WARD:  Object, privilege.  Do not
18 answer.
19       MR. LUNSFORD:  Do you know if the
20 positions inside the cubicles inside ADOC
21 facilities are considered critical posts?
22       THE WITNESS:  It's my understanding
23 they are not considered critical posts.  Maybe
24 I'm wrong.
25       BY MR. LUNSFORD:

Page 324

1    Q    Have you reviewed shift rosters?
2    A    I have not extensively reviewed shift
3  rosters.  I've looked at them on occasion.
4    Q    Do you have an understanding of what
5  a shift roster is?
6    A    Yes, I do.
7    Q    What is it?
8    A    Well, I mean, it establishes who is
9  there on a given shift, what staff you have and
10 where they're assigned to, what posts they're
11 manning.
12   Q    Are ADOC shift rosters complete?
13       MS. WARD:  Object to form.
14       THE WITNESS:  What do you mean by
15 complete?
16       MR. LUNSFORD:  Are they accurate?  Do
17 they reflect the information about a given shift?
18       MS. WARD:  Object to form.
19       THE WITNESS:  There's lots of
20 information in a given shift, so you might -- I
21 need you to narrow that down a little bit more.
22       MR. LUNSFORD:  Well, I mean, have you
23 ever seen any shift roster that's inaccurate or
24 incomplete?
25       THE WITNESS:  Well, I haven't

Page 325

1  extensively looked at shift rosters.  So it's not
2  as easy for me to answer that.
3        BY MR. LUNSFORD:
4    Q    So you don't know if shift rosters are
5  inaccurate or incomplete?
6    A    I can't right now sit here and say
7  that I have reviewed any shift rosters where I
8  have said to myself they are incomplete or
9  inaccurate.
10   Q    There's also a process by which
11 officers in the cubes we were talking about
12 earlier complete logs.  Are you aware of that?
13   A    Yes, I am.
14   Q    Have you reviewed the logs of any
15 particular officer?
16   A    I don't think I have, no.
17   Q    So do you know if any of the logs
18 completed by any particular facility are adequate
19 or incomplete or problematic in any way?
20       MS. WARD:  Object to form.
21       THE WITNESS:  I have no specific
22 knowledge of that, no.
23       MR. LUNSFORD:  So if somebody said,
24 you know, the logs maintained in ADOC facilities
25 are not accurate or complete, you couldn't attest

82 (Pages 322 - 325)

Page 326

1  to that, could you?
2      THE WITNESS:  Personally, I could not
3  attest to that, no.
4      BY MR. LUNSFORD:
5      Q   Okay.  Were you aware that ADOC has
6  conducted several staffing analyses?
7      A   I'm not aware of potentially all of
8  them, but I know that there's a staffing analysis
9  by the Savages that frequently has been talked
10  about.  I don't know when the most recent one
11  was.
12     Q   Do you know what information was
13  considered by the people who completed the
14  staffing analysis for ADOC?
15     A   I don't know that from A to Z, no.
16     Q   Do you know if the people that
17  conducted the staffing analysis for Alabama over
18  the last ten years considered the levels of
19  contraband?
20     A   I don't know if they did or not.
21     Q   Do you know if they considered the
22  levels of sexual violence?
23     A   I don't know if they did or not.  It's
24  my understanding that when you do a staffing
25  analysis that you do assess the physical building

Page 327

1  for areas where there might -- where you think
2  you need staffing to prevent certain things like
3  that, so.
4      Q   Do you know if the people who
5  conducted staffing analyses for the State of
6  Alabama considered the level of physical violence
7  among the inmate population?
8      A   I'm not specifically aware of that.
9      Q   Do you know, when ADOC hires someone
10  as a new correction officer, do you know the
11  process that that individual must go through?
12     A   Not from A to Z, no.
13     Q   Were you aware that new hires must
14  interview with an STG investigator?
15     A   I believe I've heard that before, but
16  I don't recall where exactly I heard that.
17     Q   Were you aware that a criminal
18  background check is done on new hires?
19     A   I am not aware if it was consistently
20  done, but I'm aware that that generally was
21  supposed to be done.
22     Q   Do you know if ADOC does an
23  investigation to determine whether someone has
24  previously engaged in any form of illegal
25  activity?

Page 328

1      A   Which would be part of the background
2  check, right?
3      Q   Yes.
4      A   I don't have specific knowledge of
5  that.
6      Q   So I guess my question is do you know
7  if -- do you know anything about the process that
8  ADOC uses in order to screen its employees to
9  ensure that they do not have issues that might
10  pose a threat to the population or the safety and
11  security of a facility?
12     A   I have no specific information on
13  that.
14     Q   Do you know or can you identify a
15  single correction officer employed in Alabama
16  right now who is not competent to do their job?
17     A   I don't know them by names.  What I
18  normally -- what I am normally told by inmates is
19  they observe various staff members who they --
20  who they are adamant have basically no
21  qualifications to do the job.
22     Q   Well, the qualifications for a
23  correction officer are public standards, right?
24     A   You're telling me or -- I don't know
25  for a fact.

Page 329

1      Q   You don't -- have you researched the
2  standards for being a correction officer?
3      A   Correctional officer or simply being
4  employed in a position where you have --
5      Q   As a correction officer?
6      A   So a CO proper?
7      Q   Yes.
8      A   I don't have the exact knowledge of
9  that, but that does not surprise me.
10     Q   Do you know if the background check
11  for any other position in the prison is any
12  different than a correction officer?
13     A   I don't know that.
14     Q   Do you know what changes ADOC has made
15  to its recruitment strategy in order to increase
16  the number of correction officers?
17     A   I'm aware that you hired someone, a
18  firm, sometime in '23, I think, maybe '22, I
19  can't remember, to address your staffing
20  shortages and also your approach to the labor
21  market.
22     Q   Are you aware that ADOC has increased
23  its enrollment in its correctional academy
24  classes?
25     A   Yes, I am.

Page 330

1    Q    Have you looked at how much ADOC pays
2  its officers?
3    A    I have.
4    Q    And how does that compare to other
5  states?
6    A    It's pretty high.
7    Q    Do you -- have you identified --
8    A    Pretty high regionally.
9    Q    Are you aware that it's higher than
10  the state -- New York City?
11    A    I wasn't aware of that.
12    Q    Are you aware it's higher than New
13  York -- or Texas?
14    A    No, I was not aware of that.
15    Q    Were you aware it's higher than
16  Washington State, your home state?
17    A    No, I wasn't.
18    Q    Are you aware of anything that ADOC
19  has done to increase the recruitment and
20  retention of officers that has not been
21  effective?
22    A    Well, recruitment is not always the
23  same as retention. I think, based on the
24  information I receive through inmates, people
25  leaving is still a thing. So the retention issue

Page 331

1  there is still a concern. Recruitment, I can't
2  speak to that.
3    Q    Let me direct your attention to page
4  13. I'm about halfway down the page. This
5  sentence begins on the right side. ADOC does not
6  consistently, thoroughly, or effectively pursue
7  alternative means of staffing in the facilities.
8  Do you see that?
9    A    Yeah.
10    Q    What are alternative means of
11  staffing?
12    MS. WARD: Object, privilege. Do not
13  answer.
14    MR. LUNSFORD: Did you have an
15  understanding at the time you signed this what
16  alternative means of staffing meant?
17    THE WITNESS: Yes, I did.
18    BY MR. LUNSFORD:
19    Q    And what was that understanding?
20    A    Something beyond your normal process
21  of hiring, essentially, or, in the case of maybe
22  potentially emerging situation, a National Guard
23  scenario, something like that.
24    Q    So does the alternative means of
25  staffing, does it include reference to the

Page 332

1  bringing in the National Guard?
2    A    It potentially includes bringing in
3  people that would be -- that would help you with
4  a situation --
5    (Simultaneous speaking.)
6    Q    Has ADOC done that?
7    A    I'm not aware of them bringing in the
8  National Guard. If I missed it, I apologize. I
9  don't know if they brought in -- I think I've
10  heard that they brought in a third-party or
11  contractors, whatever, a security company,
12  individuals. They work frequently in the cubes,
13  they have different uniforms, different
14  parameters regarding what they are allowed to do.
15  So I'm aware of that.
16    Q    Other than the National Guard and
17  local law enforcement, any other alternative
18  means of staffing that you understood at the time
19  of signing this?
20    A    Not that I can think of, no.
21    Q    And then look at the next sentence.
22  ADOC has not taken advantage of all potential
23  appropriated funding for correctional staff
24  hiring. What does that mean?
25    MS. WARD: Object to form -- I object,

Page 333

1  privilege. Do not answer.
2    MR. LUNSFORD: What did you understand
3  that to mean at the time that you swore to it?
4    THE WITNESS: The potential
5  appropriated funding --
6    MR. LUNSFORD: Yes.
7    (Simultaneous speaking.)
8    THE WITNESS: -- of all potential
9  appropriated funding? Well, that was an
10  assessment made by the combined efforts of the
11  team, effectively, and their research.
12    MR. LUNSFORD: What would be the
13  source of this potential appropriated funding?
14    MS. WARD: Privileged. Objection, do
15  not answer.
16    MR. LUNSFORD: So let me just get this
17  straight, you all are alleging that we -- our
18  client has not taken advantage of potential
19  appropriated funding for correctional staff
20  hiring, and you're not going to tell us what it
21  is?
22    MS. WARD: This is not a deposition of
23  the litigation team.
24    MR. LUNSFORD: But, I mean, you're not
25  going to tell us -- you're going to play hide the

84 (Pages 330 - 333)

Page 334

1  ball? I mean, I'm just -- like, why would you do
2  that? Why would you not tell us what -- we
3  haven't done something, and you're saying this
4  could help you out if you took advantage of
5  appropriated funding. I mean, you're not going
6  to tell us what it is?
7       MS. WARD:  That -- that's --
8       MR. LUNSFORD:  You're going to claim
9  it's privileged?
10      MS. WARD:  That's an appropriate
11 conversation for mediation, but you are taking a
12 deposition. This is not a deposition of the
13 litigation team.
14      We are in mediation right now, are we
15 not?
16      MR. LUNSFORD:  In terms of on down --
17 next -- about probably four lines up, it says
18 ADOC central office staff and facility leadership
19 do not consistently follow policies. Do you see
20 that?
21      THE WITNESS:  I'm sorry, I lost where
22 we are.
23      BY MR. LUNSFORD:
24   Q   We're down toward the bottom.
25   A   Oh, I see, you jumped down. Can you

Page 335

1  reread it?
2    Q   ADOC central office staff --
3    A   I got it, I got it, I got it. Okay,
4  I see it.
5    Q   What information do you have that in
6  any way supports that statement?
7       MS. WARD:  Object to form.
8       THE WITNESS:  Based on my interaction
9  with inmates and family members about -- there
10 have been numerous references to -- well, central
11 office staff, excuse me. That is a statement
12 that is consistent with what our team
13 investigated, and it comes from that source.
14      MR. LUNSFORD:  Can you identify for me
15 one member of the central office staff in ADOC
16 who has not followed ADOC policy on any occasion?
17      THE WITNESS:  I can't give you an
18 example right now, no.
19      BY MR. LUNSFORD:
20   Q   Then we go on to the next line. ADOC
21 does not provide programs for the majority of
22 prisoners in the facilities. Do you see that?
23   A   I do.
24   Q   I'm kind of -- help me understand what
25 you understood that to mean at the time you

Page 336

1  signed this.
2    A   So just a blanket --
3    Q   Help me understand what you meant by
4  this.
5    A   Inmates call me all the time and
6  reflect upon the fact that the vast majority of
7  them are sitting idle 24/7.
8    Q   Have those inmates completed programs?
9    A   At times they have; at times maybe
10 not. I'm not --
11      (Simultaneous speaking.)
12   Q   Have you --
13   A   -- sure.
14   Q   -- ever encouraged an inmate in these
15 phone calls --
16      MS. WARD:  Bill, he's -- you're
17 cutting him off.
18      MR. LUNSFORD:  Sorry.
19      THE WITNESS:  It's all right.
20      MS. WARD:  Just let him finish his
21 answer, please.
22      THE WITNESS:  Well, I said, at times
23 I have, at times I haven't, so.
24      MR. LUNSFORD:  Have you encouraged
25 inmates to participate in programs?

Page 337

1       MS. WARD:  Object to form.
2       THE WITNESS:  I may have told an
3  inmate or asked an inmate have you done this,
4  have you done that, something along those lines,
5  but it's not my role to encourage them to do
6  this, that, or the other inside the prison.
7       MR. LUNSFORD:  So my question is this.
8  Have you done any review to determine how many
9  inmates are eligible for a program and have
10 elected not to take it?
11      THE WITNESS:  I don't have that
12 information. I wouldn't have a way of accessing
13 how many elected not to take it.
14      BY MR. LUNSFORD:
15   Q   Every ADOC facility offers some form
16 or programming, correct?
17   A   I'm not 100 percent sure about that,
18 but I know that there's a lot of programs. I
19 don't know if every facility offers programming.
20   Q   Before you signed this interrogatory
21 -- before you signed the interrogatory, did you
22 review the programming offerings at every
23 facility?
24   A   I did not.
25   Q   Before you signed this interrogatory,

85 (Pages 334 - 337)

Page 338

1  did you evaluate the different types of programs
2  that are available across the State of Alabama?
3      A    Through the many years of talking to
4  the inmates, I have gained a knowledge of the
5  types of programs that are available.  They
6  talked about them for all the different prisons
7  and they switch at times, moving from one prison
8  to the next.  So I've gained a decent bit of
9  knowledge about that through those conversations.
10     Q    Do you know how many much extra capacity
11  ADOC has in its programs currently?
12     A    For more inmates, you mean?
13     Q    Yes.
14     A    I do not.
15     Q    At the time that you signed this, do
16  you know if there was enough programming space
17  and programming activity for every inmate at
18  every institution?
19     A    I do not know that.  I think one of
20  the key issues that the inmates identify is that
21  the programming is either repetitive,
22  ineffective, and they've taken it multiple times,
23  kinds of things.  And therefore, they've tapped
24  out, there's nothing to do.
25     Q    But you say here a majority, so 51

Page 339

1  percent of the prisoners don't have access to
2  programming, is that what you're saying?
3          MS. WARD:  Object, privilege.  Do not
4  answer.
5          MR. LUNSFORD:  How -- I guess my
6  question is this, Mr. Williams, do you have any
7  understanding of how many inmates today in
8  Alabama, if they decided they wanted to
9  participate in a program, have a program
10  available to them?
11         THE WITNESS:  I don't have the raw
12  numbers, no.
13         BY MR. LUNSFORD:
14     Q    The next line says ADOC does not
15  provide enough yard time for prisoners in the
16  facilities.  Do you see that?
17     A    Yes.
18     Q    Okay.  So, and A-side of Limestone,
19  how much yard time do they receive on A-side of
20  Limestone?
21     A    Right now, I'm not sure how much they
22  receive of late.  Throughout all the prisons,
23  yard time is down according to my phone calls.
24     Q    What is enough yard time?
25         MS. WARD:  Object, privilege.  Do not

Page 340

1  answer.
2          MR. LUNSFORD:  Is an hour enough yard
3  time?
4          MS. WARD:  Object, privilege.  Do not
5  answer.
6          MR. LUNSFORD:  Is 12 hours enough yard
7  time?
8          MS. WARD:  Object, privilege.  Do not
9  answer.
10         MR. LUNSFORD:  Do all inmates at all
11  facilities receive the same amount of yard time?
12         THE WITNESS:  I believe the answer to
13  that, based on the phone calls I have, is no.
14         BY MR. LUNSFORD:
15     Q    Let me ask a question --
16     A    It's also not the same --
17     Q    I'm sorry.
18     A    -- within facilities, meaning
19  different dorms might have more than others.
20     Q    What did you do prior to signing these
21  interrogatories to feel comfortable attesting to
22  the fact that ADOC does not provide enough yard
23  time for prisoners in the facilities?
24     A    Again, it's based on my conversations
25  with inmates extensively throughout all the

Page 341

1  prisons about how little yard time they have.
2      Q    Next page, page 14, we're talking
3  about physical conditions.  You used the phrase
4  design capacity.  What did you understand design
5  capacity to mean?
6      A    That when the prison was originally
7  built, that all the infrastructure related to
8  every component of the facility, including
9  plumbing, was designed to sustain a certain
10  population size and probably also from the
11  standpoint of security of being able to properly
12  control the inmates, the number of inmates for
13  which the design was intended, and that that
14  would then maintain a safe running prison.
15     Q    Where did you gain that understanding
16  from?
17     A    That's sort of a combination of common
18  sense and also in discussions with people that
19  have had more experience than I.
20     Q    Did you ever read that definition in
21  a deposition?
22         MS. WARD:  Object, privilege.  Do not
23  answer.
24         MR. LUNSFORD:  Reading a deposition is
25  privileged?

Page 342

1         MS. WARD:  So any work he does on
2    behalf of the litigation team is privileged.
3         MR. LUNSFORD:  So if he read -- okay.
4    So you're not going to let him testify as to
5    whether he read a deposition and found that
6    definition?
7         So can you tell me anyone who's ever
8    said publicly that definition you just referred
9    to as the definition of design capacity?
10        THE WITNESS:  I can't.
11        BY MR. LUNSFORD:
12    Q    Do you know who derived the design
13    capacity for Bibb Correctional Facility?
14    A    No, I don't.
15    Q    Do you know what -- whether that was
16    an architect or a correctional specialist?
17    A    I don't know, and if I did, I forgot
18    it.
19    Q    Do you know whether design capacity
20    for any facility has been adjusted when
21    improvements or additional space has been
22    constructed?
23    A    I don't recall hearing that.  If that
24    were the case would that then increase the design
25    capacity?

Page 343

1    Q    You refer here to ADOC does not
2    consistently, thoroughly, or effectively ensure
3    adequate ventilation in the dorms.  Can you
4    identify for us any dorms that don't have
5    adequate ventilation currently?
6    A    I can't identify all of them, but it
7    is a common and a constant complaint by inmates.
8    Q    I understand it's a complaint, but you
9    talk about adequate ventilation.  And so have --
10    are you aware of any study that's been done to
11    determine the amount of ventilation in any
12    particular dorm in any ADOC facility?
13    A    Like an EPA analysis or something --
14    Q    Any analysis --
15        (Simultaneous speaking.)
16    Q    -- by HVAC contractor, by an
17    environmental specialist, anything like that?
18    A    I am not aware of any recent analysis,
19    audit, or anything along those lines that would
20    establish a scientific definition of adequate
21    ventilation.
22    Q    Do you have any training, education,
23    or experience that would qualify you to evaluate
24    the adequacy of ventilation in a dorm?
25    A    I do not.

Page 344

1    Q    Are you aware of any inmate that
2    you've spoken to who's incarcerated but has some
3    background in HVAC or environmental safety that
4    can assess, in a professional manner, the
5    adequacy of ventilation?
6    A    Several.
7    Q    Several?  And they've told you that
8    there's not adequate ventilation?
9    A    They and many others.
10    Q    Inmates?
11    A    Correct.
12    Q    Anybody other than inmates ever told
13    you there's not adequate ventilation?
14    A    I have not spoken to anybody else that
15    would --
16    Q    Can you --
17    A    -- said that.
18    Q    Can you name these incarcerated HVAC
19    specialists that we have?
20    A    I don't remember their names right
21    now.
22    Q    It also says many ADOC facilities lack
23    heating.  Which ones?
24    A    It's a pretty constant, you know, you
25    can set your clock by it every season when the

Page 345

1    weather gets colder and that we start getting the
2    calls.  And then well into the much colder months
3    where inmates essentially say the heating is
4    either off or not working.
5    Q    No, your statement that you attest to
6    says many ADOC facilities lack heating.  My
7    question is which ones are you referring to?
8    Because you don't say all of them, you said many.
9    A    Okay.
10    Q    So which is the many?
11    A    Well, as of today, as of the most
12    recent time, or as of when I signed this?
13    Q    As of the time you signed it?
14    A    Certainly Limestone, certainly
15    Donaldson, certainly Fountain, and some dorms it
16    takes place frequently and maybe not the dorms it
17    doesn't.  So you have a breakdown of the heating
18    system in a particular dorm or series of dorms.
19    So, I think that's been the case at Kilby.  I've
20    had complaints like that from Easterling and
21    Ventress as well.  I don't know if that's all of
22    them, but it seems like it's been all of them.
23    Q    Are you saying there's no heating unit
24    installed at all or that it's not functioning?
25        MS. WARD:  Object, privilege.  Do not

87 (Pages 342 - 345)

Page 346

1  answer.
2        MR. LUNSFORD:  Are you aware of any
3  ADOC facility that has operational heating or had
4  operational heating at the time you signed this?
5        THE WITNESS:  Well, there may be
6  individual dorms, but I wasn't specifically aware
7  of them.
8        MR. LUNSFORD:  Have you done anything
9  to track which facilities you claim lack adequate
10  heating?
11        MS. WARD:  Object to form.
12        THE WITNESS:  Beyond noting it in --
13  when the information comes in, I've not created a
14  database of any sort.
15        MR. LUNSFORD:  You mention in here,
16  down below, blind spots.  You said the facilities
17  have several blind spots.  Have you done anything
18  to map the location of blind spots?
19        THE WITNESS:  No, not as such.  It's
20  not always easy for me to know exactly like you
21  would know on a blueprint where those blind spots
22  are.  They're described to me, and then I take
23  note of that.
24        BY MR. LUNSFORD:
25    Q    Do you know if any incident has ever

Page 347

1  occurred in any of those blind spots?
2    A    I believe many incidents have occurred
3  --
4    Q    That's not what I asked.  Do you know,
5  these blind spots referenced on page 14 of your
6  interrogatories, do you know if there's ever been
7  a documented incident of an inmate being harmed
8  in any of those blind spots?
9    A    So you mean in an ADOC incident
10  report?  Is that what you mean by --
11        (Simultaneous speaking.)
12    Q    I mean a confirmed incident, what --
13  that it actually occurred?
14    A    I'm sorry, a confirmed incident --
15    Q    A confirmed incident that actually
16  occurred?
17    A    Well, are you accepting it occurred if
18  an inmate told me it occurred?
19    Q    No.
20    A    Well, then -- then I don't have that.
21    Q    There are some statements down below
22  them I'm curious about.  You said ADOC's current
23  plan to build a new prison in Elmore is over
24  budget and delayed at only 25 percent complete.
25        Do you know when the Elmore County

Page 348

1  facility is -- which is now the Governor Kay Ivey
2  Correctional Complex, when it's due to be
3  complete?
4    A    It's slated to be completed in May of
5  '26.
6    Q    Okay.
7    A    Per Commissioner Hamm's
8  representations.
9    Q    Were you aware that a staffing
10  analysis had been done of the prospective design
11  of that facility?
12    A    I think I've read that somewhere or
13  was aware of it.
14    Q    Then this statement, there's no
15  publicly allocated money to fully fund any
16  additional new ADOC prison facility.  Do you see
17  that?
18    A    Yes.
19    Q    Do you understand that that's no
20  longer true?
21    A    I'm aware that it's no longer true.
22    Q    Do you know what efforts ADOC
23  undertook to address the physical conditions
24  inside its prisons beginning prior to DOJ's
25  investigation?

Page 349

1    A    I don't have -- no, I don't have much
2  information on that.
3    Q    Were you aware that Commissioner Dunn
4  did a facility by facility assessment in terms of
5  deferred maintenance?
6    A    I believe I, at one point, got wind of
7  that, but I don't have specifics of it.
8    Q    Do you know how much money ADOC has
9  devoted to correcting maintenance issues within -
10  - inside its facilities?
11    A    When you say devoted, does that mean
12  budgeted or actually spent?
13    Q    Either?
14    A    Well, because the -- I don't know the
15  exact figures, but I can tell you that from my --
16  the inmates that call me that have worked on
17  maintenance that there's a budget that frequently
18  is not spent anywhere near to its fullest.
19    Q    And that's based exclusively on the
20  testimony of inmates?
21    A    Yes, and in some cases, they are
22  speaking to their free world supervisors who
23  indicate this to them.
24    Q    Well, you can review ADOC's
25  expenditures that are publicly available, right?

88 (Pages 346 - 349)

Page 350

1     A    In theory.
2     Q    Have you reviewed them to determine
3 whether what you're being told is true?
4     A    I'm not sure I could do the analysis,
5 the forensics of looking at something like that
6 and determining whether or not they fixed some
7 tiles.
8     Q    Do you know why inmates sleep on the
9 floor if they're assigned a bed?
10    A    There are a variety of reasons.
11    Q    What are those reasons?
12    A    Frequently, it's either they have been
13 not allowed on their racks by other inmates,
14 usually gang members who don't want them anywhere
15 near.  They sometimes are sleeping on floors of
16 dorms that they're not assigned to because they
17 can't stay in the dorms that they were in.  They
18 will suffer violence along -- or something along
19 those lines.
20         It's possible that, at times, it's
21 related to drug debts, but usually it's the
22 threat of violence that prevents them from having
23 a rack and having to sleep on the floor.
24    Q    In your current position, do you have
25 the authority, if you determine or identify that

Page 351

1 a crime has been committed in an Alabama prison,
2 do you have the authority in your current role to
3 refer that to the local U.S. Attorney's Office
4 for prosecution?
5     A    The criminal division, you mean --
6     Q    Yes.
7     A    -- the criminal side?  I can -- I
8 would refer it to my supervisors for
9 consideration, if that's the case.
10    Q    Who's your supervisor?
11    A    Direct supervisor is Kerry Dean.
12    Q    Do you have an indirect supervisor?
13    A    Not on the team.
14    Q    Who would that be?
15    A    Well, that's someone here at SPL who's
16 not on the Alabama investigation.
17    Q    Have you worked with Ken Ray on any
18 other cases?
19    A    Other than Alabama?
20    Q    Yes.
21    A    No.
22    Q    What about Marty Horn?
23    A    No.  Wait a minute.  No, I did,
24 briefly on Mississippi.  Is that right?  I think
25 that's right.

Page 352

1         MR. LUNSFORD:  Why don't we take a
2 brief break?  It'll give me a minute to try to
3 get that --
4         THE VIDEOGRAPHER:  Going off the
5 record at 4:51 p.m. Eastern Time.
6         (Whereupon, the above-entitled matter
7 went off the record at 4:51 p.m. and resumed at
8 4:56 p.m.)
9         THE VIDEOGRAPHER:  This is video file
10 number five, back on the record at 4:56 p.m.
11 Eastern Time.
12        MR. LUNSFORD:  I had a question I
13 meant to ask on page 12 of the interrogatory
14 responses.
15        THE WITNESS:  Okay.
16 BY MR. LUNSFORD:
17    Q    There is a statement here, it's six
18 lines up from the bottom, it's in the middle of
19 the page.  It starts ADOC does not consistently,
20 thoroughly, or effectively communicate relevant
21 information between shifts in the facilities.  Do
22 you see that?
23    A    Yes, I do.
24    Q    At the time that you executed this set
25 of interrogatories, what did you understand

Page 353

1 relevant -- what types of relevant information
2 should be shared between shifts?
3     A    Well, a lot of potential things.  You
4 -- essentially revolving around what might be
5 going on in the dorm that might explode, that
6 might lead to a violent incident and/or an
7 individual who has come to you to say that
8 they're in danger and what that situation might
9 be, something that would be relevant for the next
10 person coming on the shift to be aware of if
11 they're looking out for that.
12    Q    What -- will -- were you ever present
13 at shift change?
14    A    I was not -- no, I don't think I was.
15 No, I don't think I was.
16    Q    Have you ever been present during an
17 exchange between housing unit officers during
18 shift change?
19    A    Well, I've not been behind the wall if
20 you recall.
21    Q    Do you know what information unit
22 officers exchange during shift change?
23    A    I don't have the full range of
24 information they exchange, no.
25    Q    Well, do you have any range of

89 (Pages 350 - 353)

1  information of what's exchanged?
2      A   I think I'm aware of the fact that
3  they will talk, and then so they might share
4  something, but I'm not sure what exactly it is.
5      Q   I guess my question is how do you
6  conclude that there's no effective communication
7  of relevant information between shifts if you
8  don't know what was communicated?
9      A   It's -- my initial response is based
10  on information that I normally glean in the way
11  that I do my investigatory work for the team.
12  And the rest of this is based on other work that
13  the team does overall.
14      Q   Do you have access to any information
15  about what information is shared between shifts
16  at the facility during shift change or between
17  shifts?
18      A   I don't have specific information
19  about what is shared.
20      Q   Are you saying you've received
21  information from inmates about what information
22  is exchanged?
23      A   Yes.
24      Q   Well, are the inmates in the front
25  lobby during shift change?

1      A   They are not.
2      Q   Are the inmates in the shift
3  commander's office when shift change happens?
4          MS. WARD:  Object to form.
5          THE WITNESS:  I believe, generally,
6  they are not.
7          MR. LUNSFORD:  Is there information in
8  the log book about what happened during the prior
9  shift?
10          THE WITNESS:  I do not know if it's in
11  the log book.
12          BY MR. LUNSFORD:
13      Q   And does the oncoming shift have
14  access to the log books where details about the
15  prior shift is included?
16      A   In -- yes, it has access to it if it's
17  logged.
18          MR. LUNSFORD:  I'm going to hand you
19  what I've marked as Defendant's Exhibit 4.  See
20  if you recognize that.  Do you recognize this
21  document?
22          (Whereupon, the above-referred to
23  document was marked as Defense Exhibit No. 4 for
24  identification.)
25          THE WITNESS:  I have a recollection of

1  seeing it before, yes.
2          MR. LUNSFORD:  Okay.  This is
3  Administrative Regulation 440 that deals with
4  inmate drug screening.  As you can see, this was
5  in place at the time you executed these
6  interrogatory responses, correct?
7          THE WITNESS:  That is correct.
8          BY MR. LUNSFORD:
9      Q   Did you review this AR prior to
10  executing the interrogatories?
11      A   I don't recall specifically if I did
12  or not.  I know it's dated before then, but I'm
13  not sure if we had it.  But I don't recall --
14  either way, I don't recall reviewing it.
15      Q   Do you know the last time you reviewed
16  this AR440?
17      A   I couldn't tell you exactly when.
18      Q   Do you know what AR440 calls for in
19  the event that an inmate tests positive for any
20  type of drug use?
21      A   I don't know the exact details of
22  this, but I'm imagining it's some combination of
23  screening the individual and then punishing the
24  individual.
25      Q   Were you aware that there's an

1  expectation that individual is offered drug
2  treatment?
3      A   I have heard that as well, yes.
4      Q   Are you aware that inmates can refuse
5  drug treatment?
6      A   Yes, I am.
7      Q   Do you know if an inmate tests
8  positive for illicit substances and refuses drug
9  treatment that they're disqualified from other
10  programming?
11      A   I've heard that.  I don't know the
12  specific policy that indicates that, but I'm
13  aware of that.
14      Q   But you don't have any specific
15  recollection of considering this AR440 prior to
16  executing your -- these interrogatories, do you?
17      A   I do not.
18      Q   Are there documents, Mr. Williams,
19  that you wish you had reviewed prior to executing
20  these interrogatories?
21      A   As I sit here today, I cannot give you
22  a list of them, no.
23      Q   Did you expect to have to sit for a
24  deposition at the time that you executed the
25  interrogatory responses?

Page 358

1    A    I don't think I did, no.
2    Q    What -- you say that, were you
3  surprised that you were -- your deposition was
4  requested?
5    A    No, I was not surprised, but at the
6  time I was not necessarily expecting it.
7    Q    Can you provide me with any more
8  clarity about additional financial resources that
9  the United States claims is available to the
10  State of Alabama?
11    MS. WARD:  Object, privilege.  Do not
12  answer.
13    MR. LUNSFORD:  Are you aware that ADOC
14  is utilizing private security guards to fill non-
15  contact posts within its facilities?
16    THE WITNESS:  Based on -- yes, I
17  believe I am aware of that based on both inmates
18  telling me and seeing documents to that effect.
19    BY MR. LUNSFORD:
20    Q    Would that be considered an
21  alternative staffing model that would be
22  something along the lines of what was mentioned
23  in your interrogatory responses?
24    A    It is definitely an alternative method
25  of staffing.  As to whether or not it's effective

Page 359

1  and sustainable on its own is a different
2  question.
3    Q    In your communications with inmates,
4  do the inmates know the locations of the videos -
5  - cameras inside the facilities?
6    A    Usually they do, yes.
7    Q    Are -- do they typically know what's
8  being captured on video?
9    A    Well, they don't know how the cameras
10  literally function, so it's hard -- they would
11  not be able to tell you that.
12    Q    Are you aware that violence actually
13  increased after cameras were installed at St.
14  Clair?
15    A    I have no knowledge of those
16  statistics.
17    Q    Do you know how many cameras ADOC has
18  installed during the pendency of this case?
19    A    I do not.
20    Q    We have received several requests for
21  camera footage from -- for discrete incidents
22  from the United States, are you aware of that?
23    A    Yes, I am.
24    Q    Those discrete instances when videos
25  have been requested, we understand, is based on

Page 360

1  specific instances that have been reported by
2  inmates, right?
3    A    It was a combination of that or a
4  review of documents from ADOC where you wanted to
5  see what it looked like.
6    Q    Do you know how many different
7  excerpts of videos you've received?
8    A    I couldn't tell you.
9    Q    Have you reviewed all of them?
10    A    I have reviewed some, but I am not the
11  one who's reviewed all of them.  I think it's
12  been a team effort.
13    Q    Were there any particular instances
14  when the videos confirmed what you had been told?
15    A    Yes.
16    Q    Which instances were those?
17    A    Many, I don't -- I'm not going to be
18  able to remember all of them.  The one that
19  stands out was the one that resulted in a
20  homicide essentially.  I think that might have
21  been Staton or something like that.  It involved
22  the beating of an inmate with a broom handle, and
23  he later, not too long after, died of brain
24  bleeding.
25    Q    Were there any instances when the

Page 361

1  videos did not confirm what you were told?
2    A    Well, sometimes videos were maybe not
3  as conclusive about all the details, but I
4  personally can't sit here right now and say that
5  they were all 100 percent conclusive.  It may
6  have been some that were not conclusive, but I
7  don't recall all of those.
8    Q    Are there any other facts or
9  circumstances that you relied upon in executing
10  these interrogatories that you've not told me
11  about?
12    A    Not that I'm aware of.
13    Q    On the physical facility issue at the
14  very end of your interrogatories, you mention
15  structural problems.  Could you tell me what
16  those are?
17    MS. WARD:  Object, privilege.  Do not
18  answer.
19    MR. LUNSFORD:  Are you aware of any
20  facility that has roof leaks?
21    THE WITNESS:  Yes, I am.
22    BY MR. LUNSFORD:
23    Q    Which facilities?
24    A    As of right now, or at the time that
25  I signed this?

91 (Pages 358 - 361)

Page 362

1    Q    At the time you signed it.
2    A    I'm not going to be able to remember
3  them in any detail.  But roof leaks essentially
4  are a pretty common, repeated observance by
5  inmates.  And when it rains, the calls invariably
6  were -- invariably mention at pretty much any
7  location you can -- you can cite.
8    Q    So the roof leaks at every facility,
9  is that your testimony?
10    A    But not necessarily in every -- every
11  single dorm or every single building.
12    Q    Do you know which facilities have
13  undergone roof repairs?
14    A    I do not know that at this time, no.
15    Q    Let's go back to this, I want to ask
16  -- this sentence on the bottom of page 14 says
17  ADOC takes years or fails to address major
18  condition or structural problems inside the
19  facility.  What's a major condition?
20    MS. WARD: Objection, privilege.  Do
21  not answer.
22    MR. LUNSFORD: What -- give me an
23  example of a major condition that ADOC has taken
24  years to address?
25    THE WITNESS: If one is -- the measure

Page 363

1  is to adequately address, it would -- certainly
2  any -- all of the scenarios involving mold.
3    BY MR. LUNSFORD:
4    Q    Okay, so a major condition would be
5  mold?
6    A    It's a major health hazard.
7    Q    Okay, what else?
8    A    Well, the leaky roofs or the leaky,
9  you know, leaky roofs, the plumbing --
10    Q    You're saying -- can you identify a
11  facility that has had a, quote, leaky roof for
12  years?
13    A    I can't confirm if it's been for
14  years, but I have consistently for years gotten
15  those references or those informations.
16    Q    Can you identify a structural problem
17  that's existed for years inside an ADOC facility?
18    A    Right now, I can't remember that, but
19  I have spoken to inmates who were on maintenance
20  and who refer to such problems in various
21  prisons, yes.
22    Q    But you can't tell me a single
23  facility right now where that exists?
24    A    I could -- I would be guessing, based
25  on my memory, I think Limestone has had problems.

