FILED
2026 Aug-25 AM 11:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# INVESTIGATION OF ALABAMA'S STATE PRISONS FOR MEN

United States Department of Justice
Civil Rights Division

United States Attorney's Offices for the
Northern, Middle, and Southern Districts of Alabama

July 23, 2020

## TABLE OF CONTENTS


I. INTRODUCTION .... 1

II. INVESTIGATION .... 3

III. BACKGROUND .... 5

IV. CONDITIONS IDENTIFIED .... 7

A. Excessive Force Is Too Common Throughout Alabama's Prisons .... 10

1. Correctional Officers Use Excessive Force on Prisoners Who Are Restrained or Who Are Compliant .... 10

2. Correctional Officers Unlawfully Use Force as Punishment or Retribution .... 14

3. Correctional Officers Use Chemical Spray Inappropriately .... 15

B. ADOC Lacks Accountability in Reviewing Uses of Force .... 16

1. ADOC Employees Often Fail to Report or Accurately Document Uses of Force .... 17

2. Uses of Force Are Frequently Not Investigated by I&I .... 18

3. Uses of Excessive Force Are Inadequately Addressed By ADOC .... 18

C. Use of Force Investigations Are Frequently Inadequate .... 19

D. Conditions That Contribute to the Use of Excessive Force .... 21

V. MINIMUM REMEDIAL MEASURES .... 22

A. Immediate Measures .... 22

B. Long-Term Measures .... 25

VI. CONCLUSION .... 27

## I. INTRODUCTION

The Civil Rights Division and the three U.S. Attorney's Offices for the State of Alabama ("Department" or "Department of Justice") provide notice, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.* ("CRIPA"), that there is reasonable cause to believe, based on the totality of the conditions, practices, and incidents discovered that: (1) the conditions throughout Alabama's prisons for men ("Alabama's prisons")[1] violate the Eighth Amendment of the U.S. Constitution; and (2) these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth Amendment. The Department does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Notice should be construed as such. Consequently, this Notice Letter is not intended to be admissible evidence and does not create any legal rights or obligations.

Consistent with the statutory requirements of CRIPA, we write this Notice Letter to notify Alabama of the Department's conclusions with respect to constitutional violations, the facts supporting those conclusions, and the minimum remedial measures necessary to address the identified deficiencies.

There is reasonable cause to believe that the correctional officers within the Alabama Department of Corrections ("ADOC") frequently use excessive force on prisoners housed throughout Alabama's prisons for men. Such violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment. We identified frequent uses of excessive force in 12 of the 13 Alabama prisons that we reviewed.[2] Given the identified pervasiveness of the uses of excessive force and the statewide application of ADOC's use of force policies and procedures, we have reasonable cause to believe that the uses of excessive force occurring within Alabama's prisons give rise to systemic unconstitutional conditions.

The severe overcrowding and understaffing present in Alabama's prisons contribute to the patterns or practices of uses of excessive force. As of January 2020, Alabama's 13 prisons

[1] Our investigation covers 13 correctional facilities: Bibb Correctional Facility; Bullock Correctional Facility; Donaldson Correctional Facility; Easterling Correctional Facility; Elmore Correctional Facility; Fountain Correctional Facility; Hamilton Aged & Infirmed Center; Holman Correctional Facility; Kilby Correctional Facility; Limestone Correctional Facility; St. Clair Correctional Facility; Staton Correctional Facility; and Ventress Correctional Facility. We also initially investigated the conditions at Draper Correctional Facility; however, in late 2017, the Alabama Department of Corrections ("ADOC") closed that facility. As a result, we did not include any findings related to Draper in this Notice Letter. And in January 2020, we learned that ADOC had decided to decommission most of Holman. We did not review the conditions in other ADOC facilities, such as work release facilities or the Julia Tutwiler Prison for Women.

[2] Due to the substantial limitations on our investigation and the failure to properly document incidents, we are unable to determine whether there were patterns of excessive force at one of the 13 prisons—Hamilton Aged & Infirmed. Further, because ADOC prohibited us from interviewing any correctional officers, we were unable to determine whether the training those officers receive is robust and effective.

held 6,000 prisoners over their designed capacity. The severe and pervasive overcrowding increases tensions and escalates episodes of violence between prisoners, which lead to uses of force.

At the same time, the understaffing tends to generate a need for more frequent uses of force than would otherwise occur if officers operated at full strength. In an adequately staffed prison, officers can use a show of force and command presence to discourage fighting among prisoners or to quickly end fighting through sheer force of their numbers. But because Alabama's prisons are severely overcrowded and operate substantially below the necessary staffing level, officers often find themselves near instances of prisoner violence.

As might be expected, the increase in use of force incidents tends to produce a rise in the number of incidents of *excessive* force, regardless of the initial reasons for that force. In some circumstances, officers may perceive the need to extricate themselves quickly from potential dangers posed by dozens of unrestrained prisoners, given the housing circumstances in most facilities,[3] and may use more force than is reasonably necessary to subdue resisting or fighting prisoners. And relatedly, officers sometimes use force to punish prisoners involved in altercations. In addition, inadequate supervision and the failure to hold officers accountable for their behavior contribute to an increase in the incidence of excessive force. Insufficient staffing extends to supervisor ranks as well. Without correctional supervisors who demand adherence to use of force policy, training, and law, and who identify, discipline, and remove offending officers, correctional officers are far more likely to act with impunity than if staffing levels were appropriate. Combined with the lack of accountability—particularly the failure to discipline officers who engage in excessive force—this understaffing exacerbates the pattern of excessive force in Alabama's prisons. In sum, overcrowding and understaffing at every level contribute to uses of force that that might otherwise be avoidable and to a significant number of uses of force that go beyond constitutional limits.

These uses of excessive force—which include the use of batons, chemical spray,[4] and physical altercations such as kicking—often result in serious injuries and, sometimes, death. Indeed, in the last months of 2019, at least two prisoners at two different ADOC facilities died following uses of force. In October 2019, correctional officers at Donaldson used force against a prisoner, resulting in his death. As part of the autopsy, an ADOC investigator informed a coroner that, after an officer opened his cell, the prisoner rushed toward another prisoner carrying two prison-made weapons. A correctional officer ordered the prisoner to drop the weapons, but the prisoner failed to comply. As a result, the officer sprayed the prisoner with a chemical agent, but it had no effect. The officer then struck the prisoner on the arm, causing the prisoner to drop one weapon. A second correctional officer responded to the scene and administered palm-heel strikes to the prisoner's head as well as knee-to-head strikes as he tried to disarm the prisoner. The prisoner eventually went to the ground face down and officers

---

[3] The large-scale, barracks design of most of Alabama's prisons contributes to the consequences of overcrowding. Prisoners are unable to remain separate. With more people in close proximity and given the pervasiveness of contraband in Alabama's prisons, an abundance of conflicts arise.

[4] Sabre Red is a chemical agent, or pepper spray, that is used most frequently in ADOC facilities. When applied directly to the face, it irritates a person's eyes and causes a burning sensation, pain, and even temporary blindness.

reported that the prisoner concealed a knife between his upper torso and the floor. Numerous prisoner-witnesses, however, reported that correctional officers continued to strike the prisoner after he dropped any weapons and posed no threat. The prisoner was airlifted to a hospital due to the extent of his injuries. Photographs revealed extensive and severe bruising and swelling along the prisoner's face, left ear, eyes, and nose. The level of force used caused the prisoner to sustain multiple fractures to his skull, including near his nose, both eye sockets, left ear, left cheekbone, and the base of his skull, many of which caused extensive bleeding in multiple parts of his brain. The autopsy listed 16 separate and distinct injuries to the prisoner's head and neck, in addition to multiple fractured ribs and bleeding around a kidney.

Two months later, in December 2019, a prisoner at Ventress died after the use of force by staff. The autopsy revealed that the prisoner died from blunt force trauma to the head. He sustained multiple areas of intracranial bleeding, fractures of his nose and left eye socket, and had at least six teeth knocked out. ADOC personnel informed hospital medical personnel that the injuries occurred after the prisoner fell from a bunk bed. Two correctional officers were placed on mandatory leave while ADOC investigated the circumstances surrounding the death. Subsequently, in what ADOC described as an effort to "deter unacceptable behavior" by staff, ADOC's Commissioner announced the establishment of an internal task force to examine, among other things, uses of excessive force by staff. In addition, ADOC announced that it would begin training to reinforce how force is to be used, starting in mid-December 2019 at Donaldson and Ventress.

