FILED
2026 Sep-02 PM 04:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff;<br>v.<br><br>STATE OF ALABAMA and ALABAMA DEPARTMENT OF CORRECTIONS,<br><br>Defendants. | Civil No. 2:20-cv-01971-HDM |

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

**United States' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ..........1**

1. Background ..........1

2. Violence in ADOC is Regular and Serious. ..........6

3. Sexual Violence in ADOC is Regular and Serious. ..........45

4. Alabama Knows the Prisons are Understaffed and Overcrowded, and Prisoners are Unsupervised, Leading to Violence and Sexual Abuse. ..........62

5. Alabama Knows Its Failure to Control Contraband Leads to Prisoner Violence and Sexual Abuse. ..........70

6. Alabama Knows Its Failure to Control Prisoner Movement Leads to Prisoner Violence and Sexual Abuse. ..........87

7. Alabama Leadership Does Not Supervise What Occurs in the Prisons. ..........94

8. Alabama Does Not Use Available Information to Mitigate the Substantial Risk of Violence. ..........107

9. ADOC Repeatedly Uses Force that Violates the Eighth Amendment. ..........118

10. ADOC's Inadequate Supervision Leads to Excessive Force, and ADOC Supervisors Use Excessive Force. ..........127

11. ADOC Fails to Effectively Investigate or Exercise Oversight Regarding Uses of Force. ..........136

12. Alabama's Prison Conditions Pose a Substantial Risk ..........143

13. Alabama Fails to Respond Reasonably to Unsafe Conditions. ..........162

**United States' Brief in Support of Motion for Summary Judgment ..........164**

I. Introduction ..........164

II. Summary Judgment Standard ..........165

III. Alabama Violates the Eighth Amendment ..........165

IV. Alabama Fails to Protect Prisoners from Violence and Sexual Violence (United States' Counts 1 and 2) ..........166

A. Substantial Risk of Violence and Sexual Violence. ..........167

1. Violence in ADOC is regular and serious. ..........168

2. Sexual violence in ADOC is regular and serious. 181
B. Alabama's Conduct and Failure to Act Puts Prisoners at Risk. 192
1. Alabama knows the prisons are understaffed and overcrowded, and prisoners are unsupervised, leading to violence and sexual abuse. 193
2. Alabama knows its failure to control contraband leads to prisoner violence and sexual abuse. 199
3. Alabama knows its failure to control prisoner movement leads to prisoner violence and sexual abuse. 207
C. Alabama Fails to Respond Reasonably to the Risk. 212
1. Alabama leadership does not supervise what occurs in the prisons. 213
2. Alabama does not use available information to mitigate the substantial risk of violence. 223
V. Alabama Uses Excessive Force (United States' Count 3) 229
A. ADOC Repeatedly Uses Force That Violates the Eighth Amendment. 231
B. ADOC's Inadequate Supervision Leads to Excessive Force, and ADOC Supervisors Use Excessive Force 238
C. ADOC Fails to Effectively Investigate or Exercise Oversight Regarding Uses of Force. 244
VI. Alabama Fails to Provide Safe Conditions of Confinement (United States' Count 4) 251
A. Alabama's Prison Conditions Pose a Substantial Risk 251
B. Alabama Fails to Respond Reasonably to Unsafe Conditions. 254
VII. Conclusion 255

**UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Court's Initial Order, the United States submits its Statement of Undisputed Material Facts in Support of Motion for Summary Judgment. The United States submits there is no genuine issue regarding the following facts:

**1. Background**

1.1 Defendants Alabama Department of Corrections ("ADOC") and State of Alabama ("State" or "Alabama") operate Bibb Correctional Facility ("Bibb" or "BCCF"), Bullock Correctional Facility ("Bullock" or "BCF"), Donaldson Correctional Facility ("Donaldson" or "WDCF"), Easterling Correctional Facility ("Easterling" or "ECF"), Elmore Correctional Facility ("Elmore" or "ELMCF"), Fountain Correctional Facility ("Fountain" or "FCF"), Holman Correctional Facility ("Holman" or "HCF"), Kilby Correctional Facility ("Kilby" or "KCF"), Limestone Correctional Facility ("Limestone" or "LCF"), St. Clair Correctional Facility ("St. Clair" or "SCCF"), Staton Correctional Facility ("Staton" or "SCF"), and Ventress Correctional Facility ("Ventress" or VCF") (collectively, "prisons" or "facilities").[1]

[1] ADOC Correctional Facilities, Alabama Department of Corrections, https://www.doc.alabama.gov/facilities/.

1.2 Bibb is a Level 4, medium facility[2] and has a population of approximately [redacted]

1.3 Bullock is a Level 4, medium facility[4] and has a population of approximately [redacted]

1.4 Donaldson is a Level 5 facility, [redacted] and has a population of approximately [redacted]

1.5 Easterling is a Level 4 facility, [redacted] and has a population of approximately [redacted]

1.6 Elmore is a Level 4 facility, [redacted] and has a population of approximately [redacted]

1.7 Fountain is a Level 5 facility, [redacted] and has a population of approximately [redacted]

---

[redacted]

1.8 Holman is Level 5 facility, [redacted] and has a population of approximately [redacted] prisoners and [redacted] death row prisoners[15]. [redacted]

1.9 Kilby is a Level 5 facility, [redacted] and has a population of approximately [redacted]

1.10 Limestone is a Level 5 facility, [redacted] and has a population of approximately [redacted]

1.11 St. Clair is a Level 5 facility, [redacted] and has a population of approximately [redacted]

1.12 Staton is a Level 4 facility, [redacted] prisoners and has a population of approximately [redacted]

---

[redacted]

1.13 Ventress is a Level 4 facility, [redacted] and has a population of approximately [redacted]

1.14 [redacted]

1.15 [redacted]

1.16 [redacted]

1.17 [redacted]

1.18 [redacted]

---

[redacted]

1.19 [redacted]

1.20 [redacted]

1.21 [redacted]

1.22 On April 2, 2019, the United States notified Defendants that it had found reasonable cause to believe conditions in Alabama's prisons for men violate the Eighth Amendment for failing to protect prisoners from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and failing to provide safe conditions.[36]

1.23 On July 23, 2020, the United States notified Defendants that it had found reasonable cause to believe conditions in Alabama's prisons for men violate the Eighth Amendment for using excessive force.[37]

1.24 On December 9, 2020, the United States filed a complaint against Defendants, initiating the present action.[38]

[redacted]

[36] Doc. 354-1; Doc. 354-2.

[37] Doc. 354-3; Doc. 354-4.

[38] Doc. 1.

1.25 On November 19, 2021, the United States filed the Second Amended Complaint, the operative pleading, bringing four counts of violations of the Eighth and Fourteenth Amendments: failure to protect from prisoner-on-prisoner violence (Count 1), failure to protect from prisoner-on-prisoner sexual abuse (Count 2), use of excessive force (Count 3), and failure to provide safe conditions (Count 4).[39]

1.26 On December 20, 2021, Defendants filed an Answer to the Second Amended Complaint.[40]

**2. Violence in ADOC is Regular and Serious.**

2.1 Violence is pervasive throughout the system and has been for several years.[41]

2.2 A prisoner testified, "There's no safety man. You don't feel safe. Anything liable to happen."[42]

2.3 [redacted]

---

[39] Doc. 71.
[40] Doc. 75.
[redacted]

2.4 From 2019 to 2024, as reported by Alabama, prisoners killed at least 78 other prisoners in ADOC, as shown below.

2.5 In 2019, Alabama reported at least 13 prisoner-on-prisoner deaths.[44]

2.6 [redacted] died by homicide on January [redacted], 2019, at Staton.[45]

2.7 [redacted] died by homicide on March [redacted], 2019, at Bibb.[46]

2.8 [redacted] died by homicide on March [redacted], 2019, at Bibb.[47]

2.9 [redacted] died by homicide on June [redacted], 2019, at Fountain.[48]

2.10 [redacted] died by homicide on September [redacted], 2019, at Ventress.[49]

2.11 [redacted] died by homicide on October [redacted], 2019, at Donaldson.[50]

2.12 [redacted] died [redacted] at Ventress on October [redacted], 2019.[51]

2.13 [redacted] died [redacted] at Elmore on October [redacted], 2019.[52]

---

[44] Doc. 354-5, p. 5 (Jan. 2019: 1 in Staton and 1 in Kilby); Doc. 354-6, p. 5 (Feb. 2019: 0); Doc. 354-7, p. 5 (Mar. 2019: 1 in St. Clair and 2 in Bibb); Doc. 354-8, p. 5 (April 2019: 0); Doc. 354-9, p. 5 (May 2019: 0); Doc. 354-10, p. 5 (June 2019: 1 in Fountain and 1 in Staton); Doc. 354-11, p. 5 (July 2019: 0); Doc. 354-12, p. 5 (Aug. 2019: 0); Doc. 354-13, p. 5 (Sept. 2019: 1 in Ventress); Doc. 354-14, p. 5 (Oct. 2019: 1 in Donaldson, 1 in Elmore, 1 in Ventress); Doc. 354-15, p. 5 (Nov. 2019: 0); Doc. 354-16, p. 5 (Dec. 2019: 1 in Holman and 1 in Bibb).

[redacted]

2.14 [redacted] died by homicide on December [redacted], 2019, at Holman.[53]

2.15 [redacted] at Bibb on December [redacted], 2019.[54]

2.16 [redacted] died by homicide on [redacted]

2.17 In 2020, Alabama reported at least 9 prisoner-on-prisoner deaths, as shown below.

2.18 [redacted]

2.19 [redacted]

2.20 [redacted]

2.21 [redacted]

2.22 [redacted]

2.23 [redacted]

2.24 [redacted]

---

[redacted]

2.25 [redacted]

2.26 [redacted]

2.27 In 2021, Alabama reported at least 11 prisoner-on-prisoner deaths, as shown below.

2.28 [redacted]

2.29 [redacted]

2.30 [redacted]

2.31 [redacted]

2.32 [redacted]

2.33 [redacted]

2.34 [redacted]

2.35 [redacted]

2.36 [redacted] on October 7, 2021, at Bibb.[redacted]

2.37 [redacted] on October 11, 2021, at Donaldson.[redacted]

---

[redacted]

2.38 [redacted]

2.39 In 2022, Alabama reported at least 18 prisoner-on-prisoner deaths, as shown below.

2.40 [redacted] died by homicide on January 11, 2022, [redacted]

2.41 [redacted] on January 31, 2022, at Staton.[redacted]

2.42 [redacted] died by homicide on February 22, 2022, at Donaldson.[redacted]

2.43 [redacted] died by homicide on March 1, 2022, at Easterling.[redacted]

2.44 [redacted] died by homicide on March 2, 2022, at Donaldson.[redacted]

2.45 [redacted] at Kilby on May 4, 2022.[redacted]

2.46 [redacted] died by homicide on May 29, 2022, at Ventress.[redacted]

2.47 [redacted]

2.48 [redacted] died by homicide on June 15, 2022, at Donaldson.[redacted]

2.49 [redacted] on June [redacted], 2022, at Bibb.[redacted]

---

[redacted]

2.50 [redacted] died by homicide on July 17, 2022, at Donaldson.[redacted]

2.51 [redacted] died by homicide on July 19, 2022, at Bullock.[redacted]

2.52 [redacted] died by homicide on October 1, 2022, at Donaldson.[redacted]

2.53 [redacted], died by homicide on October 3, 2022, at Donaldson.[redacted]

2.54 [redacted] died by homicide on October 15, 2022, at Limestone.[redacted]

2.55 [redacted] at Elmore on November 4, 2022.[redacted]

2.56 [redacted] died by homicide on November 14, 2022, at Donaldson.[redacted]

2.57 [redacted], 2022, [redacted] at Easterling.[redacted]

2.58 In 2023, Alabama reported at least 14 prisoner-on-prisoner deaths, as shown below.

2.59 [redacted] at Limestone on January 4, 2023.[redacted]

2.60 [redacted]

---

[redacted]

2.61 [redacted] at Ventress on February [redacted], 2023.[redacted]

2.62 [redacted] died on May 14, 2023, [redacted] at Easterling.[redacted]

2.63 [redacted] at St. Clair on May 15, 2023.[redacted]

2.64 [redacted] at Easterling on May 16, 2023.[redacted]

2.65 [redacted] at Elmore on May 16, 2023.[redacted]

2.66 [redacted] St. Clair on May 31, 2023.[redacted]

2.67 A prisoner died by homicide on June 25, 2023, at Staton.[redacted]

2.68 [redacted] died by homicide [redacted] at Ventress on August 8, 2023.[redacted]

2.69 [redacted] died on October 10, 2023, [redacted] at Ventress.[redacted]

2.70 [redacted] died by homicide on October 15, 2023, at Donaldson.[redacted]

2.71 [redacted]

2.72 [redacted] died by homicide on December 12, 2023, at Elmore.[redacted]

---

[redacted]

2.73 In 2024, Alabama reported at least 13 prisoner-on-prisoner deaths, as shown below.

2.74 [redacted] at Limestone on March 5, 2024.[redacted]

2.75 [redacted]

2.76 [redacted]

2.77 [redacted]

2.78 [redacted] died on May 25, 2024, [redacted] at Staton [redacted]

2.79 [redacted]

2.80 A prisoner died by homicide on June 17, 2024, at Bullock.[115]

2.81 A prisoner died by homicide on August 21, 2024, at Ventress.[116]

2.82 [redacted]

---

[redacted]

[115] Doc. 354-18, p. 63 (BCF-24-01106).

[116] Doc. 354-19, p. 58 (VCF-24-00732).

[redacted]

2.83 A prisoner died by homicide on October 30, 2024, at Staton.[118]

2.84 A prisoner died by homicide on November 1, 2024, at Elmore.[119]

2.85 A prisoner died by homicide on November 6, 2024, at Bibb.[120]

2.86 A prisoner died by homicide on November 12, 2024, at Bullock.[121]

2.87 [redacted]

2.88 [redacted]

---

[118] Doc. 354-20, p. 68 (SCF-24-01411-INV).
[119] Doc. 354-21, p. 70 (KCF-24-02586-INV).
[120] Doc. 354-22, p. 68 (BCCF-24-01281-INV).
[121] Doc. 354-23, p. 68 (BCF-24-02242-INV).
[redacted]

2.89 [redacted]

2.90 [redacted]

[redacted]

2.91 [redacted]

2.92 [redacted]

2.93 [redacted]

2.94 [redacted]

---

[redacted]

[redacted]

---

[redacted]

2.95 [redacted]

2.96 [redacted]

---

[redacted]

[redacted]

2.97 [redacted]

2.98 [redacted]

---

[redacted]

[redacted].[157]

2.99 [redacted]

---

[redacted]

[redacted]

2.100 Violence is a daily occurrence in ADOC.[redacted]

2.101 Reported prisoner assaults occur, on average, at rates of slightly under 100 per month.[167]

2.102 ADOC staff testified: "Some days they just – and then if you've got a facility with 12 – 2,000 inmates and 15 officers, you've got one officer trying to cover three dorms, well, it's very, very possible that nobody sees that."[redacted] "They get into fights every day. It's a lot of them that we don't see."[redacted]

---

[redacted]

2.103 Alabama also fails to properly classify all incidents, obscuring the official numbers reported for some violence. For example, staff in incident reports identify some stabbings or incidents where prisoners have to be treated for injuries at an outside hospital as assaults with "Non Serious Injury" rather than the category for a serious injury.[redacted]

2.104 Official reports reveal that fights, stabbings, beatings, and hospitals transports from violence are all routine occurrences in ADOC.[redacted]

170 [redacted]

171 [redacted]

2.105 Prisoners are routinely stabbed with prison-made knives and knives smuggled in from the outside.[redacted]

2.106 It is not uncommon for prisoners to report being held hostage, beaten, abused, and extorted by other prisoners.[redacted]

2.107 [redacted]

---

[redacted]

173 [redacted]

2.108 [redacted]

2.109 [redacted]

2.110 [redacted]

[redacted]

2.111 [redacted]

2.112 [redacted]

2.113 [redacted]

2.114 [redacted]

---

[redacted]

2.115 [redacted]

2.116 [redacted]

2.117 [redacted]

2.118 [redacted]

2.119 In some instances, the violence is captured on video through contraband cellphones[redacted] or surveillance camera as shown below.

