FILED
2026 Oct-02 PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-cv-01971-HDM** |
| | ) | |
| **STATE OF ALABAMA and ALABAMA DEPARTMENT OF CORRECTIONS,** | ) | **OPPOSED** |
| | ) | |
| **Defendants.** | ) | |

**THE STATE'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................1

PLAINTIFF'S CLAIMS ...............................................................................3

LEGAL STANDARDS .................................................................................5

I. Summary Judgment Standard ..................................................................5

II. CRIPA .....................................................................................................7

III. Eighth Amendment Deliberate Indifference ...........................................8

STATEMENT OF UNDISPUTED FACTS ....................................................10

I. Correctional Staffing..................................................................................10

A. The National Correctional Staffing Crisis ..............................................10

B. ADOC's Staffing Analysis Process .........................................................13

C. Alabama's Response to the Correctional Staffing Crisis ........................23

D. Alabama's Recruitment & Retention Efforts ..........................................35

E. Correctional Staffing Levels within ADOC's Facilities ..........................53

F. Correctional Staffing within the Bureau of Prisons ("BOP") ..................70

G. BOP's Response to the National Correctional Staffing Crisis .................73

H. BOP's Augmentation Process ..................................................................78

I. BOP-Specific Correctional Staffing. ..........................................................80

1. FCI Atlanta ...............................................................................................80

2. FCC Coleman ...........................................................................................82

3. USP Hazelton ...........................................................................................84

4. FCC Yazoo City .......................................................................................86

II. Use of Force ......................................................................................88

A. ADOC's Use-of-Force Policy Effective Until January 27, 2025............89

B. Use of Force Training Under the 2015 Use-of-Force Policy...................92

C. Investigations Under the 2015 Use-of-Force Policy ...............................95

D. Discipline Under the 2015 Use-of-Force Policy ...................................103

E. Criminal Referrals Under the 2015 Use-of-Force Policy ......................106

F. Development of ADOC's New Use-of-Force Policy and New Use of Force Manual ...............................................................................108

G. ADOC's Revised Use-of-Force Policy and New Use of Force Manual ...............................................................................................111

H. Training on ADOC's New Use-of-Force Policy and Use of Force Manual ...............................................................................................114

I. Investigations Under ADOC's New Use of Force Policy and Manual ...............................................................................................116

J. Discipline for Improper Uses of Force Under the New Use-of-Force Policy .................................................................................................120

K. Dr. Quinn's Testimony with Respect to Use of Force ...........................123

III. Classification........................................................................................124

A. Plaintiff's Expert Opinions Concerning Classification..........................124

B. Development of ADOC's Classification System..................................127

C. ADOC's Classification Policy and Manual ..........................................129

D. Initial Classification..............................................................................132

E. Review of Initial Classification Recommendations ..............................141

F. Periodic Classification Reviews and Reclassification ..........................142

G. Safety Information Used in Classification and Housing Decisions.......151

ARGUMENT ....................................................................................................157

I. The Court Should Grant Summary Judgment to the State to the Extent Plaintiff's Claims Rely on Allegations of Correctional Understaffing. .......157

A. All of Plaintiff's Claims Rely Substantially on Allegations of Correctional Understaffing. ..............................................................157

B. Plaintiff Cannot Establish Deliberate Indifference as to Correctional Staffing. ..........................................................................................161

1. External Factors, not Controlled by the State, Directly Contribute to ADOC's Correctional Staffing Challenges.................163

2. The State Responded Reasonably to Correctional Staffing Challenges. ........................................................................................166

II. The Court Should Grant Summary Judgment to the State on Plaintiff's Use-of-Force Claim. ......................................................................180

A. Plaintiff Cannot Establish a Sufficiently Serious Deprivation with Respect to Use of Force.......................................................................182

B. Plaintiff Cannot Establish Criminal Recklessness as to Excessive Force. ...........................................................................................184

1. The Record Reflects that ADOC Implemented Adequate Policies and Procedures Regarding Use of Force. ............................185

2. Plaintiff Cannot Demonstrate A "Widespread History of Abuse" or that Supervisors Knew Subordinates Would use Excessive Force and Failed to Stop Them. ......................................189

C. The Record Establishes ADOC's Reasonable Response as to Excessive Force. .......................................................................191

III. The Court Should Grant Summary Judgment to the State to the Extent Plaintiff's Inmate Violence and Sexual Abuse Claims Rely on Allegations Regarding ADOC's Classification Policies. .............................193

A. Plaintiff Cannot Establish a Sufficiently Serious Deprivation Related to ADOC's Classification Policies..........................................194

B. Plaintiff Cannot Establish Deliberate Indifference as to Classification. ....198

CONCLUSION ....201

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 182

*Barker v. Norman*,
651 F.2d 1107 (5th Cir. 1981) .......... 6

*Bennett v. Parker*,
898 F.2d 1530 (11th Cir. 1990) .......... 183

*Bonner v. City of Prichard, Ala.*,
661 F.2d 1206 (11th Cir. 1981) .......... 6

*Case v. Montana*,
607 U.S. 107 (2026) .......... 184

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 6

*Cockrell v. Sparks*,
510 F.3d 1307 (11th Cir. 2007) .......... 182

*Cottone v. Jenne*,
326 F.3d 1352 (11th Cir. 2003) .......... 181

*Danley v. Allen*,
540 F.3d 1298 (11th Cir. 2008) .......... 182, 183

*Dunn v. Comm'r, Ala. Dep't of Corr.*,
179 F.4th 1277 (11th Cir. 2026) .......... Passim

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... Passim

*Goodman v. Kimbrough*,
718 F.3d 1325 (11th Cir. 2013)........................................................................ 172

*Helling v. McKinney*,
509 U.S. 25 (1993)............................................................................................ 10

*Hudson v. McMillian*,
503 U.S. 1 (1992).............................................................................................. 181

*In re HealthSouth Corp.*,
308 F. Supp. 2d 1253 (N.D. Ala. 2004)............................................................ 6, 7

*Ingram v. Kubik*,
30 F.4th 1241 (11th Cir. 2022)......................................................................... 184

*LaMarca v. Turner*,
995 F.2d 1526 (11th Cir. 1993)........................................................................ 175

*Marbut v. Phillips*,
176 F.4th 1256 (11th Cir. 2026)....................................................................... 184

*Mathews v. Crosby*,
480 F.3d 1265 (11th Cir. 2007)....................................................................Passim

*Mosley v. Zachery*,
966 F.3d 1265 (11th Cir. 2020)..................................................................... 9, 199

*Mulvania v. Sheriff of Rock Island Cnty.*,
850 F.3d 849 (7th Cir. 2017)............................................................................ 190

*Pearson v. Callahan*,
555 U.S. 223 (2009)..................................................................................... 181, 182

*Peate v. McCann*,
294 F.3d 879 (7th Cir. 2002)............................................................................ 174

*Rasho v. Jeffreys*,
22 F.4th 703 (7th Cir. 2022).........................................................................Passim

*Rosario v. Brawn*,
670 F.3d 816 (7th Cir. 2012) ........ 174

*Skrtich v. Thornton*,
280 F.3d 1295, 1300 (11th Cir. 2002) ........ 182

*Swain v. Junior*,
961 F.3d 1276 (11th Cir. 2020) ........ Passim

*Valentine v. Collier*,
993 F.3d 270 (5th Cir. 2021) ........ 173

*Wade v. McDade*,
106 F.4th 1251 (11th Cir. 2024) ........ Passim

*Whitley v. Albers*,
475 U.S. 312 (1986) ........ 182

*Wilson v. Seiter*,
501 U.S. 294 (1991) ........ 8, 171

*Wilson v. Williams*,
961 F.3d 829 (6th Cir. June 9, 2020) ........ 171, 173

**STATUTES**

18 U.S.C. § 4351(a) ........ 73

18 U.S.C. § 4351(b) ........ 73

18 U.S.C. § 4351(c) ........ 73

42 U.S.C. § 1997(a) ........ 7

Ala. Code § 14-1-20 ........ 28

Ala. Code § 14-1-20(a) ........ 28

Ala. Code § 14-1-20(b)(2) ........ 29

**RULES**

Fed. R. Civ. P. 56 ........................................................................................ 7

Fed. R. Civ. P.  56(a)................................................................................. 5, 6

Fed. R. Civ. P.  56(c)...................................................................................... 6

Fed. R. Civ. P. 56(e)........................................................................................ 6

Defendants the State of Alabama ("Alabama") and Alabama Department of Corrections ("ADOC," and together with Alabama, the "State") submit this Memorandum of Law in Support of their Motion for Summary Judgment (doc. 372). In accordance with this Court's Orders (docs. 294, 348), the State submitted its Evidentiary Submission on August 28, 2026, and August 31, 2026, (docs. 360, 361, 364, 373, 374, 375, 376), and evidentiary citations contained herein reference the State's Evidentiary Submission by ECF page numbers.

## INTRODUCTION

The State of Alabama and its Department of Corrections have worked for years to proactively address the present-day challenges of operating a prison system, and they continue to address those challenges today. In the face of a persistent and on-going national correctional staffing shortage readily acknowledged by Plaintiff's retained experts, the State invested hundreds of millions of dollars and countless hours of time from members of ADOC's leadership focused solely upon the recruitment and retention of correctional officers. The State employed creative, diverse, and comprehensive measures to combat the on-going national crisis in correctional staffing shortages. As a result, in the midst of this crisis, ADOC's correctional staffing numbers increased substantially and continue to do so. ADOC reconsidered, revised, and improved its policies with the intent of improving officer training, performance, and outcomes within its prison system. When correctional

staff members engage in isolated acts of excessive use of force, ADOC investigates the incidents, disciplines the officers, and refers them for criminal prosecution where appropriate. ADOC continues to rely upon long-standing, well-accepted correctional practices and principles in classifying its inmate population in order to appropriately manage its facilities. Again, even Plaintiff's retained experts agree that ADOC maintains appropriate classification policies. These facts and conclusions are beyond dispute. Far from showing that the State acted with deliberate indifference in these areas, the extensive record developed through discovery in this action and reflected in the State's evidence demonstrates the State's reasonable response, and, indeed, positive actions to address these challenges.

Rather than applauding the efforts of the State in these areas, Plaintiff simply ignores them in their entirety. Rather than acknowledging the actions of the State, Plaintiff highlights old, anecdotal, cherry-picked evidence that fails to reflect the conditions across ADOC facilities. In response to this Motion for Summary Judgment, Plaintiff will almost certainly continue its efforts to suppress and distract from the undisputed evidence regarding the success of the State in undertaking unprecedented steps over more than a decade to address these challenges. Even worse, while Plaintiff attempts to condemn the State of Alabama's correctional facilities over issues related to correctional staffing shortages, Plaintiff suffers from the same challenges, which Plaintiff has yet to correct, in its own prison system. For

the reasons outlined in this Memorandum and based upon the undisputed facts supported by the evidence submitted by the State, the State is entitled to judgment as a matter of law to the extent Plaintiff asserts any claim for any relief related to correctional staffing, uses of force by correctional staff, or ADOC's long-standing classification policies and procedures.

The State's Motion for Summary Judgment attempts to capture decades of work by the State of Alabama and its Department of Corrections in these areas. It is no small task given all of the time, energy, and resources invested by the State in its facilities. However, as set forth below, the State submits that the Court should grant it summary judgment on the following claims and issues:

(1) All four of Plaintiff's claims to the extent those claims rely on allegations of alleged correctional understaffing;

(2) Plaintiff's excessive force claim (Count Three) in its entirety; and

(3) Plaintiff's inmate violence and inmate sexual abuse claims (Counts One and Two) to the extent those claims rely on allegations regarding ADOC's classification policies.

For the reasons set forth below, the State respectfully requests that the Court grant it summary judgment on these claims and issues.

## PLAINTIFF'S CLAIMS

Plaintiff purports to assert four claims in the Second Amended Complaint: failure to protect from inmate-on-inmate violence (doc. 71, ¶¶ 264-66); failure to protect from inmate-on-inmate sexual abuse (id., ¶¶ 267-69); failure to protect from

use of excessive force (id., ¶¶ 270-72); and failure to provide safe conditions (id., ¶¶ 273-75). Plaintiff's Second Amended Complaint includes a section entitled "Defendants are Deliberately Indifferent to the Serious Risk of Substantial Harm." (Id., ¶¶ 254-63, the "Deliberate Indifference Allegations"). This section purports to articulate the bases for each of Plaintiff's claims. (See id., ¶ 265 (inmate violence), ¶ 268 (inmate sexual violence), ¶ 271 (excessive force), and ¶ 274 (safe conditions) (each citing the Deliberate Indifference Allegations in support of allegations that the State "exhibited deliberate indifference to the serious risk of substantial harm" in each of these areas)). Plaintiff's Deliberate Indifference Allegations largely focus on ADOC's correctional staffing vacancies. (Id., ¶¶ 256a-e, 258, 259). Hence, on the face of Plaintiff's Second Amended Complaint, Plaintiff presents correctional staffing as the central basis for its requested finding of deliberate indifference as to each of Plaintiff's claims.

In similar manner, Plaintiff alleges that the State's "classification" policies contribute to inmate violence and inmate sexual abuse. For example, the Second Amended Complaint alleges claims with respect to violence, arguing that the State "fail[s] to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should be kept separate." (Doc. 71, ¶ 113). With respect to issues of inmate sexual violence, Plaintiff avers: "ADOC's failure to supervise prisoners and enforce classification and housing

assignments" enables "sexual predators . . . to move from unit to unit without intervention, which results in sexual abuse." (Doc. 71, ¶ 153; see also id., ¶ 155 (alleging that the State "fail[s] to employ adequate screening, classification, and housing of prisoners to prevent sexual abuse")). Thus, while Plaintiff does not purport to set out its claim related to "classification" in a numbered count, Plaintiff clearly alleges that ADOC's allegedly insufficient classification policies and procedures underlie its claims regarding inmate violence and inmate sexual abuse.

Accordingly, the State moves for summary judgment on all four of Plaintiff's claims to the extent Plaintiff relies on allegations regarding correctional understaffing. Additionally, the State moves for summary judgment on those two claims to the extent Plaintiff relies on allegations regarding classification to support them. Finally, the State moves for summary judgment on Plaintiff's excessive force claim (Count Three) in its entirety.

## LEGAL STANDARDS

### I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought," and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, a plaintiff must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

Moreover, "'[i]n cases that involve complicated fact patterns and multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties but not as to others; the necessary predicate for a decision on a summary judgment motion is a sorting out of causes of action and defendants.'" In re HealthSouth Corp., 308 F. Supp. 2d 1253, 1266 n. 21 (N.D. Ala. 2004) (quoting Barker v. Norman, 651 F.2d 1107, 1123 (5th Cir. 1981)).[1]

> The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16

[1] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981).

> and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact.

Fed. R. Civ. P. 56 advisory committee's notes to 1946 amendment; see also In re HealthSouth Corp., 308 F. Supp. 2d 1253, 1266 n. 22 (N.D. Ala. 2004) (quoting Fed. R. Civ. P. 56 advisory committee's notes to 1946 amendment). As to the issues set forth below, Plaintiff cannot produce any, much less substantial, evidence supporting its claims. Accordingly, the Court should grant summary judgment in favor of the State on these issues.

## II. CRIPA

CRIPA authorizes only "such equitable relief as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of such rights, privileges, or immunities." 42 U.S.C. § 1997(a). As this Court previously held, "CRIPA is a statutory vehicle that confers standing on the Attorney General to enforce existing constitutional rights and federal statutory rights." (Doc. 57 at 7). Thus, CRIPA itself creates no rights but exists only as a means to enforce, in this case, the Eighth Amendment rights of inmates in Alabama's men's facilities. Accordingly, as this Court held, to succeed on its claims, Plaintiff must establish "both the objective and subjective elements of an Eighth Amendment violation within each count." (Doc. 57 at 5).

## III. EIGHTH AMENDMENT DELIBERATE INDIFFERENCE

A claim against a governmental official or entity consists of two distinct elements. First, Plaintiff must prove that inmates faced a "deprivation" that "was 'objectively, sufficiently serious.'" Wade v. McDade, 106 F.4th 1251, 1256 (11th Cir. 2024) (*en banc*) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (additional internal quotation marks and citation omitted). Second, Plaintiff must demonstrate that the State possessed "a 'sufficiently culpable state of mind'—*i.e.*, 'deliberate indifference." Id. (quoting Farmer, 511 U.S. at 824).

"Deliberate indifference itself has two components—one subjective and one objective." Dunn v. Comm'r, Ala. Dep't of Corr., 179 F.4th 1277, 1292 (11th Cir. 2026). To satisfy the subjective standard, the "plaintiff must show that the defendant acted with 'subjective recklessness as used in the criminal law.'" Wade, 106 F.4th at 1253 (quoting Farmer, 511 U.S. at 839). The subjective recklessness standard requires the plaintiff to "demonstrate that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." Id. This "subjective approach isolates those who inflict punishment." Farmer, 511 U.S. at 839; see also Wade, 106 F.4th at 1257 (observing that "'[t]he Eighth Amendment does not outlaw cruel and unusual conditions; it outlaws cruel and unusual punishments'") (quoting Farmer, 511 U.S. at 837) (some internal quotation marks omitted); Wilson v. Seiter, 501 U.S. 294, 300 (1991) ("If the pain

inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify."). Therefore, the subjective prong of the deliberate-indifference standard requires that the conduct qualify as punishment to invoke the Eighth Amendment's prohibition against cruel and unusual punishments.

Under the objective prong of the deliberate-indifference standard, "even if the defendant 'actually knew of a substantial risk to inmate health or safety,' he cannot be found liable under the Cruel and Unusual Punishments Clause if he 'responded reasonably to th[at] risk.'" Wade, 106 F.4th at 1257 (quoting Farmer, 511 U.S. at 844); Swain v. Junior, 961 F.3d 1276, 1286 (11th Cir. 2020) ("Indeed, even where 'prison officials . . . actually knew of a substantial risk to inmate health or safety,' they may nonetheless 'be found free from liability if they responded reasonably to the risk'—and, importantly for present purposes, 'even if the harm ultimately was not averted.'") (quoting Farmer, 511 U.S. at 844). "So 'a plaintiff must show both that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner.'" Dunn, 179 F.4th at 1292 (quoting Mosley v. Zachery, 966 F.3d 1265, 1270 (11th Cir. 2020)). Moreover, "'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct.'" Farmer, 511 U.S. at 845 (quoting

Helling v. McKinney, 509 U.S. 25, 36 (1993)). Therefore, "to survive summary judgment" on a deliberate-indifference claim, a plaintiff "must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . ." Farmer, 511 U.S. at 845-46. Plaintiff cannot meet this standard with respect to the issues set forth below.

## STATEMENT OF UNDISPUTED FACTS

### I. CORRECTIONAL STAFFING

#### A. THE NATIONAL CORRECTIONAL STAFFING CRISIS

1. Plaintiff retained Martin Horn ("Horn") as an expert to evaluate conditions within ADOC's men's facilities, with Horn testifying that he "was asked to focus on the contraband and inter-personal violence issues." (Doc. 361 (Ex. 168) at 266:18-22).

2. Horn agrees a "national crisis [exists] around correctional staffing." (Doc. 361 (Ex. 168) at 262:13-16).

3. Plaintiff retained Kenneth Ray ("Ray") as an expert on correctional staffing, and Ray agreed that "the sole area of focus" of his expert retention in this case is "correctional staffing." (Doc. 373-26 (Ex. 160) at 32:5-12).

4. Ray acknowledged that there "has been a general decline in the number of people working correctional officer jobs," which has grown over approximately fifteen years and "grown steady through and has persevered after [the] pandemic." (Doc. 373-26 (Ex. 160) at 140:3-17).

5. According to public-employment data published by the U.S. Census Bureau, state prison staffing nationwide decreased approximately 10% between 2019 and 2022, and 21 states experienced decreases in corrections staffing exceeding 10% during this same timeframe. (Doc. 360-7 (Ex. 7) at 3-4)

6. At least thirteen states, including Texas, Tennessee, Georgia, South Carolina, and Florida, experienced declines in correctional staffing of more than 25% between 2017 and 2022. (Doc. 360-5 (Ex. 5) at 3).

7. In 2022, the state prison population rose 2.2% while the number of corrections officers continued to fall sharply (-11.65%). (Id. at 2).

8. The number of people employed by state prisons nationwide reached its lowest level in more than two decades in 2022. (Doc. 360-8 (Ex. 8) at 1).

9. On February 28, 2024, the Senate Subcommittee on Criminal Justice and Terrorism held a hearing entitled "The Nation's Correctional Staffing Crisis: Assessing the Toll on Correctional Officers and Incarcerated Persons." (Doc. 360-127 (Ex. 128)). Concerning the national correctional staffing crisis, the National President of the Council of Prison Locals, Brandy Moore White, provided a written

statement asserting BOP only employed approximately 12,300 correctional officers against an appropriated level of 20,446 officers, approximately 40% below the appropriated number. (Id.).

10. During the 2024 Senate hearing, witness testimony described the correctional staffing crisis as a national problem affecting prisons and jails across state lines and resulting in excessive work hours, multiple mandated shifts, burnout, and use of non-custody staff to fill custody posts. (Doc. 380-127 (Ex. 128); Doc. 360-4 (Ex. 4)).

11. As of January 2024, 15,309 of the 18,255 authorized correctional officer positions were filled by BOP. (Doc. 373-29 (Ex. 163) at 50:6-51:15). Additionally, as of the first pay period of 2024, BOP employed 1,500 fewer correctional officers than the first pay period in 2019. (Id. at 103:15-23).

12. Former Pennsylvania Secretary of Corrections John Wetzel testified before the United States Senate in 2024: "The most significant challenge our correctional systems face is insufficient staffing." (Doc. 360-125 (Ex. 126)).

13. During the fourth quarter of fiscal year 2024, BOP reported that nine federal institutions had inmate-to-correctional-officer ratios greater than 15:1. (Doc. 360-124 (Ex. 125)).

14. The national crisis surrounding the shortage of correctional officers has been the subject of media reports. (Doc. 361 (Ex. 168) at 280:19-23).

## B. ADOC'S STAFFING ANALYSIS PROCESS

15. Horn agreed that correctional staffing levels represent "an important factor" in Plaintiff's claims:

> Q: . . . Of the issues in your report including contraband, uses of force, classifications, inmate movement, extortion, count, let's just start with those. Does ADOC's current staffing levels contribute, in your mind, to those particular issues?
>
> A: I believe it does.
>
> Q: All of them?
>
> A: I believe it does.
>
> Q: Okay. Would you say that staffing is the principal contributing factor in all of those areas?
>
> A: Yeah, I would certainly say it's important. Is it principal? I don't know. I'd have to think about that. I can't – I don't know. I'd have to really think about that more. But it's – I'll concede that it's an important factor.

(Doc. 361 (Ex. 168) at 384:16-385:11).

16. A staffing analysis includes a calculation of a "shift-relief factor" which helps officials identify "the difference between how many hours a year you need staff for and how many you have staff for." (Doc. 373-26 (Ex. 160) at 84:20-85:4).

17. The shift-relief factor formula "include[es] all off time." (Id.).

18. "Some of the adjustments that can be made during a shift to safely and securely operate a facility that might not involve the filling of every post" include

reducing certain activities that "don't increase the risk of harm." (Id. at 79:20-80:5-3).

19. When asked, Ray agreed, "a staffing analysis is an appropriate process and mechanism to determine correctional staffing needs inside of a prison." (Id. at 77:5-10).

20. Ray concurred that "different prisons typically have different staffing needs," depending on the age and design of a facility, security practices, technology, housing configuration, restrictive housing, the number of mentally ill inmates, death-row operations, medical transports, gates and barriers, institutional classification level, educational programs, post-plan design, and gang affiliations. (Id. at 112:10-118:13).

21. Ray agreed that "an appropriate part of the staffing analysis process" is a byproduct referred to as a "post plan." (Id. at 77:11-18).

22. Correctional staffing may be organized into two twelve-hour shifts or three eight-hour shifts. (Id. at 68:17-22).

23. Two twelve-hour shifts versus three eight-hour shifts carry "benefits and risks." (Id. at 69:18-21).

24. A post plan "indicates on a shift-by-shift basis where officers should be deployed on each shift." (Id. at 77:23-78:3).

25. Ray affirmed, "[s]tatewide personnel policies that relate to overtime, vacation time, time off, Family Medical Leave Act leave, workers' compensation leave, all of those, that personnel data needs to be considered in terms of a staffing analysis." (Id. at 72:4-10).

26. Ray explained that different prisons have similar and different staffing needs, depending on age, design, security practices, and technology used. (Id. at 112:10-20). Bonner similarly testified "[t]here's no one staffing plan that's going to be the same for every facility." (Doc. (Ex. 173) at 55:20-56:14).

27. "Even if you have two facilities that are right next door to each other and they seem to mirror each other and how they're built, if there are different populations," then factors such as "different things that affect the physical plant, different numbers of the population, if that fluctuates," will contribute towards a staffing plan that may be different per facility. (Doc. 373-38 (Ex. 173) at 56:6-14).

28. One part of the staffing analysis process includes consideration of "structured and unstructured activities, movements," which Ray described as "sort of a time study." (Doc. 373-26 (Ex. 160) at 72:11-73:4).

29. Whether a facility houses inmates in a dormitory setting versus celled environment may affect staffing needs. (Id. at 112:21-113:3).

30. Gates, barriers, and the configuration of housing units in terms of inmate movement and the manner of controlling inmate movement can impact staffing needs. (Id. at 114:4-9).

31. The daily schedule at a correctional facility can affect the staffing analysis. (Id. at 71:21-72:3).

32. Educational programming can affect staffing levels. (Id. at 118:3-6).

33. The frequency with which inmates must be transported off-site for medical or mental health treatment affects staffing needs. (Id. at 113:22-114:3).

34. The number of inmates affiliated with gangs or security-threat groups can affect staffing needs. (Id. at 118:10-21).

35. The existence of death row may affect a facility's staffing requirements. (Id. at 113:18-21).

36. The number of mentally ill inmates at a facility may affect its staffing needs. (Id. at 113:9-12).

37. Whether a correctional agency uses a particular housing unit for general-population inmates or restrictive housing may affect staffing requirements. (Id. at 113:4-8).

38. A staffing analysis "typically doesn't anticipate or calculate overtime." (Id. at 92:8-12).

39. Russ and Meg Savage (collectively, the "Savages") were former corrections practitioners who provided "staffing analyses and training on doing staffing analysis at the facility level," and were "heavily involved and instrumental in authoring the products that the National Institute of Corrections ("NIC") uses to train on staffing." (Doc. 373-19 (Ex. 153) at 72:15-73:8).

40. During former Commissioner Jefferson Dunn's ("Dunn") tenure, ADOC adopted the Savages' staffing analysis process for "developing of a post plan for every shift and every activity in each individual facility." (Id. at 332:10-333:16).

41. The Savages provided ADOC's wardens the ability to identify different categories of posts, including "critical" and "routine" posts, making it "much more effective in helping the wardens make resource decisions." (Id. at 333:10-16).

42. [redacted]

43. [redacted] Before becoming Coordinator, she worked as a Special Projects Coordinator, assisting the former RPU Coordinator with the 2022 staffing analysis until the end of January. (Id. at 11:1-20).

44. The RPU assists "[ADOC] facilities with any questions they may have regarding their staffing analysis or their post plan or general questions relating to the analysis." (Id. at 14:11-16).

45. "So per AR-238, [ADOC's staffing] analysis gets updated every two years"; therefore, "[w]e go through every facility like we've never conducted an analysis here before and we review the documents and do site visits and make recommendations for any changes or updates that the facility may need." (Id. at 14:19-20, 15:1-5).

46. The RPU performs each staffing analysis using the same process as the original analysis and following NIC guidelines. (Id. at 37:23-38:5).

47. Every other year the RPU publishes a staffing review report submitted to Operations, including Lambert-Hughes "review[ing] the current staffing analysis and not[ing] any facility changes, mission changes, additions of buildings, something that will need to be prioritized for the staffing update year which will be this year." (Id. at 19:3-14).

48. [redacted] She also received NIC staffing implementation training starting in November of 2022 through January of 2023, involving "how to conduct a staffing analysis from start to finish." (Id. at 12:11-20).

49. ADOC's RPU conducts staffing analyses "based on the needs of the facility" and does not "factor in budgetary concerns." (Id. at 36:23-37:2).

50. In conducting the 2022 staffing analysis, ADOC's RPU visited each facility and each post at each facility. (Doc. 373-5 (Ex. 139) at 60:14-61:2).

51. In performing a staffing analysis, the RPU does not consider the number of officers currently employed at the facility. (Doc. 373-13 (Ex. 147) at 49:21-50:8). Instead, the RPU considers the facility's physical plant, including sight lines, and recommends the number and location of posts needed. (Id.).

52. ADOC's RPU analyzed each area based on the number of inmates, number of officers, necessity for officer coverage, inmate custody level, activities occurring within the facility, and inmate movement. (Doc. 373-5 (Ex. 139) at 60:14-61:2).

53. The RPU spoke with inmates and staff while on site at the facilities. (Id.).

54. The RPU's 2022 staffing analysis included consideration of "critical incidents within the past five years," with facility leaders reviewing documents and incident reports relating to those incidents. (Doc. 373-13 (Ex. 147) at 75:18-76:24).

55. The RPU's staffing analysis evaluates how many officers are required to fill each post by applying a shift-relief factor. (Id. at 52:10-24, 54:16-22). The

shift-relief factor accounts for leave, days available, and days unavailable and is used to calculate the full-time-equivalent staffing number required for a post. (Id.).

56. The RPU's staffing analysis "denotes the type of housing unit and inmate population and gives a recommendation for the number of officers." (Id. at 57:22-58:2).

57. When conducting a staffing analysis, ADOC's RPU reviews discipline and incidents occurring at the facility, including the facility's security level and how inmates are housed, to determine whether an additional post or additional officers should be added. (Id. at 59:14-21).