Page 364

1  I think Bibb is one of them for sure.  And then
2  there are probably others, but I can't remember.
3    Q    Is there any particular facility that
4  you believe is taking measures to address inmate
5  on inmate physical violence?
6    A    Well, I don't view it as a facility by
7  facility issue alone because camps have changed
8  their character over the time that I've been
9  working on this case when I first began.  I was
10  not hearing about as much at Limestone as I do
11  now, for example.
12    So if you take measures, it's my
13  understanding, you're shuffling inmates around.
14  You might try to make Bibb into a program prison
15  and then start shifting some of your problem
16  inmates out of Bibb, but then they end up
17  somewhere else.
18    At any given time, wherever you're
19  sending your problems, that's where the flare-ups
20  are going to happen more regularly.  And then the
21  time will come where at that prison, you can no
22  longer take the level of violence and chaos
23  there, so then you move that problem to the next
24  prison.
25    So it's a hard question to answer, but

Page 365

1  that's because it's a systemic thing.  It's --
2  you can move the problem around, but basically
3  the problem is in the foundation of how it's
4  being run and how it's able to function so that
5  any prison is, in practice, a problem.
6    Q    If you were to be asked by the judge
7  which facility you would live in, if you were
8  going to live in any facility, which one would
9  you tell her?
10    A    It's a question of what dorm.  If I
11  can be guaranteed a particular dorm in a
12  particular facility, I might be able to answer
13  that.
14    Q    Is that to say there are safe dorms at
15  every facility?
16    A    Safer, but not safe.
17    Q    Are they reasonably safe?
18    MS. WARD: Object, privilege.  Do now
19  answer.
20    MR. LUNSFORD: We have some time left,
21  but I'm going to stop there and just say we're
22  going to hold the deposition open.
23    We have a lot of, obviously, discovery
24  disputes about what happened today, and we'll
25  raise those with the appropriate authority, and

92 (Pages 362 - 365)

Page 366

1  then we'll decide how we proceed from there.
2      MS. WARD:  And that's your
3  prerogative.
4      We will take a quick break and then
5  may have a few questions.
6      MR. LUNSFORD:  Okay.
7      THE VIDEOGRAPHER:  Going off the
8  record at 5:13 p.m. Eastern Time.
9      (Whereupon, the above-entitled matter
10  went off the record at 5:13 p.m. and resumed at
11  5:15 p.m.)
12      THE VIDEOGRAPHER:  This is file number
13  six, back on the record at 5:15 p.m. Eastern
14  Time.
15      CROSS EXAMINATION
16      BY MS. WARD:
17  Q    All right, Mark, I just have a few
18  follow-up questions.  As you testified earlier,
19  you are an employee of the Department of Justice,
20  is that -- that's correct?
21  A    That is correct.
22  Q    And as part of your job as an
23  employee, you are part of a large litigation team
24  on this case?
25      MR. LUNSFORD:  Object to the form.

Page 367

1      THE WITNESS:  That is correct.
2      MS. WARD:  Have you reviewed every
3  incident report?
4      THE WITNESS:  That has been produced?
5  I have not.
6      BY MS. WARD:
7  Q    Have you reviewed every LESD file?
8  A    I have not.
9  Q    Have you watched every video?
10  A    I have not.
11  Q    Have you reviewed every policy?
12  A    I have not.
13  Q    Do you have possession, a personal
14  knowledge of every response provided in our
15  interrogatories?
16  A    I do not.
17  Q    Was anything that you reviewed in our
18  interrogatories inconsistent with anything that
19  you obtained in your work?
20      MR. LUNSFORD:  Object to the form.
21      THE WITNESS:  Nothing was inconsistent
22  with what I learned through my work.
23      MS. WARD:  Okay.  I don't have any
24  further questions.
25      MR. LUNSFORD:  Okay.  Thank you, Mr.

Page 368

1  Williams.
2      THE WITNESS:  Thank you.
3      THE VIDEOGRAPHER:  Since there are no
4  more questions, we're going off the record at
5  5:16 p.m. Eastern Time.
6      (Whereupon, the taking of deposition
7  in the above-entitled matter was concluded at
8  5:16 p.m., signature having NOT been waived.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 369

1      C E R T I F I C A T E
2  This is to certify that the foregoing transcript
3  Deposition of: Mark Williams
4  In the matter of: USA v Alabama
5  Before: US District Court
6  Date: 04-08-25
7  Place: Washington, D.C.
8  were duly recorded and accurately transcribed
9  under my direction; further, that said transcript
10  is a true and accurate record of the proceedings;
11  and that I am neither counsel for, related to,
12  nor employed by any of the parties to this action
13  in which this deposition was taken; and further
14  that I am not a relative nor an employee of any
15  of the parties nor counsel employed by the
16  parties, and I am not financially or otherwise
17  interested in the outcome of the action.
18
19
20
21
22  _____
23  Court Reporter
24
25

93 (Pages 366 - 369)

Page 370

1  KERRY K. DEAN, ESQ.
2  kerry.k.dean@usdoj.gov
3          April 18, 2025
4  RE: United States Of America v. State Of Alabama, et al.
5    4/8/2025, Mark Williams (#7224402)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com.
16   Return completed errata within 30 days from
17  receipt of testimony.
18   If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 372

1  United States Of America v. State Of Alabama, et al.
2  Mark Williams (#7224402)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Mark Williams, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____    _____
12  Mark Williams                Date
13  *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Page 371

1  United States Of America v. State Of Alabama, et al.
2  Mark Williams (#7224402)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____    _____
24  Mark Williams            Date
25

**[01971 - 33]**

| **0** |
|---|
| **01971**  1:8 4:10 |
| **02**  37:19 |
| **04-08-25**  369:6 |

| **1** |
|---|
| **1**  3:6 26:25 |
| 81:22 94:15,18 |
| 250:16 |
| **1,542**  92:10 |
| **1,657**  92:14 |
| **1,861**  92:6 |
| **10**  59:3 296:20 |
| 300:17 301:13 |
| **10,000**  51:17 |
| **100**  2:14 267:7 |
| 337:17 361:5 |
| **103**  319:9 |
| **108**  319:11 |
| **10:48**  93:1,3 |
| **11**  213:1 |
| **11:12**  93:4,6 |
| **11th**  222:12 |
| **12**  68:1 340:6 |
| 352:13 |
| **12082**  369:22 |
| **12:52**  187:1 |
| **12th**  222:15 |
| **13**  39:12 331:4 |
| **138**  319:9,10 |
| **13th**  222:16 |
| **14**  18:17 31:4 |
| 341:2 347:5 |
| 362:16 |

**14th**  21:15
222:18
**15**  59:3 67:25
68:13
**150**  1:19
**17**  5:23 7:8
11:22 39:12
40:16,16 44:13
96:8
**18**  46:2 97:23,25
102:3,8,19
103:1,17 370:3
**1801**  2:4
**1994**  37:10
**1:31**  187:2,4

| **2** |
|---|
| **2**  3:7 95:21,23 |
| 96:3 135:1 |
| 188:20 235:16 |
| 235:23,24 261:1 |
| **20**  118:6 243:22 |
| 264:20 372:15 |
| **200**  2:13 79:20 |
| **2000**  45:25 |
| **2001**  37:19 |
| **2013**  6:2 |
| **2017**  6:2 7:11,12 |
| 7:18 40:5 41:3 |
| 44:15 |
| **2019**  319:12 |
| **202-258-3036** |
| 2:9 |

**2020**  86:23
106:13 120:14
120:18 141:13
142:2 260:7
296:24 297:3,10
298:2 299:5,21
319:12
**2021**  14:5 15:1
73:8 141:25
260:6 296:25
297:6,11 298:2
299:5,12,21
319:12
**2022**  5:21 105:6
105:11,25
119:13 121:8
141:6,9,11,25
260:3 296:25
299:13
**2023**  3:11 25:8
105:7,11 119:10
141:11,25 260:3
298:11,16,20
**2023's**  105:8
**2024**  25:8 86:23
87:22 96:6
118:25 259:25
260:6 297:13
298:18
**2025**  1:13 4:5
370:3
**205-603-3599**
2:5

**20530**  2:8
**21**  52:12 54:21
54:24 73:7
118:6
**22**  73:7 118:6
329:18
**23**  25:8 329:18
**231**  18:17 31:4
**235**  3:8
**24**  25:9 35:15
52:14 105:5
294:13
**24-00494**  3:9
**24/7**  89:10,18
181:10 336:7
**25**  347:24
**255**  3:9
**256-936-5615**
2:15
**256-936-5650**
2:15
**26**  348:5
**28th**  96:6
**2:20**  1:8 4:10

| **3** |
|---|
| **3**  3:8 235:13,19 |
| 237:10 250:5,7 |
| 250:15 |
| **30**  3:11 16:7 |
| 370:16 |
| **300**  81:18 |
| **33**  112:6 |

**35203-2101** 2:5
**35801** 2:14
**36** 294:15
**366** 3:3
**37** 16:7
**38** 16:7
**3:20** 283:8,10
**3:33** 283:11
**3:34** 283:13
**3rd** 5:21

**4**

**4** 3:9 283:13
   355:19,23
**4/8/2025** 370:5
**42** 276:24
**44** 92:17
**440** 3:10 356:3
**48** 294:18,19
   295:3
**4:51** 352:5,7
**4:56** 352:8,10
**4th** 2:4

**5**

**5** 3:3 81:22
   97:23
**51** 338:25
**5:13** 366:8,10
**5:15** 366:11,13
**5:16** 368:5,8
**5s** 82:17

**6**

**6** 98:13 104:20
   188:20
**64** 221:12,14
**65** 222:18

**7**

**7** 204:18 222:12
   238:16
**72** 290:18
   291:21 294:23
   295:10
**7224402** 370:5
   371:2 372:2
**75** 211:24
   223:10
**785** 92:1

**8**

**8** 1:13 138:4
   222:11 249:23
   258:18 261:1
   279:5
**80** 88:4,19 89:23
   90:3,7,12,13
**800** 50:11
**8th** 4:5 21:15

**9**

**9** 279:5 282:5
   283:16
**90** 312:2
**94** 3:6 37:11
**95** 3:7

**950** 2:8
**9:00** 53:7
**9:04** 4:2,4

**a**

**a.m.** 4:2,4 53:7
   93:1,3,4,6
**aaron** 45:13
**abiding** 104:1
**ability** 61:20
   65:23 78:25
   79:22 111:13
**able** 19:17 20:6
   28:12 40:15
   58:2 59:8 66:17
   68:11 69:18
   78:12 79:25
   83:19 92:3
   105:20 120:15
   125:8 126:9
   127:7 129:22
   130:3 156:13
   165:25 170:4
   206:23 219:6
   245:14 265:22
   281:9 296:5
   303:9 304:14
   309:2,18 341:11
   359:11 360:18
   362:2 365:4,12
**above** 93:2
   94:17 95:22
   147:14 186:25
   235:18 269:1

283:9 352:6
   355:22 366:9
   368:7 370:6
   372:7
**absolutely**
   237:25 238:5,8
   264:4
**abundance** 65:7
   65:8
**abuse** 262:21
   264:7 278:6
   281:25 282:8,11
   283:19,20 284:1
   285:23 289:19
   289:20 292:5,12
   292:14 295:14
   295:20 296:8,24
   297:2,10 298:11
   299:1,5,12,19
   299:20,24
   319:20
**aca** 43:5
**academy** 306:24
   329:23
**accept** 309:7,10
**acceptable**
   180:22
**accepting**
   347:17
**access** 61:12,21
   89:10,16 91:5
   151:24 167:1,3
   176:9 189:13,16
   191:16 192:20

193:5 194:23
210:11 263:14
281:8,9 286:15
311:20 339:1
354:14 355:14
355:16
**accessing** 91:14
337:12
**accidents**
321:23
**account** 209:15
209:16
**accumulation**
263:9
**accuracy** 97:6
370:9
**accurate** 50:2
96:16 114:21
158:10 161:16
176:11 181:8
309:15 322:14
324:16 325:25
369:10
**accurately**
124:6 128:13
129:19 130:8
131:16,24
132:16 141:3
147:14,16 369:8
**accusation**
139:3 261:23
**accusations**
261:18

**accused** 305:25
**acknowledge**
18:20 198:18
**acknowledge...**
372:3
**acknowledgm...**
370:12
**acquaintances**
60:6
**acronym** 13:1
**act** 10:2 20:6,9
85:1 169:15
172:19 232:3
260:18 280:16
285:10,21
**action** 1:8 3:6
204:21 205:9
207:23 208:9
216:12 219:4,11
228:20 257:24
303:15,18 305:2
369:12,17
**actions** 169:14
169:16 171:3,5
257:11
**active** 231:24
**activists** 93:23
**activities** 247:16
**activity** 76:22
78:20 214:16,21
229:2 327:25
338:17
**acts** 86:13

**actual** 60:14
155:8 164:19
191:9 259:5
299:20
**actually** 10:10
12:25 38:3
43:13 47:15
56:20 82:23
109:9 111:9
121:5 123:2
190:14,24
205:24 221:11
221:12 228:12
250:25 261:9
279:13 304:18
304:22 310:4
319:13 347:13
347:15 349:12
359:12
**ada** 10:2 65:15
**adamant** 328:20
**add** 4:20,20
102:7 195:22
216:24
**addiction** 66:6,7
**addicts** 78:23
**addition** 159:4
**additional**
147:18 342:21
348:16 358:8
**additions** 372:6
**address** 56:23
62:16 65:18
173:24 257:12

319:18 329:19
348:23 362:17
362:24 363:1
364:4
**addressed** 75:21
124:23
**adequacy**
343:24 344:5
**adequate**
238:14,22
239:14 240:7
241:19 242:23
252:11,15
325:18 343:3,5
343:9,20 344:8
344:13 346:9
**adequately**
268:16 363:1
**adjectives**
123:17
**adjusted** 342:20
**admin** 254:12
**administrative**
3:10 242:17
243:1 356:3
**admit** 316:1,7
316:10
**admitted** 104:7
218:25
**adoc** 48:1 61:11
61:19 62:14,24
63:8 64:25 71:6
71:8,25 73:16
73:21 80:15

85:4 88:6,18
91:5,18,25 92:6
92:9,13 94:7
98:2,6 100:5,12
101:5,21 102:17
105:9 107:2,14
107:22 108:6
109:10 114:11
116:14 117:13
118:2 121:12
124:6,12,17,22
124:24 125:24
126:14,25 127:3
127:10,14,19
128:2,12 129:15
130:1,8 131:16
131:24 134:14
135:9,14,20
137:2,8 138:11
138:14 139:8,20
140:3,8,17,23
144:9 147:14,16
147:20 148:5,8
148:13,24 149:7
149:12,23 151:6
155:10 156:7
157:18 159:1,11
160:8 161:23
162:12 165:10
167:8 168:1
171:3,9,15,24
172:2 173:9
174:19 175:13
176:7,17 177:10

177:19 178:21
179:7,21 180:2
181:13,21,21
183:12 184:21
188:16,21
194:13 195:15
196:3,13 198:24
199:17,18 200:6
202:12 204:8,19
207:22 208:16
208:21 209:11
209:15,16
210:19 211:1,24
212:10 213:7,21
214:19 216:3,10
216:16 217:2
218:1 219:10,13
220:5,13,18,20
223:20,25 224:9
224:22 226:25
229:20 234:12
236:25 238:12
240:18 241:2
242:7,16 243:4
243:5 245:13
249:23,23
251:22 252:18
254:4,9 255:22
256:5,11,14,19
256:24 257:9,19
262:10,18
264:21 265:11
266:24 267:1,9
267:23 268:15

268:21 269:5,11
271:3 272:15,23
273:22,24 274:1
274:4,9,13
275:11,13 276:2
276:4 277:12
278:2 282:5
283:17,24 284:8
286:20 287:16
288:6,11,17
289:18 292:6,10
293:3,16 295:22
296:12 298:3
299:13 300:2
302:2,12,20,22
303:11 304:19
305:5,23 306:6
306:11 307:6,10
308:13 310:11
314:11 315:5
316:18 317:21
318:13 319:17
320:2,4,9,21
321:18 322:10
323:15,20
324:12 325:24
326:5,14 327:9
327:22 328:8
329:14,22 330:1
330:18 331:5
332:6,22 334:18
335:2,15,16,20
337:15 338:11
339:14 340:22

343:1,12 344:22
345:6 346:3
347:9 348:16,22
349:8 352:19
358:13 359:17
360:4 362:17,23
363:17
**adoc's** 151:25
154:5 156:22
160:25 161:8,14
163:22 164:1,23
165:4,23 171:10
176:10 180:6
213:18,23
218:20 245:9
250:11,19
252:10 262:24
295:14,19
296:23 305:9,13
305:18 306:23
318:9 322:12
323:3 347:22
349:24
**adopted** 95:9
**advantage**
332:22 333:18
334:4
**affairs** 37:7
**affect** 55:23
218:24
**affiliated** 216:4
**affiliates** 210:20
**affiliation** 79:21
176:24 178:4,16

210:15 213:19
213:24 214:12
215:15,19
236:21 237:6
**affiliations**
176:11 209:17
212:18 237:1
**afraid** 64:5
103:24 104:3
205:17 225:4
**aftermath**
156:20
**agency** 8:9 9:6
9:12,18,19
11:17 12:13
17:3 19:5
228:19,22
231:13
**agent** 228:4,6
228:25 239:19
267:19,20
**ago** 54:15 76:25
105:24 319:6
**agree** 20:13,23
122:17 159:9
160:1,8 191:11
240:3 251:22
268:7 285:20
291:1,10
**agreed** 34:22
65:3 95:9 112:2
261:13
**agreeing** 282:16

**agreement**
21:23 146:3,9
146:14 224:4
225:13 236:8,10
237:12,17
**agreements**
223:21,23 225:8
225:12 233:18
233:24 234:12
234:14
**agrees** 287:3
**ahead** 111:12
141:19 220:19
229:8
**air** 227:22
229:12
**al** 1:9 370:4
371:1 372:1
**alabama** 1:1,9
2:5,14 3:8,9 4:7
4:9,24 13:18,19
15:12,24 20:23
32:25 33:11
44:10 46:23
47:4 49:7 50:12
51:2 53:6 54:2,9
54:10 73:22
75:17 76:7
93:25 94:1,8,23
98:18 99:8
103:16 104:21
113:15 115:16
117:15 158:19
159:5 171:12

187:8 188:6
193:2 194:9
195:1 197:20
210:11,16 229:4
265:7 285:14
292:2 303:22
316:24 317:4,9
317:13 318:4,9
326:17 327:6
328:15 338:2
339:8 351:1,16
351:19 358:10
369:4 370:4
371:1 372:1
**alexander** 5:15
**allegation** 88:18
89:7 100:20
139:14,16
178:24 201:18
229:2 233:8
248:21 252:17
259:6 266:10
274:2 281:22
283:17 291:8
292:9,10 302:21
**allegations** 31:8
104:7,8 200:19
200:21 238:4
259:11 261:2
262:20,24 264:6
264:23 266:5
267:23 282:8
292:4 296:23
297:2 298:10

299:10,14,20
**allege** 89:4
**alleged** 9:14
101:12 154:17
157:17 227:4
283:25 284:9,11
284:25 290:17
**allegedly** 101:5
**alleging** 88:17
98:18 295:7
322:10 333:17
**alleviate** 173:6
**allocated**
348:15
**allotted** 370:19
**allow** 20:8
124:3 190:18
203:2 311:20
**allowed** 31:1,12
31:20,24 47:8
47:12,16,18,21
48:8 49:17
169:7 189:24,25
191:16 238:1
332:14 350:13
**allowing** 180:11
**allows** 234:12
**alter** 62:14
**altercation**
106:20 151:18
234:20
**altercations**
244:24

**altered** 72:18
**alternative**
  331:7,10,16,24
  332:17 358:21
  358:24
**altman** 38:13
  144:14
**amazing** 103:22
**amended** 31:8
**amendment**
  21:15 98:7,20
  98:24 99:10,21
  101:12 107:23
  107:24 110:7
**amendments**
  99:17
**america** 1:6 4:7
  133:11 370:4
  371:1 372:1
**american** 37:5
  42:24
**americans** 10:1
**amount** 48:1
  91:12 198:19
  219:15 221:4
  315:11 316:23
  317:3,8 340:11
  343:11
**amounts** 69:15
**analyses** 322:23
  326:6 327:5
**analysis** 79:12
  117:19 128:10
  128:20 184:13

184:17 219:8,12
301:2 315:11
326:8,14,17,25
343:13,14,18
348:10 350:4
**analyze** 79:8
  115:2 317:19
**analyzed** 115:4
  233:4
**anecdote** 205:19
  205:23,23 215:8
**anecdotes** 310:8
**announced** 16:6
  32:19
**annual** 84:16
**answer** 9:15
  17:16 18:25
  19:1,17 22:20
  22:22 24:15
  25:4 26:3 29:18
  30:10,17 32:9
  32:13 49:3 51:6
  52:8,9 53:2
  68:11,13,17
  70:19,24 87:7
  101:1,24 102:6
  102:12,21
  103:19 111:8
  113:25 117:4,8
  119:11,14
  120:20 121:21
  121:22 122:25
  123:11 124:1,4
  124:11 125:9

128:1,20 129:4
138:8 145:5
146:5,20 161:12
161:18 163:2,9
165:2,7 168:16
168:17 169:7
172:8 177:16
179:13 185:22
196:16 200:12
208:13 209:9,14
210:22 212:6,7
212:25 213:11
214:18 223:16
223:18 230:11
233:14 243:13
243:18 244:4,15
245:25 246:6
253:5 256:22
257:6 258:1,6
259:8,14 263:20
268:19 273:7
274:7,12 275:18
280:2 283:2
287:21 289:9
290:2 294:7
295:12 296:5,18
298:1,22 299:7
300:15 301:6,6
301:11,17,21,25
302:25 305:12
305:17,22
310:21 313:2
316:21 317:1,6
317:11,16 320:2

322:16 323:18
325:2 331:13
333:1,15 336:21
339:4 340:1,5,9
340:12 341:23
346:1 358:12
361:18 362:21
364:25 365:12
365:19
**answered** 52:17
  150:6
**answering**
  50:20,21 52:4
  53:4 54:16
  131:14 178:11
  184:14 273:6
**answers** 112:8
  122:1 123:17
  198:12 312:3
**anybody** 177:19
  344:12,14
**anymore** 191:14
  271:20
**anyway** 48:4
  64:12 73:5
  192:11
**apologize** 35:18
  332:8
**appeal** 10:13,14
  11:7,10
**appear** 94:23
  163:18 241:25
**appearances** 2:1

**appeared** 303:7
**appears** 134:1
  161:21 195:20
  203:16
**appended** 372:7
**applicable**
  99:14 185:8
  370:8
**application**
  205:5 221:7
**applied** 39:1
  223:9
**applies** 216:24
  286:3
**apply** 39:2
  103:9 104:13
  208:17 305:10
**appointed** 34:21
  197:21 279:3
**appreciate**
  17:20
**approach** 66:10
  143:17 329:20
**appropriate**
  17:10,11,19
  18:15 106:22
  180:1,5 181:6
  229:19 233:17
  233:23 234:3
  236:6,9,11
  237:11 282:25
  301:15,23 302:6
  316:17,23
  334:10 365:25

**appropriated**
  332:23 333:5,9
  333:13,19 334:5
**approximate**
  152:3
**approximately**
  8:1 45:25
**april** 1:13 4:4
  25:7 370:3
**ar** 356:9
**ar440** 356:16,18
  357:15
**architect** 342:16
**area** 6:12 189:1
  189:9,19,19
  190:2,10,14
  194:4,10,11
  195:13
**areas** 32:23
  78:15 188:23
  189:3,14,21,23
  190:17 194:23
  194:24 195:2,8
  211:22 254:14
  258:9 327:1
**argue** 14:6
**arguments**
  100:24
**arm** 194:19,20
  194:22 242:3
**arose** 59:16
**arrange** 312:9
**arrived** 7:7
  27:18 44:12,15

  50:7 139:10
  315:20
**arrives** 7:22
  155:23
**articles** 318:8
**articulate** 17:24
**asbestos** 38:22
**aside** 202:24
  233:3
**asides** 202:20
  203:11
**asked** 8:25
  35:25 69:13
  88:10 93:12
  97:25 101:11,25
  115:8 122:22,22
  124:11 139:11
  168:1,6 173:15
  198:4 200:24
  202:8 221:21
  247:20,25
  311:12 317:20
  337:3 347:4
  365:6
**asking** 16:8
  19:13 28:16
  30:21 31:25
  42:12 43:12
  47:1 51:11 61:3
  61:5 67:19
  95:11 103:5,9
  121:1,17 129:2
  130:13,25
  137:17 143:15

  155:14 168:15
  187:18,22 188:1
  201:9,12,25
  209:19,22 210:4
  222:2,4,22
  235:16 237:20
  270:20,23
  275:25 288:22
  321:8
**aspect** 197:25
**aspects** 199:23
  199:25 239:16
**assailant** 167:21
  168:1 170:13,16
  207:1 218:12,13
**assailants**
  170:23,24
  207:23 214:6
  237:1
**assault** 86:24,25
  145:21 149:8
  151:9,11,12,17
  158:9 164:13,15
  164:19,20
  165:20,24
  166:24 167:17
  169:15 170:17
  173:11,22
  174:20 205:20
  206:3 214:4
  215:14 218:15
  233:10 259:5,6
  260:15,16
  261:25 285:7

286:6 290:17
291:17,20
**assaulted** 150:1
164:7,8 205:8
205:12 256:2
285:1 288:18
308:12
**assaulter**
206:22,24
**assaulting**
206:18,20 208:4
**assaults** 69:15
82:9 85:18
91:13,13 140:24
140:24 142:8
143:6 144:11
145:8,13 147:17
147:21 148:9
149:13,15,24
150:14,17 151:2
151:6,13 158:21
159:2,7,21
160:4,10,16,22
161:15,25
162:14 163:23
164:2,24 165:5
165:12 167:16
170:7 172:1
173:21,25
204:22 215:11
215:13 250:1,1
252:19,19 258:9
258:14,18,24
259:4,11,11

260:10,11,13,25
261:7,18,18
262:6,15 286:3
**assemble** 309:14
**asserted** 98:23
**assertion** 287:1
**assess** 58:2
66:19 79:25
120:21 122:18
140:7 144:8
309:15 310:3
317:25 326:25
344:4
**assessing**
143:20 224:14
**assessment**
69:12 333:10
349:4
**assigned** 6:22
7:21 11:13 12:2
12:24 14:5 40:9
44:10,12 105:5
178:23 179:8,23
180:2,23 181:10
181:14 183:14
184:16 185:4,11
185:12,14,16,20
195:18 197:8
198:21 215:18
324:10 350:9,16
**assigning**
210:19
**assignment**
185:4 274:10

**assignments**
208:23
**assist** 231:15
**assistant** 37:17
**assists** 241:16
**association**
42:25
**assume** 74:2
124:25 125:17
142:5 200:10
210:13 221:6,13
252:7 295:9
321:16
**assuming** 32:21
148:17 149:3
213:12 216:19
265:9 267:20
273:14 321:1,20
**assumptions**
152:24
**attached** 95:7
370:11
**attachments**
254:19
**attack** 207:24
**attacked** 86:11
308:11
**attacking** 174:3
**attacks** 218:12
**attempt** 194:14
**attempted** 72:7
89:14 220:21
311:23

**attend** 10:19
22:1,25 46:14
**attended** 16:22
22:4,9 23:2,11
24:11,13 35:7
35:10,14 37:1
41:19,22,25
45:1,19 247:13
319:23
**attention** 60:18
97:22 302:11,19
331:3
**attest** 101:11
275:25 309:13
317:20,25
325:25 326:3
345:5
**attested** 107:21
130:14 162:17
211:23
**attesting** 96:14
260:9 340:21
**attitude** 79:22
**attorney** 4:22
370:13
**attorney's** 2:4
23:5 351:3
**attorneys** 11:5
45:16 48:10
104:15 182:1
**attributable**
297:21
**audio** 246:18

**audit** 343:19
**austin** 2:19
**authorities**
  106:22,24 107:1
**authority** 19:23
  273:25 274:8
  275:12,21 276:3
  300:2 350:25
  351:2 365:25
**authorization**
  191:17
**authorized**
  193:1
**autopsy** 321:19
**available** 26:4
  32:10 84:10
  112:10 129:23
  218:8 244:25
  338:2,5 339:10
  349:25 358:9
  370:6
**avenue** 2:4,8
**average** 68:17
  186:3
**avoid** 164:8
  285:15
**aware** 19:3,13
  19:22 26:1 46:6
  46:9 50:3 53:24
  56:9 59:13
  62:18,23 63:4
  69:15 74:25
  75:3 86:22
  87:19,19 99:12

102:14,23,24
103:13,19 110:2
127:16 128:2
138:16 139:8
140:11 149:22
156:19 166:6
170:6,12 171:12
178:9 191:15
192:12,16,18
194:20 195:3
196:18 197:19
197:22 198:24
202:11 203:24
207:22 212:19
214:14 217:18
232:20 238:3
244:7 249:11,14
251:3 253:23
256:10 264:5,10
264:25 271:1
278:13 280:23
282:10 284:16
286:20,25 287:2
299:23 300:1
302:18 303:13
303:17,18,20
304:5,10 306:3
306:6,10,11,14
306:22 307:2
315:7 318:25
319:3 320:5,11
320:17 325:12
326:5,7 327:8
327:13,17,19,20

329:17,22 330:9
330:11,12,14,15
330:18 332:7,15
343:10,18 344:1
346:2,6 348:9
348:13,21 349:3
353:10 354:2
356:25 357:4,13
358:13,17
359:12,22
361:12,19
**awareness**
  171:6 298:3

**b**

**b** 80:10 81:10
  112:6
**bachelor's** 37:1
**back** 23:8 26:16
  36:23 45:11
  47:25 52:2 63:8
  70:23 91:4 93:6
  105:25 106:10
  108:22 114:10
  118:12 119:14
  120:3 123:15
  141:18,21,23
  157:11 173:18
  187:3 188:4,19
  193:18,23
  203:21 232:1
  234:11 241:12
  250:4 265:6
  270:10 272:5,8

272:19 275:23
278:10 279:4
283:13 292:15
304:18 320:14
320:18 352:10
362:15 366:13
**background**
  35:20 36:25
  175:24 327:18
  328:1 329:10
  344:3
**backup** 278:11
**bad** 68:4 78:8
  80:19
**badly** 80:6
  86:20 307:24
**ball** 334:1
**bands** 194:19,20
  194:22
**barred** 231:7,8
**barter** 216:17
**bartering**
  216:12 217:3,8
  217:10,19 218:3
  218:6,16,22
  219:9,23
**base** 183:9
  227:22
**baseball** 183:17
**based** 6:11 14:1
  19:1 27:11,22
  66:25 67:1,1
  70:12 71:20
  77:17 80:1 85:3

**[based - bibb]** Page 382

87:9,23 90:9
103:8 119:16
142:4 149:15
150:16 159:19
175:21 180:16
183:5,9 197:23
199:19,22 201:7
204:7 210:7
230:15 253:2
257:1 260:4
267:14 275:10
278:22 282:23
288:7 300:10
302:8 303:6
308:4,7 321:14
330:23 335:8
340:13,24
349:19 354:9,12
358:16,17
359:25 363:24
**baseline** 25:7,10
**basic** 58:1 193:7
232:8
**basically** 46:13
58:12 64:5 80:3
80:12,25 106:11
254:1 270:9
328:20 365:2
**basing** 149:17
**basis** 18:16,25
27:11 46:10
52:6 57:8,8
69:14 77:3
84:16 144:8

148:6 150:18
158:17 183:10
199:15,18
200:11 252:22
258:21,24 264:1
276:7 315:4
**batch** 163:18
315:19
**bathroom** 59:2
65:15 255:2,6
**bear** 290:12,13
**beaten** 61:4
307:24 308:11
309:3,7
**beating** 307:22
360:22
**beatings** 86:8,10
86:14 118:20
**bed** 185:3,4,12
185:14 196:22
196:25 197:2,3
197:7,9 198:10
198:21 270:8
350:9
**bedlam** 81:2
**beds** 197:8
268:23 269:6
270:5,6,8,12,17
271:2,14
**beef** 234:6
**began** 364:9
**beget** 242:2
**beginning** 14:16
14:19,23 15:1,4

54:15 56:6
72:12 98:13
127:22 221:7
348:24
**begins** 263:1
331:5
**behalf** 1:19 2:2
2:11 29:10
137:20 342:2
**behaviors**
244:22
**belief** 27:11,23
71:24
**believability**
58:15
**believable** 58:4
**believe** 12:17
19:18 21:22
24:21 26:7 27:8
28:7,8 30:14
31:18 33:8 34:7
36:13,17 38:23
42:1 44:23 48:6
71:14 76:8
84:16 100:8
103:14 125:3,24
127:2 128:5
130:3 137:5
148:7 175:17
176:12 181:16
189:22 193:4
196:10 201:19
210:17 217:4
220:7 224:17

226:2,13,15
229:3 236:9
237:7 240:19
243:2 244:15,25
254:13 258:25
265:19 266:1,7
266:25 267:5,16
281:6 285:13
287:13 288:13
294:14 311:3
312:21 313:4,18
313:20 327:15
340:12 347:2
349:6 355:5
358:17 364:4
**believing** 90:17
313:11
**best** 37:15 58:24
61:17 89:20
153:3
**bethesda** 38:15
**better** 59:8
66:21 119:24,25
155:19 195:7,11
268:17
**beyond** 140:16
204:2 215:6
231:13 253:5
274:1 276:4
331:20 346:12
**bibb** 69:2 72:13
72:14 81:7
92:10 116:22
117:1 118:23

**[bibb - call]**                                                    Page 383

119:4,8,9,12,19
119:23 120:4,6
120:8,11,13
121:19,23
144:20,21 145:6
145:11 188:14
205:13 303:25
304:9,21 314:7
342:13 364:1,14
364:16
**big**  81:1 171:9
198:3
**bill**  4:23 9:5,7
18:7 25:18 30:7
110:23 111:7,7
112:17,20,22
113:1 193:11
202:19 222:2
313:10 336:16
**bill.lunsford**
2:16
**birmingham**  2:5
**bit**  36:11 44:8
71:12 73:24
80:17 99:2
121:16 324:21
338:8
**blank**  62:10
**blanket**  336:2
**bleeding**  360:24
**blessing**  300:13
**blind**  307:20
346:16,17,18,21
347:1,5,8

**blocked**  270:10
271:18
**blood**  68:3
**bloody**  72:14
**blueprint**
346:21
**blur**  315:3
**blurring**  82:14
**bodily**  66:8
235:2
**book**  355:8,11
**books**  42:6,10
355:14
**bop**  35:21
**bottom**  20:10
72:25 134:17
136:2 300:17
319:11 334:24
352:18 362:16
**bound**  129:20
**boxes**  165:16
**braggs**  171:12
171:15 182:16
**brain**  360:23
**break**  93:9
125:14 145:15
186:8 276:24
277:5 283:3
352:2 366:4
**breakdown**
345:17
**breaking**  186:16
190:9,13