Based on what we learned from our investigation, including statements made by members of ADOC's executive leadership team, we have cause to believe that many other uses of excessive force are unreported or underreported. In addition, we identified numerous instances where ADOC's investigative component concluded that uses of force were "unsubstantiated" as excessive force despite the absence of critical information in investigative files. These types of unlawful incidents of excessive force, and the underreporting of these incidents, will likely continue to occur until such time as the conditions within Alabama's prisons are affirmatively addressed. Ultimately, Alabama does not properly prevent and address unconstitutional uses of force in its prisons, fostering a culture where unlawful uses of force are common.

## II. INVESTIGATION

In October 2016, the Department opened a CRIPA investigation into the conditions in ADOC facilities housing male prisoners. The investigation focused on whether ADOC (1) adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners; (2) adequately protects prisoners from use of excessive force and sexual abuse by correctional officers; and (3) provides prisoners with sanitary, secure, and safe living conditions.

In April 2019, the Department issued a CRIPA Notice Letter to the State of Alabama providing its conclusions on the first and third areas of the investigation. After carefully reviewing the evidence, the Department concluded that there was reasonable cause to believe that conditions at Alabama's prisons violate the Eighth Amendment to the Constitution and that

these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth Amendment. In particular, the Department informed Alabama that it had reasonable cause to believe that Alabama routinely violates the constitutional rights of prisoners housed in Alabama's prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe and sanitary conditions. The serious deficiencies in staffing and supervision, and overcrowding, contribute to and exacerbate these constitutional violations.

The April 2019 Notice Letter did not include conclusions on whether Alabama adequately protects prisoners from uses of excessive force or sexual abuse by staff. This Notice Letter addresses uses of excessive force within Alabama's prisons for men. We did not find a systemic pattern or practice of sexual abuse by staff.

Five experienced expert consultants in correctional practices assisted with this investigation. Three of those experts are former high-ranking corrections officials with significant experience leading state and local corrections departments; the remaining two are nationally recognized experts in medical care and sexual safety in prisons. At least two of the experts accompanied us on most site visits to Alabama prisons, interviewed ADOC staff and prisoners, reviewed documents, and provided their expert opinions and insight to help inform the investigation and its conclusions. The remaining experts reviewed documents and provided their expert opinions and insights to assist the Department in forming conclusions and recommending minimum remedial measures to tackle the significant problems encountered during the investigation.

Between February 2017 and January 2018, we conducted site visits to four Alabama prisons: Donaldson, Bibb, Draper, and Holman. Our investigation was aided by numerous sources of information. Throughout the course of this investigation, we interviewed approximately 55 ADOC staff members. Our site visits included interviews with wardens, deputy wardens, captains, Prison Rape Elimination Act ("PREA")[5] compliance officers, sergeants, medical staff, mental health staff, classification staff, and maintenance managers. In addition, we met with staff of ADOC's central office, including two former Deputy Commissioners of Operations, the head of the Intelligence and Investigations ("I&I") Division,[6] the PREA Coordinator, I&I investigators, and other members of ADOC management.

We also spoke with numerous prisoners and their family members. During the four site visits, we interviewed over 270 prisoners. Additionally, two Department investigators interviewed prisoners in seven Alabama prisons—Limestone, Donaldson, Staton, Ventress, Easterling, Bullock, and Fountain. ADOC also allowed prisoners to access a toll-free number with direct access to Department personnel. As a result, the Department conducted over 800 telephone interviews with prisoners and family members. We received and reviewed more than 400 letters from ADOC prisoners. We also received hundreds of emails from prisoners and family members to an email address established specifically for this investigation.

[5] 34 U.S.C. §§ 30301-30309.

[6] In early 2020, ADOC began referring to I&I as the Law Enforcement Services Division.

We augmented our site visits by requesting and reviewing hundreds of thousands of pages of documents and data from 2015 to 2019. In order to inform our understanding of ADOC's practices, we reviewed a variety of documents, including incident reports, medical records, autopsies, policies and regulations, mental health records, personnel files, staffing plans, shift rosters, duty post logs, investigative files, audio interviews, and employee discipline records. ADOC produced its entire incident report database from 2015 through June 2017, but only a limited portion of its incident report database from June 2017 through April 2018.[7]

In some sections of this Notice Letter, we provide many examples to illustrate the variety of circumstances in which a violation occurs, while in others we focus on one or two examples that demonstrate the nature of the violations we found. The number of examples included in a particular section is not indicative of the number of violations that we identified. During the course of this portion of our investigation, we referred a number of potential excessive force incidents to the Department's criminal components for further review. Because of the sensitive nature of those matters, we have included only limited information in this Notice about any instances where we made such referrals. We further note that, in the vast majority of examples cited in this letter, the uses of excessive force were corroborated by ADOC's own documentation. Despite ADOC's awareness of these incidents, it failed to effectively address systemic deficiencies—particularly with respect to accountability measures—that are leading to uses of excessive force. We also found that ADOC failed to make and maintain proper records of excessive force incidents and that ADOC was unwilling to produce records that it did maintain. The Department used other means to corroborate many of those incidents.

## III. BACKGROUND

ADOC currently houses approximately 16,600 male prisoners in 13 prisons with varying custody levels.[8] Five of these facilities—Donaldson, Holman, Kilby, Limestone, and St. Clair—are Security Level V, meaning they are "designed for incarcerating the most violent and highest classified offenders admitted to ADOC." In several Security Level V facilities, many of the prisoners are housed in cells, as opposed to open dormitory-style housing. They range in population from just under 900 prisoners at St. Clair to over 2,200 at Limestone. ADOC classifies eight of its facilities—Bibb, Bullock, Easterling, Elmore, Fountain, Hamilton Aged & Infirmed, Staton, and Ventress—as Security Level IV, which are "less secure than close custody for inmates who have demonstrated less severe behavioral problems." Hamilton houses approximately 300 prisoners, while Bibb houses over 1,800. Many of the prisoners housed in

[7] For the June 2017 through April 2018 period, ADOC refused to produce any attachments to the incident reports, even though the attachments include critical information, including the initial, institution-level use of force investigations completed by captains or wardens, photographs documenting the aftermath of uses of force, and witness statements. ADOC also produced only I&I investigative files for closed investigations. Throughout the investigation, ADOC also prohibited us from interviewing non-supervisory correctional officers and severely restricted our access to individuals working in prison health care units.

[8] ADOC's in-house population—including the Julia Tutwiler Prison for Women and work release facilities—totals approximately 21,000 individuals. Our investigation, however, only reviewed conditions in Alabama's prisons housing men.

Security Level IV facilities live in open dormitories; however, even in these facilities, there are a number of segregation cells.

Over the last decade, correctional officers in multiple prisons have pleaded guilty or been convicted of using excessive force against prisoners. In one incident, at least four officers beat a prisoner to death. In 2017, ADOC's incident reporting system documented 1,800 uses of force. A reported use of force incident does not equate to a use of *excessive* force. Indeed, many uses of force in a prison setting may be justified. However, the Department's review of a statistically significant set of ADOC's use of force incident reports and accompanying documentation from a six-month period demonstrated that a large number of reported uses of force were unjustified under the legal standard.

Following most uses of force by correctional officers in Alabama's prisons, a correctional supervisor—typically a captain or an assistant warden—conducts an initial, institution-level use of force investigation. Those investigations almost always result in one of three determinations: (1) that the force was justified and no further action be taken; (2) that corrective action be taken against the officer who used the force; or (3) that the use of force be referred to I&I for further review.

Despite the substantial number of uses of force that occur in Alabama's prisons for men, the overwhelming majority of uses of force do not receive scrutiny beyond an institution-level use of force investigation. Referrals to I&I or for corrective action are made in only a small percentage of use of force incidents. Among those facility-level investigations resulting in referrals for additional review or action, the following statistics related to uses of force are especially concerning:

- In 2017, half of Alabama's prisons referred either one or no uses of force for corrective action or I&I review. As discussed in this Notice, in countless instances, the institution-level investigations fail to address uses of excessive force.

- In 2017, approximately 55% of referrals for corrective action or for I&I review from all of Alabama's prisons originated from Bullock, though only 6% of all reported uses of force occurred at Bullock.