---

[redacted]

2.120 [redacted]

[redacted]

[redacted]

2.121 [redacted]

[redacted]

[redacted]

2.122 [redacted]

[redacted]

2.123 [redacted]

[redacted] [redacted]

[redacted]

2.124 [redacted]

[redacted]

[redacted]

2.125 [redacted]

2.126 [redacted]

[redacted]

[redacted]

2.127 [redacted]

---

[redacted]

[redacted]

2.128 [redacted]

[redacted]

2.129 [redacted]

[redacted] [redacted]

[redacted]

2.130 [redacted]

[redacted]

2.131 [redacted]

I haven't heard anything from you about my money and I sent u pictures of how [redacted] looks now,but if I don't get at least 100 dollars of my money tonight [redacted] is going to have some huge problems. I'm done playing with your son about my money. I need at least 100 of my money tonight or I'm going to start stabbing on your son point blank period....So I need to be hearing SOMETHING ABOUT MY MONEY!!!! I see u don't give a dam if your son [redacted] live or die... so I'll make it easy for u cause I'm gonna keep stabbing him every day until I get my money from [redacted] and don't cry when he is dead!!! I gave u plenty of chances to pay my money !!! [redacted] Deposited a new message: "Need you to answer your goddamn phone now. Yeah." Click here: [redacted] to listen to full voice message.

*Figure 14: Photo and message sent extorting mother of son in ADOC prison.*[206]

[redacted] [redacted]


10:38
Cancel
[redacted]
They can't and won't protect your son cause they don't give a dam about him
Tue, Jun 20 at 10:48 PM
I SWARE TO GOD IM GONNA MAKE U WISH U WOULD HAVE PAID ME MY MONEY U CAN COUNT YOUR SON OUT CAUSE U JUST GOT HIM KILLED I PROMISE U THAT!!!!!
Monday 6:38 PM
YOUR SON WILL CONTINUE TO GET TORCHED UNTIL U SEND MY MONEY,I PROMISE U THAT BEFORE I LET U OR YOUR SON TAKE ANY FOOD OUT MY FAMILY MOUTH,ILL LITERALLY HAVE YOUR SON KILLED!!!!! THIS IS MY LAST WARNING
I WANT MY MONEY
Today
I KNOW ONE THING,U DON'T LOVE YOUR SON AND I PROMISE U WILL BE GETTING SOME TERRIBLE NEWS ABOUT [redacted] CAUSE DJ ALREADY BEEN RAPING HIM,IM GONNA MAKE DJ TORCHER [redacted] UNTIL HE DIE ,GET MY MONEY TO ME IF U WANNA SAVE YOUR SON!!!!!! POINT BLANK PERIOD

2.132



[redacted]

*Figure 15: Messages and photo sent extorting mother of son in ADOC prison.*[207]

2.133 Alabama's prisons are chaotic. For example, looking at approximately one week in June 2024, ADOC reported that 19 prisoners tested positive for drugs,[redacted] staff found 12 contraband cellphones[redacted] and 12 knives,[redacted] staff took seven prisoners to the hospital or used Narcan after the prisoners were found

---

[redacted]

unresponsive[redacted] prisoners set four fires[redacted] 16 prisoners were not in the right location[redacted] and seven prisoners reported they feared for their safety and could not live in their dorms[redacted]

2.134 [redacted]

---

[redacted]

[redacted]

2.135 [redacted]

[redacted]

[redacted]

2.136 [redacted]

2.137 [redacted]

---

[redacted]

[redacted]

2.138 [redacted]

[redacted]

[redacted]

3. **Sexual Violence in ADOC is Regular and Serious.**

3.1 Sexual violence is also regular, serious, and systemic in ADOC.[redacted]

3.2 Since mid-2022, there have been, on average, more than 30 inmate-on-inmate sexual assault reports documented per month.[redacted]

---

[redacted]

3.3 There is also unreported sexual violence in ADOC, hidden behind sheets draped from top bunks to conceal what is happening on lower bunks, all occurring in the absence of staff.[redacted]

3.4 Prisoners engage in sexual acts for protection, for drugs, and to work off debts[redacted]

3.5 [redacted]

---

[redacted]

[redacted]

3.6 [redacted]

3.7 [redacted]

[redacted]

[redacted]

3.8 [redacted]

3.9 [redacted]

---

[redacted]

3.10 [redacted]

3.11 [redacted]

3.12 [redacted]

3.13 [redacted]

3.14 [redacted]

[redacted]

3.15 [redacted]

3.16 [redacted]

3.17 [redacted]

3.18 [redacted]

3.19 In her [redacted] deposition, PREA Director Christy Vincent testified [redacted]

---

[redacted]

[redacted]

3.20 [redacted]

[redacted]

[redacted]

3.21 [redacted]

[redacted]

[redacted]

3.22 [redacted]

3.23 [redacted]

[redacted]

[redacted]

3.24 [redacted]

3.25 [redacted]

---

[redacted]

[redacted]

3.26 [redacted]

---

[redacted]

[redacted]

3.27 [redacted]

3.28 [redacted]

---

[redacted]

[redacted]

3.29 [redacted] testified that he had been beaten, held down, and raped numerous times in ADOC, [redacted]

3.30 [redacted]

3.31 [redacted]

3.32 [redacted]

---

[redacted]

3.33 [redacted]

3.34 [redacted]

3.35 [redacted]

[redacted]

3.36 [redacted]

3.37 [redacted]

3.38 [redacted]

---

[redacted]

[redacted]

3.39 [redacted]

3.40 [redacted]

3.41 [redacted]

3.42 [redacted]

[redacted]

3.43 [redacted]

3.44 [redacted]

3.45 [redacted]

3.46 [redacted]

3.47 [redacted]

---

[redacted]

3.48 [redacted]

3.49 [redacted]

## 4. Alabama Knows the Prisons are Understaffed and Overcrowded, and Prisoners are Unsupervised, Leading to Violence and Sexual Abuse.

4.1 The overcrowding in Alabama's prisons has persisted for more than two decades.[redacted]

4.2 [redacted]

4.3 By operating above the prisons' designed capacities, since at least 2000, there is increasing pressure on both the facilities' physical capabilities and on the staff who operate within them to supervise the number of prisoners housed closely together.[redacted]

---

[redacted]

4.4 Overcrowding within the living units also contributes to heightened tensions among prisoners.[redacted]

4.5 [redacted]

[redacted]

[redacted]

4.6 [redacted]

4.7 In addition to being overcrowded, there is no dispute that ADOC is understaffed.[redacted]

---

[redacted]

4.8 For example, for 2023, ADOC reported 17.4 prisoners to each correctional officer and 67.8 prisoners to each supervisor [371] when ADOC was authorized [372] to have 5.2 prisoners to each correctional officer and 34.8 prisoners to each supervisor.[373]

4.9 Regional Director Edward Ellington testified that it was permissible for an ADOC facility to have no officers assigned to watch a housing unit.[redacted]

4.10 ADOC regularly has one officer covering multiple posts, leaving entire housing units unsupervised for excessively long periods of time.[redacted]

4.11 [redacted]

---

[redacted]

4.12 [redacted]

4.13 [redacted]

4.14 [redacted]

4.15 The warden at [redacted] approved giving prisoners in one of the dorms a radio to use if prisoners needed help because "a lot of time" they do not have an officer there.[redacted]

4.16 [redacted]

---

[redacted]

4.17 [redacted]

4.18 [redacted]

4.19 As Regional Director Ellington testified, "Officer presence is a number one way to prevent a lot of stuff from happening inside the facility."[385]

4.20 On staffing, one prisoner said, "Because they don't do nothing to stop nothing. If the inmates don't stop it, it don't get stopped. They just come after you're dead or he's dead or after they're all done and be like, Come on, let's go to Seg."[redacted]

4.21 [redacted] testified, "There shouldn't be a dorm at Staton that don't have an officer present because if you do that you're not doing security, custody, and control."[387] Without officer supervision, violent incidents occur, creating an "environment where the rule of the strongest prevails."[redacted]

---

[redacted]

4.22 As for the weak, as one prisoner put it: "They know who's weak and who's strong. You know what I mean? So I've been – the whole time I've been in prison, I've been a target because I'm weak, yeah. I still have fear, you know, and I've been a target the whole time I've been in prison to gangs." [redacted]

4.23 [redacted]

---

[redacted]

[redacted]

4.24 Another prisoner testified that it took him a week to report that he was sexually assaulted because other prisoners would not let him out of the dorm.[redacted]

4.25 A prisoner at [redacted] testified that in [redacted], he was beaten around 9:00 p.m. and was left unsupervised, lying in his own blood, until the shift change at 6:30 a.m.[397]

4.26 [redacted]

4.27 [redacted]

4.28 When asked how prisoners could get an officer's attention in between any security checks, a Lieutenant at [redacted] said, "I don't know. They would have to yell or something."[redacted]

---

[redacted]

4.29 [redacted]

**5. Alabama Knows Its Failure to Control Contraband Leads to Prisoner Violence and Sexual Abuse.**

5.1 [redacted]

5.2 [redacted]

5.3 ADOC does not control dangerous tools in the prisons.[redacted]

5.4 ADOC's failures result in pervasive contraband.[redacted]

---

[redacted]

5.5 As one prisoner put it, "Because there's no officers to protect us. You've got to protect yourself."[406]

5.6 Staff and prisoners confirmed that most prisoners have weapons.[redacted]

5.7 Drugs permeate the prisons.[redacted]

5.8 The United States' experts observed, first-hand, prisoners high on drugs in ADOC facilities.[redacted]

5.9 Prisoners frequently overdose.[redacted]

5.10 Prison staff regularly use Narcan, a drug used to treat opioid-related overdoses.[redacted]

---

[redacted]

5.11 Prisoners also have contraband cellphones which are used to facilitate the introduction of contraband, extortion inside and outside of the prison, and other nefarious acts.[redacted]

5.12 The average number of contraband incidents (meaning contraband that is recovered) in ADOC from 2019 to June 2024 has remained on average above 150 incidents per month.[redacted]

5.13 [redacted]

---

[redacted]

5.14 [redacted]

[redacted]

[redacted]

5.15 [redacted]

[redacted] [redacted]

[redacted]

5.16 [redacted]

---

[redacted]

[redacted]

5.17 [redacted]

5.18 Staff have repeatedly introduced contraband to prisoners in ADOC.[redacted]

5.19 [redacted]

418 Exh. 625 (Doc. 369-15); Exh. 263 (Doc. 359-64).
419 *See, e.g.*, ADOC staff arrests: Exh. 128 (Doc. 358-11), (2023); Exh. 126 (Doc. 358-9), (2022); Exh. 125 (Doc. 358-8), (2021); Exh. 124 (Doc. 358-7), (2020); Exh. 123 (Doc. 358-6).
420 Exh. 210 (Doc. 359-11); Exh. 487 (Doc. 362-167); Exh. 183 (Doc. 358-66).
421 Exh. 487 (Doc. 362-167), p. 1.
422 Exh. 487 (Doc. 362-167), pp. 1-2; Exh. 210 (Doc. 359-11).

[redacted]

5.20 [redacted]

---

[redacted]

[redacted]

5.21 [redacted]

[redacted]

5.22 [redacted]

5.23 [redacted]

[redacted]

5.24 [redacted]

5.25 Pervasive contraband leads to violence.[redacted]

5.26 As the prisoners explain: Q. I mean, have you seen assaults here in prison? A. Yes, I have. Q. What do you think the assaults are usually about? A. Debts, drugs. It goes hand in hand. Debt, drug, debt, drugs.[443]

5.27 Q. So in your experience, are most of these fights about somebody owing somebody else for something? A. Yes. Q. Do you see fights because somebody owes something that they borrowed from the commissary? A. No. Q. Is it more contraband? A. It's just fights about dealing with money or something. It's either about somebody got some drugs or something from that person or when they borrowed something from that dude and he went and told you he put a hit on him or something, little stuff like that. Q. You said one thing is about drugs; what else are people owing each other? A. Majority of it, that's it, for real.[444]

---

[redacted]

5.28 [redacted]

5.29 [redacted]

5.30 [redacted]

---

[redacted]

5.31 [redacted]

---

[redacted]

[redacted]

5.32 [redacted]

---

[redacted]

[redacted]

5.33 Drugs play a significant role in the proliferation of sexual abuse in Alabama prisons, with prisoners getting into debt and being forced to perform sexual acts or prisoners being drugged and raped.[473]

5.34 One prisoner testified that a gang forced him to put drugs in his anus and he woke up in the infirmary.[redacted]

5.35 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

5.36 [redacted]

5.37 Alabama's failure to control contraband causes violence.[redacted]

[redacted]

**6. Alabama Knows Its Failure to Control Prisoner Movement Leads to Prisoner Violence and Sexual Abuse.**

6.1 When prisoners do not live in their assigned beds, staff do not consistently intervene—which the United States's expert also observed first-hand.[redacted]

6.2 Staff gave conflicting testimony on whether prisoners are allowed to access housing units to which they are not assigned.[redacted]

6.3 Policies on controlled movements, including doing counts that verify prisoners' housing assignments (bed roster counts), and prisoners wearing wristbands that specify their housing units, are not consistently enforced.[redacted]

---

[redacted]

[redacted]

[redacted]

6.4 For example, [redacted] failed to do a bed roster count for several months.[redacted]

6.5 [redacted] said bed rosters occur at [redacted] only once a month.[redacted]

6.6 [redacted]

6.7 [redacted]

6.8 [redacted] and [redacted] testified that each shift needs to do a bed roster count at least once a week.[redacted]

6.9 [redacted] testified that at Limestone they do bed roster counts twice a week and if the count is off twice.[redacted]

6.10 One prisoner testified to prisoners checking dorm assignments, but being unfamiliar with bed rosters by staff: Q. Do you remember them doing a bed roster at [redacted]? A. I don't recall a bed roster at this camp. You've got inmates that will have a bed roster in their hand. If you ain't on that bed roster, they don't want you in the dorm. But as far as an officer coming through with

---

[redacted]

that bed roster checking your bed, no, I have not seen that. I have been here two years and I haven't seen that, period.[redacted]

6.11 Even Commissioner John Hamm minimized unauthorized prisoner movement, testifying, "Well, you go visit other people at their house, and I mean, you're not there with malicious intent, then everything is fine, you go back to your house. So if an inmate in a dorm goes to another dorm and just going to say hi, that's fine, but they are inmates."[redacted]

6.12 Because Alabama does not enforce bed or housing assignments, prisoners lose the assigned beds to stronger prisoners or due to debts/disagreements with other prisoners, becoming essentially "homeless"—sleeping on the floor, in day rooms, or even outside.[redacted]