58. In performing a post analysis, RPU personnel observe the post, analyze its functions and tasks, review the applicable SOPs, and interview the officer working the post to determine whether a new post or additional staff are needed. (Id. at 61:6-62:1).

59. The "critical minimum staffing," as used by ADOC's RPU, is a specific minimum level of security staffing derived from a staffing analysis and identified in each facility's post plan. (Id. at 45:8-18).

60. ADOC has completed four staffing analyses since 2016. (Doc. 373-26 (Ex. 160) at 73:9-12).

61. ADOC's staffing analysis process included visits to each facility and each post at each facility to analyze the area in terms of number of inmates, number

of officers, and the necessity of officer coverage in that area. (Doc. 373-5 (Ex. 139) at 60:14-61:2).

62. ADOC completed all four staffing analyses in a professional manner according to Ray. (Doc. 373-26 (Ex. 160) at 74:6-8).

63. When asked, Ray agreed "all four [of ADOC's] staffing analyses considered all of the appropriate information." (Id. at 74:9-12).

64. Horn testified that Alabama conducted its staffing-analysis process in an "appropriate and reasonable" manner. (Doc. 361 (Ex. 168) at 251:11-15).

65. Each ADOC facility utilizes a post plan. (Id. at 256:4-8).

66. ADOC prioritizes posts with its posts plan. (Doc. 361 (Ex. 168) at 256:9-257:7).

67. "Every critical post is mandatory but not every mandatory post is critical." (Doc. 373-13 (Ex. 147) at 45:21-46:4).

68. Under the NIC approach reflected in ADOC's post plan and staffing analysis, ADOC's facilities assign staff by priority "from the outside in." (Id.).

69. Each facility's staffing Standard Operating Procedure identifies posts classified as critical and classified as mandatory. (Id. at 47:16-24).

70. An "essential" post differs from a critical or mandatory post because it "can be temporarily interrupted without significant impact to the facility." (Id. at 48:7-11).

71. Critical posts generally include towers, central control, housing units, and other critical operations such as feeding and pill call. (Id. at 48:25-49:6).

72. "Critical minimum staffing" is derived from the number of critical posts at a particular facility, and the number of critical posts may change based on that facility's needs. (Id. at 49:7-14).

73. Each ADOC facility determines which mandatory posts are prioritized as critical, and most facilities prioritize towers, central control, and housing units, although additional critical posts may vary by facility. (Id. at 52:25-53:18).

74. ADOC designates critical posts as the "highest priority," "must be covered," and, if not covered, the vacant post must be reported through the chain of command to Central Office. (Doc. 373-49 (Ex. 184) at 86:3-17).

75. ADOC also maintains shift rosters to permit the assessment of vacant posts. (Id. at 80:17-81:8).

76. When asked, Ray agreed "adjustments can be made in the implementation of a post plan to safely and securely run an institution without all of the officers called for in a staffing analysis…or post plan." (Doc. 373-26 (Ex. 160) at 79:13-19).

77. ADOC's post plans provide shift-by-shift guidance concerning where correctional officers should be deployed. (Id. at 77:19-78:3).

78. ADOC's AR 238 requires any facility that falls below critical minimum staffing levels to report the event to a Regional Director, who in turn reports the event to ADOC's RPU. (Doc. 373-13 (Ex. 147) at 55:14-19).

79. If an ADOC facility falls below critical minimum staffing levels, the Regional Director may take steps to increase staffing, fill the uncovered posts, or request resources from other facilities. (Id. at 56:5-10).

80. As of February 16, 2024, the RPU Coordinator had not received any notifications that a facility had fallen below critical minimum staffing and was unaware of any such prior notifications. (Id. at 55:16-56:2).

81. Lambert-Hughes receives post-assignment rosters, including both day and night shifts, and testified that facility leadership know she reviews those rosters. (Id. at 35:21-36:16).

82. Lambert-Hughes testified that, based on her review, ADOC was covering all shifts in line with the staffing analysis. (Id. at 35:6-20).

### C. ALABAMA'S RESPONSE TO THE CORRECTIONAL STAFFING CRISIS

83. Ray wrote in his report:

> Addressing these [correctional staffing] issues requires urgent, structured, and systematically implemented reforms from policymakers and facility administrators. Enhanced recruitment, significant salary boosts, retention incentives, and budget adjustments are essential steps towards stabilizing staffing levels. Additionally, integrating advanced technological solutions and

> improving training can help mitigate the risks posed by high inmate to supervisory ratios. This comprehensive approach is crucial for reversing the deteriorating conditions in correctional facilities and ensuring the safety and security of both staff and inmates.

(Ray Report (Pl. Ex. 121) at 72).

84. At his deposition, Ray admitted he was not aware of any of these recommendations that ADOC had not already implemented. (Doc. 373-26 (Ex. 160) at 236:19-245:13; see also id. at 245:17-246:4 and Doc. 360-130 (Ex. 131) (showing ADOC's budget almost doubled between 2015 and 2024)).

85. Ray admitted he did not know how Alabama's compensation compares to other states. (Doc. 373-26 (Ex. 160) at 234:19-21).

86. When shown a document comparing Alabama's starting correctional officer salaries to other states' starting correctional officer salaries (and showing that Alabama's starting salary exceeds those in New York, Tennessee, Texas, Florida, Washington, and South Carolina), Ray admitted that the Alabama legislature and ADOC took a significant step of making sure that Alabama had competitive salaries for first year correctional officers. (Doc. 373-26 (Ex. 160) at 234:22-236:18 and Doc. 360-129 (Ex. 130)).

87. Alabama experiences statewide unemployment and labor participation rates lower than national averages, both of which "create a major challenge for all employers across Alabama, including ADOC." (Doc. 361 (Ex. 281) at 19-30; Doc.

373-34 (Ex. 169) at 84:12-25; Doc. 373-35 (Ex. 170) at 179:18-180:3, 185:13-186:1, 194:8-13, 201:1-14).

88. Ward stated "[t]here are simply not enough people to meet job demand in Alabama." (Doc. 361 (Ex. 281) at 31).

89. "Nine of [ADOC's] thirteen major men's facilities are located in counties with a population of less than 100,000 people," which "negatively impacts the availability of qualified labor." (Doc. 361 (Ex. 281) at 31).

90. Younger workers seek "flexible work and work-life balance," which "largely do not align with careers in corrections due to the 24/7 nature of operations and the increasing staffing challenges that require staff to work mandatory overtime." (Doc. 361 (Ex. 281) at 36-37; Doc. 373-34 (Ex. 169) at 74:6-22; 373-35 (Ex. 170) at 151:7-16, 152:16-19, 186:7-187:2)).

91. Younger workers also wish to maintain the ability "to communicate by text and email" while at work, and, "[c]urrently, corrections does not allow for the use of technology in the form of cell phones while at work." (Doc. 361 (Ex. 281) at 36-37; Doc. 373-34 (Ex. 169) at 74:6-18; 373-35 (Ex. 170) at 151:7-16, 152:16-19, 186:7-187:2)).

92. ADOC experienced an increase in the number of correctional security staff "from 2,579 in FY 2006 to 3,179" in FY 2010. (Doc. 360-83 (Ex. 84) at 26).

93. "The number of graduates from the Training Academy . . . consistently increased" from FY 2005 to FY 2010, "with nearly 400 in FY 2010." (Id.).

94. In 2011, ADOC employed 3,054 total correctional staff. (Doc. 360-84 (Ex. 85) at 47).

95. In 2012, ADOC employed 3,024 total correctional staff. (Doc. 360-85 (Ex. 86) at 37).

96. In 2013, ADOC employed 2,920 total correctional staff. (Doc. 360-86 (Ex. 87) at 33).

97. In 2014, ADOC employed 2,915 total correctional staff. (Doc. 360-87 (Ex. 88) at 38).

98. In 2015, ADOC employed 2,843 total correctional staff. (Doc. 360-88 (Ex. 89) at 43).

99. Dunn served as Commissioner of the Alabama Department of Corrections from April 1, 2015, through December 31, 2021. (Doc. (Ex. 153) at 8:7-14).

100. Early in former Commissioner Dunn's tenure, ADOC operated under a staffing-ratio concept under which inmate classification affected the assumed ratio of inmates to officers. (Doc. 373-19 (Ex. 153) at 332:10-23).

101. Former Commissioner Dunn was "not aware of anybody in the industry that continues with that practice" because "every facility is different and every inmate population is different." (Id. at 333:1-5).

102. Former Commissioner Dunn believed that "appropriate and competitive compensation is a very important element of staffing." (Doc. 373-19 (Ex. 153) at 329:12-14).

103. Former Commissioner Dunn explained that, although he did not believe "compensation is everything," he considered it "certainly a significant part of any plan to address a staffing issue." (Id. at 329:21-330:2).

104. In approximately 2016, ADOC obtained what former Commissioner Dunn believed was then "the largest pay increase that the department had ever had in the history of the department." (Id. at 169:16-23)

105. When asked whether changing ADOC's compensation structure could improve staffing, former Commissioner Dunn responded: "I not only believe it, I believe the evidence shows it." (Id. at 330:3-8).

106. In 2019, ADOC published its first strategic plan under former Commissioner Dunn, covering the timeframe from 2019 to 2022. (Id. at 320:19-321:17).

107. According to former Commissioner Dunn, ADOC "work[ed] hard to increase the staffing across the board throughout [the]entire department" in order to

implement the Strategic Plan's goals and objectives, and increased staffing, professional development, and compensation were intended to work together to achieve those objectives. (Id. at 339:22-340:20).

108. During former Commissioner Dunn's tenure, ADOC also hired two marketing firms to "improve our marketing, our lead generation, but also our onboarding, our initial training." (Id. at 170:7-21).

109. ADOC, under former Commissioner Dunn's leadership, "opened up additional training academies in order to address the situation" with staffing. (Id. at 170:12-21).

110. ADOC's staffing efforts under former Commissioner Dunn took "a very positive turn" in approximately January or February 2019, before COVID "completely changed everything." (Id. at 341:13-23).

111. COVID hindered ADOC's efforts to increase staffing. (Id. at 170:18-21).

112. Horn "ha[s] the sense" that correctional staffing levels dropped after COVID-19. (Doc. 361 (Ex. 168) at 264:19-21).

113. In 2019, Ala. Code § 14-1-20 authorized ADOC to offer structured hiring and retention bonuses to correctional officers and directed ADOC to establish a program specifically designed to increase correctional officer hiring and retention. (Ala. Code § 14-1-20(a)).

114. The statutory program established under Ala. Code § 14-1-20 applied to all qualifying appointments made between May 29, 2019, and December 31, 2022, and allowed ADOC to continue paying bonuses to eligible officers through December 31, 2025. (Ala. Code § 14-1-20(b)(2)).

115. In 2021, former Commissioner Dunn "advocat[ed] and work[ed] hard to increase the staffing across the board throughout [the] entire department." (Doc. 373-19 (Ex. 153) at 339:22-340:5).

116. According to former Commissioner Dunn, increased staffing was one piece of a larger strategy. (Id. at 340:6-20). Dunn testified that "[w]ith increased numbers of staff accompanying the training program that we were putting in place, the professional development system that we were putting in place, the compensation system that we were putting into place, all of those things together" would enable ADOC to fulfill its strategic goals. (Id.).

117. ADOC's staffing initiatives during former Commissioner Dunn's tenure consisted of "a holistic array of specific initiatives to increase staffing." (Id. at 169:16-19).

118. ADOC used augmentation from other facilities to address correctional staffing requirements at St. Clair. (Id. at 175:15-20). Correctional staff from Limestone, Decatur, and Hamilton A&I would "travel on a temporary basis to fulfill staffing requirements at St. Clair." (Id.).

119. ADOC's augmentation program operated on a rotational basis: employees would work at St. Clair "for a certain period of time" and then "rotate back to their facility." (Id. at 176:8-14).

120. ADOC continued to use its rotational augmentation program when former Commissioner Dunn left office at the end of December of 2021. (Id. at 176:12-14).

121. As part of addressing St. Clair's physical-security challenges, ADOC was "working to put as many correctional officers on the floor as possible to rove [in that] facility." (Id. at 215:14-18).

122. Between 2021 and 2022, the Alabama Legislature implemented two statewide pay increases for state employees, including correctional staff. (Doc. 373-26 (Ex. 160) at 231:1-232:3; Doc. 360-120 (Ex. 121) at ¶ 21).

123. During this timeframe, ADOC implemented an employee referral bonus under which employees could receive compensation for referring other employees. (Doc. 373-26 (Ex. 160) at 233:1-5).

124. Ray described ADOC's employee-referral bonus as a positive development. (Doc. 373-26 (Ex. 160) at 233:1-8).

125. Ray likewise agreed that retention bonuses for employees who stayed on the job for specified periods constituted another positive development in terms of ADOC's response to its correctional staffing levels. (Id. at 233:9-234:1).

126. In 2016, ADOC created new correctional classifications, including a basic correctional officer classification and a cubicle-officer classification, as part of its staffing initiatives. (Doc. 373-19 (Ex. 153) at 170:4-6, 173:1-7).

127. The duties of a cubicle officer represented "a narrow portion of a much broader responsibility of a certified—APOSTC-certified correctional officer." (Id. at 173:21-174:9).

128. ADOC created and specifically trained cubicle officers "in order to bring the correctional officers out of the cubes onto the floor." (Id.).

129. ADOC also trained its new cubicle officers "to be especially observant." (Id. at 215:14-20).

130. The creation of the basic correctional officer position was a collaborative effort between ADOC and Alabama's State Personnel Department ("SPD") "to assist in the desire to significantly increase our staff." (Id. at 148:20-149:5).

131. During former Commissioner Dunn's tenure, SPD's system imposed limitations on ADOC because it was "set up primarily to hire from within," but "[ADOC] worked within the system that we had to develop and produce the highest-quality individuals that we could." (Id. at 143:16-144:2).

132. Former Commissioner Dunn specifically credited the SPD with being "very helpful" when ADOC created the basic correctional officer and cubicle-officer positions, calling the work "a collaborative effort." (Id. at 144:16-145:11).

133. Correctional staffing challenges extend well beyond Alabama, as former Commissioner Dunn found ADOC's challenges "echo what most of my colleagues around the country now say is the greatest challenge in corrections, which is staffing." (Id. at 215:20-216:1).

134. Former Commissioner Dunn stated that "every day I was commissioner until the very last day, we worked hard to do everything within our power to improve our staffing position." (Id. at 217:4-8).

135. Former Commissioner Dunn further testified that "nothing was off the table, from my perspective, as an idea to be considered to help staffing." (Id. at 217:8-10).

136. Some aspects of ADOC's operational plans were dependent upon matters outside ADOC's control, particularly staffing, "which was heavily reliant on people choosing to come to work for the department, which we had influence but certainly not control." (Id. at 292:3-13).

137. Former Commissioner Dunn acknowledged that "working conditions and the institutional environment [do] play a role" in retention. (Id. at 331:4-8).

138. Former Commissioner Dunn explained the retention rationale behind ADOC's $1.3 billion infrastructure revitalization plan as follows: "If you give people conditions to work in in which they want to come to work and they want to be there, then the likelihood is that you're going to retain, all things being equal." (Id. at 331:15-332:1).

139. Former Commissioner Dunn testified that "[ADOC is] building new prisons to address a whole host of challenges that we identified throughout the entire system." (Id. at 332:5-9).

140. Former Commissioner Dunn did not view personnel alone as determinative of facility safety because "in corrections, there are so many factors that lead to the safety and security equation, I would not pin it on one particular factor like personnel." (Id. at 145:17-146:9).

141. ADOC's staffing initiatives continued through Dunn's tenure and continued to receive State support after his departure. (Id. at 150:14-151:3).

142. Former Commissioner Dunn left office on December 31, 2021. (Id. at 8:7-11).

143. When John Hamm ("Hamm") became ADOC Commissioner on January 1, 2022, his number one priority since becoming Commissioner centered around correctional staffing. (Doc. 373-20 (Ex. 154) at 8:16-18; 25:8-9).

144. Former Commissioner Hamm described correctional staffing as the "number one issue." (Id. at 38:21-39:2).

145. ADOC maintains "enough staff to keep correctional staff and inmates safe." (Id. at 42:20-43:3).

146. ADOC implemented additional compensation measures in FY 2023, including a salary increase of approximately 10%, revised salary ranges for officer classifications, and the creation of the Correctional Security Guard ("CSG") Senior position, which provided "[qualified] CSGs a promotional pay raise and subsequent probationary raise equivalent to the compression pay raise implemented for security staff." (Doc. 360-120 (Ex. 121) at ¶¶ 20, 21, 36).

147. In March 2023, ADOC "worked with the Governor's Office and State personnel to raise correctional officers salaries by approximately $20,000." (Doc. 373-19 (Ex. 154) at 25:24-26:3).

148. Following the 2023 salary increases, ADOC posted available correctional officer and security jobs on Indeed (an employment platform to search, and apply, for jobs). (Doc. 373-13 (Ex. 147) at 44:5-13).

149. When Dr. Wendy Williams, Deputy Commissioner of Operations-Men's Services ("Williams"), assumed her role in January 2022, her "immediate goal was to make sure [ADOC was] creating an environment at those facilities where staff wanted to work there and stay there." (Doc. 373-55 (Ex. 190) at 34:2-11).

150. During this same time, the topic of recruitment and retention of correctional officers constituted a regular focus on meetings among ADOC's executive staff on a weekly or bi-weekly basis. (Id. at 34:2-35:7).

### D. ALABAMA'S RECRUITMENT & RETENTION EFFORTS

151. When asked, Ray, agreed "recruiting for vacant correctional officer positions. . . is harder today than it was ten years ago." (Doc. 373-26 (Ex. 160) at 338:5-11).

152. ADOC's "primary means of 'advertising' open correctional positions a decade ago involved radio ads offered during the Alabama and Auburn football games." (Doc. 373-35 (Ex. 170) at 233:18-23).

153. ADOC "consistently" advertised correctional openings on social media for years and was "acting on social media reasonably as far back as 2018, maybe 2017." (Id. at 290:17-291:10).

154. ADOC's recruitment strategy included "targeted digital campaigns including social media, email, text, billboards, and digital ads." (Id. at 290:11-16).

155. ADOC's social-media strategy sought to "hone in on some of these target markets, ideal candidates." (Id. at 291:3-10).

156. ADOC used "digital billboards across the state" through Markstein before January 2024. (Id. at 293:14-23).

157. In 2019, ADOC partnered with Troy University to conduct a validation study to develop a correction-specific Physical Agility/Ability Test ("PAAT"). (Doc. 360-120 (Ex. 121) at ¶ 59).

158. The goal of the validation study included the development of a PAAT specific to the ADOC Correctional Officer job duties and developing a scoring rubric that scored applicants on overall performance. (Id.).

159. The Alabama Peace Officers' Standards and Training Commission ("APOSTC") adopted the validation study effective October 1, 2022, for a three-year trial period. (Id.).

160. ADOC subsequently obtained approval to provide Correctional Officer Trainees ("COT") additional time to satisfy the physical ability requirement. (Id.).

161. Instead of requiring applicants to pass the physical ability test within the first week of the Academy, ADOC permitted trainees additional opportunities during the first six weeks. (Id.).

162. The modified assessment also replaced a strict pass/fail approach with a scoring system permitting stronger performance in one area to offset lower performance in another. (Id.).

163. On February 27, 2024, APOSTC Academy permanently adopted the modified physical ability test and performance rubric. (Id.).

164. In 2017, ADOC retained Warren Averett, an accounting and advisory firm, to provide recommendations regarding recruiting and retaining correctional staff. (Doc. 361 (Ex. 11)). In April 2019, Warren Averett issued its report, entitled "Recruiting and Retaining Correctional Officers, A Report for the Alabama Department of Corrections." (Id.).

165. Warren Averett was retained to review ADOC's compensation package for COTs and conducted separate analyses of "COT entry-level pay" and ADOC's "benefits package." (Id. at 78).

166. Warren Averett's compensation analysis included "an internal review of current practices and programs and an external review of the competitive job market," including ADOC documents, data, and employee interviews. (Id. at 78).

167. Warren Averett recommended increasing the starting COT salary from $29,371 to between approximately $36,500 and $38,500 because doing so would "make the base pay more competitive with other positions in the marketplace" and "reduce the impact of compensation as a deterrent" to prospective employees. (Id. at 71).

168. One compensation option recommended a COT base salary of approximately $36,500 to $37,500 together with an "Academy graduation bonus" paid partly upon certification and partly six months later. (Id. at 83).

169. Warren Averett's alternative compensation option recommended a higher COT base salary of approximately $37,500 to $38,500 without an Academy-graduation bonus. (Id. at 83).

170. Both compensation options recommended maintaining ADOC's existing education differentials and providing a "3% Locality Payment" in Alabama labor markets with at least a 3% cost-of-labor premium. (Id. at 83).

171. Warren Averett recommended that ADOC consider a $2,000 to $10,000 "sign on/retention bonus" that would be paid in stages following Academy graduation and at one, two, and three years of employment as an APOSTC-certified correctional officer. (Id. at 71).

172. Warren Averett concluded that "[i]ncreasing compensation, in conjunction with a sign-on/retention bonus," would make ADOC correctional-officer positions more competitive with other law-enforcement positions. (Id. at 71).

173. Warren Averett recommended increasing ADOC's existing employee-referral bonus from $500 to $1,000, with payments made after the referred employee completed 90 days and one year of employment. (Id. at 71).

174. By the time Warren Averett issued its report, ADOC had already adopted changes to its historical uniform policy, which Warren Averett reported "resulted in positive feedback from the COs." (Id. at 108).

175. ADOC "lost a lot of employees during COVID." (Doc. 373-55 (Ex. 190) at 35:12-13).

176. In June 2023, ADOC hired a new Personnel Director, whose responsibilities included improving the efficiency of ADOC's hiring process and administering the correctional-staff bonus program. (Doc. 360-120 (Ex. 121) at ¶ 13).

177. Renee Minor ("Minor") became ADOC's Personnel Director on June 1, 2023. (Doc. 373-45 (Ex. 180) at 13:21-14:8). In that role, she oversees personnel transactions, a team dedicated to hiring security personnel, and the recruiting division. (Id. at 19:9-25).

178. Commissioner Hamm instructed Minor to make hiring CSGs and COTs her personnel priority and instructed her "to hire as many officers as quickly as we can." (Id. at 133:16-134:15).

179. In August 2023, ADOC hired a Hiring Manager to manage the Hiring Unit and provide strategic planning for correctional staff hiring. (Id. at 23:4-6).

180. ADOC's Hiring Manager worked with APOSTC and ADOC's Strategic Security Threat Group Division to improve the hiring and candidate-vetting processes. (Doc. 360-120 (Ex. 121) at ¶ 14).

181. As of January 2024, ADOC's recruiting operation included Recruiting Director Napoleon Goodson ("Goodson"), four Recruiting Lieutenants assigned to

different regions of the State, and a newly hired Talent Acquisition Manager. (Doc. 373-45 (Ex. 180) at 24:23-25:18).

182. ADOC added the Talent Acquisition Manager to take security and non-security recruiting "to sort of a higher level," including more targeted recruiting for specific areas and facilities. (Id. at 25:19-26:5).

183. Since adding the Talent Acquisition Manager, ADOC modified its marketing and branding efforts, developed relationships with community partners, and pursued new recruiting initiatives. (Doc. 360-120 (Ex. 121) at ¶ 16).

184. ADOC retained Horizon Point Consulting to assist with its recruitment activities. (Doc. 373-45 (Ex. 180) at 121:6-23)

185. [redacted]

186. [redacted]

187. ADOC implemented ApplicantPro to track applicants through the security-hiring process. (Doc. 373-45 (Ex. 180) at 23:7-24:19).

188. ADOC utilizes ApplicantPro to post COT and CSG positions on Indeed and to track candidates from initial expression of interest through recruiting, background checks, and hiring. (Id.).

189. Horizon Point assisted with the implementation of ApplicantPro; trained ADOC's hiring team on the system; provided staffing and applicant statistics; and offered recruiting ideas concerning outreach, job fairs, advertising, and applicant communications. (Id. at 123:12-124:23).

190. Between March 2023 and May 25, 2023, ApplicantPro reported 1,243 individuals expressed interest in employment with ADOC. (Doc. 373-40 (Ex. 175) at 57:3-5).

191. ADOC's recruiting team follows up with candidates appearing in ApplicantPro, assists them through the initial application steps for COT and CSG positions, attends job fairs, and conducts hiring events throughout Alabama. (Doc. 373-45 (Ex. 180) at 33:2-21).

192. ADOC facilities can utilize ApplicantPro to "see if there are candidates interested in a CSG position at their facility." (Id. at 57:3-11).

193. ADOC restructured its approach to correctional officer hiring events to make the hiring process more accessible to applicants. (Doc. 360-120 (Ex. 121) at ¶ 32).

194. Hiring events permit applicants to complete multiple components of the hiring process at one location, including the physical ability test, interview, fingerprinting, criminal-history screening, drug testing, and submission of required documentation. (Id. at ¶ 32).

195. ADOC expanded the number and geographic distribution of hiring events to reduce the distance applicants must travel to participate in the hiring process. (Id. at ¶ 32).

196. ADOC has also conducted additional localized hiring events designed to market to those areas with the highest success rate of attendees. (Id. at ¶ 32).

197. Beginning in August 2023, ADOC began offering Saturday hiring events to provide applicants with additional opportunities to participate outside their existing work schedules. (Id. at ¶ 33).

198. Before hiring events, ADOC personnel conduct pre-event calls to potential candidates to confirm attendance. (Id. at ¶ 46).

199. ADOC streamlined the hiring process for CSGs. (Id. at ¶ 27).

200. CSGs perform specified security functions in non-contact or limited-contact positions, including control rooms, monitoring posts, and gate posts. (Id. at ¶ 27).

201. Because CSGs do not perform the full range of duties assigned to certified Correctional Officers, they can complete a shorter training program and be placed into facilities more quickly. (Id. at ¶ 27).

202. ADOC adjusted the CSG hiring process in multiple different ways after July 2023 to improve its efficiency. (Id. at ¶ 27).

203. ADOC created a CSG Senior classification that provides eligible employees an opportunity for promotion and associated pay increase. (Id. at ¶ 28).

204. ADOC also created a Correctional Officer–Hourly classification to bring experienced, APOSTC-certified law-enforcement personnel back into correctional facilities on a part-time basis. (Id. at ¶ 29).

205. Retired or active APOSTC-certified personnel can serve in Correctional Officer–Hourly positions. (Id.).

206. The Correctional Officer–Hourly classification allows ADOC to draw upon experienced security personnel. (Id.).

207. In 2019, ADOC hosted 16 hiring events with 1,498 total attendees. (Id. at ¶ 36).

208. In 2020, ADOC hosted 14 hiring events with 849 total attendees. (Id.).

209. In 2021, ADOC hosted 17 hiring events with 443 total attendees. (Id.).

210. In 2022, ADOC hosted 17 hiring events with 375 total attendees. (Id.).

211. In 2023, ADOC hosted 57 hiring events with 691 total attendees. (Id.).

212. In 2024, ADOC hosted 138 hiring events with 2,230 total attendees. (Id.).

213. ADOC sends recruiting officers to college and high-school career fairs to meet with students. (Id. at ¶ 34).

214. ADOC recruiting personnel meet with students and members of the public at career fairs to expand the pool of potential applicants. (Id.).

215. ADOC recruiters work to develop relationships with faculty at Alabama high schools. (Id.).

216. ADOC maintains a database of high-school career counselors to facilitate continued recruiting outreach. (Id.).

217. From October 2024 to November 2024, ADOC attended the following job fairs: Jacksonville State University; Career Day hosted by Alabama Career Center; Jefferson State University; Columbus State University; Troy University; Alexander City Career Center; West Alabama University; Northport City Hall Workforce Initiative; East Alabama Works Oxford; Alexander City Career Center; University of West Alabama; Stillman College; AUM State of Alabama; Veteran and Public Job Fair Tuscaloosa Career Center; Jasper Career Center and Bevill State Job Far; Veteran Resource and Hiring Fair-Opelika Career Center; Handley High School Next Steps College and Career Fair-Roanoke; Jacksonville State University Social Services Career Fair; Veteran Resources and Hiring Job Fair Auburn,

Alabama; Goodwill Career Center Job Fair Phenix City; University of Alabama Huntsville Spring Career Fair; Big Lots Distribution Job Fair Hosted by ADOL-Montgomery; and Bay Minette Veteran and Job Expo Alabama Career Center. (Id. at ¶ 37).

218. ADOC recruiting officers also attend career fairs in neighboring states. (Id. at ¶ 35).

219. ADOC uses social media as a recruiting tool. (Id. at ¶ 38).

220. ADOC uses a social-media management platform to track interactions and impressions generated by recruitment content. (Id.).

221. ADOC analyzes social-media performance data to determine which recruiting strategies generate applicant interest. (Id.).

222. ADOC also recruits through television, radio, newspapers, public billboards, Indeed, and the ADOC website. (Id. at ¶ 40).

223. ADOC uses sponsored Indeed.com advertisements targeted geographically around facilities. (Id. at ¶ 41).

224. ADOC uses Indeed matching tools and artificial-intelligence tools to identify potential applicants. (Doc. 360-120 (Ex. 121) at ¶ 40).

225. ADOC's new Talent Acquisition Manager created a 60-day social media content calendar to manage ADOC's online platforms. (Doc. 360-120 (Ex. 121) at ¶ 16).

226. In 2024, ADOC also initiated a rebranding of ADOC's social media campaigns, resulting in an increase of 12.5% in total engagements across ADOC's online platforms for the 30-day period compared to the previous 30-day period; an increase of 7.1% in total impressions across ADOC's online platforms for the 30-day period compared to the previous 30-day period; and an increase of 24.5% in total net audience growth across ADOC's online platforms. (Id. at ¶ 39).

227. In 2024, ADOC's Talent Acquisition Manager also developed a project tracker for progress of all marketing resources and created a Recruiting Style Guide for use on all marketing resources. (Id. at ¶ 17).

228. ADOC implemented facility-specific job listings and typically places successful COT applicants at a facility of their choice or at a nearby facility when operational demands require another placement. (Doc. 373-45 (Ex. 180) at 57:3-58:5).