**breath**  202:20
203:11
**brief**  21:9 26:13
28:21 352:2
**briefly**  6:18
351:24
**bring**  23:16,20
49:17 95:1
**bringing**  312:18
313:8 314:18
315:1 332:1,2,7
**broad**  20:11
136:22 140:1
145:5 311:8
**broadly**  73:18
94:12
**broke**  190:24
**broom**  260:19
360:22
**broomsticks**
86:12
**brought**  23:24
24:7 74:2 95:12
139:5 157:24
241:11 302:11
332:9,10
**bruce**  110:18
111:19 112:1
**budget**  347:24
349:17
**budgeted**
349:12
**build**  347:23

**building**  254:12
326:25 362:11
**built**  341:7
**bulk**  11:5 55:21
**bunch**  315:18
**bunk**  255:1
270:8
**bunks**  269:20
**business**  52:24
53:1 148:18
**butler**  2:13,20
**butlersnow.com**
2:16,16
**byproduct**
315:17

**c**

**c**  2:3 4:1 6:10,10
80:11 81:4,7
236:12 250:16
369:1,1
**caci**  6:10,11
**calculation**
262:17
**call**  12:25 50:12
50:22 51:19
53:23 54:1 55:2
55:4,13 56:4,16
58:9 59:23
61:15 63:7
64:16 65:19,24
65:25 67:3
69:21,24 73:4
91:5 111:18,19

140:15 150:5
152:15 175:15
175:16 181:4
197:2,3 198:2
207:9 226:16
247:12 267:3
270:6 309:19
310:9 315:14
316:3,6 336:5
349:16
**called** 1:17 5:6
15:7 27:6 54:18
64:6,23 123:2,4
314:10,17
**caller** 54:2
**callers** 57:19
69:11
**calling** 51:22
54:23 55:10,25
56:3 57:24 58:6
58:25 60:21
63:2,9 65:18,22
70:4 309:13
312:10 316:4
**calls** 50:20,21
51:2,8,18,24
53:25 54:5,8,16
55:19,21 56:22
58:11 60:3
68:10,20,23
70:5,8,12 73:12
104:9 150:9
154:9 176:2
178:11 190:16

191:18 197:25
206:9 213:15
233:4 253:4,21
262:12 266:12
276:6 308:5
310:24 311:10
315:25 336:15
339:23 340:13
345:2 356:18
362:5
**camera** 359:21
**cameras** 89:10
232:1,5,5
307:20 359:5,9
359:13,17
**camps** 174:23
364:7
**cancer** 67:22
**canteen** 216:13
218:8 219:15,18
220:2,3,6,21
221:4
**capability** 266:1
**capacity** 29:14
29:15 81:19
99:15 100:17
181:1 338:10
341:4,5 342:9
342:13,19,25
**captain** 300:7
**captured** 359:8
**cards** 313:22
**care** 234:6
235:7

**carefully** 153:5
**carla** 2:3 4:25
9:1 45:6 102:24
**carla.ward** 2:6
**carried** 248:15
**carries** 279:5
**carry** 178:20
**case** 4:10 8:6,16
9:23 10:1,8 11:3
11:7,8 13:22
15:21 17:4 18:3
24:12 25:11
26:15 27:16
28:3,4,6,20
29:16 31:5 34:3
34:6,15 35:4,17
36:14,15 40:4
44:8,10,14
48:24 49:8 50:1
50:4,24 56:17
56:21 57:2,6
93:21 97:10,20
99:21 100:23,25
104:15,18
107:11 134:6,18
136:11 139:6,9
144:8,8,9
146:16,18 147:8
150:25 161:11
161:12 169:20
192:9 200:5,17
206:7 218:21
227:18 228:2,14
228:15,17

235:10 237:24
238:10 251:3
263:25,25
264:10 265:12
267:6,6 276:19
279:14 281:7
286:6 291:16
295:4 298:8
303:7 310:2,10
316:13 318:9,23
331:21 342:24
345:19 351:9
359:18 364:9
366:24
**cases** 12:24
13:16 14:18,19
18:22 20:13
38:23 40:2,3
43:14 69:19
94:9 146:23,25
147:3,7 192:16
227:15 228:13
267:5 298:25
307:23 321:21
322:2 349:21
351:18
**categories** 87:3
311:7
**category** 188:15
311:9
**cause** 27:14,23
261:6
**causes** 173:24

caution 65:7,8
cc 304:20
cell 54:6,11,18
  54:23 55:1,6,11
  84:24 185:19
  186:1,3 310:18
  311:2,6 316:17
cells 185:24
center 294:12
central 126:19
  126:20,25
  212:13,17
  274:14 334:18
  335:2,10,15
certain 26:19
  35:1 36:10 72:6
  78:12,19,22
  101:3 145:11
  179:19,21
  180:12 192:12
  193:5 194:23
  211:14,18
  220:21 232:23
  233:5 245:18
  246:4 264:18
  268:3 291:13
  294:16,25 300:5
  300:7 301:4
  327:2 341:9
certainly 21:2
  28:17 72:3 85:2
  85:23 143:1
  211:18 268:4
  303:5 345:14,14

345:15 363:1
certainty
  180:11 228:21
  260:3 284:3
certification
  247:14 248:7,16
certified 248:15
certify 369:2
cetera 238:24
challenge 175:1
  175:4
chang 287:7
change 62:15
  70:20 80:15
  92:18 117:8
  134:14,16,17
  135:10,15,20
  136:4,8,19
  137:3,8,9,9,11
  137:12,13
  139:11 172:6
  173:1,8,9,14,16
  174:14 205:1
  216:24 353:13
  353:18,22
  354:16,25 355:3
  371:4,7,10,13
  371:16,19
changed 40:18
  72:6 135:6
  364:7
changes 70:20
  117:11,13
  133:23 135:4,5

138:2,3,10,18
  138:22 139:18
  139:22,23,24
  140:3,8,15,18
  172:3 173:17,20
  173:23 174:9
  182:14,20,23,25
  183:2 300:3
  329:14 370:10
  372:6
changing
  134:23
channels 302:20
chaos 272:24
  364:22
chapel 181:3
character 80:16
  364:8
characteristics
  77:5,7,16,19
  79:2
characters 72:6
charge 231:11
  241:11
charged 125:5
  190:6,23 191:17
  241:14,21,24
  242:16 243:4
  245:13
charges 231:14
chase 268:14
check 165:15
  327:18 328:2
  329:10

checks 204:12
  314:3,12
cheek 45:6
choose 231:9
chris 287:7
chuck 45:7 48:6
circumstance
  139:17 236:7
circumstances
  60:14 115:25
  207:12 302:7
  323:1 361:9
cite 362:7
citizen 227:21
city 13:7,17
  36:4 330:10
civil 1:8 3:6
  4:13 6:23 40:6,9
  40:11 41:8,14
  41:18 43:9
  46:21 75:1
claim 66:15
  98:23 99:5
  334:8 346:9
claimed 175:25
claiming 111:20
claims 302:15
  358:9
clair 69:24 70:3
  182:7,8,15
  188:14 359:14
clarification
  19:14 61:8

**clarify** 13:23 49:9 106:7 110:23 141:20 187:11 223:5,15 259:22

**clarifying** 105:19 222:20

**clarity** 157:13 358:8

**class** 247:14 248:5,14

**classes** 41:19 329:24

**classification** 15:20 210:10 273:24 274:4,9 274:14,20,25 275:11 276:2,8 276:10,12

**classified** 176:14,24 177:11,21,23 178:4 279:12,22

**classify** 107:3 177:14 280:13 321:15

**clause** 147:19

**clear** 40:14 70:24,25 93:13 95:15 127:24 139:15 156:2 183:24 191:7 203:2,8 206:25 207:3,4,10

218:13 222:2,8 232:9 247:7 259:23 322:9

**clearly** 28:14 29:21 121:14 229:11 251:22

**client** 289:12 333:18

**clinic** 290:19 291:11

**clock** 344:25

**close** 21:1 36:12 36:20 109:19 190:5 255:20 294:21

**closed** 16:3,4 36:12,20

**closer** 211:19

**closet** 191:16 255:2

**coach** 103:22 141:16

**coaching** 17:20 103:21 113:17 113:25 130:18 141:17

**cocaine** 317:8

**colder** 345:1,2

**colleague** 203:14

**colleagues** 4:21 42:13

**collect** 191:12

**collected** 201:3 201:14 292:12 292:18,20 293:4 293:13,22 294:11

**collecting** 291:5 292:17

**collection** 217:17

**collective** 137:20 182:1 187:20,23 201:7

**colloquial** 50:19

**colon** 123:4

**colorado** 48:15

**combination** 59:25 117:14 169:21 341:17 356:22 360:3

**combine** 116:11

**combined** 107:15 117:20 118:1,15 132:11 198:12 243:2 282:20 333:10

**come** 27:13 38:24 53:7 68:3 91:6 100:6 122:7 123:15 128:16,18 168:4 175:25 225:4 239:24 272:23 302:15,19 353:7 364:21

**comes** 65:20 138:24 232:16 232:21 315:16 335:13 346:13

**comfortable** 202:7 210:25 211:3 222:22 288:20 340:21

**coming** 57:21 311:11 315:4 353:10

**commander** 169:2,4,13 276:16

**commander's** 355:3

**comment** 202:16

**comments** 207:19

**commingling** 183:21

**commissioner** 127:6 142:5 143:16 148:24 149:1 348:7 349:3

**commit** 204:21

**committed** 279:21 351:1

**committing** 203:5

**common** 63:15 75:15 77:4,7,19

79:2 85:25 86:8
86:13 167:23
236:24 266:18
285:6 341:17
343:7 362:4
**commonly**
75:19 286:1
**communicate**
309:22 310:2
352:20
**communicated**
176:22 308:14
354:8
**communicating**
309:17
**communication**
288:25 289:2,4
309:3 354:6
**communicatio...**
212:20 288:12
288:16 359:3
**community**  14:2
**company**
332:11
**comparatively**
70:3
**compare**  71:3
86:22 154:5
330:4
**compared**  155:8
157:16,19
**comparison**
155:9,11

**compel**  123:14
**competent**
328:16
**compilation**
87:9
**compile**  148:5
**complaint**  31:8
60:13 71:2,5
104:8 106:11
107:24 110:7
141:13 203:6
233:9 291:8
343:7,8
**complaints**
51:24 56:13
59:12 64:24
298:4 345:20
**complete**  59:5
226:21 251:1
324:12,15
325:12,25
347:24 348:3
372:8
**completed**
264:6 293:22
314:4 325:18
326:13 336:8
348:4 370:16
**completely**
28:12 36:20
159:12 237:23
308:1
**complex**  348:2

**compliance**
277:7 278:12,15
278:20
**compliant**
107:23
**complicated**
218:5 224:25
253:13 284:23
**component**
21:13 48:21
243:2 260:15,20
272:25 286:8
306:21 307:2
341:8
**components**
77:11 78:14
**composite**
205:22,24
**concept**  99:13
99:25 143:25
145:3 211:6
**conceptually**
144:2,3
**concern**  60:12
62:17 64:21
71:2,5 85:16
261:6,14 331:1
**concerned**  71:9
310:25
**concerns**  18:21
27:15 59:11
63:25 64:23
65:21 97:5,11
97:15 267:23

**conclude**  211:15
245:21 301:3
354:6
**concluded**
26:22 159:20
368:7
**concludes**  15:5
**concluding**
322:9
**conclusion**
28:16 122:13,23
122:23 123:9
124:8,10
**conclusions**
123:5
**conclusive**
361:3,5,6
**condition**  100:1
362:18,19,23
363:4
**conditions**  28:7
48:21 56:10
62:15 65:12
85:16 341:3
348:23
**conduct**  128:10
231:2 238:14,22
321:18
**conducted**
47:11 196:13
197:20 326:6,17
327:5
**conducting**
242:23 247:8

293:12
**conducts** 241:13
**conferences**
   41:22,25 42:2,2
**confirm** 89:14
   89:16 91:15
   300:24 361:1
   363:13
**confirmed**
   347:12,14,15
   360:14
**confused** 97:2
**conjecture**
   89:22
**connecticut**
   12:21,22 13:4
   20:24 33:22
   34:20 35:8,11
   35:24
**connection** 38:7
**consent** 34:5,22
   36:13
**consider** 84:18
   84:25 85:11
   143:21 194:18
   233:8 234:10
**consideration**
   67:7 351:9
**considered**
   72:13 85:10,19
   95:17 210:15
   279:16 303:4
   323:21,23
   326:13,18,21

327:6 358:20
**considering**
   171:10 357:15
**consistent** 97:9
   128:14 132:12
   161:8 164:5
   165:18 166:3,23
   167:12 170:22
   182:3 184:18
   199:22 211:3,8
   211:11 223:12
   252:12 253:1,3
   255:13,19 264:7
   272:2 335:12
**consistently**
   88:15 124:7
   130:9 131:17
   132:16,19 133:4
   133:15,17 134:8
   135:9,25 137:2
   139:21 147:14
   147:17 149:13
   149:23 161:21
   161:23 162:13
   162:22,24
   163:17 165:10
   170:21 171:25
   172:2 178:22
   179:22 181:18
   184:6 185:6
   188:21 195:16
   195:21 196:13
   202:12 204:20
   206:4 208:17

211:1,25 212:3
   212:11,22
   216:11,22
   219:14 221:5
   222:9 223:10
   238:13 242:22
   243:15,23,24
   245:22 246:2
   249:24 255:23
   257:10 262:19
   264:22 268:10
   268:22 269:5
   278:3 282:6,25
   283:18,24 284:8
   284:13 287:17
   289:18 292:11
   305:10 327:19
   331:6 334:19
   343:2 352:19
   363:14
**consists** 307:8
**constant** 77:2
   315:25 343:7
   344:24
**constantly** 81:5
   174:2
**consternation**
   162:7
**constitute**
   103:14
**constitutes** 6:4
**constitution**
   98:8

**constitutional**
   27:9 28:9 99:17
   144:5
**constructed**
   342:22
**construed**
   260:18
**consultant**
   24:18
**consultants**
   24:21,23 25:2
   25:20 48:11,12
   49:6 93:22
**consumed** 316:9
**contact** 53:11
   53:17 358:15
**contacted** 267:9
**contacting**
   53:14
**contained** 31:9
   104:9
**contend** 288:24
**contending**
   209:10
**contends** 196:12
**contention**
   105:9,13 200:6
   201:4,6 203:25
   218:14 271:19
**contents** 3:1
**contest** 87:24
**context** 99:23
   115:19 117:18
   133:5,7 134:15

134:24 135:3
169:23 234:5
236:17 279:25
280:12,15 296:7
**continue** 18:24
32:1 145:19
238:7
**continued** 98:3
**continues**
110:18 272:3
**continuously**
288:3
**contraband**
78:22 79:1 81:4
84:24 218:7,9
219:24 220:4,17
230:16 239:1
310:16,17,19,23
311:8,11 312:19
314:18 315:1,6
315:11,15,22
316:2,5,8,9
318:11 326:19
**contract** 6:9
**contracting** 6:1
**contractor** 5:22
6:7 7:8 40:8,10
40:18 41:2,4
343:16
**contractors**
42:14 332:11
**contribute** 56:7
241:6

**control** 119:23
175:12 188:22
194:14 272:24
273:21 341:12
**controversial**
271:13
**conversation**
57:3 59:17
142:14 143:10
143:13,16 168:9
199:19 334:11
**conversations**
90:10 150:10,16
170:20 338:9
340:24
**conviction**
240:5,12 241:18
241:18
**convictions**
213:14
**copiers** 49:17
**copies** 265:10
370:14
**copy** 42:15
**corecivic** 12:18
**coroners** 107:5
**correct** 6:10
11:11,15,21
12:20,23 15:12
15:18,22 24:22
33:3,4,15 36:5,6
40:19 47:17
50:13,14 62:1
66:16,25 89:11

89:12 90:18
94:24,25 96:9
96:17 98:14,15
98:20 101:6,8,9
101:13,16,17
105:12 106:1
107:11,13
109:23,24 110:7
122:20 125:9
136:7 142:20,25
147:5 152:16
153:11 155:18
159:2,3,7,8,18
159:23,25 160:4
160:10 166:25
179:24,25
184:20 186:3
224:6 237:12
240:21,24
246:17 249:6
250:8,18 254:15
255:12 258:22
260:1 265:8,13
265:20 270:13
285:19 290:20
291:2,3,6,11
292:16,22 308:8
308:9 310:19
337:16 344:11
356:6,7 366:20
366:21 367:1
372:8
**correcting**
349:9

**correction** 3:8
249:21 327:10
328:15,23 329:2
329:5,12,16
**correctional**
6:25 7:5 8:2
11:16 12:17
13:10 17:2 19:5
19:19 32:6,12
33:1 42:24
92:10 116:17,21
117:1 145:7
243:16 244:12
244:18 249:9
306:18 314:4
329:3,23 332:23
333:19 342:13
342:16 348:2
**corrections** 3:10
12:15,19 13:7
13:15,24 14:1
14:25 15:10
104:21 113:16
242:4 372:6
**corrective**
257:11,24
**correctly** 88:23
162:15 177:14
242:19
**correspondence**
75:16,16
**counsel** 1:17
4:18,20 5:6 10:8
18:12 74:3,7

92:16 93:22
125:13 187:17
191:10 276:23
288:12 308:13
308:16 369:11
369:15 370:14
**count** 84:20
152:7 195:16
196:13,18,19,23
196:25 197:3,8
197:10,15,18,20
198:6,25 199:5
199:9 201:5
202:13 204:12
**counted** 243:21
**counties** 213:14
**counting** 11:19
16:15 30:12
196:4,7 197:13
200:7
**country** 318:21
**counts** 196:9
197:2 198:10
199:12,12,17,18
**county** 81:20
176:1 347:25
**couple** 40:13
70:19 71:11
75:10 105:24
193:17
**course** 51:13
60:10 71:15
78:18 87:19
128:16 131:25

148:17 200:5
201:3,17 202:20
276:19 280:16
**court** 1:1 4:8,16
5:2 6:19 10:21
17:18 18:10,11
18:17,18,20
23:8 31:3,5,17
31:23 34:21,22
75:4 95:9
103:12,23 104:2
104:3 111:18
131:2 193:21
203:4,7 238:1
369:5,23
**court's** 31:4
104:17
**courtroom**
17:14
**courts** 11:11
**covered** 17:3
19:7,10 21:5
265:5
**covid** 72:21 73:5
73:7,8
**crazy** 159:10
**create** 152:12
**created** 69:7
346:13
**creates** 81:23
183:19 271:25
**crews** 193:5
**crime** 232:11
241:16 351:1

**crimes** 241:15
241:15
**criminal** 6:3
39:4 40:6 41:11
56:21 57:2
58:18 227:7,11
227:16 229:2
231:11,14 241:5
241:8,10,11,20
241:24 242:25
248:21 327:17
351:5,7
**cripa** 19:25 20:3
20:12
**critical** 322:19
322:23 323:2,7
323:10,13,15,21
323:23
**cross** 3:2 156:22
366:15
**crossing** 114:2,4
**crowded** 78:9
**cruel** 99:22
103:14
**cs** 370:15
**cube** 78:10
190:5
**cubes** 325:11
332:12
**cubicles** 189:25
323:20
**culture** 174:23
**curious** 97:13
206:6 226:1

317:18 347:22
**current** 6:15
14:16 21:17
26:17 32:5
33:16,21 34:18
43:9 260:6
347:22 350:24
351:2
**currently** 68:9
68:24 73:20
208:22 252:24
277:16 338:11
343:5
**curtains** 269:16
**custody** 81:2,22
81:23 130:1
216:4 321:19
**cut** 106:13
142:2 147:12
206:25 207:3,4
207:10 268:13
271:16 298:20
311:20 313:22
**cutoff** 294:24
**cuts** 78:13
**cutting** 336:17
**cv** 1:8 4:10
**cycle** 66:6

### d

**d** 4:1 12:16
57:16 82:1
**d.c.** 1:14 2:8
4:14 37:5,18

369:7
**daily** 52:6 69:14
  150:18 183:10
  276:7 314:22
**danger** 55:25
  60:22 81:23
  224:20 285:18
  353:8
**dangerous** 77:2
  77:6,21,22,24
  79:9 80:2,10,10
  81:8,10,13,17
  81:25 82:2
  232:22
**data** 87:13
  105:6 108:5
  132:17 148:25
  244:19 254:18
  259:1 260:2,4
  265:15 281:21
  282:1,1,3
  290:15 297:4
  299:2
**database** 75:19
  129:19 151:25
  152:12 154:5
  245:17,23
  346:14
**date** 4:4 44:11
  46:1 56:19,20
  58:24 152:19,21
  153:1,7 154:14
  158:15 307:16
  369:6 371:24

372:12
**dated** 3:11
  356:12
**day** 52:14 53:9
  61:11 68:9,13
  78:3 81:8 196:2
  198:3 263:24
  318:2 372:15
**days** 52:13,18
  72:14 107:14
  370:16
**deal** 25:24 68:15
  68:16 72:8
  225:7 266:14
**dealing** 66:7
  87:15 99:20
  127:25 136:21
  141:22,24
  176:19 178:11
  229:10 242:25
**deals** 356:3
**dean** 2:7 4:25
  351:11 370:1
**dear** 202:5
**death** 107:7
  125:7 126:13,19
  127:13 128:23
  130:1,4 131:23
  135:10,16,21
  136:9 137:4,8
  138:19 140:9,12
  140:19 318:22
  321:12,16,19

**deaths** 124:7,13
  124:17 125:23
  126:3 127:9
  128:11,22
  129:14,16 130:9
  131:17 132:15
  133:24 134:19
  136:12,20,21
  138:23 140:4
  147:15 238:24
  317:13,22 318:4
  318:6 320:20,21
  320:22 321:22
  322:7,11
**debt** 217:17
  218:14 284:23
  286:8
**debts** 217:15
  284:24,25
  350:21
**decent** 338:8
**decide** 9:9 102:1
  366:1
**decided** 339:8
**deciding** 274:15
**decision** 47:23
  137:23 234:4
  282:24
**decisions** 22:8
  22:18 24:13
  43:14 209:17
  210:15
**declare** 372:4

**decrease** 72:21
  118:19,20 319:7
**decreased** 71:14
  72:3 220:11
  318:23,25 319:3
  319:6
**decree** 34:5
  36:14
**deemed** 106:21
  239:14 322:24
  372:6
**defendant** 4:6
  5:7 227:11
**defendant's** 3:7
  31:6 95:21 96:3
  96:5 134:25
  188:20 235:12
  250:7,15 261:1
  355:19
**defendants** 1:10
  1:18 2:11 10:13
  31:10 38:18
**defended** 38:22
**defense** 94:15
  94:18 95:23
  235:19 237:10
  355:23
**deferred** 349:5
**deficiencies**
  257:12 258:3
**deficiency**
  257:14,20
**define** 39:15
  123:6 174:21

**[define - determinations]** Page 392

301:18 302:5
**defined** 107:18
  127:11 163:6
  264:1
**definitely** 70:15
  72:4 121:11
  123:13 158:2
  358:24
**definition** 119:5
  154:19 179:4,18
  185:7 195:23,25
  216:24 223:9
  238:1 255:19
  261:12 289:24
  322:22 341:20
  342:6,8,9
  343:20
**definitive**
  166:19
**defrauding**
  227:22
**defuse** 230:17
  230:21
**defuses** 230:23
**degree** 26:20
  37:2,4 62:20
  69:17 167:8
  177:25 239:21
  300:6 320:1,6
**dehumanize**
  260:17
**delay** 203:17
  293:4

**delayed** 347:24
**delays** 7:9
**deliberate** 99:14
  101:20
**demographic**
  79:12
**demographics**
  55:8 79:18
**demonstrate**
  98:3 99:8
  102:14 103:1
**demonstrated**
  101:20 144:22
**dempsey** 34:10
**deny** 137:22
**department**
  1:18 2:7,19,19
  3:8,9 4:13 5:17
  5:20 6:3,7,20
  9:20,21 12:15
  12:19 13:6,24
  14:1,25 15:10
  17:2 18:23 19:4
  29:9 31:13,19
  32:11 38:25
  41:15 49:16
  91:19 97:16
  99:7 100:16
  104:5,21 113:15
  146:1 159:5
  242:3 287:3
  303:20 366:19
**depending**
  127:6 226:16

263:24
**depends** 68:14
  115:25 175:5
  176:18 247:11
**deponent**
  370:13 372:3
**depopulated**
  46:7
**depose** 123:16
**deposed** 74:21
  74:23 75:2
**deposing** 370:13
**deposition** 1:15
  3:6 4:5,12 9:2
  18:4,9,11,14,19
  18:21 30:24
  31:15 73:23
  74:4 94:24
  95:16 104:2
  114:8 202:21
  203:9,12,17
  221:8 238:2,9
  333:22 334:12
  334:12 341:21
  341:24 342:5
  357:24 358:3
  365:22 368:6
  369:3,13
**depositions**
  17:13 18:2
**depth** 75:12
  246:24
**derive** 262:4,5
  322:23

**derived** 84:11
  342:12
**describe** 6:18
  8:22 137:7
**described** 185:7
  190:12 346:22
**describes** 79:3
**describing** 27:2
  87:16
**design** 81:19
  183:16 341:4,4
  341:13 342:9,12
  342:19,24
  348:10
**designated** 25:6
  279:7 322:24
**designation**
  256:15
**designed** 81:12
  341:9
**desk** 75:18
**detail** 9:1 86:6
  362:3
**detailed** 79:12
**details** 8:23 26:8
  58:17 156:11
  194:16 205:18
  294:17 355:14
  356:21 361:3
**determination**
  28:19 98:2
  127:23 234:7
**determinations**
  213:16

**[determine - disruption]**                                     Page 393

determine  89:11
  101:18 106:25
  136:8 151:3
  170:4 184:14
  213:10 214:9
  215:22 219:9
  246:1 251:6
  259:5 321:12
  327:23 337:8
  343:11 350:2,25
determined
  261:25 291:17
  321:13
determining
  101:4 350:6
develop  58:23
  59:5
development
  306:17
develops  217:15
deviated  307:10
devolves  99:17
devoted  73:21
  349:9,11
die  127:1
died  130:1
  139:4 360:23
dies  106:20
  124:21 126:18
difference  23:15
  151:3 171:22
  172:4,5 223:6
  287:25

differences
  172:16 197:5
different  7:19
  8:1,3 16:7,9
  37:22 41:8
  45:11 46:19
  47:2,5 58:21
  77:11 81:24
  85:4 90:14,18
  91:17,20,22,23
  121:17 135:25
  136:17 138:13
  142:25 162:23
  162:25 163:5,13
  163:17 172:15
  172:18 176:16
  179:4 180:18
  196:9 211:24
  221:14 224:15
  239:25 240:14
  245:5 263:25
  281:8 286:17
  287:10,11
  288:22 309:22
  329:12 332:13
  332:13 338:1,6
  340:19 359:1
  360:6
differentiate
  187:16
differentiating
  90:20
differently
  99:18 171:11

difficult  78:13
  175:10 184:1,2
  224:14
direct  3:2 5:9
  18:25 53:19
  78:1 110:9
  274:19 312:8
  331:3 351:11
direction  369:9
directly  6:8 57:5
  57:6 156:19
  167:19 267:2
director  127:5
disabilities  10:1
disability  8:6,15
  9:14
disagree  91:25
  92:4 270:16
disagreement
  225:1
disciplinaries
  273:14,17
disciplinary
  171:5 194:11
  204:21 205:9,13
  205:21 206:16
  207:23 208:9
  216:12 219:4,11
  234:15 273:15
  303:15,17 305:2
  320:12
discipline
  181:13 218:2,21

disciplined
  195:13 208:4
  218:16,24 282:7
  282:12
disclosure  18:13
disclosures  25:1
discovered
  219:10
discovering
  29:25 31:7
  100:19
discovery
  365:23
discrete  359:21
  359:24
discuss  168:12
  315:20
discussed  42:3
  58:13
discussing  57:5
discussions
  47:25 183:3,9
  341:18
disgusting  78:7
dishonest  66:2
dismissed  139:9
dispute  92:6,9
  92:13
disputed  270:17
disputes  365:24
disqualified
  357:9
disruption  9:2

**distinction**
108:8 188:3
**distinguish**
14:20
**district** 1:1,1
4:8,9 10:21
38:15 45:7,8,15
48:8 75:17
369:5
**division** 1:2 4:9
4:13 6:3,24 40:6
40:7,11 41:9,11
41:14,18 75:1
227:1 351:5
**dmv** 6:12
**docket** 7:25
11:14
**doctor** 48:19
67:23
**document** 18:17
31:4 84:6 87:9
88:1,18 91:8
94:18 95:7,23
96:18,22 97:3
156:3 159:6
211:1 235:13,19
256:25 262:3
355:21,23
**documentation**
61:25 62:13
88:4 106:22
107:2 127:2
128:6 151:19
246:11,13,15

252:21 256:5
262:9 266:16
267:16
**documented**
71:22 87:22
88:5 150:14
154:18 156:9
158:7 254:2
347:7
**documenting**
240:1
**documents**
49:19 61:10,11
62:18,19,21,22
62:24 63:4 75:6
91:6 93:9 95:2
95:12,15,15
150:23 159:6
204:13,14
218:23 255:4
282:20,23 288:8
357:18 358:18
360:4
**doing** 30:12
39:16 43:11
49:21 57:22
66:13 73:25
111:21 115:18
131:8,12 132:13
147:23 149:5,19
167:13 179:16
192:11,11
199:11,12,13
202:23,24 212:3

212:4 231:8,9
241:21,24
248:25 312:21
314:11 320:3
**doj** 11:7 19:23
23:13,16,20
25:14 27:8,21
50:1 51:8,19
55:2,4 56:4 64:6
65:25 98:1
146:10,11,13
159:12,20 161:3
177:13 295:1
**doj's** 24:11 25:6
348:24
**donaldson** 82:2
82:7,10 83:5,11
83:17 86:23
92:14 120:24
121:7,11,23
122:3,3 182:21
308:3 345:15
**dorm** 63:17
71:10 76:12,15
77:7,8,9 78:11
78:16,17,17
79:4,19 80:2,2,4
80:4,4,5,9,10,10
80:11,16 81:1,2
81:10 82:2,13
82:16,20 83:2,5
83:7,8,24,25
84:1,19 85:24
88:13,14 91:13

155:24 174:3,16
175:1,4,10,12
180:3,14,15,23
181:5 183:20
184:7 189:10
190:8 197:12
198:21,25 199:4
199:10 229:16
236:12,14,15,16
252:10,21,22
253:23,25 254:1
269:23,24 281:8
281:9 286:14,17
286:19 343:12
343:24 345:18
353:5 362:11
365:10,11
**dormitories**
254:6
**dorms** 47:8,12
48:3 64:9 66:23
66:24 69:16
76:18,18,19,20
76:21,23 77:2,5
77:20 78:2,5,6
79:5,5,6,10 80:7
80:19,25 81:4,7
81:8,13,14,15
81:16,17,24
83:10,12,17
86:1 90:1
140:13 150:18
171:8 178:23
179:8,23 180:13

181:10,14
183:14,18,23,25
184:4,5,6,15
195:18 269:19
273:21 312:11
340:19 343:3,4
345:15,16,18
346:6 350:16,17
365:14
**double** 269:19
**doubt** 107:4
226:19
**dozen** 71:11
247:5
**drafted** 110:8
**draper** 44:25
45:10,20,21
46:16,18 47:14
47:16 49:20
188:13
**drift** 239:22
**drop** 72:25
**dropped** 144:15
**drops** 193:15
**drug** 3:10 66:5
66:7 78:21,23
319:18 320:4,6
320:7,9 350:21
356:4,20 357:1
357:5,8
**drugs** 79:6
310:18 311:2,6
315:23 316:9

**due** 117:13
348:2
**duke** 235:5
**duly** 5:7 369:8
**dunn** 349:3
**duration** 74:13
74:15
**duties** 39:21
43:10 278:17
**duty** 129:20
204:11
**dying** 315:24
318:12
**dynamic** 71:9
122:10 225:1
**dynamics** 67:1
284:24 287:12

**e**

**e** 2:12 4:1,1
12:16 57:16,16
81:4 82:1 369:1
369:1 371:3,3,3
**earlier** 11:14
13:25 26:12
39:11 53:8
65:11 88:11
115:8 118:5
145:14 150:15
154:20,21
162:20 163:6
167:6 195:23
213:9 230:11
247:21 325:12

366:18
**early** 11:21
**easier** 78:14
188:10
**easily** 78:16
**east** 81:7
**easterling** 81:11
183:15 188:13
345:20
**eastern** 4:4 93:1
93:7 187:4
283:8,14 352:5
352:11 366:8,13
368:5
**easy** 51:9
168:15 309:20
325:2 346:20
**eat** 186:21
**ebbs** 68:21
119:17
**economy** 219:25
**edge** 294:21
**education** 42:4
42:5,12 43:6
343:22
**educational**
36:25
**effect** 211:8
246:12 312:1
358:18
**effective** 136:5,9
136:24 142:19
142:22,23
165:19 166:3,23

240:7 263:5
264:8 319:22
330:21 354:6
358:25
**effectively** 40:16
56:12 78:2
132:20 134:9
135:20,24,25
136:3,3 137:3
139:21 161:22
161:24 162:13
162:22,24
163:17 165:11
171:25 172:3,23
173:20 174:22
178:22 179:22
183:13 185:6
188:22 195:16
195:21 196:14
199:17 200:7
202:13 204:20
208:17 212:1,4
212:11,23
216:11,23
219:14 221:6
222:10 223:10
236:3 238:13
242:22 243:15
249:25 255:23
256:24,25
257:10 262:19
264:22 268:11
268:22 269:6
278:3 287:17

289:19 292:11
305:19 331:6
333:11 343:2
352:20
**effort** 282:20
360:12
**efforts** 319:17
333:10 348:22
**eight** 13:20
14:11 16:14
53:9 68:17
248:11,14
**eighth** 98:7,20
98:23 99:9,21
101:12
**either** 24:20
43:3 55:22
62:25 63:18
74:10 82:22
128:7 146:2
147:4 156:19
161:3 198:21
204:10 229:13
240:5 241:18
245:7 251:10
267:1 298:14
313:18 338:21
345:4 349:13
350:12 356:14
**eji** 70:4
**elected** 337:10
337:13
**elements** 98:23
99:5

**eleven** 221:12
**eligible** 227:25
337:9
**eliminate** 43:22
195:2
**elmcf** 3:9
**elmore** 347:23
347:25
**email** 60:11
62:13 65:8
184:24 267:17
**emailed** 62:5
64:20 71:1 75:9
177:20 304:23
307:15
**emailing** 94:1
**emails** 31:10
59:10,14,16,22
60:23 62:25
65:2,10 67:11
75:8,25 93:12
93:14,17,19
94:5,9,11 104:9
127:3 304:19
**emerging**
331:22
**employed** 5:17
5:21 6:8 37:16
38:1 194:14
328:15 329:4
369:12,15
**employee** 5:19
5:24,25 18:23
29:8,14 100:15

293:17 366:19
366:23 369:14
**employees**
328:8
**employer** 40:23
**employment** 6:5
37:13,20,24
43:19,23,24
44:1
**encapsulates**
311:9
**encountered**
295:2
**encourage**
337:5
**encouraged**
336:14,24
**endanger**
224:17
**ended** 146:19
**endemic** 121:15
**ends** 57:3
**enforce** 204:20
216:11 305:10
305:15,20
**enforcement**
8:14 227:1
242:17 248:16
332:17
**engage** 89:22
234:15 312:8
**engaged** 27:1
78:19 217:8
218:2,22 280:15