The quality of institution-level use of force file documentation and investigation varies greatly from prison to prison. In some prisons, for instance, institutional use of force investigation reports contained little more than vague language describing a use of force that was often copied in large part from an incident report. These institution-level use of force reviews often happen months after an incident.

I&I is tasked with investigating suspected criminal violations that occur within Alabama's prisons. I&I reviews uses of force for potential criminal liability and requires proof beyond a reasonable doubt in order to refer a use of excessive force for prosecution. While using this heightened burden of proof is appropriate for criminal prosecutions, it should not be employed by a prison system making a criminal referral as it interferes with prosecutors' evaluation of a case and decision on whether to prosecute. In other words, by requiring proof

beyond a reasonable doubt to refer a matter for prosecution, I&I limits the number of uses of force that are reviewed by outside prosecutors.

A substantial number of uses of force occur when a prisoner who is indebted to another prisoner in his dormitory—typically for a drug debt—refuses to return to his assigned dormitory, explaining that he fears for his safety. Such prisoners are frequently disciplined for creating a safety hazard. In those situations, it is rare for the investigating supervisor to discuss the debt issue and the prisoners' safety fears in the investigative report. There is also a significant number of uses of force that occur as a result of a prisoner using an illicit substance. In those instances, correctional supervisors typically do not document any attempt to uncover the source of the illicit substance in their investigations. In addition, in a large number of incidents, prisoners sustain injuries after being forced to the ground, but the description of force fails to mention anything that would cause an injury. In a few prisons, institutional-level use of force investigations are more thorough. There, captains or wardens conducting such investigations regularly obtain witness statements, access video footage, and thoroughly assess and document whether the force was justified.

The systemic use of excessive force within Alabama's prisons for men violates the Eighth Amendment. In this Notice Letter, we highlight many uses of excessive force involving restrained or compliant prisoners as well as instances of force that were used as punishment. Additionally, we cite numerous incidents where uses of force were not properly and thoroughly investigated or were handled solely within a prison's disciplinary process, rather than through the formal I&I investigative process.

## IV. CONDITIONS IDENTIFIED

The Eighth Amendment's protection from cruel and unusual punishment forbids the use of excessive physical force against prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002).

The Constitution requires the State to operate prisons in a manner that is not deliberately indifferent to conditions that pose "a substantial risk of serious harm" to prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991). An official acts with deliberate indifference when she or he "knows of and disregards an excessive risk to prisoner health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. To find deliberate indifference, there must be evidence of the following: (1) facts presenting an objectively substantial risk to prisoners and awareness of these facts on the part of the officials charged with deliberate indifference; (2) that the officials drew the subjective inference from known facts that a substantial risk of serious harm existed; and (3) that the officials responded in an objectively unreasonable manner. *Doe v. Ga. Dep't of*

*Corrs.*, 248 F. App'x 67, 70 (11th Cir. 2007); *Marsh v. Butler Co.*, 268 F.3d 1014, 1028-29 (11th Cir. 2001).

Whether a particular use of force by a correctional officer violates the Constitution depends on whether force is applied "in a good-faith effort to maintain or restore discipline" or instead is administered "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see also Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999); *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996); *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991). Courts may examine a variety of factors in determining whether the force used was excessive, most commonly including: (1) the need for the application of force; (2) the relationship between the need for force and the amount of force applied; (3) the threat, if any, reasonably perceived by responsible correctional officers; and (4) "any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7-8; *see also Campbell*, 169 F.3d at 1375; *Harris*, 97 F.3d at 505; *Williams*, 943 F.2d at 1575. Additionally, courts will also factor into the analysis the extent of the prisoner's injury at the hands of the correctional officers. *Hudson*, 503 U.S. at 7-8; *Campbell*, 169 F.3d at 1375; *Williams*, 943 F.2d at 1575. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (internal quotations omitted). Applying that standard, the Supreme Court has ruled that blows directed at a prisoner causing bruising, swelling, loosened teeth, and a cracked dental plate were not *de minimis* for Eighth Amendment purposes. *Id*. at 10.

Further, prison staff may not use force gratuitously against a prisoner who has been already subdued. *See Smith v. Vavoulis*, 373 F. App'x 965, 967 (11th Cir. 2010) (per curiam) (finding excessive force where a prisoner submitted calmly to being cuffed so "the amount of force applied necessarily appears inordinate compared to the need for force"); *Harris*, 97 F.3d at 505-06 (holding that excessive force occurred when officers slapped or hit a prisoner's face, and his head was snapped back with a towel, while the prisoner was restrained to have a haircut); *Davis v. Locke*, 936 F.2d 1208, 1212-13 (11th Cir. 1991) (excessive force where prison guards dropped the prisoner, head first, from back of pickup truck while the prisoner's hands were shackled behind his back after he had been apprehended following attempted escape); *Williams v. Cash*, 836 F.2d 1318, 1320 (11th Cir. 1988) (finding genuine issue of material fact as to how a prisoner's elbow was broken while restrained by two officers).

Force directed at a subdued prisoner violates the Eighth Amendment. *Hope v. Pelzer*, 536 U.S. 730, 738-39 (2002) (holding that "the Eighth Amendment violation is obvious" when subjecting a prisoner to "unnecessary pain" after any "safety concerns had long since abated"); *McReynolds v. Ala. Dep't of Youth Servs.*, 204 F. App'x 819, 822 (11th Cir. 2006). In addition, "once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation." *Williams*, 943 F.2d at 1576 (citing *Ort v. White*, 813 F.2d 318, 324 (11th Cir. 1987)). Correctional officers "step over the line of constitutionally permissible conduct" if they "summarily and maliciously inflict harm in retaliation for past conduct." *Ort*, 813 F.2d at 324-325; *see also Johnson v. Conway*, 688 F. App'x 700, 707 (11th Cir. 2017). "A constitutional violation occurs where

prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased." *Id.* Similarly, "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) (internal quotation marks and citations omitted)); *see also Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) ("[W]here chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement.").

In evaluating the use of chemical agents, it is essential to "consider the relationship between the need for force and the amount of force that was used." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (use of additional bursts of pepper spray after a prisoner attempted to comply with an officer's orders and which possibly contributed to a prisoner's asphyxiation and death sufficiently alleged objective component of excessive force claim). When an initial burst of a chemical agent may be warranted, use of excessive force may ensue due to prolonged exposure, repeated bursts, lack of decontamination, and exposure after the prisoner no longer presents a threat. *Id.*; *see also Danley v. Allen*, 540 F.3d 1298, 1309, 1311 (11th Cir. 2008) (holding that prolonged exposure to pepper spray due to a failure to properly decontaminate a prisoner may form the basis of an Eighth Amendment claim); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain.").

Although a *de minimis* use of force cannot support a claim for use of excessive force, the kind of injuries suffered is one factor to consider in determining the excessiveness of the force used. *Skrtich*, 280 F.3d at 1302. Nevertheless, a prisoner is not required to show that the application of force resulted in serious injury to sustain an excessive force claim. *Hudson*, 503 U.S. at 7-8. Further, an "officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance." *Skrtich*, 280 F.3d at 1301 (citing *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985)).

The obligation to protect prisoners from the substantial risk of unconstitutional uses of force includes the obligation to implement appropriate policies and oversight procedures to prevent the misuse of force. *Farmer*, 511 U.S. at 837, 840-41; *Jones v. Gusman*, 296 F.R.D. 416, 439-40, 442 (E.D. La. 2013) (approving consent judgment that included, among other things, measures to address deficiencies in supervision and investigation of staff uses of force, which adversely impacted prisoner "safety and security"). With regard to deficient policies and procedures governing use of force, prison officials evince a deliberate indifference to prisoners' constitutional rights to protection from use of excessive force where they deliberately ignore incidents of excessive force or fail to adequately monitor, supervise, investigate, or review uses of force. *Hope*, 536 U.S. at 739-45; *Hudson*, 503 U.S. at 11; *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1253 (M.D. Ala. 1998) (applying "*Farmer* standard" to evaluate use of excessive force under the Eighth Amendment in the absence of allegations that the prisoners' behavior created an immediate disturbance or threat).