6.13 Prisoners move between dorms and live in housing units and beds they are not assigned to—sometimes running from other prisoners.[redacted]

---

[redacted]

6.14 Keeping prisoners in their assigned housing is also critical to keeping potential sexual assault victims and predators apart.[redacted]

6.15 A prisoner testified, Q. What do you think causes violence in prison? A. A lot of it's got to do with money being owed, people not being able to get their racks that causes violence sometimes. They will actually jump on you. If you demand your rack and keep -- you know, don't give it up, they will jump on you and take it. Q. When was the last time you saw that? A. It happened here about a week, week and a half ago. A guy transferred in after the quarantine ended, and he wanted his rack, the rack he was assigned to when he transferred in, and he got a black eye behind it.[redacted]

6.16 Prisoners are often assaulted or get into fights over disputes related to beds/bed assignments or in situations where at least one of the prisoner-combatants is not assigned to that particular dorm.[redacted]

---

[redacted]

6.17 [redacted]

6.18 [redacted]

6.19 [redacted]

6.20 [redacted]

---

[redacted]

[redacted]

6.21 [redacted]

[redacted]

[redacted]

6.22 [redacted]

[redacted]

**7. Alabama Leadership Does Not Supervise What Occurs in the Prisons.**

7.1 As of July 2023, most of the prisons had at least one prison warden vacancy.[redacted]

7.2 [redacted] admitted he had not read all of [redacted]'s SOPs, despite his responsibility to review and update these procedures.[redacted] He has not read the [redacted] SOP about Warden III responsibilities.[redacted] He says it is possible there are shifts without enough officers to fill every cube, but does not know how often that happens.[redacted] He also said he depends on supervisors to know if officers are doing rounds, but admitted officers do not have to log their rounds anywhere.[redacted] He would have to look up how often he receives a staffing deviation justification.[redacted] When asked about getting post closures by email, he said, "I don't look at every set of documents."[redacted] He does not know how many critical posts [redacted] has.[redacted] He said "[i]t's very possible" there's a connection between gangs and

---

[redacted]

contraband at the facility, but he does not know—would need LESD to "iron out the details." [redacted] has since been arrested and terminated. [redacted]

7.3 [redacted] testified that he does not know if there are shifts that are harder to staff than others; [redacted] that he does not remember if he reviews shift rosters; [redacted] that review of shift rosters is the shift commander's responsibility not the warden's; [redacted] he does not know if the warden has responsibility for the number of staff working at the facility; [redacted]; and he does not remember what the warden's responsibility for staffing is. [redacted]

7.4 [redacted] When asked which Administrative Regulations [redacted] is familiar with, she did not identify any and said she knew where to find them—she is not sure the last time she reviewed them and was not sure if it was in the last year. [redacted] She testified that she does not

---

[redacted]

know the responsibilities of a Warden III.[redacted] When asked if she was familiar with [redacted]s SOPs, she said not all of them and when asked which ones, she said, "I have the binder for them" and she confirmed she could not list any SOP, with which she is familiar.[redacted] She is not sure how many dorms [redacted] has.[redacted] She did not know if [redacted]'s population was less than 10,000 prisoners (it is around 1,200 prisoners).[redacted] She did not know how many critical staffing posts [redacted] has.[redacted] She does not ensure searches occur or even know how often security inspections are or should be taking place.[redacted] She said she was not sure if there are any drugs or cellphones at Easterling.[redacted] She was not sure how many homicides there have been at Easterling since she has been warden.[redacted] And she knew very little about a homicide that occurred in her facility the previous month.[redacted] She said she was familiar with what PREA is, but when asked about her understanding of

---

[redacted]

PREA, she said "I'm not sure."[redacted] When asked if she could change one thing about [redacted], she said the location because of her commute.[redacted]

7.5 [redacted] He could not recall any [redacted] SOP he regularly used and did not know if staff is required to review every SOP.[redacted] He testified he did not know approximately how many security staff work each shift, what posts are usually staffed, or how many officers are typically assigned to each dorm.[redacted] He is not sure whether his shift supervisors have been unable to staff critical posts.[redacted]

7.6 [redacted] She is not familiar with [redacted]'s SOPs.[redacted] She testified that it could take more than two years to become familiar with [redacted]s current SOPs.[redacted]

7.7 [redacted] She has not read all of the ADOC Administrative Regulations or the [redacted] SOPs.[redacted] She does not know how many floor officers are supposed to be assigned to a dorm.[redacted]

---

[redacted]

7.8 An LESD investigator testified that ADOC promoted a warden to [redacted] that had only previously led work release type camps, "And you make him the Warden III at the largest, most dangerous prison we got. You know, and then, then you wonder why two minutes after 4:00 he's blowing the gate every day, you know. He's, he's there by name but as far as his leadership, he is not there. And that's a problem with the majority of our – All of the facilities we have, that's the problem." [redacted]

7.9 *Commissioner John Hamm*: [redacted] The Commissioner oversees the entire operations and is "responsible for [the] entire agency regarding policies and procedures." [redacted] When asked who is responsible for ensuring the facilities have sufficient security staff, he said wardens run the facilities so wardens fill the posts. [redacted] He said to his knowledge critical posts are covered because if they do not have the staff, they use overtime. [redacted] He does not know how many overdose deaths there are in the facilities—he does not receive reports on overdose deaths, but he asked about them "periodically." [redacted] He testified he does not visit each facility at least once a year. [redacted] He has heard reports of

---

[redacted]

prisoners sleeping in dorms they're not assigned to, selling their racks, and being homeless but that's the warden's job to run the facility and he has not talked to them about those issues.[redacted] He does not keep track of data about sexual assaults; he does not review LESD reports about sexual assault; and has not talked to wardens about sexual assaults in the facilities.[redacted]

7.10 *Chief Deputy Commissioner Greg Lovelace*:[redacted] He testified that he is the number two in the organization and is supervising the entire ADOC system for the Commissioner.[redacted] He spends most of his time on the new prison project,[redacted] and has not seen any reports regarding the extent of violence, contraband, or sexual assaults in the system.[redacted]

7.11 *Regional Director*[redacted] *Edward Ellington*:[redacted] He has not read all the ARs and does not think the regional director should be familiar with SOPs, but he also testified that he is responsible for ensuring the highest official at the facility follows the proper regulations and policies.[redacted] He is not familiar with the

---

[redacted]

SOPs related to staffing levels and said he has no responsibilities over staffing.[redacted] It has been a couple of years since he has looked at the quarterly correctional staffing reports.[redacted] He does not need to be notified if staffing falls below critical staffing levels and he is not provided reports on staffing or overtime from the facilities.[redacted] [redacted]

7.12 *Regional Director LaGreta McClain*:[redacted] She said she does not think the facilities are understaffed but does not know how often officers are working overtime.[redacted] Meanwhile officers consistently report working overtime.[593] When asked to identify some issues ADOC currently faces in the security context, she testified that she could not answer that.[redacted] She testified that she does not know if extortion or gang activity occurs in the prisons.[redacted]

---

[redacted]

7.13 *Regional Director Cynthia Stewart-Riley*:[redacted]

7.14 *PREA Director Christy Vincent*:[redacted] After acknowledging the risk of prisoners designated as predators entering dorms where there are victims, she testified she does not know what Alabama does to keep prisoners in their assigned housing units, identifying it as an "operational area of concern."[redacted]

7.15 *Director of Facilities Management Jenny Abbott*:[redacted] Despite ADOC's prisons operating above designed capacities, the Facilities Maintenance Division has not assessed whether the prisons are overcrowded.[redacted]

---

[redacted]

[redacted]

7.16 *Acting Resource Planning Coordinator Carl Damone*:[redacted] [redacted]

7.17 *Resource Planning Unit Coordinator Elizabeth Lambert-Hughes*:[redacted] She is responsible for assisting the prisons with questions regarding the staffing analysis and post plans.[613] She claims every critical post is covered for every facility.[614] She does not track the number of vacancies at a facility.[615] According to policy, when a facility falls below critical minimum staffing

[redacted]

they are supposed to report that to the regional director who then reports it to Resource Planning, but she has not received such notification.[redacted] She has no idea how often prisons are falling below critical minimum staffing.[redacted] She does not know if overall staffing levels at ADOC for security staff have improved since she issued her 2022 staffing report.[redacted]

7.18 *Personnel Director Renee Minor*:[redacted]

---

[redacted]

[redacted]

7.19 *Director of Recruiting Napoleon Goodson*:[redacted] He does not know how many authorized correctional officer positions ADOC has or how many vacant correctional officer positions ADOC has—he does not receive any reports on vacancies.[redacted] He does not know how many correctional officers were hired in the past year [as of May 2023] or in 2022, 2021, or 2020.[redacted] He had not been told how many officers will be required to run the new prison.[redacted]

7.20 *Constituent Service Officer Janet Eddings*:[redacted]

---

[redacted]

[redacted]

7.21 *Office of Inspector General April Bickhaus*:[redacted] She had worked for the OIG for nine months, but did not know if there was someone acting as Inspector General.[redacted] She does not know how many security audits occur in a year or even how many are supposed to occur.[redacted] She does not review the monthly statistical reports, annual reports, or quarterly reports.[redacted]

7.22 *LESD Director Arnaldo Mercado*:[redacted] Mercado supervises LESD and the Security Threat Group (STG) bureau.[redacted] He could not answer whether the number of deaths by foul play or overdoses have increased in his time as LESD Director.[redacted]

7.23 *Security Threat Groups Statewide Coordinator* [redacted] He does not know what wardens do with STG data, but testified that STG facility

---

[redacted]

coordinators' use of the data is very limited.[redacted] He said he does not have any control of what happens in the facility level when asked what efforts he's taking to ensure STG-affiliated members stay in their assigned housing unit.[redacted] His responsibilities are limited to making sure ADOC conducts STG assessments on prisoners and incoming employees.[redacted]

7.24 An LESD investigator described an increase in violence at Limestone that he partially attributed to the abandonment of leadership: "Two, lack of leadership and the change in the culture at the, at the facility. You put inept people in charge, specifically, couple of the wardens that they've had should not have been there. I mean should have been retired. But they put them there, uh, any way. To, I mean, to the point that when you, when you have a mass exodus -- I mean just major just -- I mean Limestone lost 40 officers in the one-year period . . . . They have, they have staffing levels now that, you know, you would not even start to run a shift back in the day. I mean there's, there's more people on, on my shift back in 2015, there was more people assigned to my shift than there are on all of night shift now. And for what, you know? Because you wanted, you wanted to give somebody a cushy job and I mean they just ran people off. People that were the culture of Limestone and some

[redacted]

of these other facilities. And, you know, when you put people – When you work for somebody, you know, that lacks leadership qualities and is just vacant leadership, they're, they're just – they're there in person, but there's no leadership quality there."[redacted]

7.25 A prisoner testified, "It's just like at a prison if the warden is against something going on, it's not going to happen. The staff is not going to do it if they know that warden is not going to allow it, but if it is going on, then that warden is okay with it. And it's the same way with the commissioner and the regional coordinator, you know, how I look at it, but what I think don't really matter, you know. I think they could probably do more than what they're doing. I think that. They're just in the position they're in and letting everything happen and okay with it."[redacted]

## 8. Alabama Does Not Use Available Information to Mitigate the Substantial Risk of Violence.

8.1 Even setting aside unreported and unobserved incidents, there are thousands of incidents of violence, including sexual violence documented by ADOC.[redacted]

---

[redacted]

8.2 Several prisoners testified that they reported violence, but there was no investigation or follow-up.[redacted]

8.3 LESD is responsible for investigating felonies committed in the prison system.[redacted]

8.4 [redacted]

8.5 Despite the extensive violence, there are only approximately five supervisory agents and 34-to-35 investigators in LESD covering the whole state.[redacted]

8.6 During investigations of prisoner-on-prisoner violence and sexual abuse, the LESD Director testified that agents should attempt to obtain a statement from the victim, perpetrator, and witnesses, and request video, but that is not written in policy.[redacted]

8.7 The LESD reports themselves do not consistently address these critical pieces of information.[redacted]

---

[redacted]

8.8 As to sexual violence, despite the increase in allegations and policy that investigators should use a preponderance of the evidence standard, [redacted] Alabama uses a probable cause standard and substantiates few cases.[redacted]

8.9 Alabama also fails to account for when a prisoner has been named as a suspect numerous times.[redacted]

8.10 [redacted]

8.11 [redacted]

8.12 [redacted]

---

[redacted]

[redacted]

8.13 [redacted]

8.14 [redacted]

[redacted]

[redacted]

8.15 [redacted]

8.16 Beyond criminal investigations, it is not clear that there are any administrative investigations of prisoner-on-prisoner violence/sexual violence.[redacted]

8.17 For example, the LESD Director testified that he could not say crime scenes were properly secured by the prison's officers, despite policies requiring crime scene preservation.[redacted]

---

[redacted]

8.18 [redacted]

8.19 [redacted]

[redacted]

8.20 [redacted]

[redacted]

8.21 [redacted]

8.22 As [redacted] explained living agreements are for incidents that are "not serious" to "cover us" and prevent prisoners from saying that ADOC did not address the issue.[redacted]

---

[redacted]

8.23 [redacted]

8.24 [redacted]

8.25 [redacted]

8.26 Regional Director Ellington is not tracking overdoses.[692]

8.27 Alabama is aware that STGs are responsible for a large portion of the violence and illegal activity in the prisons.[redacted]

---

[redacted]

8.28 There is only one STG supervisor and six investigators assigned to the STG Bureau within ADOC.[redacted]

8.29 Even the LESD Director testified this staffing was inadequate for the STG Bureau to effectively complete its mission.[redacted]

8.30 Effectively, ADOC is not identifying patterns, trends, and behaviors of STG members.[redacted]

8.31 For example, Commissioner Hamm testified that he does not know if contraband, inmate fights, inmate assaults, sexual assaults, or overdoses have increased or decreased during his time as Commissioner.[redacted]

8.32 Chief Deputy Commissioner Lovelace testified that he has not seen any reports on the extent of violence, contraband, or sexual assault in the facilities.[redacted]

8.33 PREA Director Vincent does not track repeated incidents involving the same aggressor.[redacted]

---

[redacted]

8.34 [redacted]

8.35 [redacted]

8.36 In the few instances when a review team does note an area to be addressed in the prison, the warden does not follow up.[redacted]

8.37 Similarly, Alabama also used to hold regular meetings where they would discuss violence in the prisons, but Alabama stopped these meetings and when the meetings occurred, Alabama did not track whether any recommended violence mitigation measures discussed at the meetings were implemented by the facility wardens.[redacted]

---

[redacted]

## 9. ADOC Repeatedly Uses Force that Violates the Eighth Amendment.

9.1 From 2019 through January 31, 2025, at least 12 ADOC officers and supervisors have been criminally convicted of charges related to assaulting prisoners.[redacted]

9.2 At least five other officers and supervisors were criminally charged for assaulting prisoners during this period.[redacted]

9.3 [redacted]

9.4 [redacted] a sergeant was criminally charged for assaulting [redacted]

---

[redacted]

9.5 At Elmore, two officers, a sergeant, and a lieutenant were convicted of an incident in which the sergeant repeatedly punched, kicked, and struck two handcuffed prisoners with a baton.[redacted]

9.6 At Bibb, an officer pleaded guilty to a federal civil rights offense for an incident in which officers kicked and struck a prisoner with their batons, including while the prisoner was curled up in a fetal position.[redacted]

9.7 At Staton, an officer and a sergeant were convicted of kicking a prisoner and striking him with a baton, and then lying about the incident in a report and to a state investigator.[redacted]

9.8 ADOC's own videos and incident reports show further evidence of excessive force.[redacted]

9.9 [redacted]

---

709 [redacted] *see also* U.S. Dep't of Justice, *Former Alabama Correctional Sergeant Sentenced for Assaulting Inmates* (Apr. 8, 2022), https://www.justice.gov/archives/opa/pr/former-alabama-correctional-sergeant-sentenced-assaulting-inmates.