229. ADOC took a variety of measures to reduce delays in the hiring process for correctional staff. (Doc. 373-45 (Ex. 180) at 134:16-136:20).

230. ADOC entered into a Memorandum of Understanding with the Alabama Department of Public Health so ADOC could obtain required birth certificates for Alabama-born applicants and pay the associated cost in a shorter timeframe. (Doc. 373-45 (Ex. 180) at 134:18-135:16; Doc. 360-120 (Ex. 121) at ¶ 43).

231. By obtaining and paying for the required birth certificates itself, ADOC removed an administrative and financial barrier from the correctional-officer hiring process. (Doc. 373-45 (Ex. 180) at 134:16-135:16).

232. ADOC's hiring manager has been working to make the personnel division the proctor of the basic aptitude test (otherwise referred to as the BAT test or WorkKeys) so that ADOC can schedule those tests itself. (Doc. 373-45 (Ex. 180) at 135:17-136:2).

233. ADOC coordinated with its Office of Health Services to provide a mobile medical unit for on-site medical examinations at hiring events. (Doc. 360-120 (Ex. 121) at ¶ 44).

234. The mobile medical unit eliminates the need for qualifying applicants to travel to another facility or arrange a separate medical examination with a private medical provider. (Id.).

235. Providing medical examinations at hiring events expedites the hiring process and reduces or eliminates medical-examination costs to applicants. (Id.).

236. ADOC also "is looking at hiring [their] own licensed professional counselors to do psych evals as staff members so that we're not. . . bound and limited by [the contract company] schedule." (Doc. 373-45 (Ex. 180) at 136:6-20).

237. ADOC added personnel dedicated to the timely processing of Certificates of Eligibles for qualified applicants. (Doc. 360-120 (Ex. 121) at ¶ 15).

238. When asked whether ADOC leadership previously provided sufficient support to overcome these hiring barriers, Minor answered, "Absolutely." (Doc. 373-45 (Ex. 180) at 137:4-7).

239. Minor stated "it was easy to be able to implement these things and remove those barriers. . . because at the Department of Corrections, that's what they're about. They're about improving the process." (Doc. 373-45 (Ex. 180) at 137:4-20).

240. ADOC also retained a company by the name of RippleWorx to assist with retention. (Doc. 373-45 (Ex. 180) at 121:24-122:6).

241. As part of ADOC's retention efforts, ADOC charged RippleWorx with the task of increasing employee engagement so that correctional staff would feel comfortable raising issues or concerns and believe those concerns would be heard and addressed. (Doc. 373-45 (Ex. 180) at 125:19-126:12).

242. Prior to June 2023, ADOC also established a Correctional Security Guard ("CSG") Senior classification as a retention measure. (Doc. 373-45 (Ex. 180) at 14:1-4, 72:6-73:7; see also Doc. 361 (Ex. 168) at 267:9-268:10).

243. ADOC began making promotions to CSG Senior in September of 2023 "in an effort to give a little bit of a career path to those correctional security guards that might incentivize them to stay." (Doc. 373-45 (Ex. 180) at 72:11-16).

244. In March 2023, ADOC implemented one of the largest correctional officer pay range increases in its history, increasing the starting salary for COTs from approximately $35,000 to approximately $51,000 annually. (Doc. 360-120 (Ex. 121) at ¶ 21).

245. ADOC's 2023 salary increases were intended, among other things, to incentivize security officers to remain employed with ADOC. (Doc. 373-45 (Ex. 180) at 72:17-21).

246. COTs are eligible for approximately 27% in additional pay increases during their first eighteen to twenty-four months of employment. (Doc. 360-120 (Ex. 121) at ¶ 21).

247. The State "almost doubled" correctional officer salaries over approximately five years, which Plaintiff's staffing expert characterized as a "very positive trajectory." (Doc. 373-26 (Ex. 160) at 231:18-232:7).

248. These pay increases produced positive recruitment and retention results. (Doc. 373-26 (Ex. 160) at 232:8-13).

249. ADOC advertised the increased correctional officer salaries through social-media platforms and online job-posting platforms, including Indeed. (Doc. 360-120 (Ex. 121) at ¶ 22).

250. Following the 2023 salary increase, ADOC received thousands of applications for open positions and experienced increases in the size of its APOSTC Academy graduating classes. (Id.).

251. In 2023, ADOC created the Correctional Officer – Hourly classification following the enactment of legislation allowing for a $52,000 earnings threshold for retired correctional officers under the Retirement Systems of Alabama ("RSA"). (Doc. 360-120 (Ex. 121) at¶ 29). Prior to this legislative enactment, this classification of officers could only earn an hourly rate equivalent to their rate of pay at retirement, which typically did not reach the $52,000 limit. (Id.). This initiative was intended to increase retention among existing retirees and provide an incentive for other retirees to return to ADOC. (Id.).

252. As of December 31, 2023, ADOC employed 157 individuals in the Correctional Officer – Hourly classification at the facilities. (Id. at ¶ 30).

253. As of December 31, 2024, ADOC employed 244 individuals in the Correctional Officer – Hourly classification at the facilities. (Id. at ¶ 31).

254. Beginning in 2024, ADOC partnered with the Alabama Community College System ("ACCS") to create the ACTIVATE program. (Id. at ¶ 52).

255. ACTIVATE is a six-week, no-cost college and career readiness program targeting individuals who want to become ADOC correctional officers but may need additional assistance to meet pre-employment standards. (Id.).

256. After successful completion of ACTIVATE, participants may proceed to the APOSTC Academy for certification as ADOC correctional officers. (Id.).

257. Upon completion, participants may earn up to nine college credit hours at an Alabama community college and are eligible to transition into the 10-week APOSTC Academy for certification as an ADOC correctional officer. (Id.).

258. ADOC expanded ACTIVATE from its initial locations at Reid State Technical College and Jefferson State Community College to additional community colleges. (Id. at ¶ 53).

259. Between August 12, 2024, and September 20, 2024, the ACTIVATE program resulted in 20 newly hired correctional officers assigned as follows: Bibb (3), Donaldson (4), Easterling (1), Fountain (4), Holman (3), Limestone (1), St. Clair (3) and Staton (1). (Doc. 360-120 (Ex. 121) at ¶ 54).

260. From December 16, 2024, to January 24, 2025, the ACTIVATE program resulted in 21 newly hired correctional officers assigned to Bibb (1), Donaldson (3), Limestone (7), St. Clair (4), Staton (3), and Kilby (3). (Id. at ¶ 55).

261. ADOC also contracted with private-security companies, including Allied Universal and Security Solutions, to provide private security guards at several facilities. (Doc. 373-45 (Ex. 180) at 118:20-119:13; see also Doc. 361 (Ex. 168) at 267:9-268:10).

262. ADOC deployed private security guards to noncontact posts so that certified correctional staff could be placed "on the floors moving around" with the inmate population. (Doc. 373-55 (Ex. 190) at 69:5-22).

263. The use of private security guards did not reduce or alter ADOC's effort to hire its own correctional personnel. (Doc. 373-45 (Ex. 180) at 120:3-8).

264. As of September 2024, ADOC had hired "close to 250 private security guards … statewide." (Doc. 373-55 (Ex. 190) at 11:12-14, 70:17-25).

265. ADOC implemented a Field Training Officer ("FTO") program to provide standardized orientation and mentoring to newly hired correctional staff. (Doc. 360-120 (Ex. 121) at ¶ 56).

266. The FTO program provides a standardized initial orientation for newly hired correctional staff. ADOC assigns an FTO to each CSG and COT for on-site mentoring at the CSG or COT's assigned site. (Id.).

267. The program assists new correctional officers in transitioning from the APOSTC Academy into facility operations. (Id.).

268. ADOC updates the Field Training Officer program to improve continuous evaluation of correctional officer performance under actual field conditions, identify areas requiring additional training, and provide remedial instruction when necessary. (Id. at ¶ 57).

269. Ray testified that he did not know what else ADOC could do to increase its correctional staffing levels. (Doc. 373-26 (Ex. 160) at 274:13-275:11).

## E. Correctional Staffing Levels within ADOC's Facilities

270. At the outset of employment with ADOC, incoming applicants for correctional officer positions must attend a ten-week APOSTC Academy during which incoming applicants receive training in various different disciplines. (Doc. 360-120 (Ex. 121) at ¶ 60).

271. In 2019, 169 applicants graduated from the APOSTC Academy for employment with ADOC. (Doc. 360-120 (Ex. 121) at ¶ 63).

272. In 2020, 89 applicants graduated from the APOSTC Academy for employment with ADOC. (Id.).

273. In 2021, 72 applicants graduated from the APOSTC Academy for employment with ADOC. (Id.).

274. In 2022, 52 applicants graduated from the APOSTC Academy for employment with ADOC. (Id.).

275. In 2023, 160 applicants graduated from the APOSTC Academy for employment with ADOC. (Id.).

276. In 2024, 266 applicants graduated from the APOSTC Academy for employment with ADOC. (Id.).

277. ADOC routinely reports its correctional staffing levels in its Quarterly Correctional Staffing Reports in the lawsuit styled Braggs, *et al*. v. Hamm, *et al*., In the Middle District of Alabama, Northern Division; Case No. 2:14-cv-00601-MHT ("Braggs"). (Docs. 360-89 (Ex. 90), 360-90 (Ex. 91), 360-91 (Ex. 92), 360-92 (Ex. 93), 360-93 (Ex. 94), 360-94 (Ex. 95), 360-95 (Ex. 96), 360-96 (Ex. 97), 360-97 (Ex. 98), 360-98 (Ex. 99), 360-99 (Ex. 100), 360-100 (Ex. 101), 360-101 (Ex. 102), 360-102 (Ex. 103), 360-103 (Ex. 104), 360-104 (Ex. 105), 360-105 (Ex. 106), 360-106 (Ex. 107), 360-107 (Ex. 108), 360-108 (Ex. 109), 360-109 (Ex. 110), 360-110 (Ex. 111), 360-111 (Ex. 112), 360-112 (Ex. 113), 360-113 (Ex. 114), 360-114 (Ex. 115), 360-115 (Ex. 116) 360-116 (Ex. 117)).

278. These Quarterly Correctional Staffing Reports from Braggs also report "vacancy rates" for correctional staff for each reporting period. (Id.).

279. When asked if the vacancy rate of a facility can be determined without a staffing analysis, Horn answered, "I'm not sure its meaningful to you if you don't look at the staffing analysis." (Doc. 361 (Ex. 168) at 253:11-254:7).

280. For example, knowing that a facility experiences a ten-percent vacancy rate does not, by itself, help understand the operational impact. (Doc. 361 (Ex. 168) at 253:19-254:7).

281. Horn agreed with the statement that "[e]very state that I know of has some vacancy rate." (Doc. 361 (Ex. 168) at 263:6-8).

282. ADOC's facilities experienced varying vacancy rates between 2018 and 2024. (Docs. 360-89 (Ex. 90), 360-90 (Ex. 91), 360-91 (Ex. 92), 360-92 (Ex. 93), 360-93 (Ex. 94), 360-94 (Ex. 95), 360-95 (Ex. 96), 360-96 (Ex. 97), 360-97 (Ex. 98), 360-98 (Ex. 99), 360-99 (Ex. 100), 360-100 (Ex. 101), 360-101 (Ex. 102), 360-102 (Ex. 103), 360-103 (Ex. 104), 360-104 (Ex. 105), 360-105 (Ex. 106), 360-106 (Ex. 107), 360-107 (Ex. 108), 360-108 (Ex. 109), 360-109 (Ex. 110), 360-110 (Ex. 111), 360-111 (Ex. 112), 360-112 (Ex. 113), 360-113 (Ex. 114), 360-114 (Ex. 115), 360-115 (Ex. 116) 360-116 (Ex. 117)) ("Braggs Quarterly Staffing Reports").

283. As the following graph illustrates, Bibb's correctional staffing[2] levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

284. Between Q3 2022 and Q4 2024, correctional staffing levels at Bibb increased by 85.7%. (Id.).

285. Bibb employed five additional supervisors in Q4 2024 compared to Q4 2023. (Id.).

---

[2] The term "correctional staffing" includes Correctional Cubicle Officers ("CCOs"), Correctional Security Guards ("CSGs"), Correctional Officers ("COs"), Correctional Officers – Hourly ("CO Hourly"), Correctional Officer Trainees ("COTs"), Part Time Officers ("PTs"), and Supervisors (which includes Sergeants, Captains, Lieutenants, and Wardens).

286. As the following graph illustrates, Bullock's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports)

287. Between Q2 2023 and Q4 2024, correctional staffing levels at Bullock rose by 9.2%. (Id.).

288. Bullock employed thirteen COTs in Q4 2024, rising from zero in Q1 2023. (Id.)

289. As the following graph illustrates, Donaldson's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

290. Between Q1 2023 and Q4 2024, correctional staffing at Donaldson rose by 38.1%. (Id.).

291. Donaldson employed thirty-five COTs in Q4 2024, rising from four in Q1 2023. (Id.).

292. As the following graph illustrates, Easterling's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

293. Easterling employed six COTs in Q4 2024, rising from zero in Q1 2023. (Id.).

294. As the following graph illustrates, Elmore's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

295. Between Q1 2019 and Q4 2024, correctional staffing at Elmore rose by 20.5%. (Id.).

296. Elmore employed five additional supervisors in Q4 2024 compared to Q4 2023. (Id.).

297. As the following graph illustrates, Fountain's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

298. Between Q2 2023 and Q4 2024, correctional staffing at Fountain rose by 27.3%. (Id.).

299. Fountain employed seventeen COTs in Q4 2024, rising from zero in Q1 2023. (Id.).

300. As the following graph illustrates, Holman's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

301. Between Q4 2022 and Q4 2024, correctional staffing at Holman rose by 41.5%. (Id.).

302. Holman employed fifteen COTs in Q4 2024, rising from zero in Q1 2023. (Id.).

303. As the following graph illustrates, Kilby's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

304. Between Q3 2018 and Q4 2024, correctional staffing at Kilby rose by 39.2%. (Id.).

305. Kilby employed forty-one COTs in Q4 2024, rising from six in Q1 2023. (Id.).

306. As the following graph illustrates, Limestone's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

307. Between Q1 2023 and Q4 2024, correctional staffing at Limestone rose by 62.3%. (Id.).

308. Limestone employed fifty-one COTs in Q4 2024, rising from four in Q1 2023. (Id.).

309. As the following graph illustrates, St. Clair's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

310. Between Q2 2018 and Q4 2024, correctional staffing at St. Clair increased by 59.7%. (Id.).

311. In 2024 alone, St. Clair's correctional staffing numbers grew by thirty-six. (Id.).

312. As the following graph illustrates, Staton's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

313. Between Q1 2023 and Q4 2024, correctional staffing at Staton rose by 48.8%. (Id.).

314. Staton employed eighteen COTs in Q4 2024, rising from zero in Q1 2023. (Id.).

315. As the following graph illustrates, Ventress's correctional staffing levels changed between 2018 and 2024:




(Braggs Quarterly Staffing Reports).

316. Between Q2 2023 and Q4 2024, correctional staffing at Ventress rose by 23.4%. (Id.).

317. Ray acknowledged that he was not aware of a prison system anywhere in the world that does not rely on overtime among its correctional staff. (Doc. 373-26 (Ex. 160) at 93:7-11).

318. Ray agreed that eliminating paid overtime could itself create a retention problem among existing correctional staff. (Doc. 373-26 (Ex. 160) at 93:12-16).

319. According to Ray, it is unreasonable to expect a correctional system to completely eliminate overtime. (Doc. 373-26 (Ex. 160) at 94:3-7).

320. Ray confirmed that ADOC experienced an increase in correctional staffing in 2024. (Doc. 373-26 (Ex. 160) at 154:21-23, 247:22-249:15; Docs. 360-112 (Ex. 113), 360-113 (Ex. 114), 360-114 (Ex. 115), 360-115 (Ex. 116), 360-116 (Ex. 117)).

321. Ray "began to see an upward trend" in correctional staffing within Alabama's facilities in 2025. (Doc. 373-26 (Ex. 160) at 155:1-3).

322. Ray investigated the possible reasons for the increases in correctional staffing in Alabama's facilities. (Doc. 373-26 (Ex. 160) at 155:4-18).

323. Ray credited the increasing numbers of correctional officers working in Alabama's facilities to ADOC's recruitment strategies. (Id.).

324. As ADOC increased correctional staffing, its average turnover rate also "dropped quite a bit." (Doc. 373-26 (Ex. 160) at 251:1-5).

325. Horn agreed that ADOC slightly increased its correctional staffing levels in the preceding two to three years. (Doc. 361 (Ex. 168) at 291:13-21).

326. Horn agreed that since 2023, "ADOC has had success in adding to its correctional officer ranks." (Doc. 361 (Ex. 168) at 413:17-21).

327. Ray was not asked to evaluate how ADOC deployed correctional staff on a shift-by-shift basis within its facilities. (Doc. 373-26 (Ex. 160) at 97:14-18).

328. Ray did not look for or identify any evidence demonstrating that ADOC's staffing levels increased sexual violence inside any Alabama facility. (Doc. 373-26 (Ex. 160) at 167:10-15).

329. When asked whether he knew if contraband is a problem in ADOC facilities, Ray stated "[n]ot specifically." (Doc. 373-26 (Ex. 160) at 166:9-11).

330. Ray did not identify any instance in which contraband entered an ADOC facility because of a shortage of correctional staff. (Doc. 373-26 (Ex. 160) at 203:18-22).

331. Ray did not identify any instance in which an inmate was sexually assaulted by another inmate because of a staff shortage. (Doc. 373-26 (Ex. 160) at 203:23-204:4).

332. Ray did not identify any instance in which an officer used force against an incarcerated person, whether justified or unjustified, because of a shortage of correctional staff. (Doc. 373-26 (Ex. 160) at 204:5-10).

333. Ray did not identify any instance in which an inmate required off-site medical or mental-health transportation and could not be transported because of staffing shortages. (Doc. 373-26 (Ex. 160) at 203:7-12).

334. Ray did not identify any instance in which an inmate required mental-health care and failed to receive it because of a correctional-staffing shortage. (Doc. 373-26 (Ex. 160) at 203:1-6).

335. Ray acknowledged that he did not conclude that ADOC's staffing levels were causing harm or causing risk; instead, he identified those staffing levels as indicators of conditions that "could be a risk." (Doc. 373-26 (Ex. 160) at 160:12-20).

336. Ray did not report that "the staffing levels [within ADOC] are causing harm." (Doc. 373-26 (Ex. 160) at 160:12-16).

337. When asked whether Ray saw "any evidence in the record that any Alabama DOC official was ignoring the challenges that it faces in terms of needing more correctional staff," Ray stated "No." (Doc. 373-26 (Ex. 160) at 252:11-15).

338. Ray testified that he saw no evidence in the record that ADOC officials were ignoring the challenge of needing additional correctional staff. (Doc. 373-26 (Ex. 160) at 252:11-15).

### F. Correctional Staffing within the Bureau of Prisons ("BOP")

339. Plaintiff operates the BOP. (https://www.justice.gov/doj/federal-bureau-prisons).

340. Ray agreed that BOP struggled to hire correctional officers, has been unable to fill all authorized correctional-officer positions, and has substantial vacancy rates throughout its system. (Doc. 373-26 (Ex. 160) at 146:17-147:6).

341. In a letter dated May 28, 2024, to the BOP Director, eight sitting Senators wrote:

> BOP has experienced staffing shortages over the last several decades.
>
> At a recent Senate Judiciary Committee hearing, you acknowledged that BOP's pay rates, including recruitment and retention pay incentives, have not made BOP staff salaries competitive with state correctional institutions or the private sector and are therefore a barrier to addressing the BOP staffing crisis.

(Doc. 360-128 (Ex. 129) at 2, 3).

342. During the decade spanning 2014 to 2024, BOP's total corrections officers decreased from 19,238 to 15,992, reflecting a loss of 3,246 corrections officers over 10 years. (Doc. 360-122 (Ex. 123) at 2).

343. According to a February 2024 Department of Justice Office of the Inspector General report evaluating inmate deaths, "BOP specifically identified insufficient staffing as an issue in at least 30 of the inmate deaths in [the] scope" of the report. (Doc. 360-121 (Ex. 122) at 69).

344. BOP experiences instances in which officers scheduled to work call in sick and do not report for their shifts. (Doc. 373-16 (Ex. 150) at 41:6-10).

345. On other occasions, BOP officers neither call in sick nor report for scheduled shifts. (Doc. 373-16 (Ex. 150) at 41:11-14).

346. BOP Administrator, Correctional Services Branch Evan Norris ("Norris") attributes this issue of correctional officers not appearing for work to

"somewhat of a cultural shift" in employee work ethic. (Doc. 373-16 (Ex. 150) at 41:15-22).

347. BOP does not track any trends related to correctional officers who fail to report for work on a nationwide basis. (Doc. 373-16 (Ex. 150) at 41:23-42:7).

348. When officers do not report to BOP prisons for scheduled shifts, BOP's institutions make "some type of modification" to operations within the BOP warden's discretion. (Doc. 373-16 (Ex. 150) at 42:12-21).

349. BOP Wardens have the authority to collapse a post or close a post for a shift, "but the captain would be the one that would receive the information." (Doc. 373-16 (Ex. 150) at 42:22-43:7).

350. Norris could not provide any "specifics" when asked whether BOP has done any analysis "across the system to determine how many times that occurs on a daily, weekly, or monthly basis" concerning modified operations due to lack of staff. (Doc. 373-16 (Ex. 150) at 44:4-21).

351. Warden Mistelle Starr ("Starr") could not identify a BOP policy that requires officials to submit a report to superiors when a prison enters modified operations. (Doc. 373-39 (Ex. 174) at 193:21-194:3).

352. When a BOP prison is required to transport an inmate offsite for medical care, the transportation creates "two additional posts [BOP] do[es]n't have the staffing for." (Doc. 373-16 (Ex. 150) at 43:14-25).

### G. BOP'S RESPONSE TO THE NATIONAL CORRECTIONAL STAFFING CRISIS

353. The National Institute of Corrections (the "NIC") is an agency of Plaintiff "within the Bureau of Prisons." 18 U.S.C. § 4351(a).

354. Plaintiff's Attorney General appoints 10 of the 16 members of the Advisory Board overseeing the NIC. 18 U.S.C. § 4351(c).

355. Plaintiff's BOP Director sits on the Advisory Board of the NIC. 18 U.S.C. § 4351(b).

356. Ray agreed that a staffing analysis was "an appropriate process and mechanism to determine correctional staffing needs inside of a prison." (Doc. 373-26 (Ex. 160) at 77:4-10).

357. Horn contends that a staffing analysis informs the prison officials "how many staff you need." (Doc. 361 (Ex. 168) at 253:11-15).

358. Norris could not identify the last time Plaintiff's prison system (BOP) completed a "perfect world" staffing analysis. (Doc. 373-16 (Ex. 150) at 64:16-25).

359. Rather than conducting a staffing analysis, Plaintiff's prison system conducts a "complement analysis" to determine "if you have X posts, how many correctional officers it takes to fill those posts throughout a yearly period" and "includes periods of leave and that type of thing. (Doc. 373-16 (Ex. 150) at 35:6-20).

360. BOP's complement analysis is "broken down by formula" in one of BOP's policies. (Doc. 373-16 (Ex. 150) at 35:21-25).

361. BOP's complement analysis no longer includes calculation of a shift relief factor because "[w]e do not have that luxury anymore. There's not enough staff to fill the posts." (Doc. 373-16 (Ex. 150) at 36:1-4).

362. Even BOP's quarterly institutional-level staffing evaluations were constrained by the number of positions authorized to the agency: "it has to be within what you have authorized." (Doc. 373-16 (Ex. 150) at 63:22-64:9).

363. Norris agreed that BOP's authorized staffing level did not represent a "perfect world number," responding, "Not by any means," and explained that BOP's own assessments showed that it "could actually use more staff." (Doc. 373-16 (Ex. 150) at 51:16-24).

364. According to Norris, BOP retained Deloitte to conduct "a professional evaluation of variables to determine a perfect world." (Doc. 373-16 (Ex. 150) at 64:10-15).

365. BOP's Deloitte analysis considered multiple variables to determine staffing needs without limiting the analysis to the authorized complement. (Doc. 373-16 (Ex. 150) at 64:10-15).

366. Deloitte's needs-based staffing analysis identified that BOP needed more correctional officers than the number of correctional-officer positions authorized for BOP at the time. (Doc. 373-16 (Ex. 150) at 51:25-52:20).

367. If Congress accepts Deloitte's recommendation arising out of its needs-based analysis, BOP's number of authorized positions will increase. (Doc. 373-16 (Ex. 150) at 65:1-5).

368. BOP prisons have not yet deployed Deloitte's automated staffing tool. Norris stated that it "is still an ongoing contracting solution." (Doc. 373-16 (Ex. 150) at 46:10-17).

369. In January 2022, the Office of Personnel Management ("OPM") "approved a 25% retention incentive for Federal correctional officers due to the need to recruit and retain more employees." (Doc. 374-77 (Ex. 291) at 1). The incentive was extended in January 2023. (Id.). OPM also approved a retention incentive of 10% for all non-custody employees at FCC Yazoo City. (Id.).

370. As of February 26, 2024, BOP was offering "a national recruitment award of $1,000 for employees when they refer[red] a new applicant for a position and the applicant [was] hired" and "offering all lieutenants a 10% retention incentive" Further, BOP offered an "agency-wide group retention incentive" for "employees who were eligible to retire by December 2022." (Doc. 374-75 (Ex. 289) at 2).

371. Plaintiff designated BOP's Personnel Director Lisa Gradiska ("Gradiska") as its Rule 30(b)(6) representative related to "staffing" and "high level staffing data on behalf of the Agency." (Doc. 373-29 (Ex. 163) at 7:25-8:7).

372. Gradiska agreed with BOP Director Peters that BOP is understaffed. (Doc. 373-29 (Ex. 163) at 27:8-16).

373. BOP does not receive sufficient funding to fill its vacant correctional officer positions. (Doc. 373-29 (Ex. 163) at 29:2-6).

374. BOP describes recruiting correctional officers as "challenging," but a direct hire initiative has increased applicant pools. (Doc. 373-29 (Ex. 163) at 61:3-25).

375. One BOP warden testified that staffing a prison presents "a challenge in recruitment" because competitors have changed their recruiting practices and the workforce has changed. (Doc. 373-44 (Ex. 179) at 119:5-17).

376. BOP further agreed that compensation affects both recruitment and retention of correctional officers. (Doc. 373-29 (Ex. 163) at 74:3-6).

377. In FY 2025, BOP requested "funding dedicated to continuing to increase hiring and retention incentives at its most affected institutions." (Doc. 376-2 (Ex. 298) at 1).

378. BOP pays "25 percent recruitment bonus on the step that the pay is set" to incentivize the employee. (Doc. 373-29 (Ex. 163) at 75:8-23).

379. BOP also provides group retention incentives that may range from 10 percent to 35 percent at particular institutions. (Doc. 373-29 (Ex. 163) at 95:16-96:4).

380. BOP also pays a $1,000 employee referral award to employees who successfully recruit correctional officers. (Doc. 373-29 (Ex. 163) at 100:15-101:8).

381. BOP has not lowered its correctional-officer qualification or testing requirements to increase the applicant pool for correctional officers. (Doc. 373-29 (Ex. 163) at 75:24-76:4).

382. Former BOP Director Peters increased the maximum entry age for correctional officers from thirty-seven to forty. (Doc. 373-29 (Ex. 163) at 96:9-16).

383. BOP's mandatory retirement remained fifty-seven and had not been adjusted in light of the current correctional-staffing issues. (Doc. 373-29 (Ex. 163) at 80:8-15).

384. BOP cannot guarantee that it will achieve 100% correctional staffing levels at its institutions within either the next twenty-four months or the next ten years. (Doc. 373-29 (Ex. 163) at 74:7-20).

385. BOP cannot point to a correctional institution "in the world" that could predict with certainty that it will achieve 100% correctional staffing within a particular period. (Doc. 373-29 (Ex. 163) at 74:21-25).

386. According to BOP, "too many variables" exist to predict when it would achieve 100-percent correctional staffing. (Doc. 373-16 (Ex. 150) at 73:2-7).

387. The efforts by state correctional agencies (like Alabama) to increase correctional-officer pay was "part of [BOP's] problem" in terms of its efforts to resolve its correctional staffing shortages. (Doc. 373-16 (Ex. 150) at 73:21-74:2).

388. BOP never expects to completely eliminate overtime for its correctional officers. (Doc. 373-16 (Ex. 150) at 68:2-8).

### H. BOP's Augmentation Process

389. Augmenting the correctional staff is a common phrase within BOP. (Doc. 373-52 (Ex. 187) at 57:21-58:8).

390. Augmenting or reassigning "a particular staff member from another discipline to the correctional services roster" is "ultimately a temporary billet to fill a vacant post so that we can run the institution effectively and safely." (Doc. 373-52 (Ex. 187) at 58:9-18).

391. One BOP Warden described "augmentation" as a process employed when "correctional officers—there's a shortage" and the BOP prison needs another employee to fill a correctional-services position. (Doc. 373-44 (Ex. 179) at 139:13-19).

392. For the BOP, augmentation means assigning non-correctional staff, such as secretaries, teachers, counselors, case managers and maintenance personnel,

to fill correctional positions. (Doc. 373-44 (Ex. 179) at 139:13-22, 140:11-17; see also Doc. 373-39 (Ex. 174). at 120:8-19).

393. BOP Warden Withers ("Withers") augmented staff daily when he first arrived at FCC Yazoo City. (Doc. 373-52 (Ex. 187) at 58:19-21).

394. As of January 24, 2025 (i.e., the date of his deposition), Warden Withers continued to utilize augmentation following his transfer to FCC Coleman. (Doc. 373-52 (Ex. 187) at 113:12-16).

395. FCI Atlanta Warden Thomas ("Thomas") augmented staff by assigning two or three non-correctional staff per week to the day watch when he was a warden at Beaumont. (Doc. 373-1 (Ex. 134) at 81:18-82:1).