282:11 327:24
**enrollment**
329:23
**ensure** 178:23
179:8,9,18
195:17 268:22
269:6 278:3
281:11 282:6
287:18 289:19
292:11 328:9
343:2
**ensuring** 185:3
**entails** 7:3
**entered** 194:3,9
**entering** 183:13
184:15 195:2,8
195:13
**entire** 6:4 21:1,1
49:10 51:13
95:7 108:6
117:20 118:1
119:17,22 190:8
235:17
**entirely** 114:24
142:2 267:25
**entirety** 41:17
223:12
**entities** 240:19
241:6
**entitled** 17:24
17:25 29:19
93:2 186:25
283:9 352:6
366:9 368:7

entity 6:8,10 9:4
9:12 12:13 13:8
32:20 112:7
114:17,18
240:17 241:1,2
241:5
environment
59:7 229:10
271:25 285:2
environmental
343:17 344:3
epa 343:13
episode 304:5
episodes 72:15
307:21 311:3
equal 6:16,20
64:22
equate 112:4
213:3
equipment
315:5,8
equivalent
277:8
errata 370:11
370:13,16
esq 2:3,7,12,12
370:1
essentially 7:1
9:18 47:25
50:10,20 65:22
66:13 78:25
119:16 122:10
164:9 170:2
199:2 236:14

260:14,21 287:4
309:1 331:21
345:3 353:4
360:20 362:3
establish 58:19
126:10 232:3
343:20
established 50:1
131:20 254:2
establishes
324:8
establishing
231:14
estimate 11:19
51:10 54:11
152:3
estimation
54:22
et 1:9 238:24
370:4 371:1
372:1
european 37:7
evaluate 101:19
140:2,17 160:16
166:1 199:9,11
225:10 338:1
343:23
evaluated 62:4
165:23 323:14
evaluation
290:20
event 233:4
304:8 356:19

eventual 215:3
eventually
75:18 85:8
everybody
174:6
evidence 149:21
150:2 156:18
200:14,22,25
201:2,14,14,16
201:16 202:3,10
203:24 204:2
220:20,24 263:9
272:14 291:6,16
292:12,17,18,19
293:4,12,21
294:12 295:3
evolves 117:11
exact 6:16 9:17
11:18 13:8
16:15 20:4
44:11 46:1
150:8 156:12,12
212:20 290:15
294:2 329:8
349:15 356:21
exactly 23:2
43:5,8 50:5 66:9
68:5 118:6
124:15 131:22
253:20 304:14
319:8 327:16
346:20 354:4
356:17

exaggerate
89:21
exaggerating
67:5
exam 290:6
examination
1:17 5:6,9 290:8
290:12,12 291:2
291:18,20 292:5
366:15
examinations
289:21 292:1,13
examined 5:8
example 15:14
29:3 80:17
83:22 84:23,24
91:11 135:9,14
183:16 190:1,3
205:14 214:8,12
214:13 215:9
218:25 219:6
232:21 241:13
244:22 250:15
257:17,18
279:21 281:5
282:14 285:5,6
320:13 335:18
362:23 364:11
examples 132:2
132:6,6 134:12
150:8 186:4
except 33:13
104:4

exception 76:24
79:4 185:23
exceptionally
72:11 94:6
exceptions 65:4
excerpts 360:7
excessive 301:9
301:13,19 302:9
302:15 303:25
304:8 306:1
309:23
exchange
353:17,22,24
exchanged
354:1,22
exclusively
183:6 349:19
excuse 4:11 7:8
12:6 16:21 73:8
292:19 335:11
executed 352:24
356:5 357:24
executing
356:10 357:16
357:19 361:9
execution 290:9
exercise 254:12
exhibit 3:5,6,7,8
3:9 94:15,18
95:21,23 96:3
135:1 188:20
235:13,19
237:10 250:5,7
250:15 261:1

355:19,23
exist 38:11 91:8
224:7
existed 363:17
exists 363:23
expect 307:2
357:23
expectation
252:3 357:1
expecting 358:6
expects 251:23
expenditures
349:25
experience
25:13 46:18,19
46:20 77:23
295:1 300:11
341:19 343:23
experienced
66:22 145:4
experiencing
118:2 145:2
expert 24:25
25:2,7,20
237:24
explain 31:17
52:3 130:7,10
133:3,14 134:22
144:2 171:21
301:7
explanation
196:11
explicit 260:20

explicitly 15:23
254:20,24
explicitness
255:3
explode 353:5
exposing 285:15
expressing
203:15
expressly 112:6
extensive 183:9
extensively
192:23 324:2
325:1 340:25
extorted 265:2
extortion
264:23 266:4,10
266:14,22
267:15,22 269:2
extra 338:10
extrapolating
66:12
extremely
120:11

**f**

f 82:1 369:1
face 131:19,21
184:4 196:18,19
197:10 198:25
faced 286:21
faces 48:14
197:13
facilities 12:2
13:9,10 15:25

16:3,3,5 17:3
19:6 21:2,4 33:6
44:22 49:18
68:19 69:5,10
69:20 71:13,25
76:8,9,12 78:8
98:6 102:17
104:24 105:12
107:15,18 110:5
114:13,14,16
116:13,16,17
117:20 122:19
124:8,13,18,22
127:10 128:4,12
130:10 131:18
134:19 140:19
140:25 147:15
147:18 161:25
162:14 163:23
173:11 178:24
180:7 187:6
188:5,23 189:2
194:15,18
204:22 216:13
217:24 219:16
220:22 227:2
234:14 238:15
238:23 246:10
250:2 252:10,20
255:24 262:21
264:24 265:11
268:24 269:11
269:14,19,24
270:3 274:1

275:1,13 276:4
277:9,19,24
278:6 283:21
292:6,14 302:22
306:13 310:23
311:11 315:2
320:21 323:3,21
325:24 331:7
335:22 339:16
340:11,18,23
344:22 345:6
346:9,16 349:10
352:21 358:15
359:5 361:23
362:12
**facility** 7:6
11:16 12:17,18
12:19 20:15
32:6,12 33:1,2
36:4 70:13
76:16 77:15
80:8 92:11
107:16 114:19
115:14 116:17
116:21 117:1,6
117:6 125:6
127:14,19
135:11,16 140:9
144:12,17,18,22
145:7 148:10
149:12 150:13
166:11,21 179:9
183:12 185:11
188:16 193:2

195:6,9,11
196:6 197:16
205:16 208:19
212:13,17 215:5
229:24 230:4
258:14,20,21,24
258:24 263:2
264:17 265:16
265:24 266:17
267:2 269:7
275:3 281:18
283:19 284:1
311:13 314:4,12
314:19 315:12
316:18,24
325:18 328:11
334:18 337:15
337:19,23 341:8
342:13,20
343:12 346:3
348:1,11,16
349:4,4 354:16
361:13,20 362:8
362:19 363:11
363:17,23 364:3
364:6,7 365:7,8
365:12,15
**fact** 10:5 72:23
86:7 99:8,13
101:19 111:24
112:2 119:15
123:3 131:3,5
134:18 147:12
155:16,23 157:1

157:20 161:11
167:7 191:20
193:3 194:3
203:16 206:11
210:12 213:2
215:23 227:25
242:1 245:8,20
255:6 265:14
271:24 272:24
278:19 285:8
303:21 314:21
315:17,23 320:5
328:25 336:6
340:22 354:2
**factors** 116:3,7
116:10 117:14
118:15,21
297:23 318:13
318:14 320:16
**facts** 31:7,9
58:19 59:6
90:14 97:10
98:1 100:19,22
101:3,11,11
102:2,7,13,23
102:25 103:9,14
103:19 104:6,8
104:9,10,13
110:1 113:13
123:2,3,5,19
125:22 137:21
158:17 182:3
191:10,12,14
201:8 203:4

238:3,10 312:17
361:8
**fail** 133:18,19
136:1 149:14
**failing** 229:20
**fails** 219:13
227:1,3 362:17
370:18
**fair** 23:4 27:20
61:8 84:14
275:23 290:25
295:9
**fairly** 197:24
290:16
**faith** 79:6
**fall** 35:15
**falling** 315:24
**false** 67:14
**familiar** 80:9
269:3
**families** 76:5
164:5
**family** 59:23,24
59:25 60:1,5
63:2 93:14,17
149:25 150:1
183:7 266:12,13
266:25 267:9
335:9
**family's** 267:14
**far** 30:14 47:23
52:23 54:14,18
61:19 91:3
256:9 266:15

268:8

**fashion** 28:24
224:20 269:20

**fashioned**
316:23

**faster** 203:12

**fear** 257:1

**fears** 64:16

**february** 6:2,2
7:8 39:12,12
40:15

**federal** 5:19,24
5:25 6:4 228:8

**feel** 43:19 58:6
144:5 239:25
340:21

**feels** 308:17
309:15

**felt** 56:8

**female** 287:11

**fenced** 183:20

**fences** 311:19
311:20

**fentanyl** 316:14

**fewer** 118:22

**field** 183:17

**fifty** 145:9

**fight** 150:23
151:17 234:6,21
234:23,24,25
235:5

**fighting** 85:1
87:1,2 234:5,10
234:19

**fights** 86:17,18
151:1 250:1
252:9,19 253:12

**figure** 156:1
174:15 242:5

**figured** 216:1

**figures** 108:15
321:17 349:15

**figuring** 273:22

**file** 56:14 92:18
93:5 206:17
244:2,6 283:12
352:9 366:12
367:7

**filed** 4:8 21:15
106:11

**files** 239:3,8
244:1,14

**fill** 277:12
358:14

**filled** 277:25

**final** 27:17,17

**finalized** 21:24

**finally** 253:24

**financial** 39:6
358:8

**financially**
369:16

**find** 22:11 72:7
91:7 152:20
157:10 168:11
212:2 309:16
316:18 318:10

**findings** 26:24
44:21

**fine** 13:13 14:10
92:24 125:15
134:2 168:24
186:17,24 235:6

**finish** 9:8 18:7
84:4 112:23
113:5,9 117:23
152:25 193:13
193:16 336:20

**finished** 166:5
193:7

**finishing** 239:1

**fire** 122:9

**firm** 37:20,22
38:2,2,10,14
329:18

**first** 5:7 7:22
10:23 37:19
38:1,25 39:21
40:22 41:10
44:9,21 45:18
50:6 56:2 60:20
74:18 81:18
97:13 111:19
121:22 134:24
134:25 141:23
169:24,25
177:22 196:2
250:16,24
251:10 258:11
258:18 282:5
286:11 301:12

364:9

**firsthand**
266:14 311:24
314:15

**fist** 86:17

**five** 60:7 83:23
91:19 92:2
120:24 134:1
138:14 179:3
222:15 252:8
277:1 304:1,9
352:10

**fix** 287:22

**fixed** 350:6

**flare** 70:22
76:24 364:19

**fleischer** 45:13

**flight** 286:11

**floor** 59:1
185:16 186:6
198:18,20 350:9
350:23

**floors** 350:15

**flow** 188:22

**flowing** 318:12

**flows** 68:22
119:18

**fluid** 291:15

**focus** 89:20 94:1
109:22

**focused** 7:5
107:16 142:17
143:8

**folded** 14:4
**folks** 125:11
**follow** 23:5
  60:16 61:2
  159:14 215:16
  222:10 239:22
  334:19 366:18
**followed** 335:16
**following** 123:4
**follows** 5:8
  134:15 147:11
**food** 186:12
**footage** 199:8
  243:25 244:3,9
  263:15 359:21
**footnote** 107:20
**force** 301:9,9,14
  301:15,19,23
  302:3,6,10,15
  302:22 303:3,12
  303:22,25 304:8
  305:9,14,19
  306:1,7,12,23
  307:11 309:24
  310:11
**foregoing** 369:2
  372:5
**forensics** 350:5
**forget** 10:23
  13:4 20:4 34:9
  37:10 48:16
  82:16,18 236:14
  236:22

**forgot** 342:17
**form** 11:16
  17:15,22 20:16
  22:5 27:25
  28:10,12 50:1
  87:6 90:5 98:25
  99:11 100:7,13
  101:7,14 102:4
  102:9 103:18
  107:12 108:13
  108:18,21
  110:12 123:8
  124:9 128:24
  129:1,22 130:12
  131:7 132:21
  133:9,16 135:2
  136:10 137:14
  141:8 142:12
  143:7 146:17
  157:3,6 160:5
  160:11,17 161:1
  162:4,9 163:1,7
  163:25 168:18
  169:6 180:4,24
  181:15 200:2,8
  200:9 207:2,25
  209:18 211:16
  212:5 214:22
  216:6 217:21
  218:4,17 219:10
  219:20 221:16
  224:11,23 226:4
  226:6,9 229:7
  229:22 230:9

  231:5,22 232:13
  232:19 233:19
  233:25 237:13
  237:15 238:7
  240:8,10 247:1
  247:9,10,17
  248:3,18,22
  249:5 250:6,12
  251:1,11,25
  252:3,13,25
  254:7,22 255:7
  255:17 256:8
  261:10,16
  265:18 268:18
  269:17 270:14
  271:22 272:6,11
  272:21 273:12
  273:19 274:17
  275:5 279:10,18
  280:7,10 284:19
  285:17,24
  286:24 287:5
  290:21 291:12
  291:22 293:6,14
  293:18 295:15
  295:21 296:2,10
  298:6,12 300:4
  304:2 306:2,19
  306:25 308:15
  309:9 314:13
  316:19 321:10
  322:20 324:13
  324:18 325:20
  327:24 332:25

  335:7 337:1,15
  346:11 355:4
  366:25 367:20
**formal** 38:4
  247:8,12
**format** 88:24
**formed** 266:4
**former** 177:2,4
**formerly** 177:24
**formula** 72:8
  147:12
**formulate** 28:23
**formulation**
  265:7
**fort** 227:22
**forth** 120:3
**forward** 141:6,9
  141:11 232:17
  232:21 322:19
**fought** 236:2
**found** 126:6
  181:14 232:25
  233:2 239:13
  255:3 315:11
  342:5
**foundation**
  365:3
**fountain** 69:3
  82:1 188:12
  345:15
**four** 5:25 33:8
  34:14 37:11
  39:8 68:7 83:25
  121:24 122:3

134:4 304:15 334:17

**fourth** 283:17

**frame** 43:7 71:8 141:6 152:20,21

**framed** 121:21

**frankly** 31:14 81:13

**fraud** 39:6 40:2 40:3 227:19,20 228:8,15

**free** 23:5 268:23 269:7 300:7 349:22

**french** 236:2

**frequency** 301:4

**frequent** 225:19 237:8 251:20

**frequently** 66:9 68:20 81:3 151:14 155:20 164:10 189:10 199:16 225:6 253:15 255:2 260:16 263:1 307:21 308:25 315:16 326:9 332:12 345:16 349:17 350:12

**fries** 236:2

**frivolous** 30:15

**front** 198:2 229:14 230:13 230:19 253:25

270:10 290:16 354:24

**fruit** 290:13

**frustration** 203:15

**fulfill** 6:19

**full** 5:14 7:15 44:1,2,3,7 62:22 165:13 166:1 167:1,3 239:9 264:9 282:5 320:17 321:21 353:23

**fullest** 62:20 349:18

**fully** 28:23 46:3 66:18 135:6 230:12 239:16 252:14 300:6 323:12 348:15

**function** 7:1 48:20 194:22 359:10 365:4

**functioning** 93:25 345:24

**functions** 6:19 300:6

**fund** 348:15

**fundamental** 235:7

**funding** 332:23 333:5,9,13,19 334:5

**furnishing** 112:9

**further** 11:10 98:13 203:25 204:2 216:1 231:20 367:24 369:9,13

**future** 226:24 230:18 235:4 237:21 240:13 242:6

**g**

**g** 4:1 81:1

**gain** 194:23 229:15 238:4 341:15

**gained** 338:4,8

**gang** 76:22,24 78:21 79:20 174:2 175:4,9 175:11,15 177:2 177:3,4,10,14 177:24 209:12 214:1,2,7,16,21 215:12,14,18,23 236:20,25 285:2 285:15,16 286:15 350:14

**gangs** 67:1 175:1 176:16 285:19

**gates** 38:3

**gather** 176:3 212:11 213:12 230:19,24

**gathered** 213:7 303:5

**gathering** 213:19,24 252:3

**gde** 236:22

**gearing** 44:18

**general** 37:23 71:19 207:5 245:10,15 286:18 290:6,7 290:10

**generalized** 37:16

**generally** 8:23 43:1 55:1,22 62:23 69:23 79:25 110:2 115:10 133:6 185:22 190:21 192:17 229:13 287:12 316:3 327:20 355:5

**generated** 157:21

**generic** 55:23

**genuinely** 285:13

**georgia** 12:15 13:17,23,25 14:24 15:9,17 16:1 17:4 19:8

19:18 20:23
26:18 32:25
33:11
**gesundheit**
255:25
**getting** 12:20
36:12 49:14
58:17 75:21
80:6 100:14
110:17 123:13
137:16 183:23
183:25 260:20
280:11 294:21
311:12,19
315:24 345:1
**gigabytes**
254:18
**give** 29:3 36:24
39:9 63:11
74:13 80:18
84:23 85:3
87:13 105:2
122:15 125:8
135:8,14,19
155:19 169:7,8
174:18 205:14
205:19 206:7
219:6 235:15
239:24 259:16
271:1,20 272:18
273:10 274:9
277:1 281:5,16
282:13 296:5
301:1 313:5,19

313:21 320:1
322:21 335:17
352:2 357:21
362:22
**given** 35:5 53:18
53:22 68:9
87:17 121:18
122:2 126:19
154:19 171:1
174:3 197:12
198:25 199:4
231:24,24
288:19 317:4,8
323:16 324:9,17
324:20 364:18
372:9
**gives** 271:3
**giving** 18:15
198:11 273:17
288:20 309:11
**glasses** 94:13
**glean** 220:16
354:10
**gleaned** 276:18
282:18
**go** 8:23 11:10
22:11 23:8
26:16 31:17
36:23 41:10
70:23 86:6 95:5
96:7 111:12
114:9 124:5
127:25 141:18
141:19 142:14

145:13 156:25
168:8,10 179:16
184:4 186:11
190:7,19 203:12
203:21 204:18
207:13 218:11
222:9 229:7
231:25 245:3
250:4 265:6
269:13 272:3
275:23 276:15
278:10 292:15
296:20,20 300:9
300:23 304:18
307:13,19
312:13 320:18
327:11 335:20
362:15
**goal** 30:8 66:18
**god's** 313:14
**goes** 57:13
66:23 75:16
89:19 120:2
190:18 262:16
267:18
**going** 9:17,22
10:16 23:1,7
24:14 25:3 29:5
29:18 30:3,11
30:12 48:18
55:12 57:12
58:15 59:8
60:24,25 62:9
63:14,18,18,19

64:15 66:10,11
68:25 78:20
87:24 88:12,13
92:25 94:2
100:13 104:12
105:25 106:10
111:11 117:5,5
117:7,8,10
119:14 120:15
122:15 123:14
123:15 125:8,13
127:7 139:24
141:21,23 152:5
152:23,24
161:12,18 162:3
165:14 174:10
174:15 179:17
181:2,3,3
183:10 186:11
186:15,20,21,22
188:4,19 191:12
193:21 202:18
211:14,18 221:2
222:18 224:15
229:16 232:7
234:11 235:8
241:12 243:9
245:14 258:10
263:25 270:7
273:3 275:17
276:14 279:4
283:7 289:13
291:25 300:22
303:8 304:13

**[going - happening]**

312:12 313:19
313:20 333:20
333:25,25 334:5
334:8 342:4
352:4 353:5
355:18 360:17
362:2 364:20
365:8,21,22
366:7 368:4
**gold**  45:15 48:6
**good**  5:11,12
56:18 58:4
119:24 186:7
268:16 287:9,9
320:15
**gosh**  103:22
130:18
**gotten**  60:23
66:20 88:10
97:24 150:3
363:14
**government**
9:18 29:14
37:25 41:1
112:7 227:23
228:1,4,9,25
**government's**
112:8
**governor**  348:1
**grab**  186:12
**graduation**
36:24
**grain**  58:7,8

**grand**  128:9
**gray**  190:2
**great**  162:7
203:15 313:17
**greater**  64:22
**grounds**  101:23
102:21
**group**  6:25 8:3
175:15 176:21
209:16 214:3
**groups**  176:19
176:20 208:19
208:23,24 209:1
**guaranteed**
365:11
**guard**  331:22
332:1,8,16
**guards**  358:14
**guess**  14:16
25:23 51:9,17
62:3 67:8 68:25
69:13 73:6 82:8
99:24 125:13,16
148:22,23 171:9
172:24 210:18
239:11 240:16
242:24 253:7
258:10 262:4
263:17 328:6
339:5 354:5
**guessing**  54:21
73:3 118:21
149:3 176:12
363:24

**guesswork**
54:20
**guidelines**  42:16
**guy**  63:16
236:22,23
**guy's**  48:16
67:22
**guys**  18:2 58:10
59:9 65:6 68:5,6
73:16 75:9 86:6
87:20 184:9
200:10 260:5
262:3 270:20
289:13 309:2
313:4

**h**

**h**  371:3
**habitually**
174:4
**half**  16:18 94:4
186:17,18 247:5
**halfway**  331:4
**hall**  287:8
**hamilton**  38:13
144:14
**hamm**  143:16
**hamm's**  142:5
348:7
**hampered**  78:12
**hand**  84:2 89:21
131:2 242:1
313:10,12
355:18

**handcuffed**
307:23
**handed**  250:4
**handful**  54:12
54:13
**handing**  235:12
**handle**  221:2
260:19 360:22
**hanging**  270:4
271:14
**happen**  78:15
95:1 192:8
214:1 225:22
252:9 253:16,16
253:17,22
255:15 364:20
**happened**  11:8
40:11 58:14
61:13 63:23
68:4 71:11 91:1
91:3 152:5
167:22 168:5,11
169:17 191:4,4
191:8,9,13,21
205:24 206:11
207:12 232:2
253:20,24
254:24 298:10
307:17,25
308:24 309:19
315:19 355:8
365:24
**happening**  56:5
289:15

**happens**  51:20
  56:21 60:17
  151:10 192:18
  206:4 217:14
  225:21 255:1,1
  255:2 308:1,2,2
  355:3
**harassing**
  110:13 168:19
  169:7 226:7,10
  275:19
**hard**  73:6
  118:11 203:2
  244:4 318:10
  359:10 364:25
**harder**  69:18
  239:20
**hardest**  156:17
**harm**  60:22,23
  65:21 66:8
  100:2,5,9,11,11
  178:14,15,18,20
  217:11,12 228:8
  235:2 257:2
  308:18
**harmed**  217:8
  347:7
**harming**  21:12
**harvested**
  138:22,25 139:4
**hazard**  363:6
**head**  11:20
  73:10 75:10
  83:3 105:24

135:12,17
138:20 152:9
165:21 166:9
170:18 184:9
185:1 194:7,12
204:16 205:11
205:15 208:7
213:17 219:7
225:24 249:22
258:16 281:6,20
282:13
**headcount**
  198:14,19,25
**headcounts**
  198:16
**headed**  110:20
**headquarters**
  6:13
**heads**  197:13
**health**  9:20
  171:17 363:6
**healthcare**
  33:14 42:18
  59:4
**hear**  72:15
  86:18,21 151:22
  187:16 193:15
  193:20,25
  205:25 206:1,2
  211:10,13,17
  276:7 307:20
**heard**  67:25
  68:2,5 90:7
  151:23 152:2,4

192:15 230:11
245:9 253:4
310:24 311:25
327:15,16
332:10 357:3,11
**hearing**  167:13
  211:7,20 342:23
  364:10
**heating**  344:23
  345:3,6,17,23
  346:3,4,10
**heavy**  38:21
**held**  44:1 83:2
  104:2
**helicopter**  68:2
**hell**  286:12
**help**  57:1,2 64:7
  65:24 67:2
  76:17 117:7
  122:11,12
  158:18 164:11
  213:5 229:16
  231:1 313:7
  332:3 334:4
  335:24 336:3
**helpful**  14:21
  55:16 202:19
**helps**  230:20
**hereto**  372:7
**hey**  9:7
**hide**  155:24
  333:25
**high**  36:24
  104:22 105:10

107:9 108:4,11
109:2,10,18
114:11,22 115:7
115:14,24
116:15 117:2
118:2,3,7,16
119:1,2,4,6,10
119:13 120:19
120:21 121:10
121:13,19,25
122:14 140:23
142:18 144:10
145:19 159:22
160:22 258:12
259:3,10 260:9
261:8,14 262:5
300:18 301:1,8
315:24 317:21
319:7 320:19,19
322:11 330:6,8
**higher**  145:17
  145:18 330:9,12
  330:15
**highly**  263:4
**hired**  329:17
**hires**  327:9,13
  327:18
**hiring**  331:21
  332:24 333:20
**historical**  319:7
**history**  19:15,16
  37:13 223:25
**hm**  108:19

**[hmm - identify]**

**hmm** 160:23
178:6
**hold** 39:7 131:2
133:22 164:18
178:25 365:22
**holding** 316:13
**holes** 59:1
**holman** 44:25
45:10,21,22
46:3,6,19 49:22
69:24 70:2
72:16,19 76:23
82:4 188:13
**home** 330:16
**homicidal** 65:6
**homicide** 83:8,9
86:9 106:15,21
106:23 107:3,5
108:3 115:13,23
116:1,11 117:16
119:5,12 127:5
127:18,22,25
232:25 240:4
321:22 322:5
360:20
**homicides** 71:23
104:22 105:10
105:21 106:17
107:10 108:5,11
108:16 109:3,11
109:18 110:3
114:12,17,23
115:3,4,7,10,11
116:15 117:2,11

118:2,4,8,10,18
118:22,23 119:4
119:9,20 120:4
120:5,6,9,13,18
120:23 121:8,18
121:24 122:4,8
122:14,16 123:7
123:20,24
**honest** 67:10
239:11
**honor** 79:5
81:14
**honored** 184:4
**hopefully** 213:4
**horn** 351:22
**hospital** 139:10
**hospitals** 9:25
**hotline** 50:2,6,8
50:10,17,18
51:10,16 52:5
52:13,25 53:12
53:14,23 59:17
60:4
**hour** 53:9 74:17
92:17 186:18
207:15 248:13
248:14 276:24
340:2
**hour's** 186:17
**hours** 52:14,24
53:2,2 74:18
248:9,10,12
290:18 291:21
294:13,15,18,19

294:23 295:3,10
340:6
**house** 82:17
209:11 248:7
279:17
**housed** 16:4
77:13 185:19
274:21 278:4
281:3,11,12,23
281:23
**housing** 21:12
46:7 47:16,18
47:22 77:16
170:13,17 173:5
208:18,23
209:17 210:15
210:20 220:6
227:24 250:16
257:1 273:25
274:10,16
275:12 276:3
283:20 284:2,10
286:23 353:17
**how's** 103:4
**huang** 2:19
**huge** 149:20
**human** 58:2
**hundred** 12:20
18:1 36:10
62:21 66:16
70:15,16 183:23
216:19 220:15
239:12 255:15
255:19 264:15

**hunk** 270:7
**huntsville** 2:14
**hurt** 80:6 86:20
**hvac** 343:16
344:3,18
**hypothetical**
122:15

**i**

**ice** 284:22
**idea** 286:11
**identification**
94:19 95:24
235:20 355:24
**identified** 28:14
77:4 107:22
129:25 175:19
201:17 217:7
237:5 254:14
255:6 256:12
257:20 288:11
288:23 304:4
312:17,20 330:7
**identify** 4:18
8:17 98:1
126:13 128:11
130:4 131:23
137:1 145:20
146:21 149:6,9
149:11 193:9
194:2,8 195:10
204:1,15 205:7
216:3 232:15,17
249:18 254:19

254:21 257:14
267:21 307:9,12
328:14 335:14
338:20 343:4,6
350:25 363:10
363:16
**identifying** 4:21
160:2,9 175:14
256:6
**identity** 12:13
153:24
**idle** 336:7
**ignore** 198:17
**illegal** 327:24
**illicit** 357:8
**illness** 9:19
21:13 170:25
**illnesses** 9:24
171:4
**image** 189:24
**imagine** 125:10
125:17 274:19
**imagining**
356:22
**immediate**
58:11 60:22
61:14 173:6
174:6,13
**immediately**
139:9 174:7
280:19
**immigration**
37:21

**imminent** 60:22
65:21 308:18
**immunities** 98:5
102:16 103:3
**impact** 274:21
**implement**
135:9,15,20
137:3 139:22
172:3 173:1,20
173:24 257:11
**implemented**
174:19 306:12
**implementing**
133:23 134:14
134:16,17 135:4
135:4 136:19
183:19
**important**
131:13 133:1
177:13
**impossible**
159:15
**improve** 118:22
174:16
**improved** 61:1
143:1
**improvement**
145:6,10
**improvements**
143:14 342:21
**imputing** 251:2
**inaccessible**
184:5

**inaccuracies**
176:15
**inaccuracy**
126:10
**inaccurate** 66:2
126:7,14 141:18
158:13,16
324:23 325:5,9
**inaccurately**
149:7 176:23
**inadequate**
252:15
**inappropriate**
30:20 31:14
111:21
**incarcerated**
19:7 50:11 98:5
100:6 102:16
103:3 344:2,18
**inception** 13:22
14:12 15:7
**incidence** 171:1
**incidences**
234:18 241:3
265:1 307:17
**incident** 3:9
61:24,25 84:12
84:21 85:12
87:10 90:22,23
90:23,25 91:18
91:23 92:1,6,10
92:14 116:2
145:22 148:3,5
149:9,11 151:25

152:5,6,19,20
152:21 153:2,7
153:13,16,25
154:5,6 155:8
155:12,12 156:7
156:14,18,18,23
157:1,8,20,21
157:23 167:15
168:2,13 169:11
169:12 170:19
173:23 174:7
191:2,6,23,24
207:13,14 214:5
214:16,20
215:25 232:24
235:11,14
236:18,25 237:4
242:5 245:17,23
249:10,16 250:6
250:12,13,19,21
251:1,6,9,11,12
251:24 254:18
254:20 257:23
262:7 265:1,3,6
265:8,11,24
266:3 267:10
295:14,20 296:8
303:25 304:11
304:21 309:14
346:25 347:7,9
347:12,14,15
353:6 367:3
**incidents** 56:11
61:24 83:24,25

84:15,19 85:4
86:1 87:23
88:19 90:4
144:23 148:8
154:17 155:13
155:15,21 156:5
156:10 157:18
157:24 158:1
159:12 160:3
170:12 192:3
214:1 234:13
240:18 242:6
243:25 244:1,23
245:18 246:10
252:5,22 253:10
254:5,10 261:9
265:16,24 300:1
304:17 308:13
347:2 359:21
**include**  16:7
20:25 85:6
93:21 107:2
116:17,20,21
123:4 251:6
259:11 301:15
331:25
**included**  21:1
65:11 96:15
97:6 102:2,18
102:25 103:16
106:13 127:3
144:14 260:3,12
261:1,21 282:17
355:15

**includes**  94:7,7
94:8 116:18
332:2
**including**  20:25
24:13 105:6
106:16,19
144:20,21
216:13 234:19
238:12,23
249:24 254:18
255:22 341:8
**incomplete**
226:20 324:24
325:5,8,19
**inconsistency**
264:1
**inconsistent**
165:5 182:4
211:15 213:20
213:25 243:10
252:23 253:8,10
253:12 255:16
262:25 263:4,18
263:23 367:18
367:21
**inconsistently**
172:20
**incorrect**
178:16
**incorrectly**
176:14 177:10
177:21,23 178:3
**increase**  119:21
297:18,21 298:3

299:1 318:5
329:15 330:19
342:24
**increased**  72:1
220:10 296:24
297:10 299:5,12
299:20 318:6,22
318:24 329:22
359:13
**increases**  80:5
**independent**
321:14
**independently**
140:2,7 248:20
248:23 294:10
**indicate**  56:25
128:9 158:6
198:23 206:10
229:11 251:10
261:4 293:8
349:23
**indicated**  26:12
61:20 115:8
145:14 147:10
150:1,15 176:23
177:2 191:2
192:10 197:25
215:15 230:10
259:1
**indicates**  106:3
149:23 164:5
357:12
**indicating**
224:16

**indicator**  85:23
**indifference**
99:14 101:20
**indirect**  351:12
**individual**
48:17 61:13
65:5 77:13
85:14,17 108:4
149:4 175:24
197:22 214:3,11
215:25 235:3
241:1,17 243:7
260:17 262:1
266:20 279:7
284:25 285:9
288:17 291:11
315:4 327:11
346:6 353:7
356:23,24 357:1
**individual's**
28:8
**individuals**
15:21 19:7 27:9
48:23 50:11
57:7,10 70:9
79:20 83:2
89:17 98:5,19
99:9 101:6
102:17 103:3
132:2 175:14
184:22 215:1,18
215:22 218:25
219:15 233:6
240:20 241:6

243:8 249:2
256:6,12,17
278:18 280:6
283:25 284:9
288:13,23
332:12
**ineffective**
243:10 252:23
338:22
**inference** 288:2
**infirmary**
185:24 186:2
**inflated** 261:15
**information**
17:8 18:14 22:6
24:10,25 25:3
25:15 26:4
27:13 29:11,13
31:17,18 32:10
32:11 34:25
36:21 56:7
61:21 79:13,15
79:17,18 80:14
82:4 84:11
96:15 97:6
98:13,16 105:8
108:3 112:10
128:14,16
132:12 148:20
149:16 153:3,4
153:6 154:4,8
154:13,16 155:2
155:3,5,7 156:5
156:25 157:16

157:19,23 158:2
158:19,25
159:19 167:2,4
176:3,25 189:6
196:16 200:4,14
208:13 210:11
211:7 212:12,22
213:7,12,18,23
216:2 226:17,20
226:24 227:23
229:15 230:13
230:23,25
244:21 245:4
251:14 252:24
253:2 264:9
276:18 282:15
282:18,23
289:16 293:8,9
303:6 305:24
308:4 309:11,14
310:1,6,9
313:13,19,25
324:17,20
326:12 328:12
330:24 335:5
337:12 346:13
349:2 352:21
353:1,21,24
354:1,7,10,14
354:15,18,21,21
355:7
**informations**
363:15

**informed** 65:6
**informs** 20:10
**infrastructure**
341:7
**infrequent**
198:11,13
**infrequently**
199:17
**initial** 32:19
119:14 173:2,22
263:6 354:9
**initially** 37:21
108:1 109:25
115:9 141:21
143:9 207:9
268:1
**initiated** 146:1
267:11,14
**injured** 153:22
191:22
**injuries** 145:9
151:7,14 154:15
156:12
**injury** 86:25
151:4,10,11,13
155:24 191:25
**inmate** 3:10
15:15,15 50:22
51:20,22,22
53:22 54:17
60:15,17,21,24
60:25 61:18
62:5 63:8,24
64:17 67:9

69:11,21 71:5
73:11 75:11
85:18,20,21
86:25,25 87:1,1
87:1,2 91:10,11
124:21 125:7
126:18,19
129:25 139:10
145:8,8 152:4
152:16 153:1,4
153:6 154:14
156:16 157:8
159:1,2,7,7
160:9,9 164:6
176:23 177:2,21
180:2,22,25
181:1,2,3,3
182:15,21
185:11 189:19
190:7,19,24
191:16 194:3,9
194:14 206:13
206:17,18,19,20
206:25 217:7
224:16,20,22
226:14,15,20,22
236:7 237:5
253:24 263:12
267:22 274:21
282:12 288:19
298:5 303:3
308:7,10,17,19
309:3,7,10,17
310:24 312:17