## A. <u>Excessive Force Is Too Common Throughout Alabama's Prisons</u>

Uses of excessive force in Alabama's prisons are common. The Department reviewed a statistically significant sample of ADOC's institution-level use of force documentation for the first six months of 2017—accounting for approximately 40% of the total uses of force for that year—and concluded that a large number of reported uses of force were unjustified under the legal standard described above. The Department also reviewed all of ADOC's closed use of force I&I investigations for incidents that occurred in 2017 and 2018 and, in some instances, the Department relied on autopsies and medical records that were produced by third parties. The pattern the Department identified in the first six months of 2017 continued in subsequent years.

All too often, correctional officers use force in the absence of a physical threat while making no effort to de-escalate tense situations. Such uses of force heighten tensions in already violent and overcrowded prisons. Failing to de-escalate these situations properly endangers the safety of prisoners and staff. Correctional officers also use force as a form of retribution and for the sole purpose of inflicting pain. Such uses of force violate the Eighth Amendment.

### *1. Correctional Officers Use Excessive Force on Prisoners Who Are Restrained or Who Are Compliant*

Using force on a restrained or compliant prisoner who is no longer resisting or presenting a danger is unconstitutional. *Williams*, 943 F.2d at 1576. Correctional officers' use of this kind of unlawful force is a pattern and happens too frequently in Alabama's prisons.

The following are just a few examples of those types of unconstitutional uses of force that we identified in Alabama's prisons:

- In September 2019, a lieutenant at Ventress lifted a handcuffed prisoner up off the ground and slammed him on a concrete floor several times, knocking him unconscious. The prisoner was unable to breathe on his own, was intubated, and taken to an outside hospital, where medical personnel administered CPR several times to keep the prisoner alive.

- In February 2019, a correctional officer at Elmore saw two prisoners jump a fence to retrieve contraband, stopped them, and took them to an office where three other correctional officers were working. A lieutenant in the office handcuffed the two prisoners and took them to an observation room across the hall from the office. A sergeant left the office to watch surveillance video of the fence-jumping and became enraged when he saw it. The sergeant returned to the office, got a key to the observation room, and went into the room where the handcuffed prisoners were sitting quietly. The sergeant pulled one of the handcuffed prisoners off the bed and into the hallway between the observation room and the office. The sergeant shoved the prisoner against a wall and knocked him to the floor. The sergeant punched and kicked the prisoner, and then struck the prisoner with a collapsible baton approximately 19 times on his head, legs, arms, back, and body. During the assault, the prisoner defecated on himself. Throughout the beating, the prisoner did not resist and posed no threat. The sergeant then pulled the second handcuffed prisoner into the

hallway and shoved him against the wall, striking him with a baton three times in the head, legs, and back. When the prisoner slid to the floor, the sergeant continued striking him, landing blows to his arms, legs, and abdomen. He also kicked the prisoner as he lay on the floor. Four other ADOC employees—a lieutenant, two correctional officers, and another sergeant—watched or were in the immediate vicinity of the beatings but failed to intervene, either verbally or physically. The sergeant who assaulted the prisoners later filed a false report about the incident. The sergeant and two correctional officers pleaded guilty in federal court under 18 U.S.C. § 242 of two counts of willful deprivation of constitutional rights under color of law. The lieutenant was indicted for failing to intervene.

- In December 2018, a correctional officer brutally hit, kicked, and struck a handcuffed prisoner with an expandable baton in the Ventress medical unit. Two nurses saw the officer beat the prisoner, and two other nurses could hear the beating from adjacent rooms. The prisoner did not antagonize the officer before the beating and his hands were handcuffed behind his back. During the beating, all four of the nurses heard the officer yell something to the effect of, "I am the reaper of death, now say my name!" and the prisoner begged the officer to kill him. At one point, a nurse observed the officer place his palms against the wall and his right foot on the side of the prisoner's face to grind the prisoner's head into the floor. The nurse intervened, and the officer briefly removed his foot from the prisoner's head. When the officer tried to step on the prisoner's head again, the nurse sternly told the officer to calm down. The officer then paced the floor with the prisoner's blood on his clothing and, before leaving the medical unit, told the health care workers that they did not see anything. The officer filed a false incident report stating that he did not hit the prisoner. The body chart[9] and photographs, however, documented clear swelling and abrasions to the prisoner's back and left arm, a bloody nose, and a gouge to his left shin. After an investigation, I&I concluded that the use of force was excessive and unjustified. I&I questioned whether the employee was fit for duty after the officer claimed that he suffered from undiagnosed post-traumatic stress disorder. Despite I&I's conclusions, we saw no indication in the documents ADOC provided us that I&I referred the matter for criminal prosecution or that ADOC imposed discipline.

- In July 2018, while being transported to the health care unit at Staton, a prisoner taunted a correctional sergeant by sticking out his tongue. The sergeant punched the handcuffed prisoner in the face with a closed fist. I&I concluded that the sergeant used unnecessary and excessive force and failed to file an incident report. Less than a year later, the sergeant was arrested at the prison for attempting to smuggle contraband drugs into the facility.

- In April 2018, two prisoners received care at the Ventress health care unit after being involved in an altercation. As a correctional sergeant was taking one of the prisoners to restrictive housing, the prisoner ran away and knocked on the door of the

[9] A "body chart" is completed by a medical professional following physical interactions with prisoners. The form documents the nature and scope of any visible injuries or marks on a prisoner. It also usually contains a short statement from the prisoner detailing why a body chart was completed.

administration building. The sergeant and an administrative employee caught the prisoner and handcuffed him behind his back. When they reached the restrictive housing dorm, the sergeant and the administrative employee both struck the prisoner in the jaw while he was still handcuffed. The prisoner began bleeding profusely from the mouth and was escorted back to the health care unit where the same nurse treated him. The nurse noted that the prisoner had more significant injuries than earlier and noticed a bone fragment protruding from the prisoner's gum. ADOC subsequently terminated the sergeant for the use of excessive force, among other things.

- In September 2017, an officer at Ventress sprayed a prisoner with a chemical agent as he masturbated in front of the officer and refused to stop. Regardless of whether this initial use of force was reasonable, what followed was excessive. Officers took the prisoner to the medical unit in handcuffs. Before they entered the medical unit, the prisoner began thrashing and gyrating his hips, so a correctional sergeant dumped a cooler of water and ice on the prisoner. The nurse advised the sergeant that dumping the water and ice on the prisoner constituted a fall hazard and could also cause the prisoner to go into shock if he had a fever. The prisoner was then taken into the medical unit where he continued to thrash and gyrate his hips. The nurse believed the prisoner was unable to control his actions because he was under the influence of an illicit substance. The prisoner then fell from the examination table to the floor as the nurse tried to obtain his vital signs. The first sergeant threatened to kill the prisoner if he did not control his movements. While thrashing, the prisoner struck the sergeant's boot. In response, the sergeant kicked the prisoner several times in the stomach and chest. Another sergeant then took a shoe and hit the prisoner multiple times in the genitals. I&I investigated and concluded that the first sergeant had used excessive force. The second sergeant, who observed much of the interaction, falsely denied striking the prisoner. I&I found that excessive force occurred. I&I closed the matter after both sergeants were arrested for other offenses, including smuggling contraband, and were no longer employed by ADOC.

- In August 2017, a prisoner at Limestone threw a cup of what was likely urine at an officer through the tray door of a cell. The officer sprayed a chemical agent into the cell through the tray door and closed it. A captain and a lieutenant responded to the scene, and the captain was eventually able to handcuff the prisoner without resistance. As the captain and another officer were taking the prisoner for a medical assessment and decontamination of the chemical agent, the prisoner pulled away and moved toward the original officer. The original officer pushed the handcuffed prisoner and struck him several times. The lieutenant then restrained the officer. A captain investigated and recommended that the correctional officer receive corrective action due to the "inappropriate application of force." We saw no indication that I&I investigated the matter. Based on the documentation provided by ADOC, it is reasonable to conclude that excessive force occurred when the correctional officer struck a handcuffed prisoner several times.

- In March 2017, an officer at Donaldson sprayed cell buster spray[10] into a closed cell. Several officers then opened the cell door and ordered the prisoner to exit. The prisoner claimed that he could not see and crawled out of the cell. One officer alleged that as they entered the cell and attempted to handcuff the prisoner, the prisoner grabbed the officer's legs. The officer then struck the prisoner with a baton several times. Photographs taken after the incident show at least a dozen welts or open wounds from baton strikes to the prisoner's back. The prisoner also had a laceration over his eye and a swollen hand. The prisoner claimed that officers told him they beat him because they thought he was a member of a gang. While I&I promptly opened an investigation into the incident, I&I did not take any meaningful steps to investigate until nearly two years later. An I&I investigator found that the correctional officer applied unnecessary force in using a baton given the presence of other officers. It is unclear whether the officer was disciplined; however, the officer continued to work at the same prison for years afterwards.