710 [redacted] *see also* U.S. Dep't of Justice, *Four Alabama Corrections Officers Indicted for Using Excessive Force and Obstruction of Justice* (July 28, 2020), https://www.justice.gov/archives/opa/pr/four-alabama-corrections-officers-indicted-using-excessive-force-and-obstruction-justice.

711 [redacted] *see also* U.S. Dep't of Justice, *Former Alabama Correctional Sergeant Convicted of Violating the Civil Rights of an Inmate and Obstruction of Justice* (Aug. 17, 2023), https://www.justice.gov/archives/opa/pr/former-alabama-correctional-sergeant-convicted-violating-civil-rights-inmate-and-obstruction.

[redacted]

9.10 [redacted]

9.11 [redacted]

9.12 [redacted]

---

[redacted]

[redacted]

9.13 [redacted]

9.14 [redacted]

---

[redacted]

9.15 [redacted]

9.16 A former Regional Director testified he received calls "[a]t least once a week" about officers spraying prisoners secured in their cells.[redacted]

9.17 [redacted]

9.18 [redacted]

---

[redacted]

9.19 [redacted]

9.20 [redacted]

9.21 [redacted]

9.22 [redacted]

---

[redacted]

[redacted]

9.23 [redacted]

9.24 [redacted]

---

[redacted]

9.25 After [redacted] officers used force against Steven Davis that resulted in his death, [redacted] ADOC [redacted] later settled a lawsuit filed by Davis's mother for $250,000.[750] ADOC settled that case after Judge Proctor denied in part the defendants' motion to dismiss, concluding that "fourteen incidents in three

[redacted]

[750] *Ray v. Gadson*, No. 2:20-cv-00499, Joint Stipulation of Dismissal, Doc. 213; Beth Shelburne, *Alabama to pay $250,000 to mother of man killed in prison*, Alabama Reflector (Oct. 10, 2024), https://alabamareflector.com/2024/10/10/alabama-to-pay-250000-to-mother-of-man-killed-in-prison/.

years is sufficient to plead 'obvious, flagrant, [and] rampant' abuse, especially when those incidents were purportedly brought to the attention of the supervisory officials in question." *Ray v. Gadson*, No. 2:20-cv-00499, 2023 WL 7228933, at *6 (N.D. Ala. Nov. 2, 2023). [redacted]

9.26 [redacted]

9.27 ADOC has settled numerous lawsuits alleging excessive force. *See, e.g.*, Order Dismissing Case After Settlement, *Wilhite v. Parker*, No. 7:20-cv-00847-KOB, Doc. 96, (N.D. Ala. Jan. 19, 2023); Joint Stipulation of

[redacted]

Dismissal, *Mims v. Melton*, No. 5:19-cv-2045, Doc. 68 (N.D. Ala. Apr. 1, 2022); Joint Stipulation of Dismissal, *Adams v. Clemons, et al*, No. 2:19-cv-15, Doc. 38 (M.D. Ala. Feb. 14, 2022); Joint Stipulation of Dismissal, *Ray v. Gadson*, No. 2:20-cv-00499, Doc. 213 (N.D. Ala. Oct. 15, 2024); Joint Stipulation of Dismissal, *Askew v. Isaac*, No. 2:19-cv-398, Doc. 82 (M.D. Ala. Jan. 12, 2023); Joint Stipulation of Dismissal, *Spann v. Lovejoy et al,* No. 2:19-cv-706, Doc. 60 (M.D. Ala. Mar. 29, 2023); Joint Stipulation of Dismissal, *Jacoby v. Lanier*, No. 2:19-cv-1067, Doc. 128 (M.D. Ala. May 9, 2023); Order of Dismissal After Settlement, *Byrdsong v. Dunn et al.*, 2:20-cv-00301, Doc. 83 (M.D. Ala. Feb. 27, 2024); Joint Stipulation of Dismissal, *Tucker v. Alabama Dep't of Corrections et al.*, No. 2:20-cv-365, Doc. 57 (N.D. Ala. Nov. 7, 2022).

**10. ADOC's Inadequate Supervision Leads to Excessive Force, and ADOC Supervisors Use Excessive Force.**

10.1 Not only do ADOC's supervisors fail to prevent and address excessive force, but they also use excessive force themselves.[redacted]

---

[redacted]

10.2 A lieutenant at Donaldson repeatedly used excessive force, culminating in his criminal conviction in 2023.[redacted] The United States Department of Justice

[redacted]

prosecuted the lieutenant for federal civil rights violations and obstruction offenses, and he pleaded guilty in 2023.[redacted]

10.3 At [redacted] a sergeant was charged with manslaughter [redacted]

10.4 [redacted] The sergeant pleaded guilty to a misdemeanor.[redacted]

10.5 [redacted]

---

761 U.S. Dep't of Justice, *Former Alabama Department of Corrections Lieutenant Sentenced for Civil Rights and Obstruction Offenses for Assaulting a Restrained Inmate and Lying to Cover It Up* (Dec. 19, 2023), https://www.justice.gov/archives/opa/pr/former-alabama-department-corrections-lieutenant-sentenced-civil-rights-and-obstruction.

[redacted]

[redacted][3] In 2023, the Alabama State Personnel Board agreed the captain's use of force was excessive, but reversed his termination and ordered him reinstated.[774]

10.6 At [redacted] two supervisors were convicted for an incident in which officers [redacted]

10.7 [redacted]

---

[redacted]

[774] Doc. 354-24.

[775] Exh. 28 (Doc. 357-5); *see also* U.S. Dep't of Justice, *Former Alabama Correctional Lieutenant Sentenced for Failing to Intervene in Unlawful Inmate Assault* (Feb. 4, 2022), https://www.justice.gov/archives/opa/pr/former-alabama-correctional-lieutenant-sentenced-failing-intervene-unlawful-inmate-assault; Exh. 25 (Doc. 357-2); *see also* U.S. Dep't of Justice, *Former Alabama Correctional Sergeant Sentenced for Assaulting Inmates* (Apr. 8, 2022), https://www.justice.gov/archives/opa/pr/former-alabama-correctional-sergeant-sentenced-assaulting-inmates.

[redacted]

10.8 At Draper, a sergeant was convicted of beating three prisoners with a wooden baton, breaking one prisoner's arm, and writing a false report to cover up the incident.[redacted]

10.9 [redacted]

10.10 [redacted]

10.11 A sergeant at Staton was convicted of punching, kicking, and beating a prisoner with a baton while the prisoner was on the ground and did not resist or pose a threat to anyone.[redacted]

10.12 [redacted]

---

[777] *See* Exh. 31 (Doc. 357-8); *see also* U.S. Dep't of Justice, *Former Alabama Correctional Sergeant Found Guilty of Civil Rights Violations and Obstruction for Assaulting Three Incarcerated People with a Riot-Baton and Falsifying a Report* (Apr. 19, 2023), https://www.justice.gov/archives/opa/pr/former-alabama-correctional-sergeant-found-guilty-civil-rights-violations-and-obstruction.

[redacted]

[780] Exh. 30 (Doc. 357-7); *see also* U.S. Dep't of Justice, *Former Alabama Correctional Sergeant Convicted of Violating the Civil Rights of an Inmate and Obstruction of Justice* (Aug. 17, 2023), https://www.justice.gov/archives/opa/pr/former-alabama-correctional-sergeant-convicted-violating-civil-rights-inmate-and-obstruction.

[781] Exh. 507 (Doc. 366-19); Exh. 605 (Doc. 366-112).

10.13 [redacted]

10.14 [redacted]

---

[redacted]

10.15 Supervisors repeatedly fail to identify, report, or address excessive force that violates ADOC policy.[redacted]

10.16 [redacted]

10.17 An ADOC official admitted she had never seen a facility report in which a captain recommended corrective action.[redacted]

10.18 [redacted]

---

[redacted]

10.19 [redacted]

10.20 [redacted]

10.21 [redacted] The sergeant was charged with murder.[redacted]

---

[redacted] *See also New details in murder case against former Alabama prison sergeant*, Fox 10 News (July 30, 2023), https://www.fox10tv.com/2023/07/31/new-details-murder-case-against-former-alabama-prison-sergeant/.

[redacted]

10.22 [redacted]

10.23 When asked whether he reported an excessive force incident, a prisoner responded: "You go up there and try to get some paperwork and write one of these officers up and see what they do to you . . . [T]hey're going to pay one of these inmates to do this or that to you. You can't go writing an officer up . . . That's absurd."[redacted]

---

[redacted]

**11. ADOC Fails to Effectively Investigate or Exercise Oversight Regarding Uses of Force.**

11.1 [redacted], a prisoner testified that an officer woke him up by striking him in the head with a baton because he did not turn over fast enough.[redacted] The prisoner had a sleeping disorder.[redacted] He testified that a baton blow broke his arm and that the warden later arranged for him to be seen by medical.[redacted] ADOC's files do not mention an officer using force in this incident.[redacted]

11.2 ADOC's investigations have found uses of force were justified without taking basic steps, like interviewing witnesses or watching available videos.[redacted]

11.3 [redacted]

---

[redacted]

[redacted]

11.4 [redacted]

11.5 [redacted]

11.6 [redacted]

---

[redacted]

[redacted]

11.7 [redacted]

[redacted]

[redacted]

11.8 Lacking a system to track uses of force, ADOC has failed to prevent the same officers and supervisors, and others, from repeatedly using excessive force against prisoners.[831]

11.9 In [redacted], an ADOC official testified that there is no "mechanism . . . to track all these [uses of force] automatically," but asserted ADOC may undertake "informal" efforts to "manually" identify officers with repeated uses of force for wardens to "be[] aware of."[redacted] The official also testified there is no system to track officers disciplined for using excessive force.[redacted]

11.10 Similarly, a [redacted] testified that she had no plans for "keeping up with the use[s] of force[]" and no system to track where uses of force occur in the facility.[834]

---

[redacted]

11.11 Commissioner Hamm never received training on use of force in a "correctional setting." [redacted] He did not know whether ADOC had a centralized database to track uses of force. [redacted] He did not know whether uses of force increased or decreased during his tenure. [redacted] He had never talked to a warden about uses of force at a facility. [redacted] He had never issued a directive related to use of force. [redacted] He could not remember the last time he reviewed an LESD investigative report related to use of force. [redacted]

11.12 In 2022, two years after the United States' complaint, ADOC transferred use-of-force investigations to a newly created Office of Inspector General (OIG). [redacted]

11.13 [redacted]

---

[redacted]

[redacted]

11.14 An ADOC use-of-force investigator testified that she did not recall any manual about how to conduct investigations, and she does not make determinations or recommendations about whether uses of force were justified.[redacted] Nor did she receive training about how to complete audit forms about uses of force.[redacted] The investigator concurred with facilities' findings that uses of force were justified, even when the files did not include body chart documentation, photographs, or statements from officers and prisoners.[redacted]

11.15 [redacted]

---

[redacted]

11.16 [redacted]

11.17 [redacted]

---

[redacted]

**12. Alabama's Prison Conditions Pose a Substantial Risk.**

12.1 As noted above, Alabama has been operating its prisons above the capacity they were designed to hold for over two decades, putting significant strain on the physical infrastructure and overcrowding prisoners.[redacted]

12.2 The crumbling infrastructure is used by prisoners to make weapons that contribute to the violence.[redacted] [redacted]

12.3 Alabama's prisons have "[e]xcessive dirt and filth, plumbing issues, physical damage to security glass and light fixtures, holes in walls, missing duct covers, rusted and disintegrating window frames, and litter . . . ."[redacted]

12.4 [redacted]

12.5 Fires are set throughout the prisons.[redacted]

[redacted]

12.6 Alabama fails to control the temperatures in the prisons.[redacted]

12.7 The prisons also have pests and rodents.[redacted]

[redacted]

12.8 [redacted]

---

[redacted]

12.9 [redacted]

[redacted]

12.10 [redacted]

---

[redacted]

[redacted]

12.11 [redacted]

---

[redacted]

12.12 [redacted]

866 [redacted]

[redacted]

12.13 [redacted]

---

[redacted]

[redacted]

12.14 [redacted]

---

[redacted]

[redacted]

12.15 [redacted]

[redacted] [redacted]

12.16 [redacted]

[redacted]

[redacted]

12.17 [redacted]

[redacted]

12.18 [redacted]

[redacted]

[redacted]

12.19 [redacted]

[redacted] [redacted]

[redacted]

12.20 [redacted]

12.21 Prisoners use contraband cellphones to share the physical conditions.[redacted]

[redacted]

[redacted]

12.22 [redacted]

12.23 Alabama, itself, has acknowledged the prison conditions are not safe.[redacted]

[redacted]

[877] NPR, Alabama to Move Most Inmates from Notoriously Crowded, Violent Holman Prison (Jan. 29, 2020), available at https://www.npr.org/2020/01/29/800877838/alabama-to-move-most-inmates-from-notoriously-crowded-violent-holman-prison (Former Commissioner Dunn stating, "Since my arrival at the ADOC almost five years ago, this Department has been vocal about the pervasive and extreme dilapidation crippling facilities through the correctional system . . .."); Governor Kay Ivey, Alabama Leaders: No More Avoiding the 'Prison Problem' (Sept. 24, 2021), available at https://www.al.com/opinion/2021/09/alabama-leaders-no-more-avoiding-the-prison-problem.html ("Unfortunately, the condition of Alabama's prison buildings has grown increasing worse, year-over-year, for many decades.").

12.24 [redacted]

12.25 [redacted]

12.26 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

12.27 [redacted]

---

[redacted] [redacted]

12.28 [redacted]

**13. Alabama Fails to Respond Reasonably to Unsafe Conditions.**

13.1 As the United States's expert put it: "The erosion of the physical plant of Alabama's facilities reflects the erosion of willingness or ability to manage the correctional system." [redacted]

13.2 For example, there is supposed to be a maintenance supervisor at each prison responsible for the day-to-day maintenance at the prison. [redacted] However, not

[900] Exh. 630 (Doc. 369-20); Exh. 180 (Doc. 358-63).
[901] Exh. 122 (Doc. 358-5), p. 89.
[902] O/S Exh. 41 (Doc. 370), p. 28 Ln: 11–25.

every major male prison in Alabama has at least one employee who does maintenance.[redacted]

13.3 ADOC first initiated a policy to have uniform work orders for maintenance in January of 2023, but as of May 2024, Abbott did not know if the prisons were using the standard form.[redacted]

13.4 There are no regularly scheduled audits of the working conditions of the facilities that maintenance is required to do yearly.[redacted]

13.5 To Abbott's and Hamm's knowledge, none of the major male facilities have a written preventative maintenance plan.[redacted]

13.6 The Facilities Maintenance Division does not do any regularly scheduled audits of the working conditions of the prisons.[redacted]

13.7 The person in charge of Research and Planning for ADOC[redacted] does not have information related to maintenance of facility management and she does not know who would produce that data.[redacted]

13.8 The building of Alabama's new prisons have been delayed several times.[redacted]

---

[redacted]

**UNITED STATES' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I. Introduction

Prisons are a necessary part of an effective criminal justice system to keep Americans safe. Prisons must maintain constitutional conditions when incarcerating convicted criminals. Where, as is the case with the State of Alabama, prison officials are deliberately indifferent to unconstitutional conditions, those officials jeopardize both the safety of the prisoners and, potentially, the availability of prisons to protect the public, writ large.