396. The Senate Appropriations Committee "discuss[ed] the dangerous practice of augmentation in the Fiscal Year 2024 Commerce-Justice-Science Appropriations bill and calls on BOP to take all necessary measures to end the practice." (Doc. 374-79 (Ex. 293) at 1).

397. BOP prisons also utilize a practice called "modified operations" to address staffing shortages. (Doc. 373-39 (Ex. 174) at 182:14-183:9).

398. Modified operations within BOP include "[a]ny modification to movement or schedules." (Doc. 373-39 (Ex. 174) at 181:19-21).

399. BOP staff reported refusing to conduct institutional counts due to late shift reliefs. (See, e.g., Doc. 374-78 (Ex. 292) at 1).

## I. BOP-Specific Correctional Staffing.

400. The Court permitted the State to conduct prison-specific discovery in this matter at four federal prisons. (Doc. 131; Doc. 137).

### 1. FCI Atlanta

401. As of January 14, 2025, FCI Atlanta had a custody staff staffing percentage of "roughly around 76, 77 percent." (Doc. 373-1 (Ex. 134) at 32:9-12).

402. FCI Atlanta reported approximately 40 correctional officer vacancies, which is approximately 30% of its total authorized staffing. (Doc. 373-1 (Ex. 134) at 33:1-8).

403. A BOP staffing report for Pay Period 2023-27 reflected that FCI Atlanta was 78.74% staffed overall, 75.00% staffed for authorized correctional officers, and 55.56% staffed for Clinical Medical positions. (Doc. 374-74 (Ex. 288) at 27).

404. Senators Warnock and Ossoff reported that "understaffing at USP Atlanta" had "created a reliance on mandatory overtime" and "that fatigue, exhaustion, and low morale ha[d] reduced staff productivity." (Doc. 374-80 (Ex. 294) at 1).

405. At FCI Atlanta, non-custody staff working overtime in the Special Housing Unit ("SHU") lacked access to the SHU Program application, resulting in missing entries in SHU records between January and May 2024. (Doc. 374-81 (Ex. 295) at 1).

406. Thomas testified that contraband, including cell phones, drugs, and weapons, remained present at FCI Atlanta despite his efforts to address it. (Doc. 373-1 (Ex. 134) at 115:8-24).

407. Thomas agreed that a June to July 2021 search of FCI Atlanta yielded a "significant amount of contraband." (Doc. 373-1 (Ex. 134) at 68:13-16).

408. Thomas testified that FCI Atlanta's overall staffing percentage was approximately 83%, including custody and non-custody personnel. (Doc. 373-1 (Ex. 134) at 32:6-8).

409. Thomas testified that, when he arrived at FCI Atlanta, Health Services had an approximately 60% staffing level among its authorized staff and that the staffing rate later exceeded 80%. (Doc. 373-1 (Ex. 134) at 33:22-34:2).

410. During annual training, FCI Atlanta used non-custody employees, including teachers and caseworkers, to fill correctional-officer posts while correctional officers attended training. (Doc. 373-1 (Ex. 134) at 78:18-80:2).

411. FCI Atlanta maintained a staffing roster identifying the officer assigned to each operational post on each shift and recording sick and annual leave. (Doc. 373-1 (Ex. 134) at 40:8-42:10).

412. Thomas testified that FCI Atlanta's redesignation from medium security to low security reduced the prison's staffing requirements. (Doc. 373-1 (Ex. 134). at 61:3-9).

**2. FCC Coleman**

413. BOP refers to its restricted housing unit as the SHU. (Doc. 373-39 (Ex. 174) at 206:5-14).

414. [redacted]

415. According to FCC Coleman Warden Withers ("Withers"), the ability to fill posts within the SHU at Coleman depends upon "[w]hether the staff come to work or not," and staff call out often. (Doc. 373-52 (Ex. 187) at 28:9-15).

416. As of January 24, 2025, the shortage of relevant staff at FCC Coleman prevented staff from conducting the First Step Back educational program. (Doc. 373-52 (Ex. 187) at 12:25-13:7).

417. Withers reported that, during his 28 years of corrections experience, the frequency of correctional officers "calling out" or not appearing for assigned shifts has increased, which he attributes to a generational lack of work ethic. (Doc. 373-52 (Ex. 187) at 28:12-29:7).

418. FCC Coleman continues to utilize the augmentation process. (Doc. 373-52 (Ex. 187) at 113:12-16).

419. [redacted]

420. While BOP reports a certain "vacancy rate," BOP's human-resources staffing report and complement analysis indicated that BOP needed to hire approximately 150 additional correctional officers at FCC Coleman. (Doc. 373-52 (Ex. 187) at 79:3-6; 109:2-22).

421. FCC Coleman reported 88% staffing of authorized correctional service positions. (Doc. 373-52 (Ex. 187) at 79:4-6).

422. Withers testified that staffing was his highest operational priority at FCC Coleman after staff safety. (Doc. 373-52 (Ex. 187) at 110:8-25).

423. Withers testified that COVID affected staffing at FCC Coleman because employees left for other employers out of fear of contracting COVID. (Doc. 373-52 (Ex. 187) at 48:23-49:3).

424. On the day of the deposition, Withers estimated approximately 25 FCC Coleman inmates were housed in outside hospitals. (Doc. 373-52 (Ex. 187) at 116:7-12).

425. Outside-hospital assignments required two correctional officers per inmate per shift and pulled correctional officers from FCC Coleman's institutional roster. (Doc. 373-52 (Ex. 187) at 116:7-117:2).

426. Withers testified that FCC Coleman generally relied on overtime to staff outside-hospital coverage. (Doc. 373-52 (Ex. 187) at 116:21-117:2).

### 3. <u>USP Hazelton</u>

427. BOP uses "modified operations" to address staffing challenges, including modifications to inmate movement and schedules. (Doc. 373-39 (Ex. 174) at 181:19-21, 182:14-183:9.)

428. During a staffing-related modification prior to Starr's deposition, USP Hazelton permitted only limited work details and otherwise kept inmates secured in their housing areas. (Doc. 373-39 (Ex. 174) at 196:13-22).

429. One BOP Warden at USP Hazelton could not identify from memory a seven-day period during her tenure at USP Hazelton in which USP Hazelton operated under normal operations for an entire week. (Doc. 373-29 (Ex. 174) at 195:12-196:3).

430. USP Hazelton scheduled inmate visitation on Mondays and Tuesdays rather than weekends due to staffing shortages. (Doc. 373-39 (Ex. 174) at 184:10-12, 185:15-186:2).

431. USP Hazelton reported approximately 87 authorized correctional officer positions vacant throughout the complex. (Doc. 373-39 (Ex. 174) at 105:7-9).

432. USP Hazelton reported approximately 80% staffing in correctional services. (Doc. 373-39 (Ex. 174) at 157:16-19).

433. When asked how to determine the number of times USP Hazelton had operated under modified operations during the preceding year, Warden Starr testified that personnel would have to go back through records, including lieutenant logs and rosters. (Doc. 373-39 (Ex. 174) at 194:5-10).

434. Warden Starr testified that there was no document that specifically stated whether operations were "modified" or "secured"; instead, the condition would have to be derived from other records. (Doc. 373-39 (Ex. 174) at 194:11-14).

435. Warden Starr could not state "offhand" how many times USP Hazelton had operated under modified operations during her tenure. (Doc. 373-39 (Ex. 174) at 194:15-17).

436. Most days at the Federal Corrections Complex, BOP staff serve one meal as a bag meal in order "to alleviate staff intensive feedings." (Doc. 373-39 (Ex. 174) at 197:22-198:3).

437. FCC Hazelton submitted a request for a 25% retention incentive in October 2023, which remained pending approval in January 2024. (Doc. 374-76 (Ex. 290) at 1).

438. Plaintiff's Office of Legislative Affairs stated, "hiring at FCC Hazelton remains a challenge, largely due to its rural location." (Id. at 1).

### 4. <u>FCC Yazoo City</u>

439. The wardens at FCC Yazoo City determined that they needed additional staff. (Doc. 373-52 (Ex. 187) at 51:21-24). Warden Withers stated that number included approximately 40 to 50 additional front line correctional officers. (Doc. 373-52 (Ex. 187) at 52:4-53:5).

440. BOP officials stopped inmate movement at FCC Yazoo City several times a week when facing staffing challenges, which involved movement ceasing for the shift suffering from the staffing shortage. (Doc. 373-52 (Ex. 187) at 66:8-67:3).

441. [redacted]

442. [redacted]

443. Withers identified correctional officers and health-services employees as the most difficult positions to staff at FCC Yazoo City. (Doc. 373-52 (Ex. 187) at 111:1-10).

444. FCC Yazoo City reported 377 authorized correctional officer positions, with approximately 246 to 266 of them filled (i.e., 65% to 71%). (Doc. 373-44 (Ex. 179) at 131:3-17).

445. Withers testified that he used augmentation approximately daily when he arrived at FCC Yazoo City. (Doc. 373-52 (Ex. 187) at 58:19-21).

446. Warden Keyes ("Keyes") testified that augmentation at FCC Yazoo City involved assigning non-correctional employees to correctional posts. (Doc. 373-44 (Ex. 179) at 139:13-139:22, 140:23-25).

447. Keyes testified that, if FCC Yazoo City augments a teacher, "that particular class may have an impact." (Doc. 373-44 (Ex. 179) at 143:3-11).

448. Keyes testified that correctional officers at FCC Yazoo City work overtime "every day" and that "at a complex with three institutions, significant amount of overtime would be there." (Doc. 373-44 (Ex. 179) at 145:13-20).

449. Keyes testified that "[i]t's a concern if they exceed 16 hours" in response to a question asking whether he has concerns with officers working a lot of overtime. (Doc. 373-44 (Ex. 179) at 146:16-22).

450. Withers testified that he was "absolutely" concerned about the amount of overtime some correctional officers worked at FCC Yazoo City. (Doc. 373-52 (Ex. 187) at 62:3-6).

451. Withers explained that when an officer works overtime "day after day after day after day after day," "the body can get fatigued," creating concerns for the officer's safety and the safety of others. (Doc. 373-52 (Ex. 187) at 62:7-18).

452. Withers testified that when "numerous holes in the roster" remained even after overtime, he would curtail overtime and keep inmates secured to maintain safety. (Doc. 373-52 (Ex. 187) at 63:18-64:2).

## II. USE OF FORCE

453. Plaintiff alleges that ADOC engaged in a pattern or practice of failing to protect inmates from excessive force by security staff and identifies alleged deficiencies in policy, reporting, investigation, discipline, monitoring, and accountability. (Doc. 71 ¶¶ 192, 201-02).

454. Plaintiff's corrections expert, Martin Horn, noted that "[f]orce is an essential element of running a prison or a jail." (Doc. 361 (Ex.168) at 205:8-18).

455. Horn admitted isolated incidents of excessive force unfortunately occur. (Doc. 361 (Ex. 168) at 327:3-9).

456. For example, Horn admitted that "unjustified uses of force" occurred during his tenure leading correctional systems in New York State, Pennsylvania, and New York City. (Id.).

457. Horn testified that he nonetheless believed he fulfilled his constitutional obligations in those positions, because he "think[s] the test is the frequency with which it occurs and how the system responds to it." (Doc. 361 (Ex. 168) at 327:3-9).

458. Plaintiff's corrections expert, Roger Werholtz, did not review national statistics on uses of force in prisons and stated his opinions regarding use of force were "based on videos that I reviewed where I could actually observe what was happening and in particular what I think . . . was clearly an inappropriate use of force." (Doc. 373-49 (Ex. 184) at 106:22-109:7).

459. When asked if he "offer[ed] any criticisms of ADOC's use-of-force policies and procedures," Plaintiff's retained expert Werholtz responded, "No, I don't believe I did;" when asked if he performed "any kind of analysis to see whether ADOC took the appropriate action with respect to use of force," Werholtz responded, "I did not." (Werholtz Dep. (Ex. 184) at 107:14-16, 108:1-5).

### A. ADOC's Use-of-Force Policy Effective Until January 27, 2025

460. At the outset of this litigation, ADOC's Administrative Regulation 327, *Use of Force*, effective March 4, 2015 ("AR 327 (2015)"), governed uses of force by ADOC correctional staff. (Doc. 373-58 (Ex. 194)).

461. [redacted] (Doc. 373-58 (Ex. 194) at 1).

462. AR 327 (2015) instructed, "[t]he use of physical force shall be restricted to instances of justifiable self-defense against physical assault (actual or threatened), protection of other, protection of property, prevention of escape or apprehension of

escapees, 'quelling' a disturbance, or when an inmate exercises physical resistance to a lawful command." (Doc. 373-58 (Ex. 194) at 1).

463. AR 327 (2015) directed that:

> "[t]he application of physical force:
>
> 1. Shall be justified, reasonable, and necessary under the circumstances.
>
> 2. Shall only be used after attempts to verbally de-escalate the situation have failed, if possible.
>
> 3. Shall only be the minimum amount necessary to control the situation or achieve a legitimate correctional objective.
>
> 4. Shall never be used as punishment.
>
> 5. Shall be dependent upon the inmate's action or non-action.
>
> 6. The amount of force may change depending upon the level of inmate resistance and the totality of the circumstances.
>
> 7. Shall be consistent with the officer response options taught in Basic and In-Service Training.
>
> 8. Shall be determined on a case by case basis and the employee using or authorizing force shall be required to justify the action taken.
>
> 9. Shall stop when resistance offered by the inmate ceases and the inmate is under control and placed in appropriate restraints.
>
> 10. Shall not be used unless properly trained by, and/or the training is sanctioned by, the ADOC Training Division. The Commissioner and/or

> designee may approve specialized training for specialized units."

(Doc. 373-58 (Ex. 194) at 4).

464. Senior ADOC correctional staff members confirmed that they understood ADOC's policies to permit force only when justified or necessary to protect the officer or inmates from danger, and that force in response to verbal insults or taunting threats was "[a]solutely not" permissible. (Doc. 373-41 (Ex. 176) at 81:4-12, 85:10-15); Doc. 373-43 (Ex. 178 at 154:5-155:5; 155:12-18; Doc. 361 (Ex. 138) at 100:6-10; 101:8-102:4; Doc. 373-21 (Ex. 155) at 133:17-134:11).

465. Curtis Nolen, then-Captain at Elmore, understood as of December 5, 2022, that ADOC only permitted "justified, reasonable and necessary" force; that his training outlined that "it must be a necessary reason to use force;" and, "[i]f it's another way you could quell a disturbance without using force, then don't use [force]." (Doc. 373-8 (Ex. 142) at 183:2-17).

466. Eric Bradford, a lieutenant at Kilby as of March 30, 2023, explained that AR 327 (2015) authorized force when someone was "in harm's way, in danger." (Doc. 373-15 (Ex. 149) at 25:4-19).

467. Malcolm Holtzclaw, a lieutenant at Bibb, confirmed his understanding of AR 327 (2015) that correctional officers should consider the totality of the circumstances, including whether they could placate an inmate by "talk[ing] him down." (Doc. 373-30 (Ex. 164) at 98:20-99:5).

468. Lieutenant Holtzclaw also confirmed that he understood that once an inmate was handcuffed and no longer combative, "all force [should] cease." (Doc. 373-30 (Ex. 164) at 98:1-5).

469. On March 21, 2024, Terry Raybon, Warden of Holman, described the factors that a correctional officer should consider as "He must give the inmate a command or -- or give him instructions or give him an order to do something and give him the opportunity to comply. If he fails to comply, then he -- we encourage them to use their spray first. And if they have to escalate to their baton, then escalate to their baton, depending on what type of force is -- what type of resistance is coming to them. If an inmate is trying to fight you with a -- you may have a chance to spray him; you may not. So you might -- whatever you need to use to get -- to defend yourself, but also to the minimum amount of force necessary to get him or her to comply." (Doc. 373-54 (Ex. 189) at 280:9-22).

## B. Use of Force Training Under the 2015 Use-of-Force Policy

470. AR 327 (2015) prohibited correctional staff from using force unless "properly trained by, and/or the training is sanctioned by, the ADOC Training Division." (Doc. 373-58 (Ex. 194) at 4).

471. AR 327 (2015) assigned the Director of Training responsibility for "ensuring that appropriate use of force training is provided." (Doc. 373-58 (Ex. 194) at 3).

472. Elliott Sanders served as the Director of Training for ADOC as of June 5, 2023. (Doc. 373-14 (Ex. 148) at 9:13-15).

473. As of June 5, 2023, correctional staff received training at ADOC's APOSTC Academy, which consisted of a 400-hour written curriculum that included use of force. (Doc. 373-14 (Ex. 148) at 55:12-17, 61:13-62:2).

474. At the time AR 327 (2015) was in effect, Academy trainees took cumulative examinations drawn from lesson plans and class materials, were required to maintain a 70-percent academic average, and could not obtain APOSTC certification if they failed the Academy. (Doc. 373-14 (Ex. 148) at 62:3-18, 63:1-19, 64:5-65:17).

475. At that time, the Academy also included an approximately four-hour use-of-force course consisting of a written curriculum, lecture instruction, and PowerPoint materials. (Doc. 373-14 (Ex. 148) at 66:14-67:19).

476. ADOC updated the Academy's use-of-force course in 2023 to "reflect more distinction between fourth amendment standards and eighth amendment standards." (Doc. 373-14 (Ex. 148) at 66:14-67:19).

477. At the time AR 327 (2015) was in effect, the Academy's use-of-force training included de-escalation training, which previously addressed situation assessment, communication, crisis avoidance, and force as a last option. (Doc. 373-14 (Ex. 148) at 42:11-43:23, 68:13-70:1).

478. In 2023, the Academy expanded its de-escalation training by implementing an eight-hour course provided by an outside vendor. (Doc. 373-14 (Ex. 148) at 68:13-70:1).

479. De-escalation training involved teaching tactics such as assessing a situation, communicating appropriately, and that force should be used only if an officer cannot find another way to resolve the situation. (Doc. 373-14 (Ex. 148) at 69:12-70:1).

480. Under AR 327 (Mar.4, 2015), ADOC also trained correctional staff on circumstances warranting the use of chemical agents, deployment distance, and dispersal methods. (Doc. 373-14 (Ex. 148) at 70:2-72:13).

481. While AR 327 (2015) was in effect, ADOC required annual defensive-tactics retraining and annual qualifications in other operational subjects. (Doc. 373-14 (Ex. 148) at 99:18-100:3).

482. As of July 18, 2023, members of ADOC's Correctional Emergency Response Team ("CERT"), a specialized security-response team, received at least twenty-four hours of annual specialized training that included legal instruction, professionalism, use of force, and chemical agents. (Doc. 373-42 (Ex. 177) at 80:19-83:9).

483. As of June 5, 2023, ADOC's annual training plan was designed to "train the entire staff of the Department in a calendar year." (Doc. 373-14 (Ex. 148) at 41:20-42:7).

484. As of June 5, 2023, ADOC's annual training served as "a requirement" and "not an option." (Doc. 373-14 (Ex. 148) at 46:15-22).

485. Annual security training at Easterling under AR 327 (2015) included use-of-force training, and staff from ADOC's southern region attended a "40 hour training" at Ventress. (Doc. 373-22 (Ex. 156) at 14:20-16:3).

486. Annual training also took place during that time period at other ADOC facilities made subject of this lawsuit. (373-21 (Ex.155) at 130:6-16; Doc. 376-1 (Ex. 297) at 69:1-14; Doc 373-23 (Ex. 157) at 85:15-21; Doc. 361 (Ex. 138) 99:20-100:5).

### C. Investigations Under the 2015 Use-of-Force Policy

487. AR 327 (2015) instructed that "incidents of use of force will result in a duty officer report being completed in accordance with AR 302. *Incident Reporting*." (Doc. 373-58 (Ex. 194) at 4).

488. AR 327 (2015) also called for an "[e]xamination of the inmate(s) and documentation of the examination by medical authority" after a use of force incident. (Doc. 373-58 (Ex. 194) at 4).

489. AR 327 (2015) stated that "[u]se of force incidents shall be investigated by a Captain or Warden who has been trained . . . to conduct use of force investigations." (Doc. 373-58 (Ex. 194) at 6; see also Doc. 373-10(Ex. 144) at 70:13-25; see also Doc. 373-3 (Ex. 136) at 111:2-24).

490. AR 327 (2015) directed that "[t]he investigation shall include, but not limited to, interviewing suspects, victims, and witnesses; reviewing all relevant documents; and reviewing video surveillance, when available." (Doc. 373-58 (Ex. 194) at 6).

491. Prior to December 31, 2024,[3] after the facility-level review by the Captain or Warden as detailed above, ADOC's Office of Inspector General ("OIG") conducted administrative investigations into use of force incidents, as needed, and ADOC's Law Enforcement Services Division ("LESD") conducted criminal investigations into use of force incidents, as needed. (Doc. 373-50 (Ex. 185) at 93:21-94:9).

492. AR 327 (2015) instructed the Warden to notify the Institutional Coordinator (now known as the Regional Director), Associate Commissioner of Operations or Deputy Commissioner of Women's Services, and Director of I&I (now known as LESD) and request further investigation when the Warden possessed

[3] The implementation of the Use of Force Manual, discussed in detail below.

reason to believe a use of force to be unjustified. (Doc. 373-58 (Ex. 194) at 10; see also (Doc. 373-10 (Ex. 144) at 78:17-25).

493. As of June 27, 2023, April Bickhaus, then-Assistant Director of LESD, who was at the time assigned to OIG, confirmed that use of force incidents that caused serious bodily injury resulted in an "automatic referral to LESD for a criminal investigation" and that ADOC correctional staff referred other indications of criminal conduct to LESD. (Doc. 373-3 (Ex. 136) at 6:25-7:2, 109:9-110:5).

494. At that time, Regional Directors, the Deputy Commissioner, the Commissioner, and the Warden of the affected facility received LESD investigative reports upon completion. (Doc. 373-10 (Ex. 144) at 79:7-21).

495. Under AR 327 (2015), OIG reviewed the Captain and Warden's reports and could either "send [the report] back to the captain for further investigation" or forward the investigation to LESD if OIG believed the matter deserved criminal consideration. (Doc. 373-27 (Ex. 161) at 46:8-47:9).

496. Under AR 327 (2015), OIG compiled and cross-referenced Administrative Investigations Management ("AIM") and facility documentation module data by facility and officer. (Doc. 373-3 (Ex. 136) at 124:15-128:11).

497. [redacted]




(Doc. 370 (Pl. Exs. 743-750)).

498. [redacted]


ADOC USE OF FORCE BY UNDERLYING INCIDENT TYPE
Incidents Involving Use of Force by Year, 2019–2024 Q2
2400
2000
1600
1200
800
400
0
2,040
2,213
2,020
1,522
975
614
2019
2020
2021
2022
2023
2024 Q1–Q2
INCIDENT TYPE KEY
Failure to Obey / Insubordination
Assault / Fighting / Threatening
Disorder / Disruptive Conduct
Historical UOF Class Code
After Hours Transport
Contraband / Weapons / Searches
Self-Harm / Suicide Response
Other


ADOC USE OF FORCE BY UNDERLYING INCIDENT TYPE
Incidents Involving Use of Force, 2019–2024 Q2
Failure to Obey / Insubordination
4,613
49.2%
Assault / Fighting / Threatening
1,655
17.6%
Disorder / Disruptive Conduct
1,570
16.7%
Historical UOF Class Code
425
4.5%
Other
340
3.6%
After Hours Transport
321
3.4%
Contraband / Weapons / Searches
233
2.5%
Self-Harm / Suicide Response
226
2.4%
0
1k
2k
3k
4k
5k
NUMBER OF INCIDENTS
CATEGORY SUMMARY
9,383 TOTAL UOF INCIDENTS
Failure to Obey / Insubordination 4,613 | 49.2%
Assault / Fighting / Threatening 1,655 | 17.6%
Disorder / Disruptive Conduct 1,570 | 16.7%
Historical UOF Class Code 425 | 4.5%
Other 340 | 3.6%
After Hours Transport 321 | 3.4%
Contraband / Weapons / Searches 233 | 2.5%
Self-Harm / Suicide Response 226 | 2.4%







(Doc. 370 (Pl. Exs. 743-750)).

499. Under AR 327 (2015), ADOC identified and tracked officers involved in more than three uses of force within a ninety-day period. (Doc. 373-3 (Ex. 136) at 127:20-128:3).

500. Bickhaus explained that, under AR 327 (2015), "we're looking at the numbers of uses of force that that officer has conducted in that 90-day window, and then if it registers above three, then we make a notification to that facility head just to be aware." (Doc. 373-3 (Ex. 136) at 127:24-128:3).

501. Under AR 327 (2015), OIG attempted at least monthly to review the ninety-day tracking data "for the benefit of a use of force unit to be able to identify which facilities have active assignments that were pending, because OIG doesn't assume the audit or the independent review until the conclusion of that facility's investigations. So we -- we really do it just as a benefit to keep track of which ones we need to follow up with to that we make sure that there's nothing that slips through the cracks." (Doc. 373-3 (Ex. 136) at 124:15-129:11).

502. ADOC monitored uses of force under AR 327 (2015) through monthly command-level meetings to discuss use-of-force incidents and other trends, including "assault[s] on staff, assault[s] on inmates, homicide[s], suicide[s], and escape attempts." (Doc. 373-12 (Ex. 146) at 123:22-124:9).

503. Bickhaus described the centralized audit review process of use of force investigations under AR 327 (2015) as follows: "So if the facility has conducted its investigation and then the audit looks into all of those separate facets of that investigation to ensure that everything was included that should have been included and was -- was fairly -- fairly included, and then if both of those dispositions match

and it's not inconclusive of it's not differing, then there would be nothing further." (Doc. 373-3 (Ex. 136) at 112:13-24).

504. Under AR 327 (2015), Captain Nolen testified that a Captain conducting a use-of-force investigation would "question everyone involved," review statements, body charts, and available camera footage, determine whether the force was justified, and refer unjustified matters to LESD. (Doc. 373-8 (Ex. 142) at 22:3-17).

505. Captain Danzey confirmed that, under AR 327 (2015), if witnesses existed, the investigator would interview involved officers, the involved inmate, staff witnesses, and inmate witnesses, and would review available video, photographs, and a body chart. (Doc. 373-22 (Ex. 156) at 133:2-136:17).

506. Under AR 327 (2015), Christopher Gordy, then-Warden at Bibb, testified that involved officers, witnesses, and the inmate wrote statements; that ADOC required a duty-officer report "within four hours" for every use of force; and that a missing report triggered an investigation and corrective action. (Doc. 373-6 (Ex. 140) at 156:6-157:16).

507. Sean Stewart opined that, "prior to my involvement, ADOC investigated use of force incidents and did not ignore or tolerate bad acts by its officers when applying force. Review of the OIG, now [Office of Professional Standards] ("OPS"), investigative reports demonstrates that these investigations

culminated with a conclusion on the officer's use of force and made recommendations up the chain of command. LESD investigative reports demonstrate that the investigators reached a written conclusion on the officer's use of force and made recommendations to the appropriate attorney's office and within the chain of command." (Doc. 373-50 (Ex. 185) at 240:22-241:10).

### D. DISCIPLINE UNDER THE 2015 USE-OF-FORCE POLICY

508. On May 1, 2024, former Commissioner John Hamm, the ADOC Commissioner from January 2022 to April 2026, executed Administrative Regulation Number 208, *Employee Corrective Action*. (Doc. 360-17 (Ex. 118)).

509. AR 208, *Employee Corrective Action*, superseded the prior AR 208, *Employee Standards of Conduct and Discipline*, which ADOC enacted on August 17, 2005. (Doc. 360-17 (Ex. 118) at 18).

510. AR 208 includes an "ADOC Employee Corrective Action Table" which outlines the discipline received for each state rule infraction for employees. (Doc. 360-17 (Ex. 118) at 37-45).

511. AR 208's ADOC Employee Corrective Action Table provides a written reprimand for a first inappropriate or unnecessary use of force, a five-day suspension for a second occurrence, and termination for a third occurrence. (Doc. 374-66 (Ex. 279) ¶ 313; Doc. 374-61 (Ex. 274) ¶ 105; (Doc. 360-17 (Ex. 118) at 41).

512. AR 208's ADOC Employee Corrective Action Table provides a ten-day suspension for a first abusive or excessive use of force and termination for a second occurrence. (Doc. 374-66 (Ex. 279) ¶ 313; Doc. 374-61(Ex. 274) ¶ 105; Doc. 360-17 (Ex. 118) at 41).

513. David Lamar, then-Warden at Bullock, confirmed that as of February 26, 2024, when an "employee violates a policy or procedure," the employee's "immediate supervisor determines what sanctions [the employee is] going to receive, and then [the supervisor] send[s] their recommendation up through the chain of command to the [W]arden, who submits the recommendation to ADOC [P]ersonnel and [ADOC] [O]perations." (Doc. 373-11(Ex. 145) at 71:19-72:14). The Warden may disagree and implement a lesser or harsher discipline recommendation. (Id.).

514. As of February 26, 2024, ADOC relied upon various levels of disciplinary actions against correctional officers, including "a counseling session, a warning, written reprimand, two-day suspension, three-day suspension, dismissal." (Doc. 373-11 (Ex. 145) at 73:19-24).

515. [redacted]

516. [redacted]

517. [redacted]

518. [redacted]

519. [redacted]

520. [redacted]

521. [redacted]

522. [redacted]

523. Plaintiff's corrections expert, Martin Horn, conceded that, at times, accepting an employee's resignation is more effective than dealing with the process of terminating the employee. (Doc. 361 (Ex. 168) at 198:5-199:3).

524. Horn stated that "all" correctional administrators may utilize this approach use on a "case-by-case basis." (Id.).

### E. Criminal Referrals Under the 2015 Use-of-Force Policy

525. As of May 4, 2023, Kevin McNatt served as a Supervisory Agent with LESD who ADOC tasked with overseeing LESD investigative agents and reports. (Doc. 373-27 (Ex. 161) at 19:12-20:8).