**[inmate - instances]**

| | | | |
|---|---|---|---|
| 316:23 320:8 | 171:3,7 176:13 | 308:25 309:24 | 253:23 254:1 |
| 327:7 336:14 | 178:3,12 180:16 | 310:8 311:10,20 | 288:6 299:13 |
| 337:3,3 338:17 | 181:9,13 183:3 | 312:11 313:12 | 300:2 303:21 |
| 344:1 347:7,18 | 183:6,10,13 | 313:14 314:21 | 306:23 310:23 |
| 356:4,19 357:7 | 184:6,19 185:19 | 315:14 316:1,3 | 319:18 320:21 |
| 360:22 364:4,5 | 185:19 189:21 | 316:7,10 328:18 | 323:20,20 337:6 |
| **inmate's** 60:12 | 189:23 190:7,13 | 330:24 335:9 | 348:24 349:10 |
| 64:16,21 71:2 | 190:16 191:20 | 336:5,8,25 | 359:5 362:18 |
| **inmates** 16:4 | 192:13 193:1 | 337:9 338:4,12 | 363:17 |
| 24:8 51:2,25 | 195:2,7,12 | 338:20 339:7 | **inspector** |
| 53:11 54:5,9,23 | 196:4,7 197:11 | 340:10,25 | 245:10 |
| 59:12 60:1 64:4 | 197:24 198:2,6 | 341:12,12 343:7 | **installed** 345:24 |
| 64:8,10,16,23 | 199:3,20 204:3 | 344:10,12 345:3 | 359:13,18 |
| 65:16,21 66:1,5 | 206:9 207:24 | 349:16,20 350:8 | **instance** 63:11 |
| 66:13 70:21 | 208:3,5 216:17 | 350:13 354:21 | 135:8,19 137:1 |
| 71:10,21 75:14 | 217:20 220:14 | 354:24 355:2 | 137:7 149:7 |
| 75:25 76:3,5 | 220:25 224:5,10 | 357:4 358:17 | 166:21 174:18 |
| 78:1,19 79:9 | 225:2,5,7,11 | 359:3,4 360:2 | 177:6,19 178:7 |
| 80:3 86:4 87:16 | 226:2 233:18,23 | 362:5 363:19 | 185:10,15,18 |
| 87:18 88:2,12 | 234:3,11,19 | 364:13,16 | 190:12,22 |
| 88:16 89:2,5 | 236:2,20 237:11 | **innate** 178:20 | 191:15 194:3,9 |
| 90:10,15 91:1 | 243:6 244:21 | **input** 273:25 | 205:20 206:2 |
| 93:15 115:22,23 | 249:15 253:15 | 275:12,21 276:2 | 214:14 215:8 |
| 122:19 127:1,10 | 262:13 265:2 | **inside** 50:12 | 221:11 230:7 |
| 128:3,4 140:14 | 266:12 269:15 | 64:8 66:24 71:9 | 236:1 266:9 |
| 145:16 149:18 | 270:6,11,12 | 71:25 72:20 | 281:2 307:9 |
| 150:16,24 | 271:1,3,5,7,20 | 73:13 77:8,10 | **instances** 62:12 |
| 151:18,24,24 | 272:7,17 273:9 | 77:16 78:1,16 | 64:2,4 67:9 |
| 153:25 154:15 | 274:16 276:9,9 | 81:3 86:1 | 127:1 128:2 |
| 155:15,20,23 | 276:21 278:23 | 127:10,14,19 | 165:9,18 178:14 |
| 156:19,25 157:2 | 286:1,9,21 | 128:12 150:19 | 180:12 212:2 |
| 157:17 158:6 | 287:13 288:8,15 | 176:17 183:10 | 219:3,9 249:8 |
| 164:5,11 167:16 | 293:8 300:11 | 229:16 232:11 | 249:14 266:5,7 |
| 169:17 170:7,20 | 303:6 307:22 | 245:13 246:10 | 266:22 267:8 |

280:23 281:17
299:4,23 300:20
301:3 302:9
310:11 359:24
360:1,13,16,25
**instantly** 58:16
**instituted** 17:1
**institution** 8:8
73:14 107:10
338:18
**institutional**
277:7 278:11,15
**institutionalized**
9:25 10:6 20:5
**institutions**
72:21
**instruct** 24:15
25:3 29:18
101:1,24 102:5
102:11 161:12
161:18
**instructed**
30:16
**instructing**
22:19,21 122:25
123:11 138:7
200:12
**instructions**
18:16 23:5 31:3
**insufficient**
247:6
**insurance** 38:20
**intelligence**
212:12,16

213:13 230:20
**intend** 100:22
100:24
**intended** 295:25
341:13
**intending**
100:23
**intent** 203:16,20
260:21,22
**interacting**
169:22
**interaction**
51:21 170:3
276:8 335:8
**interdict** 315:6
**interested**
289:14 369:17
**interesting**
129:13 141:15
**interfering**
30:24
**interject** 25:19
**intermingling**
180:13
**intern** 2:19
**internal** 176:7
176:10
**international**
37:3,6
**interposing**
18:15
**interpreted**
99:18 189:10

**interpreting**
90:15
**interrogatories**
3:8 96:5 97:12
113:12,14
122:24 129:3
131:12 142:5
163:12 184:14
203:5 260:24
282:16 340:21
347:6 352:25
356:10 357:16
357:20 361:10
361:14 367:15
367:18
**interrogatory**
96:15 97:23,25
102:2,8,18,25
103:17 109:8,9
109:17 111:25
112:3 113:14
127:11 133:8,10
133:11 137:18
137:19 138:4
139:19 140:5,10
162:8,10 163:19
172:12 179:3
188:19 202:7
211:23 213:2
222:24 223:11
223:13,17
262:23 275:21
300:16 337:20
337:21,25

352:13 356:6
357:25 358:23
**interrupt**
242:15
**interrupted**
14:8
**intervene**
299:25
**interview**
167:25 246:9,16
327:14
**interviewed**
167:16,21 233:6
249:9,15
**interviewing**
226:2
**interviews**
47:11 183:6
243:11 246:19
246:23
**intimate** 175:20
312:7
**introduced** 81:5
**invariably**
126:9 230:15
266:13 267:1
362:5,6
**invest** 89:8
**investigate**
27:14,24 60:13
127:9 206:16
231:10,20
262:20 264:23
310:12

**investigated**
11:23 12:14
16:1 89:7
127:15,17,20,22
215:17 232:11
248:20,21
261:25 266:6,10
266:15 267:24
267:25 268:1,2
268:6 303:11
304:4,24 305:1
335:13
**investigates**
241:16 243:16
**investigating**
19:24 241:15
243:4 305:6
**investigation**
8:16,20 9:13
10:3 12:8 14:4
15:4,9 16:6 17:1
19:4,8,19,20
21:8,18 24:4,12
24:14 26:2,17
27:10,18,21
29:8,17 32:7,15
32:23,24 33:2,6
33:10,17,22
34:19 36:3,9,11
41:13 44:20
48:22 49:7,11
49:18 51:14
58:19 71:15
72:2 73:22 77:1

114:17 115:18
127:24 128:17
128:19 131:25
144:19 146:1,8
146:11,12,18
199:23 201:4,18
230:19 231:3
232:8 240:1,2,5
240:7 241:9,13
241:19 244:8
247:9 249:19
257:15,21 258:4
262:8 263:18,23
264:17 267:13
296:9 302:10
318:3 327:23
348:25 351:16
**investigations**
7:2,19,22 8:11
8:13 11:12 12:1
12:12 13:21
14:11 15:11
16:19 20:7
39:25 126:3
210:8 222:16
227:2 232:24
238:14,22,23
239:13,18 241:5
242:23,25 243:1
246:3 257:13
261:4 262:24
264:6,12,15,19
302:14 318:20

**investigative**
10:10 25:21
26:23 39:17,19
44:16,19 128:7
129:21 132:13
182:12 228:6,25
231:13 239:3,8
242:3 244:1,2
247:15,15
262:11
**investigator**
6:17,20 7:1
31:13 43:25
45:8 46:21 48:7
58:5 74:25
239:22 244:8
277:8 278:16
327:14
**investigators**
29:11 238:12
243:23 244:11
244:17 245:16
245:22 246:2,9
246:16 249:3,15
296:15
**investigatory**
8:14 24:5,12
31:19 72:12
241:7 248:5
354:11
**involve** 261:9
307:19 311:3
**involved** 7:20
8:17 9:23 11:16

13:21 14:15
16:2 20:15
25:11 26:10
27:16 28:22
33:9,24,25 34:1
35:2,6 36:3
39:25 47:14
49:6,10,12,13
49:23 56:24
58:8,9 59:22
61:19 63:1
125:10 127:5
136:21,23
139:13 147:4,8
153:19,25
154:15 167:16
167:19 174:7
191:25 192:2
207:13 214:4
215:12,14
218:19 234:13
244:23 246:10
249:21 265:11
295:6 304:17,22
318:3,19 319:24
360:21
**involvement**
7:23 215:4
**involves** 15:10
26:23 33:13
169:18 211:5
230:14 260:14
307:22

**involving** 8:8
40:4 60:14
245:18 284:24
286:8 302:15
363:2
**ipcms** 296:15
**irregular**
150:10
**irrelevant**
237:23 238:6,8
**isolate** 117:6
**isolated** 85:12
116:2,5,9 175:9
207:18
**issuance** 44:21
**issue** 15:16,21
15:23 21:7 66:6
198:3 220:16
225:7 235:8
242:1 270:18
271:13 286:14
286:16 287:12
330:25 361:13
364:7
**issued** 12:9 25:9
27:21 94:23
222:24
**issues** 15:10,14
15:19 21:11
28:13 33:9
55:22 56:16,23
65:15,20 67:4
178:12 328:9
338:20 349:9

**it'll** 352:2
**items** 216:14,17
218:7,7,9
219:15,19 220:2
220:3,6,21
221:4
**ivey** 348:1

**j**

**j** 81:1 82:22
**jackson** 10:18
**jail** 7:6,13,16
11:23 12:1
41:20,23 42:15
176:1
**jails** 19:24 41:14
42:7
**january** 5:20
**jason** 45:6
**jeanie** 48:16
**jeopardy** 64:17
**job** 6:1 38:6,25
41:16 42:9,12
147:13 195:7
328:16,21
366:22
**jobs** 43:23 275:3
**joey** 57:14
**joined** 214:10
**judge** 10:22
94:8 131:3
365:6
**judging** 67:24

**judgment** 10:12
54:22 67:13,20
83:14 85:3
150:12,15
251:18
**judy** 45:9 46:16
**julie** 45:15 48:5
**jumbled** 80:17
**jumped** 334:25
**june** 3:11
**jungle** 78:25
**jury** 128:9
241:19
**justice** 1:18 2:7
2:19,19 4:13
5:18,20 6:7,21
11:2 17:2 18:23
19:5 29:9 31:14
31:19 32:12
38:25 41:15
45:9,12 49:17
91:19 97:17
99:7 100:16
104:5 146:2
159:6 287:3
303:21 366:19
**justice's** 6:3
**justifies** 202:11

**k**

**k** 2:7 57:17 81:1
370:1
**k&l** 38:3

**kay** 348:1
**keep** 51:1 60:24
129:19,19
186:15,20 200:9
202:18 273:8,9
280:6
**keeps** 256:15
305:24
**ken** 351:17
**kept** 21:11,25
155:3 189:12
278:4 281:12,24
**kerry** 2:7 4:25
351:11 370:1
**kerry.k.dean**
2:9 370:2
**key** 156:15
254:3 338:20
**kicks** 86:11
**kilby** 69:2 70:6
70:9 80:20
81:16 82:6,13
83:2 92:1
108:12,15 109:4
109:20,22 110:2
115:3,6,9,9
117:9 119:15,23
122:2 188:12
308:2 345:19
**killed** 82:11
128:4
**kind** 10:10
30:20 43:23
57:12 58:20

**[kind - know]**                                                    Page 414

| | | | |
|---|---|---|---|
| 72:7 94:4 | 60:25 63:15 | 182:20,23,25 | 293:21,23,25 |
| 192:21 211:14 | 64:6 65:13,17 | 183:2,12 189:4 | 294:3,5,9 |
| 235:5 236:15 | 65:23 66:1,14 | 189:11 190:4 | 295:22 298:7,14 |
| 248:15 251:14 | 66:18 68:4,22 | 191:22 192:15 | 302:9,11,14,17 |
| 311:8 335:24 | 69:16 70:1 | 193:3 194:13,22 | 303:24 305:4,5 |
| **kinds**  51:24 | 71:11 72:23 | 195:12 196:19 | 305:8 307:25 |
| 61:18 68:8 | 73:6 78:8,24 | 196:22 198:1 | 308:22,23,25 |
| 77:15 86:13 | 79:22 83:1,6,21 | 200:23 201:13 | 312:1,16 313:8 |
| 150:9 205:18 | 84:2,25 86:10 | 207:10 208:3,6 | 314:5,8 315:5 |
| 307:21 320:16 | 88:8,13 89:9,21 | 208:21 210:12 | 316:8 319:15,17 |
| 338:23 | 91:9,17,24 | 210:14 212:21 | 319:19,20 320:7 |
| **kits**  192:20 | 95:13 97:19 | 215:25 216:7 | 320:8,15,20 |
| **knew**   23:23 24:8 | 99:3,6 106:5,12 | 220:5,15 222:1 | 321:21,22 322:3 |
| 67:9 192:10 | 106:12 118:11 | 223:20,23 | 322:6 323:4,9 |
| 277:22 | 120:22 123:23 | 225:19 228:11 | 323:12,14,19 |
| **knife**  316:14 | 125:5,12,18 | 230:11 231:6 | 325:4,17,24 |
| **knight**  57:16,16 | 126:9,17,18,23 | 232:14 233:5,12 | 326:8,10,12,15 |
| **knives**  311:2 | 126:25 129:6,13 | 237:19 239:9,16 | 326:16,20,21,23 |
| 316:10 | 130:5 131:5,20 | 239:21,23 241:2 | 327:4,9,10,22 |
| **know**  7:18 | 132:8 137:11 | 241:25 242:11 | 328:6,7,14,17 |
| 16:12,25 17:7 | 138:13,17,18 | 243:7 244:5,16 | 328:24 329:10 |
| 20:3,9 21:4,24 | 141:9 148:21 | 244:20 245:2,8 | 329:13,14 332:9 |
| 23:25 24:7,9 | 149:1 150:6,22 | 245:12,16,20 | 337:18,19 |
| 25:1,9 26:19 | 150:25 151:6,24 | 246:8 250:19,22 | 338:10,16,19 |
| 27:5,17 28:21 | 152:15,18,19 | 250:24,25 252:4 | 342:12,15,17,19 |
| 30:19 32:19 | 159:16 165:21 | 253:17 258:13 | 344:24 345:21 |
| 34:1,17,23 | 166:2 167:7 | 260:19 264:10 | 346:20,21,25 |
| 35:20,21,23 | 169:12,16 | 267:8,12,13 | 347:4,6,25 |
| 36:1,20 41:23 | 170:24 171:1,2 | 268:8,10 270:19 | 348:22 349:8,14 |
| 45:10 46:5 | 171:14 175:19 | 274:18,23 275:6 | 350:8 353:21 |
| 47:13,21 49:1,9 | 175:21,23 176:4 | 277:12,15 278:1 | 354:8 355:10 |
| 49:13,23 52:23 | 176:8,16 178:1 | 278:11,16,19,20 | 356:12,15,18,21 |
| 53:8 56:4,17 | 178:14 181:17 | 288:5 290:16 | 357:7,11 359:4 |
| 58:18 59:22 | 181:20 182:14 | 291:23 292:1,4 | 359:7,9,17 |

360:6 362:12,14 363:9

**knowing** 66:9 111:24

**knowledge** 29:20 97:10,17 104:10 112:4,9 113:11 123:19 123:20,22 148:16 175:20 182:1,3 183:5,8 187:13,21,23,24 201:7,10,15,15 202:1 203:6 213:4 215:1 252:2 275:10 277:14 296:12 311:25 312:7,8 314:15 325:22 328:4 329:8 338:4,9 359:15 367:14

**known** 32:11 281:3 288:4 319:14

**knows** 24:7 129:4,11 137:22 187:19 224:25 238:3 270:23

**kop** 181:4

**kristi** 2:20

**l**

**l** 12:16 13:3 81:1

**lab** 293:12

**labor** 329:20

**lack** 67:2 93:23 344:22 345:6 346:9

**lands** 279:24

**large** 11:4 40:4 76:25 91:24 94:5,6 117:14 180:12 183:17 366:23

**largely** 199:21

**larger** 14:4 19:5 174:11 186:3 218:9 273:20

**largest** 19:19 120:22

**late** 7:11 339:22

**launched** 19:20

**law** 8:13 37:20 38:2,2,9 99:16 100:12 226:25 248:15 332:17

**lawsuit** 56:7,14 56:24 146:9,14

**lawyer** 20:9 99:15,15

**lawyers** 59:13

**lead** 34:11 78:20 116:4,8 143:14

225:1 353:6

**leadership** 306:17 334:18

**leading** 61:14 73:23 103:10 122:9

**leads** 239:23

**leaks** 278:7 361:20 362:3,8

**leaky** 363:8,8,9 363:11

**learned** 42:9 267:3 276:18 367:22

**learning** 41:16 42:13

**leave** 155:24

**leaving** 330:25

**led** 56:14 285:11

**left** 47:17 49:1 57:14 130:19 323:7,10 365:20

**legal** 5:14 28:17 28:19 43:11,13 100:23,24 103:8 103:10 104:13 370:23

**legally** 100:24 103:6

**legislators** 94:8

**leonard** 4:14

**lesd** 126:2 127:5 127:9 128:7 175:23 229:20

229:24 230:1 231:2,19 232:24 238:12 239:2,7 240:17 241:2,13 241:16 242:16 242:24 243:11 243:15,23 244:1 244:2,7,11,16 244:20 245:16 245:21 246:2,3 246:8,16,20 249:8,15,19,24 255:22 257:13 257:15,19 258:4 262:1 263:7,8 264:15 265:4 266:19 267:4,13 304:23 307:15 367:7

**lessened** 119:20

**letter** 26:24 27:21 32:20 44:21

**letters** 75:11,13

**letting** 64:6 113:9 178:13

**level** 69:12 71:14 73:3 79:23 81:22,22 82:17 86:20 125:6 136:23 211:21 215:6 228:8 229:24 230:4 264:17

266:17 275:4
300:10 327:6
364:22
**levels** 69:9
70:17 71:24
72:20 73:13
122:7 302:6
326:18,22
**lgbti** 14:2,2
15:24
**lgbtqi** 15:20
**license** 111:4
**lieutenant**
300:10
**lieutenants**
300:8
**life** 66:24 77:8
77:24 89:18
**light** 77:18
**likelihood** 66:25
291:5
**likely** 82:11
157:10
**limestone** 69:1
70:15 72:10
80:20,24 92:7
188:12 236:13
236:17 307:25
314:4 339:18,20
345:14 363:25
364:10
**limestone's**
184:3

**limit** 48:1
182:15,21
219:14,18
220:21
**limitations**
171:2
**limited** 65:3
107:22
**limits** 220:5,7,8
220:11
**line** 29:6 51:16
61:16,16 78:10
104:16,17 114:2
114:4 137:15,16
203:3 213:10
219:13 222:11
222:11 226:25
268:21 283:17
335:20 339:14
371:4,7,10,13
371:16,19
**lines** 168:7
178:1 211:20
222:15,16
287:16 334:17
337:4 343:19
350:19 352:18
358:22
**linking** 217:12
**list** 94:6 127:7
156:5 176:5,6,7
176:10 188:8
189:4 245:14
289:1 304:21

318:18 357:22
**listed** 214:6,11
252:5
**listen** 110:14
153:5 173:14
176:2 213:15
**listened** 246:18
**listening** 50:21
102:23
**litany** 300:23
**literally** 359:10
**literature** 318:7
**litigation** 6:23
8:4 37:23 38:17
38:19,21,22
39:24 41:9
123:10 130:15
137:20,23 138:7
146:3 147:4
171:12,15
182:16 188:7
237:21 333:23
334:13 342:2
366:23
**little** 2:19 21:21
44:8 71:12
73:24 78:25
80:17 99:2
121:16 138:12
155:25 324:21
341:1
**live** 91:14
197:17 224:5,21
365:7,8

**lives** 314:22
**living** 62:14
78:2,17 85:17
145:11 223:21
223:23 224:4,8
225:11,13
227:21 233:18
233:23 234:12
234:14 236:7,10
237:12,17
**llp** 2:13
**lobby** 354:25
**local** 332:17
351:3
**locate** 309:18
**located** 1:18
233:2
**location** 4:11,12
5:22 75:22
153:13 154:14
158:15 209:12
231:25 250:12
250:21 251:2,7
251:23 252:5
253:22 254:1,21
263:14 265:25
270:1 295:25
346:18 362:7
**locations** 189:8
245:3,5,6
307:19 359:4
**locked** 190:17
193:6

locks  86:12
lockup  63:19
  286:2,4
log  22:15 355:8
  355:11,14
logged  355:17
logs  325:12,14
  325:17,24
long  5:16 7:4
  10:3,15 31:21
  31:23 32:1,1
  34:15,23 35:23
  36:14 39:7
  52:11 57:21
  69:22 71:16
  75:23 76:25
  104:16 126:8
  186:9,16 223:23
  250:19,22 319:6
  360:23
longer  11:6
  14:19,23 26:14
  38:11 49:8,12
  53:10 81:21
  147:8 348:20,21
  364:22
longest  268:5
look  61:17
  70:25 73:15
  75:19 85:15
  87:3,21 107:20
  107:20 122:3
  141:18 147:13
  157:23 158:3

167:9 175:22
179:16,17
211:19 214:5
239:17 258:23
267:19 287:15
332:21
looked  75:22
  96:24 167:14
  192:23 202:3
  217:6 297:14
  304:25 318:17
  318:20 319:5
  324:3 325:1
  330:1 360:5
looking  48:21
  65:24 71:18
  87:9,12,13
  106:2 114:10,23
  118:12 119:22
  134:11 142:6
  145:5,12 164:8
  192:8 197:9,11
  244:5 260:2
  276:11 350:5
  353:11
looks  147:12
lord  202:5
lose  320:15
loss  11:10
lost  11:7 238:18
  334:21
lot  28:23 40:3
  58:9 65:16 66:8
  67:15,24 70:5

76:21 80:13
81:20,24 94:7
109:5 119:19
120:4,9 122:6
132:25 136:20
139:24 152:24
158:13 175:11
198:8 203:12
253:20 262:14
268:4,11 273:4
276:7 284:20
303:5 311:9
337:18 353:3
365:23
lots  239:23
  318:7 324:19
loved  60:1,5
low  56:25
  120:21
lower  300:10
lunch  186:16
lunsford  2:12
  2:15 4:23,23
  5:10 8:15,19,25
  9:4,6,8,11 10:7
  17:9,12 18:5
  19:2,12 20:18
  20:21 21:3 22:7
  22:10,14,19,23
  22:24 23:3,9,19
  23:22 24:2,6,16
  25:5,17,23,25
  26:9 28:2,5 29:2
  29:19,24 30:1,5

30:8 31:25 32:4
32:16 49:4 51:7
87:12 88:7,22
89:6,13 90:6,11
92:19,23 93:8
93:11 94:14,21
95:11,19,25
96:2 99:3,6
100:4,10 101:2
101:8,10,15,18
102:1,7,13,22
103:7,12,21,24
104:19 105:1
107:8,13,17
108:10,17,20,24
109:1,7,14,24
110:4,16,20,24
111:2,4,9,11,15
111:19,23
112:11,13,16,18
112:21,24 113:2
113:6,17,20,24
114:3,6,9,20
122:11 123:1,12
123:22 124:2,5
124:12,16
128:21,25 129:5
129:8,12,17,24
130:18,24 131:9
131:15 132:22
132:24 133:2,13
133:19,21,25
134:4,7,20,21
135:7 136:14,16

136:25 137:24
138:1,9 141:10
141:15,19 142:3
142:16,23 143:3
143:4,18,19
146:6 147:2
157:4,12,15
160:7,14,20,24
161:5,6,13,19
162:6,11 163:3
163:7,10 164:1
164:14,17,22
165:3,8 168:20
168:23 169:1,9
172:9,10 177:17
179:14,15 180:8
180:17,20 181:7
181:19,23 182:6
186:9,14,24
187:5 193:12,14
194:1 196:17
200:4,13,18,20
200:24 201:2,9
201:12,21,24
202:5,9,22,25
203:13,19,21,23
207:6 208:2,14
208:15 209:10
209:15,21
210:23 211:13
211:22 212:8,9
213:6 214:19,23
215:7 216:9
217:23 218:1,11

219:2 220:1
221:17,19,21,24
222:3,6,8,14
223:2,4,8,19
224:19 225:9
226:5,8,11,12
229:18,25
230:22 231:2,17
232:4,10,14
233:7,15,22
234:9 237:14
238:11 240:9,15
243:14,19 246:1
246:7 247:3,7
247:13,19 248:8
248:19 249:1,7
252:4,7,17
253:6 254:9,16
255:5,10,14,21
256:11,18,23
257:4,8 258:2,7
259:9,15 261:13
261:20 263:21
265:21 268:20
269:21 270:16
270:21,25
271:13,19 272:4
272:9,13 273:5
273:16,23 274:8
274:13,24 275:8
275:15,22,24
277:1,4,6
279:15 280:1,8
280:22 283:5,15

283:23 285:12
285:20 286:20
287:2,6,22,24
289:10 290:3,24
291:19,24
293:11,16,20
294:8 295:13,18
295:24 296:7,14
296:19 298:2,9
298:15,23 299:8
300:14 301:7,12
301:18,22 302:1
303:1 304:7
305:13,18,23
306:5,22 307:4
309:6,21 310:7
310:15,22 311:4
312:25 313:3,16
314:2,6,9,16,23
316:16,22 317:2
317:7,12,17
318:15 321:18
321:25 322:14
322:18 323:2,6
323:19,25
324:16,22 325:3
325:23 326:4
331:14,18 333:2
333:6,12,16,24
334:8,16,23
335:14,19
336:18,24 337:7
337:14 339:5,13
340:2,6,10,14

341:24 342:3,11
346:2,8,15,24
352:1,12,16
355:7,12,18
356:2,8 358:13
358:19 361:19
361:22 362:22
363:3 365:20
366:6,25 367:20
367:25

**lynette** 2:12
4:24

**lynette.potter**
2:16

**m**

**m** 1:19 82:18,20
**machine** 189:12
**made** 10:13
47:23 50:16
65:19 77:10
137:8 138:10,19
138:21 140:3,8
140:18 168:13
173:10 182:14
182:20,23,25
183:2 191:19
195:4 201:7
215:10 275:20
287:1 288:16
296:1 305:7
329:14 333:10
372:5

**[mail - mean]**                                                    Page 419

mail  75:24
main  11:2 45:9
  45:12 66:18
maintain  217:2
  254:4,9 256:5
  302:2 305:24
  341:14
maintained  51:4
  72:4 325:24
maintenance
  193:5 349:5,9
  349:17 363:19
major  176:19
  176:20 306:13
  362:17,19,23
  363:4,6
majority  20:20
  58:10 59:19
  78:3 86:15 88:3
  261:4 335:21
  336:6 338:25
make  17:6
  18:24 28:18
  31:20,22 49:14
  67:3 70:25 73:6
  77:20 78:14
  80:3 93:13
  108:9 130:21,22
  139:15 159:10
  166:19 173:12
  179:19,21
  198:22 203:2
  207:19 213:15
  234:7 235:3

239:11 271:21
300:3 364:14
makes  75:18
  202:6 253:25
  279:24 308:10
makeup  77:12
  79:9
making  72:22
  91:10 95:13
  209:17 233:7
  273:10
malpractice
  38:23
man  186:1
manage  119:25
  120:1 192:14
  212:14
management
  41:24
manager  277:8
  278:15
managers
  278:12
manipulate
  287:14
manipulating
  286:21
manned  322:25
manner  42:11
  107:7 192:10
  210:19 243:11
  264:8 289:21,25
  290:5 292:13,20
  292:25 295:9

344:4
manning  324:11
manson  12:19
  33:22
map  346:18
march  25:8
margaret  4:16
marijuana
  317:3
mark  1:16 3:3
  4:5 5:5,15 18:19
  26:3 32:8 202:3
  277:4 366:17
  369:3 370:5
  371:2,24 372:2
  372:4,12
marked  94:15
  94:18 95:20,23
  235:12,19 250:7
  355:19,23
market  329:21
marshal  100:22
marshaling
  201:8
marty  351:22
massachusetts
  13:6 20:24 21:5
  21:8,18 22:2
  23:11,23 24:6,8
  24:10,18 25:2
  26:2 27:7,8,22
  28:6
master  95:8

master's  37:4,9
  37:14 43:20
match  55:9
  197:9
matches  55:8
material  57:4
  66:5 204:9
  230:18
materials  91:15
  204:8
matter  1:5 4:6
  8:2,5 12:25
  13:22 14:23,24
  14:25 15:2,5
  21:5 27:7 31:21
  33:24 35:3,12
  35:23 58:21
  93:2 115:20
  186:25 207:7,8
  283:9 304:24
  305:6 352:6
  366:9 368:7
  369:4
matters  8:1,24
  13:20 14:14
  23:8 42:3 97:18
  308:14
mattress  316:15
mean  12:6
  20:19 22:10,14
  22:16 23:13
  27:3 32:18 41:6
  47:9 50:17
  53:16,17 57:25

| | | | |
|---|---|---|---|
| 58:22 59:12 | 334:1,5 335:25 | **medical** 38:22 | 42:17 170:25 |
| 69:7 77:8,9 | 338:12 341:5 | 40:1 42:17 | 171:4,16 |
| 83:20 91:8 | 347:9,10,12 | 48:18 56:15 | **mention** 13:18 |
| 93:16 99:4 | 349:11 351:5 | 65:13 254:11 | 64:24 71:6,7,8 |
| 110:17 118:25 | **meaning** 19:15 | **medicare** 40:2 | 346:15 361:14 |
| 123:13 125:24 | 94:5 130:15 | 228:15,16 | 362:6 |
| 126:2,4,21 | 205:2 220:10 | **medium** 16:2,4 | **mentioned** |
| 128:21,23 | 221:14 222:23 | **meet** 74:6 | 13:17,20 20:22 |
| 129:18 130:7,11 | 225:21 227:8 | **meetings** 74:16 | 36:2 42:5 |
| 130:13 131:18 | 253:18,18 312:7 | **member** 63:2 | 191:10 307:15 |
| 131:19 133:14 | 340:18 | 85:18 150:1 | 358:22 |
| 133:22 136:3 | **meanings** 163:4 | 155:23 169:22 | **mere** 112:2 |
| 137:17 138:2,6 | **means** 46:5 | 175:9,14 177:3 | 213:1 |
| 139:23 146:10 | 106:6 116:22 | 177:10,24 | **merge** 77:23 |
| 147:6 148:11 | 129:3,13 130:25 | 189:17 224:24 | **meridian** 13:7,7 |
| 158:12 159:15 | 131:21,22 | 285:15 312:18 | 13:17 36:4 |
| 163:12 167:7 | 134:23 136:1,4 | 315:1 335:15 | **merriam** 179:18 |
| 170:9 171:17 | 136:6 137:22 | **members** 59:23 | **messages** 76:2 |
| 173:14,15 | 138:7 142:23 | 59:24,25 60:1,5 | **met** 74:3 |
| 179:11 192:4 | 222:21 259:24 | 78:21 93:14,18 | **method** 147:23 |
| 196:24 200:10 | 290:5 295:9 | 149:25 174:2 | 358:24 |
| 204:11 208:11 | 331:7,10,16,24 | 175:11 177:14 | **microphone** |
| 209:6 220:9 | 332:18 | 183:7 204:12 | 193:22 202:16 |
| 222:24 224:1 | **meant** 234:22 | 208:24 209:11 | **mid** 7:11 |
| 228:3 232:7 | 331:16 336:3 | 214:2,7 215:12 | **middle** 162:1 |
| 240:20 248:24 | 352:13 | 266:12,13,25 | 183:17 254:25 |
| 249:11 250:5 | **measure** 69:2 | 267:9 285:3 | 352:18 |
| 253:2 257:4 | 362:25 | 286:15 312:20 | **military** 43:16 |
| 261:12 268:18 | **measures** | 328:19 335:9 | 227:22 |
| 272:9 278:24 | 143:11 194:13 | 350:14 | **mind** 57:21 |
| 290:8 301:8 | 230:25 364:4,12 | **memory** 21:10 | 138:24 146:23 |
| 302:23 313:3 | **mechanism** 69:9 | 363:25 | 173:19 207:10 |
| 324:8,14,22 | **mediation** | **mental** 9:19,24 | 257:17 263:5 |
| 332:24 333:3,24 | 334:11,14 | 21:13 33:14 | |

**minimal** 7:24
36:7
**minimum** 321:7
**minute** 114:10
182:12 235:15
252:8 310:15
351:23 352:2
**minutes** 30:13
30:14 92:18
276:24 277:2
**mischaracteri...**
88:25
**mischaracteri...**
131:11
**missed** 332:8
**missing** 13:10
158:14 188:14
251:15
**mississippi** 8:7
9:13 10:18
12:18 13:8
14:22,24 20:24
33:5,7,10,13,17
36:4 351:24
**misspoke** 191:3
**mistaken** 38:12
48:15
**mixing** 81:20
**mixture** 55:20
69:1 81:22
**mm** 160:23
178:6
**model** 358:21

**modified** 138:14
306:6
**mold** 59:2 363:2
363:5
**moment** 13:12
19:15,18 27:2
27:17 44:12
45:12,16 52:10
66:10,10 68:21
70:21 73:24
91:4 124:23
134:11 138:24
141:22 143:12
184:8,12 195:10
197:17 207:18
214:8 217:11,13
229:14 230:12
235:4,10 274:23
**money** 219:1
348:15 349:8
**monitor** 33:23
34:3,4,8,22
35:18 194:14
**monitored**
34:24
**monitoring**
25:19 29:12
34:16 35:2,5,16
35:24 36:18
69:9 78:17
214:20
**monitors** 34:11
34:12 127:1

**montgomery**
126:20 149:4
267:3 274:15
300:13
**month** 10:16
70:18 91:10,12
**monthly** 73:17
84:16 148:6
155:10
**months** 7:9
21:21 40:14
61:15,24 67:24
70:19 345:2
**morning** 5:11
5:12 59:3 68:1
**morphed** 37:23
**motivated** 55:4
55:13
**move** 30:23
31:16 123:14
168:25 178:25
186:14 213:5
237:18 238:10
276:11 284:8
322:18 364:23
365:2
**moved** 40:18
41:4 63:3,16,22
72:4 140:14
169:19 170:7
**movement**
40:10 182:15,22
194:15 286:22

**moving** 30:17
33:5 258:8
285:21 338:7
**multiple** 12:2
188:17 215:12
215:13 239:12
245:2,5 248:11
263:3 278:21,24
285:10 302:20
304:22 309:12
338:22
**myriad** 297:22

**n**

**n** 4:1
**name** 4:14 5:14
10:23 12:20
34:9,10 35:19
38:12 48:17,18
132:3 152:15,18
156:15 197:9
206:12,21
215:16 227:3
231:3,18,21
288:19 303:2,9
308:23 314:25
344:18
**names** 34:13
63:13,14 83:7
132:1,5 156:12
263:13 288:13
309:1 312:4,22
313:5,8 315:3
328:17 344:20

**narrative** 17:25
235:24 251:11
**narratives** 32:2
**narrow** 324:21
**natalie** 2:19
**nation** 94:1
**national** 331:22
332:1,8,16
**natural** 48:5
321:22 322:6
**nature** 58:11
71:23 72:18
211:4 217:15
233:8 279:23
**ncchc** 42:16
**ne** 1:19
**near** 227:22
349:18 350:15
**necessarily** 22:6
24:25 40:25
54:25 62:21
63:12 65:23
66:17 125:9
127:8 143:11
198:1 220:15
253:17 284:21
303:9 358:6
362:10
**necessary**
306:21 372:6
**need** 13:23
14:20 31:18
58:13 59:5 64:7
68:16 92:18