- In December 2016, a prisoner at Bullock asked a lieutenant for help, reporting that several prisoners had threatened to stab him. The lieutenant took the prisoner to the captain's office. While talking to the captain, the prisoner raised his voice, but was not aggressive. Without warning, the lieutenant grabbed the prisoner by the arm, and the prisoner began resisting. The captain and lieutenant took the prisoner to the floor and eventually handcuffed him. The captain then shoved the prisoner's head to the floor. Several correctional officers also punched the prisoner in the back and choked him with a baton. The warden requested that I&I review the matter. The officers falsely denied striking or choking the prisoner. Approximately one year later, I&I concluded that the prisoner's allegations of excessive force were substantiated. It is unclear whether I&I referred the matter to a local district attorney. Corrective action was initiated against the captain but the records provided by ADOC did not specify what type of action was taken.

- In October 2016, a correctional officer at St. Clair opened a tray door to handcuff a prisoner for escort to the shower. The prisoner stabbed the correctional officer in the hand with a prison-made knife. The officer stepped back and sprayed the prisoner in the face with a chemical agent through the tray door. He then secured the tray door and called for his supervisor. A sergeant arrived with another correctional officer at the scene and handcuffed the prisoner without incident. While the sergeant and other officers were escorting the prisoner to the health care unit, at least six other correctional officers rushed towards the prisoner, screaming that the prisoner would not be allowed to just be taken to the infirmary. One of the accompanying officers described the scene as a "mob of officers." A lieutenant saw the situation and tried to intervene to calm the officers. The sergeant ordered the correctional officers to stand down, stating, "it's over[,] the inmate is in handcuffs." The sergeant next felt a burst of chemical spray hit the side of his face, which caused him to turn the prisoner around and place him up against the wall. The sergeant instructed another officer to continue the escort, and then witnessed three correctional officers tackle the prisoner

[10] Unlike traditional chemical agent spray, cell buster spray does not require direct facial contact to affect an individual. Cell buster spray creates a sort of fog within a confined space that inflames a person's respiratory tract.

to the ground before beating him with a baton and closed fists. The lieutenant also witnessed the beating and stomping of the prisoner while ordering everyone to stop. During the scuffle, the lieutenant was inadvertently hit in the thigh by one of the officer's batons. When the sergeant attempted to regain control of the prisoner, he was pushed back by one of the officers and the beating resumed. I&I investigated and referred the matter to the local district attorney for possible criminal prosecution. The documents ADOC provided us do not show that discipline was imposed.

#### *2. Correctional Officers Unlawfully Use Force as Punishment or Retribution*

ADOC's correctional officers often use force to punish prisoners when the prisoner's response or behavior may not accord with the officer's commands, even though the prisoner does not physically resist or present a reasonably perceived threat to others. In some prisons, it is common for officers to slap prisoners with little justification as a form of punishment. At times, officers are even more forceful. These uses of force are excessive and unlawful. *See Thomas*, 614 F.3d at 1307 (holding that if force is used "for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement").

The following examples illustrate these violations:

- In November 2018, a correctional officer at Bullock instructed several prisoners to leave the kitchen area. One prisoner disregarded the order and walked through the dining line a second time to get additional food. The prisoner was not demonstrating violent or threatening behavior at the time. Regardless, a correctional officer struck the prisoner twice with a wooden baton in the arm and back. A lieutenant observed the assault and escorted the officer to the shift office. The officer later admitted to the I&I investigator that he lost his composure, and blamed it on having to work in the kitchen alone, where he had previously been assaulted. He also stated he was stressed from having worked 12-hour days for 10 of the preceding 11 days. The officer stated that he would have hit the prisoner even if the warden had been standing nearby. I&I referred the matter to the local district attorney's office for potential prosecution. The documents ADOC provided us do not show that discipline was imposed.

- In October 2018, a prisoner was involved in an altercation with several other prisoners in his dormitory at Ventress. The prisoner ran from the dormitory, seeking assistance. An officer instructed the prisoner to return to his dormitory because the institution was on lockdown for prisoner physicals. The prisoner expressed fear for his safety and asked the officer not to force him to return to the dormitory. At that point, a sergeant approached the prisoner, yelled at him, and slapped him in the face with an open hand. A program counselor witnessed the assault and noted that the prisoner was not resisting at any time. During an interview with I&I, the sergeant denied ever striking the prisoner, but I&I substantiated the incident. I&I subsequently opted not to refer the incident to the local district attorney, but it also failed altogether to conduct an administrative review of the matter. The sergeant was arrested in December 2018 for facilitating delivery of smuggled contraband to prisoners.

- In May 2018, a prisoner at St. Clair informed a correctional captain that a sergeant had assaulted him. The sergeant failed to complete an incident report, did not permit the prisoner to go to the infirmary to secure a body chart, and initially falsely claimed that no contact had occurred with the prisoner. The confrontation originated over the prisoner's clothing. The sergeant stated that the prisoner was nude from the waist down, but the prisoner argued that he was wearing shorts that were covered by his T-shirt. The officer also claimed that the prisoner was in possession of a contraband metallic coffee cup. The prisoner told I&I that the officer punched him four or five times, and a body chart from the following day showed swelling to the right side of the prisoner's nose, bruising around both eyes, a scrape on the left side of his nose, and a small scrape on his right middle finger. But the I&I investigative report concluded that the sergeant slapped the prisoner. The officer received a three-day suspension for failing to report the incident and for using excessive force.

- In January 2018, a correctional officer at Staton used force after a prisoner refused an instruction to take a stretcher to a dormitory. The prisoner informed the officer that he could not take the stretcher to the dormitory because he was following a captain's prior order. According to the officer, the prisoner refused an order to place his hands behind his back, and a scuffle ensued. The prisoner claimed the officer slammed him into a door and hit him in the face three times with little provocation. The officer then handcuffed the prisoner. A captain reviewed the incident and concluded that the incident could have been avoided and that it "escalated unnecessarily due to provocation by the officer." The documents ADOC provided us do not show that discipline was imposed.

- In July 2017, a correctional officer at Kilby observed a prisoner working in the kitchen give some leftover chicken to another prisoner. The officer ordered the kitchen worker to report to the back of the kitchen and forced him to eat all of the leftover chicken as the officer and a lieutenant watched. The prisoner told a captain that the officer slapped him three times because he could not eat all of the chicken. When the captain questioned the lieutenant and officer about the incident, they admitted to forcing the prisoner to eat the chicken. It is unclear whether additional force was used on the prisoner.

### *3. Correctional Officers Use Chemical Spray Inappropriately*

ADOC's regulation governing the use of chemical agents generally provides that they may be deployed in order to gain control of a situation. But ADOC correctional officers often ignore ADOC's regulation and use chemical spray inappropriately. Prisoners who do not present a danger are frequently sprayed with chemical agents. In those cases, officers seem to punish prisoners for not complying with a verbal order. Chemical spray is regularly used as retribution. These kinds of applications of chemical agents violate the Constitution: "[W]here chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." *Thomas*, 614 F.3d at 1311. Examples include:

- In January 2018, a prisoner at Staton disobeyed a correctional officer's order to close the door to his dormitory. When the prisoner refused, the officer sprayed the prisoner in the face with a chemical agent and hit the prisoner several times on the legs with a baton. The captain concluded that the use of force was not justified and recommended that corrective action be taken against the officer. The documents ADOC provided us do not show that discipline was imposed.

- In August 2017, a prisoner at Holman pushed against his cell door, trying to open it. A correctional officer instructed the prisoner to step away from the door several times, but the prisoner refused. The officer then administered a chemical agent through the tray door to the prisoner's genital area even though the prisoner posed no threat. The captain concluded that the use of force was not justified as it was "not ADOC policy to administer chemical agents to an individual's underwear." The documents ADOC provided us do not show that discipline was imposed.

It is also common for officers in Alabama's prisons to use chemical spray on prisoners in locked cells. These uses of force often occur when prisoners place their arm in a tray door, even though the prisoners are secure in a cell and pose no danger to others. Rather than contacting a supervisor before spraying a chemical agent, officers frequently use chemical spray on prisoners in these circumstances.