Alabama's prisons are pervasively violent. Homicides, stabbings, beatings, and sexual assaults occur routinely. Officers use excessive force. Alabama does not maintain the physical condition of the prisons, putting prisoners' health and safety at risk. Alabama's own conduct has created these conditions, and Alabama has failed to respond reasonably. Alabama violates the Eighth Amendment rights of prisoners. Each of these facts is beyond dispute and Alabama's pattern or practice of these constitutional violations entitles the United States to judgement as a matter of law. The Court should, therefore, grant the United States' Motion for Summary Judgment.[911]

[911] If the Court grants the United States' Motion for Summary Judgment, the Court will still need to determine appropriate remedies through a remedial hearing.

## II. Summary Judgment Standard

A court shall grant summary judgment where the moving party has shown there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Alabama Violates the Eighth Amendment

The Constitution prohibits cruel and unusual punishment. U.S. Const. amend. VIII; *Dunn v. Commissioner, Alabama Dep't of Corrs.* ("*Braggs*"), 179 F.4th 1277, 1292 (11th Cir. 2026) ("The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'") (quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015)). Under the Eighth Amendment, prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To prove an Eighth Amendment violation, a plaintiff must show a sufficiently serious deprivation and that prison officials have a sufficiently culpable state of mind. *Braggs*, 179 F.4th at 1292.

Alabama violates the Eighth Amendment in numerous ways. It does so by failing to protect prisoners from violence. It does so by failing to protect prisoners from sexual abuse. It does so by failing to protect prisoners from the use of excessive force. It does so by failing to provide safe conditions of confinement.

## IV. Alabama Fails to Protect Prisoners from Violence and Sexual Violence (United States' Counts 1 and 2)

Prison officials have a duty to protect prisoners from harm, including from other prisoners. *Farmer*, 511 U.S. at 833. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Regardless of whether prisoners have contributed to violence, prison officials "are not free to let the state of nature take its course" and "gratuitously allow[] the beating or rape of one prisoner by another." *Id.* at 833; *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1259 (11th Cir. 2020). Rather, "the protection [a prisoner] is afforded against other inmates" is a condition of confinement that is subject to the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

The Eleventh Circuit has explained that to make a failure-to-protect claim under the Eight Amendment's deliberate indifference standard, a plaintiff must show that: (1) prisoners are at a substantial risk of objectively serious harm; (2) the defendant knew its actions or failure to act put the prisoners at substantial risk; and (3) the defendant did not respond reasonably to that substantial risk. *Wade v.*

*McDade*, 106 F.4th 1251, 1261-62 (11th Cir. 2024). An Eighth Amendment violation can be found across a system where there are systemic deficiencies. *Braggs*, 179 F.4th at 1318–21 (explaining a court need not make prison-specific findings).

**A. Substantial Risk of Violence and Sexual Violence.**

Violent conditions present a substantial risk of serious harm when prisoners are subject to an "unjustified constant and unreasonable exposure to violence." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). Courts distinguish cases involving "occasional, isolated attacks by one prisoner on another," from those where "violence and terror reign." *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005)). Courts also look to whether there are specific conditions of the prisons that make them particularly violent, such as "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Id.* at 1235; *see also Lane v. Philbin*, 835 F.3d 1302, 1307–08 (11th Cir. 2016); *Cotton v. Cooper*, No. 22-12927, 2024 WL 340033, at *2 (11th Cir. Jan. 30, 2024). The Eighth Amendment does not require prison officials to eliminate every instance of harm, but there is also no "proverbial floor"

as to how many violent incidents establish an unconstitutional risk of harm. *Purcell*, 400 F.3d at 1323. Rather, the risk of harm to prisoners is substantial when violent incidents are prevalent and when specific conditions make the facility particularly violent. *See Marbury*, 936 F.3d at 1235; *Marbury v. Warden III*, 180 F.4th 1349, 1359 (11th Cir. 2026) (plaintiff "has *both* shown a history of inmate violence *and* pointed to several features that make St. Clair particularly violent") (emphasis in original).

There is no genuine dispute that ADOC prisoners face a substantial risk of violence and sexual violence.

**1. Violence in ADOC is regular and serious.**

Violence in ADOC is not isolated. Violence is pervasive throughout the system and has been for many years. (SOF ¶ 2.1).[912] As described by the United States' expert, "In Alabama prisons, living units for inmates are 'Hobbesian Worlds,' where life is nasty and brutal and ruled by the inmates, not the State."[913] As a prisoner put it, "There's no safety man. You don't feel safe. Anything liable to happen." (SOF ¶ 2.2). Anything *is* liable to happen in ADOC, such as homicides, extortion, sexual abuse, and holding officers and prisoners hostage.

---

[912] UNITED STATES STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT paragraphs, *supra*, (SOF ¶ #)

[913] Exh. 119 (Doc. 358-2), p. 9

Take homicides, for example. According to Alabama's own records, prisoner-on-prisoner deaths occur, on average, once per month in ADOC—a number that has remained steady from 2019 to 2024. (SOF ¶ 2.3).



[914]

From 2019 to 2024, as reported by Alabama, prisoners killed at least [redacted] other prisoners in ADOC. (SOF ¶ 2.4). The following individuals present just a few examples from that number.

[redacted] (SOF ¶ 2.87).

[914] Exh. 120 (Doc. 358-3), p. 27.

[redacted] (SOF ¶¶ 2.88- 2.89). [redacted] (SOF ¶ 2.90).

[redacted] (SOF ¶ 2.91).

[redacted] (SOF ¶ 2.92).

[redacted] (SOF ¶ 2.93).

[redacted] (SOF ¶¶ 2.94-2.95). [redacted]

[redacted]

[redacted]

(SOF ¶ 2.96).

[redacted] (SOF ¶ 2.97).

[redacted] (SOF ¶ 2.98).

Official ADOC reports likely undercount homicides. [redacted]

[redacted]

[redacted]

[redacted]

(SOF ¶ 2.99).

Violence is a daily occurrence in ADOC. (SOF ¶ 2.100). Reported prisoner assaults occur, on average, at rates of slightly under 100 per month. (SOF ¶ 2.101).



[915]

As staff admit, there are also unreported assaults: "Some days they just – and then if you've got a facility with 12 – 2,000 inmates and 15 officers, you've got one officer trying to cover three dorms, well, it's very, very possible that nobody sees that." "They get into fights every day. It's a lot of them that we don't see." (SOF ¶ 2.102).

Alabama also fails to properly classify all incidents, obscuring the official numbers reported for some violence. [redacted] (SOF ¶ 2.103). [redacted] (SOF ¶ 2.104).

Beyond the volume, the violent incidents in Alabama prisons are often very serious, even those that do not result in death. [redacted]

[915] Exh. 120 (Doc. 358-3), p. 21.

[redacted] (SOF ¶ 2.105). [redacted] (SOF ¶ 2.106). [redacted] (SOF ¶ 2.107).

Just one month in ADOC highlights several violent incidents. [redacted] (SOF ¶ 2.108).

[redacted] (SOF ¶ 2.109).

[redacted] (SOF ¶ 2.110).

[redacted] (SOF ¶ 2.111).

[redacted].

(SOF ¶ 2.112).

[redacted] (SOF ¶ 2.113).

[redacted]. (SOF ¶ 2.114).

[redacted] (SOF ¶ 2.115).

[redacted] (SOF ¶ 2.116).

[redacted] (SOF ¶ 2.117).

[redacted] (SOF ¶ 2.118).

[redacted] (SOF ¶¶ 2.119 – 2.132).

Alabama's prisons are "chaotic." [redacted] (SOF ¶ 2.133).

The chaos in Alabama prisons is demonstrated by the following examples that Alabama reported from that one week:

- [redacted] (SOF ¶ 2.134).
- [redacted]

[redacted] (SOF ¶ 2.135).

- [redacted] (SOF ¶ 2.136).
- [redacted]

[redacted]

(SOF ¶ 2.137).

- [redacted] (SOF ¶ 2.138).
- [redacted]

[redacted] (SOF ¶ 2.139).

Far from isolated, there is no dispute that violence in ADOC is regular, serious, and systemic. This litany of incidents, taken from just one week, demonstrates the chaotic, violent environment within ADOC facilities, conditions of which ADOC is well aware.

### 2. Sexual violence in ADOC is regular and serious.

Sexual violence is also regular, serious, and systemic in ADOC. (SOF ¶ 3.1). Since mid-2022, there have been, on average, more than 30 inmate-on-inmate sexual assault reports documented per month. (SOF ¶ 3.2).



[916]

[916] Exh. 120 (Doc. 358-3), p. 24.

[redacted] (SOF ¶ 3.3). [redacted] (SOF ¶ 3.4). The sexual abuse that is reported in ADOC is shocking.

[redacted]. (SOF ¶¶ 3.5-3.6). [redacted]

[redacted]. (SOF ¶ 3.7).

[redacted] (SOF ¶ 3.8). [redacted] (SOF ¶ 3.9). [redacted] (SOF ¶ 3.10). [redacted] (SOF ¶ 3.11). [redacted] (SOF ¶ 3.12). [redacted]

[redacted]. (SOF ¶ 3.13). [redacted] (SOF ¶ 3.14). [redacted] (SOF ¶ 3.15). [redacted] (SOF ¶ 3.16). [redacted]. (SOF ¶ 3.17). [redacted] (SOF ¶ 3.18).

In her [redacted] deposition, PREA Director Christy Vincent testified [redacted]

[redacted] (SOF ¶ 3.19).

The casual nature of these responses underscores the deliberate indifference of the PREA Director and ADOC, more generally.

[redacted]

[redacted] (SOF ¶ 3.20).

[redacted] (SOF ¶ 3.21).

[redacted] SOF ¶ 3.22). [redacted]

[redacted] (SOF ¶ 3.23).

[redacted]

[redacted] (SOF ¶¶ 3.24-3.25).

[redacted] (SOF ¶ 3.26). [redacted] (SOF ¶ 3.27). [redacted] (SOF ¶ 3.28).

[redacted] testified that he had been beaten, held down, and raped numerous times in ADOC, [redacted] (SOF ¶ 3.29). [redacted] (SOF ¶ 3.30).

[redacted]. (SOF ¶ 3.32).

ADOC also misreports some incidents of sexual violence which results in these incidents not being properly labeled. [redacted] (SOF ¶ 3.33). [redacted]

[redacted] (SOF ¶ 3.34). [redacted] (SOF ¶ 3.35). [redacted] (SOF ¶ 3.36).

[redacted] (SOF ¶ 3.37). [redacted]

[redacted]. (SOF ¶ 3.38). [redacted] (SOF ¶ 3.39). [redacted] (SOF ¶ 3.40).

[redacted] (SOF ¶ 3.41). [redacted] (SOF ¶ 3.42). [redacted].

(SOF ¶ 3.43). [redacted]

(SOF ¶ 3.44). [redacted]

[redacted] (SOF ¶ 3.45). [redacted] (SOF ¶ 3.46). [redacted] (SOF ¶ 3.47).

[redacted] (SOF ¶ 3.48). [redacted] (SOF ¶ 3.49).

There is no genuine dispute that Alabama prisoners are at a substantial risk of sexual violence in ADOC facilities or that ADOC is well aware of the risk.

**B. Alabama's Conduct and Failure to Act Puts Prisoners at Risk.**

As the Eleventh Circuit recently confirmed, deliberate indifference has two components—that the defendants were subjectively aware their conduct caused a substantial risk of harm and that objectively, the defendants did not respond

reasonably to the risk. *Braggs*, 179 F.4th at 1292; *see also Wade*, 106 F. 4th at 1262; *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995).[917] Even where staff is working hard within the prisons, and absent a showing that that "past wrongs would not be repeated," the relevant inquiry is whether the institution has been historically indifferent. *Braggs*, 179 F.4th at 1313.

Alabama has known about the pervasive violence within its prisons for years. Alabama knows the prisons are understaffed and overcrowded, and prisoners are often unsupervised. Alabama knows it is not reasonably controlling the flow of contraband into its facilities, including weapons, cellphones, and drugs. Alabama knows it is not adequately controlling prisoner movement within its facilities. Alabama knows these failures place prisoners at a substantial risk of violence and sexual violence.

### 1. Alabama knows the prisons are understaffed and overcrowded, and prisoners are unsupervised, leading to violence and sexual abuse.

The overcrowding in Alabama's prisons has persisted for more than two decades. (SOF ¶ 4.1). [redacted] (SOF ¶ 4.2).

[917] While *Hale* involved a pretrial detainee, the Eleventh Circuit evaluated his claims under the Eighth Amendment. *See Hale*, 50 F.3d at 1582 & n.4.




918

By operating above the prisons' designed capacities, since at least 2000, there is increasing pressure on both the facilities' physical capabilities and on the staff who operate within them to supervise the number of prisoners housed closely together. (SOF ¶ 4.3). [redacted] (SOF ¶¶ 4.4-4.6). In addition to being overcrowded, there is no dispute that ADOC is understaffed. (SOF ¶ 4.7).

[918] Exh. 121 (Doc. 358-4), p. 20.



[919]

Alabama's prisons, that are the subject of this litigation, are woefully understaffed, causing unreasonable danger to those who are incarcerated in the prisons. For example, for 2023, ADOC reported 17.4 prisoners to each correctional officer and 67.8 prisoners to each supervisor when ADOC was authorized to have 5.2 prisoners to each correctional officer and 34.8 prisoners to each supervisor. (SOF ¶ 4.8).

Alabama knows it is not adequately supervising prisoners at a level that prevents violence. Regional Director Edward Ellington testified that it was permissible for an ADOC facility to have no officers assigned to watch a housing unit. (SOF ¶ 4.9). ADOC regularly has one officer covering multiple posts, leaving entire housing units unsupervised for excessively long periods of time. (SOF ¶ 4.10).

[redacted]

[919] Exh. 121 (Doc. 358-4), p. 33.

[redacted] (SOF ¶ 4.11). [redacted] (SOF ¶ 4.12). [redacted] (SOF ¶ 4.13). [redacted] (SOF ¶ 4.14). The warden at [redacted] approved giving prisoners in one of the dorms a radio to use if prisoners needed help because "a lot of time" they do not have an officer there. (SOF ¶ 4.15). [redacted] (SOF ¶ 4.16). [redacted] (SOF ¶ 4.17).

ADOC knows that when staff are not watching, prisoners "do whatever they want to do." (SOF ¶ 4.18). By leaving prisoners unsupervised in overcrowded dorms, Alabama has chosen to let "nature take its course" through violence. *See Farmer*, 511 U.S. at 833. As Regional Director Ellington testified, "Officer presence

is a number one way to prevent a lot of stuff from happening inside the facility." (SOF ¶ 4.19). On staffing, one prisoner said,

> Because they don't do nothing to stop nothing. If the inmates don't stop it, it don't get stopped. They just come after you're dead or he's dead or after they're all done and be like, Come on, let's go to Seg.

(SOF ¶ 4.20).

[redacted] testified, "There shouldn't be a dorm at Staton that don't have an officer present because if you do that you're not doing security, custody, and control." Without officer supervision, violent incidents occur, creating an "environment where the rule of the strongest prevails." (SOF ¶ 4.21). As for the weak, as one prisoner put it:

> They know who's weak and who's strong. You know what I mean? So I've been – the whole time I've been in prison, I've been a target because I'm weak, yeah. I still have fear, you know, and I've been a target the whole time I've been in prison to gangs.