[4] "Roughly a year and a half" prior to a March 20, 2023, deposition.

526. McNatt reviewed complaints, determined whether a crime existed therein, and if so, directed an investigative agent to create a case file. (Id.).

527. Once the agent completed the case file, McNatt reviewed it, sent it to that agent's supervisor agent, and then to the director for final approval. (Id.).

528. McNatt stated that LESD use-of-force investigators compiled evidence, interviewed witnesses and victims, reviewed video, obtained medical records, and, when they found a felony, transferred the completed case to the district attorney with jurisdiction. (Doc. 373-27 (Ex. 161) at 129:24-130:6, 169:23-170:3).

529. [redacted] (Doc. 373-27 (Ex. 161) at 128:6-129:17).

530. According to McNatt, when a district attorney declined prosecution, Agent McNatt referred the matter to OIG for potential violations of ADOC policy. (Doc. 373-27 (Ex. 161) at 166:14-167:2).

531. Agent McNatt identified two occasions prior to May 4, 2023, when federal authorities opted to pursue charges when local district attorneys did not take action. (Doc. 373-27 (Ex. 161) at 166:14-167:2).

532. [redacted]

[redacted] (Doc. 374-55 (Ex. 268)).

533. [redacted]

(Doc. 374-56 (Ex. 269)).

534. [redacted] (Doc. 374-57 (Ex. 270)).

### F. Development of ADOC's New Use-of-Force Policy and New Use of Force Manual

535. On September 25, 2023, ADOC retained Stewart Criminal Justice Consulting & Training, LLC, to create new use-of-force standards, new policies and procedures, and a use of force manual. (Doc. 373-50 (Ex. 185) at 96:19-97:20); Doc. 373-20 (Ex. 154) at 140:10-13).

536. Sean Stewart, the State's Use of Force Expert, assembled a team to assist with ADOC's use-of-force project that included Tate McCotter, Joshua Arnold, Glenn Ercanbrack, and later Rob Yantis. (Doc. 373-50 (Ex. 185) at 64:20-25, 157:20-158:24).

537. Stewart noted that the prior policy was "heavy-handed" with respect to use of force. (Doc. 373-50 (Ex. 185) at 114:5-10; 119:25).

538. Stewart testified "based on what I was looking at, again, being heavy-handed and not really knowing what the Eighth Amendment standard was, they were investigating utilizing Grandy -- the Fourth Amendment standard. And getting them to understand there's a difference between use of force on the street and use of force in a prison . . . So, again, heavy-handed. That's why I say Alabama DOC was very strict with their officers on excessive force. And I didn't know if that was because things had happened in the past; it was because of the lawsuit; I just didn't know. But they were very strict and heavy-handed with their officers on use of force." (Id. at 119:17-120:6).

539. Stewart and his team "created . . . 19 use-of-force standards, to build the foundation on the use of force," and then developed revised policies and procedures and a statewide Use of Force Manual. (Doc. 373-50 (Ex. 185) at 96:20-97:20; Doc. 373-64 (Ex. 200) Doc. 373-76 (Ex. 212); Doc. 373-62 (Ex. 198); Doc. 373-74 (Ex. 210); Doc. 373-70 (Ex. 206); Doc. 373-72 (Ex. 208); Doc. 373-68 (Ex.

204); Doc. 373-66 (Ex. 202); Doc. 373-63 (Ex. 199); Doc. 373-77 (Ex. 213); Doc. 373-75 (Ex. 211); Doc. 373-61 (Ex. 197); Doc. 373-73 (Ex. 209); Doc. 373-71 (Ex. 207); Doc. 373-69 (Ex. 205); Doc. 373-67 (Ex. 203); Doc. 373-59 (Ex. 195); Doc. 373-60 (Ex. 196); Doc. 373-65 (Ex. 201)).

540. Stewart and his team "customized [the standards] to what the law requires[,]" including applicable state law governing use of force. (Doc. 373-50 (Ex. 185) at 148:17-149:11).

541. Stewart and his team provided the nineteen use-of-force standards to ADOC in December 2023 and "[t]he policies and procedures" in January 2024. (Doc. 373-50 (Ex. 185) at 96:20-97:4).

542. Former Commissioner Hamm served as "[f]inal approval" and "sign[ed] off on the AR[s] to be published" after agency review. (Doc. 373-20 (Ex. 154) at 16:10-20, 18:15-24).

543. Former Commissioner Hamm executed ADOC's Use of Force Manual on December 31, 2024. (Doc. 361 (Ex. 193).

544. Former Commissioner Hamm executed the current AR 327, *Use of Force* ("AR 327 (2025)") effective January 27, 2025. (Doc. 373-57 (2025) (Ex. 192)).

545. AR 327 (2025) specifically superseded the prior "AR 327, *Use of Force*, dated March 4, 2015, and any changes." (Id. at 6).

### G. ADOC's Revised Use-of-Force Policy and New Use of Force Manual

546. AR 327 (2025) "establishes responsibilities, policies, and procedures for use of force." (Doc. 373-57 (Ex. 192) at 1).

547. AR 327 (2025) states, "[n]either this policy nor the Use of Force Manual creates or expands the legal duties of ADOC or its agents and employees, creates a liberty or property interests for inmates, or expands existing state or federal constitutional rights or duties." (Doc. 373-57 (Ex. 192) at 1).

548. AR 327 (2025) provides that "security staff may use force as reasonably necessary to maintain order, safety, and security of the institution and the safety of all persons." (Doc. 373-57 (Ex. 192) at 1).

549. The updated framework in AR 327 (2025) provides factors that determine the totality of the circumstances, including: severity of the incident; immediate or potential threat posed to the officer or others; resistance; number of inmates and officers involved in an incident; size, age, gender, and physical condition of the officer and inmate; amount and duration of force; inmate's known history; bystanders; available alternatives; and de-escalation efforts. (Doc. 373-57 (Ex. 192) at 4-5).

550. AR 327 (2025) identifies ADOC's Use of Force Manual as the source of specific use of force procedures. (Doc. 373-57 (Ex. 192) at 6).

551. ADOC's Use of Force Manual instructs that correctional officers should not use force "[a]s a means of punishment, reprisal, or retaliation; In a purposeless, malicious, or sadistic manner; For any purpose which does not further a legitimate governmental interest; Disproportionately to the need for force or the perceived threat presented; or In response to an inmate's verbal insults, taunting threats, or swearing where there is no physical danger to staff or inmates." (Doc. 361, Use of Force Manual (Ex. 193) at 8).

552. ADOC's Use of Force Manual directs officers, when feasible, to seek compliance without force: "officers should use de-escalation tactics to reduce the need for force[,]" and, "[i]f feasible, physical force should only be used after attempts to de-escalate have failed." (Doc. 361, Use of Force Manual (Ex. 193) at 11).

553. Senior correctional officials (i.e., Wardens and Captains) declared their understanding of the de-escalation tactics set forth in ADOC's Use of Force Manual. (Doc. 374-73 (Ex. 287) at ¶ 251; Doc. 374-66 (Ex. 279) at ¶ 301; Doc. 374-65 (Ex. 278) at ¶ 140; Doc. 374-61 (Ex. 274) at ¶ 95; Doc 374-60 (Ex. 273) at ¶ 183).

554. For a planned use of force, ADOC's Use of Force Manual directs the Shift Commander to "verbally attempt to get the inmate to comply," suggests "a qualified mental health professional" to assess the inmate and remain on scene, and provides that, before force is initiated, the Shift Commander or supervisor "will

make another attempt to verbally de-escalate the situation and to gain compliance from the inmate." (Doc. 361, Use of Force Manual (Ex. 193) at 15-16).

555. ADOC's Use of Force Manual further provides that "[u]se of force ceases when inmate is restrained and compliance is attained." (Doc. 361, Use of Force Manual (Ex. 193) at 7, 11, 15-16).

556. ADOC's Use of Force Manual provides: "[a]fter force has been used against an inmate, the inmate must be seen by vendor nursing staff, examined, and provided necessary treatment," and that the examination should "[i]dentify obvious injuries and provide treatment" and "[t]reat other discovered injuries." (Doc. 361, Use of Force Manual (Ex. 193) at 24).

557. For chemical-agent exposure, ADOC's Use of Force Manual directs ADOC personnel that "[a] contaminated inmate should be restrained and decontaminated as soon as practical after the use of CA," and instructs staff to "[s]eek medical attention immediately if the inmate displays respiratory problems" and to seek medical attention if the inmate's symptoms have not disappeared within one hour. (Doc. 361, Use of Force Manual (Ex. 193) at 19).

558. ADOC's Use of Force Manual contains a section on the duty to intervene that states "[o]fficers must intervene when they have an opportunity to prevent another officer from using unlawful force. Duty to intervene cases may be

investigated by LESD and appropriate action taken after the investigation. (Doc. 361, Use of Force Manual (Ex. 193) at 8).

559. Multiple senior correctional staff declared that their officers should act in accordance with ADOC's new Use of Force policies. (Doc. 374-67(Ex. 280) at ¶ 191; Doc. 375-65 (Ex. 278) at ¶ 140; Doc. 372-59 (Ex. 272) at ¶ 140; Doc. 374-61 (Ex. 274) at ¶ 99; Doc. 374-60 (Ex. 273) at ¶ 179; Doc. 374-58 (Ex. 271) at ¶ 203).

560. Plaintiff's correctional expert (Horn) described AR 327 (2025) as "a sound policy." (Doc. 361, Deposition of Martin Horn (Ex. 168) at 328:15-331:3).

### H. TRAINING ON ADOC'S NEW USE-OF-FORCE POLICY AND USE OF FORCE MANUAL

561. ADOC's Use of Force Manual states that "[s]taff who interact directly with inmates will receive initial training related to the use of force at the basic training academy and at least annually thereafter." (Doc. 361, Use of Force Manual (Ex. 193) at 8).

562. Similarly, AR 327 (2025) states that "staff who interact directly with inmates will receive initial training related to the use of force during basic training and annually thereafter." (Doc. 373-57 (Ex. 192) at 1).

563. ADOC's Use of Force Manual identifies subjects for the initial training that include, among other topics, "Planned use of force," "Verbal commands," "De-escalation," "Duty to intervene," "Report writing," and "Use of force standards." (Doc. 361, Use of Force Manual (Ex. 193) at 8).

564. In October 2023, Stewart and his team provided the first use of force training under the revised policy to ADOC's CERT. (Doc. 373-50 (Ex. 185) at 137:17-138:10).

565. From October 2023 through January 2025, Stewart and his team trained correctional officers working in the ADOC men's facilities at issue in this litigation on AR 327 (2025) and the Use of Force Manual. (Doc. 373-50 (Ex. 185) at 137:25-138-17; Doc. 374-73 (Ex. 287) at ¶ 250; Doc. 374-70 (Ex. 284) at ¶ 283; Doc. 374-66 (Ex. 279) at ¶ 300; Doc. 374-65 (Ex. 278) at ¶ 139; Doc. 374-64 (Ex. 277) at ¶ 379; Doc. 374-61 (Ex. 274) at ¶ 93; Doc. 374-72 (Ex. 286) at ¶ 188; Doc. 374-69 (Ex. 283) at ¶ 225).

566. This use-of-force training regimen covered a broad scope of topics, including "the changes to the use of force taking place within the (sic) Alabama . . . what changed, why it changed, what the 327 is now, what the use of force manual entails, what the investigative piece is going to be. We were heavy on report writing so they understood what was important to -- for officers to put in the reports. That was for the officers. . . . We went into decision-making covering de-escalation and things along those lines and the de-escalation and the decision-making piece. . . . Covered the application [of] use of force. Told them how they going to be investigated for line staff and first-line supervisors." (Doc. 373-50 (Ex. 185) at 139:7-140:2).

## I. INVESTIGATIONS UNDER ADOC'S NEW USE OF FORCE POLICY AND MANUAL

567. ADOC's Use of Force Manual instructs that "[o]fficers who used or witnessed the use of force or the incident are required to document the incident." (Doc. 361 (Ex. 193) at 24).

568. ADOC's Use of Force Manual states that "[e]ach Officer should document the incident according to his or her individual knowledge and actions without consultation with other persons involved in the incident." (Doc. 361(Ex. 193) at 24).

569. ADOC's Use of Force Manual directs the primary officer to complete the "Primary Incident Report" and "other officers involved in the incident" to complete an "Incident Report Amendment." (Doc. 361 (Ex. 193) at 24).

570. For a planned[5] use of force, ADOC's Use of Force Manual instructs that "each officer will write an individual statement." (Doc. 361 (Ex. 193) at 17).

571. ADOC's Use of Force Manual further provides that "[t]he Shift Commander, on-call supervisor, or supervisor equivalent shall conduct a preliminary review of all use of force incidents within forty-eight (48) hours" and that "[t]he Warden will conduct the final facility review." (Doc. 361(Ex. 193) at 27).

[5] ADOC's Use of Force Manual defines a "planned" use of force as "A situation in this the need for force if anticipated but in which the circumstances allow for the time to prepare for the use of force because there is no immediate threat of injury to inmates, others, or state property."

572. ADOC's Use of Force Manual states that, when the final facility review finds the use of force justified, "the use of force review reports will be forwarded to the OIG for storage and historical keeping." (Doc. 361 (Ex. 193) at 27).

573. ADOC's Use of Force Manual also states that "[t]he OIG will conduct quarterly audits on a minimum of 10% of all use of force incidents" and that "[a]ny use of force patterns will be addressed." (Doc. 361(Ex. 193) at 27).

574. ADOC's Use of Force Manual instructs that the Use of Force Review Board will review uses of force "found to be not justified or in which a policy violation exists." (Doc. 361 (Ex. 193) at 27).

575. ADOC's Use of Force Manual defines the Use of Force Review Board as "[a] group of Men's Services and Women's Services designees (as applicable) and Training Division designees, and others as designated tasked with reviewing use of force incidents." It further provides that the Board's "voting membership at a minimum should include" the "Warden or Designee," "Captain of Security or Designee," "Director of Training or Designee," and "[o]thers as designated." (Doc. 361(Ex. 193) at 6, 27).

576. ADOC's Use of Force Manual provides that the Use of Force Review Board "will review the use of force incident for all documentation, photos, videos, and other relevant information" and "will make a final determination as to the

disposition of the use of force (justified, unnecessary, unjustified, or inconclusive)." (Doc. 361 (Ex. 193) at 27-28).

577. ADOC's Use of Force Manual states that "[a] Use of Force Review Report will be completed and sent to Commissioner, Chief Deputy, Deputy Commissioner, Regional Directors and OIG." (Doc. 361(Ex. 193) at 28).

578. Former Commissioner Hamm confirmed that as of January 30, 2025, the Use of Force Review Board operated according to the "use of force manual." (Doc. 373-20 (Ex. 154) at 140:23-25).

579. ADOC's Use of Force Manual states that use-of-force incidents "found to be excessive, retaliatory or unjustified in nature may be investigated by the Law Enforcement Services Division (LESD) and forwarded for prosecution, if applicable." (Doc. 361(Ex. 193) at 2).

580. ADOC's Use of Force Manual also instructs that a use of force resulting in death or serious bodily injury "will be reviewed by the Use of Force Review Board and investigated by the LESD." (Doc. 361(Ex. 193) at 18).

581. Under the updated use of force investigation process set forth in the AR 327 (2025) and ADOC's Use of Force Manual, the Shift Commander or on-call supervisor conducts an initial review, Captains or other supervisory staff investigate the incident, the Warden completes the final facility review, and OIG receives the

file for additional review and audit. (Doc. 374-66 (Ex. 279) ¶¶ 306-09; Doc. 361 (Ex. 193) at 26-27.

582. Under the updated process, facility-level investigators, such as Captains or Wardens, review incident reports, interview involved officers and inmates, review witness information, examine available camera footage, and collect medical records, body charts, and photographs. (Doc. 374-66 (Ex. 279) ¶¶ 305-09; Doc. 374-65 (Ex. 278) ¶¶ 143-46).

583. When facility and OIG conclusions differ, OIG tasks an OIG investigator who has not yet investigated the case to conduct a separate investigation before referral to the Use of Force Review Board. (Doc. 374-66 (Ex. 279) ¶ 309; Doc. 374-61 (Ex. 274) ¶ 104).

584. Special Agent Suzanne Hamm, a use of force investigator with OIG, testified that as of January 27, 2025, after the OIG use of force unit assembled "our facts and investigation," it forwarded the matter to the Review Board. (Doc. 373-53 (Ex. 188) at 25:19-23, 56:10-18, 57:17-19).

585. Special Agent Hamm further testified that, as of January 27, 2025, investigators speak with persons directly involved and check the "documentation" related to the involved officer's prior force incidents in the AIM system. (Doc. 373-53 (Ex. 188) at 54:11-56:7).

### J. DISCIPLINE FOR IMPROPER USES OF FORCE UNDER THE NEW USE-OF-FORCE POLICY

586. In making its final determination, the Use of Force Review Board may "make a recommendation regarding disciplinary action and/or refer the incident to LESD for criminal investigation." (Doc. 361(Ex. 193) at 28).

587. ADOC's Use of Force Manual further provides that, if the Use of Force Review Board recommends corrective action that departs from the progressive-discipline policy (see infra, AR 208), "the recommended corrective action and the reason for the deviation will be document[ed] in the final report." (Use of Force Manual (Ex. 193) at 28).

588. The Use of Force Review Board may recommend discipline up to and including termination. (Doc. 361(Ex. 193) at 27-28).

589. LESD conducts criminal investigations after the Use of Force Review Board completes its review when unjustified use of force presents potential criminal conduct, and LESD also reviews incidents involving serious bodily injury, death, or firearm discharge. (Doc. 361(Ex. 193) at 18, 24, 25, 27-28; Doc. 374-72 (Ex. 286) ¶ 194).

590. [redacted]

[redacted]

591. [redacted][6]




592. [redacted]

[6] (Docs. 374-1 –374-53 (Exs. 214-266)).
[7] To include "Not Justified."

[redacted]

593. [redacted].[8]




[8] (Docs. 374-1 –374-53 (Exs. 214-266)).

### K. DR. QUINN'S TESTIMONY WITH RESPECT TO USE OF FORCE

594. Dr. Quinn prepared descriptive summaries of ADOC's incident data that grouped incidents into five broad categories, including use of force, and "calculat[ed] the number of incidents within that broad category that happened . . . over time." (Doc. 373-28 (Ex. 162) at 110:4-111:9).

595. When asked whether he "independently look[ed] for other data points in the spreadsheets . . . to count use of force instances other than the class code name," Dr. Quinn testified, "No. The class code names I used for the use of force were just the two that we've already talked about." (Doc. 373-28 (Ex. 162) at 244:2-20).

596. He further testified that he "did not look for or look at" whether "there was a column that had a true/false whether or not use of force was used beyond the class code name." (Id.).

597. Dr. Quinn's plot charts expressed the data as either "absolute numbers of incidents" or "the same incidents expressed as rates per 10,000 prisoners." (Doc. 373-28 (Ex. 162) at 218:15-22).

598. Dr. Quinn's charts "do not account for any differences in the severity of different incidents grouped within the same incident type category." (Doc. 373-28 (Ex. 162) at 219:10-25).

599. As to the charts in Dr. Quinn's report, "the point is not to look at the fine grained differences" among incidents within the broad categories, but rather to examine "the broader trends in the collection of those types of incidents." (Doc. 373-28 (Ex. 162) at 220:18-221:12).

600. Quinn stated he analyzed data regarding "use of force" but not "excessive force." Quinn Report (Pl. Ex. 120) at 25.

## III. CLASSIFICATION

601. According to the Second Amended Complaint, Plaintiff alleges that the State "fail[s] to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should be kept separate;" that because of the State's alleged "failure to supervise prisoners and enforce classification and housing assignments, sexual predators are able to move from unit to unit without intervention, which results in sexual abuse;" and that the State allegedly "fail[s] to employ adequate screening, classification, and housing of prisoners to prevent sexual abuse." (Doc. 71 ¶¶ 113, 153, 155).

### A. PLAINTIFF'S EXPERT OPINIONS CONCERNING CLASSIFICATION

602. In the Opinion Matrix submitted to the Court, Plaintiff indicated none of its retained experts offered opinions concerning classification, including that neither Martin Horn nor Michelle Bonner "offered an opinion as to classification" and that Horn and Bonner offered "[redacted]

[redacted] (See, e.g., Doc. 340-1, Sheet 2 ("Outside Scope of Rebuttal"), Rows 76-85)

603. Bonner does not consider herself an expert in inmate classification. (Doc. 373-38 (Ex. 173) at 95:17-21).

604. Bonner did not review inmate institutional files or inmate classification files in forming her opinions concerning the inmate incidents cited in her report. (Doc. 373-38 (Ex. 173) at 200:18-201:2).

605. Horn did not review any individual inmate classification files in forming his opinions. (Doc. 361 (Ex. 168) at 79:16-18).

606. Horn did not study the assessments ADOC performs or the information ADOC gathers during intake. (Doc. 361 (Ex. 168) at 79:12-81:7).

607. Horn did not know how medical and mental-health codes factor into classification decisions or what sentencing, pre-sentence, or other background information is available to Classification Specialists. (Doc. 361 (Ex. 168) at 79:12-81:7).

608. Horn did not know who assigns inmates their initial custody levels. (Doc. 361 (Ex. 168) at 79:12-81:7).

609. Horn did not identify any inmate whom ADOC assigned an incorrect custody level based on that inmate's classification information. (Doc. 361 (Ex. 168) at 81:8-13).

610. Horn did not identify any inmate whom ADOC assigned to a facility whose security level was inconsistent with the inmate's classification or custody status. (Doc. 361 (Ex. 168) at 343:9-18).

611. Horn did not know what training ADOC Classification Specialists receive, what training ICS officers responsible for bed assignments receive, or what factors ICS officers consider in making bed assignments. (Doc. 361 (Ex. 168) at 342:17-343:4).

612. Horn did not conduct a facility-specific review of inmate classifications or review records identifying inmates in particular housing units and their respective classification levels. (Doc. 361 (Ex. 168) at 338:7-23, 343:5-8).

613. Horn testified that he does not challenge ADOC's intake custody-level determinations, testifying: "I do not quarrel with the determinations that are being made at intake for where individual -- what level of custody people require in Alabama. I don't challenge that." (Doc. 361 (Ex. 168) at 103:11-15).

614. Horn "didn't find anything inadequate or inappropriate about the custody levels assigned to the inmates." (Doc. 361 (Ex. 168) at 96:20-97:4).

615. According to Horn, "the process by which determinations of custody levels are made [by ADOC] is consistent with national practice." (Doc. 361 (Ex. 168) at 97:11-14).

### B. Development of ADOC's Classification System

616. In 2002, ADOC retained the services of Dr. Jim Austin for the purpose of "collaborat[ing] with the Alabama Department of Corrections in developing a classification system." (Doc. 373-17 (Ex. 151) at 48:8-49:13).

617. Dr. Austin's work included designing, validating, and implementing ADOC's external classification system. (Doc. 373-17 (Ex. 151) at 48:8-11).

618. More recently, Dr. Austin served as an expert witness for a number of inmates who instituted the lawsuit styled as Mark Duke, *et al.* v. Greg Lovelace, *et al.*, In the United States District Court for the Northern District of Alabama, Middle Division, Case No. 4:14-cv-01952-HDM ("Duke").

619. During the initial development process, Dr. Austin and ADOC used a template from the National Institute of Corrections ("NIC"), pilot-tested a prototype on a random sample of ADOC's inmate population, finalized the instrument based on the results, and certified it as acceptable before ADOC implemented the system. (Doc. 373-17 (Ex. 151) at 49:3-13).

620. Then, in 2007, ADOC sought technical assistance from the NIC to revalidate its classification system, and NIC selected Dr. Austin to perform the assignment. (Doc. 373-17 (Ex. 151) at 51:15-53:1).

621. Dr. Austin then returned to revalidate ADOC's classification system in 2007. (Doc. 373-17 (Ex. 151) at 49:18-23; see also, Doc. 373-18 (Ex. 152) at 132:8-19).

622. The revalidation process included reliability testing, which involved taking "a small sample of inmates and hav[ing] different classification people score that same person multiple times to see if [they're] getting consistency." (Doc. 373-17 (Ex. 151) at 50:3-51:1).

623. During his revalidation of ADOC's classification system in 2007, Dr. Austin concluded that "[ADOC] has a centralized classification unit that is well trained and experienced in prison classification systems." (Doc. 373-17 (Ex. 151) at 60:7-20).

624. Dr. Austin reported at the conclusion of his revalidation that he "knew the people in central office and it's a specialized unit. They knew the system inside and out. They were monitoring it, so it was a very impressive operation." (Doc. 373-17 (Ex. 151) at 60:7-20).

625. At the time of his deposition in Duke, i.e., March 30, 2016, Dr. Austin confirmed that "ADOC has an external classification system that meets national standards" and that ADOC's Classification Manual represents a "well-developed guide." (Doc. 373-17 (Ex. 151) at 87:4-13).

## C. ADOC'S CLASSIFICATION POLICY AND MANUAL

626. ADOC's Administrative Regulation 400 ("AR 400") governs inmate classification and incorporates the classification system designed with the assistance of Dr. Austin. (Doc. 360-118 (Ex. 119)).

627. AR 400 provides that "[i]nmates incarcerated in the ADOC will be classified by security level, custody, and program needs as defined in the ADOC Men's Services Classification Manual …." (Doc. 360-118 (Ex. 119) at 1).

628. The Male Classification Manual ("ADOC Classification Manual") in effect as of January 31, 2025, was revised in January 2018. (Doc. 360-119 (Ex. 120)).

629. ADOC's Classification Manual provides: "[t]he Classification Manual is the official document and authority for [ADOC] classification procedures[.]" (Doc. 360-119 (Ex. 120) at 5).

630. One objective of ADOC's Classification Manual is "[t]o make security and custody assignments consistent with available resources to ensure that inmates are placed in the least restrictive setting while providing for the protection of the public, staff and inmates." (Doc. 360-119 (Ex. 120) at 5; Doc. 374-68 (Ex. 282) at ¶¶ 9-12).

631. ADOC's Classification Manual defines classification as "the method of assessing inmate risk and need in order to arrive at an appropriate assignment to an

ADOC facility, housing unit and/or required programming." (Doc. 360-119 (Ex. 120) at 5; Doc. 374-68 (Ex. 282) at ¶ 36).

632. ADOC classification staff analyze and evaluate an inmate's custody and security level and the facilities at which the inmate may be housed. (Doc. 360-119 (Ex. 120) at 5, 11-13, 51-54).

633. Inmate Control Systems ("ICS") officers at the respective facilities determine specific housing placements such as dorms and cells, "as long as such placement satisfies the parameters set by classification staff." (Doc. 374-68 (Ex. 282) at ¶¶ 6-8).

634. ADOC's Central Office personnel, including the Director of Classification, the Assistant Director of Classification, and the Central Review Board ("CRB"), are tasked with the responsibility of implementing the classification process. (Doc. 360-119 (Ex. 120) at 8-9).

635. Further, each facility employs Classification Supervisors and Classification Specialists to assist in administering the classification process. (Doc. 360-119 (Ex. 120) at 9-10; Doc. 374-82 (Ex. 296)).

636. Central Classification is ADOC's central office classification division, which includes the CRB and CRB Analysts and is responsible for performing systemwide classification review and policy compliance, providing guidance and support to facility classification staff, and performing certain final decision-making

functions for classification recommendations submitted by facility classification staff. (Doc. 360-119 (Ex. 120) at 5-6, 8-9; Doc. 373-37 (Ex. 172) at 43:4-44:4; Doc. 373-36 (Ex. 171) at 79:9-80:2; Doc. 373-2 (Ex. 135) at 24:3-27:12).

637. ADOC's Director of Classification oversees the classification processes and Central Classification, including the CRB. (Doc. 360-119 (Ex. 120) at 8).

638. The Director of Classification implements ADOC policies and procedures for inmate classification, supervises the operation of the CRB, evaluates "institutional classification units through site visits and review of work produced," and provides "classification related assistance to ADOC staff." (Doc. 360-119 (Ex. 120) at 8).

639. The Assistant Director of Classification reviews and recommends updates to the Classification Manual, provides "classification related assistance to ADOC staff," and performs the Director's duties in the Director's absence. (Doc. 360-119 (Ex. 120) at 8).

640. CRB Analysts analyze classification reviews submitted by institutional classification units to determine compliance with classification policies. (Doc. 360-119 (Ex. 120) at 9).

641. CRB Analysts also provide "instructional guidance to ADOC personnel on classification policies and procedures" and conduct institutional audits to

determine whether the classification process is operating in compliance with policies and procedures. (Doc. 360-119 (Ex. 120) at 9).

642. Classification Supervisors oversee the classification process to monitor whether the process operates in compliance with policies and procedures, serve as the direct supervisor for their facility classification unit, and train Classification Specialists. (Doc. 360-119 (Ex. 120) at 9).

643. Classification Specialists conduct interviews, document relevant information, manage inmate caseloads, address classification questions and concerns of inmates, initiate classification reviews and recommendations, and meet with inmates in person at least annually. (Doc. 360-119 (Ex. 120) at 9-10).

### D. INITIAL CLASSIFICATION

644. Kilby Correctional Facility serves as ADOC's receiving and initial-classification facility for male inmates entering ADOC custody, unless otherwise directed. (Doc. 360-119 (Ex. 120) at 11; Doc. 373-37 (Ex. 172) at 31:1-32:8).

645. Initial classification involves the processing, assessment, and evaluation of an inmate upon admission to ADOC, resulting in custody, institutional placement, and identification of treatment and programming needs. (Doc. 360-119 (Ex. 120) at 11).

646. During intake, an inmate receives a physical examination and mental-health screening and is assigned a corresponding Health Code and Mental Health Code. (Doc. 360-119 (Ex. 120) at 12).

647. The inmate also undergoes psychological testing, the results of which are used in classification recommendations and determinations. (Doc. 360-119 (Ex. 120) at 12).

648. As part of initial intake, ADOC's classification staff identify inmates believed to be affiliated with a Security Threat Group ("STG") and document this information in the Inmate Management System. (Doc. 360-119 (Ex. 120) at 11-12).