94:13 169:19
174:17 178:12
222:2 223:3
231:1 232:2
253:14 268:17
276:24 279:19
286:17 324:21
327:2
**needed** 56:8,8
143:11 263:10
**needs** 186:21
**negotiations**
27:4
**neither** 369:11
**never** 34:1 44:2
44:3,7 53:8 63:1
63:6 64:13
145:2 155:24
158:6,6 168:14
169:3 170:23
185:13 212:2
233:17 248:19
259:12 261:9
262:16 263:5
268:6
**new** 48:4 70:9
315:19 327:10
327:13,18
330:10,12
347:23 348:16
**news** 139:2
**newspaper**
318:8

**nickname** 72:14
**nine** 11:12,18
202:1 221:24
**non** 86:25 99:15
145:8 146:10
358:14
**normal** 148:17
180:9 331:20
**normally** 53:9
61:10 86:6
168:10 173:3
215:15 263:10
286:9 316:6
328:18,18
354:10
**north** 2:4
**northern** 1:1
4:9 6:14 38:15
45:7,8,15 48:7
75:17
**notary** 372:13
372:19
**notation** 155:2
236:19
**note** 8:12 28:24
59:4 72:23
156:21 198:22
346:23 370:10
**noted** 87:23
154:11 372:7
**nothing's** 63:22
**notice** 1:18 12:8
27:21 32:22
236:12

**notify** 184:21
**noting** 73:9
346:12
**nowadays**
183:15
**number** 3:10
4:10 11:19
16:15 19:6,7
31:4 39:3 50:11
53:18,19,23
54:3 56:3,25
59:10,18 60:9
64:20,22 71:1,3
71:4 82:9 83:15
91:24 93:6
97:25 102:2,8
102:19 103:1,17
104:22 105:10
107:9 108:11
109:3,11,18
114:11,18,23
115:2,7 116:15
117:2 118:4,9
120:21,22
122:13,19,19
140:23 142:8,9
142:10,17,18
143:5,12,21,24
144:3,10,23
145:7 155:21
158:20,22
159:21 160:16
160:21,22,24
170:22,22

178:19 189:3,14
190:15 191:18
197:11 199:3
208:6 211:6
221:11 222:11
247:4 258:13,15
258:23 259:3,10
260:9 261:8,15
262:5,8,8
264:14 281:16
283:13 297:19
298:24 300:18
301:1,4,8
316:17,17
317:13,21
320:19,20,21,25
321:4,9 323:5,9
329:16 341:12
352:10 366:12
**numbers**   55:12
69:6 86:23
87:25 117:19
118:7 145:17
239:10 281:19
297:5,7,13,16
298:14 299:16
301:2,14 318:6
318:20 319:6
322:12 339:12
**numerical**
255:18 315:10
**numerous**  206:9
206:9 225:5
266:11 335:10

**nurse**   289:20
291:19 292:12
**nw**    2:8

**o**

**o**   4:1 12:16
**oath**   90:3 96:11
97:12 101:3
104:20 105:17
120:8 131:3
139:20 181:23
187:12 275:10
275:11,16 276:1
297:9 299:3,9
299:11,18
**object**   9:10 10:9
19:9 20:16 22:5
23:18 24:24
27:25 28:10
29:5,6 49:2 51:5
87:6 88:21,24
90:5 98:25
99:11 100:7,13
100:14 101:7,14
101:22 102:4,9
102:10,20
103:18 107:12
108:13 110:12
122:21 123:8
124:9 128:24
130:12 131:7
132:21 133:9,16
135:2 136:10
137:14,15 138:5

141:8 142:12
143:7 146:4,17
157:3,6 160:5
160:11,17 161:1
161:9,17 162:3
162:9 163:1,7,8
163:25 165:1,6
168:18 169:6
172:7 177:15
179:12 180:4,24
181:15 196:15
200:2,8,9 207:2
207:25 208:12
209:8,13,18
210:21 211:12
211:16 212:5,6
212:24 214:17
214:22 216:6
217:21 218:4,17
219:20 221:16
221:18,20
224:11,23 226:4
229:7,22 230:9
231:5,22 232:13
232:19 233:13
233:19,25
237:13,15 240:8
240:10 243:12
243:17 245:24
246:5 247:1,1
247:10,17 248:3
248:18,22 249:5
251:25 252:13
252:25 254:7,22

255:7,17 256:8
256:21 257:5,25
258:5 259:7,13
261:10,16
263:19 265:18
268:18,19
269:17 270:14
271:22,22 272:6
272:11,21
273:12,19 274:6
274:11,17 275:5
275:14,17,18
279:10,18 280:7
280:10 283:1
284:19 285:17
285:24 286:24
287:5,20 289:8
290:1,21 291:12
291:22 293:6,14
293:18 294:6
295:11,15,21
296:2,10,17
298:6,12,21
299:6 300:4
301:5,10,16,20
301:24 302:24
304:2 305:11,16
305:21 306:2,19
306:25 308:15
309:9 310:5,20
313:1 314:13
316:19,20
317:10,15
321:10 322:13

322:15,20
323:17 324:13
324:18 325:20
331:12 332:25
332:25 335:7
337:1 339:3,25
340:4,8 341:22
345:25 346:11
355:4 358:11
361:17 365:18
366:25 367:20
**objected** 95:6
**objecting**
200:11
**objection** 8:10
17:5,14,15,21
17:22,23 18:8
30:15,22,22
108:18,20
111:16 112:14
113:3,4,5,7,8,9
114:3 130:21
137:25 181:19
297:25 316:25
317:5 333:14
362:20
**objections** 3:7
17:25 18:15,24
31:2,20,22 96:4
98:12 111:14
**observance**
362:4
**observation**
59:7

**observe** 28:7
197:18 314:22
328:19
**observed** 22:16
197:15
**observing** 211:6
299:25
**obstructive**
268:23 269:7,23
**obtain** 206:12
238:3 244:12,17
244:20 249:20
286:22
**obtainable** 81:6
**obtained** 240:6
322:1,3 367:19
**obtaining**
291:15
**obtains** 241:17
**obviously** 15:9
20:8 40:18 50:4
59:14 77:10
133:1 198:20
235:1 287:10
322:6 365:23
**occasion** 53:10
127:4 170:15
197:19,23
237:11 324:3
335:16
**occasionally**
65:10 309:19
**occasions** 62:6
62:11

**occur** 124:23
127:10,13 148:9
150:18 190:14
190:25 250:1
252:5,20,22
253:10 261:12
265:16 291:2
304:12
**occurred** 63:12
88:19 105:22
120:23 123:20
123:24 127:19
152:22 153:2
155:22 156:8
164:13 166:12
190:20 206:7
251:12 254:5,11
261:9 281:17
291:20 292:5
293:9 299:24
301:3 347:1,2
347:13,16,17,18
**occurrence**
150:11
**occurring** 90:4
199:9 287:4
**occurs** 190:3
265:7 270:1
285:7 306:23
**october** 26:25
**ods** 59:3
**offense** 279:22
**offenses** 279:23

**offer** 203:11
**offered** 357:1
**offerings** 337:22
**offers** 337:15,19
**offhand** 21:6
177:12 255:11
**office** 2:4 52:7
126:19,20 127:1
168:8 189:13
212:13,17
240:22 245:9
254:11 274:14
276:15 334:18
335:2,11,15
351:3 355:3
**officer** 169:10
169:13 190:18
250:25 263:2
272:15 276:12
278:20 299:24
303:2 308:12
325:15 327:10
328:15,23 329:2
329:3,5,12
**officers** 243:16
244:13,18 249:9
249:21 250:20
272:9 276:10
302:16 303:10
303:12,16,21
304:16,22 305:3
305:25 307:6,10
309:23 314:18
325:11 329:16

| | | | |
|---|---|---|---|
| 330:2,20 353:17 | 101:10 102:1 | 241:12 248:13 | 62:11 68:12 |
| 353:22 | 106:9 107:6 | 255:22 257:7 | 82:15 86:8 |
| **offices** 38:17 | 109:14 110:22 | 258:8 264:2 | 91:20 239:20 |
| **official** 53:1 | 111:12,20 | 266:3 267:21 | 318:19 344:23 |
| **officially** 27:6 | 112:11 113:24 | 269:4,5 273:16 | 345:7 |
| **oh** 12:6 47:20 | 114:13,25 | 275:22 276:17 | **ongoing** 27:4 |
| 50:25 152:17 | 116:13,24 | 277:1 278:14 | **online** 245:1,6 |
| 230:3 292:19 | 117:25 118:3 | 283:5 284:5,7 | **open** 14:3 27:10 |
| 334:25 | 119:7 120:7,17 | 287:23 290:25 | 27:10 32:14 |
| **oig** 245:12 | 121:6,9 122:14 | 293:1 294:4 | 49:21 51:17 |
| **okay** 7:15 9:16 | 123:12,25 124:2 | 296:22 297:6 | 52:13,16,17 |
| 11:25 12:10,11 | 124:21 125:1,20 | 307:14 311:5 | 269:19,23,24 |
| 15:14 16:17,20 | 126:5 127:18 | 314:2,16,24 | 365:22 |
| 16:25 22:23 | 133:19 134:7,10 | 315:17 319:10 | **opened** 14:5,25 |
| 23:3 25:13,17 | 134:20 137:24 | 322:17,18 326:5 | **operate** 87:18 |
| 25:23 27:7,20 | 143:3,23 145:25 | 335:3 339:18 | 192:14 |
| 28:2 31:25 33:5 | 149:21 152:8,14 | 342:3 345:9 | **operates** 19:23 |
| 33:21 36:2 38:9 | 155:7 158:25 | 348:6 352:15 | **operating** |
| 39:16 40:5,10 | 159:9,19 161:5 | 356:2 363:4,7 | 137:10 |
| 40:17 41:7 | 164:16 168:15 | 366:6 367:23,25 | **operation** 41:20 |
| 43:18,22 44:4,6 | 168:17 179:7,19 | **old** 79:21 | 137:13 |
| 49:5 50:10 | 180:19 186:9 | **older** 36:11 | **operational** |
| 51:23 52:13,19 | 188:4 196:22 | 65:16 | 346:3,4 |
| 60:11 61:9 | 197:15,19 | **onboard** 190:4 | **operations** 7:5 |
| 64:10 68:12 | 198:10 200:18 | **once** 57:11 65:5 | 41:23 42:7 |
| 71:13 72:17 | 202:2 205:4 | 65:13 98:11 | 148:25 171:19 |
| 73:20 74:20 | 208:14 210:14 | 152:25 191:5 | 180:9 182:21 |
| 82:21,23,24 | 210:18 212:8 | 272:18 286:13 | **opining** 320:19 |
| 83:1,4 84:8,14 | 221:10 222:3,6 | 304:11 | **opinion** 28:24 |
| 84:17,23 85:6 | 222:10,12 | **oncoming** | 89:3 100:17,25 |
| 85:22 89:6 | 224:19 226:11 | 355:13 | 161:10 209:20 |
| 90:21 94:14,22 | 227:6,18,20 | **one's** 7:23 82:14 | 210:5 224:13 |
| 95:1 97:22 | 228:11,23 232:4 | **ones** 14:14 15:6 | 230:5 234:2 |
| 98:11 100:10 | 233:15 235:6,25 | 57:18 60:1,6 | 237:23,24 238:5 |

**[opinion - part]**

238:8
**opinions** 29:15
**opportunity**
6:16,20 214:9
229:15 230:13
242:2
**opposed** 55:14
71:22 97:14
127:23 176:20
179:4 195:8
205:23 235:4
240:25 264:17
299:14
**option** 320:6
**order** 18:10,11
18:18 20:4
29:21,22 30:2
30:18 31:4
45:23 62:15
95:17 99:7
104:3,17 134:8
162:23,25 182:5
182:21 221:3
286:22 290:18
290:20 328:8
329:15
**ordered** 31:3
203:4
**organs** 138:23
139:1,3,10
**orientation** 7:10
**original** 34:2
49:6

**originally** 39:11
75:20 341:6
**outcome** 142:25
143:2 369:17
**outcomes** 66:7
**outer** 184:7
**outright** 67:9
**outside** 113:11
114:7 180:22
183:21 184:4
237:25 291:4,9
**overall** 66:5
68:14 69:17
71:22 74:8
77:23,24 100:1
105:15 108:15
219:23 228:25
262:11 354:13
**overcrowded**
78:10
**overdose** 315:18
317:13,22 318:3
318:5,13,22
320:20,22
321:12,16 322:6
322:11
**overdoses** 67:25
68:2 321:23
**overseas** 227:21
**overseeing**
169:11
**oversees** 9:19
**oversight**
306:18

**owe** 219:1
**owed** 218:13
**own** 69:7 97:9
99:15 116:1
132:13 189:7
248:20 282:18
282:19 319:5
322:12 359:1

**p**

**p** 4:1 13:3,3
83:24,25 84:1
**p.m.** 187:1,2,4
283:8,10,11,13
352:5,7,8,10
366:8,10,11,13
368:5,8
**page** 3:5 18:17
31:3 96:7,8
97:23 98:13
104:20 159:11
162:1 188:20
204:18,18
212:25 222:12
222:17 235:16
235:23,24
249:23 250:16
251:10 258:18
261:1 278:7
279:5,5 282:4
283:16 296:20
300:17 301:13
331:3,4 341:2,2
347:5 352:13,19

362:16 371:4,7
371:10,13,16,19
**pages** 134:4
**painting** 313:11
313:12
**palette** 140:1
**paper** 182:24
**paralegal** 2:19
2:20 37:21,24
38:5 39:4,13,14
41:5,6 43:25
45:14 75:1
**paralegals**
39:18
**parameters**
17:6 294:2
332:14
**parcel** 68:8
**parens** 215:15
**parole** 56:19
57:2
**part** 8:12 24:1
24:11,14 29:7
29:16,17 31:13
31:19 43:5,10
44:7 48:2 54:21
56:6 68:8
101:20 103:15
104:14 105:14
117:18 132:14
139:13 143:9
145:25 146:7,12
146:20 152:25
160:21 161:7,14

172:25 192:21
213:18,21,23
215:23 217:14
218:9 219:24
226:19 227:6
248:24 253:7,9
253:11 254:2,3
260:5 262:10
273:20 284:23
285:10 305:9,13
305:18 328:1
366:22,23
**partially**   28:17
**participate**
14:10 336:25
339:9
**participated**
20:14 153:16
227:10
**particular**
43:12 59:11,13
60:12 63:17
65:15 70:13
72:22 73:14
76:7 77:20 80:8
107:16 149:6,12
150:13 169:12
169:15 175:11
177:3,20 193:2
194:2,8 195:11
199:10 214:4
218:15 228:17
236:1,18 239:25
242:5 249:19

253:22 255:1
258:14 263:2
265:16,17
278:22 281:18
315:12 325:15
325:18 343:12
345:18 360:13
364:3 365:11,12
**particularly**
236:16
**parties**   1:19
26:25 369:12,15
369:16
**partners**   38:13
**party**   24:6 48:2
112:10 332:10
**passes**   75:17
**past**   30:17 57:20
75:20 91:3
98:11 304:14
316:11
**paste**   147:13
**paths**   183:20
**pattern**   98:3
102:14 103:1
116:6 145:5
164:6 211:5
**patterns**   81:12
**pay**   218:8 220:4
**paying**   220:17
220:17
**pays**   330:1
**pc**   184:3

**peacefully**
224:7
**penalty**   96:11
131:4
**pendency**   50:1
50:23 318:23
359:18
**pending**   31:7
**pennsylvania**
2:8
**people**   9:23 10:5
21:11 23:10
34:14 45:5 48:1
52:8,9 55:1,9,11
55:13,21,25
56:5,15,16 57:1
57:5,13,15 69:1
70:2 73:1 78:23
79:7 81:20,20
81:22,23 86:10
100:2 127:3
145:10 153:15
175:23 176:8
185:25 186:5
190:10 193:4
197:2,3 198:17
198:19,24 214:3
214:6,11 215:5
215:13 233:5
234:5,7 248:25
249:1 267:3
268:4 278:21,25
279:21 308:21
312:6 315:18,23

318:12 319:21
320:7 326:13,16
327:4 330:24
332:3 341:18
**perceived**
284:24
**percent**   12:21
36:10 60:7
62:22 66:16
70:16,16 81:18
88:4,19 89:23
90:3,7,13,13
145:9 183:24
216:20 220:15
255:15,20
264:20 267:7
312:2 337:17
339:1 347:24
361:5
**percentage**
54:10 56:22
60:4 78:23
132:15 239:11
264:18
**perfectly**   111:25
**perimeter**   314:3
314:12
**period**   6:6 7:10
26:13 28:21
61:14 71:16
72:25 73:4,5,8
91:6 105:22
106:10 115:5,10
141:21 145:11

**[period - place]**

277:18,23
290:17 304:20
**perjury** 96:12
131:4
**permission**
63:24 190:7
**permits** 112:6
**permitted**
189:21
**perpetrator**
227:4 231:4,19
231:21 232:16
232:17 242:4
284:18
**perpetrators**
245:18 246:4
283:25 284:9
**perpetual** 66:6
**person** 53:4
55:4,18 57:24
57:25 61:3
62:19 74:8,10
97:20 110:8
180:14 207:11
216:4 218:21
225:13 353:10
**person's** 62:14
321:15
**personal** 29:15
29:15,20 100:16
100:17 104:10
112:4,8 113:10
125:21 128:19
148:16 182:2

187:13,23
199:21 201:25
203:6 210:1
213:3 224:13
233:16 234:3
252:2 275:10
367:13
**personally**
16:11,12 28:15
47:17 75:21
102:23,24 131:5
149:2 165:9
246:8 251:8
275:15 299:3
315:13 326:2
361:4
**personnel** 94:7
251:23
**persons** 20:5
35:16 55:20
**perspective**
55:17 115:15
241:20 321:9
**pertaining**
41:19 42:7
159:1 196:7
213:19
**pertains** 196:3
**phase** 26:23
33:23 34:3,4,22
35:5 36:15
44:16,19 49:10
54:16 72:12
173:7 182:13

227:14 263:6
**phone** 50:12,20
50:21 51:1,8,24
52:5 53:19,25
54:1,6,11,16,18
55:5,6,14,14
58:9 59:9 60:3
61:14 63:7
66:20 68:10,15
68:20 69:21
70:12 84:25
87:15 91:5
110:17 150:9
154:9 176:2
178:11 190:16
191:18 206:9
207:9 213:15
221:1 225:6
233:4 253:4,21
262:12 266:11
276:6 308:5
315:25 316:6
336:15 339:23
340:13
**phones** 53:4,6
54:24 55:1,11
282:19 310:18
311:2,6 316:18
**photos** 150:3
**phrase** 132:19
132:22,25,25
133:25 134:25
161:20 185:5
195:20 204:25

208:16 216:21
221:5,13 234:1
300:25 341:3
**phrased** 107:25
**phrasing** 46:12
173:19
**physical** 15:16
75:16,24 77:11
77:12 85:5
234:20 245:5
256:20 257:1
260:15 326:25
327:6 341:3
348:23 361:13
364:5
**physically** 66:11
78:7 86:11
256:1
**pick** 68:17
**picture** 226:21
**piece** 117:16
122:6
**piled** 185:25
**pill** 181:4
**pistols** 311:3
**pivot** 40:6,8
**place** 82:10
86:19 88:5
94:14 95:6
110:2 111:13
121:14 160:2
170:5 174:24
175:3 220:24
231:7 345:16

356:5 369:7
**placed** 95:20
170:13,17 274:1
274:16 275:13
276:4 286:9
**placement**
173:3
**placements**
274:2 276:5
**places** 72:16
82:3 119:21
171:15 174:25
175:2,6 189:11
**plaintiff** 1:7 2:2
173:4
**plaintiff's** 18:12
31:8 98:2
100:19
**plaintiffs** 173:4
**plan** 347:23
**planning** 186:15
**play** 144:6
239:24 333:25
**plea** 240:6
241:18
**please** 4:18,20
5:3,13 11:15
30:25 110:16,16
110:17 113:20
204:1 213:22
336:21
**plumbing** 341:9
363:9

**plural** 117:21
178:3
**plus** 81:1
**point** 5:23 35:4
37:19 40:5
49:25 50:3
62:10 65:9,19
67:4 79:19
80:13,16 118:14
119:19 121:15
144:4,7,25
145:14 146:23
156:13 165:15
180:14 184:11
184:24 193:19
204:17 210:24
211:2 212:25
217:16 226:23
238:2 244:19
248:6 258:25
263:10 304:15
307:23 308:17
308:19 309:4
349:6
**pointless** 238:8
**poked** 75:10
**policies** 124:25
138:14 208:22
209:1 242:17
334:19
**policy** 124:22
125:2,4 137:9
137:13 138:10
139:11,18

147:22,25 148:2
173:8,9,14,16
174:9,14,19,21
196:3 210:9
217:2 218:19,20
242:16 243:5
302:2,5 305:10
305:14,19 306:7
307:11 335:16
357:12 367:11
**populated** 46:3
**population**
100:6 117:12
286:19 298:5
320:4 327:7
328:10 341:10
**populations**
72:5,9
**portion** 149:20
150:17 163:22
183:8 211:9
**portions** 239:6,7
**pose** 288:14
328:10
**position** 39:2,7
39:22 43:9
219:22 231:10
277:9 278:15,16
279:3 329:4,11
350:24
**positions** 43:18
43:24 277:13,16
277:19,24
323:20

**positive** 306:16
320:9 356:19
357:8
**possession**
112:4 213:3
367:13
**possibilities**
136:23
**possible** 53:2
79:11 85:12
184:10 185:23
206:14,15 216:3
216:8 320:12
350:20
**possibly** 105:6
121:3 127:4
141:25 191:9
260:4 268:5
**post** 248:15
322:19,24
**posts** 322:23,25
323:2,7,10,12
323:15,21,23
324:10 358:15
**potential** 164:15
225:3 241:15,16
243:5 256:13
279:8,8 280:25
332:22 333:4,8
333:13,18 353:3
**potentially** 62:2
169:25 189:9,9
230:17,20 260:7
285:3 310:2

326:7 331:22
332:2
**potter**  2:12,15
4:24
**powers**  20:7
**practically**
40:13 53:3
83:18
**practice**  6:25
8:3 38:21 52:10
98:4 102:15
103:2 116:6
183:1,3,4 211:5
365:5
**practices**  208:18
208:22 209:6,6
300:3
**prea**  262:1
263:2 264:12,17
264:18 277:7
278:11,15,20
279:7 286:21
**precise**  93:24
**predator**  78:24
279:8,8,16
280:17,18 281:3
281:7 282:11
284:22 288:1,1
**predatorial**
280:16
**predators**
256:13 278:4
279:6,23 280:9
281:12,23 282:7

287:18,19 288:6
288:10,14,24
289:3
**predominant**
270:1
**premise**  90:9
**preparation**
74:3 75:7
**prerogative**
366:3
**prescribed**
199:13
**present**  1:19
2:18 18:22 22:9
309:12 318:5
353:12,16
**presentation**
303:7
**presenting**
225:3 309:11
**presiding**  10:21
**pressure**  225:7
**preston**  45:10
46:16
**pretty**  58:14
76:19 79:3
80:11 81:2,9
121:17 136:22
166:15 232:9
276:13 315:25
330:6,8 344:24
362:4,6
**prevent**  30:21
100:5,12 136:22

229:16 231:1
240:13 242:6
327:2
**prevented**
183:13 217:19
**preventing**
195:7 289:14
**prevents**  183:22
350:22
**previously**  10:9
99:19 120:9
249:2 327:24
**prey**  78:24
**primarily**  7:4
235:15 310:18
**primary**  98:1
215:3 218:6
**prior**  5:21 6:1
7:12 11:22
43:24 44:20
61:11,12,22
85:14 140:4,9
147:13 185:7
207:13,16
213:14 225:16
244:21,22
245:18 246:3
291:21 304:20
340:20 348:24
355:8,15 356:9
357:15,19
**prison**  7:2,6,13
7:16 11:23 12:1
19:18 22:11,16

28:15 41:20,24
42:2,16 46:22
49:7 50:13 55:2
57:14,15 63:2
69:17 70:10
76:23 77:10
81:18 89:18,25
108:4 115:19,21
150:5,22 175:25
180:9 190:14
192:19 197:20
210:8 217:18
232:11 234:5
278:22 279:24
279:25 280:12
280:15,18,20
285:14 286:12
287:10,11
303:22 317:4,9
317:14 318:9,11
318:16 319:18
320:14 329:11
337:6 338:7
341:6,14 347:23
348:16 351:1
364:14,21,24
365:5
**prisoner**  106:15
124:7,13,17
125:23 128:11
128:22 129:14
129:16 130:9
131:17 133:24
134:19 135:10

135:16,21 136:9
136:12,19 137:4
138:19 140:4,9
140:18,24,24
142:8,8 143:6,6
144:11,11
145:20,21
147:15,17,17,21
147:21 148:9,9
149:8,8,13,24
149:24 150:13
150:14 158:9,9
158:20,20
159:21,21 160:3
160:3,22,22
161:15,15,24,24
162:14,14
163:23,23 164:2
164:2,24,24
165:4,5,11,11
165:19,19,24,24
166:23,24
167:15,15
169:15,15 170:6
170:7,16,16
172:1,1 173:10
173:11,21,21
174:20,20
185:16 204:22
204:22 205:8,8
205:12,13 206:3
206:3 218:2
238:23 246:9,19
249:25,25

252:18,19
253:11,12
258:13,13 259:4
259:4,10,10
260:9,10,24,25
261:7,7 262:6,6
262:20,20
268:23 269:6
296:23,24 297:2
297:2,9,10
298:11,11,24,25
298:25,25 299:4
299:4,11,12,19
299:19
**prisoners**
104:23 105:11
108:12 109:3,11
109:19 114:12
116:15 117:3
139:4 178:23
179:8,23 184:15
185:3 188:22
195:17,17 201:5
202:13 204:21
216:12 234:13
243:11 246:16
255:24 256:2,19
257:1 274:1,10
275:13 276:3
278:5 281:24
302:23 317:22
335:22 339:1,15
340:23

**prisons**  16:8
19:24 41:13
42:8 46:20 47:7
53:7 69:13,18
69:25 72:7
76:10 80:18
94:2 99:23
107:22 108:7
115:1,12 116:18
117:10,23
119:25 120:2
121:12 140:12
140:13 150:19
164:6 171:8
176:17 183:11
183:24 185:24
189:3,15 224:25
285:19 307:18
338:6 339:22
341:1 348:24
363:21
**private**  26:5
358:14
**privilege**  8:14
10:10 17:23,24
19:11 23:18,19
24:2,5 100:14
101:22 102:10
102:20 161:9
163:8 200:11
201:15 221:20
233:13 243:12
243:17 246:5
310:20 316:25

322:15 323:17
331:12 333:1
339:3,25 340:4
340:8 341:22
345:25 358:11
361:17 362:20
365:18
**privileged**  18:13
25:3,14,22 29:7
29:9,17 49:3
51:5 103:4
124:10 196:15
200:9,15,17
201:16 208:12
209:8,13 210:21
212:6,7,24
214:17 245:24
256:21 257:5,25
258:5 259:7,13
263:19 268:19
274:6,11 275:19
283:1 287:20
289:8 290:1
294:6 295:11
296:17 297:25
298:21 299:6
301:5,10,16,20
301:24 302:24
305:11,16,21
310:5 313:1,25
316:20,20 317:5
317:10,15
333:14 334:9
341:25 342:2

**privileges** 18:20
19:1 98:4
102:16 103:2
104:4 130:23
**privy** 47:24
124:14 165:14
189:5
**probably** 11:5
11:20 23:7
68:13 70:3
78:13 115:20
125:13 140:1
189:22 213:17
237:19 239:12
300:9 307:12
321:24 334:17
341:10 364:2
**problem** 61:9
116:12 171:9
211:14,18
218:10 219:23
226:8 363:16
364:15,23 365:2
365:3,5
**problematic**
72:9 237:17
325:19
**problems**
139:25 272:22
361:15 362:18
363:20,25
364:19
**procedure**
137:10 147:22

154:22 175:18
**procedures**
231:7 242:18
**proceed** 17:13
64:11 229:4
366:1
**proceedings**
369:10
**process** 24:12
31:20 111:8
129:22 160:2,9
160:13,15,19,25
161:4,8,14
175:13,18
181:17 213:19
213:24 219:24
234:15 241:7
252:12,16 253:8
253:9 262:11
263:4 273:13
286:22 287:14
325:10 327:11
328:7 331:20
**processes**
143:13,14
**proctor** 94:8
**prodding**
287:13
**produce** 73:16
87:20 122:7
129:21 158:23
**produced** 62:23
62:24 84:12
91:18 92:1,6,9

92:13 128:8
158:19,24 159:5
161:2 235:14
239:3 252:20
254:17 260:5
367:4
**produces**
155:10 159:1
**product** 18:13
95:8,18 100:25
101:23 102:5,11
102:21 104:14
114:5 122:22,24
123:10 130:22
137:16 138:6
146:4 161:10,17
163:2,9 165:1,6
172:7 177:15
179:12 200:3
203:7 223:1
**production** 63:5
**productions**
204:10
**professional**
344:4
**profile** 55:7,18
**profit** 155:25
**program** 192:21
236:15 273:21
274:2 276:4
319:25 320:6
337:9 339:9,9
364:14

**programming**
337:16,19,22
338:16,17,21
339:2 357:10
**programs**
192:13 319:19
319:22 335:21
336:8,25 337:18
338:1,5,11
**prohibition**
99:22
**prominent**
318:4
**promulgated**
42:24
**propensity** 66:2
**proper** 104:2
106:24 130:21
329:6
**properly** 282:7
341:11
**proportion**
78:19
**proposals** 195:1
195:4
**prosecute** 227:3
229:1
**prosecuted**
227:8 303:21
**prosecution**
128:3 227:7,11
241:17 351:4
**prosecutorial**
227:14

[prospective - question]                                    Page 433

**prospective**
  348:10
**protect** 18:12
**protected** 98:6
**protection**
  62:16 164:7
  168:7
**protective**
  286:18
**prove** 89:9 99:7
  100:23,25 103:5
  200:17
**proved** 30:15
**provide** 31:2
  62:16 196:11
  270:12,17
  281:22 309:2
  335:21 339:15
  340:22 358:7
**provided** 11:11
  18:10 159:20
  194:25 195:23
  227:23 288:20
  289:16 307:6
  312:4,22 367:14
**provides** 98:12
**providing**
  313:13 314:1
**proving** 103:7
  161:11
**provision** 42:17
**public** 8:16,18
  8:20 9:20 12:3,5
  12:7,10 17:7

19:10 22:6,12
22:13 24:24
25:20,21 26:6,7
29:10,11,13
32:13,17,18
146:7,11,12,18
328:23 372:19
**publicly** 12:9
22:15 25:10
26:4 32:10
84:10 158:24
159:1 161:3
342:8 348:15
349:25
**publish** 25:14
**published** 26:24
42:6 320:24
**publishes** 73:16
**publishing**
26:23
**pull** 64:5 232:5
**pulled** 233:3
**punches** 86:11
**punish** 174:8
260:17
**punished** 174:5
**punishing**
356:23
**punishment**
99:23 103:15
286:5 302:23
303:4
**purchase** 220:6

**purchased**
  219:15 315:6,8
  315:9
**pure** 54:20 82:8
**purely** 115:18
  229:24 260:21
  291:14
**purist** 117:19
**purported**
  167:15
**purpose** 203:8
  240:11 241:8
  291:10 295:13
  295:19,23
  296:13
**purposes** 55:3
  290:11
**pursuant** 1:18
  95:17 104:17
**pursue** 206:23
  227:1 331:6
**put** 18:8 36:22
  55:24 63:17,18
  64:17 68:15
  82:10 128:20
  162:22 209:3
  211:21 232:22
  247:4 269:15
  272:7,19 285:25
  286:2,4 318:10
**puts** 272:4
  273:17
**putting** 93:24
  272:10,15

**q**

**qualifications**
  28:18 328:21,22
**qualified** 25:7
**qualify** 343:23
**quantify** 118:11
**quarterlies**
  73:18
**question** 9:9
  14:7,8 16:9
  17:16 18:16,16
  18:24,25 26:10
  30:21,23 62:1,3
  67:8 70:23 71:7
  77:17 86:3
  88:11 89:21
  93:12 101:24
  102:24 103:11
  104:6 105:19,21
  108:1,23 109:15
  111:6 112:19,23
  113:3 114:1
  119:3 121:16,18
  121:20 122:21
  123:6 124:11
  127:21 131:9,10
  142:18 143:18
  147:20 153:5
  154:12 156:4
  157:12 161:7
  164:21 167:20
  169:8 180:17
  188:5 203:14,22

210:18 212:1
213:11 214:23
218:6 221:22
226:1,6 234:22
240:16 247:23
250:10 252:11
253:7,13 255:8
259:20 262:5
263:17 273:6,7
273:8 275:19
279:6,15 280:2
280:4 284:4,6
285:12 288:22
289:12 291:14
293:1 294:4,7
300:22 309:21
313:17 321:3,8
328:6 337:7
339:6 340:15
345:7 352:12
354:5 359:2
364:25 365:10
**questions**  23:7
29:6,22 30:10
30:11 31:6,12
32:9 100:18
104:18 105:19
113:10 131:13
137:15 168:25
203:3 237:20,22
238:9 300:23
366:5,18 367:24
368:4

**quick**  52:2
366:4
**quickly**  110:21
186:14 284:4
293:25
**quite**  21:19
36:11 166:10
236:15
**quote**  109:19
363:11
**quoting**  109:16

**r**

**r**  2:12 4:1 12:16
13:3 57:16
369:1 371:3,3
**rack**  350:23
**racks**  350:13
**rains**  362:5
**raise**  365:25
**raised**  267:23
**range**  40:1
136:22 165:13
168:10 321:22
353:23,25
**raped**  61:4
**rapist**  288:3
**rare**  55:4
206:23
**rate**  108:3
117:16 318:22
322:11
**rather**  30:24
234:14 253:21

267:17
**raw**  230:18
339:11
**ray**  351:17
**rdp**  1:8 4:10
**reach**  122:22
124:8 136:23
211:2 267:1
282:24
**reached**  122:13
122:23 123:9
124:10 211:21
**reacting**  86:7
**reaction**  169:21
172:25 173:2
**reactions**
140:15
**read**  20:9 30:1
42:6,10 96:24
97:8 108:22
114:21 141:3
162:15 172:12
172:13,17
193:18,19,23
216:18 234:17
235:15,23
242:21 253:14
295:7 296:5
341:20 342:3,5
348:12 370:9
372:5
**reading**  30:18
84:5,6 109:7
162:8 317:24

341:24
**real**  52:2 214:10
215:9 275:9
**realistic**  66:19
**reality**  183:4
**realize**  271:10
**realized**  233:5
**really**  65:17
73:19 75:11
78:9,9,9 82:2,2
86:15 94:5
129:12 137:15
171:7 184:11
259:23 307:24
**reason**  53:10
92:3,5 107:4
162:25 176:14
180:1,5 226:19
251:15 272:2
280:12 315:15
370:11 371:6,9
371:12,15,18,21
**reasonable**
118:9,14 142:9
143:5,21 144:3
316:17 317:3,8
317:12
**reasonably**
365:17
**reasons**  77:23
169:20 178:19
286:7 350:10,11
**reassigned**
278:17

**recall**  11:2
44:14 49:16
72:22 96:23,24
97:5 105:7
108:14 115:9
126:15 127:4
128:5 140:20
145:24 177:12
182:11 217:4
242:19 248:10
255:11 304:25
327:16 342:23
353:20 356:11
356:13,14 361:7
**receipt**  370:17
**receive**  37:8
38:4 41:12 54:1
56:23 67:14
68:10,12,20,23
70:8 71:21
75:13,25 76:2
84:15 152:15
194:10 205:9
227:24 309:23
330:24 339:19
339:22 340:11
**received**  37:13
43:20 51:2,8,25
53:25 54:5,8
59:10 60:4
61:24 63:7
69:21 70:5 71:3
93:14,17,20
94:10 104:10