### B. ADOC Lacks Accountability in Reviewing Uses of Force

In 2015, ADOC issued a regulation governing the use of force within Alabama's prisons. In broad terms, the regulation permits force to be used in various enumerated instances, including as self-defense, to protect others or property, to quell a disturbance, or when a prisoner exercises physical resistance to a lawful command. While ADOC's use of force regulation is relatively robust, it is not effectively implemented or consistently enforced by correctional supervisors. It is often ignored by correctional officers.

Whenever a use of force occurs within an Alabama prison, a warden or captain is required to conduct an initial investigation. The institution-level use of force investigation may include interviewing correctional officers, prisoners, and witnesses, and reviewing documents or surveillance footage (when available). The investigating official usually makes a finding as to whether the use of force was excessive and evaluates whether additional action should occur. Those findings and recommendations are then forwarded to the head warden, who has discretion to refer the matter to I&I for further review. ADOC's regulation requires that a prison's head warden notify I&I and request further investigation if there is reason to believe that a use of force was not justified. This system vests wardens with far too much discretion in determining whether a use of force should receive further scrutiny by I&I. Indeed, oftentimes, wardens opt to address uses of force through administrative sanctions or discipline rather than referring a matter to I&I.

The application of ADOC's use of force regulation is complicated by the fact that some prisons have established their own standard operating procedures which specify when force may be used. These polices generally ban excessive force, but they are often inconsistent from prison

to prison in their particulars and sometimes conflict with ADOC's own use of force regulation. For instance, ADOC's regulation generally allows physical force to be used only after attempts to de-escalate a situation have proven unsuccessful. But the standard operating procedures at some prisons—including Bullock, Easterling, and Ventress—contain no such requirement. Additionally, some prisons' standard operating procedures allow chemical agents to be dispersed to enforce institutional rules while other prisons allow such force only when a prisoner physically resists a lawful command. This may lead to scenarios where one prison's policy permits force while another prison's policy prohibits it in the same scenario.

ADOC does not routinely review uses of force to identify officers who may have a history or pattern of excessive force allegations. Nor does ADOC have a centralized system to track officers who are repeatedly investigated for using force. Such a centralized review could also assist operations and intelligence in determining which prisons, units within a particular prison, or shifts within a particular prison have higher rates of uses of force. It could also help ADOC identify potentially problematic officers. Most importantly, it could help ADOC formulate remedial measures and changes to policies and practices that would prevent the use of excessive force in the future.

#### *1. ADOC Employees Often Fail to Report or Accurately Document Uses of Force*

ADOC employees often fail to document or report uses of force. It is especially troubling that supervisors often fail to document, investigate, or otherwise address uses of force, demonstrating a deliberate indifference to the harms to prisoners caused by the use of excessive force. In some instances, surveillance video reveals unreported uses of force, while in others, officers admit using force after an inquiry from a supervisor. On other occasions, correctional officers—sometimes including supervisory officers—falsify reports related to uses of force. One former correctional officer informed us that in the facility to which he was assigned, some nurses help correctional officers ensure that injuries caused by uses of force are concealed and not properly documented on body charts. We also found evidence that following a use of force, officers sometimes place prisoners in segregation for extended periods, so that any injuries can heal unobserved and undocumented. In one incident at Bullock, a prisoner was taken to the floor, handcuffed, kicked, and stomped on the head by at least three correctional officers. Over one month after the incident, the prisoner was taken to an outside hospital for treatment of his injuries.

Additionally, incident reports are frequently written to contain minimal or no description of injuries experienced as a result of force. For example, one prisoner at Bibb sustained fractures to both forearms after an officer hit him with a baton. The incident report indicates that the prisoner was taken to the health care unit, but altogether fails to document the extent of the injuries. In a separate incident at Donaldson, officers used force on a prisoner who had assaulted a correctional officer. The prisoner was subsequently transferred to Kilby for medical treatment, where providers photographed the injuries documenting an eye that was swollen shut and multiple open wounds on his face. The injuries were so severe that he was transferred to an outside hospital. Despite this, there was no incident report indicating that a use of force

occurred. In failing to properly document uses of force and any resulting injuries, ADOC employees circumvent accountability.

### *2. Uses of Force Are Frequently Not Investigated by I&I*

Referrals to I&I do not always result in a use of force investigation. In many instances, I&I did not open an investigation even though a correctional supervisor—such as a captain or assistant warden—conducted an institution-level use of force investigation and recommended a referral to I&I for possible criminal prosecution. It is unclear why I&I failed to open an investigation in most of these scenarios. It is possible that the head warden overruled the investigating supervisor's recommendation and failed to refer the matter to I&I. But, in many instances, an I&I supervisory agent decided not to pursue an investigation after a warden referred a matter.

Additionally, ADOC has not devoted sufficient resources to reviewing uses of force. For instance, in 2017, ADOC employees documented over 1,800 incidents related to uses of force that occurred throughout the men's prisons. Of that number, a captain or warden recommended that I&I review around 35 cases. But I&I only opened approximately 14 investigations into uses of force in 2017. In other words, I&I reviewed only 40% the use of force incidents that a warden or captain referred for possible criminal prosecution. And several of the investigations from 2017 remain open in 2020.

### *3. Uses of Excessive Force Are Inadequately Addressed By ADOC*

ADOC tends to address uses of excessive force initially through "corrective action" as part of an institution's disciplinary process. ADOC rarely suspends or dismisses correctional officers for uses of excessive force where such action would be warranted. During the course of our investigation, we issued a subpoena for documentation related to discipline or investigations of correctional officers for excessive force as well as other improprieties such as extortion, bribery, sexual abuse, and smuggling of contraband. ADOC produced documentation identifying 97 disciplinary actions, mostly from 2016 and 2017. Nearly half of the disciplinary recommendations during that time related to correctional officers' late arrival to work or failure to show up for work. During those two years, ADOC considered suspending or dismissing only one employee for excessive force. In that incident, a lieutenant at Donaldson witnessed an officer stomping a prisoner on the back of the head as the prisoner was lying face down. As mentioned in this Notice, ADOC witnessed other instances of excessive force, and, based on the documentation provided, very few of those resulted in suspension or dismissal.

ADOC provided limited documentation of discipline (other than suspension or dismissal) in the form of unspecified "corrective actions" that are imposed against officers who use excessive force. That documentation failed to specify the type of corrective action taken, but it could include minor forms of discipline such as informal counseling, warnings, and written reprimands. As documented in this letter, ADOC witnessed instances of excessive force that merited significant discipline, however we found numerous instances where no such discipline was imposed.

Correctional supervisors within ADOC lack accountability on how they exercise disciplinary authority. Wardens and correctional supervisors often opt not to refer matters to I&I and address uses of force through "corrective actions." ADOC refused to provide documentation to us about what "corrective action" means and the type of corrective action that was imposed in specific instances where unjustified force was used. Despite these corrective actions, excessive force occurs regularly throughout most of Alabama's prisons for men.

Further, the internal, prison-by-prison handling of findings of unlawful force makes it more difficult to track potentially abusive officers who transfer to other prisons. It also makes it difficult for the Commissioner and his top officials to determine whether a particular prison or warden is addressing uses of excessive force consistently, fairly, and effectively. And because the wardens' decisions to take corrective action are not reviewed, ADOC's system enables any warden who wants to avoid leadership scrutiny to do so by refusing to refer incidents to I&I. This lack of accountability ultimately results in a failure to correct underlying problems that contribute to the continued uses of excessive force. We therefore have good reason to believe that the disciplinary system within ADOC is ineffective at combatting uses of excessive force.

While ADOC only provided us with partial data from the first four months of 2018, the agency was on pace to exceed the number of uses of force from 2017. In the first quarter of 2018, I&I opened more investigations into uses of force than the entire prior year. The agency produced documentation for 31 closed 2018 I&I investigations that were conducted in Alabama's prisons. Based on that documentation, we identified several instances where I&I substantiated excessive force, but most were not referred for criminal prosecution.

### C. <u>Use of Force Investigations Are Frequently Inadequate</u>

We thoroughly reviewed a substantial number of institution-based use of force investigations as well as dozens of I&I investigations related to uses of force. Based on the documents provided to us, we concluded that both types of investigations into uses of force are often inadequate. The failure to rigorously and properly investigate uses of force fosters an environment where the use of excessive force is not addressed.