[redacted]

(SOF ¶ 4.22).

[redacted]

[redacted] (SOF ¶ 4.23).

Another prisoner testified that it took him a week to report that he was sexually assaulted because other prisoners would not let him out of the dorm. (SOF ¶ 4.24).

A prisoner [redacted] testified that [redacted], he was beaten around 9:00 p.m. and was left unsupervised, lying in his own blood, until the shift change at 6:30 a.m. (SOF ¶ 4.25). [redacted] (SOF ¶ 4.26).

[redacted] (SOF ¶ 4.27).

When asked how prisoners could get an officer's attention in between any security checks, a Lieutenant at [redacted] said, "I don't know. They would have to yell or something." (SOF ¶ 4.28). [redacted] (SOF ¶ 4.29).

### 2. Alabama knows its failure to control contraband leads to prisoner violence and sexual abuse.

Alabama knows that contraband, particularly drugs, weapons, and cellphones contribute to violence in the prisons. ADOC still fails to adequately control contraband flooding into the prisons. *See Boykins v. Dunn*, 696 F.Supp. 3d 1061, 1081-1082 (N.D. Ala. Sept. 30, 2023) (denying summary judgment where "[i]nmate-made weapons and other contraband like cellphones permeate St. Clair" and "[t]he frequency and severity of violence is staggering"). As every prison system must deal with contraband, there are accepted practices to help control the influx, but ADOC fails to implement these practices and to follow its own policies as they relate to contraband control. [redacted] (SOF ¶ 5.1). [redacted] (SOF ¶ 5.2). [redacted] (SOF ¶ 5.3). [redacted] ADOC's failures result in pervasive contraband. (SOF ¶ 5.4).

As one prisoner put it, "Because there's no officers to protect us. You've got to protect yourself." (SOF ¶ 5.5). Staff and prisoners confirmed that most prisoners have weapons. (SOF ¶ 5.6). Drugs permeate the prisons. (SOF ¶ 5.7). The United States' experts observed, first-hand, prisoners high on drugs in ADOC facilities. (SOF ¶ 5.8). Prisoners frequently overdose. (SOF ¶ 5.9). Prison staff regularly use

Narcan, a drug used to treat opioid related overdoses. (SOF ¶ 5.10). Prisoners also have contraband cellphones which are used to facilitate the introduction of contraband, extortion inside and outside of the prison, and other nefarious acts. (SOF ¶ 5.11).




[920]

[redacted] (SOF ¶ 5.12). [redacted]

[920] Exh. 120 (Doc. 358-3), p. 22.

[redacted] (SOF ¶¶ 5.13-5.17).

[redacted].

(SOF ¶ 5.18). [redacted] (SOF ¶ 5.19).

[redacted]

[redacted] (SOF ¶ 5.20).

[redacted] (SOF ¶¶ 5.21-5.23).

[redacted] SOF ¶ 5.24).

Pervasive contraband leads to violence. (SOF ¶ 5.25). As the prisoners explain:

> Q. I mean, have you seen assaults here in prison?
> A. Yes, I have.
> Q. What do you think the assaults are usually about?
> A. Debts, drugs. It goes hand in hand. Debt, drug, debt, drugs.

(SOF ¶ 5.26).

> Q. So in your experience, are most of these fights about somebody owing somebody else for something?
> A. Yes.
> Q. Do you see fights because somebody owes something that they borrowed from the commissary?
> A. No.
> Q. Is it more contraband?
> A. It's just fights about dealing with money or something. It's either about somebody got some drugs or something from that person or when they borrowed something from that dude and he went and told you he put a hit on him or something, little stuff like that.
> Q. You said one thing is about drugs; what else are people owing each other?
> A. Majority of it, that's it, for real.

(SOF ¶ 5.27).

[redacted]. (SOF ¶ 5.28). [redacted]

[redacted] (SOF ¶ 5.29). [redacted] (SOF ¶ 5.30). [redacted]

[redacted]

(SOF ¶ 5.31).

[redacted]

[redacted]

(SOF ¶ 5.32).

Drugs play a significant role in the proliferation of sexual abuse in Alabama prisons, with prisoners getting into debt and being forced to perform sexual acts or prisoners being drugged and raped. (SOF ¶ 5.33). One prisoner testified that a gang forced him to put drugs in his anus and he woke up in the infirmary. (SOF ¶ 5.34).

[redacted]

[redacted] (SOF ¶ 5.35).

Alabama has allowed contraband to take over its prisons, leading to violence as prisoners experience:

> Q. Earlier, you said something about Staton, that it has gotten out of hand and they should have stopped it then. What should they have done?
> A. See, when you let a situation get out of hand like this dope and all of this, when you let it get out of hand -- when you first knew it hit the camp, you are supposed to put a stop to it then.
> Q. How?
> A. I know what it is, they got shorthanded. That's how come it got out of hand, they got shorthanded on staff. It's just like an inmate told them one day, said, you see all these inmates are high, you see them high. Inmates that are smoking marijuana, you want to write them up, but you don't write them up.

(SOF ¶ 5.36).

Alabama's failure to control contraband causes violence. (SOF ¶ 5.37).

**3. Alabama knows its failure to control prisoner movement leads to prisoner violence and sexual abuse.**

Alabama fails to supervise prisoners, do consistent bed roster counts, lock housing units, or otherwise enforce housing assignments, such that prisoners move freely throughout the prisons. This movement leads to violence. *Marbury v. Warden*

*III*, 180 F.4th at 1359 (rejecting Alabama's argument about unauthorized movement, citing "incident reports" showing "an inmate assigned to one cell block was involved in an assault in a different cell block").

When prisoners do not live in their assigned beds, staff do not consistently intervene—which the United States's expert also observed first-hand. (SOF ¶ 6.1). Staff gave conflicting testimony on whether prisoners are allowed to access housing units to which they are not assigned. (SOF ¶ 6.2). Policies on controlled movements, including doing counts that verify prisoners' housing assignments (bed roster counts), and prisoners wearing wristbands that specify their housing units, are not consistently enforced. (SOF ¶ 6.3). For example, [redacted] failed to do a bed roster count for several months. (SOF ¶ 6.4). [redacted] said bed rosters occur at [redacted] only once a month. (SOF ¶ 6.5). [redacted] (SOF ¶ 6.6). [redacted]. (SOF ¶ 6.7). [redacted] and [redacted] testified that each shift needs to do a bed roster count at least once a week. (SOF ¶ 6.8). [redacted] testified that at Limestone they do bed roster counts twice a week and if the count is off twice. (SOF ¶ 6.9). One prisoner testified to prisoners checking dorm assignments, but being unfamiliar with bed rosters by staff:

Q. Do you remember them doing a bed roster at [redacted]?

> A. I don’t recall a bed roster at this camp. You’ve got inmates that will have a bed roster in their hand. If you ain’t on that bed roster, they don’t want you in the dorm. But as far as an officer coming through with that bed roster checking your bed, no, I have not seen that. I have been here two years and I haven’t seen that, period.

(SOF ¶ 6.10). Even Commissioner John Hamm minimized unauthorized prisoner movement, testifying,

> Well, you go visit other people at their house, and I mean, you’re not there with malicious intent, then everything is fine, you go back to your house. So if an inmate in a dorm goes to another dorm and just going to say hi, that’s fine, but they are inmates.

(SOF ¶ 6.11).

Because Alabama does not enforce bed or housing assignments, prisoners lose their assigned beds to stronger prisoners or due to debts/disagreements with other prisoners, becoming essentially “homeless”—sleeping on the floor, in day rooms, or even outside. (SOF ¶ 6.12). Prisoners move between dorms and live in housing units and beds they are not assigned to—sometimes running from other prisoners. (SOF ¶ 6.13). Keeping prisoners in their assigned housing is also critical to keeping potential sexual assault victims and predators apart. (SOF ¶ 6.14).

Alabama’s failure to control housing assignments leads to violence. A prisoner testified:

> Q. What do you think causes violence in prison?
> A. A lot of it’s got to do with money being owed, people not being able to get their racks that causes violence sometimes. They will actually jump on you. If you demand your rack and keep -- you know, don't give it up, they will jump on you and take it.

> Q. When was the last time you saw that?
> A. It happened here about a week, week and a half ago. A guy transferred in after the quarantine ended, and he wanted his rack, the rack he was assigned to when he transferred in, and he got a black eye behind it.

(SOF ¶ 6.15).

Prisoners are often assaulted or get into fights over disputes related to beds/bed assignments or in situations where at least one of the prisoner-combatants is not assigned to that particular dorm. (SOF ¶ 6.16). [redacted] (SOF ¶ 6.17). [redacted] (SOF ¶ 6.18). [redacted] (SOF ¶ 6.19).

[redacted]

[redacted] (SOF ¶ 6.20). [redacted] (SOF ¶ 6.21). [redacted]

[redacted] (SOF ¶ 6.22).

**C. Alabama Fails to Respond Reasonably to the Risk.**

Despite knowing their conduct leads to prisoner violence, Defendants have not reasonably addressed the unconstitutional conditions. See Farmer, 511 U.S. at 833. In determining whether Alabama responded reasonably to the substantial risk of harm in their prisons, the Court should consider Alabama's entire course of conduct in addressing the risk of harm. See Swain v. Junior, 961 F.3d 1276, 1287–88 (11th Cir. 2020). This includes Defendants' efforts at mitigating the risk, other reasonable efforts that Defendants could have taken but did not, and whether Defendants knew their efforts would be ineffective at addressing the risk of harm. See LaMarca, 995 F.2d at 1537–39. "In deliberate-indifference cases, as in life, context matters." Mosley v. Zachery, 966 F.3d, 1265, 1272 (11th Cir. 2020). The analysis turns on whether Defendants' "entire course of conduct" in response to that

risk shows deliberate indifference, not whether they took any specific action. Swain, 961 F.3d at 1287–88; see also Hale, 50 F.3d at 1583–84.

### 1. Alabama leadership does not supervise what occurs in the prisons.

Alabama knows its failures cause a substantial risk of violence, but ADOC supervisors and leadership still do not supervise what occurs in the prisons. Even where policies exist on paper to address violence, leadership does not ensure policies are followed or track information from the prisons: "Policies are effective only when they are followed and consistently enforced. Otherwise, they are meaningless."[921] *See McCarley v. Dunn*, 722 F. Supp. 3d 1242, 1258 (N.D. Ala. 2024) ("A supervisors' conscious refusal to enforce a policy is identical to the absence of that policy."); *Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1275-76 (N.D. Ala. 2022) ("The ADOC Officials' mere enactment of a directive that their own subordinates notified them was never implemented or enforced reflects that they 'recklessly disregarded the necessary means to protect inmate safety.'" (quoting *LaMarca*, 995 F.2d at 1538)).

As of July 2023, most of the prisons had at least one prison warden vacancy. (SOF ¶ 7.1). And some of the wardens who are present do not supervise the prisons.

In just a few examples:

[921] Exh. 122 (Doc. 358-5), p. 5.

- [redacted]: [redacted] admitted he had not read all of [redacted]'s SOPs, despite his responsibility to review and update these procedures. He has not read the [redacted] SOP about Warden III responsibilities. He says it is possible there are shifts without enough officers to fill every cube, but does not know how often that happens. He also said he depends on supervisors to know if officers are doing rounds, but admitted officers do not have to log their rounds anywhere. He would have to look up how often he receives a staffing deviation justification. When asked about getting post closures by email, he said, "I don't look at every set of documents." He does not know how many critical posts [redacted] has. He said "[i]t's very possible" there's a connection between gangs and contraband at the facility, but he does not know—would need LESD to "iron out the details." [redacted] has since been arrested and terminated. [redacted] (SOF ¶ 7.2).
- [redacted]: [redacted] testified that he does not know if there are shifts that are harder to staff than others; that he does not remember if he reviews shift rosters; that review of shift rosters is the shift commander's responsibility not the warden's; he does not know if the warden

has responsibility for the number of staff working at the facility; and he does not remember what the warden's responsibility for staffing is. (SOF ¶ 7.3).

- [redacted]: When asked which Administrative Regulations [redacted] is familiar with, she did not identify any and said she knew where to find them—she is not sure the last time she reviewed them and was not sure if it was in the last year. She testified that she does not know the responsibilities of a Warden III. When asked if she was familiar with [redacted]'s SOPs, she said not all of them and when asked which ones, she said, "I have the binder for them" and she confirmed she could not list any SOP with which she is familiar. She is not sure how many dorms [redacted] has. She did not know if [redacted]'s population was less than 10,000 prisoners (it is around 1,200 prisoners). She did not know how many critical staffing posts [redacted] has. She does not ensure searches occur or even know how often security inspections are or should be taking place. She said she was not sure if there are any drugs or cellphones at [redacted]. She was not sure how many homicides there have been at [redacted] since she has been warden. And she knew very little about a homicide that occurred in her facility the previous month. She said she was familiar with what PREA is, but when asked about her understanding of PREA, she said "I'm not sure." When asked

if she could change one thing about [redacted], she said the location because of her commute. (SOF ¶ 7.4).

- [redacted]: He could not recall any [redacted] SOP he regularly used and did not know if staff is required to review every SOP. He testified he did not know approximately how many security staff work each shift, what posts are usually staffed, or how many officers are typically assigned to each dorm. He is not sure whether his shift supervisors have been unable to staff critical posts. (SOF ¶ 7.5).
- [redacted]: She is not familiar with [redacted]'s SOPs. She testified that it could take more than two years to become familiar with [redacted]'s current SOPs. (SOF ¶ 7.6).
- [redacted] She has not read all of the ADOC Administrative Regulations or the [redacted] SOPs. She does not know how many floor officers are supposed to be assigned to a dorm. (SOF ¶ 7.7).

An LESD investigator testified that ADOC promoted a warden to [redacted] that had only previously led work-release type camps:

> And you make him the Warden III at the largest, most dangerous prison we got. You know, and then, then you wonder why two minutes after 4:00 he's blowing the gate every day, you know. He's, he's there by name but as far as his leadership, he is not there. And that's a problem with the majority of our – All of the facilities we have, that's the problem.

(SOF ¶ 7.8).

The lack of accountability and supervision starts with ADOC's headquarters and executive leadership. *See Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1285 (M.D. Ala. 2021), *aff'd in relevant part by Dunn v. Commissioner*, 179 F.4th 1277, 1317 (11th Cir. 2026) ("Moreover, at various points during the omnibus remedial hearings the court heard testimony from high level ADOC officials that turned out not to accurately reflect conditions on the ground."). In just a few examples:

- *Commissioner John Hamm*: The Commissioner oversees the entire operations and is "responsible for [the] entire agency regarding policies and procedures." When asked who is responsible for ensuring the facilities have sufficient security staff, he said wardens run the facilities so wardens fill the posts. He said to his knowledge critical posts are covered because if they do not have the staff, they use overtime. He does not know how many overdose deaths there are in the facilities—he does not receive reports on overdose deaths, but he asked about them "periodically." He testified he does not visit each facility at least once a year. He has heard reports of prisoners sleeping in dorms they're not assigned to, selling their racks, and being homeless, but that's the warden's job to run the facility and he has not talked to them about those issues. He does not keep track of data about sexual assaults; he does not review LESD reports about sexual assault; and has not talked to wardens about sexual assaults in the facilities. (SOF ¶ 7.9).