649. Dr. Austin agreed that STG identification is "necessary" as an initial step in a classification system. (Doc. 373-17 (Ex. 151) at 117:21-118:11).

650. ADOC screens incoming inmates within seventy-two hours of arrival for potential risk of sexual vulnerability or sexual aggression. (Doc. 360-119 (Ex. 120) at 11).

651. The screening relies upon an inmate interview and available information regarding the inmate's prior history, and inmates identified as potential victims or potential predators are referred to a mental-health professional for further evaluation and final designation. (Doc. 360-119 (Ex. 120) at 11).

652. A Classification Specialist conducts an individual interview as part of the classification process. (Doc. 360-119 (Ex. 120) at 12; Doc. 374-68 (Ex. 282) at ¶¶ 48-50).

653. Classification Specialists review relevant databases, records, and other available information, including court records, sentence information, psychological evaluations, pre- or post-sentence investigations, inmate records, AlaCourt and AlaCop information, Ohio Risk Assessment System ("ORAS") information when available, and information from county jails and other sources. (Doc. 360-119 (Ex. 120) at 12; Doc. 374-68 (Ex. 282) at ¶¶ 50-52).

654. Classification Specialists may seek additional information from district attorneys, sheriffs, police departments, and other correctional systems. (Doc. 360-119 (Ex. 120) at 13; Doc. 373-37 (Ex. 172) at 63:9-64:16).

655. Classification staff ask inmates whether they have known enemies within ADOC and review the inmate's records for previously validated enemies. (Doc. 360-119 (Ex. 120) at 57; Doc. 374-68 (Ex. 282) at ¶¶ 53-54).

656. Classification staff enter enemies identified and validated during the interview into the Classification Module. (Doc. 360-119 (Ex. 120) at 57; Doc. 374-68 (Ex. 282) at ¶¶ 53-54).

657. Enemy information does not affect an inmate's custody classification or the categories of information used in the Risk Assessment. (Doc. 374-68 (Ex. 282) at ¶ 54).

658. Validated enemy information, however, may affect an inmate's housing or transfer placement. (Doc. 360-119 (Ex. 120) at 47; Doc. 374-68 (Ex. 282) at ¶ 54, n4).

659. The Classification Manual defines the Risk Assessment as "[a]n objective scoring instrument used in determining an inmate's custody level." (Doc. 360-119 (Ex. 120) at 7).

660. Initial classification uses the Risk Assessment to determine an inmate's scored custody level. (Doc. 360-119 (Ex. 120) at 57-59; Doc. 373-37 (Ex. 172) at 67:6-23).

661. The Risk Assessment considers seven categories: history of institutional violence, severity of the current offense, prior assaultive-offense history, escape history, prior felony convictions, current age, and other risk factors, including mental-health and substance-abuse issues. (Doc. 360-119 (Ex. 120) at 57-59, 72-73).

662. Dr. Austin testified in Duke that development of the points and scales in ADOC's Initial Classification Instrument was a "joint effort" involving "a lot of interaction with the classification staff." (Doc. 373-17 (Ex. 151) at 135:2-17).

663. BOP considers similar categories during its initial classification, including an inmate's history of violence, affiliations, length of sentence, and age. (Doc. 373-16 (Ex. 150) at 173:20-174:17).

664. After reviewing ADOC's Initial Classification Instrument, Dr. Austin agreed that it appropriately includes scoring items and scales addressing prior assaultive-offense history, escape history, and prior felony convictions. (Doc. 373-17 (Ex. 151) at 135:13-136:14).

665. Dr. Austin and ADOC developed the age scale in ADOC's Initial Classification Instrument through statistical analysis comparing inmates' ages to rates of misconduct. (Doc. 373-17 (Ex. 151) at 136:15-137:12).

666. Finally, ADOC further included mental-health and substance-abuse issues as predictive of inmate misconduct, and Dr. Austin concluded that these are appropriately included as "other risk factors" in the Initial Classification Instrument. (Doc. 373-17 (Ex. 151) at 137:10-138:1).

667. According to Dr. Austin, ADOC's Classification Module's automatic scoring of items based on database information is "a classic objective system." (Doc. 373-17 (Ex. 151) at 133:2-8).

668. ADOC's Classification Module assigns a numeric score using information in the database as well as information entered during the classification process. (Doc. 360-119 (Ex. 120) at 57; Doc. 374-68 (Ex. 282) at ¶¶ 55-56).

669. ADOC's Classification Manual provides that an inmate's scored numeric rating "will translate into one of three (3) custody levels (Close, Medium, or Minimum) and into security levels that determine specific institutional placement." (Doc. 360-119 (Ex. 120) at 7).

670. ADOC's Classification Manual directs staff that "[p]rofessional judgment and experience should be used in making recommendations and approvals." (Doc. 360-119 (Ex. 120) at 28).

671. Classification Specialists consider the objectively generated custody-level score but "do not disregard an inmate's individual history when making a final classification and security-level recommendation to the CRB." (Doc. 374-68 (Ex. 282) at ¶ 59).

672. Dr. Austin agreed that professional judgment is important in ADOC's objective classification process and that one would "never want to eliminate the element of professional judgment from this process." (Doc. 373-17 (Ex. 151) at 133:9-19).

673. ADOC's Classification Manual defines an "override" as a change to an inmate's actual scored custody level. (Doc. 360-119 (Ex. 120) at 6).

674. A mandatory override within ADOC's classification system changes the scored custody level based on classification policy, while a discretionary

override changes the scored custody level "when professional judgment indicates another custody level is more appropriate." (Doc. 360-119 (Ex. 120) at 6).

675. Dr. Austin also agreed that overrides are "an essential component of a classification system." (Doc. 373-17 (Ex. 151) at 102:12-14).

676. Dr. Austin explained that a Classification Specialist may disagree with the scored level because there is "something about the inmate's background that's not being picked up in the scoring process" that warrants an override. (Doc. 373-17 (Ex. 151) at 65:22-67:8).

677. Dr. Austin further agreed with ADOC's scoring thresholds of 12 or more for Close custody, 6 to 11 for Medium custody, and 5 or less for Minimum custody. (Doc. 373-17 (Ex. 151) at 139:3-7).

678. After the ADOC's Risk Assessment produces an initial scored custody level, Classification Specialists review the inmate's file to determine whether a discretionary override is appropriate. (Doc. 374-68 (Ex. 282) at ¶ 72).

679. In making that determination, Classification Specialists consider the known and verified factors, such as history of institutional violence, the severity of an inmate's current offense, prior assaultive offense and escape history, and prior felony convictions relevant to the individual inmate. (Doc. 374-68 (Ex. 282) at ¶¶ 61, 72-73; Doc. 360-119 (Ex. 120) at 57-58).

680. Inmates convicted of adult sex offenses, other than one conviction for Indecent Exposure or one conviction for Sexual Misconduct, "are eligible for no less than Medium custody." (Doc. 360-119 (Ex. 120) at 31; Doc. 374-68 (Ex. 282) at ¶¶ 67, 71).

681. ADOC's Classification Manual also identifies custody restrictions based on factors including escape history, violent offenses committed during escape, felony detainers, time remaining to serve, and disciplinary conduct. (Doc. 360-119 (Ex. 120) at 28-36; Doc. 374-68 (Ex. 282) at ¶¶ 66-71).

682. For initial intake classification, the Classification Specialist reviews available documentation and makes "recommendations for custody level, institutional placement, and treatment/program(s) participation." (Doc. 360-119 (Ex. 120) at 13).

683. The Psychological Associate and Warden then view the recommendation "for comments and/or recommendations." (Doc. 360-119 (Ex. 120) at 13).

684. The recommendation returns to the Classification Specialist "for final review before submission to the CRB." (Doc. 360-119 (Ex. 120) at 13; see Doc. 373-37 (Ex. 172) at 43:17-23 ("All of Kilby's progress reviews, whether they are annual progress reviews, initial reviews, they go down to the Central Review Board for final determination.")).

685. CRB Analysts then "review the recommendations and will approve, deny, or amend the recommendation resulting in the approved custody level, institutional placement, and treatment/program(s)." (Doc. 360-119 (Ex. 120) at 13; see Doc. 373-37 (Ex. 172) at 86:10-14 ("[A]t the end of the day, the Central Review Board has the final say" on initial classifications and if "anything else is not correct, it should be caught . . . at that step.")).

686. At least two classification professionals, one at Kilby and one in Central Classification, evaluate and formulate an inmate's initial classification under ADOC's classification procedures. (Doc. 374-68 (Ex. 282) at ¶ 19).

687. Classification Specialists at Kilby also collaborate with one another to finalize recommendations, and in many cases "at least three classification professionals – two at Kilby and one in Central Classification," participate in the classification process. (Doc. 374-68 (Ex. 282) at ¶ 20).

688. Classification Supervisors also review initial classifications "to make sure it is in line with the [ADOC Classification Manual]" and sign for accuracy. (Doc. 373-2 (Ex. 135) at 56:12-25).

689. Dr. Austin agreed that a Central Review Board is an "essential component of a classification system." (Doc. 373-17 (Ex. 151) at 94:15-17).

690. Dr. Austin also agreed that it is appropriate for CRB Analysts to review institutional classification recommendations for compliance with classification

procedures and criteria and to "approve, deny or amend" recommendations concerning "custody level and institutional placement and/or treatment/programs." (Doc. 373-17 (Ex. 151) at 94:18-95:16).

691. Close custody is "the most restrictive custody level to which an inmate can be assigned," and "[g]enerally, a Close custody inmate is housed in a restrictive housing unit in a close security institution." (Doc. 360-119 (Ex. 120) at 28).

692. Medium-custody inmates "are considered to be suitable for participation in formalized institutional treatment programs, work assignments or other activities within the confines of an institution," and "should be assigned to a medium or close security institution." (Doc. 360-119 (Ex. 120) at 30).

693. Minimum custody "is the lowest custody designation" and includes Minimum-In, Minimum-Out, and Minimum-Community. (Doc. 360-119 (Ex. 120) at 32).

### E. Review of Initial Classification Recommendations

694. ADOC's CRB Analysts may return a classification recommendation to the facility-level classification staff "for correction or clarification." (Doc. 360-119 (Ex. 120) at 22).

695. If a recommendation does not comply with ADOC's Classification Manual, the CRB Analyst may amend the classification or return it to the

Classification Unit with instructions for amendment. (Doc. 373-2 (Ex. 135) at 54:4-55:8; Doc. 374-68 (Ex. 282) at ¶ 27).

696. The CRB's approved classification decision is entered into the Classification Module and documented on a Boarding Sheet. (Doc. 360-119 (Ex. 120) at 13-14; Doc. 374-68 (Ex. 282) at ¶ 27).

697. The Boarding Sheet identifies the inmate's approved custody level, institutional placement, and treatment or programming. (Doc. 374-68 (Ex. 282) at ¶ 27).

698. A copy of the Boarding Sheet is maintained in the inmate's file. (Doc. 360-119 (Ex. 120) at 13; Doc. 374-68 (Ex. 282) at ¶ 80).

699. "The initial inmate classification process concludes with the transfer/assignment of the inmate to an approved institution." (Doc. 360-119 (Ex. 120) at 15).

### F. PERIODIC CLASSIFICATION REVIEWS AND RECLASSIFICATION

700. The Classification Manual defines "Reclassification" as "[t]he process of reevaluating an inmate's custody and placement as often as circumstances warrant, but not less than twice per year." (Doc. 360-119 (Ex. 120) at 6).

701. The State's classification expert, Kathlene "Kathy" Lane, possesses more than thirty-four years of experience with BOP and personally conducted inmate classifications for approximately twelve years in roles including case

manager, case management coordinator, and regional designator. (Doc. 373-24 (Ex. 158) at 124:8-125:1).

702. As a case manager with BOP, Lane performed both classifications and reclassifications, reviewed inmate progress and disciplinary history, and used the BOP's classification system to determine security and custody levels of inmates. (Doc. 373-24 (Ex. 158) at 99:17-101:15).

703. As a case management supervisor, Kathy Lane reviewed classification paperwork and trained staff on scoring and the FBOP Custody Classification Manual; as Southeast Regional Designator, she handled initial classifications and transfers for twenty-two facilities and reviewed approximately 17,000 inmates annually. (Doc. 373-24 (Ex. 158) at 108:14-109:10, 110:5-24).

704. Kathy Lane also served as a Unit Manager, Associate Warden, and Warden with BOP, where she supervised classification work, reviewed inmate packets and classification forms, trained case management staff on BOP's classification manual, and acted as an approving or denying official on classification and transfer decisions. (Doc. 373-24 (Ex. 158) at 111:12-112:4, 116:23-117:4, 118:1-120:5, 120:6-121:13).

705. According to Kathy Lane, ADOC maintains an ongoing classification process, reflecting "a structured process for reassessing custody, placement, and

safety concerns throughout an inmate's period of incarceration." (Doc. 373-24 (Ex. 158) at 182:4-8).

706. With semi-annual and special progress reviews, in addition to annual reviews, an inmate's classification "is not one and done. It is a fluid document that goes -- as long as the inmate is incarcerated, it continues." (Doc. 373-24 (Ex. 158) at 185:14-18).

707. Once an inmate transfers to their assigned facility, the facility assigns the inmate to a Classification Specialist. (Doc. 360-119 (Ex. 120) at 16).

708. The Classification Specialist reviews the inmate's file and conducts a meeting with the inmate within five working days "to discuss recommended program(s), expectations, and the schedule for future reviews." (Doc. 360-119 (Ex. 120) at 16; see, e.g., Doc. 374-61 (Ex. 274) at ¶ 155; Doc. 374-59 (Ex. 272) at ¶ 102 ("Classification staff generally interview inmates within 72 hours of arriving to Bullock.")).

709. Classification Specialists "utilize ADOC's [C]lassification [M]anual to classify inmates," considering "an inmate's institutional behavioral history, known enemies, programming needs, and mental health and medical needs, among other factors." (Doc. 374-64 (Ex. 277) at ¶ 399).

710. After meeting with a Classification Specialist, the inmate is added to the Specialist's caseload management system. (Doc. 360-119 (Ex. 120) at 16).

711. Inmates receive an annual progress review except inmates serving a death sentence. (Doc. 360-119 (Ex. 120) at 16; see, e.g., Doc. 374-61 (Ex. 274) at ¶ 161).

712. Inmates also receive a file review at least every six months, except inmates serving a life-without-parole or death sentence. (Doc. 360-119 (Ex. 120) at 16-17; see, e.g., Doc. 374-64 (Ex. 277) at ¶ 401 ("Classification Specialists review an inmate's classification two times per year."); Doc. 374-66 (Ex. 279) at ¶ 176 ("Staton's Classification staff members conduct periodic reviews of inmates, generally twice per year."); Doc. 374-73 (Ex. 287) at ¶ 232 ("The duties of the classification staff at Donaldson primarily consist of conducting reclassifications of inmates for those inmates' annual and semiannual reviews. Inmates meet with classification staff at least twice per year.").

713. If the file review indicates no change in custody level, institutional placement, or program needs, the results are documented and the next progress review is scheduled. (Doc. 360-119 (Ex. 120) at 17; see, e.g., Doc. 374-61 (Ex. 274) at ¶ 162).

714. If changes are deemed appropriate, a formal progress review is scheduled. (Doc. 360-119 (Ex. 120) at 17; see, e.g., Doc. 374-61 (Ex. 274) at ¶ 162 ("If the inmate does not qualify for changes in custody level, the Classification Specialist may send the inmate a written notification of the results of the semi-annual

classification review rather than meeting with the inmate in person. However, Classification Specialists meet with the inmate in person when the inmate's custody level changes.")).

715. During the annual review, an "inmate's contact information, religious preference and veteran's status" are validated and updated if needed. (Doc. 360-119 (Ex. 120) at 16).

716. During semi-annual reviews, "[w]here no change in custody level, institutional placement or program needs is indicated, the results of the review will be documented and the month of the next scheduled progress review will be indicated. A copy of the review will be given to the inmate and added to the inmate file." (Doc. 360-119 (Ex. 120) at 17; see, e.g., Doc. 374-66 (Ex. 279) at ¶ 178 ("[I]f the Classification review shows that an inmate is not eligible for a change in custody level, the Classification staff member may notify the inmate in writing of the results of the review.")).

717. If changes to an inmate's classification are needed, the Classification Specialist schedules a formal progress review. (Doc. 360-119 (Ex. 120) at 17; see, e.g., Doc. 374-66 (Ex. 279) at ¶ 178; Doc. 374-61 (Ex. 274) at ¶ 162).

718. In addition to annual and semi-annual reviews, "a special progress review will be conducted when there has been a significant change in program needs or status." (Doc. 360-119 (Ex. 120) at 17).

719. Such changes may include: "completion of a program; disposition of a felony detainer previously limiting custody level and institutional placement; placement of a felony detainer that impacts custody eligibility; receipt of source documentation or information previously requested by the CRB; identification and verification of a known enemy; granting of a judicial appeal on a current conviction; [or] reduction in sentence." (Doc. 360-119 (Ex. 120) at 17).

720. A special progress review may also be triggered, when, for example, "[i]nmates involved in violent incidents receive disciplinary action and, if found guilty of a disciplinary violation, undergo reclassification to a higher level." (Doc. 374-73 (Ex. 287) at ¶ 159).

721. The Classification Manual provides that institutional violence, including fighting with a weapon, fighting resulting in serious injury, assault resulting in serious injury, or assault with a weapon, may result in placement in Close custody. (Doc. 360-119 (Ex. 120) at 28-29).

722. Similarly, in BOP, a violent incident may affect an inmate's classification score and result in a recommendation for transfer to a higher-security facility. (Doc. 373-16 (Ex. 150) at 181:25–184:11).

723. Classification Specialists "review inmate records, including any requests from the inmate for programming or vocational training, and [attempt] to assign the inmate to programming that best meets the inmate's needs and can provide

him with essential tools for re-integration upon release." (Doc. 374-64 (Ex. 277) at ¶ 401).

724. Inmates also can request a classification review. (Doc. 374-64 (Ex. 277) at ¶ 401).

725. At Bullock, classification staff conduct semi-annual and annual reviews addressing inmate behavior, program participation, time served, housing needs, job assignments, and program eligibility. (Doc. 374-59 (Ex. 272) at ¶¶ 100-105).

726. At Donaldson, classification staff conduct annual and semi-annual reclassification reviews, receive updates concerning inmate disciplinary information, update health and mental health codes, verify programming needs, and process inmate requests for reclassification. (Doc. 374-73 (Ex. 287) at ¶¶ 230-234).

727. At Easterling, Classification Specialists review inmate classifications twice each year. (Doc. 374-65 (Ex. 278) at ¶ 158).

728. Inmates may request additional classification reviews, and the CRB determines whether to approve facility-level reclassification recommendations. (Doc. 374-65 (Ex. 278) at ¶¶ 158-159).

729. Classification staff at Elmore conduct annual and semi-annual classification reviews, "during which the inmate's assigned Classification Specialist reviews the inmate's institutional file and determines whether the inmate is eligible for a decrease in custody level." (Doc. 374-61 (Ex. 274) at ¶ 161).

730. During these reviews, "the Classification Specialist also recommends programming to the inmate and determines whether the inmate may be eligible for transfer to a work release facility." (Doc. 374-61 (Ex. 274) at ¶ 161).

731. Fountain's classification staff meet with inmates to review classification, which may result in changes to custody or security levels. (Doc. 374-67 (Ex. 280) at ¶ 227).

732. If the inmate requires a classification change, the Classification Specialist makes a recommendation and sends it to CRB, which makes a final decision regarding classification changes. (Doc. 374-67 (Ex. 280) at ¶ 227).

733. Kilby's Classification Specialists "review inmates' files biannually and perform annual progress reviews to decide whether to amend an inmate's classification status." (Doc. 374-68 (Ex. 282) at ¶ 30).

734. During Reclassification, "Kilby's Classification Unit considers the available information, including input from correctional staff, medical providers, work supervisors, the Chaplain, and other staff members." (Doc. 374-68 (Ex. 282) at ¶ 92).

735. Classification specialists at Limestone review an inmate's classification twice per year, and inmates also may request a classification review. (Doc. 374-70 (Ex. 284) at ¶ 256).

736. Limestone's classification staff make recommendations to increase or decrease an inmate's custody level, and CRB approves or disapproves the recommendations. (Doc. 374-70 (Ex. 284) at ¶ 257).

737. The Internal Classification Board ("ICB") at St. Clair "meets weekly and reviews inmates for classification, job assignment, and programming needs/assignment." (Doc. 374-69 (Ex. 283) at ¶ 192).

738. During the assessment process, "the ICB reviews various factors, including but not limited to disciplinary history, behavior at previous institutions, safety concerns, education level, ability to live in population, mental health status, classification history, enemies, programming needs, and [STG] affiliation." (Doc. 374-69 (Ex. 283) at ¶ 193).

739. Staton's classification staff conduct periodic reviews of inmates, generally twice per year. (Doc. 374-66 (Ex. 279) at ¶ 176).

740. During these reviews, "the Classification staff member reviews an inmate's institutional file, disciplinary history, program completion, and employment history while incarcerated." (Doc. 374-66 (Ex. 279) at ¶ 177).

741. Ventress Classification Specialists conduct annual and semi-annual reviews. They also review inmates for increases in custody following disciplinary conduct and for reductions in custody based on institutional adjustment. (Doc. 374-58 (Ex. 271) at ¶¶ 154-156).

### G. SAFETY INFORMATION USED IN CLASSIFICATION AND HOUSING DECISIONS

742. In addition to the PREA screening conducted during initial intake, ADOC classification staff screen inmates again within seventy-two hours after transfer to an institution for potential risk of sexual vulnerability or sexual aggression. (Doc. 360-119 (Ex. 120) at 11, 16; see, e.g., Doc. 374-59 (Ex. 272) at ¶ 102).

743. BOP likewise considers PREA screening information in making institution-level housing assignments. (Doc. 373-16 (Ex. 150) at 171:3–172:18).

744. During PREA screening, the Classification Specialist or authorized designee interviews the inmate and uses available information concerning the inmate's prior history to screen for potential sexual vulnerability or sexual aggression. (Doc. 360-119 (Ex. 120) at 11, 16; see, e.g., Doc. 374-59 (Ex. 272) at ¶ 102 ("The classification staff further review whether an inmate possesses a history of sexual abuse or sexual harassment complaints (either as the victim or the perpetrator) and an inmate's responses to PREA-related questions to assist in determining if the inmate meets the designation of a predator or prey as defined by PREA."); Doc. 374-70 (Ex. 284) at ¶ 270 ("Classification staff screen incoming inmates for [PREA] designations utilizing a PREA Risk Factors Checklist pursuant to AR 454-2[.]")).

745. If PREA screening identifies an inmate as a potential victim or potential predator, classification staff refer the inmate to a mental-health professional for further evaluation and final designation. (Doc. 360-119 (Ex. 120) at 11, 16; Doc. 373-37 (Ex. 172) at 80:18-81:14).

746. PREA screening information may be used in making specific housing decisions within a facility. (Doc. 373-2 (Ex. 135) at 67:5-21).

747. PREA screening does not determine an inmate's custody classification or facility placement. (Doc. 373-2 (Ex. 135) at 67:5-21).

748. At Bibb, classification staff "may recommend that an inmate who engages in violence against another inmate or staff to a closed-custody level, which necessitates a transfer from the medium-security facility to a Level V facility." (Doc. 374-64 (Ex. 277) at ¶ 339).

749. At Bullock, classification staff consider criminal history, disciplinary history, psychological assessments, medical and mental-health needs, substance-abuse issues, sexual-abuse history, and PREA screening information to assess incoming inmates and to assist in assigning inmates to dormitories that meet their classification needs. (Doc. 374-59 (Ex. 272) at ¶¶ 100-104).

750. Classification staff at Donaldson conduct reclassification reviews of inmates on an annual and semiannual basis. (Doc. 374-73 (Ex. 287) at ¶ 232).

751. The classification staff also receive constant updates on inmates' disciplinary information, which can affect the inmate's classification. (Doc. 374-73 (Ex. 287) at ¶ 232).

752. At Easterling, classification staff conduct a PREA assessment when an inmate arrives and review available information, including the inmate's conviction and prior discipline for sexually violent conduct. (Doc. 374-65 (Ex. 278) at ¶¶ 160-162).

753. Easterling's classification staff consider [redacted] (Doc. 374-65 (Ex. 278) at ¶¶ 163-165).

754. When reviewing an inmate's custody level, Elmore's classification staff use the classification module to see the current bed assignment, mental and physical health code, a flag signaling if the inmate carries a PREA designation, and the inmate's STG affiliation. (Doc. 374-61 (Ex. 274) at ¶ 159).

755. Classification Specialists recommend the lowest custody placement for which the inmate is eligible. (Doc. 374-61 (Ex. 274) at ¶ 161).

756. Correctional staff at Fountain work to balance inmates affiliated with STGs across dorms to prevent a single STG from gaining disproportionate influence within a particular dorm. (Doc. 374-67 (Ex. 280) at ¶ 226).

757. Holman's classification staff conduct an intake interview for new inmates, during which inmates receive a PREA risk assessment. (Doc. 374-72 (Ex. 286) at ¶ 127).

758. The PREA risk assessment evaluates several factors and determines whether to designate the inmate a victim, predator, potential victim, or potential predator. (Doc. 374-72 (Ex. 286) at ¶ 127).

759. Classification staff refer inmates with a PREA-designation to mental health for further evaluation. (Doc. 374-72 (Ex. 286) at ¶ 127).

760. After this initial review by the Classification staff, the Institutional Classification Review Board at Holman makes an inmate classification recommendation and sends the recommendation to the Central Review Board in Montgomery for a final determination. (Doc. 374-72 (Ex. 286) at ¶ 128).

761. When reclassifying inmates at Kilby, Classification Specialists use professional discretion and judgment when evaluating the relevant factors, "including the safety of the community, potential for negative community reaction, overall criminal and institutional record, etc." (Doc. 374-68 (Ex. 282) at ¶ 92).

762. Negative institutional behavior may result in an increase in custody level. (Doc. 374-68 (Ex. 282) at ¶ 84).

763. At Limestone, ICS staff first look at an inmate's PREA designation when making bed assignments. (Doc. 374-70 (Ex. 284) at ¶ 258).

764. Classification staff and ICS staff also consider inmates' STG affiliations when making housing assignments. (Doc. 374-70 (Ex. 284) at ¶ 262).

765. At St. Clair, Classification Specialists assess incoming inmates for potential victim or predator status using standardized questions, observations, and information in the inmate's file. (Doc. 374-62 (Ex. 275) at ¶ 29).

766. Classification Specialists also reassess inmates following sexual-abuse or sexual-harassment incidents when appropriate. (Doc. 374-62 (Ex. 275) at ¶ 29).

767. St. Clair uses PREA designations in making housing assignments and houses inmates designated as victims separately from inmates designated as predators. (Doc. 374-62 (Ex. 275) at ¶ 31).

768. St. Clair reassigns inmates between housing units when necessary to maintain separation between inmates designated as victims and predators. (Doc. 374-62 (Ex. 275) at ¶ 32).

769. The ICS Officer implements bed and housing changes resulting from PREA designations. (Doc. 374-62 (Ex. 275) at ¶ 35).

770. During classification reviews, the classification staff at Staton determine whether an inmate requires an increase in custody level or is eligible for a decrease in custody level. (Doc. 374-66 (Ex. 279) at ¶ 177).

771. Classification staff also evaluate an inmate's eligibility for transfer to a work release facility or another facility for programs Staton does not offer. (Doc. 374-66 (Ex. 279) at ¶ 177).

772. If a classification review shows that an inmate should receive an increase or decrease in custody level, the assigned classification staff member must meet with the inmate in person to notify the inmate. (Doc. 374-66 (Ex. 279) at ¶ 178).

773. At Ventress, a Classification Specialist completes a PREA assessment to determine whether an incoming inmate falls into the category of "predator" or "victim." (Doc. 374-58 (Ex. 271) at ¶ 152).

774. If the Classification Specialist categorizes the inmate as a potential PREA "predator," the inmate will typically be housed in [redacted] (Doc. 374-58 (Ex. 271) at ¶ 152).

775. If the Classification Specialist categorizes an inmate as a potential PREA "victim," the inmate will typically be housed in [redacted]. (Doc. 374-58 (Ex. 271) at ¶ 152).

776. Classification staff at Ventress may review an inmate for an increase in custody level based on disciplinary actions taken against an inmate for violations of rules and policies. (Doc. 374-58 (Ex. 271) at ¶ 156).

# ARGUMENT

## I. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE STATE TO THE EXTENT PLAINTIFF'S CLAIMS RELY ON ALLEGATIONS OF CORRECTIONAL UNDERSTAFFING.

### A. ALL OF PLAINTIFF'S CLAIMS RELY SUBSTANTIALLY ON ALLEGATIONS OF CORRECTIONAL UNDERSTAFFING.

Plaintiff's claims rest largely on allegations of insufficient correctional staffing. Plaintiff's Deliberate Indifference Allegations focus almost exclusively on alleged understaffing. (Doc. 71, ¶¶ 254-263). In that section of the Second Amended Complaint, Plaintiff alleges that the State is "deliberately indifferent to the serious risk of substantial harm in all 13 of Alabama's Prisons for Men" and that the State is "aware of [its] failure to protect prisoners at Alabama's Prisons for Men from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, ADOC staffs' excessive use of force, and unsafe and unsanitary conditions." (Id., ¶¶ 254, 255). According to Plaintiff, the State "ha[s] been aware of the dangerous conditions in Alabama's Prisons for Men for many years, as evidenced by numerous statements by Alabama officials." (Id., ¶ 256). The Second Amended Complaint then quotes five alleged statements by State officials, all relating to alleged correctional staffing shortages:

a. In ADOC's Annual Report for Fiscal Year 2017, Commissioner Dunn emphasized that "the Department's major challenges continue to be critical shortages in correctional staffing, and crumbling infrastructure."

b. In ADOC's Annual Report for Fiscal Year 2018, Commissioner Dunn continued to highlight "critical shortages in correctional officer staffing" as a major challenge."

c. In February 2019, during an address to the Legislature, Commissioner Dunn explained that "there is a direct correlation between the shortage of officers in our prisons and the increase in violence," noting that the current level of violence was "unacceptably high."

d. In an op-ed published on February 12, 2019, Governor Ivey stated that "issues of violence, poor living conditions and mental illness persist within our system. These issues, and others, are exacerbated by a crowded inmate population, correctional and health care staffing challenges, and aging prison infrastructure—each piece compounding the others."

e. In an op-ed published on August 12, 2020, Commissioner Dunn stated that "[o]ur facilities are crowded, and our buildings are falling apart. Living and working conditions are, unquestionably, not sustainable. We face staffing shortages. Instances of violence among our inmate population pose a real challenge."