154:9 155:13
157:17 200:5
204:8,10 205:13
205:21 247:8,14
248:1 265:10,14
266:11 291:9
293:7 298:4
308:5 310:8,10
354:20 359:20
360:7
**receives**  51:19
**recent**  57:19
70:14 326:10
343:18 345:12
**recently**  33:25
35:7 306:9
**recipient**  94:6
**recognize**  94:16
95:25 355:20,20
**recollection**
46:16 65:9
296:4 355:25
357:15
**recommend**
257:11
**recommendati...**
95:10 112:1
213:1
**recommendati...**
295:25
**record**  4:3 18:8
30:9,14 31:2
51:1 93:1,3,6
95:6,14 111:5

111:14 157:13
186:23 187:1,3
193:23 251:23
283:8,10,13
289:11 313:4
352:5,7,10
366:8,10,13
368:4 369:10
**recorded**  369:8
**records**  61:19
**recross**  3:2
**recruitment**
329:15 330:19
330:22 331:1
**redirect**  3:2
**reduce**  142:8
152:25
**reduced**  145:7
**reducing**  231:15
**reduction**
144:23 145:2,4
**reed**  57:16
**reeves**  10:24
**refer**  7:25 110:6
178:13 221:4
259:18 283:16
298:16,19 343:1
351:3,8 363:20
**reference**  105:3
156:22 258:12
258:20 287:16
311:18 331:25
**referenced**
221:7 259:17

260:25 347:5
370:6
**references**
236:25 335:10
363:15
**referencing**
269:23
**referred**  94:17
95:22 116:13
128:3 171:23
235:18 342:8
355:22
**referring**  19:25
106:16 110:6
114:14 137:12
138:3,25 151:13
167:6 197:1
208:8 209:7
242:24 258:19
261:8 264:16
274:5 345:7
**refers**  261:17
310:17
**reflect**  155:13
170:19 324:17
336:6
**reflecting**  61:25
**reflection**  122:8
**reflective**  122:4
**reflects**  158:20
**refuse**  357:4
**refused**  232:15
**refuses**  357:8

| | | | |
|---|---|---|---|
| **regan** 45:7 48:7 | 222:15 227:24 | **rely** 36:22 107:1 | 228:21 247:23 |
| **regard** 258:11 | 235:3 237:21,22 | 122:1 224:9,22 | 257:22 259:1 |
| **regarding** 195:5 | 244:21 246:3 | 282:15 | 297:5,7,13 |
| 208:18,22 | 266:4 269:22 | **relying** 200:16 | 300:19 303:9 |
| 212:17 213:16 | 279:5 284:21 | 238:6 | 304:14 307:16 |
| 230:14 245:17 | 286:1 319:19 | **remained** 14:3 | 329:19 344:20 |
| 288:17 332:14 | 341:7 350:21 | 71:25 164:13 | 360:18 362:2 |
| **regards** 295:23 | 369:11 | **remaining** | 363:18 364:2 |
| 296:12 | **relates** 99:25 | 221:10,12 | **remembered** |
| **regional** 38:14 | 108:5 133:23 | **remarkable** | 198:12 |
| **regionally** 330:8 | 271:24 | 313:6 | **remembering** |
| **regular** 57:8 | **relating** 58:18 | **remember** 9:17 | 184:25 |
| 151:22 197:24 | 67:4 171:16 | 9:22 11:20 13:8 | **remove** 272:1 |
| 286:18 | 253:21 | 21:6,14 23:1 | **repairs** 362:13 |
| **regularly** 308:2 | **relations** 37:6 | 34:13 35:19 | **repeat** 14:8 |
| 308:14 364:20 | **relative** 369:14 | 38:12 43:5,8 | 117:5 139:16 |
| **regulation** 3:10 | **relatively** 48:4 | 45:1,9,16,19 | 140:6 160:6 |
| 356:3 | 151:5 | 46:1 47:15 48:6 | 164:20 174:1 |
| **regulations** | **relatives** 60:5 | 48:9,12,14,18 | 213:21 238:18 |
| 216:16 | **relay** 70:21 | 49:20 50:5 | 259:19 280:4 |
| **reign** 300:7 | **relayed** 285:7 | 54:14,19 57:12 | 302:13 |
| **relate** 41:23 | **release** 320:13 | 62:9,10 63:13 | **repeated** 139:14 |
| 147:1 207:19 | **released** 25:10 | 63:14 73:9 | 139:17 185:5 |
| **related** 6:4 10:2 | **relevant** 31:15 | 80:14 82:3,19 | 204:25 362:4 |
| 10:4 13:9 15:14 | 57:6 71:18 | 83:7 97:4 | **repercussions** |
| 18:10,18,21 | 207:20 352:20 | 105:23 108:24 | 170:23 320:17 |
| 21:11 25:2 | 353:1,1,9 354:7 | 108:25 118:6 | **repetitive** |
| 56:17 57:6 | **reliable** 320:25 | 121:3 126:16 | 338:21 |
| 59:11 65:11,14 | 321:4,5,6,9,17 | 132:1,4 142:1 | **rephrasing** |
| 85:13 87:20 | **reliant** 161:3 | 144:13 150:8 | 109:21 113:23 |
| 93:20 95:16 | **relied** 101:4 | 166:10 176:21 | **report** 3:9 25:7 |
| 101:12 116:3 | 160:15,18,20 | 182:13 205:18 | 26:24 55:10,22 |
| 167:2 209:1 | 322:11 361:9 | 209:3 216:18 | 55:24 64:11,11 |
| 214:16 221:4 | | 217:5 218:23 | 90:24 112:1 |

126:13,18 130:2
130:5 145:22
152:6 154:6
156:17 157:21
158:8 159:16
235:22 236:18
236:25 237:4
240:1 250:6,21
251:9,11 253:15
254:20 262:8
265:8 266:3,16
267:10,15
283:18 292:14
295:14,20 296:8
305:7 308:12,16
322:5 347:10
367:3
**reported**   61:23
80:1 88:1 90:22
122:5 145:17,18
150:4,19,21
151:15 155:16
155:17,22 156:2
156:6,11 157:9
157:18 158:3,6
159:11 161:24
162:13 163:22
164:20,23 170:6
170:16 171:25
173:10 213:1
262:16 265:1
266:24 283:20
285:23 360:1

**reporter**   4:16
5:2 193:21
369:23
**reporting**   29:10
56:10,11,11
66:3 67:22
151:25 152:16
152:19 154:14
160:3 161:14
164:4 184:18,22
191:20 245:17
245:23 250:12
250:20 251:1
253:9,19 254:14
286:21 296:15
298:5
**reports**   25:10
25:19,19 29:12
61:25 67:14,15
67:15 71:20
73:17 84:12
85:4 86:5 87:10
88:6 91:18,23
92:1,6,10,14
125:23,25 126:4
126:7,8,10
128:7 148:3,6
155:8,10,12,12
155:13 156:7,14
156:23,23 157:1
157:20,23 214:5
214:16,20
235:14 239:10
239:18 251:6,13

254:18 263:3,3
265:1,3,4,11
295:23,24
296:13 308:20
308:20 309:23
**represent**   4:15
4:19
**representation**
224:5
**representations**
348:8
**representative**
112:7
**represents**   4:17
**reproduce**
193:25
**reputation**
120:11
**request**   95:7,16
123:15 243:24
244:9
**requested**   95:2
358:4 359:25
**requests**   256:25
359:20
**require**   302:10
**required**   79:24
100:21 250:20
310:1 372:13
**requires**   310:4
**reread**   335:1
**research**   27:12
37:17 43:11,13
43:14 333:11

**researched**
329:1
**researcher**
43:25
**reserve**   23:6
**residing**   100:2
**resistance**   98:4
102:15 103:2
**resolve**   235:9
313:17
**resolved**   26:2,5
123:14
**resource**   89:16
**resources**   358:8
**respect**   15:19
**respective**   1:19
**respond**   133:10
161:23 162:12
171:24 172:23
174:10 192:24
296:6
**responded**
133:11 165:11
168:2
**responding**
105:18 298:17
**responds**
169:25
**response**   63:9
97:9 102:18
103:16 108:9
109:8,10,17
112:5,9 116:14
133:24 134:18

135:10,15,21
136:9,19 137:3
137:8,12,18,19
137:23 138:4,19
140:3,8,18
142:7 163:22
164:2,9,15,23
165:4,19,23
166:1,4,23
167:9 168:13
169:8,14 170:4
171:10,22 172:4
172:5 173:10,20
173:22 174:13
174:20 188:20
198:4 213:4
223:11,14,17
259:19 299:22
354:9 367:14
**responses** 3:7
96:4,16 111:25
112:3 133:7
140:10 163:19
165:13 166:6
167:2 213:2
298:17 352:14
356:6 357:25
358:23
**responsibilities**
39:21 43:11
125:6 245:12
**responsibility**
215:3,4 240:22

**responsible**
214:20 215:2
273:22 293:11
**responsiveness**
62:25
**rest** 78:11 243:9
354:12
**restricted**
170:13
**restrictions**
171:14,16,18
**restrictive** 21:12
170:17 173:5
256:25
**result** 62:13
67:11 86:9
106:20 145:21
146:2,8,13
151:19 182:16
191:23 205:9
**resulted** 128:6
139:17 267:10
303:19 360:19
**results** 66:8
142:20,25
146:19 148:2,12
148:14 265:7
293:22 322:1
**resumed** 93:3
187:1 283:10
352:7 366:10
**retain** 24:17
**retaliation** 64:8
285:22

**retention**
330:20,23,25
**retract** 120:10
**return** 370:13
370:16
**reveal** 26:6
62:24 130:22
203:7
**revealed** 24:10
199:24 257:12
257:15 258:3
**review** 60:14
77:18 93:9
96:18,21 139:6
148:8,12,13,18
148:19,25 207:7
214:15 239:14
243:24,25 244:9
245:3,17,22
246:3,22 282:19
282:23 295:14
295:20 296:8,9
321:14 337:8,22
349:24 356:9
360:4 370:7
**reviewed** 42:6
42:20,23 43:4
62:19,20 75:6,8
125:1,3,22
138:10 147:25
148:1,2 166:4
199:5,7,8 239:2
239:4,5,6,8,12
264:13,16 307:5

324:1,2 325:7
325:14 350:2
356:15 357:19
360:9,10,11
367:2,7,11,17
**reviewing** 207:8
215:2 288:8
356:14
**reviews** 149:2
204:8,12 240:18
241:3
**revolving** 353:4
**richard** 57:15
**ridiculous**
313:11,13
**right** 9:22 13:11
13:19 14:22
15:25 16:23
23:6 26:16,22
27:4 35:19
40:24 41:2 45:9
48:8 57:18,21
59:14 60:20
61:6 67:16,17
73:2 76:10
78:16 80:17
81:2 82:3,14,19
83:6,18 89:1
105:18 106:4
114:9 117:24
130:19 131:2
133:24 135:12
142:6,19 152:22
153:2,10,16,22

154:1,6 164:19
166:10,19
170:19 172:24
177:7 178:5
179:17 182:8
184:25 186:19
187:14,24
193:24 195:3
198:5 209:20
210:5 211:5
216:18 221:15
225:24 230:3
236:2 240:9
242:13,13 247:5
248:4 249:4
254:24 255:9
257:22 261:24
265:12,17
266:21 269:2,16
271:2,24 278:7
290:15,23
292:20 310:14
315:3 316:13,14
319:7 325:6
328:2,16,23
331:5 334:14
335:18 336:19
339:21 344:20
349:25 351:24
351:25 360:2
361:4,24 363:18
363:23 366:17
**rights** 6:24 8:6
8:15 9:14 14:2

27:9 28:9 40:7,9
40:11 41:9,14
41:18 43:10
46:21 75:1 98:4
98:19 99:9
101:5 102:15
103:2
**ring** 52:7 183:18
**rise** 86:20
**risk** 60:22 80:5
100:2 164:12
178:14,15,18,20
288:14
**rluipa** 12:25
20:24 34:19
35:3,12,23
**road** 237:22
**robbed** 236:5
**robert** 4:14
**rock** 319:11
**role** 39:13,14,17
39:20 41:4
52:11 214:15
219:22 231:12
231:15 274:15
337:5 351:2
**roles** 275:7
**roll** 84:15 87:13
265:14
**roof** 361:20
362:3,8,13
363:11
**roofs** 363:8,9

**room** 49:21
177:20 190:5,8
190:23,24
254:25
**rooms** 47:10
186:2 192:14
193:2
**rose** 28:19
**roster** 196:25
197:3,7,8,10
198:10,22
204:11 324:5,23
**rosters** 204:12
324:1,3,12
325:1,4,7
**rough** 64:20
171:8
**roughly** 5:23
16:18 52:12
60:8 69:14
74:17 89:23
94:4 105:11
**route** 146:24
**routine** 57:8,11
**rule** 17:12 112:6
276:13
**rules** 18:5
**rumor** 67:25
312:16
**rumors** 312:1
**run** 13:14 15:8
78:7 154:25
192:13 294:1
365:4

**running** 180:6
341:14

**s**

**s** 4:1 12:16
371:3
**safe** 49:5 66:11
76:20,21 80:11
81:3 286:10
341:14 365:14
365:16,17
**safely** 224:21
**safer** 76:8
365:16
**safety** 63:17
65:20 169:19
174:16 257:12
258:3 328:10
344:3
**salt** 58:7,8
**samples** 295:8
**sane** 290:6,8,11
290:12,19 291:1
291:11,17,19
292:1,5 294:12
295:3,8
**sarcastic** 202:24
203:11
**savages** 326:9
**save** 117:7
237:21 251:1
**saw** 68:3 287:7
**saying** 11:14
80:3 103:13

107:8 155:17
156:24 157:5,7
165:17 168:23
178:17 179:20
180:8 181:23
189:18,20 200:9
200:13 211:3
229:19 231:17
255:14 256:18
268:14 270:21
281:14 293:2
334:3 339:2
345:23 354:20
363:10
**says** 17:12 18:12
18:17 29:21,22
31:5,11 109:10
123:23 142:7,17
179:7,19 188:21
195:15 216:10
219:13 224:20
226:25 230:1
231:19 234:12
237:5 250:12,16
252:18 278:2
281:10,11 282:5
284:17 292:18
296:23 334:17
339:14 344:22
345:6 362:16
**scan** 49:19
**scanners** 49:17
**scenario** 63:15
180:21 184:25

218:12,15
219:22 311:24
331:23
**scenarios** 181:4
229:11 363:2
**school** 36:24
181:2
**scientific** 343:20
**scope** 113:11
114:8 237:25
**screen** 328:8
**screening** 3:11
356:4,23
**search** 156:14
157:1
**searchable**
154:24
**searched** 156:7
**season** 344:25
**seasonal** 43:23
**seattle** 37:3
**second** 3:7
30:16 96:5
107:23,24 110:7
161:20 163:18
178:25 204:19
286:13
**secondary** 67:6
**section** 6:23 8:4
39:5,6,23 40:3
41:9 221:3
242:21 250:11
258:8 310:17

**secure** 190:9
**secured** 98:6
**securities** 39:5
**security** 16:3,4
208:18,23,24
209:1,16 257:12
258:2 300:3
328:11 332:11
341:11 358:14
**see** 43:6 45:19
48:14 54:2
60:16 61:18
69:16 79:6 84:8
86:2,3 88:3 98:9
104:24 117:15
118:19 119:20
122:5 123:13
132:22 141:1
152:23 154:5
155:12 156:7
157:1,20 161:20
161:25 162:5
164:18 165:25
178:24 179:9
185:5 188:23
195:18 197:11
204:23,25
208:19 212:14
214:5 215:11
216:14 217:23
219:16 226:23
227:4 231:25
234:15 236:24
237:3,8,16

238:15 241:10
250:2 254:25
256:2 257:2
264:25 266:16
268:11,24 269:8
270:2,7 274:2
277:10 278:6,9
282:8 283:21
289:21 300:17
312:11 318:7
319:5 331:8
334:19,25 335:4
335:22 339:16
348:16 352:22
355:19 356:4
360:5
**seeing** 120:1
156:20,20 356:1
358:18
**seek** 232:7
235:2
**seeks** 260:16
**seem** 70:17
**seemed** 239:19
**seems** 11:14
30:8 31:14 72:8
159:15 232:9
242:1 345:22
**seen** 62:12 63:6
67:23 78:16
86:5 90:22,25
127:2,13,18
128:6,15 137:5
145:13 150:20

150:20 158:8,16
165:9,17,22
167:10 170:15
185:10,13,15,17
185:18 199:6
207:16 218:23
219:3,5 220:20
232:23 237:4,7
239:17 244:2,14
246:11,15 249:8
250:6 251:9,13
251:16,21
256:14 265:3
266:4,7,9
267:16 271:5,7
271:8 272:14
279:13 281:2,6
300:19 307:7
310:24 322:4
324:23
**sees** 289:12
**seg** 63:19
**segregation**
81:4 183:25
184:1
**seize** 317:3,8
**selected** 49:19
**self** 21:12 42:4,5
43:6
**seminal** 291:15
**send** 265:23
**sending** 364:19
**sense** 27:11,22
70:20 80:19

88:10 116:12
136:17 145:15
154:10 155:19
158:14 171:23
174:11 233:1
245:15 288:9
302:19 308:17
318:8 341:18
**sent** 31:10 60:11
177:1 272:1
320:14 370:14
**sentence** 106:3
114:11 124:6
130:8 131:21
132:18 133:5
134:13 140:22
141:23 147:11
147:13 161:22
163:13 172:2
173:19 178:21
185:2 195:15
204:19 208:14
212:10 216:10
223:13 238:15
258:11,18
262:18 278:2
282:4,5 289:17
293:2 295:19
296:21 301:13
331:5 332:21
362:16
**sentences**
172:12,13,15,17

**separate** 14:6
232:17 278:5
280:6 281:12,24
284:11 288:25
**separated** 170:8
**separately**
53:12,13,16
**separation**
173:3
**september** 25:8
25:9
**serial** 287:18,25
288:2,3,5,9,14
288:24
**series** 173:4
235:13 345:18
**serious** 9:24
21:13 86:25
119:3 145:8
151:10 170:25
171:4 232:24
233:10,11
234:24,25
235:10,10 286:7
**seriously** 153:22
224:18
**seriousness**
234:22 235:1
**served** 43:16
**service** 43:13
52:19,22
**services** 227:1
**sessions** 248:11

**set** 3:7 17:6 59:5
96:5 134:13
284:24 305:24
344:25 352:24
**sets** 46:14
**settings** 269:24
**settled** 147:5
**settlement** 26:5
26:8,11 27:4
33:20 146:2,8
146:13
**seven** 13:14,15
13:15,16 16:13
16:14 52:13,17
287:16
**seventy** 134:1
179:2
**several** 33:19
35:14 77:10
80:18 83:10,12
104:23 105:3
106:3,6 108:12
109:4,12,19
114:12 116:16
117:3 132:7
140:25 141:5
145:1 191:10
239:12 259:17
259:24 269:11
291:25 317:23
326:6 344:6,7
346:17 359:20
**severely** 78:11

**sex** 279:21
**sexual** 15:16
  233:10 250:1
  252:19 256:13
  257:2 258:9,14
  258:18,23 259:4
  259:5,6,11
  260:10,13,15,18
  260:22,25 261:7
  261:25 262:6,14
  262:21 264:7
  278:4,5 279:6
  279:16,17 280:8
  280:9,17,18,20
  280:21,24,24,25
  281:3,3,7,12,25
  282:6,8,10,11
  283:19 284:1,10
  284:12,21,22,22
  285:7,21,23
  286:3,6 287:19
  288:1,9 289:3
  289:19,20
  290:17 291:17
  292:5,12,14
  295:14,19 296:8
  296:24 297:2,10
  298:3,11,25
  299:5,12,19,24
  326:22
**sexually** 256:2,7
  280:16 288:18
**shape** 238:7

**share** 63:25
  212:12 354:3
**shared** 75:19
  212:16 226:17
  353:2 354:15,19
**sharing** 212:21
**sheet** 273:18
  370:11
**sheets** 199:5
  268:23 269:7,15
  269:23 270:4,9
  270:12,17 271:2
  271:4,6,8,20
  272:2,10,15,18
  272:25 273:3,9
  273:10
**shift** 168:8
  169:2,3,13
  189:13 254:11
  276:15,16
  323:16 324:1,2
  324:5,9,12,17
  324:20,23 325:1
  325:4,7 353:10
  353:13,18,22
  354:16,25 355:2
  355:3,9,13,15
**shifting** 364:15
**shifts** 352:21
  353:2 354:7,15
  354:17
**short** 221:3
  239:22 246:23

**shortages**
  329:20
**shorten** 238:9
**shorter** 239:20
**show** 63:5 90:23
  130:1,4 142:20
  142:24 282:3
**showing** 73:1
  204:11 254:4,10
**shown** 280:14
  280:17
**shows** 252:21
  265:15
**shuffling** 364:13
**sick** 73:2
**side** 2:13 81:8
  104:17 224:13
  227:13 331:5
  339:18,19 351:7
**sidewalk** 68:3
**sight** 78:10
**sign** 233:18,23
  234:14 236:7
  237:12 282:16
  370:12
**signature** 96:8
  368:8 369:22
**signed** 21:24
  96:6,19,22
  97:21 110:11
  118:24 119:16
  139:19 141:22
  163:12 172:11
  259:25 260:8,24

  262:22 293:2
  317:17 331:15
  336:1 337:20,21
  337:25 338:15
  345:12,13 346:4
  361:25 362:1
  370:19
**significant**
  118:18,20
  150:17 151:5
  183:8 318:6,13
**significantly**
  71:20 72:18,24
  235:2
**signing** 96:11
  97:12 131:12
  140:4,10 210:25
  222:22 225:8,11
  332:19 340:20
**signs** 225:13
**similar** 15:11
  32:25 33:11
  41:5 81:11
  134:12 148:4
**simple** 121:17
  121:20,21
  158:17 275:9
**simplest** 27:1
**simply** 20:20
  33:2 114:14
  149:14 156:13
  158:12 168:16
  180:14 191:25
  203:13 231:9

**[simply - sorry]**

233:2 268:14
329:3
**simpson** 2:20
**simultaneous**
30:4 67:21
87:11 130:17
134:3 141:14
144:1 167:11
174:12 181:22
186:13 192:5
193:10 201:11
259:21 271:9
297:20 309:5
332:5 333:7
336:11 343:15
347:11
**single** 9:1 20:15
21:2 28:4 76:22
77:16 78:3
107:10 111:24
114:19 115:19
115:20 120:23
120:25 121:24
122:16 126:13
129:25 131:23
135:19 144:17
144:18 149:9
150:22,23
151:17 166:21
167:14 169:22
191:2 205:7
215:25 217:7
240:25 252:10
254:20 257:22

267:21 302:18
303:2,24 328:15
362:11,11
363:22
**singular** 191:6
**sir** 92:22 238:17
**sit** 17:15 21:16
30:9 31:21
106:14 126:12
126:15 140:20
149:10 151:16
195:3 216:20
243:3 249:18
254:16 257:16
257:23 259:2
277:21 290:23
293:23 294:25
296:3 297:4,12
298:13 303:8
310:14 314:25
325:6 357:21,23
361:4
**site** 16:22 22:1,4
22:9,25 23:11
23:16,21 35:7
35:11,14 45:2
45:18 46:14
**sitting** 17:13
142:6 293:23
336:7
**situation** 61:1
63:16 66:14
138:22 139:2
164:12 169:18

175:8 224:15
229:5 230:14
263:12 288:17
293:9 331:22
332:4 353:8
**situations** 91:7
174:1
**six** 21:20 30:14
121:5,7,18
122:3 185:25
248:11,13
352:17 366:13
**size** 122:18
341:10
**slated** 348:4
**sleep** 185:4,16
186:5 350:8,23
**sleeping** 198:17
198:20 350:15
**slew** 11:5
**slight** 76:23
**slightly** 58:20
70:19 96:25
99:18
**small** 291:6
**smaller** 60:9
72:19
**smoke** 122:9
**smuggled**
311:19
**smuggling**
311:23
**sneezed** 255:24

**snow** 2:13,20
**socks** 86:12
**sole** 199:15,18
203:16,20
**solely** 149:17
**solid** 264:14
320:2
**solution** 272:17
272:20
**solutions** 273:2
370:23
**somebody**
153:21 187:19
201:13 279:16
325:23
**someone's**
213:10
**somewhat** 99:24
**son** 63:3
**soon** 92:18
276:25 290:16
293:21
**sops** 196:6
**sorry** 12:23
13:12 14:7 21:6
60:19 76:14
84:9 94:12
102:10 107:19
113:4 136:18
160:6 164:20
172:22,22
193:12,24 200:9
202:17 212:6
228:12 229:7

238:16 242:9
268:19,25
271:12 292:19
295:16 299:10
302:13 316:20
319:2 334:21
336:18 340:17
347:14
**sort** 21:23 37:16
37:17,23 42:3
48:20 57:3
158:15 170:4
173:24 176:8
183:17,19
198:11 234:6
256:15 265:22
265:23 288:25
319:10 341:17
346:14
**sought** 216:1
**sound** 66:20
159:10 210:9
**source** 333:13
335:13
**sources** 93:20
94:10
**southeast**
370:15
**southern** 1:2 4:9
**space** 224:8
338:16 342:21
**spaces** 189:25
**speak** 27:19
57:7 169:2,10

184:9 220:13
276:9,15 331:2
**speaking** 30:4
53:3 67:21
69:24 87:11
115:11 130:17
134:3 141:14
144:1 167:11
174:12 181:22
186:13 191:1,3
192:5 193:10
201:11 259:21
271:9 297:20
309:5 332:5
333:7 336:11
343:15 347:11
349:22
**speaks** 63:3
113:15
**special** 6:23 8:3
41:9 95:8 277:8
278:16 296:15
**specialist** 4:15
39:4,14 41:6
48:19 342:16
343:17
**specialists**
210:10 344:19
**specialization**
37:3,6
**specialized**
41:12
**specially** 249:3

**specific** 18:10
20:11 43:2
46:16 125:4,10
128:19 145:23
171:6 174:18
192:16 194:16
195:4 196:6
200:19 205:14
206:2 207:18
222:14 232:21
236:19 250:11
257:17 271:23
274:22,22
292:10 296:4,12
301:1,2 312:18
315:7 325:21
328:4,12 354:18
357:12,14 360:1
**specifically** 6:24
18:18 29:23
31:5,6 39:5
42:11 49:22
51:10 65:18
73:9 100:18
126:16 171:20
189:23 192:25
204:15 212:19
229:13 306:14
307:1 327:8
346:6 356:11
**specificity**
222:20
**specifics** 194:21
209:2 279:20

349:7
**specified** 189:20
**specify** 99:1
**spectrum** 86:24
**spent** 349:12,18
**spiel** 111:5
**spiked** 130:15
**spl** 351:15
**splinter** 176:20
**split** 176:18
**spoke** 191:1
268:4
**spoken** 169:3
215:21 344:2,14
363:19
**spots** 307:20
346:16,17,18,21
347:1,5,8
**spread** 114:19
**spreadsheet**
256:16 265:15
265:23
**square** 2:13
**st** 69:24 70:3
182:7,8,15
188:14 359:13
**stabbed** 61:4,22
68:6,6
**stabbing** 86:14
**stabbings** 86:12
118:20
**staff** 64:6,8 67:2
71:10 78:13
85:18 86:7 88:6

155:23 164:9
168:4,4 169:22
174:23 189:17
190:1,6 198:24
212:13,17
224:14,24 225:6
243:5 249:9
253:18 271:25
273:24 274:4,9
274:14,25
275:11 276:2
302:22 306:18
307:18 311:16
312:3,5,9,18,20
313:7 315:1
324:9 328:19
332:23 333:19
334:18 335:2,11
335:15
**staffing**  72:24
77:14 87:21
322:19,23 326:6
326:8,14,17,24
327:2,5 329:19
331:7,11,16,25
332:18 348:9
358:21,25
**stage**  7:24 25:21
26:14 27:17
34:2
**stages**  172:24
**stand**  131:6
314:10

**standard**  103:9
103:10
**standards**  28:20
42:7,16,21,23
43:1 104:13
328:23 329:2
**standpoint**  81:9
85:16 180:6
341:11
**stands**  20:3
360:19
**start**  16:15
30:12,12 40:15
116:11 169:24
191:12 273:1
294:16 345:1
364:15
**started**  37:19
50:5 72:2,25
**starters**  68:12
**starting**  4:22
**starts**  168:3
352:19
**stash**  79:1
**state**  1:9 3:9 4:7
4:19,24 5:13
9:12,25 12:21
12:22 13:4,6
15:11 19:8
21:23 23:23
26:17 27:8,22
30:22 31:2
32:20 34:19
54:1,9,9 76:10

94:23 98:3,18
99:8 103:15
115:1 158:19
159:5 195:1
229:4 292:2
320:14 327:5
330:10,16,16
338:2 358:10
370:4 371:1
372:1
**state's**  16:5
**stated**  31:24
39:11 72:10
215:24
**statement**  49:15
59:6 109:22
162:18 191:19
202:11 249:20
257:9 269:22
275:20 276:1,20
279:4 282:17
292:16,23
308:10 317:21
318:1 335:6,11
345:5 348:14
352:17
**statements**  80:3
244:12,17 308:7
347:21
**states**  1:1,6,18
2:4,7 3:7 4:7,8
4:13 5:1,17 17:1
19:4 98:7,12,18
101:4 133:10

194:25 196:12
201:20,22
217:24 229:3
317:20 330:5
358:9 359:22
370:4 371:1
372:1
**statewide**
114:23 258:19
**statistic**  87:17
**statistical**  130:2
156:22
**statistically**
71:18
**statistics**  69:6,8
73:15 87:20
124:20 129:20
154:25 184:18
254:4,10 359:16
**staton**  69:2 81:9
81:11 360:21
**status**  14:16
21:17 26:17
32:5 33:16,21
34:18 36:8
44:14 62:16
213:10
**statutory**  19:22
**stay**  28:20 48:5
104:16 350:17
**stays**  121:22
285:1
**step**  82:1

**steps** 62:14
142:24 320:9,11
**stg** 176:10,24
178:4,15 210:14
210:20 212:17
213:10,19,24
216:5 237:5
327:14
**stgs** 175:17
212:12,14 213:8
**sticks** 86:12
**stop** 92:19,23
113:21 237:19
242:9 365:21
**stopped** 49:13
54:23
**stops** 266:21
**stories** 205:25
**story** 206:1
240:14
**straight** 333:17
**strategic** 175:15
**strategy** 329:15
**street** 1:19
22:17 279:22
280:19
**strong** 21:13
**structural**
361:15 362:18
363:16
**structure** 77:12
78:6
**structured**
76:18 79:5

**student** 44:5
**studies** 37:4
**study** 251:5,8
343:10
**stuff** 28:23
58:20 67:25
68:15 158:4,5
158:13 313:8
**subject** 10:9
188:6 316:6
**subjective** 99:25
**subjects** 65:2
**submitted** 95:16
126:14
**suboxone**
319:25
**subpoena** 1:18
3:6 94:22 95:3,8
95:17
**subscribed**
372:14
**subsidies**
227:25
**substance**
319:20
**substances**
357:8
**substantiate**
107:5 129:22
263:16
**substantiated**
259:12 299:1
**substantiates**
201:18 281:22

**substantiating**
263:11
**substantive**
57:4
**succinct** 246:24
**succinctly** 30:22
**suddenly**
232:16
**sued** 98:18
**suffer** 170:23
285:3 350:18
**suffering** 85:14
**sufficient**
246:24
**sufficiently** 80:8
**suggested** 312:6
**suggesting**
181:9,12
**suicidal** 65:5
**suicide** 85:10,13
322:5
**suicides** 106:16
321:23
**suing** 10:2
**suite** 2:14
**summarizing**
268:13
**summer** 43:23
52:12
**supervised**
189:16
**supervision**
78:1 189:7,13

**supervisor**
351:10,11,12
**supervisors**
349:22 351:8
**support** 137:22
211:20 238:4
**supports** 200:6
201:4 203:25
276:19 335:6
**suppose** 27:5
**supposed** 48:20
56:19 114:8
179:20 180:13
181:20 184:2,5
189:7,15,15
190:10,18 192:7
192:11 193:6
197:12 198:16
199:1,3 296:9
327:21
**sure** 13:2 17:6
22:7,12 70:24
70:25 76:19
90:19 93:13
95:14 126:23
130:22 139:15
140:7 142:1
157:14 159:10
188:9 193:18
198:9 209:2
215:5 227:15
247:25 277:3
293:15,19 320:1
322:8 336:13

**[sure - tattoos]**

337:17 339:21
350:4 354:4
356:13 364:1
**surprise** 192:25
329:9
**surprised** 358:3
358:5
**surreptitiously**
192:1,6
**surveillance**
243:24 244:3,9
**survey** 79:23
88:11 198:11
**surveyed** 69:11
**suspect** 285:9
**suspected**
321:23
**suspects** 214:7
285:10
**suspended** 18:6
**suspicion**
312:16
**suspicions**
312:12
**sustain** 341:9
**sustainable**
359:1
**swear** 5:3 90:3
131:2,4 275:9
275:11,16,25
297:9 299:3
**swearing** 131:1
**switch** 338:7

**swore** 101:3
107:21 110:9
129:5,8 139:20
333:3
**sworn** 5:7
123:17 372:14
**system** 21:1,2
49:7 50:13 55:2
70:10 72:4
107:15 108:6
114:24 116:7
117:15,20 118:1
119:17,17,22
122:17,18
139:25 145:12
150:7 217:14,18
272:23 287:11
295:2 318:10,11
319:18 321:15
345:18
**systematic**
154:21
**systemic** 365:1
**systems** 192:19
192:24 295:5
303:22 318:16

**t**

**t** 12:16 369:1,1
371:3,3
**tablets** 190:3,13
190:23 191:17
**tactic** 30:19

**tail** 10:4
**tailored** 29:23
31:7 100:18
**take** 30:9 85:15
86:19 131:6
154:3 171:3
174:6 186:8,10
207:23 211:19
224:17 230:25
231:1,11 239:17
272:18 276:7
277:5 283:3,5
337:10,13
346:22 352:1
364:12,22 366:4
**taken** 4:6 94:4
142:25 155:7
156:4 157:19
169:14 219:4,11
220:23 227:15
303:15,18 305:3
316:8 332:22
333:18 338:22
362:23 369:13
**takes** 31:21 88:5
234:6 320:10
345:16 362:17
**talk** 8:13 44:8
56:20 86:4
87:17 132:24
145:16 182:7
185:2 191:8,9
220:14 233:3
258:17 273:2,3

310:15 343:9
354:3
**talked** 168:14
184:24 213:9
233:15 326:9
338:6
**talking** 46:22
58:3 71:17,21
82:15 88:15
89:17 134:13
141:6 150:7
151:1 155:21
158:4,5 164:14
171:23 172:19
189:11 191:13
197:23 200:20
200:21,21 204:2
218:7 222:19
226:22 270:4
273:1 288:7
290:8 297:12
300:11 325:11
338:3 341:2
**talks** 27:1,3
33:20
**tapes** 246:19
**tapped** 338:23
**target** 142:10
143:11
**targeted** 177:4
177:25
**task** 211:25
**tattoos** 175:22
213:12

**team**  11:4 16:11
21:20 24:19
29:11,16 34:10
45:6,11,17
47:20 59:13
104:14 105:14
105:14,15
123:10 128:18
130:16 132:11
132:14 137:20
137:23 138:7
148:25 187:20
187:23 201:8
204:13 248:24
249:1 282:21
310:3 333:11,23
334:13 335:12
342:2 351:13
354:11,13
360:12 366:23
**team's**  253:3
**teams**  46:13
**technical**
322:22
**technically**  14:3
44:12
**technique**  248:5
**techniques**
247:15
**telephone**  73:11
74:10 266:23
**tell**  11:9 23:10
54:20 55:15
58:12,25 59:8