Many use of force investigations conducted by captains or wardens at the institutional level contain numerous problems. In some prisons, these institutional investigations rarely document what, if any, investigative steps have been taken. For example, a significant number of those investigations fail to identify whether any officers, prisoners, or other subjects had been interviewed. And frequently they do not list prisoners or staff who were present and might have witnessed the incident. In other prisons, such as Holman and Bibb, findings in the use of force investigation are frequently copied directly from an incident report's narrative, suggesting that the investigator simply adopts whatever was documented in the incident report with little to no further inquiry.

At times, institution-level investigations are not conducted even though serious injuries resulted from a use of force. For instance, in May 2017, a lieutenant at Easterling took a handcuffed prisoner to the ground face down. The incident report clearly states that force was used and includes statements from two other correctional officers who witnessed the incident. The prisoner was initially taken to a local hospital. The injuries were so serious, however, that

the prisoner was subsequently transferred to a hospital over 150 miles away and treated for a broken hip. We saw no indication that the institution conducted a use of force investigation.

Similarly, some I&I investigations are also inadequate and contain minimal documentation. For example, very few I&I files contained surveillance video related to the incident under investigation even at facilities where video was available. This is a grave weakness in ADOC's ability to monitor activity and to determine what occurred before, during, or after a use of force. In a significant number of I&I investigative files provided to us, medical assessments or body charts were absent and there was no documented effort to determine if the injuries sustained were consistent with the officer's description of the events. Additionally, many I&I investigative files contain a description of an incident consisting of the duty officer's report and a narrative consisting of less than one-third of a page. This description is often copied largely from the incident report. There is little indication in these files that any subsequent review occurred.

In many instances, I&I supervisory agents refer a use of force matter back to a warden for further review, but the reason for such referrals was not provided to us. Once an I&I supervisor referred a matter back to a warden, we were unable to identify a single instance that later underwent further I&I review. In other scenarios, the I&I investigative files consist only of an incident report. Those files fail to contain photographs or body charts, and there is no indication that interviews were conducted. In each of these scenarios, I&I failed to document any conclusion as to whether force was justified.

I&I also closes a significant number of administrative investigations prematurely. This occurs, at times, due to a prisoner's lack of cooperation or when a prisoner is released from incarceration while an investigation is ongoing. There are a number of reasons why a prisoner may refuse to cooperate with a use of force investigation, such as a fear of retaliation. While a victim's failure to cooperate makes an investigation difficult, it is not an appropriate reason for closing an administrative investigation.

I&I investigators sometimes take few steps to interview potential witnesses as part of their investigations. For example, I&I determined that a prisoner was serving time for committing a crime against the relative of a correctional officer. The prisoner was housed at the same prison as the correctional officer. Upon learning this, ADOC made arrangements to transfer the prisoner to another prison to protect the prisoner from harm. Before the transfer occurred, the prisoner alleged that, when the officer discovered the reason for his incarceration, the officer choked him and banged his head against a gate until he lost consciousness. The prisoner requested that medical providers complete a body chart, but one was not obtained until approximately two weeks later. Despite the officer's refusal to cooperate with the investigation, I&I found the allegations of force to be unfounded and closed the matter. I&I did not take steps to interview other individuals who may have been able to substantiate the prisoner's allegations.

In addition, I&I has a practice of recording interviews by audio. The audio recordings, however, frequently do not contain all of the substantive discussions about the incident. Before the audio recording begins, I&I investigators have undocumented substantive discussions with the witness about the allegations, which they then reference during the recorded interview. On

some occasions, it appears that the undocumented discussion is used to guide the witness's answers in the recorded interview.

Finally, I&I has a small number of internal affairs investigators who focus exclusively on reviewing matters for potential administrative sanctions or discipline. These internal affairs investigators only proceed after an I&I investigation into criminal conduct is completed and only review matters that are not criminal in nature—such as a misapplication of ADOC policy. ADOC informed us that it did not conduct a single administrative investigation into a use of force incident from 2017 and 2018, but we identified several files that appeared to be administrative in nature.

### D. Conditions That Contribute to the Use of Excessive Force

The severe levels of overcrowding and understaffing contribute to the systemic use of excessive force. Since we issued our April 2019 Notice Letter, the overcrowding within Alabama's prisons has actually *increased*. In addition, and as we noted in our April 2019 Notice Letter, ADOC is critically understaffed, and even now, ADOC remains critically understaffed. Many of Alabama's prisons have a staffing rate below 50%, and several facilities' staffing levels are well below that number. ADOC still needs to hire approximately 2,000 correctional officers to adequately staff its men's prisons. ADOC is aware of the severe staffing deficiency yet has not taken meaning steps or other emergency measures to address the understaffing.

In these conditions, security staff are regularly required to work long overtime hours and extra shifts. This leads to officers being tired, stressed, overworked, and angry. These officers can find it difficult to maintain a calm, professional approach in situations requiring de-escalation. Additionally, these conditions lead officers to feel outnumbered by prisoners and improperly resort to uses of force without justification, believing such disproportionate responses are the only effective method for maintaining safety and security. One former Alabama prison warden said that without adequate staffing, officers feel like they have no back-up or support when they face violent situations. In these situations, force is more likely to be used without adequate justification. ADOC's severe understaffing can place officers in unnecessary danger,[11] and in situations where, while a use of force may be justified, it could have been avoided. And while some uses of force in those situations may be justified, uses of excessive force are not.

The high levels of contraband weapons in Alabama's prisons also heightens correctional officers' sense of danger even when they lack particularized evidence that a prisoner presents a danger. The officers' generalized fear for their own safety may lead them to use more force than is necessary and appropriate in cases where no such threat is present. Thus, by failing to adequately staff its prisons, Alabama is contributing to dangerous conditions that give rise to uses of excessive force. These conditions, combined with the lack of a grievance system for

---

[11] In many scenarios, uses of force begin when a prisoner is in an unauthorized area. The disrepair of locking mechanisms contributes to this problem. As a result of the overcrowding and understaffing, there is inadequate supervision of prisoners, which, in turn, allows them to wander into unauthorized areas where confrontations may take place. As one expert noted, this could contribute to the sense of danger that the officers experience, leading to the unnecessary escalation in the levels of force used. The understaffing in Alabama's prisons led one former warden to state that correctional officers are in "extreme danger." A warden at Holman told us that staff safety is her biggest concern.

prisoners or a central way to track repeated allegations of uses of force against particular correctional officers, increases the likelihood that there are officers who repeatedly use excessive force with little or no repercussions.

Uses of force are so commonplace in Alabama's prisons that officers, even supervisors, watch other officers brutally beating prisoners and do not intervene. Throughout our investigation, we identified numerous examples of officers standing by and watching serious uses of excessive force occur and never speaking up or physically intervening. Uses of force happen so regularly in Alabama's prisons that some officers appear accustomed to that level of violence and consider it normal. In short, in Alabama's prisons, cruel treatment of prisoners by staff is common and de-escalation techniques are regularly ignored.

## V. MINIMUM REMEDIAL MEASURES

To remedy the constitutional violations identified in this Notice, we recommend that ADOC implement, at a minimum, the remedial measures listed below. We also note that, in addition to the positive strides identified in our April 2019 Notice Letter, Alabama has taken additional, noteworthy steps in recent months. For example, the state legislature enacted a law providing significant pay raises to correctional officers in an effort to increase its staffing levels. Additionally, the state personnel board established the position of Basic Correctional Officer, which is authorized to complete most of the job responsibilities of a traditional correctional officer, but is not required to undergo as extensive training. As a result, ADOC reports that it has hired 280 new correctional officers during 2019. Additionally, ADOC has coordinated several joint operations with other law enforcement agencies targeting contraband at several different prisons. Some of these positive strides are offset to an extent, however, by the recent population increases in Alabama's already overcrowded prisons. Recent statistical reports show that, for the first time since 2013, ADOC's in-house population steadily increased in each month of 2019. Further, because ADOC closed Draper in late 2017 and is in the process of decommissioning most of Holman, Alabama's already overcrowded prisons are becoming even more crowded as ADOC moves hundreds of prisoners to other facilities throughout the State. The following are the minimum remedial measures we believe are necessary to remedy the violations we have identified.