- *Chief Deputy Commissioner Greg Lovelace*: He testified that he is the number two in the organization and is supervising the entire ADOC system for the Commissioner. He spends most of his time on the new prison project, and has not seen any reports regarding the extent of violence, contraband, or sexual assaults in the system. (SOF ¶ 7.10).
- *Regional Director Edward Ellington*: He has not read all the ARs and does not think the regional director should be familiar with SOPs, but he also testified that he is responsible for ensuring the highest official at the facility follows the proper regulations and policies. He is not familiar with the SOPs related to staffing levels and said he has no responsibilities over staffing. It has been a couple of years since he has looked at the quarterly correctional staffing reports. He does not need to be notified if staffing falls below critical staffing levels and he is not provided reports on staffing or overtime from the facilities. [redacted] (SOF ¶ 7.11).
- *Regional Director LaGreta McClain*: She said she does not think the facilities are understaffed, but does not know how often officers are working overtime. Meanwhile officers consistently report working overtime. When asked to identify some issues ADOC currently faces in the security context, she

testified that she could not answer that. She testified that she does not know if extortion or gang activity occurs in the prisons. (SOF ¶ 7.12).

- *Regional Director Cynthia Stewart-Riley*: [redacted] (SOF ¶ 7.13).
- *PREA Director Christy Vincent*: After acknowledging the risk of prisoners designated as predators entering dorms where there are victims, she testified she does not know what Alabama does to keep prisoners in their assigned housing units, identifying it as an "operational area of concern." (SOF ¶ 7.14).
- *Director of Facilities Management Jenny Abbott*: Despite ADOC's prisons operating above designed capacities, the Facilities Maintenance Division has not assessed whether the prisons are overcrowded. [redacted] (SOF ¶ 7.15).

- *Acting Resource Planning Coordinator Carl Damone*: [redacted] (SOF ¶ 7.16).
- *Resource Planning Unit Coordinator Elizabeth Lambert-Hughes*: [redacted] (SOF ¶ 7.17).
- *Personnel Director Renee Minor*: [redacted]

[redacted]

(SOF ¶ 7.18).

- *Director of Recruiting Napoleon Goodson*: [redacted] (SOF ¶ 7.19).

- *Constituent Service Officer Janet Eddings*: [redacted]

[redacted] (SOF ¶ 7.20).

- *Office of Inspector General April Bickhaus*: She had worked for the OIG for nine months, but did not know if there was someone acting as Inspector General. She does not know how many security audits occur in a year or even how many are supposed to occur. She does not review the monthly statistical reports, annual reports, or quarterly reports. (SOF ¶ 7.21).
- *LESD Director Arnaldo Mercado*: Mercado supervises LESD and the Security Threat Group (STG) bureau. He could not answer whether the number of deaths by foul play or overdoses have increased in his time as LESD Director. (SOF ¶ 7.22).
- *Security Threat Groups Statewide Coordinator* [redacted]: He does not know what wardens do with STG data, but testified that STG facility coordinators' use of the data is very limited. He said he does not have any control of what happens at the facility level when asked what efforts he's taking to ensure STG-affiliated members stay in their assigned housing unit. His responsibilities are limited to making sure ADOC conducts STG assessments on prisoners and incoming employees. (SOF ¶ 7.23).

An LESD investigator described an increase in violence at Limestone that he partially attributed to the abandonment of leadership:

> Two, lack of leadership and the change in the culture at the, at the facility. You put inept people in charge, specifically, couple of the wardens that they've had should not have been there. I mean should have been retired. But they put them there, uh, any way. To, I mean, to the point that when you, when you have a mass exodus -- I mean just major just -- I mean Limestone lost 40 officers in the one-year period . . . . They have, they have staffing levels now that, you know, you would not even start to run a shift back in the day. I mean there's, there's more people on, on my shift back in 2015, there was more people assigned to my shift than there are on all of night shift now. And for what, you know? Because you wanted, you wanted to give somebody a cushy job and I mean they just ran people off. People that were the culture of Limestone and some of these other facilities. And, you know, when you put people – When you work for somebody, you know, that lacks leadership qualities and is just vacant leadership, they're, they're just – they're there in person, but there's no leadership quality there.

(SOF ¶ 7.24).

Even the prisoners recognize the lack of leadership:

> It's just like at a prison if the warden is against something going on, it's not going to happen. The staff is not going to do it if they know that warden is not going to allow it, but if it is going on, then that warden is okay with it. And it's the same way with the commissioner and the regional coordinator, you know, how I look at it, but what I think don't really matter, you know. I think they could probably do more than what they're doing. I think that. They're just in the position they're in and letting everything happen and okay with it.

(SOF ¶ 7.25).

#### 2. Alabama does not use available information to mitigate the substantial risk of violence.

Alabama does not respond reasonably to the substantial risk of violence/ sexual violence. Alabama fails to properly investigate or track and use information

that could mitigate the violence. [redacted] (SOF ¶ 8.1).

Each incident is an opportunity for ADOC to gather information to mitigate future violence. Several prisoners testified that they reported violence, but there was no investigation or follow-up. (SOF ¶ 8.2). Even when there is an investigation, ADOC fails to use available information to mitigate future violence.

LESD is responsible for investigating felonies committed in the prison system. (SOF ¶ 8.3). [redacted]. (SOF ¶ 8.4). Despite the extensive violence, there are only approximately five supervisory agents and 34 to 35 investigators in LESD covering the whole state. (SOF ¶ 8.5). During investigations of prisoner-on-prisoner violence/sexual abuse, the LESD Director testified that agents should attempt to obtain a statement from the victim, perpetrator, and witnesses, and request video, but that is not written in policy. (SOF ¶ 8.6). The LESD reports themselves do not consistently address these critical pieces of information. (SOF ¶ 8.7).

As to sexual violence, despite the increase in allegations and policy that investigators should use a preponderance of the evidence standard, Alabama uses a probable cause standard and substantiates few cases. (SOF ¶ 8.8). Alabama also fails to account for when a prisoner has been named as a suspect numerous times.

(SOF ¶ 8.9). [redacted] (SOF ¶ 8.10). [redacted] (SOF ¶ 8.11). [redacted] (SOF ¶ 8.12). [redacted] (SOF ¶ 8.13). [redacted]

[redacted] (SOF ¶ 8.14). [redacted] (SOF ¶ 8.15).

Beyond criminal investigations, it is not clear that there are any administrative investigations of prisoner-on-prisoner violence/sexual violence. (SOF ¶ 8.16).

Meanwhile, at the prison level, officers' failure to enforce policies also hinders investigations. For example, the LESD Director testified that he could not say crime scenes were properly secured by the prison's officers, despite policies requiring crime scene preservation. (SOF ¶ 8.17). [redacted] (SOF ¶¶ 8.18-8.21).

Rather than addressing the violence with thorough investigations, at the facility level, ADOC frequently addresses violence with living agreements. As [redacted] explained living agreements are for incidents that are "not serious" to "cover us" and prevent prisoners from saying that ADOC did not address the issue. (SOF ¶ 8.22). [redacted] (SOF ¶ 8.23). [redacted] It is equally clear that ADOC relies on such agreements to mitigate the need for having to hold anyone accountable, whether that be prisoners, staff, leadership, or ADOC writ large.

Proper investigation of contraband, such as the introduction of drugs or use of drugs in the prisons, is another means to mitigate the endemic violence within ADOC's prisons. [redacted] (SOF ¶ 8.24). [redacted] (SOF ¶ 8.25). Regional Director Ellington is not tracking overdoses. (SOF ¶ 8.26).

Additionally, Defendants fail to undertake other reasonable means to mitigate violence and harm to prisoners, such as proper identification and monitoring of

Security Threat Groups (STGs) within and outside of the prisons. Alabama is aware that STGs are responsible for a large portion of the violence and illegal activity in the prisons. (SOF ¶ 8.27). STG investigators, however, are not properly and reasonably used to mitigate the risk posed by STGs. There is only one STG supervisor and six investigators assigned to the STG Bureau within ADOC. (SOF ¶ 8.28). Even the LESD Director testified this staffing was inadequate for the STG Bureau to effectively complete its mission. (SOF ¶ 8.29). Effectively, ADOC is not identifying patterns, trends, and behaviors of STG members. (SOF ¶ 8.30).

The failure to track valuable information spans across the agency. For example, Commissioner Hamm testified that he does not know if contraband, inmate fights, inmate assaults, sexual assaults, or overdoses have increased or decreased during his time as Commissioner. (SOF ¶ 8.31). Chief Deputy Commissioner Lovelace testified that he has not seen any reports on the extent of violence, contraband, or sexual assault in the facilities. (SOF ¶ 8.32). PREA Director Vincent does not track repeated incidents involving the same aggressor. (SOF ¶ 8.33). Even when information about violence/sexual violence is available, Alabama does not use that information to mitigate violence to prisoners. [redacted] (SOF ¶ 8.34). [redacted]

[redacted] (SOF ¶ 8.35). In the few instances when a review team does note an area to be addressed in the prison, the warden does not follow up. (SOF ¶ 8.36). Similarly, Alabama also used to hold regular meetings where they would discuss violence in the prisons, but Alabama stopped these meetings and when the meetings occurred, Alabama did not track whether any recommended violence mitigation measures discussed at the meetings were implemented by the facility wardens. (SOF ¶ 8.37).

Alabama fails to respond reasonably to the extensive violence and sexual violence in the prisons. Alabama fails to conduct proper investigations, track valuable information, or use available information to mitigate the substantial risk of violence and sexual violence. These systemic deficiencies, taken as a whole, show deliberate indifference. *See Braggs*, 179 F.4th at 1312–15.

## V. Alabama Uses Excessive Force (United States' Count 3)

While the United States appreciates that working in correctional settings can be dangerous and requires committed staffing, staff must react within constitutional constraints and require adequate staffing, supervision, and training to accomplish this. Failure to do so is a violation of the Eighth Amendment. ADOC's failure to protect the absolute minimum safeguards for Constitutional rights is actionable, as already detailed herein. The Eighth Amendment prohibits excessive force by

corrections officers. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992). Corrections officers use excessive force when they apply force "maliciously or sadistically to cause harm," rather than in "a good-faith effort to maintain or restore discipline." *Id*. at 1-2. In evaluating whether uses of force violate the Eighth Amendment, courts look to five factors:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

*Williams v. Radford*, 64 F.4th 1185, 1196-97 (11th Cir. 2023).

Applying these factors, courts have established clear principles governing the use of force in prisons. "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990), *abrogated on other grounds by Williams*, 64 F.4th at 1198–99. At the same time, officers "may not use gratuitous force against a prisoner who has already been subdued," "incapacitated," or "restrained" by other officers, or who "no longer pose[s] a threat." *Skrtich v. Thornton*, 280 F.3d 1295, 1303-04 (11th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) ("Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need"),

*overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Similarly, "[p]epper-spraying and slamming a person to the ground without penological justification certainly offends common standards of decency." *Sconiers v. Lockhart*, 946 F.3d 1256, 1268 (11th Cir. 2020). In addition, "a prisoner initiating a verbal altercation does not give prison guards carte blanche to use force sadistically and maliciously." *Williams*, 64 F.4th at 1197. Finally, force need not cause serious injury to violate the Eighth Amendment: "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

ADOC officers repeatedly use force that violates the Eighth Amendment, as shown by criminal convictions of officers, civil settlements, and ADOC's own videos and incident reports. Beatings from officers have resulted in brain damage, fractured skulls, broken bones, and death. ADOC supervisors fail to prevent and address this unconstitutional conduct, and they use excessive force themselves. ADOC fails to effectively track and investigate uses of force, permitting excessive force to continue unchecked.

### A. ADOC Repeatedly Uses Force That Violates the Eighth Amendment.

There is no genuine dispute that ADOC officers repeatedly use force in violation of the Eighth Amendment. From 2019 through January 31, 2025, at least

12 ADOC officers and supervisors have been criminally convicted of charges related to assaulting prisoners. (SOF ¶ 9.1). *See S.E.C. v. Curshen*, No. 1:11-cv-20561, 2012 WL 1981878, at *3 (S.D. Fla. Jun. 1, 2012) (granting summary judgment based on defendant's criminal conviction and indictment). At least five other officers and supervisors were criminally charged for assaulting prisoners during this period. (SOF ¶ 9.2).

These criminal cases alone involved many malicious uses of force that seriously injured prisoners in ADOC custody. [redacted] (SOF ¶ 9.3). At [redacted] a sergeant was criminally charged for assaulting [redacted]. (SOF ¶ 9.4). At Elmore, two officers, a sergeant, and a lieutenant were convicted of an incident in which the sergeant repeatedly punched, kicked, and struck two handcuffed prisoners with a baton. (SOF ¶ 9.5). At Bibb, an officer pleaded guilty to a federal civil rights offense for an incident in which officers kicked and struck a prisoner with their batons, including while the prisoner was curled up in a fetal position. (SOF ¶ 9.6). At Staton, an officer and a sergeant were convicted of kicking a prisoner and striking

him with a baton, and then lying about the incident in a report and to a state investigator. (SOF ¶ 9.7).

ADOC's own videos and incident reports show further evidence of excessive force. (SOF ¶ 9.8). Officers have used gratuitous, retaliatory, punitive force against prisoners who were already subdued, restrained, or incapacitated. (SOF ¶ 9.9). *See Skrtich*, 280 F.3d at 1303; *see also Hudson v. Gordy*, No. 2:19-cv-00968, 2020 WL 4912619, at *4 (N.D. Ala. July 14, 2020). [redacted] (SOF ¶ 9.10). [redacted] (SOF ¶ 9.11). [redacted]

[redacted] (SOF ¶ 9.12).

ADOC officers use force to punish prisoners for past conduct, rather than in good-faith efforts to maintain order within the prisons. *See Davis v. Locke*, 936 F.2d 1208, 1212 (11th Cir. 1991) (affirming finding of excessive force where officers "intended to punish [prisoner] for his attempted escape"). [redacted] (SOF ¶ 9.13). [redacted] (SOF ¶ 9.14). [redacted] (SOF ¶ 9.15). A former Regional Director testified he received calls "[a]t least once a week" about officers spraying prisoners secured in their cells. (SOF ¶ 9.16). [redacted]

[redacted] (SOF ¶ 9.17).

Moreover, ADOC officers have repeatedly and wrongfully used force in retaliation for verbal altercations and similar minor encounters between officers and prisoners. (SOF ¶ 9.18). *See Williams*, 64 F.4th at 1197. [redacted] (SOF ¶ 9.19). [redacted] (SOF ¶ 9.20). [redacted] (SOF ¶ 9.21). [redacted] (SOF ¶ 9.22).

[redacted] (SOF ¶ 9.23). [redacted] (SOF ¶ 9.24).

After [redacted] officers used force against Steven Davis that resulted in his death, [redacted]

[redacted]

ADOC [redacted] later settled a lawsuit filed by Davis's mother for $250,000. ADOC settled that case after Judge Proctor denied in part the defendants' motion to dismiss, concluding that "fourteen incidents in three years is sufficient to plead 'obvious, flagrant, [and] rampant' abuse, especially when those incidents were purportedly brought to the attention of the supervisory officials in question." *Ray v. Gadson*, No. 2:20-cv-00499, 2023 WL 7228933, at *6 (N.D. Ala. Nov. 2, 2023). [redacted]. (SOF ¶¶ 9.25-9.26).