(Doc. 71, ¶ 256a-e). Plaintiff then alleges that "Alabama's Prisons for Men are still critically and dangerously understaffed." (Id., ¶ 258). The next paragraph of the Second Amended Complaint alleges that, "[b]y the first quarter of 2021, most of Alabama's prisons had correctional staff vacancy rates of over 50%," and includes charts purporting to reflect the vacancy rate of each facility as of that date. (Id., ¶ 259). Thus, Plaintiff's Deliberate Indifference Allegations focus largely on alleged correctional understaffing.

Aside from Plaintiff's Deliberate Indifference Allegations, the Second Amended Complaint contains multiple additional allegations regarding correctional staffing in support of each of Plaintiff's four claims:

- In the section of the Second Amended Complaint entitled "Defendants Fail to Protect Prisoners from Prisoner-on-Prisoner Violence at Alabama's Prisons for Men," Plaintiff alleges that "[a]nother factor contributing to the violence is the dangerously low level of security staffing throughout Alabama's Prisons for Men," and "ADOC continues to have approximately half of its staff positions filled." (Doc. 71, ¶ 87; see also id., ¶¶ 88-90 (containing further allegations about ADOC's correctional staffing vacancy rates)). Plaintiff relies on these allegations in support of its claim for failure to protect from prisoner-on-prisoner violence. (Id., ¶ 264).

- The section of the Second Amended Complaint entitled "Defendants Fail to Protect Prisoners at Alabama's Prisons for Men from Prisoner-on-Prisoner Sexual Abuse" alleges that "[i]nsufficient staffing leads to inadequate supervision, which in turn allows prisoner-on-prisoner sexual abuse to occur." (Id., ¶ 151; see also id., ¶ 152 (alleging that "[t]he physical plant designs of the facilities, combined with understaffing, makes visibility difficult and creates opportunity for prisoner-on-prisoner sexual abuse to occur unobserved"). Plaintiff relies on these allegations in support of its claim for failure to protect from prisoner-on-prisoner sexual abuse. (Id., ¶ 267).

- In the section of the Second Amended Complaint entitled "Defendants Fail to Protect Prisoners from Excessive Force at Alabama's Prisons for Men," Plaintiff alleges that the State's "overcrowding and understaffing of Alabama's Prisons for Men causes use of excessive force." (Id., ¶ 203). According to Plaintiff, "[o]verworked security staff in the overcrowded prisons lack sufficient backup and support to manage prison security, which results [sic] officers' increased fear of prisoner threats and excessive force." (Id.). Plaintiff relies on these allegations in

support of its claim for failure to protect from use of excessive force. (Id., ¶ 270).

- Finally, the section of the Second Amended Complaint entitled "Defendants Fail to Provide Safe and Sanitary Conditions at Alabama's Prisons for Men" alleges that "[u]nderstaffing" at each Facility (other than Draper and Holman), "coupled with" other factors, constitutes a "[c]ondition[]" that "expose[s] prisoners to a risk of serious harm." (Id., ¶¶ 240d (Bibb); 241c (Bullock); 242c (Donaldson); 244d (Easterling); 245c (Elmore); 246c (Fountain); 248c (Kilby); 249c (Limestone); 250c (Staton); 251c (St. Clair); and 252c (Ventress)). Plaintiff relies on these allegations in support of its claim for failure to provide safe conditions. (Id., ¶ 273).

Thus, all four of Plaintiff's claims rely heavily on allegations regarding correctional staffing. Plaintiff's retained expert Horn agreed that correctional staffing levels represent "an important factor" in Plaintiff's claims:

> Q: . . . Of the issues in your report including contraband, uses of force, classifications, inmate movement, extortion, count, let's just start with those. Does ADOC's current staffing levels contribute, in your mind, to those particular issues?
>
> A: I believe it does.
>
> Q: All of them?
>
> A: I believe it does.
>
> Q: Okay. Would you say that staffing is the principal contributing factor in all of those areas?
>
> A: Yeah, I would certainly say it's important. Is it principal? I don't know. I'd have to think about that. I can't – I don't know. I'd have to really think about that more. But it's – I'll concede that it's an important factor.

(SOF ¶ 15; see also Doc. 358-2 (Pl. Ex. 119) at 7); (Doc. 358-4 (Pl. Ex. 121) at 33); (Doc. 358-1 (Pl. Ex. 118) at 35). Thus, Plaintiff's retained experts' reports and testimony confirmed Plaintiff's reliance on alleged correctional understaffing in support of all of its claims.

### B. PLAINTIFF CANNOT ESTABLISH DELIBERATE INDIFFERENCE AS TO CORRECTIONAL STAFFING.

"[P]laintiff must demonstrate, as a threshold matter, that [inmates] suffered a deprivation that was, 'objectively, sufficiently serious.'" Wade, 106 F.4th at 1262 (quoting Farmer, 511 U.S. at 834) (some internal quotation marks omitted). Plaintiff cannot demonstrate that correctional staffing causes a sufficiently serious deprivation to inmates in ADOC's facilities. The undisputed facts presented here demonstrate that ADOC continues to recruit and retain correctional staff to increase its overall staffing compliment, while deploying current correctional staff so as to operate the State's facilities in a safe manner. (SOF ¶¶ 140, 145). [redacted]. (SOF ¶ 42). The RPU completes a full staffing analysis for each facility every other year following National Institute of Corrections guidelines. (SOF ¶¶ 45-46). In addition, in each "off" year, the RPU provides a staffing-review report. (SOF ¶ 47). The RPU conducts its analysis "based on the needs of the facility;" interviews staff and inmates; and analyzes factors such as the number of inmates, custody level, activities occurring within the facility, disciplinary incidents, and inmate movement. (SOF ¶¶ 45, 49-57). Based on its facility visits and review

of these factors, the RPU's staffing analysis recommends the number and locations of necessary posts. (SOF ¶ 51). The RPU performs this analysis without regard to the number of officers currently employed at the facility and does not "factor in budget concerns." (SOF ¶¶ 49-51).

Elizabeth Lambert-Hughes, ADOC's RPU Coordinator, receives and reviews post assignment rosters and testified that, based on her review, ADOC facilities cover shifts in line with the staffing analysis. (SOF ¶¶ 81-82). Plaintiff's retained expert Ray agreed that a staffing analysis represents "an appropriate process and mechanism to determine correctional staffing needs inside of a prison. (SOF ¶ 356). Additionally, Ray could not identify any evidence that ADOC's staffing levels led to increased sexual violence, led to contraband entering a facility, led to a correctional officer using force against an inmate, or led to an inmate not receiving transportation for necessary off-site medical or mental-health care. (SOF ¶¶ 328-34). In fact, Ray acknowledged that he did not conclude that ADOC's staffing levels in fact caused harm; instead, he opined only that ADOC's staffing levels "could be a risk." (SOF ¶ 355). Thus, Plaintiff cannot establish that correctional staffing leads to a sufficiently serious deprivation under Wade.

Even assuming for purposes of this Motion that Plaintiff can establish a sufficiently serious deprivation stemming from correctional staffing, Plaintiff cannot establish the State's deliberate indifference regarding correctional staffing. To

establish the State's deliberate indifference with respect to correctional staffing, Plaintiff must establish, with respect to each of Plaintiff's four claims, that: (1) the State's own actions regarding correctional staffing knowingly placed inmates at a substantial risk of serious harm, and (2) the State failed to respond to that risk in an objectively reasonable manner. Wade, 106 F.4th at 1253-54; Dunn, 179 F.4th at 1292. Plaintiff cannot make either showing. The evidence demonstrates (1) to the extent the State faces correctional staffing challenges, external factors, and not the State's actions, caused those challenges; and (2) the State responded reasonably to those challenges by engaging in extensive efforts to recruit and retain correctional staff.

#### 1. **External Factors, not Controlled by the State, Directly Contribute to ADOC's Correctional Staffing Challenges.**

In support of its claims that the State exhibited deliberate indifference to inmate violence, inmate sexual abuse, excessive force, and facility conditions, Plaintiff may not "focus . . . on some preexisting risk that [inmates] faced, without regard to its origin or cause[.]" Wade, 106 F.4th at 1260. Instead, to meet the Farmer-Wade criminal-recklessness standard, Plaintiff must show that ADOC "was subjectively aware that [its] own conduct put [inmates] at substantial risk of serious harm." Id. at 1255. In Farmer, the Supreme Court made clear that "'[t]he Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and

unusual "punishments."'"' Wade, 106 F.4th at 1257 (quoting Farmer, 511 U.S. at 837). "'[A] subjective approach,' the [Farmer] Court stressed, 'isolates those who inflict punishment,' and thus 'ensure[s] that only inflictions of punishment carry liability.'" Id. (quoting Farmer, 511 U.S. at 839). Plaintiff cannot make a criminal-recklessness showing as to correctional staffing within ADOC's facilities.

The record establishes that correctional staffing represents a considerable challenge not only for ADOC, but for correctional agencies across the United States, including state prisons, federal prisons, and local jails. (SOF ¶¶ 1-14). Indeed, even Plaintiff's retained experts admitted to "a national crisis of correctional staffing." (SOF ¶¶ 2, 4). According to U.S. Census Bureau data, state prison staffing decreased approximately ten percent nationwide between 2019 and 2022, and 21 states saw decreases in correctional staffing of greater than ten percent. (SOF ¶ 5). The correctional staffing crisis extends to the Federal Bureau of Prisons, which, in 2024, employed approximately 40% fewer correctional officers than appropriated. (SOF ¶ 9). The COVID-19 pandemic contributed to a further decrease in correctional staffing between 2020 and 2022. (SOF ¶ 4). The number of people employed by state prisons nationwide reached its lowest level in more than two decades in 2022, following the COVID-19 pandemic. (SOF ¶ 8). Thus, ADOC's correctional staffing challenges are not unique; federal, state, and local corrections agencies throughout the country share these challenges.

Other outside factors compound these challenges for ADOC. For example, Alabama experiences statewide unemployment and labor participation rates lower than national averages, both of which "create a major challenge for all employers across Alabama, including ADOC." (SOF ¶ 87). According to Ward, "[t]here are simply not enough people to meet job demand in Alabama." (SOF ¶ 88). In addition, "[n]ine of [ADOC's] thirteen major men's facilities are located in counties with a population of less than 100,000 people," which "negatively impacts the availability of qualified labor." (SOF ¶ 89). Younger workers seek "flexible work and work-life balance," which "largely do not align with careers in corrections due to the 24/7 nature of operations and the increasing staffing challenges that require staff to work mandatory overtime." (SOF ¶ 90). Younger workers also wish to maintain the ability "to communicate by text and email" while at work, and, "[c]urrently, corrections does not allow for the use of technology in the form of cell phones while at work." (SOF ¶ 91). Thus, many outside factors influence ADOC's ability to recruit and retain correctional staff. Accordingly, Plaintiff cannot demonstrate that ADOC's "own conduct," as opposed to "some preexisting risk," led to ADOC's correctional staffing challenges. Wade, 106 F.4th at 1260. Plaintiff therefore cannot establish criminal recklessness on the part of the State with respect to correctional staffing levels within ADOC's men's facilities.

**2. The State Responded Reasonably to Correctional Staffing Challenges.**

Even if Plaintiff could demonstrate criminal recklessness as to correctional staffing, no Eighth Amendment liability exists where prison officials "'responded reasonably to the risk, even if the harm ultimately was not averted.'" Wade, 106 F.4th at 1257 (quoting Farmer, 511 U.S. at 844); Swain, 961 F.3d at 1286. Plaintiff cannot demonstrate that the State responded unreasonably to any risk posed by correctional understaffing at ADOC's facilities, much less that it continues to respond unreasonably to any such risk.

Here, the undisputed evidence demonstrates that, in the face of these challenges, ADOC took and continues to take meaningful and effective steps to increase correctional staffing levels at its facilities. ADOC's efforts to increase correctional staffing challenges began as early as 2006. ADOC's total number of security staff increased from 2,579 in 2006 to 3,179 in 2010. (SOF ¶ 92). In approximately 2016, under its former Commissioner, Jefferson Dunn, ADOC obtained what Dunn reported was then the largest pay increase in ADOC's history. (SOF ¶¶ 104). Also in 2016, ADOC introduced new classifications of officers to work non-contact posts, increasing the availability of fully-trained correctional officers for tasks requiring contact with inmates. (SOF ¶¶ 126-30). In 2017, ADOC retained Warren Averett to advise it regarding correctional staffing. (SOF ¶ 164).

ADOC implemented several recommendations from Warren Averett, including a pay increase and morale-boosting measures. (SOF ¶¶ 164-74).

ADOC, under Dunn's leadership, published its first Strategic Plan in 2019, setting forth ADOC leadership's goals for the department for 2019-2022. (SOF ¶ 106). Dunn's administration implemented "a holistic array of specific initiatives to increase staffing." (SOF ¶ 117). Dunn testified that ADOC's staffing efforts took "a very positive turn" in approximately January or February 2019, before the COVID-19 pandemic "completely changed everything." (SOF ¶¶ 110-12). As noted above, the COVID-19 pandemic had an unprecedented impact on correctional staffing throughout the country. (Supra at 163). Between 2021 and 2022, the Alabama Legislature implemented two pay increases for state employees, including ADOC correctional staff. (SOF ¶ 122). ADOC also implemented an employee referral bonus and a retention bonus during this time. (SOF ¶ 123).

After Dunn left office on December 31, 2021, John Hamm became ADOC Commissioner on January 1, 2022. (SOF ¶¶ 142-43). Former Commissioner Hamm continued Dunn's efforts to increase ADOC's correctional staffing and described correctional staffing as his "number one issue." (SOF ¶¶ 143-44). In March 2023, under Hamm, ADOC implemented one of the largest pay raises in its history. (SOF ¶ 244). ADOC partnered with Troy University to develop a Physical Agility/Ability Test ("PAAT") specific to correctional officer job duties, and the Alabama Peace

Officer Standards and Training Commission ("APOSTC") adopted the revised PAAT for a three-year trial period effective October 1, 2022, and later adopted it permanently. (SOF ¶¶ 159, 163). Additionally, ADOC created opportunities for experienced correctional personnel, including retirees, to work on a part-time basis. (SOF ¶¶ 204-06). ADOC also contracted with private security companies to provide private security guards to work non-contact posts; as of September 2024, ADOC had hired approximately 250 private security guards. (SOF ¶¶ 261-64). In addition, ADOC implemented a Field Training Officer Program to help newly hired correctional staff transition to ADOC facilities. (SOF ¶¶ 265-68).

Under Hamm's Administration, ADOC hired additional personnel to oversee hiring additional correctional staff and retained Horizon Point Consulting to assist with recruiting. (SOF ¶¶ 176-84). ADOC implemented new recruiting software to track applicants through the hiring process and expanded the number and geographic location of hiring events, including offering recruiting events on Saturdays beginning in August 2023. (SOF ¶¶ 187-97). ADOC increased hiring events from 17 per year in 2021 and 2022 to 138 in 2024, and ADOC attended over twenty job fairs in October and November 2024. (SOF ¶¶ 207-17). ADOC also took measures to streamline the hiring process, including obtaining and paying for birth certificates for Alabama-born applicants; providing on-site medical examinations at hiring events; and offering ACT WorkKeys testing free of charge at ADOC training

facilities so applicants would not have to obtain and pay for the test elsewhere. (SOF ¶¶ 230-31).

ADOC's extensive efforts to increase correctional staff paid dividends. Following the impact of COVID-19, only 52 applicants graduated from the Alabama Corrections Academy in 2022; in 2023, 160 applicants graduated, and 266 applicants graduated in 2024. (SOF ¶¶ 271-76). Total correctional staff at almost all of ADOC's men's facilities increased between 2022 and 2024. (SOF ¶¶ 282-316). For example, Bibb's correctional staffing levels increased by 85.7% between the third quarter of 2022 and the fourth quarter of 2024; Limestone's correctional staffing levels rose by 62.3% between the first quarter of 2023 and the fourth quarter of 2024; Staton's correctional staffing levels rose by 48.8% between the first quarter of 2023 and the fourth quarter of 2024; Donaldson's correctional staffing levels increased by 38.1% between the first quarter of 2023 and the fourth quarter of 2024; and Ventress's correctional staffing levels increased by 23.4% between the second quarter of 2023 and the fourth quarter of 2024. (SOF ¶¶ 282-316). Thus, while ADOC could not eliminate all correctional staffing vacancies, it took multiple, substantial steps that led to significant reductions in correctional staffing vacancies.

In Swain, the Eleventh Circuit addressed steps taken by correctional officials to respond to the COVID-19 pandemic. In that case, "medically vulnerable inmates" alleged that jail officials "inadequately responded to the COVID-19 outbreak and

thereby violated their constitutional rights." 961 F.3d at 1280. The district court commissioned an independent expert, who concluded that the jail officials were "doing their best balancing social distancing and regulation applicable to the facility." Id. at 1282 (internal quotation marks and citation omitted). Despite this expert conclusion, the district court issued a preliminary injunction, "emphasiz[ing] that it was 'unrebutted' that 'the rate of inmate infections has increased dramatically' and that undisputed 'medical evidence and testimony from numerous doctors' showed 'that other measures—absent social distancing—are not alone sufficient to stop the spread of the virus.'" Id. at 1283 (quoting Dist. Ct. Order at 34). The district court concluded that the jail officials' "'contention that the actions they have taken to date are sufficient is belied by the exponential rate of infection since this case commenced.'" Id. (quoting Dist. Ct. Order at 37). The district court's reasoning failed to survive appellate review.

The Eleventh Circuit reversed the district court's preliminary injunction in Swain. Id. at 1280. The parties agreed that COVID-19 presented "a substantial risk of serious harm," and the jail officials did not "dispute that they had 'subjective knowledge' of the risk[.]" Id. at 1285. The appeal therefore "hinge[d] on whether the" jail officials "'recklessly disregard[ed] that risk.'" Id. (quoting Farmer, 511 U.S. at 836). According to the Eleventh Circuit, "[a]s applied in the prison context, the deliberate-indifference standard sets an appropriately high bar." Id. The Court

observed that, "even while the district court seemed to assume a state of affairs in which the [jail officials] had taken numerous measures to combat the virus, it held that the [jail officials] were nonetheless deliberately indifferent based on two considerations: (1) the increase in the rate of infections at [the jail] and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility." Id. at 1287. The Court concluded that "the district court erred" because "[n]either the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the [jail officials] acted with 'subjective recklessness as used in the criminal law.'" Id. (quoting Farmer, 511 U.S. at 839-40). The Eleventh Circuit explained this conclusion as follows:

> First, and most obviously, the district court erred in relying on the increased rate of infection. On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id.* at 844, 114 S. Ct. 1970 (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303, 111 S. Ct. 2321, 115 L.Ed.2d 271 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 961 F.3d 829, 842-43 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").
>
> Second, and separately, the district court erred in concluding that the defendants' inability to ensure

> adequate social distancing constituted deliberate indifference. The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible." *See, e.g.*, Dist. Ct. Order at 7, 11, 12, 13, 16, 38. (The plaintiffs acknowledge the same at least six times in their brief. *See, e.g.*, Br. of Appellees at 4, 8, 12, 15, 19, 54). The court-commissioned expert report likewise observed that [the jail]'s population made it "impossible to follow CDC guidance for social distancing measures." Expert Report at 3. And indeed, the district court noted that the inmates' own declarations supported the conclusion that social distancing "is impossible to achieve given the current population at [the jail.] Dist. Ct. Order at 12. Failing to do the "impossible" doesn't evince indifference, let alone deliberate indifference.

Id. (first four alterations in original).

The Court emphasized that "the fundamental question in any deliberate-indifference case is whether the defendants exhibited 'a sufficiently culpable state of mind.'" Id. (quoting Farmer, 511 U.S. at 834). "In evaluating that question, we must focus not on isolated failure—or impossibilities, as the case may be—but rather on the defendants' entire course of conduct." Id. at 1287-88. The Court wrote: "Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, 'the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not.'" Id. at 1288 (quoting Goodman v. Kimbrough, 718 F.3d 1325, 1334 (11th

Cir. 2013)). While the officials in Swain failed to "do the impossible by ensuring six-foot social distancing," the court-appointed expert concluded that they "d[id] their best." Id. (internal quotation marks and citation omitted). Thus, "[w]hatever deliberate indifference is, the defendants' conduct here doesn't show it." Id. at 1289; Valentine v. Collier, 993 F.3d 270, 283 (5th Cir. 2021) (reversing injunction regarding response to COVID-19: "We conclude that it was not unreasonable for Defendants to rely on the healthcare experts who were legally delegated the responsibility of crafting a COVID-19 response policy, and, in any event, the policy was a reasonable response because it set forth safety measures in accordance with the CDC guidelines."); Wilson v. Williams, 961 F.3d 829, 841 (6th Cir. 2020) (holding that BOP "'responded reasonably to the risk' [posed by COVID-19] and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights") (quoting Farmer, 511 U.S. at 844). Similarly, here, with respect to correctional staffing, ADOC "did [its] best," but "failed to do the impossible"—i.e., eliminate all correctional staffing vacancies while almost all, if not all, state, local, and federal jails and prisons continue to face significant correctional staffing challenges.

In a case addressing mental-health staffing for the Illinois Department of Corrections, the Seventh Circuit reversed an injunction prescribing particular levels of staff. Rasho v. Jeffreys, 22 F.4th 703, 706 (7th Cir. 2022). There, the district

court held that the department violated the Eighth Amendment "in five areas of mental-health treatment and noted that [the] deficiencies were primarily attributable to a chronic, severe shortage of mental-health staff." Id. The district court concluded that the Illinois prison officials acted with deliberate indifference because they "displayed a 'lack of a sense of urgency' in fixing the [understaffing] issue." Id. The district court "entered a permanent injunction requiring [the department] to hire and maintain a specific minimum number of staff in multiple areas of care and imposing other specific requirements for the delivery of mental-health services—all on a court-imposed, mandatory timetable." Id. Like the injunction in Swain, the district court's injunction in Rasho failed to withstand appellate review.

The Seventh Circuit vacated the injunction, finding that "the evidence establishes that [the Illinois officials] made reasonable efforts to cure the deficiencies in the five areas identified in the plaintiffs' claim and to alleviate the staffing shortage." Id. at 710. The Court concluded that "[t]hese actions . . . demonstrate a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment claim." Id. (citing Rosario v. Brawn, 670 F.3d 816, 822 (7th Cir. 2012)). According to the Seventh Circuit, the mere fact that the Illinois officials' "efforts fell short . . . does not equate to a constitutional violation." Id. at 711. Instead, the officials "cannot have been deliberately indifferent because they undertook reasonable measures to achieve

those goals, even though they were ultimately unsuccessful." Id. (citing Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002)). The Court noted that "[i]t is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm." Id. (internal citations omitted). The Court concluded:

> It was reasonable to expect that paying higher salaries and offering bonuses would attract more mental-health personnel, just as it was reasonable to believe that expanding the use of telepsychiatry and paying travel stipends would enable them to more efficiently deploy their limited resources. . . . Put simply, [the Illinois] officials took multiple reasonable steps to fix the complex problem of understaffing in mental-health services, so they cannot have been deliberately indifferent.

Id. Like the Illinois officials in Rasho, ADOC "took reasonable steps to cure the deficiencies identified by the plaintiff[]—in particular, the understaffing—and those actions cannot be squared with [a] finding of deliberate indifference. Even if those steps were not fully successful, [ADOC's] reasonable effort to address a known risk of harm shows that [it] did not recklessly disregard that risk." Id. at 706.

In Dunn, 179 F.4th at 1313, the Eleventh Circuit affirmed the district court's finding that "known systemic deficiencies that had persisted for years that prevented [ADOC] from meeting the constitutional floor for minimally adequate mental health care" supported a finding of an "unreasonable response" to mental-health and correctional understaffing and overcrowding. The Dunn Court cited LaMarca v.

Turner, 995 F.2d 1526 (11th Cir. 1993), for the proposition that "what mattered in an official-capacity suit was the institution's 'historical indifference,'" and "[w]ithout a showing that the institution's past wrongs would not be repeated,' a finding of liability against the entity was warranted." Dunn, 179 F.4th at 1313 (quoting LaMarca, 995 F.2d at 1542). First, the Dunn findings were limited to the provision of mental-health care and did not touch on the issues Plaintiff asserts here. Second, the district court made those findings in 2017 and 2021—before many of the measures outlined above that ADOC took to increase correctional staffing in its men's facilities. Id. at 1294-95. This action covers a separate timeframe than the timeframe considered in Dunn, and ADOC now possesses years-long records of extensive and effective efforts to increase correctional staffing, including an unprecedented pay raise. These efforts by the State demonstrate that any "past wrongs" with respect to correctional staffing will "not be repeated."

As set forth above and in the Statement of Facts (SOF ¶¶ 1-338), the undisputed evidence establishes ADOC's monumental efforts to increase correctional staffing statewide. ADOC retained qualified consultants to assist in devising and implementing creative recruiting and retention strategies. Each Commissioner devoted substantial time and attention to correctional staffing concerns. Recognizing the limits on their authority, ADOC's Commissioners worked with the Alabama legislature and other state agencies to, among other things,

implement unprecedented pay increases for correctional officers; streamline ADOC's hiring process; and increase the salary cap for retired law enforcement employees. These extensive efforts to increase correctional staffing represent "the antithesis of" deliberate indifference. Rasho, 22 F.4th at 710. Unfortunately, just as social distancing proved "impossible" in Swain, eliminating all correctional staffing vacancies has thus far represented an impossibility for ADOC.

Indeed, the correctional staffing challenges faced by Plaintiff's correctional agency, BOP, further demonstrate the complicated nature of correctional staffing and the impossibility of eliminating correctional staffing vacancies within a system. (SOF ¶¶ 339-452). Like ADOC and other state correctional agencies, BOP struggles with substantial correctional staffing vacancy rates. (SOF ¶¶ 339-88). Because of its shortage of correctional staff, BOP routinely assigns non-correctional staff members, such as secretaries, teachers, counselors, case managers, and maintenance personnel, to staff correctional positions at multiple prisons. (SOF ¶¶ 389-99). The BOP prisons at which the Parties conducted prison-specific discovery report vacancy rates between approximately twenty and forty percent. (SOF ¶¶ 401-452). BOP bases these vacancy rates on its current authorized correctional officer positions, but a "needs-based staffing analysis" recently commissioned by BOP concluded that BOP needed more correctional officers than currently authorized. (SOF ¶¶ 364-68). Therefore, BOP's stated vacancy rates likely understate the extent of BOP's

correctional staffing shortage. To be clear, the State does not argue that BOP violates the Constitution with respect to its correctional staffing; the State simply argues that BOP faces similar challenges and, like ADOC, has thus far been unable to eliminate correctional staffing vacancies.

Underscoring the impossibility of eliminating correctional staffing vacancies within ADOC, Plaintiff and its retained experts cannot offer a single meaningful recommendation as to any additional step ADOC should have taken but failed to take to increase correctional staff. (SOF ¶¶ 83-86). For example, Ray stated in his report:

> Addressing these issues requires urgent, structured, and systematically implemented reforms from policymakers and facility administrators. Enhanced recruitment, significant salary boosts, retention incentives, and budget adjustments are essential steps towards stabilizing staffing levels. Additionally, integrating advanced technological solutions and improving training can help mitigate the risks posed by high inmate to supervisory ratios. This comprehensive approach is crucial for reversing the deteriorating conditions in correctional facilities and ensuring the safety and security of both staff and inmates.

(SOF ¶ 83). However, at his deposition, Ray admitted he was not aware of any of these recommendations that ADOC had not already implemented:

> Q: Feel free to reference page 72 of exhibit[ 1], which you're talking about several things that you're saying should be outcomes of staffing, and you said enhanced recruiting. And, you know, my question is: Is there anything that falls into what you believe

should be enhanced recruiting by ADOC that you're not aware of ADOC doing?

A: Not now.

Q: Okay. When you wrote it were you aware of those items?

A: Not all of them, but I've learned since, yes.

* * *

Q: Okay. The other issue you mentioned next on page 72 is significant salary boost. And, again, it appears as though Alabama has already made significant improvements in salary, correct?

A: Yes.

Q: Okay. Would you describe what you've seen as the salary numbers, assuming those are true, would you agree those are significant?

A: Yes.

Q: Okay. The next thing you mention is – is retention incentives. What do you mean by that?

A: Well, whatever – other than financial incentives or other kind of incentives, use creative incentive to encourage people to stay for a career, yes.

Q: That would include, for example, re-evaluating the manner in which people are promoted through the system?

A: Oh, certainly, certainly, yes.

Q: And do you know if ADOC has done that?

A: I don't.

* * *

Q: . . . On page 72 you mention budget adjustments was something you think Alabama should consider in light of the current circumstances with correctional staff. Do you know if ADOC has paid

any attention or the Governor's office has done anything with regard to ADOC's budget over the last ten years?

A: Well, they have to have expanded it to achieve that (indicating).

Q: Do you have any judgment about how much ADOC's budget has gone up over the last ten years?

A: No, I don't.