62:10 64:10
74:14 79:19
80:20 82:20
88:2,2,12 89:2,4
89:5,19 90:15
108:23 116:5
125:13,18
142:10 151:17
151:21 161:7
166:8,11 168:5
169:17 170:2
175:3,7 176:13
177:22 179:17
180:16 186:5
206:8 232:8
234:24 239:21
243:3 247:21
252:8 254:17
263:13 276:10
276:11 277:21
278:23 289:24
304:16 311:15
311:17 313:8,9
333:20,25 334:2
334:6 342:7
349:15 356:17
359:11 360:8
361:15 363:22
365:9
**telling**  155:15
157:2,8 184:10
187:25 198:5
203:13 207:11
207:11,17 221:1

230:4 328:24
358:18
**tells**  91:10,12
157:9 226:14,16
**template**  250:20
**ten**  8:1 60:7
68:17 118:8,17
118:17,22
122:16 221:11
326:18
**tender**  100:21
**tends**  108:16
**tennessee**  12:18
**tents**  271:21
273:11
**term**  27:23
81:21 116:16
**terminology**
97:3 109:13
**terms**  12:12
14:15 19:6,23
41:13 46:7
55:17 69:5 82:8
88:11 109:5
122:18 171:4,18
180:9 191:3
195:7 222:23
224:14 233:9
234:2 247:14
264:2 274:9
306:17 334:16
349:4
**terrible**  289:15

**test**  293:22
295:8 320:4,7,9
**tested**  292:13,20
292:21 294:12
294:18
**testified**  5:8
75:4 104:20
120:8 140:16,22
162:20 163:14
228:7 366:18
**testify**  3:6 10:25
26:21 100:22
110:25 131:6
187:13,18,22
228:2,16 299:9
299:11,18
314:10,11,17,20
342:4
**testifying**
100:15 103:25
105:16 111:1,2
111:3
**testimony**  77:18
88:25 90:2
161:10 205:1
211:7 253:21
349:20 362:9
370:9,17 372:8
**testing**  292:16
292:23 293:5
320:6
**tests**  293:12
294:1 295:2
320:8 356:19

357:7
**texas** 330:13
**text** 76:2
**thank** 256:1
367:25 368:2
**that'd** 14:21
**theft** 233:11
**themes** 170:21
**theory** 52:9
154:7 350:1
**thing** 30:6 50:16
51:9 57:12 58:1
65:13 86:15
90:16,16 138:24
147:16 151:22
156:15 173:6
206:10,11 229:6
248:7 271:24
301:22 318:4
330:25 365:1
**things** 7:3 27:12
28:25 29:16,20
40:1 43:4,7,7
55:10 61:13,18
65:11 66:3 68:8
71:23 94:2
99:22 113:10
122:7 128:8,9
128:15 136:20
139:24 140:1
148:4 156:17
158:22,22,23
166:7 168:10
175:21 191:3

198:8 204:11
211:2 217:15
219:5 224:9
230:16 233:5
237:23 238:5
239:24 253:3,15
253:16,22
262:11 268:15
273:4 289:14
300:8,12 311:9
312:7 315:9
319:24 320:2
327:2 338:23
353:3
**think** 6:13 13:11
15:5 16:6 20:25
21:14 22:18
23:2,22 26:19
28:12 34:10
36:12,19,19
37:10,11 38:3
38:16 39:18
42:10 44:2
45:13 46:2,9
48:10,19 50:16
52:23 55:1,7
56:12,23 58:1
61:8 65:1,4,7,14
66:4 73:18
74:12 75:8,10
75:23 77:19
78:14 82:9,10
82:23,25,25
83:7 88:10

89:23 90:7 94:3
94:12 97:8,13
100:11 106:2,10
107:3 108:15
111:17 118:5,17
121:14 130:6
131:20 134:5
135:22 138:21
141:4 142:9
144:15 145:14
146:22 148:1
149:25 151:8
152:1 158:22
166:13,15
170:18 171:20
175:23 176:7,15
177:1,5,7 182:9
182:11 183:15
184:8 185:13
186:7 187:19
188:12 191:11
198:23 206:22
213:17 218:23
225:18 231:1
234:4 236:13
242:8,9 243:21
243:22 251:20
253:5,14 255:12
255:12 257:18
260:2 262:14
265:5 279:13
280:20 288:20
288:21 289:5
291:14 294:24

300:9 313:16
316:13 319:14
319:15 321:24
322:4 325:16
327:1 329:18
330:23 332:9,20
338:19 345:19
348:12 351:24
353:14,15 354:2
358:1 360:11,20
363:25 364:1
**thinking** 57:18
83:10 90:12
138:21 173:13
186:4 191:5
229:9
**third** 48:17
74:19 332:10
**thirds** 73:25
238:20
**thorough** 96:23
134:16 163:24
164:3,25 165:18
166:3,22 173:8
214:25 223:9
239:19,25
252:12,23 263:5
264:7
**thoroughly**
132:19 133:21
134:8,15,23
135:5,15 136:1
137:2 139:21
161:21,23

162:12,21,23
163:11 165:10
171:24 172:3,23
178:22 179:22
185:6 188:21
195:16,21
196:14 202:12
204:20 208:17
211:25 212:4,11
212:23 216:11
216:22 219:14
221:5 222:9
238:13 242:22
243:14 249:24
255:23 256:24
257:10 262:19
264:22 268:10
268:22 269:6
278:3 287:17
289:18 292:11
305:14 331:6
343:2 352:20
**thoroughness**
264:3
**thought** 28:13
35:25 56:18
97:17 107:21
108:1 193:15
280:3
**thousand** 65:1
115:22,22
**threat** 66:19
85:8 175:15
208:18,23,24

209:1,16 328:10
350:22
**threats** 85:6,7
235:3
**three** 23:2 38:16
48:23 49:5,10
49:11 67:23,23
68:1,6 72:5
74:12,18 83:16
97:1 121:4
132:9,10 162:21
163:4 179:2
185:19 186:5
193:20 195:20
204:25 216:21
221:5
**throw** 143:12
**tile** 59:1
**tiles** 350:7
**time** 4:3,4 6:6
7:15 11:9 19:20
21:9,20 25:12
26:13,14 28:13
28:21 30:10
32:1 35:10
40:12 41:18
44:1,2,3,7,7
46:4,10 47:13
47:14,24 49:25
50:4 54:17
55:15 56:2,18
57:21 58:23
65:19 66:17
67:7 68:22

69:22 70:22
71:16 73:10,20
73:21,25 74:14
74:15,17,19
75:23 78:24
88:15 90:3 91:4
91:6 93:1,7
99:16,18 105:4
105:8,22,24
106:2,13,19
117:4,7,12,12
118:12 119:19
121:15 135:23
141:6,13,21
144:13,24,25
145:11,16,24
147:9 149:10
152:14,20,21
153:2,7 154:14
158:15 161:20
163:18 172:11
178:13 181:21
184:24 186:8
187:4 197:21
207:18 215:11
220:18 229:14
231:24 236:13
237:21 253:23
255:16 258:25
260:23 262:22
263:7 267:2,7
268:5,9 273:17
277:18,23 283:8
283:14 287:14

287:14 304:15
305:6 311:14
320:15 331:15
332:18 333:3
335:25 336:5
338:15 339:15
339:19,23,24
340:3,7,11,23
341:1 345:12,13
346:4 352:5,11
352:24 356:5,15
357:24 358:6
361:24 362:1,14
364:8,18,21
365:20 366:8,14
368:5 370:18
**timeframe** 39:9
259:16,18
265:17 291:1,4
291:9 370:8
**timely** 289:21
289:25 290:5,11
292:13,20,25
294:5,13,19
295:8
**times** 20:11
31:22 42:1
45:17 54:12,13
58:24 64:19,20
64:22 67:14
69:13 71:1,4,11
74:6,12,18
96:21 97:1
107:5 120:2

**[times - trained]**

134:1 140:12
149:25 152:2,4
156:12 167:22
170:22,22 177:9
179:3 188:17
190:15 191:11
196:2 199:13
202:1 211:24
220:8 221:12,14
221:24 222:18
223:11 225:2,6
232:15 255:5
272:1 336:9,9
336:22,23 338:7
338:22 350:20
**tip** 151:20
**title** 6:15,16
9:17 40:17 41:1
41:3
**today** 21:16
44:9 74:21 75:7
95:2 126:12,15
151:16 187:12
187:13 215:24
216:20 243:3
249:18 254:17
257:16 259:2
293:24 294:25
296:4 297:5,12
298:13 299:4,11
303:8 314:1,25
315:17 339:7
345:11 357:21
365:24

**today's** 4:4 74:3
94:24
**together** 16:23
122:7 157:25
224:6
**told** 43:20,21
62:4 65:5 71:4,5
83:22 86:4
87:10 88:9
90:13,18 91:1
148:22 149:18
176:25 177:9,19
177:23 178:2,8
179:5 190:15
191:4 207:4
220:23 224:10
225:5 262:12,15
266:17,23
269:12 271:3
276:13,20
293:10 294:11
309:8 314:21
328:18 337:2
344:7,12 347:18
350:3 360:14
361:1,10
**tongue** 151:21
**took** 38:25
56:18 62:14
64:19 145:15
170:5 235:7
248:6 334:4
**tool** 192:14,20
193:2

**tools** 189:12
193:5
**top** 20:10 60:24
83:3 105:23
134:16 135:12
135:17 136:2
138:20 165:21
166:9 170:18
184:9 185:1
194:7,12 204:16
205:11,15 208:6
213:17 219:7
225:24 249:22
249:23 258:15
281:6,19 282:4
282:13 283:16
**topic** 108:1
237:22 315:25
**topics** 43:12
315:22
**total** 13:13,15
13:16 23:14
71:1 132:15
**totality** 16:5
79:3 244:6
264:20
**totally** 136:16
**tough** 193:15
**tour** 44:17
**tours** 16:21,22
24:13 36:16
44:18
**toward** 84:20
334:24

**towing** 137:15
**toxicologically**
321:13
**toxicology**
322:1,4
**track** 69:4 73:13
124:7,12,15,17
128:22,23
129:14,16 130:9
131:17,21,24
147:15,17,21
149:13,14,15,23
155:3 238:18
249:25 252:18
255:23 256:11
256:19 305:25
346:9
**tracked** 128:13
132:16 149:7
152:10,11 154:8
154:10,13,16
**tracking** 136:12
148:3 154:19,21
160:25 161:8
172:20 253:11
**tracks** 151:6
**trade** 78:21,22
181:2 216:17
**trading** 216:13
217:3,9,10,19
218:3 219:10
**trained** 38:8
249:3

**training** 38:4
41:13 192:13
247:8,12,25
248:14 306:12
306:16,23,23
307:5,7 343:22
**transcribed**
369:8
**transcript**
289:12 369:2,9
370:6,19 372:5
372:8
**transfer** 283:18
283:24 284:17
284:18 285:13
290:5,19
**transferred**
63:19 169:20
289:20
**transferring**
291:10
**treatment** 15:20
319:25 357:2,5
357:9
**trial** 10:4,11,12
10:15,19,25
227:13,16 240:6
314:10,17
**tried** 10:17 11:3
80:12 267:1
**trigger** 64:5
**trips** 48:11,13
49:12

**trouble** 276:13
**troubling** 29:1,4
**trousdale** 12:16
15:3 32:6 33:12
**true** 17:17 96:16
131:3,5 157:2
184:7 309:8
348:20,21 350:3
369:10 372:8
**truly** 116:5,8
**truth** 110:9
313:14
**truthful** 224:10
**truthfulness**
162:17 276:1
318:1
**try** 60:16,23
65:22 73:12
87:19 89:20
221:2 242:5
267:3 309:16
352:2 364:14
**trying** 37:10
108:2,9 122:12
125:19 130:20
156:1 168:24
203:2,9 220:18
242:15 268:13
273:21 287:22
**tuesday** 1:12
**turn** 97:22
104:20 222:17
230:15

**turner** 12:16,16
15:3 32:6 33:1
33:12
**tutwiler** 287:3,9
**tweak** 220:8
**twelve** 117:23
**twice** 97:1
**twinkies** 233:12
**two** 11:21 38:16
44:23 48:10,14
68:5 72:5 73:25
74:18 83:16,23
93:6 121:3
132:9,10 151:18
157:24 167:22
172:12,15,17
186:1 222:11,16
223:6 224:5
228:12 234:11
234:19 236:1
238:20 300:20
**type** 8:5,8 38:19
39:16 41:19
44:1 48:19 55:9
77:13,14,14
80:1 121:14
174:14 227:18
227:20 234:21
251:5 265:24
291:5 315:10
356:20
**types** 84:19 85:4
86:1 91:22
100:11 138:3

173:16 196:9
205:25 258:2
260:11 310:23
338:1,5 353:1
**typically** 25:14
55:18 265:6
359:7
**typo** 287:23

**u**

**u** 12:16 13:3,3
**u.s.** 96:4 134:6
227:21 351:3
**uab** 139:5
**ultimate** 215:18
**um** 289:7
**un** 77:25 263:15
**unaffiliated**
215:22
**unauthorized**
188:23 189:1,4
189:8,19 194:4
194:10,11 195:2
195:8,13
**unaware** 159:12
**uncertain**
279:11
**unchanged** 72:1
**unclear** 109:12
223:7
**under** 8:13 9:13
19:23 20:6 21:5
21:15 31:7 33:2
33:6 34:15,21

35:24 36:13,13
36:17 41:11
85:17 90:3
96:11,11 97:12
98:19,23 99:9
100:12 101:3
104:20 105:16
120:8 131:3,4
139:20 181:23
182:1 187:12
202:20 203:11
258:18 275:9,11
275:16 276:1
279:7 297:9
299:3,9,11,18
301:13 322:25
369:9
**undergone**
362:13
**underlying**  98:1
161:11 233:9
**underneath**
316:15
**underpinning**
100:19 104:7,8
203:5
**understand**
23:15 47:24
53:13,15 61:23
76:17,19 85:1
86:19 87:14
88:22 89:18,18
90:8,14 96:10
98:17,21 100:12

101:2 122:11,12
130:20 137:24
139:12,22
147:24 158:18
163:11 172:16
187:11,12,17,21
188:2,3 189:6
200:10 209:5
218:20 230:22
231:12 253:19
256:23 268:12
270:11 315:8
333:2 335:24
336:3 341:4
343:8 348:19
352:25 359:25
**understanding**
20:12 33:19
55:17 66:23,24
74:20 98:22
100:5 105:4
110:1 124:19
125:22 127:12
130:14 133:3
141:24 142:4
162:21 163:16
163:21 172:14
180:16 193:8
196:5,8 197:6
197:14 199:16
199:19,21
203:10 208:25
210:1,4,8 222:5
222:21 223:8,16

223:22 233:16
233:17,21
240:17 241:4
252:15 260:11
260:23 262:7,23
263:22 275:2
278:22 279:20
290:4,10 291:7
293:3 294:20
302:4,8 321:11
322:22 323:22
324:4 326:24
331:15,19 339:7
341:15 364:13
**understood**
99:16 151:23
332:18 335:25
**undertake**
211:25
**undertook**
348:23
**unemployed**
40:16
**unfortunately**
26:21 304:13
**unfounded**
262:2
**uniforms**
332:13
**unique**  18:4,9
18:20
**unit**  59:4 77:16
169:10,11,13
184:3 250:16

254:11 283:20
284:2 286:23
345:23 353:17
353:21
**united**  1:1,6,18
2:4,7 3:7 4:7,8
4:12 5:1,17 17:1
19:4 98:7,12,17
101:4 133:10
194:25 196:12
201:20,22 229:3
317:20 358:9
359:22 370:4
371:1 372:1
**units**  46:8 47:16
47:19,22 184:1
210:20 220:6
273:25 274:10
274:16 275:13
276:3 284:10
**universe**  62:22
65:3 239:9
**universities**
37:18
**university**  37:2
37:5
**unknown**  237:6
**unnecessary**  9:2
**unplug**  193:22
**unquestionably**
119:6
**unreasonable**
123:7,9 143:20

| | | | |
|---|---|---|---|
| **unreasonably** | **usdoj.gov** 2:6,9 | **usually** 38:17 | **vanni** 4:16 |
| 104:22 105:10 | 370:2 | 54:14 55:10,21 | **varies** 68:16 |
| 107:9 108:11 | **use** 27:23 55:5 | 56:1 57:4 58:11 | **variety** 7:3 |
| 109:2,10,18 | 132:18 194:21 | 61:7 66:19 78:6 | 38:20 77:22 |
| 114:11,22 115:6 | 216:22 220:24 | 78:9,18 79:7,7 | 81:16 175:21 |
| 115:14,24 | 222:12,15 | 86:21 156:16 | 176:4 204:7 |
| 116:14 117:2 | 230:24 236:10 | 157:22 167:18 | 215:5 260:14 |
| 119:1,4,10,13 | 236:11 243:22 | 167:23 168:3 | 286:7 307:18 |
| 120:19 121:10 | 300:25 301:13 | 169:18 175:21 | 350:10 |
| 121:13,19,25 | 301:19,23 302:2 | 183:24 190:4 | **various** 20:7 |
| 122:14 140:23 | 302:10,22 | 198:4,14 206:21 | 43:4 127:3 |
| 142:17 144:10 | 303:22 305:9,14 | 207:17 311:24 | 140:12,13,13 |
| 159:22 258:12 | 305:19 306:7,12 | 312:3 315:16 | 171:8 302:6 |
| 259:10 261:14 | 306:22 307:10 | 320:14 350:14 | 315:9 328:19 |
| 300:18,25 301:8 | 310:11 319:18 | 350:21 359:6 | 363:20 |
| 317:21 320:19 | 356:20 | **utilized** 223:24 | **vary** 89:25 90:1 |
| 322:10 | **used** 65:13 97:3 | 301:14 | **vast** 58:10 59:19 |
| **unreliable** 58:7 | 128:22 134:24 | **utilizes** 223:20 | 78:2 88:3 336:6 |
| **unsafe** 271:25 | 179:2 220:3 | **utilizing** 358:14 | **ventilation** |
| **unsubstantiated** | 221:12,13 | | 343:3,5,9,11,21 |
| 261:2,5,11,22 | 223:10,13 237:3 | **v** | 343:24 344:5,8 |
| 261:24 262:2 | 254:23 260:19 | | 344:13 |
| 263:13 | 269:15 302:6 | **v** 1:8 369:4 | **ventress** 81:11 |
| **unsupervised** | 303:3 341:3 | 370:4 371:1 | 183:16 188:14 |
| 189:20 | 370:19 | 372:1 | 345:21 |
| **unusual** 99:22 | **useful** 145:3 | **vacancies** | **verbally** 4:19 |
| 103:15 | **uses** 301:9,15 | 278:14 | **verified** 112:3 |
| **ups** 364:19 | 303:12 328:8 | **vacant** 277:9,13 | 133:12 137:21 |
| **upwards** 243:22 | **using** 54:6 55:2 | 277:16,20 323:8 | 213:2 |
| **usa** 369:4 | 55:3 109:12 | 323:10,15 | **verify** 61:3,21 |
| **usable** 291:5 | 160:21 193:7 | **vacuum** 87:18 | 66:17 91:9,11 |
| 294:22 | 194:19 220:16 | **vague** 65:9 | 112:7 267:6 |
| **usage** 134:25 | 272:18 273:9 | 109:6 | 290:22 295:4 |
| | 309:23 | **vaguely** 49:22 | 323:11 370:9 |

**verifying**
181:25 202:7
**veritext** 4:15,17
370:14,23
**veritext.com.**
370:15
**versed** 21:10
62:22 124:24
**version** 13:25
**versus** 4:7
**vet** 57:23
**victim** 167:18
167:21,24,25
206:18,21 207:1
218:12,13,15,21
227:2 228:2
229:1 231:3,18
231:18,20 232:2
232:15,18
267:22 279:9,17
279:24 280:20
281:4,8,9
284:17,23
285:21 308:23
309:18
**victimized**
225:12 228:19
256:7 280:19,24
286:2,4
**victimizing**
284:22
**victims** 225:3,4
237:2 245:19
246:4 256:20

280:9,21,24,25
281:13 283:18
284:11,12
289:19 292:14
308:22
**video** 4:5,15
93:5 199:8
263:15 283:12
352:9 359:8
367:9
**videographer**
4:3 5:2 92:16,17
92:21,25 93:5
186:22 187:3
276:23 277:3
283:7,12 352:4
352:9 366:7,12
368:3
**videos** 42:1
204:11 270:2
271:5 359:4,24
360:7,14 361:1
361:2
**view** 237:14,16
270:10 286:5
306:16,20 364:6
**viewed** 122:4
285:22
**violate** 99:9
246:20
**violated** 28:8
98:19 101:5
**violating** 27:9

**violation** 9:14
101:13
**violations** 144:5
243:5
**violence** 15:15
15:16,16 69:5
69:10,12 70:13
71:14,22,25
72:20 73:4,13
76:22,25 78:15
78:20 80:1 81:9
83:18 85:5,8,10
85:11,13,19,20
85:21,24 86:9
86:14 87:4,21
88:3,5 116:4,6
118:19 120:5
121:15 122:5,8
122:9 173:7
192:2 214:2,10
217:12,13,17
229:10,12,17
230:17,18,21,23
231:1,15,24
235:9 240:13
242:1,2 256:20
284:10,12,21
285:4,21 298:3
326:22 327:6
350:18,22
359:12 364:5,22
**violent** 72:9,11
72:13,15 82:5,6
83:5,11 84:19

84:20 85:1,2
86:1 87:23
91:13 120:12
121:12 214:2
225:2 230:15
234:13,18
236:16 260:16
260:21 308:1
353:6
**virginia** 6:14,14
38:16
**virtually** 77:25
**virtue** 77:25
**vision** 271:17
**visit** 16:10 35:11
44:22 188:15
**visitation**
311:23
**visited** 7:13 16:9
44:23 187:7
188:6,13,16
217:24
**visiting** 46:18
46:20
**visits** 22:1,4,9
22:25 23:11,17
23:21 35:7,14
45:2,18 46:14
46:23 47:2,2,4
**vocational**
192:13,21
**voicemail** 52:19
52:21

**[volkswagen - ward]** Page 456

| | | | |
|---|---|---|---|
| **volkswagen** | 74:14 80:4 | 28:10 29:5,22 | 163:1,25 165:1 |
| 40:4 | 92:19 93:13,21 | 29:25 30:3,7 | 165:6 168:18,22 |
| **volume** 159:6 | 98:17 108:22 | 31:1 32:3,8 45:6 | 169:6 172:7 |
| **volunteer** 198:2 | 125:12,16,17,18 | 49:2 51:5 87:6 | 177:15 179:12 |
| **volunteered** | 130:21 132:24 | 88:21,24 90:5 | 180:4,24 181:15 |
| 233:2 | 139:15 142:7,19 | 95:5,13 98:25 | 181:20,25 186:7 |
| **voracity** 57:23 | 142:19,21 155:1 | 99:11 100:7,13 | 186:11,18,20 |
| 58:12 | 159:10 186:10 | 101:7,14,22 | 187:19 193:11 |
| **vulnerable** | 187:11,16 | 102:4,9,20 | 193:13 196:15 |
| 278:5 281:24 | 190:21 191:7,9 | 103:5,8,18,23 | 200:2,8,16,19 |
| **w** | 198:8 203:1 | 104:1 107:12 | 200:23 201:1,6 |
| **wait** 102:22 | 206:1,2 225:6 | 108:13,19,22,25 | 201:19,23 202:2 |
| 108:17 182:12 | 235:21 237:19 | 109:5,9 110:12 | 202:6,19,23 |
| 351:23 | 239:17 240:12 | 110:15,19,22 | 203:1,18,20 |
| **waiting** 226:23 | 273:1 280:3 | 111:1,3,7,10,13 | 207:2,25 208:12 |
| **waive** 130:23 | 283:16 286:9 | 111:17,20,24 | 209:8,13,18 |
| **waived** 368:8 | 296:20 312:13 | 112:12,15,17,20 | 210:21 211:12 |
| **walk** 12:11 | 312:16 350:14 | 112:22 113:1,4 | 211:16 212:5,24 |
| 37:12 48:8 | 362:15 | 113:8,19,22 | 214:17,22,24 |
| 78:12 80:24 | **wanted** 48:1 | 114:2,4,7 | 216:6 217:21 |
| 180:15 | 53:3 56:6 | 122:21 123:8,18 | 218:4,17 219:20 |
| **walked** 22:11,15 | 173:18 235:16 | 123:25 124:3,9 | 221:16,18,20,23 |
| 22:17 269:10 | 339:8 360:4 | 128:24 129:2,7 | 222:1,4,7,19 |
| **walking** 48:2 | **wants** 164:7 | 129:10 130:12 | 223:1,3,5,15 |
| **wall** 55:5,14 | 169:8 184:11 | 130:20 131:7,11 | 224:11,23 226:4 |
| 59:2 270:8 | **ward** 2:3 4:25 | 132:21 133:9,16 | 226:7,10 229:7 |
| 353:19 | 4:25 8:10,18,22 | 135:2 136:10 | 229:22 230:9 |
| **walls** 68:3 | 9:3,5,7,15 17:5 | 137:14 138:5 | 231:5,22 232:13 |
| 269:13 | 17:11 18:3,7 | 141:8,12,17 | 232:19 233:13 |
| **want** 17:5 31:22 | 19:9 20:16 22:5 | 142:12 143:7 | 233:19,25 |
| 31:23 46:15 | 22:8,13,18,21 | 146:4,17 157:3 | 237:13,15,18 |
| 56:20 60:25 | 23:18,20,25 | 157:6 160:5,11 | 240:8,10 243:12 |
| 68:13 70:23,25 | 24:4,9,24 25:18 | 160:17 161:1,9 | 243:17 245:24 |
| | 26:3 27:25 | 161:17 162:3,9 | 246:5 247:1,10 |

| | | | |
|---|---|---|---|
| 247:17 248:3,18 | 310:5,20 313:1 | **watch** 89:10 | **weapon** 85:2 |
| 248:22 249:5 | 313:10,24 | **watched** 42:1 | 87:1,2,3 153:18 |
| 251:25 252:13 | 314:13 316:19 | 367:9 | 252:9 |
| 252:25 254:7,22 | 316:25 317:5,10 | **waving** 104:4 | **weapons** 79:1 |
| 255:7,17 256:8 | 317:15 321:10 | **way** 25:24 27:1 | 81:5 310:18 |
| 256:21 257:5,25 | 322:13,15,20 | 36:22 47:2,6 | 311:6 316:23 |
| 258:5 259:7,13 | 323:17 324:13 | 50:15 55:23 | **weather** 345:1 |
| 261:10,16 | 324:18 325:20 | 66:18 67:24 | **website** 25:6,15 |
| 263:19 265:18 | 331:12 332:25 | 71:18 75:18 | 29:12 32:21 |
| 268:18 269:17 | 333:14,22 334:7 | 81:12 82:10 | 73:17 |
| 270:14,19,23 | 334:10 335:7 | 91:14,15 92:4 | **webster** 179:18 |
| 271:12,16,22 | 336:16,20 337:1 | 93:24 107:25 | **week** 52:14,18 |
| 272:6,11,21 | 339:3,25 340:4 | 108:2 110:20 | 57:11 61:12,22 |
| 273:12,19 274:6 | 340:8 341:22 | 126:23 134:12 | 70:18 145:4 |
| 274:11,17 275:5 | 342:1 345:25 | 134:22 141:16 | 207:15 |
| 275:14,17 | 346:11 355:4 | 146:19 149:19 | **weekly** 69:14 |
| 279:10,18 280:7 | 358:11 361:17 | 157:24 158:11 | **weeks** 67:23 |
| 280:10 283:1 | 362:20 365:18 | 170:1 209:4 | **welcome** 31:16 |
| 284:19 285:17 | 366:2,16 367:2 | 238:7,20 241:25 | 32:3 123:18 |
| 285:24 286:24 | 367:6,23 | 243:15 280:13 | **went** 10:4,10,12 |
| 287:5,20 289:8 | **warden** 63:3 | 302:18 303:3 | 10:13 41:1 |
| 290:1,21 291:12 | 168:12,14 | 306:4 309:16 | 45:17 49:12 |
| 291:22 293:6,14 | 169:13 170:1 | 325:19 335:6 | 59:3 72:24 |
| 293:18 294:6 | 267:18 276:16 | 337:12 354:10 | 88:10 93:3 |
| 295:11,15,21 | 300:6 | 356:14 | 128:9 147:4 |
| 296:2,10,17 | **warden's** 81:14 | **ways** 176:4 | 187:1 283:10 |
| 297:25 298:6,12 | 125:10 | **we've** 18:2 | 352:7 366:10 |
| 298:21 299:6 | **wardens** 148:19 | 30:13 84:12 | **west** 2:13 |
| 300:4 301:5,10 | 296:16 | 131:19 159:20 | **when's** 54:17 |
| 301:16,20,24 | **washington** | 171:23 202:1 | **wide** 168:9 |
| 302:24 304:2 | 1:14 2:8 4:14 | 239:3 252:20 | **widespread** |
| 305:11,16,21 | 37:2,5,18 | 254:17 265:5 | 319:20 |
| 306:2,19,25 | 330:16 369:7 | 300:16,19 | **wilhite** 57:14 |
| 308:15 309:9 | | | |

**william** 2:12
**williams** 1:16
  3:3 4:6 5:5,11
  5:13,15,16
  18:14,19,21
  19:3 23:3 25:14
  31:9 93:8 95:19
  104:19 112:2,21
  114:10 130:25
  187:6 202:3
  210:25 213:2
  275:9 283:15
  292:24 297:8
  299:10 300:18
  317:18 339:6
  357:18 368:1
  369:3 370:5
  371:2,24 372:2
  372:4,12
**willing** 142:13
  164:11 263:12
  283:4
**willingness** 67:2
**wind** 349:6
**wish** 136:21
  207:19 227:3
  229:1 357:19
**wishes** 64:15
  235:9
**withhold** 66:4
  66:15
**withholding**
  67:5

**witness** 3:2 5:3
  9:16 17:20
  20:17,19,22
  26:7 28:1,3,11
  30:23 32:14
  87:8,14 89:1,8
  90:8 93:10
  94:20 96:1 99:1
  99:4,12 100:8
  101:9,17 104:25
  107:14 108:14
  109:21,25
  110:14 114:16
  124:14 129:15
  129:18 132:23
  133:17,20,22
  134:2,5,10
  135:3 136:11,15
  136:18 141:20
  142:13,21 143:1
  143:8 146:22
  152:18 157:7,14
  160:6,12,18,23
  161:2 162:5
  164:4,16,18
  167:19 180:5,10
  180:19,25
  181:16 186:17
  186:19 193:17
  193:24 207:3
  208:1 209:19
  211:17 214:25
  216:7 217:22,25
  218:5,18 219:21

  222:13,25
  223:18 224:12
  224:24 229:9,23
  230:10,24 231:6
  231:23 232:6,12
  232:16,20,21
  233:20 234:1
  237:16 240:11
  247:2,4,11,18
  248:4,23 249:6
  252:1,6,14
  253:1 254:8,13
  254:23 255:8,11
  255:18 256:9,14
  257:3,7 261:11
  261:17 265:19
  269:18 270:15
  271:14,17,23
  272:7,12,22
  273:13,20
  274:18 275:6
  279:11,19
  280:11 283:3,22
  284:20 285:18
  285:25 286:25
  290:22 291:13
  291:23 293:7,15
  293:19 295:16
  295:22 296:3,11
  298:7,13 300:5
  304:3 306:3,20
  307:1 308:16
  309:10,25
  310:13 311:1

  314:5,14,20
  318:2 321:11,20
  322:17,21 323:4
  323:22 324:14
  324:19,25
  325:21 326:2
  331:17 333:4,8
  334:21 335:8,17
  336:19,22 337:2
  337:11 339:11
  340:12 342:10
  346:5,12,19
  352:15 355:5,10
  355:25 356:7
  358:16 361:21
  362:25 367:1,4
  367:21 368:2
  370:8,10,12,18
**witnessed** 28:15
  28:25 29:4,16
  249:16 308:21
  308:24
**witnesses** 232:1
  232:6,7,25
  233:1 246:9,19
**won** 10:13
**wondering**
  284:15
**word** 110:5
  128:22 133:4
  135:24 138:2
  160:21 179:9
  195:20 204:25
  209:6 216:21

**[word - years]**                                          Page 459

221:5 243:22
254:24 282:25
**worded**   158:11
158:12 217:5
**words**   27:15
97:2 116:4
123:3 129:15
155:14 159:24
162:21 163:4,16
163:18 179:2
192:7 193:17,20
197:13 205:2,4
240:23
**work**   6:22,24
7:4 18:13 20:10
24:17 29:7
31:12 38:17,19
39:17,19 41:6,8
50:18 95:8,17
100:25 101:23
102:5,10,11,21
104:13 105:15
114:5 121:22
122:22,24
123:10 130:22
132:11,13 136:6
137:16 138:5
146:4 149:16
161:10,17 163:2
163:8 165:1,6
172:7 176:8,17
177:4,15 179:12
189:25 200:3
203:7 210:7

211:4 223:1
253:3 276:6
282:18 288:7
310:10 320:13
332:12 342:1
354:11,12
367:19,22
**worked**   7:15
8:24 35:21
37:20 38:10
50:8,17 249:2
349:16 351:17
**worker**   181:1
**working**   39:24
50:6 51:23 53:5
239:15 295:1
345:4 364:9
**workload**   68:14
**works**   52:4
104:15
**world**   87:16
150:23 217:19
297:8 349:22
**worried**   64:7
**worst**   82:12
**wow**   129:9
**write**   65:13 88:6
**writing**   28:22
117:4 152:11
**written**   22:14
43:7 56:13
75:24 126:11
174:22 239:18
244:12,17

249:20 311:1
**wrong**   11:15
46:17 68:7
128:25 210:19
226:5 296:14
323:24
**wrote**   38:8
193:19 304:19

---

**x**

**x**   17:16 91:12
198:19

---

**y**

**y'all**   313:17
**yard**   81:1 181:1
254:12 339:15
339:19,23,24
340:2,6,11,22
341:1
**yeager**   57:16
**yeah**   13:2 23:22
23:25 46:12
54:13 55:16
57:9 60:19
63:14 92:23
94:20 99:6
106:5 109:1
111:17 130:5
139:12 142:16
154:23 170:14
175:8,17,17
186:15,18 257:3
267:17 269:3
281:14 283:5

298:20 302:14
319:13,16 331:9
**year**   26:25 37:8
61:16 94:3,3
115:13,23 116:1
118:23 119:24
120:23,25 121:8
121:19,24
142:11 208:4
292:2 307:16
316:24 317:9
319:1,4,15
**years**   6:1 33:19
35:22 37:17,22
39:8 54:15
66:12 70:14
72:6 83:23,25
91:19 92:2
104:23 105:2,3
105:24 106:3,6
108:12 109:4,12
109:19 114:13
116:16 117:3
118:13 120:24
138:15 140:25
141:5 145:1
197:23 211:7
252:8 259:17,24
304:1,9,15
308:6 317:4,23
326:18 338:3
362:17,24
363:12,14,14,17

**yesterday**
　315:18
**york**　330:10,13
**younger**　79:7
　175:12
**youth**　12:19
　13:9 33:22 36:3

**z**

**z**　275:7 326:15
　327:12
**zero**　83:24
　118:23 119:2,3
　119:9 120:16,18
　120:20 122:2
　275:12,21
**zoom**　74:10

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.


(F) Certification and filing by officer; exhibits;
copies; notice of filing.

(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.



DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.