### A. <u>Immediate Measures</u>

ADOC should:

- Install cameras in dormitories, housing areas, congregate use areas, hallways, and other areas where high numbers of use of force incidents are occurring. Cameras should be of sufficient number and appropriately placed to be able to capture all activity occurring in these locations.

- Install secure recording capacity and retain video for 30 days unless an incident has been detected in which case it shall be retained until the conclusion of investigation or any

resulting prosecution or litigation. Such video recordings of incidents that are undergoing investigations shall only be discarded with written approval of I&I.

- Establish procedures to secure the recordings and limit access to video to the wardens, captains, and I&I.
- Establish a centralized tracking database related to uses of force so that ADOC can identify patterns of force or officers who are outliers in uses of force.
- Implement a grievance procedure so that prisoners can register formal complaints about uses of force.
- Establish a centralized system—including a toll-free number—where prisoners, ADOC staff, ADOC contractors, and security staff can anonymously and confidentially report uses of excessive force. ADOC should adopt a policy requiring I&I to initiate a preliminary investigation—including collecting any documentary evidence—within three business days of receiving an anonymous report that provides sufficient reason to believe that unjustified or excessive force has occurred.
- Hire additional I&I investigators.
- Establish and implement a robust policy ensuring that prisoners' movements are controlled.
- Ensure that the Deputy Commissioner of Operations and the Director of I&I meet with each warden to describe accountability measures for wardens regarding use of force at their respective prisons.
- Require that, when corrective action is taken in response to a use of force, the nature of the corrective action is accurately and explicitly documented in a systemwide database.
- Require that a knowledgeable and competent person conduct regular reviews or audits of institution-level excessive force investigations to determine if they are properly classified, investigated, and resolved.
- Establish a procedure where use of force investigators or supervisors are required to document why each investigation is closed.
- Establish a procedure where I&I investigators or supervisors are required to document, with sufficient detail, when and why any use of force incident is referred back to a warden.
- Establish an auditing process where a centralized authority ensures that, where excessive force is identified, wardens are referring the matter to I&I, rather than solely addressing such incidents with corrective action.

- Instruct all prisons to rescind any standard operating procedures or other policies related to uses of force that conflict with ADOC's use of force regulation. Establish a centralized process where a prison's standard operating procedures on uses of force are reviewed to ensure that facility policies are consistent with ADOC's regulation and to prevent situations where a use of force is acceptable within some prisons but not in others.

- Modify its use of force or chemical agents regulations and procedures to:

    - Specifically define the types of uses of force that must be referred to and investigated by I&I. The regulation should require that uses of force resulting in serious injuries be investigated by I&I.

    - Ensure that a single head warden at each facility is responsible for determining whether to refer a use of force to I&I for further review.

    - Explicitly state that strikes or contact to the head constitute a form of lethal force that should only be used if a correctional officer has grounds to reasonably believe that the subject of the force poses an imminent danger of death or serious bodily injury to the officer or to another person.

    - Require statements or interviews of any medical personnel who treat a prisoner following a use of force that results in a serious injury.

    - Require that a medical assessment be *timely* conducted after a use of force on any staff and prisoners involved. That assessment should be recorded and retained for future review.

- Modify its I&I regulation and procedures to:

    - Explicitly establish that the standard of proof used in reviewing uses of force is a preponderance of the evidence, and define that standard.

    - Require that all use of force investigations are completed, including referrals for consideration of criminal prosecution, even if a correctional officer no longer works at ADOC.

    - Require that use of force investigations are not closed because an alleged victim refuses to cooperate or is unable to be located due to a release from incarceration.

- Establish a procedure to ensure that an I&I supervisor routinely audits I&I investigative files to ensure that proper and required documentation is included.

## B. <u>Long-Term Measures</u>

ADOC should:

- Staff Alabama's prisons consistent with the staffing orders entered by the district court in *Braggs v. Dunn*.

- Maintain and expand the use of video surveillance and recording cameras to improve coverage throughout ADOC facilities in order to monitor activity and determine what is occurring when force is used.

- Retain a reputable and experienced law enforcement investigator to train each captain, warden, and I&I investigator on how to conduct professional investigations into uses of force, including interviewing techniques (e.g., use of open-ended questions). Such training shall be refreshed and provided annually.

- In consultation with a reputable and experienced law enforcement investigator, draft and disseminate a manual on how to conduct institution-level use of force investigations.

- Establish a use of force quality improvement committee to identify trends and interventions, make recommendations for further investigation or corrective action, and monitor the implementation of recommendations and corrective action. ADOC's quality improvement system should include an early intervention component to alert administrators of potential problems with staff. The purpose of the early intervention system is to identify and address patterns of behavior or allegations that may indicate persistent policy violations, misconduct, or criminal activity.

- Require that the quality improvement committee conduct systemic reviews of use of force at least quarterly, in order to identify patterns or trends. ADOC should incorporate such information into quality management practices and take necessary corrective actions.

- Modify its use of force or chemical agents regulations and procedures to:

    - Require that supervisors be informed *immediately* after a use of force.

    - Include a force continuum that emphasizes de-escalation as a first resort and clarifies that force is to be used only after all other reasonable efforts to resolve a situation have failed.

    - Require that chemical agent use is authorized only when (1) a prisoner is armed and/or self-barricaded; or (2) a prisoner cannot be approached without danger to self or others and it is determined that a delay in bringing the situation under control would constitute a serious hazard to the prisoner or others, or would result in a major disturbance or serious property damage.

- Require that, where practical, physical force shall not be used until the following conditions have been met:
  - A warning or command has been given, and, if practical, repeated;
  - The prisoner has had time to comply with the warning or command; and
  - It appears that the prisoner is going to continue to resist the order or the staff's effort to control the situation.
- Incorporate additional non-force alternatives, including crisis intervention methods and specific defusing techniques.
- Contain explicit prohibitions on the following:
  - The use of force to retaliate against a prisoner;
  - The use of force in response to a prisoner's verbal insults, taunting threats, or swearing;
  - The use of force on a prisoner who is under control;
  - The use of unjustifiably painful escort or restraint techniques;
  - Causing or facilitating prisoner-on-prisoner violence; and
  - Pressuring or coercing prisoners, staff, or non-ADOC staff to not report use of force.
- Contain an explicit requirement stating that "all force shall cease when control of the prisoner has been established."

- Ensure that ADOC policy and all facility standard operating procedures:
  - Prohibit the use of force as a response to prisoners' failure to follow instructions, verbal insults, or non-threatening behavior when there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;
  - Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;
  - Prohibit the use of force as punishment or retaliation; and
  - Ensure that officers use only the level of force commensurate and proportionate with the justification for the use of force, and prioritize de-escalation techniques and tactics.

- Consistent with *Garrity v. New Jersey*, and applicable law, require that any officers who used or witnessed force submit a report or statement immediately after an incident occurs and before leaving for the day. ADOC should take measures to ensure that no statements are prepared in consultation with anyone else.

- Require that all incident reports describe any use of force, including what precipitated the event, the level of resistance encountered, and any attempts at de-escalation.

- Ensure that use of force investigations include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable.

- Ensure that use of force investigations include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, body charts, photographs, and video or audio recordings.

- Ensure that use of force investigations at the facility level thoroughly document the basis for the investigator's recommended finding, based upon application of a preponderance of the evidence standard.

- Discipline any correctional officer found to have: engaged in excessive force; failed to report or report accurately the use of force; retaliated against a prisoner or other staff member for reporting the use of force; or interfered or failed to cooperate with an internal investigation regarding the use of force.

- Maintain a computerized use of force tracking system and compile summary reports on at least a monthly basis. The summary reports shall be used to identify trends such as rates of use of force in general, as well as by prison, unit, shift, time of day, prisoner, and staff member. The system shall also note incidents referred to I&I or any other entity for investigation. The system shall be used to identify officers engaged in multiple uses of force within a reasonable timeframe for whom an evaluative meeting with their warden shall be required.

## VI. CONCLUSION

The Department has reasonable cause to believe that ADOC violates the constitutional rights of prisoners housed in Alabama's prisons by failing to protect them from uses of excessive force by staff.

We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this letter if State officials have not satisfactorily addressed our concerns. 42 U.S.C. § 1997b(a)(1). The Attorney General may also move to intervene in related private suits 15 days after issuance of

this letter. 42 U.S.C. § 1997c(b)(1)(A). Please also note that this Notice is a public document. It will be posted on the Civil Rights Division's website.