ADOC has settled numerous lawsuits alleging excessive force. *See, e.g.*, Order Dismissing Case After Settlement, *Wilhite v. Parker*, No. 7:20-cv-00847-KOB, Doc. 96, (N.D. Ala. Jan. 19, 2023); Joint Stipulation of Dismissal, *Mims v. Melton*, No. 5:19-cv-2045, Doc. 68 (N.D. Ala. Apr. 1, 2022); Joint Stipulation of Dismissal, *Adams v. Clemons, et al*, No. 2:19-cv-15, Doc. 38 (M.D. Ala. Feb. 14, 2022); Joint Stipulation of Dismissal, *Ray v. Gadson*, No. 2:20-cv-00499, Doc. 213 (N.D. Ala. Oct. 15, 2024); Joint Stipulation of Dismissal, *Askew v. Isaac*, No. 2:19-cv-398, Doc. 82 (M.D. Ala. Jan. 12, 2023); Joint Stipulation of Dismissal, *Spann v. Lovejoy et al*, No. 2:19-cv-706, Doc. 60 (M.D. Ala. Mar. 29, 2023); Joint Stipulation of Dismissal, *Jacoby v. Lanier*, No. 2:19-cv-1067, Doc. 128 (M.D. Ala. May 9,

2023); Order of Dismissal After Settlement, *Byrdsong v. Dunn et al.*, 2:20-cv-00301, Doc. 83 (M.D. Ala. Feb. 27, 2024); Joint Stipulation of Dismissal, *Tucker v. Alabama Dep't of Corrections et al.*, No. 2:20-cv-365, Doc. 57 (N.D. Ala. Nov. 7, 2022). (SOF ¶ 9.27). These settlements provide further evidence of repeated unconstitutional conduct. *See Perez v. Miami-Dade County*, 168 F. App'x 338, 341 (11th Cir. 2006) (considering prior settlements regarding unconstitutional conduct in Section 1983 case); *Poventud v. City of New York*, No. 07 Civ 3998, 2015 WL 1062186, at *15 (S.D.N.Y. Mar. 9, 2015) (same).

### B. ADOC's Inadequate Supervision Leads to Excessive Force, and ADOC Supervisors Use Excessive Force

Supervisors play a critical role in supporting officers and enforcing constitutional standards for conduct. *See Mathews v. Crosby*, 480 F.3d 1265, 1273–75 (11th Cir. 2007) (describing warden's failure to address "widespread abuse" by officers); *Greer v. County of San Diego*, 726 F. Supp. 3d 1058, 1083 (S.D. Cal. 2023) ("[A] jail supervisor cannot turn a blind eye to subordinate actions that would reasonably result in a denial of [constitutional] rights"). Not only do ADOC's supervisors fail to prevent and address excessive force, but they also use excessive force themselves. (SOF ¶ 10.1). Unconstitutional and criminal conduct by ADOC's sergeants, lieutenants, and captains is further evidence of systemic problems related to the use of force.

A lieutenant at Donaldson repeatedly used excessive force, culminating in his criminal conviction in 2023. [redacted] The United States Department of Justice prosecuted the lieutenant for federal civil rights violations and obstruction offenses, and he pleaded guilty in 2023. (SOF ¶ 10.2).

[redacted] a sergeant was charged with manslaughter [redacted] (SOF ¶ 10.3). [redacted] The sergeant pleaded guilty to a misdemeanor. (SOF ¶ 10.4). [redacted]

[redacted] In 2023, the Alabama State Personnel Board agreed the captain's use of force was excessive, but reversed his termination and ordered him reinstated. (SOF ¶ 10.5).

As the foregoing and following examples underscore, supervisors' use of excessive force across ADOC's facilities is systemic and well-known. At [redacted], two supervisors were convicted for an incident in which officers [redacted] (SOF ¶ 10.6). [redacted] (SOF ¶ 10.7). At Draper, a sergeant was convicted of beating three prisoners with a wooden baton, breaking one prisoner's arm, and writing a false report to cover up the incident. (SOF ¶¶ 10.8).

[redacted] (SOF ¶ 10.9). [redacted]

[redacted] (SOF ¶ 10.10). A sergeant at Staton was convicted of punching, kicking, and beating a prisoner with a baton while the prisoner was on the ground and did not resist or pose a threat to anyone. (SOF ¶ 10.11). [redacted] (SOF ¶ 10.12).

[redacted]

[redacted] (SOF ¶ 10.14).

Supervisors repeatedly fail to identify, report, or address excessive force that violates ADOC policy. (SOF ¶ 10.15). *See United States v. Hinds County Bd. of Supervisors*, 128 F.4th 616, 631 (5th Cir. 2025) (affirming finding of "jail-wide constitutional violation" where "supervisors often fail to review incident reports concerning the use of force"). [redacted] (SOF ¶ 10.16). An ADOC official admitted she had never seen a facility report in which a captain recommended corrective action. (SOF ¶ 10.17).

[redacted] (SOF ¶ 10.18). [redacted] (SOF ¶ 10.19). [redacted]

[redacted] (SOF ¶ 10.20).

[redacted] The sergeant was charged with murder. [redacted]

(SOF ¶ 10.21).

[redacted]

(SOF ¶ 10.22).

Supervisors who use and justify excessive force dissuade prisoners from reporting mistreatment. When asked whether he reported an excessive force incident, a prisoner responded:

> You go up there and try to get some paperwork and write one of these officers up and see what they do to you . . . [T]hey're going to pay one of these inmates to do this or that to you. You can't go writing an officer up . . . That's absurd.

(SOF ¶ 10.23).

**C. ADOC Fails to Effectively Investigate or Exercise Oversight Regarding Uses of Force.**

ADOC's undisputed and repeated use of unconstitutional force is sufficient to establish Eighth Amendment liability, even if ADOC thoroughly investigates and identifies excessive force. *See, e.g.*, *Danley*, 540 F.3d at 1315 (recognizing liability where supervisors "received numerous reports of [excessive force and the deliberate indifference of employees] and did nothing to remedy the situation"); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) (affirming Section 1983 liability based on "several incidents" of "excessive force" and defendant's "continued failure . . . to prevent known constitutional violations"). In this case, as clearly demonstrated above and below, ADOC does not conduct thorough investigations. ADOC's own files reveal uses of force that were not investigated at all and others that resulted in perfunctory investigations that were missing basic steps. *See Rodriguez v. County of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) (affirming

verdict and ruling based on evidence that jail "tolerated excessive force" and "promoted the practice of incomplete and ineffective investigations into deputy misconduct"). ADOC only started tracking officers' uses of force near the close of discovery in this case, and even then, it does nothing with that data. These deficiencies provide yet more evidence that ADOC's use-of-force practices violate the Eighth Amendment. *See Ewing v. Cumberland County*, 152 F. Supp. 3d 269, 305 (D.N.J. 2015) (jury could reasonably conclude that jail's procedures "were little more than a rubber stamp to justify" excessive force).

ADOC has failed to investigate uses of force documented in its own incident reports. *See Rodriguez*, 891 F.3d at 803; *Ewing*, 152 F. Supp. 3d at 305 (describing jail's "culture of ignoring and failing to investigate misconduct"). At [redacted], a prisoner testified that an officer woke him up by striking him in the head with a baton because he did not turn over fast enough. The prisoner had a sleeping disorder. He testified that a baton blow broke his arm and that the warden later arranged for him to be seen by medical. ADOC's files do not mention an officer using force in this incident. (SOF ¶ 11.1).

ADOC's investigations have found uses of force were justified without taking basic steps, like interviewing witnesses or watching available videos. (SOF ¶ 11.2). *See Rodriguez*, 891 F.3d at 803. [redacted]

[redacted] (SOF ¶ 11.3). [redacted] (SOF ¶ 11.4). [redacted] (SOF ¶ 11.5).

[redacted]

[redacted] (SOF ¶ 11.6).

[redacted] (SOF ¶ 11.7).

Until well into this litigation, ADOC did not track uses of force by officers. *See Ewing*, 152 F. Supp. 3d at 305 (jail had "no formal procedures in place to track complaints against individual officers"); *Rodriguez,* 891 F.3d at 803 (jail "had not used their force-tracking system to monitor force used against many prisoners"). Lacking such a system, ADOC has failed to prevent the same officers and supervisors, and others, from repeatedly using excessive force against prisoners. (SOF ¶ 11.8). As noted above, supervisors who were later criminally charged for excessive force had previously used excessive force against prisoners. In [redacted], an ADOC official testified that there is no "mechanism . . . to track all these [uses of

force] automatically," but asserted ADOC may undertake "informal" efforts to "manually" identify officers with repeated uses of force for wardens to "be[] aware of." The official also testified there is no system to track officers disciplined for using excessive force. (SOF ¶ 11.9). Similarly, a [redacted] testified that she had no plans for "keeping up with the use[s] of force[]" and no system to track where uses of force occur in the facility. (SOF ¶ 11.10).

ADOC's leadership fares no better. Commissioner Hamm never received training on use of force in a "correctional setting." He did not know whether ADOC had a centralized database to track uses of force. He did not know whether uses of force increased or decreased during his tenure. He had never talked to a warden about uses of force at a facility. He had never issued a directive related to use of force. He could not remember the last time he reviewed an LESD investigative report related to use of force. (SOF ¶ 11.11). *See Matthews v. Crosby*, 480 F.3d 1265, 1274 (11th Cir. 2007) (warden did not read use-of-force complaints or reports).

ADOC's investigations remain deficient. In 2022, two years after the United States' complaint, ADOC transferred use-of-force investigations to a newly created Office of Inspector General (OIG). (SOF ¶ 11.12). The Eleventh Circuit has held that "improvements in the allegedly infirm conditions of confinement, while potentially relevant, are not determinative." *LaMarca v. Turner,* 995 F.2d 1526, 1541 (11th Cir. 1993). "When a defendant corrects the alleged infirmity after suit

has been filed," the court explained, "a court may nevertheless grant injunctive relief unless the defendant shows that absent an injunction, the institution would not return to its former, unconstitutionally deficient state." *Id.*; *see also Thomas v. Bryant*, 614 F.3d 1288, 1319 (11th Cir. 2010) (affirming liability finding because prisoner would have faced continued violations "but for this litigation"). [redacted] (SOF ¶ 11.13). An ADOC use-of-force investigator testified that she did not recall any manual about how to conduct investigations, and she does not make determinations or recommendations about whether uses of force were justified. Nor did she receive training about how to complete audit forms about uses of force. The investigator concurred with facilities' findings that uses of force were justified, even when the files did not include body chart documentation, photographs, or statements from officers and prisoners. (SOF ¶ 11.14).

[redacted]

[redacted] (SOF ¶ 11.15). [redacted] (SOF ¶ 11.16). [redacted]

(SOF ¶ 11.17).

Alabama violates the Eighth Amendment by using excessive force against prisoners.

## VI. Alabama Fails to Provide Safe Conditions of Confinement (United States' Count 4)

Deprivation of basic sanitary conditions in prison can violate the Constitution. *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015). "Eighth Amendment violations can arise from 'conditions lacking basic sanitation,' including inadequate provision of hygiene items such as toilet paper." *Brooks*, 800 F.3d at 1306 (quoting *Chandler v. Baird*, 926 F.2d 1057, 1066 (11th Cir. 1991)). It can also arise from "claims of inadequate cooling and ventilation." *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004); *see also Rutledge v. Sansing*, No. 2:21-cv-00226-RDP, 2024 WL 3839516, at *14 (N.D. Ala. Aug. 15, 2024).

### A. Alabama's Prison Conditions Pose a Substantial Risk.

As noted above, Alabama has been operating its prisons above the capacity they were designed to hold for over two decades, putting significant strain on the physical infrastructure and overcrowding prisoners. (SOF ¶ 12.1). The crumbling infrastructure is used by prisoners to make weapons that contribute to the violence. (SOF ¶ 12.2). Alabama's prisons have "[e]xcessive dirt and filth, plumbing issues, physical damage to security glass and light fixtures, holes in walls, missing duct covers, rusted and disintegrating window frames, and litter . . . ." (SOF ¶ 12.3). [redacted] (SOF ¶ 12.4). *See Tillery v. Owens*, 907 F.2d 418, 424–28 (3d Cir. 1990) (affirming Eighth Amendment liability where district court

found, among other conditions, “lack of fire safety equipment”). Fires are set throughout the prisons. (SOF ¶ 12.5). Alabama fails to control the temperatures in the prisons. (SOF ¶ 12.6). The prisons also have pests and rodents. (SOF ¶ 12.7-12.20). Prisoners use contraband cellphones to share the physical conditions. (SOF ¶¶ 12.21-12.22). Alabama, itself, has acknowledged the prison conditions are not safe. (SOF ¶ 12.23). These physical conditions put prisoners at a substantial risk of harm. [redacted] (SOF ¶ 12.24).

[redacted] (SOF ¶ 12.25).

[redacted]

[redacted]

[redacted] (SOF ¶ 12.26-12.28).

### B. Alabama Fails to Respond Reasonably to Unsafe Conditions.

As the United States's expert put it: "The erosion of the physical plant of Alabama's facilities reflects the erosion of willingness or ability to manage the correctional system." (SOF ¶ 13.1). Despite acknowledging that the prisons are falling part, Alabama has failed to respond reasonably to the substantial risk posed to prisoners continuing to be incarcerated in the facilities.

For example, there is supposed to be a maintenance supervisor at each prison responsible for the day-to-day maintenance at the prison. However, not every major male prison in Alabama has at least one employee who does maintenance. (SOF ¶ 13.2). ADOC first initiated a policy to have uniform work orders for maintenance in January of 2023, but as of May 2024, Abbott did not know if the prisons were using the standard form. (SOF ¶ 13.3). There are no regularly scheduled audits of the working conditions of the facilities that maintenance is required to do yearly. (SOF ¶ 13.4). To Abbott's and Hamm's knowledge, none of the major male facilities have a written preventative maintenance plan. (SOF ¶ 13.5).

The Facilities Maintenance Division does not do any regularly scheduled audits of the working conditions of the prisons. (SOF ¶ 13.6). The person in charge of Research and Planning for ADOC does not have information related to maintenance of facility management and she does not know who would produce that data. (SOF ¶ 13.7).

While Alabama has focused attention on building new prisons that have been delayed several times (SOF ¶ 13.8), prisoners continue to face a substantial risk of harm in the current prisons due to unsafe and unsanitary conditions, in violation of the Eighth Amendment.

## VII. Conclusion

Through Alabama's own conduct, including failing to supervise prisoners, address contraband, or control prisoner movement, prisoners are subjected to a substantial risk of serious violence and sexual violence. Officers use excessive force against prisoners. Alabama also fails to address the physical conditions of the prisons, putting prisoners' health and safety at risk. These are violations of the Eighth Amendment.

The Court should, therefore, grant the United States' Motion for Summary Judgment.

Respectfully submitted,


PHILLIP W. WILLIAMS JR.
United States Attorney

/s/ *Carla Ward*
CARLA C. WARD
Deputy Civil Chief

JASON R. CHEEK
Chief, Civil Division

GRACE J. POSEY
ALEX MCKENZIE LAGANKE
DON B. LONG III
Assistant United States Attorneys
United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203
(205) 244-2185
carla.ward@usdoj.gov

ASHLEY LIGHT
EILEEN ULATE
MATTHEW J. DONNELLY
CRISTINA GAMONDI
JULIA Z. HALLER
PATRICIA NATION
JOSHUA BACHMAN
MARLYSHA MYRTHIL
JOSHUA BEDOYA
ELENA BEN DAVID
Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 718-2258
ashley.light@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Carla Ward*
CARLA C. WARD
Attorney for the United States