(SOF ¶ 84; Doc. 373-26 (Ex. 160) at 236:19-245:13; see also id. at 245:17-246:4). Ray further admitted he did not know how Alabama's compensation compares to other states. (SOF ¶ 85). When shown a document comparing Alabama's starting correctional officer salaries to other states' starting correctional officer salaries (and showing that Alabama's starting salary exceeds those in New York, Tennessee, Texas, Florida, Washington, and South Carolina), Ray admitted that the Alabama legislature and ADOC took a significant step of making sure that Alabama had competitive salaries for first year correctional officers. (SOF ¶ 86). Ray further admitted that he saw no evidence that ADOC officials were ignoring the challenges presented by correctional staffing. (SOF ¶ 338). Thus, Plaintiff cannot establish that ADOC responded unreasonably to correctional staffing challenges.

## II. The Court Should Grant Summary Judgment to the State on Plaintiff's Use-of-Force Claim.

Plaintiff alleges that the State engaged in an unconstitutional "pattern or practice of failing to protect prisoners from use of excessive force" and "exhibited deliberate indifference to the serious risk of substantial harm caused by use of

excessive force in all 13 of Alabama's Prisons for Men." (Doc. 71, ¶¶ 270, 271). According to Plaintiff, the State failed to implement appropriate use-of-force policies and procedures, failed to adequately investigate use-of-force incidents, and failed to adequately discipline security staff members who use excessive force. (Doc. 71, ¶¶ 201-202). Certain of Plaintiff's factual allegations also allege that ADOC supervisors failed to intervene in excessive uses of force. (Doc. 71, ¶¶ 214, 224). The record fails to support these allegations.

To establish its deliberate-indifference claim based on use of force, Plaintiff must establish that (1) inmates faced a sufficiently serious deprivation from excessive force; (2) ADOC "was subjectively aware that [its] own conduct" regarding excessive force placed inmates "at substantial risk of serious harm;" and (3) ADOC failed to respond to that risk in an objectively reasonable manner. Wade, 106 F.4th at 1253, 1260; Dunn, 179 F.4th at 1292; Hudson v. McMillian, 503 U.S. 1, 7-9 (1992). To make these showings, Plaintiff must establish that (1) "'a history of widespread abuse'" put ADOC on notice of excessive uses of force, and ADOC failed to correct the issue; or (2) a "custom or policy result[ed] in deliberate indifference to constitutional rights;" or (3) "facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th

Cir. 2003), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009)). Plaintiff can establish none of these facts. Instead, the evidence demonstrates that ADOC maintains adequate policies regarding use of force; trains security staff regarding appropriate uses of force; investigates uses of force; and disciplines security staff who engage in improper uses of force, including termination of employment and referral for criminal prosecution where appropriate.

### A. PLAINTIFF CANNOT ESTABLISH A SUFFICIENTLY SERIOUS DEPRIVATION WITH RESPECT TO USE OF FORCE.

"Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (internal alterations omitted). "Whether a [correctional officer's] use of force is excessive . . . depends on whether the [officer's] act 'shocks the conscience.'" Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008), overruled in part on other grounds by Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007)). Force that an officer applies "maliciously and sadistically for the very purpose of causing harm" necessarily "shocks the conscience." Id. However, to evaluate whether other uses of force "shock the conscience" and therefore constitute excessive force, courts evaluate "(1) the need

for force; (2) the relationship between that need and the amount of force used; and (3) the extent of the resulting injury." Id. (quoting Albers, 475 U.S. at 321). Moreover, "[p]rison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." Id. (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990), abrogated on other grounds as recognized by Williams v. Radford, 64 F.4th 1185, 1198-99 (11th Cir. 2023)). Thus, the law plainly permits ADOC correctional staff to use force in appropriate circumstances.

Plaintiff's retained expert Horn admitted at his deposition that "[f]orce is an essential element of running a prison or a jail." (SOF ¶ 454). Thus, the mere fact that ADOC correctional staff sometimes use force cannot establish that inmates face a sufficiently serious deprivation related to excessive force. Wade, 106 F.4th at 1262; Danley, 540 F.3d at 1307-08. At most, Plaintiff can establish isolated uses of excessive force; Plaintiff cannot establish a policy or practice of excessive force or a "history of widespread abuse" that should have put supervisors on notice of repeated excessive uses of force. Mathews, 480 F.3d at 1271. Plaintiff's Second Amended Complaint included allegations regarding individual uses of allegedly excessive force between 2017 and 2022. (Doc. 71, ¶¶ 207-32). However, neither Plaintiff's pleading nor Plaintiff's retained experts provided any statistics purporting to establish the frequency with which ADOC correctional staff use excessive force.

(SOF ¶¶ 458-59, 600). Thus, Plaintiff based its use-of-force claim solely only allegations of isolated incidents. (Doc. 71, ¶¶ 207-32; SOF ¶ 458 (Werholtz testifying that his opinions regarding use of force were "based on videos that I reviewed where I could actually observe what was happening and in particular what I think . . . was clearly an inappropriate use of force")). Accordingly, Plaintiff cannot establish that inmates face a sufficiently serious deprivation related to excessive force.

### B. PLAINTIFF CANNOT ESTABLISH CRIMINAL RECKLESSNESS AS TO EXCESSIVE FORCE.

As set forth above, the subjective recklessness standard requires Plaintiff to "demonstrate that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." Wade, 106 F.4th at 1253. To establish criminal recklessness as to excessive force, Plaintiff must establish that (1) ADOC failed to address excessive uses of force despite a "widespread" history of such abuses; (2) ADOC's customs or policies resulted in excessive uses of force; or (3) supervisors directed subordinates to use excessive force or knew subordinates would use excessive force and failed to stop them. Mathews, 480 F.3d at 1270; Ingram v. Kubik, 30 F.4th 1241, 1256 (11th Cir. 2022) abrogated in part on other grounds by Case v. Montana, 607 U.S. 107 (2026), as recognized in Marbut v. Phillips, 176 F.4th 1256 (11th Cir. 2026) ("A supervisor can be held liable for implementing or failing to implement a policy that causes his

subordinates to believe that they can permissibly violate another's constitutional rights if the subordinates then do so based on that belief"). Plaintiff can establish none of these elements.

### 1. The Record Reflects that ADOC Implemented Adequate Policies and Procedures Regarding Use of Force.

When Plaintiff initiated this action, ADOC's AR 327 (2015) governed use of force in ADOC facilities. (SOF ¶ 460). AR 327 (2015) restricted uses of force to "justifiable self-defense against physical assault (actual or threatened), protection of other, protection of property, prevention of escape or apprehension of escapees, 'quelling' a disturbance, or when an inmate exercises physical resistance to a lawful command." (SOF ¶ 462). AR 327 (2015) also required, among other things, that uses of force "be justified, reasonable, and necessary under the circumstances;" "only be used after attempts to verbally de-escalate the situation have failed, if possible;" "never be used as punishment;" and "stop when resistance offered by the inmate ceases." (SOF ¶ 463). AR 327 (2015) also provided for correctional staff to receive training on use of force and prohibited correctional staff from using force unless they received training on proper uses of force. (SOF ¶¶ 463). Numerous senior correctional staff members testified that they understood the policy to permit force only when justified or necessary and that force should not be used in response to verbal taunts or insults from inmates. (SOF ¶¶ 464-69).

AR 327 (2015) instructed that correctional members involved in uses of force should complete duty officer reports and Captains or Wardens with training to conduct use of force investigations should investigate uses of force. (SOF ¶¶ 487-89). Until ADOC's implementation of its Use of Force Manual on December 31, 2024, ADOC's OIG conducted administrative investigations into use of force incidents after the facility-level review, and LESD conducted criminal investigations where appropriate. (SOF ¶¶ 491). ADOC identified and tracked correctional staff members involved in more than three uses of force in a 90-day period, including notifying facility heads. (SOF ¶¶ 499-500). ADOC's AR 208 included an Employee Corrective Action table that provided for discipline, including termination, for unnecessary or excessive uses of force. (SOF ¶¶ 510-12). The record includes numerous instances in which supervisors recommended discipline, including termination, for correctional staff members who used inappropriate or excessive force. (SOF ¶¶ 515-22). The record also reflects numerous incidents that LESD referred for potential state or federal criminal prosecution. (SOF ¶¶ 532-34).

In September 2023, ADOC retained Stewart Criminal Justice Consulting & Training, LLC, led by Sean Stewart, to create new use-of-force standards, policies, procedures, and a use-of-force manual. (SOF ¶¶ 535-36). Stewart and his team provided ADOC with nineteen use-of-force standards in December 2023 and provided policies and procedures in January 2024. (SOF ¶¶ 539-41). Stewart

observed that, under the previous policy, ADOC was "very strict and heavy-handed with their officers on use of force." (SOF ¶ 38). ADOC implemented the Use of Force Manual on December 31, 2024, and AR 327 (2025) superseded AR 327 (2015) on January 27, 2025. (SOF ¶¶ 543-45). Under AR 327 (2025), ADOC correctional staff "may use force as reasonably necessary to maintain institutional order, safety, and security and the safety of all persons." (SOF ¶ 548). The Use of Force Manual provides that correctional officers should not use force as "punishment;" "malicious[ly] or sadistic[ally]; "[d]isproportionately;" or "[i]n response to an inmate's verbal insults, taunting threats, or swearing where there is no physical danger to staff or inmates." (SOF ¶ 551). In addition, the Use of Force Manual establishes that "[o]fficers must intervene when they have an opportunity to prevent another officer from using unlawful force," and "[d]uty to intervene cases may be investigated by LESD and appropriate action taken after the investigation." (SOF ¶ 558).

ADOC's Use of Force Manual further instructs correctional officers to use verbal de-escalation where possible and to cease use of force upon compliance or restraint of the inmate. (SOF ¶¶ 553-55). ADOC correctional staff received training on the new Use of Force Manual and AR 327 (2025). (SOF ¶¶ 561-66). The Use of Force Manual requires officers involved in or who witness uses of force must complete incident reports. (SOF ¶¶ 567-70). Under ADOC's Use of Force Manual,

a supervisor shall conduct a preliminary review of uses of force within 48 hours, and the Warden conducts the final facility review. (SOF ¶ 571). ADOC's Use of Force Manual provides for audits of at least 10% of all use of force incidents on a quarterly basis. (SOF ¶ 573). In addition, where a use of force is found not justified or in violation of policy, ADOC's Use of Force Manual provides that the Use of Force Review Board should review the incident and make a final determination. (SOF ¶ 574-76).

ADOC's comprehensive use-of-force policies represent a far cry from policies courts found to lead subordinates to believe they could use excessive force without punishment. For example, in Ingram, the plaintiff alleged that the sheriff "established a policy that incidents of possible, likely, or known misconduct were not investigated, with the foreseeable result that deputies . . . believed they could get away with violating [plaintiff's] rights." 30 F.4th at 1255 (internal quotation marks omitted) (describing allegations in which the sheriff allegedly knew of uses of force such as a "revenge beating" but failed to investigation and "allegedly took no action against any of the deputies involved"). The record reflects no such failure to act here. To the contrary, the record reflects robust policies that result in investigations and discipline when excessive uses of force occur.

Indeed, Plaintiff's retained expert Horn described ADOC's current policy, AR 327 (2025), as "a sound policy." (SOF ¶ 560). When asked if he "offer[ed] any

criticisms of ADOC's use-of-force policies and procedures," Plaintiff's retained expert Werholtz responded, "No, I don't believe I did." (SOF ¶ 459). When asked if he performed "any kind of analysis to see whether ADOC took the appropriate action with respect to use of force," Werholtz responded, "I did not." (SOF ¶ 459). Thus, Plaintiff possesses no evidence that ADOC's policies or customs caused excessive uses of force. Mathews, 480 F.3d at 1270; Ingram, 30 F.4th at 1256. Instead, the record demonstrates the adequacy of ADOC's policies regarding use of force.

**2. Plaintiff Cannot Demonstrate A "Widespread History of Abuse" or that Supervisors Knew Subordinates Would use Excessive Force and Failed to Stop Them.**

Plaintiff cannot establish a "widespread" history of excessive uses of force that put ADOC on notice of constitutional violations or that supervisors knew subordinates would use excessive force and failed to stop them. Instead, Plaintiff and its retained experts establish, at most, isolated instances of excessive force at ADOC facilities. As Horn admitted, however, isolated incidents of excessive force unfortunately occur. (SOF ¶ 455). For example, Horn admitted that "unjustified uses of force" occurred while he led correctional systems in New York State, Pennsylvania, and New York City. (SOF ¶ 456). He testified that he nonetheless believed he fulfilled his constitutional obligations in those positions, because he

"think[s] the test is the frequency with which it occurs and how the system responds to it." (SOF ¶ 457).

The facts here fail to approach the facts in cases in which courts found supervisory liability for excessive use of force. For example, in Mathews, an inmate's Eighth Amendment individual-capacity claim against a warden for supervisory liability survived summary judgment where the inmate produced evidence that the warden received notice that particular officers possessed a reputation for using excessive force but "did not take steps to neutralize" those officers and instead sought to provide one of them with favorable treatment. 480 F.3d at 1274-75. Similarly, in Ingram, the plaintiff successfully stated an individual-capacity supervisory liability claim for excessive force against a sheriff where he alleged that officers engaged in multiple prior incidents of excessive force, but the sheriff *never* investigated those incidents, which led to a belief among officers that they could "act with impunity." 30 F.4th at 1254-56; see also Mulvania v. Sheriff of Rock Island Cnty., 850 F.3d 849, 853-54 (7th Cir. 2017) (affirming grant of summary judgment to defendants on excessive force claim where plaintiff failed to provide "evidence of a widespread practice of excessive force"). Plaintiff cannot make a similar showing here.

Far from ignoring excessive uses of force, ADOC provides comprehensive training regarding use of force. (SOF ¶¶ 470-86; 561-66). As set forth above, both

iterations of AR 327 provide for investigations of use-of-force incidents and discipline where officers use excessive or unjustified force. (SOF ¶¶ 487-507, 567-85). The record reflects that the investigations occur; ADOC tracks officers involved in multiple uses of force; and ADOC imposes discipline for excessive or unjustified force. (SOF ¶¶ 487-534). OIG's records regarding use of force demonstrate a decrease in use-of-force incidents from over 2,000 incidents per year between 2019 and 2021 to 1,522 incidents in 2022 to 975 incidents in 2023 and to 614 incidents in the first half of 2024. (SOF ¶ 497). Accordingly, Plaintiff cannot demonstrate a widespread history of abuse or otherwise show that ADOC supervisors knew subordinates would use excessive force but failed to stop them.

### C. THE RECORD ESTABLISHES ADOC'S REASONABLE RESPONSE AS TO EXCESSIVE FORCE.

Finally, the record reflects ADOC's reasonable response to excessive uses of force. As set forth above, ADOC provides extensive training regarding use of force. (SOF ¶¶ 470-86; 561-66). ADOC hired Stewart to update its use-of-force manual and policy. (SOF ¶¶ 535-36). ADOC's policies require multi-level investigations of uses of force, and the record demonstrates that these investigations occur. (SOF ¶¶ 487-534, 567-85). The investigations result in discipline and/or referral for criminal prosecution where warranted. (SOF ¶¶ 515-22, 532-34). The Use of Force Review Board reviewed at least 58 use-of-force incidents between August 2024 and January 2025. (SOF ¶ 590). ADOC's Use of Force Review Board found 26

incidents to be unjustified or unnecessary, and recommended discipline, termination, or an EAP in 22[9] of those cases. (SOF ¶¶ 592).

Indeed, many of Plaintiff's own allegations of excessive force reflect that ADOC investigated the incidents and disciplined staff members and/or referred incidents for criminal prosecution where appropriate. (Doc. 71, ¶ 207 (alleging that officer "was arrested" for 2021 incident at Bibb); ¶ 209 (alleging that "a federal grand jury indicted two security staff, including a supervisor, for assaulting a prisoner at Staton" in 2021); ¶ 224 (alleging that correctional staff members "pleaded guilty to federal charges" in connection with an assault of an inmate at Elmore in 2021); ¶ 226 (alleging that an "officer pleaded guilty to a federal charge of willfully using excessive force against a prisoner" at Bibb in 2018); ¶ 227 (alleging that "an officer at St. Clair was suspended for three days for using excessive force against a prisoner, failing to document the incident, and initially denying that the use of force occurred")). Thus, even Plaintiff's own allegations reflect investigations and discipline for excessive uses of force under AR 327 (2015). ADOC's policies, multi-level investigations of uses of force, and imposition of discipline (including termination and/or referral for criminal prosecution) reflect a reasonable response to any risk posed to inmates by excessive uses of force.

---

[9] In two of the 26 cases, the officer resigned in lieu of termination or discipline, rendering a recommendation moot. (SOF ¶ 592).

## III. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE STATE TO THE EXTENT PLAINTIFF'S INMATE VIOLENCE AND SEXUAL ABUSE CLAIMS RELY ON ALLEGATIONS REGARDING ADOC'S CLASSIFICATION POLICIES.

In attempting to support its claims regarding inmate violence and inmate sexual abuse, Plaintiff alleges that ADOC fails to adequately classify inmates. (Doc. 71, ¶¶ 113, 153, 155). For example, Plaintiff alleges ADOC "fail[s] to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should be kept separate." (Doc. 71, ¶ 113). Plaintiff further alleges that "ADOC's failure to supervise prisoners and enforce classification and housing assignments" enables "sexual predators … to move from unit to unit without intervention, which results in sexual abuse." (Doc. 71, ¶ 153; see also id., ¶ 155 (alleging that ADOC "fail[s] to employ adequate screening, classification, and housing of prisoners to prevent sexual abuse")). With respect to classification, Plaintiff cannot establish an objectively sufficiently serious deprivation. Wade, 106 F.4th at 1262. Plaintiff possesses no evidence to support its allegations that ADOC failed to implement adequate classification policies. Instead, the evidence demonstrates that ADOC implemented constitutionally adequate classification policies. Indeed, even Plaintiff's experts agree that ADOC adequately classifies inmates. Moreover, Plaintiff can demonstrate neither that ADOC's actions regarding classification placed inmates at a substantial risk of serious harm nor that the State responded unreasonably to any risk of harm posed by classification. Wade,

106 F.4th at 1262. To the contrary, the record establishes ADOC's reasonable actions with respect to its classification policies and system. Accordingly, to the extent Plaintiff's claims regarding inmate violence and inmate sexual abuse rely on allegations regarding ADOC's classification policies or system, the State is entitled to summary judgment on those claims.

### A. PLAINTIFF CANNOT ESTABLISH A SUFFICIENTLY SERIOUS DEPRIVATION RELATED TO ADOC'S CLASSIFICATION POLICIES.

While Plaintiff's pleading attacked ADOC's classification system, Plaintiff recently confirmed that its retained experts offer no opinions concerning classification. (SOF ¶ 602). Bonner testified that she does not consider herself an expert in inmate classification. (SOF ¶ 603). She confirmed that she reviewed no inmate institutional files or inmate classification files in forming her opinions in this matter. (SOF ¶ 604). Horn also testified that he did not review any inmate classification files. (SOF ¶ 605). Horn confirmed at his deposition that he did not identify any inmate to whom ADOC assigned an incorrect custody level or assigned to a facility whose security level was inconsistent with the inmate's classification or custody status. (SOF ¶¶ 609-10). He "didn't find anything inadequate or inappropriate about the custody levels assigned to the inmates" and did "not quarrel with the determinations that are being made at intake for … what level of custody people require in Alabama." (SOF ¶¶ 613-14). Indeed, Horn agreed that "the

process by which determinations of custody levels are made [by ADOC] is consistent with national practice." (SOF ¶ 615). Thus, Plaintiff possesses no expert evidence suggesting that ADOC's classification system subjects inmates to any risk of harm whatsoever; in fact, Horn agrees it does not.

The record evidence confirms the adequacy of ADOC's classification system. Under its Classification Manual, ADOC assigns inmates to "security and custody assignments consistent with available resources to ensure that inmates are placed in the least restrictive setting while providing for the protection of the public, staff and inmates." (SOF ¶ 630). ADOC employs a Director of Classification, an Assistant Director of Classification, and a Central Review Board ("CRB") in ADOC's Central Office and employs Classification Supervisors and Classification Specialists at each facility. (SOF ¶¶ 634-35).

ADOC performs initial classification of male inmates upon intake at Kilby. (SOF ¶ 644). During the initial classification process, ADOC makes decisions regarding custody level and facility placement and identifies treatment and programming needs. (SOF ¶ 645). Each inmate receives a medical exam and mental-health screening at intake and is assigned a corresponding Health Code and Mental Health Code. (SOF ¶ 646). Inmates also undergo psychological testing, and ADOC uses the results of these tests in making classification decisions. (SOF ¶ 647). ADOC's classification staff also identifies inmates believed to be affiliated

with Security Threat Groups ("STGs") and documents this information. (SOF ¶ 648). In addition, ADOC screens incoming inmates for potential risk of sexual vulnerability or sexual aggression within 72 hours of intake. (SOF ¶ 650). ADOC's classification staff refer inmates identified as potential victims or predators to mental-health professionals for further evaluation and final designation. (SOF ¶ 651). Classification staff also interview inmates as part of the initial intake process, and review information such as court records, sentence information, information from county jails, information from pre- or post-sentence investigations, AlaCourt, and other available sources. (SOF ¶¶ 651-54). The classification process also involves staff documenting information about known enemies, both from inmate interviews and record reviews; while enemy information does not affect an inmate's custody classification, it may affect the inmate's facility assignment. (SOF ¶¶ 655-58).

Classification staff also utilize "[a]n objective scoring instrument" known as the Risk Assessment to determine each inmate's initial scored custody level. (SOF ¶¶ 659-60). ADOC's Classification Module assigns a numeric classification score, which "translate[s] into one of three (3) custody levels (Close, Medium, or Minimum) and into security levels that determine specific institutional placement." (SOF ¶ 669). ADOC's classification system also provides for mandatory overrides, which change the scored custody level based on classification policy, and

discretionary overrides, which change the scored custody level based on classification staff's professional judgment. (SOF ¶¶ 670-76). The Classification Specialist makes recommendations; the Psychological Associate and Facility Head review the recommendation and may provide comments or other recommendations; and the Classification Specialist reviews the recommendation again and submits it to the CRB. (SOF ¶¶ 678-88, 694-99). CRB Analysts "approve, deny, or amend the recommendation resulting in the approved custody level, institutional placement, and treatment/program(s)." (SOF ¶ 685). Thus, at least two classification professionals (one at Kilby and one with the CRB) provide input into each inmate's initial classification. (SOF ¶ 686).

Each ADOC facility assigns arriving inmates to facility-based Classification Specialists. (SOF ¶ 707). In addition to the PREA screening that occurs at intake, each inmate undergoes PREA screening within 72 hours after arrival at a facility. (SOF ¶ 742). If the facility PREA screening identifies an inmate as a potential victim or predator, classification staff refer the inmate to a mental-health professional for further evaluation and final designation. (SOF ¶ 745). While PREA screening does not determine an inmate's custody classification or facility placement, ADOC does use it in making specific housing decisions within a facility. (SOF ¶¶ 746-47).

Under ADOC's Classification Manual, inmates undergo "Reclassification," which involves a re-evaluation of custody level and placement, "as often as

circumstances warrant, but not less than twice per year." (SOF ¶ 700). If a semi-annual file review indicates no changes are necessary, the Classification Specialist documents the findings, provides a copy to the inmate, and schedules the next review. (SOF ¶¶ 712-13). If the review indicates that changes are necessary, the Classification Specialist schedules an in-person meeting with the inmate. (SOF ¶ 714). In addition to the annual and semi-annual reviews, classification staff conduct special reviews upon significant changes, such as completion of programs, receipt of new information, reduction in sentence, validation of known enemies, or disciplinary actions. (SOF ¶¶ 718-20). Inmates also may request classification reviews. (SOF ¶ 724).

Thus, the record reflects, and Plaintiff does not dispute, that ADOC implemented an adequate classification system. Accordingly, Plaintiff cannot demonstrate that inmates face a sufficiently serious "deprivation" related to classification. Wade, 106 F.4th at 1262. This fact alone entitles the State to summary judgment on Plaintiff's claims regarding inmate violence and inmate sexual abuse to the extent those claims rely on allegations regarding ADOC's classification policies or system.

### B. PLAINTIFF CANNOT ESTABLISH DELIBERATE INDIFFERENCE AS TO CLASSIFICATION.

Aside from Plaintiff's inability to establish a sufficiently serious deprivation as to classification, Plaintiff cannot establish deliberate indifference as to

classification. As set forth above, to establish deliberate indifference, 'a plaintiff must show both that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm and that the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner.'" Dunn, 179 F.4th at 1292 (quoting Mosley v. Zachery, 966 F.3d 1265, 1270 (11th Cir. 2020)). Furthermore, the "risk" must be traceable to the State's "own conduct," not "some preexisting risk that [inmates] faced, without regard to its origin or cause." Wade, 106 F.4th at 1260. As to classification, Plaintiff can show neither that the State's own conduct placed inmates at a substantial risk of serious harm nor that the State responded unreasonably to any such risk.

First, as set forth above, the undisputed evidence demonstrates that ADOC implemented an adequate classification system, and Plaintiff's retained experts raise no issues with ADOC's classification system. Therefore, ADOC's conduct with respect to classification could not place inmates at a substantial risk of serious harm. Wade, 106 F.4th at 1262. Second, even assuming such a risk existed, Plaintiff cannot show that the State acted unreasonably with respect to classification. To the contrary, the record shows that the State acted reasonably with respect to classification for over two decades.

In 2002, ADOC retained Dr. Jim Austin to assist it in designing, validating, and implementing an external classification system. (SOF ¶¶ 616-17).[10] Dr. Austin and ADOC used a template from the National Institute of Corrections ("NIC"), and Dr. Austin tested it, and certified it as acceptable before ADOC implemented it. (SOF ¶ 619). In 2007, ADOC sought NIC's assistance to revalidate its classification system, and NIC selected Dr. Austin to perform the assignment. (SOF ¶ 620). During the revalidation process, Dr. Austin performed reliability testing, which involved having different classification staff members score the same inmate to test whether they reached the same results. (SOF ¶¶ 621-22). After conducting the revalidation assignment, Dr. Austin concluded that ADOC's central classification unit was "well trained and experienced in prison classification systems," and "it was a very impressive operation." (SOF ¶¶ 623-24). At Dr. Austin's March 2016 deposition in Duke, he confirmed that "ADOC has an external classification system that meets national standards" and that ADOC's Classification Manual represents a "well-developed guide." (SOF ¶ 625). Thus, the record reflects that ADOC acted reasonably with respect to classification over a period of more than twenty years by retaining an expert to help it design, validate, and implement an adequate classification system. ADOC's extensive efforts regarding classification amount to

[10] Dr. Austin served as an expert witness for plaintiff inmates in the Duke litigation. (SOF ¶ 618). Plaintiff in this matter and the Duke plaintiffs claim a common-interest privilege. (Docs. 163, 191).

the "antithesis" of deliberate indifference. Rasho, 22 F.4th at 706, 710; Swain, 961 F.3d at 1287. Accordingly, the Court should grant summary judgment to the State on Plaintiff's claims for inmate violence and inmate sexual abuse to the extent those claims rely on allegations regarding classification.

## CONCLUSION

For the reasons set forth above, as well as in the State's Motion and Evidentiary Submission, the State respectfully requests that the Court grant summary judgment in its favor on (1) all four of Plaintiff's claims to the extent they rely on allegations regarding correctional staffing; (2) Plaintiff's claim regarding excessive use of force in its entirety; and (3) Plaintiff's claims regarding inmate violence and inmate sexual violence to the extent they rely on allegations regarding ADOC's classification policies and practices.

Dated: September 4, 2026

/s/ *William R. Lunsford*
William R. Lunsford
*One of the Attorneys for the State*

William R. Lunsford
Lynette E. Potter
Daniel J. Chism
Megan M. Everett
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, AL 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651

bill.lunsford@butlersnow.com
lynette.potter@butlersnow.com
daniel.chism@butlersnow.com
megan.everett@butlersnow.com

John R. Alford, Jr.
**BUTLER SNOW LLP**
1819 5th Avenue North
Suite 1000
Birmingham, AL 35203
Telephone: (205) 297-2200
Facsimile: (205) 297-2201
john.alford@butlersnow.com

Will R. Allen
**BUTLER SNOW LLP**
1020 Highland Colony Parkway
Suite 1400
Ridgeland, MS 39157
Telephone: (601) 948-5711
Facsimile: (601) 985-4500
will.allen@butlersnow.com

Keith J. Fernandez
George Wright
**BUTLER SNOW LLP**
445 North Boulevard
Suite 300
Baton Rouge, LA 70802
Telephone: (225) 325-8700
Facsimile: (225) 325-8800
keith.fernandez@butlersnow.com
george.wright@butlersnow.com

Michael B. Beers
**BUTLER SNOW LLP**
250 Commerce Street
Suite 100
Montgomery, AL 36104
Telephone: (334) 832-2905

Facsimile: (334) 832-2901
mike.beers@butlersnow.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system on this 4th day of September, 2026:

Ashley Light
Eileen Ulate
Matthew Donnelly
Cristina Gamondi
Julia Haller
Patricia Nation
Joshua Bachman
Marlysha Myrthil
Joshua Bedoya
Elena David
**UNITED STATES DEPARTMENT OF JUSTICE**
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 705-8762
ashley.light@usdoj.gov
natasha-eileen.ulate@usdoj.gov
matthew.donnelly@usdoj.gov
cristina.gamondi@usdoj.gov
julia.haller@usdoj.gov
patricia.nation@usdoj.gov
joshua.bachman@usdoj.gov
marlysha.myrthil@usdoj.gov
joshua.bedoya@usdoj.gov
elena.bendavid@usdoj.gov

Carla Ward
Jason Cheek
Grace Posey
Praveen Krishna
Don Long III
**UNITED STATES ATTORNEY'S OFFICE**
1801 4th Avenue North
Birmingham, AL 35203
Telephone: (205) 244-2185
carla.ward@usdoj.gov
jason.cheek@usdoj.gov
grace.posey@usdoj.gov
praveen.krishna@usdoj.gov
don.long2@usdoj.gov

*/s/ William R. Lunsford*
Of Counsel