FILED
2026 Nov-10 PM 08:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**STATE OF ALABAMA, *et al.*,**

**Defendants.**

**Case No. 2:20-cv-01971-HDM**

# PRETRIAL ORDER

A pretrial conference was held in the above case on October 30, 2026, wherein, or as a result of which, the following proceedings were held and actions were taken:

1. Appearances. Appearing at the conference were:

For Plaintiff, the United States ("United States"):

- Carla C. Ward
- Jason R. Cheek
- Ashley Light
- Alex LaGanke
- Grace Posey

For Defendants, the Alabama Department of Corrections and the State of Alabama (together, the "State"):

- William R. Lunsford
- Lynette Potter
- Will Allen
- Mike Beers
- George Wright
- Megan Everett

- Sonia Lazaro
- Anne Hill

2. Nature of the Action, Jurisdiction, and Venue.

(a) The nature of this action is as follows:

The United States brings this action against the State of Alabama and Alabama Department of Corrections pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997 *et seq.*, to enforce the Eighth and Fourteenth Amendment rights of men housed in Bibb Correctional Facility ("Bibb"), Bullock Correctional Facility ("Bullock"), Donaldson Correctional Facility ("Donaldson"), Draper Correctional Facility ("Draper"), Easterling Correctional Facility ("Easterling"), Elmore Correctional Facility ("Elmore"), Fountain Correctional Facility ("Fountain"), Holman Correctional Facility ("Holman"), Kilby Correctional Facility ("Kilby"), Limestone Correctional Facility ("Limestone"), St. Clair Correctional Facility ("St. Clair"), Staton Correctional Facility ("Staton"), and Ventress Correctional Facility ("Ventress") (collectively, the "ADOC Facilities" or "Facilities").[1]

The United States alleges that the State violates the Eighth and Fourteenth Amendment rights of these prisoners by failing to prevent inmate-on-inmate violence, by failing to prevent inmate-on-inmate sexual abuse, by failing to protect inmates from the use of excessive force by security staff, by failing to prevent the introduction of contraband into its prisons, by failing to adequately supervise inmates in its custody, by failing to provide safe physical conditions of confinement, and by failing to take reasonable measures to address these harms, all in violation of the Constitution.

(b) The court has subject matter jurisdiction of this action under the following statutes, rules, or cases:

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

The Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997 *et seq.* provides jurisdiction over this action.

[1] The lawsuit does not allege constitutional deficiencies exist in Hamilton Aged & Infirmed. Further, Draper Correctional was decommissioned during the course of this litigation and is no longer used to house male prisoners.

The United States is authorized to initiate this action pursuant to 42 U.S.C. § 1997a(a).

(c) All jurisdictional and procedural requirements prerequisite to maintaining this action have been met.

At least 49 days prior to filing suit, the United States notified the Governor of Alabama, the Attorney General of Alabama, the Commissioner of the Alabama Department of Corrections, and other officials of the allegedly unconstitutional conditions in the ADOC Facilities. Specifically, in notice letters dated April 2, 2019, and July 23, 2020, the United States detailed the facts supporting those allegations and included minimum measures that it believed may remedy the alleged constitutional deficiencies.

The Attorney General of the United States has certified that all pre-filing requirements specified in 42 U.S.C. § 1997b have been met. (*See* Docs. 1, 37-1, 71-1.)

(d) Personal jurisdiction and/or venue are not contested.

3. Parties and Trial Counsel. Any remaining fictitious parties are hereby **STRICKEN.** The parties and designated trial counsel are correctly named as set out below:

| | Parties: | Trial Counsel: |
|---|---|---|
| Plaintiff: | **United States of America** | Carla C. Ward |
| | | Jason R. Cheek |
| | | Ashley Light |
| | | Grace Posey |
| | | Juli Haller |
| | | Patricia Nation |
| | | Joshua Bachman |
| | | Elena Ben David |

| | | |
|---|---|---|
| | | Kevin Mawyer |
| | | Don Long |
| | | Alex LaGanke |
| | | Richard Goemann |
| | | Eileen Ulate |
| | | Matthew Donnelly |
| Defendants: | **State of Alabama & Alabama Department of Corrections** | William R. Lunsford |
| | | Lynette E. Potter |
| | | Daniel J. Chism |
| | | Megan M. Everett |
| | | Sonia M. Lazaro |
| | | John R. Alford, Jr. |
| | | William R. Allen |
| | | George A. Wright |
| | | Michael B. Beers |

4. Pleadings. The following pleadings have been allowed:

(a) United States' Second Amended Complaint, (Doc. 71); and

(b) Defendants' Answer to the Second Amended Complaint, (Doc. 75).

5. Statement of the Case.

(a) Narrative Statement of the Case.

The United States alleges that the State violates the Eighth and Fourteenth Amendment rights of male inmates by failing to prevent inmate-on-inmate violence, by failing to prevent inmate-on-inmate sexual abuse, by failing to protect inmates from the use of excessive force by security staff, and by failing

to provide safe physical conditions of confinement in violation of the Constitution.

(b) Undisputed Facts.

The Parties' undisputed facts are set forth in **Exhibit C**. The Parties will continue to work together to develop additional undisputed facts.

(c) Plaintiff's Claims.

The United States' claims are set forth in **Exhibit D**.

(d) Defendants' Defenses.

The State's defenses are set forth in **Exhibit E**.

6. Discovery and Other Pretrial Procedures.

(a) Pretrial Discovery.

1. Pursuant to previously entered orders of the court, discovery closed on January 31, 2025.

2. Post-Fact Cutoff Evidence. On the issue of evidence after January 31, 2025, the court has ordered: "Unless the court first grants a particularized motion establishing good cause pursuant to its prior Order, (doc. 93), and Rule 16(b)(4), Defendants may not rely during the liability phase of trial on an expert opinion to the extent that the opinion materially depends on evidence exceeding the January 31, 2025, fact cutoff—including case-specific facts, events, conditions, practices, programs, remedial measures, inspections, investigations, or datasets concerning the Alabama Department of Corrections ('ADOC') that arose after the cutoff." (Doc. 347 at 2.)

The court has further ordered as follows: "A party seeking to use post-cutoff evidence during the liability trial must first file a focused motion identifying the exact evidence, the affected Opinion Matrix line and opinion, the evidence's date, the diligence supporting the request, the reason it belongs in liability rather than remedy, and any responsive discovery required." *Id.* at 5.

(b) Pending Motions.

1. The United States' Pending Motions:

    a. Motion in Limine to Exclude Undisclosed ADOC Employee Witnesses (Doc. 467);

    b. Motion in Limine to Exclude Mark Williams Deposition Testimony (Doc. 468);

    c. Motion in Limine to Sequester Expert Witnesses (Doc. 469);

    d. Motion in Limine to Exclude ADOC Employee Declarations (Doc. 470);

    e. Motion in Limine to Exclude Expert Report and Testimony of Sean Stewart (Doc. 471);

    f. Motion in Limine to Exclude BOP Evidence (Doc. 472);

    g. Motion in Limine to Exclude the Expert Report and Testimony of Robert Carter (Doc. 473);

    h. Motion in Limine to Exclude the Expert Report and Testimony of Kathleen Lane (Doc. 474); and

    i. Motion in Limine to Exclude the Expert Report and Testimony of Mary Ila Ward (Doc. 475).

2. The State's Pending Motions:

    a. Motion to Strike Plaintiff's Seventh Amended Disclosures and Supplemental Expert Report of Dr. Kevin Quinn (Doc. 428);

    b. Motion in Limine to Exclude Undisclosed Medical-Examiner Opinions (Doc. 476);

    c. Motion in Limine to Exclude or Limit Michelle Bonner's Expert Testimony (Doc. 477);

d. Motion in Limine to Exclude or Limit Martin Horn's Expert Testimony (Doc. 478);

e. Motion in Limine to Exclude Medical and Mental-Health Opinions from Martin Horn and Roger Werholtz (Doc. 479);

f. Motion in Limine to Exclude Expert Opinions and Testimony from Kenneth Ray (Doc. 480); and

g. Motion in Limine to Exclude Evidence Concerning Draper Correctional Facility (Doc. 481).

3. Meet and Confer on Pending Motions:

   a. Pursuant to this court's order during the Pretrial Conference held on October 30, 2026, the Parties met and conferred regarding potential stipulations that would resolve many of the motions in limine. The Parties will continue to confer and may withdraw pending motions if the Parties enter a joint stipulation that fully resolves the issues raised therein.

4. Pending Evidentiary Issues:

   a. Plaintiff's Objections to the State's Witness List (Doc. 461);

   b. Plaintiff's Objections to the State's Exhibit List (Doc. 462);

   c. The State's Objections to Plaintiff's Witness List (Doc. 465); and

   d. The State's Objections to Plaintiff's Exhibit List (Doc. 466).

(c) Deadlines.

1. Witness lists were filed on **October 19, 2026**.

2. Objections to witness lists were filed on **November 2, 2026**.

3. Exhibit lists were filed on **October 19, 2026**.

4. Objections to exhibit lists were filed on **November 2, 2026**.

5. Motions *in limine* were filed on **November 4, 2026**.

6. Responses to motions *in limine* shall be filed on or before **November 16, 2026**.

7. Proposed findings of fact and conclusions of law shall be filed by each party no later than **twenty-one (21) calendar days** after the liability trial.

7. Trial Procedures and Issues.

(a) Stipulation Regarding Evidentiary Foundations of Certain Documents. In an effort to increase efficiency at trial, the parties agreed to, and filed, a Joint Stipulation related to the evidentiary foundations of certain documents that will be used as exhibits at trial. (Doc. 385).

(b) Stipulation on the Admissibility of Certain Documents into Evidence. The parties stipulate the admissibility at trial of the documents listed in **Exhibit F**. The Parties anticipate working together to agree to additional admissible documents prior to trial.

(c) Procuring Testimony of Inmates. The parties continue to discuss a joint stipulation related to the testimony of inmates, which will be filed with the court upon agreement.

8. Trial Date.

(a) This case is set for a non-jury trial on **November 30, 2026**.

(b) The trial of this matter is expected to last for approximately two months.

(c) The parties are to read and comply fully with each provision contained in **Exhibits A and B** to this order, which are incorporated into this order by reference as if fully set forth herein, and as further clarified during the October 30, 2026, pretrial conference.

The court **ORDERS** that the above provisions be binding on all parties unless modified for good cause shown.

**DONE** and **ORDERED** this 10th day of November, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE

## EXHIBIT A – STANDARD PRETRIAL PROCEDURES

**1. Damages.**

No later than thirty (30) calendar days before the date set for trial, the parties shall file and serve a list itemizing all damages and equitable relief being claimed or sought; such list shall show the amount requested and, where applicable, the method and basis of computation.

**2. Witnesses.**

The parties shall file witness lists on or before the date specified in the pretrial order. If a witness shown on the list will be presented by deposition, the party designating that witness must specify the pages of the deposition to be used. Objections to witness lists must be filed on or before the date specified in the pretrial order.

Unless specifically agreed by the parties in writing or allowed by the court for good cause shown, the parties shall be precluded from offering substantive evidence through any witness not included on the party's witness list. The listing of a witness does not commit the party to have that witness available at trial or to call that witness to testify, but it does preclude the party from objecting to the presentation of that witness's testimony by another party.

As to any witnesses shown on the list to be presented by deposition, an opposing party may serve a list of additional pages of the deposition to be used, and may serve and file a list disclosing any objections to the use of the deposition testimony under Federal Rules of Civil Procedure 32 or 26(a)(3)(B). Any objections to deposition testimony should be accompanied by excerpts from the depositions including the testimony to which the objection relates and must be filed with objections to the witness list.

Objections to the witness list not made within the time specified in the pretrial order, other than objections under Federal Rules of Evidence 402 and 403, shall be deemed waived, unless such failure to timely object is excused by the court for good cause shown.

**3. Exhibits.**

The parties shall file exhibit lists on or before the date specified in the pretrial order. Objections to exhibit lists must be filed on or before the date specified in the pretrial order.

(a) **Marking**. Each party that anticipates offering more than five (5) exhibits as substantive evidence shall premark the exhibits in advance of trial, using exhibit labels and lists available from the Clerk of Court. The court will provide up to 100 labels; if any party needs more labels, that party must use labels of the same type as those supplied by the court. Counsel must contact the courtroom deputy for the appropriate exhibit list form for use at trial. The court urges counsel to be judicious in determining which documents are actually relevant to necessary elements of the case.

(b) **Examination by Opposing Party**. Except where beyond the party's control or otherwise impractical (*e.g.*, records from an independent third-party being obtained by subpoena), each party shall make exhibits available for inspection and copying. The presentation of evidence at trial ordinarily will not be interrupted for opposing counsel to examine a document that has been identified and was made available for inspection.

(c) **Court's Copies**. In addition to the premarked trial exhibits mentioned above, the court requests for the bench an exhibit notebook of anticipated trial exhibits. The notebook should include a copy of the Exhibit List. The parties shall also email a courtesy copy of the exhibit notebook to the chamber's email address at mooty_chambers@alnd.uscourts.gov.

(d) **Limiting Personal Information in Transcripts and Exhibits**. The judiciary's privacy policy restricts the publication of certain personal data in documents filed with the court. The policy requires limiting Social Security and financial account numbers to the last four digits, using only initials for the names of minor children, and limiting dates of birth to the year. However, if such information is elicited during testimony or other court proceedings, it may become available to the public. The better practice is for you to avoid introducing this information into the record in the first place. Please take this into account when questioning witnesses, presenting documents, or making other statements in court. If a restricted item is mentioned in court, you may ask to have it stricken from the record or partially redacted to conform to the privacy policy, or the court may do so on its own motion.

(e) **Objections**. Objections to the exhibit list not made within the time specified in the pretrial order, other than objections under Federal Rules of Evidence 402 and 403, shall be deemed waived, unless such failure to timely object is excused by the court for good cause shown.

**4. Failure to Disclose**.

**THE PARTIES ARE REMINDED THAT THEY WILL NOT BE ALLOWED TO USE AT TRIAL ANY WITNESS OR EXHIBIT NOT DISCLOSED IN ACCORDANCE WITH FEDERAL RULE OF CIVIL PROCEDURE 26(a) OR 26(e), UNLESS THE FAILURE WAS SUBSTANTIALLY JUSTIFIED OR THE OFFERING PARTY CAN SHOW THAT ITS FAILURE TO DISCLOSE WAS HARMLESS. *See* Fed. R. Civ. P. 37(c)(1).**

**5. Motions *In Limine***.

Motions *in limine* must be filed on or before the date specified in the pretrial order. Supporting arguments and legal authorities should be included in the motion rather than filed as separate memoranda. Counsel must indicate whether each motion is opposed. Parties are encouraged to resolve evidentiary issues by stipulation. Responses in opposition to the motions *in limine* must be filed on or before the date specified in the pretrial order. Counsel are reminded that under the Initial Order, all motions *in limine* should include a proposed order.

The parties must provide the court with a courtesy copy of each motion *in limine* and each response to a motion *in limine*, including exhibits. These materials should be double-sided. Each page must be three-hole punched and securely bound in a three-ring binder or a large clip, with tabs separating each exhibit. Courtesy copies should reflect the CM/ECF case number, document number, date, and page stamp on each page.

**6. Use of Depositions at Trial**.

(a) The court will accept the parties' written agreement to use a deposition at trial even though the witness is available. In the absence of such an agreement, parties must comply with Federal Rule of Civil Procedure 32.

(b) Before trial, counsel must provide the courtroom deputy with a copy of all depositions to be used as exhibits at trial.

(c) Counsel will designate the portion of any deposition that counsel anticipates reading by citing pages and lines in the final witness list. Objections, if any, to those portions (citing pages and lines) with supporting authority must be filed with objections to the witness list.

(d) Use of videotape depositions is permitted and the parties must make good faith efforts to agree on admissibility or edit the videotape to resolve objections.

(e) In a non-jury trial, for any deposition offered as a trial exhibit, counsel shall attach to the front of the exhibit a summary of what each party intends to prove by the deposition testimony, with line and page citations, and include an appropriate concordance of the deposition pages offered.

## 7. Trial Submissions to Court.

The court does not request trial briefs, but any party may file a trial brief. The decision not to file a trial brief will not prejudice a party in any way. If a party chooses to file a trial brief, it is limited to ten pages, footnotes are not allowed, and it must be filed no later than ten days before the trial date. Responsive trial briefs will not be allowed. Parties are encouraged to file trial briefs only if there is a legal issue to which they would like to draw the court's attention. Trial briefs that recite alleged facts or rehash motions *in limine* will not help the court.

## 8. Jury Charges, Verdict Form, and Voir Dire.

On or before the date specified in the pretrial order, the parties shall file a **single, joint proposed jury charge** that includes all necessary instructions.

(a) Each requested instruction must be numbered and presented on a separate sheet of paper with authority cited.

(b) Counsel must include all necessary instructions or definitions, particularly: (1) the *prima facie* elements of each cause of action and defense asserted; (2) legal definitions required to be given to the jury; (3) elements of damages; and (4) methods of calculation of damages.

(c) Counsel must use the Eleventh Circuit Pattern Jury Instructions, or appropriate state pattern jury instructions, as modified by case law or statutory amendments, wherever possible. Any deviations must be identified and accompanied with legal authorities for the proposed deviation.

(d) If the parties cannot agree on all instructions, definitions or questions, the parties should nonetheless submit a single, **unified** charge. Each disputed instruction, definition, or question should be set out in bold type, underlined or italics and identified as disputed. Each disputed item should be labeled to show which party is requesting the disputed language. Each instruction shall include all authority or related materials upon which each party relies.

(e) Together with the joint proposed jury charge, the parties must file a **joint proposed verdict form**. If the parties are unable to agree on a joint proposed verdict form, they may file separate forms. The court expects that shortly after the close of evidence, the parties will submit any amendments to the proposed jury charge and verdict form required by the evidence presented at trial.

(f) The parties shall email the joint or unified proposed charge and the joint proposed verdict form in Word format, to the chamber's email address at mooty_chambers@alnd.uscourts.gov.

(g) If the parties have agreed on questions that they would like for the court to consider asking during voir dire, the parties should include those questions in the filing and email submission of their proposed jury instructions and verdict form.

## EXHIBIT B – GUIDELINES FOR CONDUCT OF TRIALS

*These guidelines reflect the standard practices of this court in the trial of cases. They do not alter the rules of civil or criminal procedure, the rules of evidence, or local rules.*

**1.** **<u>Hours</u>**. Trials ordinarily commence at 9:00 a.m. and continue until approximately 5:00 p.m., Mondays through Fridays.

(a) **Punctuality**. You, your client, and your witnesses should be present and ready to proceed promptly at the appointed time, both at the beginning of the day and after recesses. Counsel should be present at the courthouse at least 30 minutes before the beginning of each trial day to avoid delays and to be available to discuss unanticipated problems.

(b) **Recesses**. A witness whose examination has not been completed at the time of a recess or adjournment should be back in the witness box at the time trial is scheduled to resume.

(c) **Requests for changes**. Make known to the court as soon as can be anticipated any requests for changes in the trial schedule, including those relating to religious holidays or arising because of unavailability of witnesses.

(d) **Conferences**. In jury cases, the judge may hold a brief conference in chambers at the end of the trial day or before the trial commences or resumes, or both, at which time counsel can discuss the schedule of witnesses and documents and any anticipated evidentiary problems. Alert the court reporter if you want to have some motion, argument, proffer, or other matter placed on the record during the conference.

(e) **Settlement discussions**. Although settlements should occur to the extent possible before the trial is scheduled to begin, counsel are encouraged to discuss settlement as the trial progresses. These discussions should ordinarily be conducted during recesses and adjournments. The court will not delay the start or resumption of trial for such discussions. Advise the court if at any point you believe the court's assistance might be helpful in arriving at a settlement.

2. **Selection of jury**.

(a) **Voir Dire**. The court will conduct voir dire. Once all questions have been asked, the court will allow the attorneys time to ask questions, but those questions will be limited to follow-up questions concerning inquiries made by the court. If the parties have questions that they agree that they would like for the court to ask during voir dire, they are encouraged to submit those with their joint proposed jury instructions and verdict form.

(b) **Size**. The size of the jury in civil trials ranges from six to twelve, with alternates to be set by the judge, taking into account such factors as the expected length of trial and the number of jurors available for that and other scheduled trials. Absent special agreement by the parties, only a unanimous verdict of all selected jurors not excused or discharged for good cause may be received.

(c) **Peremptory challenges**. The number of peremptory challenges to be allowed will depend on (1) the number of jurors not excused or challenged for cause and (2) the size of the jury to be selected. For example, if 18 jurors remain after any challenges for cause, the court might allow each side five peremptory challenges to select a jury of 8 or might allow each side four peremptory challenges to select a jury of 10. Peremptory challenges are exercised by indicating on a form (provided by the court) the name and juror number of the person(s) so challenged. When completed, these forms are shown to the court and opposing counsel at the bench, outside the hearing of the panel; at this time, the court can consider any *Batson* issues. Subject to consideration of any *Batson* issues, the peremptory challenges shown on the lists will be accepted by the court. Jurors not peremptorily challenged by either side will, in the order in which they were presented, be deemed as selected, up to the number of jurors previously determined by the court. As an example, for a jury of 8, the first 8 jurors not peremptorily challenged by either side will constitute the jury.

3. **Opening statements**. Unless otherwise allowed by the court, opening statements are limited to 20 minutes per party. Although a description of the basic claims and defenses and of the principal factual disputes between the parties is usually helpful, do not be argumentative and do not in jury cases refer to disputes about questions of law. In non-jury cases, opening statements are often

limited to  stating what claims and defenses are being pursued and what witnesses will becalled.

**4.** **<u>Witnesses</u>**. Cooperative witnesses not immediately needed should, to the extent practical, be placed "on call." At the same time, you remain responsible for having sufficient witnesses available in court so that, absent developments that could not have been reasonably anticipated, the trial may proceed during the normal trial hours without the need for adjournments or lengthy recesses to obtain further witnesses. Since defendants should be ready to proceed with their evidence promptly at the conclusion of the plaintiff's presentation, plaintiff's counsel should keep defendant's counsel advised as to when they expect to complete their presentation of evidence.

(a) **Order**. Counsel are expected to cooperate in resolving scheduling problems, including agreement in most circumstances for a witness to be called out of the normal order, even if the testimony of another witness is interrupted. Such accommodations are the norm for physicians and similar professionals called as witnesses and may be appropriate for other witnesses with personal, family, or occupational conflicts. Counsel are also expected to cooperate in placing "on call" those employees of another party whose absence would disrupt such party's normal business activities.

(b) **Production**. Do not ask opposing counsel to produce a witness or a document in a way that might suggest to the jury that such counsel would be concealing evidence if the witness or document is not produced. Address such requests to opposing counsel (or, if necessary, to the court) in a manner that will not be heard by the jury.

(c) **Oaths**. The courtroom deputy ordinarily administers an oath/affirmation to the witnesses and immediately asks their name and place of residence. If you know that the standard questions might be inappropriate (for example, the witness is in prison), so advise the deputy before the witness is called to the stand.

(d) **Release**. Witnesses should be released from further attendance or subpoena as soon as they are no longer needed. After testifying, a witness shall be deemed as released by consent unless counsel or the court finds that the witness should not be so excused. You should not consent to release of a witness if you will later offer in evidence

a prior inconsistent statement about which the witness was not examined or if you wish to make a proffer of testimony of that witness to which an objection was sustained.

(e) **Exclusion**. Requests under Federal Rule of Evidence 615 for exclusion of witnesses from the courtroom should be made before examination of the first witness begins, preferably before opening statements. Be alert for witnesses arriving during trial and inadvertently coming into the courtroom. Although the Rule does not prevent talking with excluded witnesses during recesses about their expected testimony, do not in such discussions disclose the courtroom testimony given by other witnesses. After testifying and provided they will not be recalled, witnesses are no longer subject to the Rule and may remain in the courtroom.

**5. Examination of witnesses**. Absent physical disabilities, examination of a witness should ordinarily be conducted while the witness is seated in the witness box and counsel is standing at the lectern.

(a) **Approaching clerk's desk or witness box**. Permission of the court to approach the clerk's desk or the witness box is not necessary if for the purposes of submitting or obtaining an exhibit, handing an exhibit to the witness, or conducting examination about an exhibit when counsel needs to be next to the witness during the examination. Return to the lectern after such examination is finished.

(b) **Other locations**. Request permission of the court if you wish the witness to step from the witness box (for example, to display an injury, to prepare a sketch, or to identify objects in a photograph). Assist the court in assuring that your voice and that of the witness are sufficiently loud to be heard and that opposing counsel's view is not obstructed.

(c) **Depositions**. As you use or read from a deposition, indicate the page and line number of the starting and stopping points. Colloquies and objections of counsel should ordinarily be omitted, as should questions that are rephrased or changed before the answer is given. When the deposition refers to an exhibit, counsel may, in addition to the identification used in the deposition, indicate the exhibit number used during the trial. Persons asked to read the deponent's

testimony should do so fairly and impartially. Depositions are not ordinarily read aloud in non-jury cases; you should submit to the court well before the trial is completed a list of the portions you want the court to read.

(d) **Harassment**. Treat witnesses with courtesy, even when conducting vigorous impeachment. Do not shout at, ridicule, harass, or unfairly embarrass a witness. Use temperate language when requesting the court's assistance to control or direct a witness who is giving unresponsive or argumentative answers.

**6. Objections**. Rise before (or as) you object; this draws the attention of the court and other counsel to you and should alert the witness not to answer until your objection is ruled on. While standing, state that you are objecting and specify concisely the ground(s) of your objection (for example, "hearsay," "irrelevant," "lack of personal knowledge," "leading question"). Do not make a speech or argument to the jury. Do not disparage opposing counsel or the witness. Do not attempt to summarize other evidence. Do not suggest an answer to the witness.

(a) **Response by offeror**. The person who asked the question should not interrupt the person making the objection except to withdraw the question or if the objection itself is being made in an improper manner (for example, as an argument to the jury or to suggest an answer to the witness). After the objection has been stated, you may indicate if the evidence is being offered only for a limited purpose or only against certain parties.

(b) **Argument on the objection**. Neither counsel should present arguments regarding the objection unless authorized or invited by the court. If you wish to be heard in argument, request the court's permission.

(c) **Continuing objection**. In some circumstances you may be allowed to have a "continuing objection" to a particular line of inquiry, and therefore, you may not have to repeat your objection to a series of questions. Typically, this occurs when your objection on the grounds of relevancy is overruled and you wish to make a relevancy objection to further questions on the same subject.

(d) **Anticipating evidentiary problems**. Evidentiary questions which

may involve extended discussion and argument should be anticipated and called to the court's attention at the start or end of the trial day so that the question can be adequately considered without having to interrupt the trial schedule.

**7.** **Special equipment**. Audio-visual equipment should be brought into the courtroom and tested before or after trial hours or during a recess. You are responsible for seeing that the trial is not substantially delayed while such equipment is being set up. Make arrangements with the courtroom deputy if you need special access to the courtroom.

**8.** **Closing arguments**. Unless otherwise allowed by the court, closing arguments are limited to 30 minutes per side. Counsel for the party having the burden of proof shall be the first to present closing argument and may reserve a portion of the allotted time (not in excess of initial time taken) to respond to the other parties' arguments. A party seeking damages and who is permitted to divide its time of argument should address both liability and damages issues in its initial argument. Do not express your own personal opinions about the facts. Do not invite jurors to return a verdict as if they were in the position of one of the parties. You may leave the lectern, but keep your voice sufficiently loud to be heard by other counsel, the judge, and the court reporter.

**9.** **Instructions**. Persons are not ordinarily permitted to enter or leave the courtroom during the time the court is instructing the jury. The court will provide counsel with an opportunity to present objections or exceptions to the instructions outside the hearing of the jury and before the deliberations begin either at the bench or after excusing the jurors from the courtroom. Counsel are expected to remain in general attendance at the courthouse while the jury is deliberating; the failure to do so may be treated as a waiver of any right to object should the jury request and be given supplemental instructions. If counsel must leave the courthouse, they should provide a contact number, to be reached at a moment's notice, to the courtroom deputy.

**10.** **Other Matters of Proper Decorum and Conduct**.

(a) Do not argue with or disparage other counsel in the hearing of the jury. In most situations, the court's permission should be obtained before counsel engage in dialogue between themselves in the courtroom. Side comments between counsel should be limited to situations in which such conversations are intended to facilitate the fair and efficient conduct of the trial and not for any tactical

advantage; they should, moreover, be done in a respectful and courteous manner that does not detract from the dignity of the proceedings. In-court offers to stipulate should ordinarily be made only if previously agreed upon or if counsel has reason to believe the offer would have been accepted if made outside the courtroom.

(b) All should rise and remain standing and quiet while court is being formally opened. All should rise when the jury enters and exits the courtroom. Counsel should rise and remain standing while examining a witness, making an objection, presenting a motion, request, or argument, or otherwise addressing the court. At other times while court is in session, remain seated.

(c) Address or refer to witnesses or other parties using their surname.

(d) While opposing counsel is presenting a matter to the court or the jury or is examining a witness, other counsel and their clients or associates should not engage in conversation or activity at counsel table or otherwise move about the courtroom in a manner that might be distracting.

(e) **Indicating agreement and disagreement**. No one should by words, facial expressions, or other conduct indicate personal agreement or disagreement with what is being said by the court, the jury, an attorney, or a witness. Counsel are responsible for assuring that their clients and the friends or supporters of their clients are warned about such behavior.

(f) **Attendance**. Parties need not remain in continuous attendance during civil trials. To facilitate arranging for the attendance of witnesses and procuring documents, attorneys may, without need for permission from the court, enter and leave the courtroom during the trial from time to time if their client remains represented by co-counsel. Such movements should, however, be done in an unobtrusive and non-distracting manner. Paralegals not expected to testify may, without the need for special permission from the court, be inside the railing to assist counsel.

(g) **Findings under Federal Rule of Evidence 104(a)**. Do not disclose to the jury in any manner the findings of the court made under Federal Rule of Evidence 104(a) in connection with questions of

admissibility. For example, do not argue to the jury that you were allowed to present evidence of A's statement because the court found under Federal Rule of Evidence 801(d)(2)(E) that A and B were engaged in a conspiracy. Similarly, do not ask in the presence of the jury for the court to "recognize" a witness as an "expert" or as "hostile."

(h) **Smoking, eating, and drinking**. Smoking, eating, and drinking (other than water or coffee in a cup with a lid) are never permitted in the courtroom.

(i) **Cellular telephones; recording devices**. Keep cellular telephones in an "off" position while in the courtroom. Recording devices may be used in the courthouse only with express permission of the court.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:20-cv-01971-HDM** |
| **STATE OF ALABAMA, *et al.*,** | |
| **Defendants.** | |

**STIPULATED FACTS**

## I. PROCEDURAL HISTORY

1. On December 9, 2020, the United States filed this action against the State of Alabama and the Alabama Department of Corrections ("ADOC") (collectively, the "State"). (Doc. 1)

2. The United States filed this lawsuit pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C § 1997 et seq. alleging violations of the Eighth and Fourteenth Amendment rights of men incarcerated in ADOC's prisons for men.

3. On May 19, 2021, the United States filed its First Amended Complaint in this action.

4. On November 19, 2021, the United States filed its Second Amended Complaint in this action.

5. The Second Amended Complaint includes allegations regarding Bibb Correctional Facility ("Bibb"), Bullock Correctional Facility ("Bullock"), Donaldson Correctional Facility ("Donaldson"), Draper Correctional Facility ("Draper"), Easterling Correctional Facility ("Easterling"), Elmore Correctional Facility ("Elmore"), Fountain Correctional Facility ("Fountain"), Holman Correctional Facility ("Holman"), Kilby Correctional Facility ("Kilby"), Limestone Correctional Facility ("Limestone"), St. Clair Correctional Facility ("St. Clair"), Staton Correctional Facility ("Staton"), and Ventress Correctional Facility ("Ventress") (collectively, the "ADOC Facilities" or "Facilities").

6. The United States asserts four claims against the State under CRIPA and the Eighth and Fourteenth Amendments of the Constitution: (1) failure to protect from prisoner-on-prisoner violence; (2) failure to protect from prisoner-on-prisoner sexual abuse; (3) failure to protect from use of excessive force; and (4) failure to provide safe conditions. (Doc. 71).

7. On December 20, 2021, the State filed its Answer to the United States' Second Amended Complaint. (Doc. 75).

## II. UNDISPUTED FACTS

### A. <u>Alabama Department of Corrections Facilities</u>

1. ADOC's Facilities are institutions as defined within 42 U.S.C. § 1997(1).

2. ADOC intends to begin housing inmates in a new facility in Elmore County, named the Governor Kay Ivey Correctional Complex.

3. ADOC operates Bibb, a medium-security, or Security Level IV, facility in Brent, Alabama.

4. Bibb has a population of approximately 1,800.

5. Photographs Bates stamped SITE-0005342 to SITE-0006533 are photographs of Bibb taken by Plaintiff on or about November 16 and 17, 2022.

6. ADOC operates Bullock, a medium-security, or Security Level IV, facility in Union Springs, Alabama.

7. Bullock has a population of approximately 1,500.

8. Photographs Bates stamped SITE-0007809 to SITE-0008385 are photographs of Bullock taken by Plaintiff on or about December 12 and 13, 2022.

9. ADOC operates Donaldson, a close security, or Security Level V, facility in Bessemer, Alabama.

10. Donaldson has a population of approximately 1,400 to 1,500.

11. Photographs Bates stamped SITE-0006534 to SITE-0007334 are photographs of Donaldson taken by Plaintiff on or about November 14 and 15, 2022.

12. ADOC previously operated Draper, a medium-security, or Security Level IV, facility in Elmore, Alabama.

13. ADOC operates Easterling, a medium-security, or Security Level IV, facility in Clio, Alabama.

14. Easterling has a population of approximately 1,258.

15. Photographs Bates stamped SITE-0011145 to SITE-0012109 are photographs of Easterling taken by Plaintiff on or about March 1 and 2, 2023.

16. ADOC operates Elmore, a medium-security, or Security Level IV, facility in Elmore, Alabama.

17. Elmore has a population of approximately 1,138.

18. Photographs Bates stamped SITE-0013920 to SITE-0014893 are photographs of Elmore taken by Plaintiff on or about April 26 and 27, 2023.

19. ADOC operates Fountain, a close security, or Security Level V, facility in Atmore, Alabama.

20. Fountain has a population of approximately 1,200 to 1,300 with an additional 200 prisoners in the Annex.

21. Photographs Bates stamped SITE-0012110 to SITE-0013461 are photographs of Fountain taken by Plaintiff on or about March 21 and 22, 2023.

22. ADOC operates Holman, a close security, or Security Level V, facility in Atmore, Alabama.

23. Holman has a population of approximately 185 prisoners and 166 death row prisoners.

24. Photographs Bates stamped SITE-0013462 to SITE-0013919 are photographs of Holman taken by Plaintiff on or about March 23, 2023.

25. ADOC operates Kilby, a close security, Security Level V, facility in Mt. Meigs, Alabama.

26. Kilby is the primary Receiving and Classification Center for men entering the ADOC system.

27. Kilby has a population of approximately 1,312.

28. Photographs Bates stamped SITE-0008386 to SITE-0010285 are photographs of Kilby taken by Plaintiff on or about December 14 and 15, 2022.

29. ADOC operates Limestone, a close security, Security Level V, facility in Harvest, Alabama.

30. Limestone has a population of approximately 1,900 to 2,200.

31. Photographs Bates stamped SITE-0007335 to SITE-0007808 are photographs of Limestone taken by Plaintiff on or about December 7 and 9, 2022.

32. ADOC operates St. Clair, a close security, Security Level V, facility in Springville, Alabama.

33. St. Clair has a population of approximately 1,165.

34. Photographs Bates stamped SITE-0003914 to SITE-0005341 are photographs of St. Clair taken by Plaintiff on or about October 19 and 21, 2022.

35. ADOC operates Staton, a medium-security, Security Level IV, facility in Elmore, Alabama.

36. Staton has a population of approximately 1,200 to 1,400.

37. Photographs Bates stamped SITE-0014894 to SITE-0016195 are photographs of Staton taken by Plaintiff on or about April 24 and 25, 2023.

38. ADOC operates Ventress, a medium-security, Security Level IV, facility in Clayton, Alabama.

39. Ventress has a population of approximately 1,218.

40. Photographs Bates stamped SITE-0010290 to SITE-0011144 are photographs of Ventress taken by Plaintiff on or about February 27 and 28, 2023.

41. ADOC's Facilities differ in their security levels, physical designs, inmate populations, housing configurations, programming, specialized functions (such as mental-health focused dorms), and institutional missions (such as facilities designated for providing programming).

## B. <u>Alabama Department of Corrections Leadership</u>

1. The ADOC Commissioner is the highest-ranking official in ADOC and exercises general oversight of ADOC's statewide operations. The ADOC Commissioner reports to the Governor of the State of Alabama.

2. Jefferson Dunn served as the ADOC Commissioner during the period from approximately April 1, 2015, to approximately January 1, 2022.

3. John Hamm served as the ADOC Commissioner during the period from approximately January 1, 2022, through the fact cutoff of January 31, 2025.

4. ADOC's Deputy Commissioner of Operations, Men's Services, reports directly to the Commissioner.

5. ADOC's Deputy Commissioner of Operations exercises general oversight, subject to the Commissioner's supervision, over the operations of the ADOC Facilities.

6. Charles Daniels served as the Deputy Commissioner of Operations in 2019.

7. Grant Culliver served as the Deputy Commissioner of Operations from approximately 2019 to approximately 2022.

8. Dr. Wendy Williams served as the Deputy Commissioner of Operations, Men's Services from approximately January 6, 2022, to approximately September 1, 2024.

9. Since approximately October 2024, Charles "Chuck" Williams has served as the Deputy Commissioner of Operations and New Prison Construction.

10. ADOC's Director of Facilities Management exercises general oversight, subject to the Commissioner's supervision, over new construction projects, renovation projects, and maintenance operations for the ADOC Facilities.

11. Since approximately 2017, Jenny Abbott has served as the Director of Facilities Management.

12. Director Abbott oversees ADOC's Facilities Management Division which encompasses the Engineering Administrative Division, Security Technology Division, and Environmental Division.

13. ADOC employs multiple Regional Directors (formerly Institutional Coordinators) who exercise oversight, subject to supervision of the Commissioner and/or his designees, over the security operations of the Facilities within their assigned regions.

14. ADOC's Regional Directors are notified about all Class A and B incidents at the Facilities they oversee, including homicides, fights with a weapon, overdoses, sexual assaults, and confiscations of contraband.

15. ADOC's Regional Directors report certain Class A and B incidents to the Deputy Commissioner of Operations, depending on the seriousness of the incident.

16. Lagreta McClain previously served as Regional Director for Donaldson, Limestone, and St. Clair.

17. Edward Ellington previously served as Regional Director for Bibb, Donaldson, Elmore, Limestone, St. Clair, and Staton.

18. Cynthia Stewart-Reilly previously served as Regional Director for Bibb, Elmore, Holman, and Staton.

19. Edward Ellington serves as Regional Director for Donaldson, Fountain, Holman, Limestone, and St. Clair.

20. Administrative Regulations ("ARs") provide guidance to entities on the parameters to derive their Standard Operating Procedures ("SOPs").

21. SOPs are issued by the institution and define the mission and practice of that institution.

22. Wardens are responsible for developing SOPs based on the guidance provided in the ARs.

23. Basic Correctional Officers ("BCOs") are not certified to use firearms and cannot staff posts that use a weapon such as the tower or perimeter control.

### C. Prisoner-on-Prisoner Violence

1. ADOC utilizes an Incident Report Module to collect and maintain Incident Reports.

2. Debt among inmates in the Facilities may cause threats or acts of violence by a creditor inmate, another inmate, inmate groups, and ADOC staff.

3. In 2019, ADOC's monthly reports identified 13 prisoner-on-prisoner deaths.

4. John David Teague died by homicide on January 7, 2019, at Staton.

5. Quinton Few died by homicide on March 12, 2019, at Bibb.

6. Following Quinton Few's March 2019 death at Bibb, the investigation identified Terence Griffin as the assailant.

7. Ray Little died by homicide on March 15, 2019, at Bibb.

8. The investigation into Ray Little's March 2019 death at Bibb resulted in a murder warrant against Devarrieo Shepherd.

9. Jeremy Rashad Bailey died by homicide on June 15, 2019, at Fountain.

10. The investigation into Jeremy Rashad Bailey's June 2019 death at Fountain resulted in murder warrants.

11. Joshua David Willingham died by homicide on September 13, 2019, at Ventress.

12. The investigation into Willingham's September 2019 death at Ventress resulted in a murder warrant.

13. Elvin Jess Burnseed died by homicide on October 7, 2019, at Donaldson.

14. The investigation into Burnseed's October 2019 homicide at Donaldson resulted in a substantiated homicide case.

15. William Warren died after being stabbed in the eye at Ventress on October 17, 2019.

16. The investigation into William Warren's October 2019 death at Ventress resulted in a substantiated criminal case.

17. Robert Green died after he was assaulted at Elmore on October 23, 2019.

18. The investigation into Robert Green's October 2019 death at Elmore supported a manslaughter charge.

19. Willie Leon Scott died by homicide on December 6, 2019, at Holman.

20. The investigation into Willie Leon Scott's December 2019 death at Holman identified Xavier Taylor and Ellis Diggs as suspects.

21. Brandon Ladd died after a stab wound to the neck at Bibb on December 10, 2019.

22. Moses Robinson died by homicide on December 31, 2019, at Holman.

23. Following Moses Robinson's December 2019 death at Holman, the investigation resulted in a murder warrant against Michael Eaton.

24. Kenneth Locke died by homicide on March 24, 2020, at Fountain.

25. The investigation into Kenneth Locke's March 2020 death at Fountain resulted in referral to the Escambia County Grand Jury.

26. Dennis Benson died after a stabbing at Ventress on March 30, 2020.

27. The investigation into Dennis Benson's March 2020 death at Ventress identified Juanderius Woods as the assailant.

28. Curtis James William, Jr. died by homicide on April 22, 2020, at Ventress.

29. Jamal Cornelius King died by homicide on May 27, 2020, at Elmore.

30. The investigation into Jamal Cornelius King's May 2020 death at Elmore resulted in a murder warrant against Kori Brown.

31. Moses Knight died by homicide on June 15, 2020, at Bullock.

32. The investigation into Moses Knight's June 2020 death at Bullock resulted in a capital-murder warrant against McDonald.

33. Demarcus Harrison died after a stabbing on September 29, 2020, at Fountain.

34. The investigation into Demarcus Harrison's September 2020 death at Fountain identified Decoreyon Green as a suspect.

35. Edwin Wells died after a stabbing on October 10, 2020, at Easterling.

36. The investigation into Edwin Wells's October 2020 death at Easterling resulted in a substantiated murder case.

37. Dwight Campbell died by homicide on November 10, 2020, at Bullock.

38. The investigation into Dwight Campbell's November 2020 death at Bullock resulted in a substantiated murder case.

39. Dexter Freeman died after a stabbing on February 8, 2021, at St. Clair.

40. The investigation into Dexter Freeman's February 2021 death at St. Clair resulted in a substantiated homicide case against Aaron Thomas.

41. David Lee Franklin died by homicide on February 9, 2021, at Donaldson.

42. The investigation into David Lee Franklin's February 2021 death at Donaldson identified Tony Evans as the suspected offender.

43. Ian Rettig died after a stabbing on May 4, 2021, at Fountain.

44. The investigation into Ian Rettig's May 2021 death at Fountain identified Taray Ford as the assailant.

45. Larry Brown died on May 5, 2021, after an assault at Bullock.

46. Following Larry Brown's April 2021 death at Bullock, the investigation concluded a manslaughter charge against Darryl Lamont Ellington.

47. Jody Lynn Potts died by homicide on May 6, 2021, at Limestone.

48. The investigation into Jody Potts's May 2021 death at Limestone identified Milstead and Lawhorne as suspects, resulting in murder warrants.

49. Regial Ingram died after a stabbing on May 8, 2021, at Bullock.

50. The investigation into Regial Ingram's May 2021 death at Bullock resulted in a murder warrant against Shanwell Flowers and referral for prosecution.

51. Edwin Brazil died after an assault on June 22, 2021, at Bullock.

52. The investigation into Edwin Brazil's June 2021 death at Bullock identified multiple participants, resulted in murder warrants.

53. Tyrone Billups died after a stabbing on July 13, 2021, at Fountain.

54. The investigation into Tyrone Billups's July 2021 death at Fountain identified Marcell Cummings and Bilal Zaman as the assailants.

55. Travis Hutchins died after a stabbing on October 7, 2021, at Bibb.

56. The investigation into Travis Hutchins's October 2021 death at Bibb resulted in a murder warrant against Antonio Hughley.

57. Kenneth Gilchrist died after a stabbing on October 11, 2021, at Donaldson.

58. The investigation into Kenneth Gilchrist's October 2021 death at Donaldson resulted in a murder charge against Dezra Tellis and substantiated failure-of-duty charges against two COs.

59. Cody Brock died after a stabbing on December 23, 2021, at Staton.

60. Following Cody Brock's December 2021 death at Staton, the investigation concluded with a capital-murder charge against Rodney Woodgett.

61. Harold Dejuan Wallace, Jr. died on January 11, 2022, after being stabbed at Staton.

62. Harold Dejuan Wallace, Jr.'s death was classified as a homicide.

63. Ricky Stewart died after a stabbing on January 31, 2022, at Staton.

64. The investigation into Ricky Stewart's January 2022 death at Staton resulted in a murder warrant against Samuel Ellis.

65. Barry Wardell Gardner died by homicide on February 22, 2022, at Donaldson.

66. Terry Lee Jones died by homicide on March 1, 2022, at Easterling.

67. The investigation into Terry Lee Jones's March 2022 death at Easterling identified Finney Fitzgerald Banks as the suspected assailant.

68. William Jennings died by homicide on March 2, 2022, at Donaldson.

69. The investigation into William Jennings's March 2022 death at Donaldson resulted in a murder warrant against Keith Secrest.

70. Marcus Grubbs died after a stabbing at Kilby on May 4, 2022.

71. The investigation into Marcus Grubbs's May 2022 death at Kilby resulted in a murder warrant against Brandon Jackson and closure by arrest.

72. Eric Crenshaw died by homicide on May 29, 2022, at Ventress.

73. The investigation into Eric Crenshaw's May 2022 death at Ventress was exceptionally cleared.

74. Justin Denson died on June 3, 2022, after an assault at Ventress.

75. The investigation into Denson's May 2022 death at Ventress identified Travis Byfield, Rodriquez Williams, and Deshon Coplin and resulted in referral of murder charges.

76. Mitchell R. Cosby died by homicide on June 15, 2022, at Donaldson.

77. The investigation into Mitchell Cosby's June 2022 death at Donaldson resulted in murder warrants against four suspects.

78. Nyheim Toney died after a stabbing on June 28, 2022, at Bibb.

79. The investigation into Nyheim Toney's June 2022 death at Bibb resulted in a murder warrant against Johntayveious Fleming, and referral for prosecution.

80. David Daniel Sloan died by homicide on July 17, 2022, at Donaldson.

81. The investigation into David Sloan's June 2022 death at Donaldson resulted in a murder warrant against Abernathy.

82. Lawrence Turner died by homicide on July 19, 2022, at Bullock.

83. The investigation into Lawerence Turner's July 2022 death at Bullock supported a manslaughter charge against Jermaine Brooks.

84. Denarieya Letrex Smith died by homicide on October 1, 2022, at Donaldson.

85. Joseph Agee, III, died by homicide on October 3, 2022, at Donaldson.

86. The investigation into Joseph Agee III's October 2022 death at Donaldson resulted in a substantiated homicide case involving Martez Garrett and referral for prosecution.

87. Kenyon Demon Arrington died by homicide on October 15, 2022, at Limestone.

88. Marquis Hatcher died after a stabbing at Elmore on November 4, 2022.

89. The investigation into Marquis Hatcher's November 2022 death at Elmore was exceptionally cleared.

90. Kenneth Earl Ray, II, died by homicide on November 14, 2022, at Donaldson.

91. Richard Lancaster died on November 16, 2022, after an assault at Easterling.

92. Ariene Kimbrough died after a stabbing at Limestone on January 4, 2023.

93. The investigation into Ariene Kimbrough's January 2023 death at Limestone resulted in a capital-murder warrant against Kenyatta Martin.

94. Roderick Lee died after a stabbing at Kilby on January 27, 2023.

95. The investigation into Roderick Lee's January 2023 death at Kilby was exceptionally cleared.

96. Christopher Melton died after an assault at Ventress on February 22, 2023.

97. The investigation into Christopher Melton's February 2023 death at Ventress supported a murder charge against Gerald Hill.

98. Christopher Mount died on May 14, 2023, after an assault at Easterling.

99. The investigation into Christopher Mount's May 2023 death at Easterling resulted in referral of a capital-murder charge against William Smith.

100. Jamal McCain died after a stabbing at St. Clair on May 15, 2023.

101. The investigation into Jamal McCain's May 2023 death at St. Clair resulted in a murder warrant against Kevin Watts.

102. Colton Hall died after a stabbing at Easterling on May 16, 2023.

103. The investigation into Colton Hall's May 2023 death at Easterling resulted in a murder warrant against Cedric Moore.

104. Stephone Marshall died after a stabbing at Elmore on May 16, 2023.

105. The investigation into Stephone Marshall's May 2023 death at Elmore resulted in a felony-murder warrant against Myndarius Rogers and closure by arrest.

106. Tarrance Guyton died after a stabbing at St. Clair on May 31, 2023.

107. The investigation into Tarrance Guyton's May 2023 death at St. Clair found probable cause for a murder charge.

108. Christopher Streiff died by homicide after an assault at Ventress on August 8, 2023.

109. The investigation into Christopher Streiff's August 2023 death at Ventress resulted in murder warrants.

110. Louis Latham died on October 10, 2023, after an assault at Ventress.

111. The investigation into Louis Latham's October 2023 death at Ventress supported a reckless-manslaughter charge against Marcus Walker.

112. Cedric Lavoris Watts died by homicide on October 15, 2023, at Donaldson.

113. The investigation into Cedric Lavoris Watts's October 2023 death at Donaldson resulted in murder and capital-murder warrants.

114. Daniel Terry Williams died by homicide on November 9, 2023, at Kilby.

115. Derrek Wendell Martin died by homicide on December 12, 2023, at Elmore.

116. The investigation into Derrek Martin's December 2023 death at Elmore resulted in a murder warrant against Antonio Thomas.

117. Taurus White died after an assault at Limestone on March 5, 2024.

118. The investigation into Taurus White's March 2024 death at Limestone identified Xzavier Maddox and David McBride as suspected assailants.

119. Samuel Ward died after a stabbing at Limestone on March 21, 2024.

120. The investigation into Samuel Ward's March 2024 death at Limestone included Stephen Gordon's admission.

121. Gary Knight died after an assault at Bullock on May 13, 2024.

122. The investigation into Gary Knight's May 2024 death at Bullock was exceptionally cleared and closed and referred to the Bullock County Grand Jury.

123. Ronald Martin died on May 15, 2024, after an assault at Limestone.

124. Ronald Martin died from injuries sustained during a May 2024 assault at Limestone involving Jeremy Riley.

125. Frank Sims died on May 25, 2024, after he was assaulted at Staton several months earlier.

126. The investigation into Frank Sims's October 2023 assault at Staton was exceptionally cleared.

127. Deandre Roney died by homicide on June 8, 2024, at Donaldson.

128. The investigation into Deandre Roney's June 2024 death at Donaldson was recommended for inactive status.

129. In August 2020, after hearing from concerned family members, Bibb officers located Donavan Spenard, who told officers he had been "detained" by gang members, stabbed, and extorted for a debt.

130. On April 18, 2024, at Easterling, Carter Franklin reported two prisoners grabbed him off the yard, forced him into a dorm bathroom, tied his arms and legs, and then beat him with a broken broomstick over a debt.

131. Following Carter Franklin's April 2024 injuries at Easterling, staff reviewed surveillance footage.

132. In April 2024 at Easterling, staff found Garrett Dotch on the floor of the dorm with 8 puncture wounds and cameras confirmed he had been stabbed.

133. Garrett Dotch was taken by helicopter to a hospital for a suspected collapsed lung after being found by staff.

134. In connection with Garrett Dotch's April 2024 injuries at Easterling, staff reviewed surveillance footage.

135. In April 2024, both at Fountain, staff observed Michael Cooper leaving a dorm with several puncture wounds to the head and a helicopter took Tevin Wells to a hospital for a suspected punctured lung after being stabbed in the chest and neck.

136. Following Michael Cooper's April 2024 injuries at Fountain, staff provided assistance.

137. In April 2024, staff found Jeffrey Young in his Limestone cell with visible bruises and abrasions to his face and body.

138. When asked about his injuries in April 2024, Jeffrey Young reported that he had been beaten by another prisoner with a belt for several hours inside the cell and that the same prisoner beat him multiple times over the past two weeks.

139. Following Jeffrey Young's April 2024 allegations at Limestone, staff provided assistance and initiated disciplinary action against Alfred Jones.

140. In April 2024 at St. Clair, a prisoner approached staff requesting assistance on K-2 side, where they discovered Fitzgerald Russaw with stab wounds to his left side, requiring hospitalization for a possible punctured lung.

141. Following Fitzgerald Russaw's April 2024 stabbing at St. Clair, staff provided assistance.

142. In April 2024 at Donaldson, four prisoners beat Broderickus Carmichael with a broken broom and violently punched and stomped on his head.

143. The investigation into Broderickus Carmichael's April 2024 assault at Donaldson identified four participants.

144. In May 2024, prisoners assisted Juan Villasenor to the Shift Office at Limestone, stating that Villasenor had passed out. Facility medical staff discovered puncture wounds to his neck and arm, and he was transported to a hospital for treatment.

145. In June 2024 at St. Clair, a prisoner assisted Brandon Lowery to the infirmary after an assault, that caused a large cut down Lowery's back and thigh, requiring a helicopter transport to the hospital.

146. Following Brandon Lowery's June 2024 assault at St. Clair, staff provided assistance.

**D. Prisoner-on-Prisoner Sexual Violence**

1. Prisoners engage in sexual acts for protection, for drugs, and to work off debts.

2. In June 2016, at Limestone, Tyvorius Key reported Lamont Wilson stabbed him and forced him to have anal sex.

3. On May 1, 2019, at Fountain, Rahaim Fennell reported he blacked out after smoking a cigarette and woke up to Lamont Wilson penetrating him in the anus.

4. ADOC investigated the May 2019 incident involving Rahaim Fennell at Fountain with an unfounded finding.

5. On October 24, 2019, at Elmore, Michael Williams reported Lamont Wilson had been harassing him daily for sex, chasing him around B1 dorm to get him to come back to C1 dorm.

6. ADOC investigated the October 2019 incident involving Michael Williams at Elmore.

7. On December 11, 2019, John Hendrix at Staton reported Lamont Wilson had been pressuring him to be in a relationship and had attempted to stab him with a knife.

8. On July 24, 2020, at Bibb, William Sexton reported that Lamont Wilson forced him to move from his assigned bed in E dorm to B dorm and sexually

assaulted him, and that he attempted to flee Wilson several times but was continuously forced back.

9. On April 27, 2021, at Kilby, Draper Terry reported that Lamont Wilson pulled a knife on him, said "he's going to fuck me tonight" and grabbed his buttocks.

10. On May 5, 2021, at Ventress, Draper Terry also reported that Lamont Wilson had touched his buttocks on the way to kitchen.

11. On August 23, 2022, Joshua Tunnell reported Lamont Wilson anally penetrated him at Ventress as two other prisoners held him down.

12. On September 10, 2022, Bryan Taylor reported he was raped by several prisoners at Ventress, including Lamont Wilson (identified by his nickname).

13. On January 30, 2023, Jason Brawner reported about a month and a half earlier, he had used drugs, passed out, and woke up with semen all over his buttocks—the suspected offender was identified as Lamont Wilson.

14. ADOC investigated the October 2023 incident involving Daniel Williams at Staton.

15. Following the June 26, 2024, altercation between De'abra Richmond and Michael Cooper at Elmore, staff separated and medically assessed both inmates.

16. Following the October 2023 incident involving Frank Sims at Staton, ADOC referred the case to the Grand Jury as Assault First Degree.

17. ADOC hired Christy Vincent as its PREA Director in 2015.

**E. <u>Staffing</u>**

1. According to Quarterly Staffing Reports filed in *Braggs v. Dunn*, Civ. No. 2:14-cv-601-MHT (M.D. Ala.), the combined total vacancy rate for Bibb "correctional staffing and correctional supervisor staffing" was at least 50% or higher between March 2020 and December 31, 2024.

2. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Bullock "correctional staffing and correctional supervisor staffing" was at least 50% or higher between March 2020 and December 31, 2024.

3. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Donaldson "correctional staffing and correctional supervisor staffing" was at least 50% or higher between March 2020 and December 31, 2024.

4. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Easterling "correctional staffing and correctional supervisor staffing" was at least 50% or higher between March 2020 and December 31, 2024.

5. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Elmore "correctional staffing and correctional supervisor staffing" was at least 40% or higher between March 2020 and December 31, 2024.

6. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Fountain "correctional staffing and correctional supervisor staffing" was at least 40% or higher since March 2020 to December 31, 2024.

7. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Holman "correctional staffing and correctional supervisor staffing" has been at least 45% or higher since March 2020 to December 31, 2024.

8. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Kilby "correctional staffing and correctional supervisor staffing" has been at least 40% or higher since March 2020 to December 31, 2024.

9. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Limestone "correctional staffing and correctional supervisor staffing" has been at least 35% or higher since March 2020 to December 31, 2024.

10. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for St. Clair "correctional staffing and correctional supervisor staffing" has been at least 47.6% or higher since March 2020 to December 31, 2024.

11. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Staton "correctional staffing and correctional supervisor staffing" has been at least 40% or higher since March 2020 to December 31, 2024.

12. According to Quarterly Staffing Reports filed in *Braggs*, the combined total vacancy rate for Ventress "correctional staffing and correctional supervisor staffing" has been at least 50% or higher since March 2020 to December 31, 2024.

13. These Quarterly Correctional Staffing Reports from *Braggs* also report "vacancy rates" for correctional staff for each reporting period.

14. ADOC's facilities experienced varying vacancy rates between 2018 and 2024.

15. In 2023, ADOC reported 17.4 prisoners to each correctional officer and 67.8 prisoners to each supervisor when ADOC was authorized to have 5.2 prisoners to each correctional officer and 34.8 prisoners to each supervisor.

16. Regional Director Ellington testified, "Officer presence is a number one way to prevent a lot of stuff from happening inside the facility."

17. In May 2024, at Easterling, four prisoners fought inside a dorm, using knives, but staff did not know about the fight until three days later when a captain "received information" and reviewed the cameras.

18. On June 19, 2024, at 4:34 p.m. a prisoner stabbed Paul Reynolds in the back at Bibb and staff only learned about it around 11:40 p.m. after a nurse handed a letter to staff from an unidentified prisoner alerting them to the incident.

19. When asked how prisoners could get an officer's attention in between any security checks, a Lieutenant at Limestone said, "I don't know. They would have to yell or something."

20. Similarly, Lt. Wilson at Bibb testified that if a prisoner in restrictive housing needed to get an officer's attention, "Sometime they might kick on the door or something like that."

21. Elizabeth Lambert-Hughes served as ADOC's RPU Coordinator since the beginning of February 2023.

22. Lambert-Hughes received training from the Savages regarding staffing analysis beginning in May 2022.

23. Each facility's staffing Standard Operating Procedure identifies posts classified as critical and classified as mandatory.

24. Critical posts generally include towers, central control, housing units, and other critical operations such as feeding and pill call.

25. "Critical minimum staffing" is derived from the number of critical posts at a particular facility, and the number of critical posts may change based on that facility's needs.

26. Each ADOC facility determines which mandatory posts are prioritized as critical.

27. ADOC's AR 238 requires any facility that falls below critical minimum staffing levels to report the event to a Regional Director.

28. If an ADOC facility falls below critical minimum staffing levels, the Regional Director may take steps to increase staffing, fill the uncovered posts, or request resources from other facilities.

29. As of February 16, 2024, the RPU Coordinator testified that she had not received any notifications that a facility had fallen below critical minimum staffing and was unaware of any such prior notifications.

30. Lambert-Hughes testified that, based on her review, ADOC was covering all shifts in line with the staffing analysis.

31. ADOC experienced an increase in the number of correctional security staff "from 2,579 in FY 2006 to 3,179" in FY 2010.

32. Dunn served as Commissioner of the Alabama Department of Corrections from April 1, 2015, through December 31, 2021.

33. In 2019, ADOC published its first strategic plan under former Commissioner Dunn, covering the timeframe from 2019 to 2022.

34. In 2019, Ala. Code § 14-1-20 authorized ADOC to offer structured hiring and retention bonuses to correctional officers and directed ADOC to establish a program specifically designed to increase correctional officer hiring and retention. (Ala. Code § 14-1-20(a)).

35. The statutory program established under Ala. Code § 14-1-20 applied to all qualifying appointments made between May 29, 2019, and December 31, 2022, and allowed ADOC to continue paying bonuses to eligible officers through December 31, 2025. (Ala. Code § 14-1-20(b)(2)).

36. ADOC used augmentation from other facilities to address correctional staffing requirements at St. Clair.

37. Former Commissioner Dunn acknowledged that "working conditions and the institutional environment [do] play a role" in retention.

38. Former Commissioner Dunn explained the retention rationale behind ADOC's $1.3 billion infrastructure revitalization plan as follows: "If you give people conditions to work in in which they want to come to work and they want to be there, then the likelihood is that you're going to retain, all things being equal."

39. Former Commissioner Dunn testified that "[ADOC is] building new prisons to address a whole host of challenges that we identified throughout the entire system."

40. Former Commissioner Dunn testified, "in corrections, there are so many factors that lead to the safety and security equation, I would not pin it on one particular factor like personnel."

41. Former Commissioner Dunn left office on December 31, 2021.

42. When John Hamm ("Hamm") became ADOC Commissioner on January 1, 2022, his number one priority since becoming Commissioner centered around correctional staffing.

43. Former Commissioner Hamm described correctional staffing as the "number one issue."

44. When Dr. Wendy Williams, Deputy Commissioner of Operations-Men's Services ("Williams"), assumed her role in January 2022, she testified that her "immediate goal was to make sure [ADOC was] creating an environment at those facilities where staff wanted to work there and stay there."

45. ADOC also retained a company by the name of RippleWorx to assist with retention.

46. ADOC began making promotions to CSG Senior in September of 2023, according to Renee Minor, "in an effort to give a little bit of a career path to those correctional security guards that might incentivize them to stay."

47. Some ADOC correctional staff received pay increases in 2019.

48. Some ADOC correctional staff received pay increases in 2023.

49. ADOC's 2023 salary increases were intended, among other things, to incentivize security officers to remain employed with ADOC. COTs are eligible for approximately 27% in additional pay increases during their first eighteen to twenty-four months of employment.

50. In 2023, ADOC created the Correctional Officer – Hourly classification following the enactment of legislation allowing for a $52,000 earnings threshold for retired correctional officers under the Retirement Systems of Alabama ("RSA").

51. The Correctional Officer–Hourly classification allows ADOC to draw upon experienced security personnel.

52. As of December 31, 2023, ADOC employed 157 individuals in the Correctional Officer – Hourly classification at the facilities.

53. As of December 31, 2024, ADOC employed 244 individuals in the Correctional Officer – Hourly classification at the facilities.

54. At the outset of employment with ADOC, incoming applicants for correctional officer positions must attend a ten-week APOSTC Academy.

55. In 2019, 169 applicants graduated from the APOSTC Academy for employment with ADOC.

56. In 2020, 89 applicants graduated from the APOSTC Academy for employment with ADOC.

57. In 2021, 72 applicants graduated from the APOSTC Academy for employment with ADOC.

58. In 2022, 52 applicants graduated from the APOSTC Academy for employment with ADOC.

59. In 2023, 160 applicants graduated from the APOSTC Academy for employment with ADOC.

60. In 2024, 266 applicants graduated from the APOSTC Academy for employment with ADOC.

## F. Inmate Population and Custody

1. ADOC's in-custody population changes daily, and ADOC publicly reports in-custody population statistics.

## G. Contraband

1. Contraband contributes to violence in the Facilities.

2. In 2019, ADOC's multi-agency contraband seizure campaigns led to the seizure of 315 cell phones, over 4,500 grams of assorted drugs, and over 2,800 makeshift weapons.

3. In 2022, ADOC reported confiscating more than 160,000 grams/350 pounds of drugs, 6,200 weapons, and 3,300 cell phones in the Facilities.

4. In 2023, ADOC reported confiscating more than 200,000 grams/440 pounds of drugs, 5,500 weapons, and 5,800 cell phones in the Facilities.

5. In 2024, ADOC reported confiscating more than 110,000 grams/220 pounds of drugs, 4,000 weapons, and 4,100 cell phones in the Facilities.

6. Some inmates use illicit drugs during their incarceration at ADOC Facilities.

7. On August 13, 2023, Donaldson prisoner Derrol Shaw brandished a semi-automatic gun, handcuffed staff, forced staff into the shift office and a cubicle, stole a uniform and stab proof vest, unsuccessfully attempted to climb the fence, and used a cellphone to create several social media videos.

**H. <u>Contraband Interdiction</u>**

1. ADOC employs K-9 handlers and K-9 agents.

2. ADOC uses drone-detection technology to identify and track unauthorized drones near correctional Facilities.

3. In 2024, ADOC arrested 41 security staff members and 150 civilians for bringing contraband into ADOC Facilities.

**I. <u>Use of Force</u>**

1. Plaintiff's corrections expert, Martin Horn, noted that, "Force is an essential element of running a prison or a jail. The question is is it used appropriately."

2. At the outset of this litigation, ADOC's Administrative Regulation 327, Use of Force, effective March 4, 2015 ("AR 327 (2015)"), governed uses of force by ADOC correctional staff.

3. AR 327 (2015) permitted only APOSTC certified employees and certain "contract security" employees to use force against inmates.

4. AR 327 (2015) instructed, "[t]he use of physical force shall be restricted to instances of justifiable self-defense against physical assault (actual or threatened), protection of others, protection of property, prevention of escape or apprehension of escapees, 'quelling' a disturbance, or when an inmate exercises physical resistance to a lawful command."

5. AR 327 (2015) directed that: "[t]he application of physical force: 1. Shall be justified, reasonable, and necessary under the circumstances. 2. Shall only be used after attempts to verbally de-escalate the situation have failed, if possible. 3. Shall only be the minimum amount necessary to control the situation or achieve a legitimate correctional objective. 4. Shall never be used as punishment. 5. Shall be dependent upon the inmate's action or non-action. 6. The amount of force may change depending upon the level of inmate resistance and the totality of the circumstances. 7. Shall be consistent with the officer response options taught in Basic and In-Service Training. 8. Shall be determined on a case by case basis and the employee using or authorizing force shall be required to justify the action taken. 9. Shall stop when resistance offered by the inmate ceases and the inmate is under control and placed in appropriate restraints. 10. Shall not be used unless properly trained by, and/or the training is sanctioned by, the ADOC Training Division. The Commissioner and/or designee may approve specialized training for specialized units."

6. Curtis Nolen, then-Captain at Elmore, testified as of December 5, 2022, that ADOC only permitted "justified, reasonable and necessary" force; that his training outlined that "it must be a necessary reason to use force;" and, "[i]f it's another way you could quell a disturbance without using force, then don't use [force]."

7. Eric Bradford, a lieutenant at Kilby as of March 30, 2023, explained that AR 327 (2015) authorized force when someone was "in harm's way, in danger."

8. On March 21, 2024, Terry Raybon, Warden of Holman, described the factors that a correctional officer should consider as "He must give the inmate a command or -- or give him instructions or give him an order to do something and give him the opportunity to comply. If he fails to comply, then he -- we encourage them to use their spray first. And if they have to escalate to their baton, then escalate to their baton, depending on what type of force is -- what type of resistance is coming to them. If an inmate is trying to fight you with a -- you may have a chance to spray him; you may not. So you might -- whatever you need to use to get -- to defend yourself, but also to the minimum amount of force necessary to get him or her to comply."

9. AR 327 (2015) prohibited correctional staff from using force unless "properly trained by, and/or the training is sanctioned by, the ADOC Training Division."

10. AR 327 (2015) assigned the Director of Training responsibility for "ensuring that appropriate use of force training is provided."

11. Elliott Sanders served as the Director of Training for ADOC as of June 5, 2023.

12. As of June 5, 2023, ADOC's annual training served as "a requirement" and "not an option."

13. Annual security training at Easterling under AR 327 (2015) included use-of-force training, and staff from ADOC's southern region attended a "40 hour training" at Ventress.

14. AR 327 (2015) stated that "[u]se of force incidents shall be investigated by a Captain or Warden who has been trained . . . to conduct use of force investigations."

15. From August 2024 through January 2025, the Use of Force Review Board reviewed at least 58 use-of-force incidents.

16. Between August 2024 and January 2025, the Use of Force Review Board classified 26 reviewed uses of force as unjustified or unnecessary.

17. The Use of Force Review Board recommended corrective action under ADOC's disciplinary framework in 20 of those 26 matters.

18. From 2019 through January 31, 2025, at least 12 ADOC officers and supervisors have been criminally convicted of charges related to assaulting prisoners.

19. From 2019 through January 31, 2025, at least five other officers and supervisors were criminally charged for assaulting prisoners during this period.

20. Two officers at Limestone struck a 74-year-old prisoner with a broom handle, causing bleeding around his brain and from his ears and nose. ADOC only learned of this incident from the FBI, who were alerted by an attorney.

21. At Donaldson, a sergeant was criminally charged for assaulting a prisoner, including by striking him with a baton, causing a fractured skull and broken ribs and fingers.

22. At Elmore, two officers, a sergeant, and a lieutenant were convicted of an incident in which the sergeant repeatedly punched, kicked, and struck two handcuffed prisoners with a baton.

23. At Bibb, an officer pleaded guilty to a federal civil rights offense for an incident in which officers kicked and struck a prisoner with their batons, including while the prisoner was curled up in a fetal position.

24. At Staton, an officer and a sergeant were convicted of kicking a prisoner and striking him with a baton, and then lying about the incident in a report and to a state investigator.

25. At Elmore, an officer woke up a prisoner who was sleeping in the rec room with a shirt over his head; when the prisoner lifted his shirt, the officer pepper-sprayed him in the face.

26. At Kilby, two officers kicked and punched a prisoner after another prisoner had assaulted an officer. Video shows the officers pulled the prisoner from

his bunk bed, punched him in the back of his head, "forcibly tripped [the prisoner] causing him to fall onto the floor," and "kicked and stomped [the prisoner] multiple times to the head."

27. At Bibb, a prisoner threw his meal tray out of the cell door slot, striking an officer in the foot; the officer pepper-sprayed the prisoner, who was still confined in his cell.

28. Former Regional Director Crow testified he received calls "[a]t least once a week" about officers spraying prisoners secured in their cells.

29. After a Limestone prisoner refused to leave the yard area and cursed at an officer, the officer told another officer to hold his equipment and punched the prisoner in the face.

30. An officer at Bullock got into a "verbal argument" with a prisoner in a wheelchair and pepper-sprayed him while he was backing away from the officer; the prisoner "did not receive medical attention for approximately seven hours later." The officer also "instructed another inmate to assault" the prisoner who had cursed at her.

31. In yet another incident, an officer "start[ed] beating on [an] inmate" who got into an argument with the officer about leaving his dorm, and the warden reported the prisoner was later hospitalized for "severe" injuries, including a "brain bleed." ADOC's investigation later found that the prisoner "did not appear to be

resisting or posing any time of immediate threat" and "complied with [the officer's] instructions."

32. An Easterling officer used excessive force in three separate incidents within about a month. After a prisoner threw a cup of water on her, the officer swung her baton at the prisoner several times, and as other officers escorted the prisoner away, she "approache[d] from behind and attempt[ed] to strike [the] inmate . . . in the head with her baton." Nine days later, she ran up behind another prisoner in a hallway and struck him in the face. Less than a month after that, the officer slapped and struck a prisoner with a baton, before another officer separated them.

33. At Bibb, an officer choked a prisoner, picked him up, and threw him on a bench in the infirmary, all while the prisoner was handcuffed to the wall. The prisoner had cursed at the officer because the officer refused to release him from the infirmary.

34. At Ventress, a sergeant was charged with manslaughter after he punched a prisoner in the face, causing the prisoner to fall and hit his head. The sergeant and another officer "continued assaulting [the prisoner] after he fell to the ground." The prisoner died from head trauma a few days later.

35. Another sergeant struck a prisoner in the jaw while the prisoner was handcuffed; the blow dislocated the prisoner's jaw. The sergeant pleaded guilty to a misdemeanor.

36. At Elmore, two supervisors were convicted for an incident in which officers kicked, punched, and beat a prisoner with a baton.

37. At Draper, a sergeant was convicted of beating three prisoners with a wooden baton, breaking one prisoner's arm, and writing a false report to cover up the incident.

38. An Elmore sergeant ordered prisoners to assault a prisoner, Rubyn Murray, who was involved in an altercation with another officer earlier that day. After the initial altercation, the sergeant put Murray into a holding cell, then escorted two prisoners to the cell, unlocked the cell, and allowed the prisoners to beat Murray. The sergeant told officers to ignore Murray's cries for help. Murray died later that day. The sergeant was charged with murder. The Elmore warden did not review the video or the autopsy, nor did she review any LESD report about the incident.

39. In 2022, two years after the United States' complaint, ADOC transferred use-of-force investigations to a newly created Office of Inspector General (OIG).

40. Phillip Mitchell, then-Warden at St. Clair, testified that, near the end of 2022, an incident took place at St. Clair where a sergeant used excessive force that resulted in corrective action from OIG.

41. Clatys Jenkins, then-Captain at Kilby, stated that, after reviewing video of an incident that took place prior to April 11, 2024, he determined the officer's

"force was unnecessary" and recommended the officer receive corrective action for excessive force.

42. Captain Jenkins commented that, prior to April 11, 2024, a Kilby Supervisor cited both a Kilby officer and Sergeant for failing to report a use of force incident.

43. Warden Kenneth Peters, Warden at Fountain, at some point prior to April 30, 2024, noted an incident where Fountain Correctional Staff referred a matter to LESD that involved a Fountain supervisor who allegedly entered a crisis cell and assaulted an inmate.

44. After video review of a December 13, 2023, incident at Kilby showed that an inmate did not pose the threat reported by an officer, ADOC found the officer's closed-hand strike unjustified.

45. Lieutenant Eric Bradford stated that, near the end of 2021 or the start of 2022,[4] ADOC dismissed two correctional officers at Kilby after the officers continued using force "[w]hen the inmate was subdued" and "the situation was under control."

46. Warden Lamar confirmed that, at some point in the year prior to February 26, 2024, he recommended the dismissal of a corrections officer at Bullock after "[the officer's] second excessive use of force," in which he "stuck an inmate with a closed fist."

47. As of May 4, 2023, Kevin McNatt served as a Supervisory Agent with LESD who ADOC tasked with overseeing LESD investigative agents and reports.

48. McNatt reviewed complaints, determined whether a crime existed therein, and if so, directed an investigative agent to create a case file.

49. Agent McNatt identified two occasions prior to May 4, 2023, when federal authorities opted to pursue charges when local district attorneys did not take action.

50. On May 6, 2022, a LESD investigator completed a report that substantiated a criminal use-of-force case after reviewing interviews, video, photographs, and medical evidence related to an incident that took place at Donaldson on February 28, 2022. The investigator recommended that ADOC forward the matter to the Jefferson County District Attorney's Office for prosecution.

51. On October 14, 2022, another LESD investigator completed an investigation report after the investigator obtained TikTok and facility video, interviewed staff and an inmate, documented injuries, and attempted to interview the officer after his resignation related to a September 14, 2022, incident at Elmore. The investigator designated the matter for presentation to the Elmore County Grand Jury.

52. In February of 2022, ADOC LESD investigators found sufficient evidence for third-degree assault charges against a Staton corrections officer related to a January 25, 2022, incident. The investigator documented that "Elmore County

will not present misdemeanors to [the] Grand Jury[,]" so ADOC administratively closed the criminal file and referred the matter to the Staton Warden for corrective action.

53. Sean Stewart, the State's Use of Force Expert, assembled a team to assist with ADOC's use-of-force project that included Tate McCotter, Joshua Arnold, Glenn Ercanbrack, and later Rob Yantis.

54. Stewart and his team "created . . . 19 use-of-force standards, to build the foundation on the use of force," and then developed revised policies and procedures.

55. Stewart and his team provided the nineteen use-of-force standards to ADOC in December 2023 and "[t]he policies and procedures" in January 2024.

56. AR 327 (2025) states, "[n]either this policy nor the Use of Force Manual creates or expands the legal duties of ADOC or its agents and employees, creates a liberty or property interests for inmates, or expands existing state or federal constitutional rights or duties."

57. Plaintiff's correctional expert (Horn) described AR 327 (2025) as "a sound policy."

58. Between August 2024 and January 2025, the Use of Force Review Board found 26 uses of force to be unjustified or unnecessary. Of those 26 instances, the Use of Force Review Board recommended corrective action pursuant to AR 208

in 20 cases. On two occasions, the officer in question resigned prior to the Use of Force Review Board determination. On one occasion ADOC placed the officer on an Employee Assistance Program ("EAP").

59. LESD investigated the October 19, 2023, use-of-force incident at Limestone involving COs Samuel Dial and Jesse Cobb and William Rhinesmith, and the Limestone County District Attorney's Office presented the case to a grand jury, which indicted both COs.

60. ADOC's OIG conducted an audit of the May 20, 2024, incident at Bibb and agreed with the facility determination of an unjustified use of force.

61. LESD investigated a use-of-force incident that took place on March 12, 2021, at Limestone with a finding of unjustified and presented the case to the Limestone County District Attorney's Office for criminal prosecution.

62. ADOC investigated the July 2022 use-of-force incident at Bullock, determined the force was unjustified after reviewing the relevant documents, video footage, and CO testimony.

63. On December 12, 2022, the Deputy Commissioner for ADOC e-mailed to ensure that ADOC and the facility instituted corrective action for an unjustified and excessive use of force.

64. ADOC investigated a use-of-force incident that took place at Ventress on November 30, 2019.

65. On December 5, 2019, I&I initiated an investigation related to the death of the inmate that occurred on December 4, 2019, several days after the incident occurred.

66. Investigators conducted multiple interviews with inmates and correctional staff and determined that the case should be forwarded to the Barbour County District Attorney's Office.

67. The Sergeant pled guilty to manslaughter on April 8, 2025.

68. ADOC investigated an incident that took place on April 24, 2018, at Ventress.

69. On March 21, 2019, Markeon Person, an ADOC Sergeant, pleaded guilty to a misdemeanor stemming from the April 24, 2018, incident.

70. The FBI investigated a use-of-force incident that took place at Elmore on February 16, 2019.

71. The investigation led to a sentence of 108 months in prison with two years of supervised release for Willie Burks III, a former ADOC Lt.

72. Former Sgt. Ulysses Oliver, Jr. pled guilty to federal charges which led to a sentence of 30 months in prison with three years of supervised release.

73. An investigation was conducted into whether Lorenzo Mills engaged in excessive force as a Sgt. on October 25, 2020, at Draper.

74. The investigation led to a sentence of eight months in prison with two years of supervised release.

75. LESD and ADOC conducted an investigation into the incident that took place on July 26, 2023, at Elmore, and performed over 100 interviews with correctional staff, medical staff, and inmates.

76. ADOC constructed a timeline of the July 26, 2023, incident at Elmore based on surveillance camera footage and provided that information to the Elmore County District Attorney's Office.

**J. Incident Reporting and Investigations**

1. ADOC can refer conduct for criminal prosecution and can pursue administrative discipline independently of any criminal investigation.

**K. Classification and Housing**

1. ADOC implemented Administrative Regulation 400, Classification of Inmates, on December 1, 2022.

2. ADOC uses three principal custody levels: Close, Medium, and Minimum, with additional designations within Minimum custody.

3. Close custody is "the most restrictive custody level to which an inmate can be assigned," and "[g]enerally, a Close custody inmate is housed in a restrictive housing unit in a close security institution."

4. Medium-custody inmates "are considered to be suitable for participation in formalized institutional treatment programs, work assignments or other activities within the confines of an institution," and "should be assigned to a medium or close security institution."

5. Minimum custody "is the lowest custody designation" and includes Minimum-In, Minimum-Out, and Minimum-Community.

6. PREA screening information may be used in making specific housing decisions within a facility.

7. PREA screening does not determine an inmate's custody classification or facility placement.

**L. <u>Physical Conditions</u>**

1. ADOC's major male facilities do not rely on electronic fire alarm systems to detect fires.

2. Prisoners set fires throughout ADOC facilities.

3. On December 7, 2020, Tommy Rutledge died from hyperthermia inside Donaldson.

# UNITED STATES' CLAIMS

## INTRODUCTION

The Constitution prohibits cruel and unusual punishment. U.S. Const. amend. VIII; *Dunn v. Commissioner, Alabama Dep't of Corrs.*, 179 F.4th 1277, 1292 (11th Cir. 2026) ("The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'") (quoting *Glossip v. Gross*, 576 U.S. 863, 876 (2015)). Under the Eighth Amendment, prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). To prove an Eighth Amendment violation, a plaintiff must show a sufficiently serious deprivation and that prison officials have a sufficiently culpable state of mind. *Dunn*, 179 F.4th at 1292. Alabama violates the Eighth Amendment in numerous ways. It does so by failing to protect prisoners from violence. It does so by failing to protect prisoners from sexual abuse. It does so by failing to protect prisoners from the use of excessive force. It does so by failing to provide safe conditions of confinement.

Prison officials have a duty to protect prisoners from harm, including from other prisoners. *Farmer*, 511 U.S. at 833. "Being violently assaulted in prison is

simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Regardless of whether prisoners have contributed to violence, prison officials "are not free to let the state of nature take its course" and "gratuitously allow[] the beating or rape of one prisoner by another." *Id.* at 833; *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1259 (11th Cir. 2020). Rather, "the protection [a prisoner] is afforded against other inmates" is a condition of confinement that is subject to the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). The Eleventh Circuit has explained that to make a failure-to-protect claim under the Eight Amendment's deliberate indifference standard, a plaintiff must show that: (1) prisoners are at a substantial risk of objectively serious harm; (2) the defendant knew its actions or failure to act put the prisoners at substantial risk; and (3) the defendant did not respond reasonably to that substantial risk. *Wade v. McDade*, 106 F.4th 1251, 1261–62 (11th Cir. 2024). An Eighth Amendment violation can be found across a system where there are systemic deficiencies. *Dunn*, 179 F.4th at 1318–21 (explaining a court need not make prison-specific findings).

I. <u>Failure to Provide Reasonable Safety from Prisoner-on-Prisoner Violence</u>

Violent conditions present a substantial risk of serious harm when prisoners are subject to an "unjustified constant and unreasonable exposure to violence." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). Courts distinguish cases

involving "occasional, isolated attacks by one prisoner on another," from those where "violence and terror reign." *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005)). Courts also look to whether there are specific conditions of the prisons that make them particularly violent, such as "pervasive staffing and logistical issues rendering prison officials unable to address near constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Id.* at 1235; *see also Cotton v. Cooper*, No. 22-12927, 2024 WL 340033, at *2 (11th Cir. Jan. 30, 2024); *Lane v. Philbin*, 835 F.3d 1302, 1307–08 (11th Cir. 2016). The Eighth Amendment does not require prison officials to eliminate every instance of harm, but there is also no "proverbial floor" as to how many violent incidents establish an unconstitutional risk of harm. *Purcell*, 400 F.3d at 1323. Rather, the risk of harm to prisoners is substantial when violent incidents are prevalent and when specific conditions make the facility particularly violent. *See Marbury*, 936 F.3d at 1235; *Marbury v. Warden* III, 180 F.4th 1349, 1359 (11th Cir. 2026) (plaintiff "has both shown a history of inmate violence and pointed to several features that make St. Clair particularly violent") (emphasis in original).

Moreover, the presence of contraband, along with the lack of supervision in the Facilities greatly contributes to the ongoing violence. Alabama knows that contraband, particularly drugs, weapons, and cellphones contribute to violence in the prisons. ADOC still fails to adequately control contraband flooding into the prisons. *See Boykins v. Dunn*, 696 F. Supp. 3d 1061, 1081–82 (N.D. Ala. Sept. 30, 2023) (denying summary judgment where "[i]nmate-made weapons and other contraband like cellphones permeate St. Clair" and "[t]he frequency and severity of violence is staggering").

The Alabama Department of Corrections ("ADOC") fails to provide reasonable safety from prisoner-on-prisoner violence in the following manner or based on the following contributing factors:

a. ADOC had an unreasonably high number of homicides of prisoners in the last several years in the Facilities;
b. ADOC does not accurately and consistently track prisoner deaths in the Facilities;
c. ADOC does not consistently, thoroughly, or effectively implement changes in response to prisoner deaths in the Facilities;
d. ADOC had an unreasonably high number of prisoner-on-prisoner assaults in the last several years in the Facilities, including with weapons and serious injuries;

e. ADOC does not accurately and consistently track prisoner-on-prisoner assaults in the Facilities;

f. ADOC does not respond thoroughly, consistently, or effectively to reported prisoner-on-prisoner assaults in the Facilities;

g. ADOC does not consistently, thoroughly, or effectively implement changes in response to reported prisoner-on-prisoner assaults in the Facilities;

h. ADOC does not consistently, thoroughly, or effectively ensure prisoners are in their assigned dorms in the Facilities;

i. ADOC does not consistently, thoroughly, or effectively ensure prisoners have a bed and are sleeping on their assigned bed;

j. ADOC does not consistently, thoroughly, or effectively control the flow of prisoners into unauthorized areas in the Facilities;

k. ADOC does not consistently, thoroughly, or effectively count prisoners to ensure prisoners are in their assigned dorms in the Facilities;

l. ADOC fails to supervise prisoners in the Facilities such that prisoner-on-prisoner assaults, fights, and stabbings often occur while an officer is not present or paying adequate attention;

m. ADOC does not consistently, thoroughly, or effectively enforce disciplinary action for prisoners who commit prisoner-on-prisoner assaults in the Facilities;

n. ADOC does not consistently, thoroughly, or effectively apply practices regarding the housing of security threat groups (STGs) in the Facilities;

o. ADOC does not consistently, thoroughly, or effectively gather information on STGs and share intelligence between Facility staff and the Central Office to manage STGs;

p. ADOC does not consistently, thoroughly, or effectively enforce disciplinary action for prisoners bartering and trading in the Facilities, including bartering and trading of canteen items;

q. ADOC fails to consistently, thoroughly, or effectively limit the amount of canteen items purchased by individual prisoners in the Facilities;

r. ADOC allows prisoners involved in violent incidents in the Facilities to sign living agreements rather than engage in the disciplinary process;

s. ADOC Law Enforcement Services Division ("LESD") fails to pursue investigations in the Facilities if a victim does not wish to prosecute or fails to name the alleged perpetrator;

t. ADOC, including LESD investigators, do not thoroughly, consistently, or effectively conduct adequate investigations in the Facilities, including

investigations of prisoner deaths, prisoner-on-prisoner assaults, fights, and stabbings, and prisoner possession of contraband;

u. LESD investigators do not thoroughly, consistently, or effectively interview prisoner witnesses, correctional officers assigned to the location of the incident, or other staff who may have witnessed the incident in the Facilities;

v. LESD investigators do not consistently request and review surveillance footage of incidents in the Facilities;

w. LESD investigators do not consistently obtain written statements from correctional officers for incidents in the Facilities;

x. LESD investigators do not consistently review the incident report database or prior LESD investigations related to certain perpetrators or victims for incidents in the Facilities;

y. ADOC, including LESD, does not consistently, thoroughly, or effectively track where prisoner-on-prisoner fights, assaults, or sexual assaults occur in the Facilities;

z. ADOC, including LESD, does not consistently, thoroughly, or effectively track which prisoners in the Facilities have been physically or sexually assaulted by other prisoners;

aa. ADOC does not consistently, thoroughly, or effectively document requests for restrictive housing by prisoners based on a fear of physical or sexual harm;

bb. ADOC does not consistently, thoroughly, or effectively recommend and implement corrective actions to address security and safety deficiencies revealed by LESD investigations; and

cc. ADOC has not consistently, thoroughly, or effectively addressed prisoner-on-prisoner violence in its Facilities.

I.A. Failure to Prevent the Introduction of Contraband Contributes to Violence

a. ADOC does not consistently, thoroughly, or effectively search for contraband in the Facilities;

b. ADOC, including LESD, does not consistently, thoroughly, or effectively track where knives, drugs, cellphones or other contraband are found or consistently communicate relevant information on contraband to Facility leadership;

c. ADOC does not consistently, thoroughly, or effectively search individuals, including staff, coming into the Facilities;

d. ADOC does not consistently, thoroughly, or effectively supervise the perimeters of the Facilities, including conducting routine perimeter checks;

e. ADOC Facilities have an unreasonably large amount of contraband, including but not limited to weapons, drugs, and cellphones;

f. ADOC had an unreasonably high number of deaths by overdose of prisoners in the last several years in the Facilities;

g. ADOC does not consistently, thoroughly, or effectively investigate the sources of contraband when a prisoner overdoses or tests positive for drugs in the Facilities; ADOC fails to supervise prisoners in the Facilities such that prisoners use contraband while an officer is not present or paying adequate attention;

h. ADOC does not consistently, thoroughly, or effectively secure seized contraband;

i. ADOC does not consistently, thoroughly, or effectively intervene when staff sees prisoners that are under the influence of drugs;

j. ADOC's failure to prevent the flow of contraband into its Facilities allows prisoners to become indebted to one another;

k. ADOC does not consistently, thoroughly, or effectively implement changes in response to collected contraband in the Facilities; and

l. ADOC has not consistently, thoroughly, or effectively addressed contraband in its Facilities.

I.B. <u>Failure to Provide Adequate Staffing and Supervision Contributes to Violence</u>

a. ADOC Facilities are severely understaffed and have been consistently understaffed for years;

b. ADOC correctional staff does not consistently, thoroughly, or effectively supervise prisoners in the Facilities;

c. ADOC correctional staff does not consistently, thoroughly, or effectively conduct security checks in the housing units in the Facilities;

d. ADOC does not consistently have at least one officer supervising each dorm housing prisoners in the Facilities;

e. ADOC does not consistently staff all critical posts in the Facilities;

f. ADOC does not consistently staff cubicles in the Facilities;

g. ADOC does not consistently follow staffing plans in the Facilities;

h. ADOC supervisors frequently staff posts in the Facilities, impacting their time to complete supervisory responsibilities;

i. ADOC does not consistently, thoroughly, or effectively ensure security staff are not sleeping on posts;

j. ADOC does not consistently, thoroughly, or effectively complete accurate shift rosters in the Facilities;

k. ADOC does not consistently, thoroughly, or effectively complete accurate logs in the Facilities;

l. ADOC does not consistently, thoroughly, or effectively communicate relevant information between shifts in the Facilities;

m. ADOC does not consider the unreasonably high levels of contraband and violence in the Facilities when conducting staffing analyses;

n. ADOC does not adequately screen security staff hires, including for illegal activity;

o. ADOC alters the chain of command with such regularity that staff have difficulty knowing who they are supposed to report to;

p. ADOC does not consistently, thoroughly, or effectively track arrests of correctional officers;

q. ADOC has not consistently, thoroughly, or effectively implemented the recommendations of staffing analyses for the Facilities;

r. ADOC does not consistently, thoroughly, or effectively hire competent correctional staff in the Facilities;

s. ADOC does not consistently, thoroughly, or effectively ensure wardens in the Facilities are competent to perform their responsibilities;

t. ADOC does not consistently, thoroughly, or effectively supervise staff in the Facilities to detect and discipline staff for violating policies;

u. ADOC staff in the Facilities are frequently overworked and tired;

v. ADOC does not consistently determine whether current hiring practices in the Facilities are effective;

w. ADOC does not consistently, thoroughly, or effectively pursue alternative means of staffing in the Facilities;

x. ADOC has not taken advantage of all potential appropriated funding for correctional staff hiring;

y. ADOC does not consistently, thoroughly, or effectively monitor video cameras in the Facilities;

z. ADOC does not consistently, thoroughly, or effectively ensure policies are accurate and up to date in the Facilities;

aa. ADOC does not consistently, thoroughly, or effectively ensure all correctional staff are familiar with policies in the Facilities;

bb. ADOC does not consistently, thoroughly, or effectively ensure all wardens are familiar with policies in the Facilities;

cc. ADOC does not consistently, thoroughly, or effectively enforce policies in the Facilities;

dd. ADOC Central Office staff and Facility leadership do not consistently follow policies;

ee. ADOC does not provide jobs for the majority of prisoners in the Facilities;

ff. ADOC does not provide programs for the majority of prisoners in the Facilities;

gg. ADOC does not provide enough yard time for prisoners in the Facilities; and

hh. ADOC has not consistently, thoroughly, or effectively addressed understaffing in its Facilities.

II. Failure to Provide Reasonable Safety from Prisoner-on-Prisoner Sexual Assault

The law outlined with respect to Claim I is consistent with and applicable to this Claim. Further, the proliferation of contraband, in Alabama's prisons for men, as outlined in Claim I.A, and the lack of supervision, as outlined in Claim I.B, also contribute to this Claim.

ADOC fails to provide reasonable safety from prisoner-on-prisoner sexual assault in the following manners or based on the following contributing factors:

a. ADOC had an unreasonably high number of prisoner-on-prisoner sexual assaults in the last several years in the Facilities;

b. ADOC does not consistently, thoroughly, or effectively investigate allegations of prisoner-on-prisoner sexual abuse in the Facilities;

c. ADOC does not consistently, thoroughly, or effectively investigate allegations of extortion in the Facilities;

d. ADOC does not consistently, thoroughly, or effectively ensure prisoner beds are free of obstructive sheets in the Facilities;

e. ADOC does not consistently, thoroughly, or effectively implement changes in response to reported sexual assaults in the Facilities;

f. ADOC classification staff do not have input or authority on which housing units prisoners are placed in at ADOC Facilities, beyond program placements;

g. ADOC's PREA Director does not consistently, thoroughly, or effectively provide adequate oversight of sexual abuse prevention practices at the Facilities; the Institutional PREA Compliance Manager (IPCM) or equivalent Special Investigator position is often vacant at the Facilities;

h. ADOC does not consistently, thoroughly, or effectively ensure that sexual predators are housed and kept separate from prisoners vulnerable to sexual abuse in the Facilities;

i. ADOC does not consistently ensure that sexual predators are properly disciplined for allegations of sexual abuse in the Facilities;

j. ADOC does not consistently, thoroughly, or effectively implement measures to protect victims who report sexual abuse from further harm in the Facilities;

k. ADOC does not consistently transfer victims who report sexual abuse out of the Facility or even the housing unit where abuse was reported in the Facilities;

l. ADOC subjects victims who report sexual abuse to restrictive housing in the Facilities;

m. ADOC does not consistently, thoroughly, or effectively ensure that serial predators are prevented from committing sexual abuse against multiple victims at multiple Facilities;

n. ADOC does not consistently, thoroughly, or effectively ensure that victims of sexual abuse are transferred for Sexual Abuse Nurse Examinations in a timely manner from the Facilities;

o. ADOC does not consistently, thoroughly, or effectively ensure that evidence collected in Sexual Abuse Nurse Examinations is tested in a timely manner after victims report sexual abuse at the Facilities;

p. ADOC fails to consistently, thoroughly, or effectively address prisoners exchanging sexual favors for contraband in the Facilities;

q. ADOC's Sexual Abuse Incident Review reports from the Facilities are often boilerplate with no recommendations and no evidence of a thorough review of the investigation;

r. ADOC fails to supervise prisoners in the Facilities such that prisoner-on-prisoner sexual assaults occur while an officer is not present or paying adequate attention;

s. At some point in 2023, the Special Investigator IPCMs in the Facilities began reporting to the ADOC PREA Director, and now the wardens claim no supervision, oversight, or insight into sexual abuse practices at the Facilities;

t. Other than in compiling ADOC's annual PREA report, ADOC's PREA Director does not consistently review data on sexual abuse in the Facilities to identify and address trends;

u. ADOC does not consistently refer victims who report sexual abuse as a result of a drug debt for substance abuse treatment;

v. ADOC's PREA Director does not consistently interview prisoners at the Facilities about sexual safety, even during her annual internal PREA audits; ADOC's Special Investigator IPCMs do not conduct any investigations of sexual abuse at the Facilities;

w. ADOC's PREA Director does not review or provide input on sexual abuse investigations in the Facilities before the investigation is complete;

x. ADOC's PREA Director does not participate in Sexual Abuse Incident Reviews at the Facilities;

y. ADOC's PREA Director does not track corrective action recommended in Sexual Abuse Incident Reviews at the Facilities;

z. ADOC's PREA Director does not track corrective action recommended as a result of investigations into sexual abuse at the Facilities;

aa. ADOC's PREA Director and Special Investigator IPCMs do not have authority to require implementation of corrective action to remedy deficiencies identified in investigations of sexual abuse or Sexual Abuse Incident Reviews at the Facilities; ADOC's PREA Director and Special Investigator IPCMs do not have authority to require any changes to security practices to prevent sexual abuse at the Facilities;

bb. ADOC does not consistently, thoroughly, or effectively communicate the findings from the PREA Director's audits to Facility staff; ADOC does not conduct an administrative investigation of prisoner-on-prisoner sexual abuse incidents at the Facilities separate from the LESD investigation;

cc. ADOC's allegations of prisoner-on-prisoner sexual abuse increased from 2020 to 2021 and again in 2022; and

dd. ADOC has not consistently, thoroughly, or effectively addressed prisoner-on-prisoner sexual assault in the Facilities.

## III. Uses of Excessive Force

The Eighth Amendment prohibits excessive force by corrections officers. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992). Corrections officers use excessive force when they apply force "maliciously or sadistically to cause harm," rather than in "a good-faith effort to maintain or restore discipline." *Id.* at 1–2. In evaluating whether uses of force violate the Eighth Amendment, courts look to five factors:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

*Williams v. Radford*, 64 F.4th 1185, 1196–97 (11th Cir. 2023).

Applying these factors, courts have established clear principles governing the use of force in prisons. "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990), *abrogated on other grounds by Williams*, 64 F.4th at 1198–99. At the same time, officers "may not use gratuitous force against a prisoner who has already been subdued," "incapacitated," or "restrained" by other officers, or who "no longer pose[s] a threat." *Skrtich v. Thornton*, 280 F.3d 1295, 1303–04 (11th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) ("Once a prisoner has stopped resisting there is no

longer a need for force, so the use of force thereafter is disproportionate to the need"), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Similarly, "[p]epper-spraying and slamming a person to the ground without penological justification certainly offends common standards of decency." *Sconiers v. Lockhart*, 946 F.3d 1256, 1268 (11th Cir. 2020). In addition, "a prisoner initiating a verbal altercation does not give prison guards carte blanche to use force sadistically and maliciously." *Williams*, 64 F.4th at 1197. Finally, force need not cause serious injury to violate the Eighth Amendment: "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

a. ADOC had an unreasonably high number of uses of excessive force by correctional staff in the last several years in the Facilities;

b. ADOC does not consistently, thoroughly, or effectively enforce use of force policies in the Facilities;

c. ADOC, including LESD or the Office of Inspector General (OIG) and/or the Office of Professional Standards (OPS), does not consistently, thoroughly, or effectively investigate use of force by staff in the Facilities;

d. ADOC, including LESD, does not consistently, thoroughly, or effectively track which officers use excessive force in the Facilities and communicate that information to Facility leadership;

e. ADOC does not consistently, thoroughly, or effectively ensure all correctional staff, including wardens, are familiar with use of force policies in the Facilities;

f. ADOC staff in the Facilities use unnecessary force against prisoners when there are staffing shortages;

g. ADOC staff in the Facilities use force against prisoners as punishment;

h. ADOC does not consistently, thoroughly, or effectively implement changes in response to excessive use of force incidents in the Facilities; and

i. ADOC has not consistently, thoroughly, or effectively addressed the use of excessive force by correctional staff in its Facilities.

## IV. Failure to Provide Safe and Sanitary Physical Plant Conditions

Deprivation of basic sanitary conditions in prison can violate the Constitution. *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015). "Eighth Amendment violations can arise from 'conditions lacking basic sanitation,' including inadequate provision of hygiene items such as toilet paper." *Brooks*, 800 F.3d at 1306 (quoting *Chandler v. Baird*, 926 F.2d 1057, 1066 (11th Cir. 1991)). It can also arise from

"claims of inadequate cooling and ventilation." *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004); *see also Rutledge v. Sansing*, No. 2:21-cv-00226-RDP, 2024 WL 3839516, at *14 (N.D. Ala. Aug. 15, 2024).

a. All of the Facilities, except Holman, are holding more prisoners than the design capacity of the prison;

b. ADOC Facilities lack adequate plumbing systems to serve the prisoner population;

c. ADOC Facilities have exposed electrical wiring;

d. ADOC Facilities have mold and mildew;

e. ADOC fails to adequately control rodents and other pests in the Facilities;

f. ADOC Facilities have leaking ceilings;

g. ADOC facilities lack adequate fire safety systems;

h. Many ADOC Facilities lack heating;

i. Many living areas in ADOC Facilities lack air conditioning;

j. ADOC does not consistently, thoroughly, or effectively ensure adequate ventilation in the dorms;

k. ADOC does not consistently, thoroughly, or effectively conduct security inspections in the Facilities;

l. ADOC does not consistently, thoroughly, or effectively ensure prisoners have adequate cleaning supplies in the Facilities;

m. ADOC does not consistently, thoroughly, or effectively clean or ensure adequate cleaning supplies for restrictive housing cells;

n. The Facilities have several blind spots;

o. ADOC does not consistently, thoroughly, or effectively supervise prisoners to prevent them from destroying state property in the Facilities;

p. ADOC does not consistently, thoroughly, or effectively conduct institutional security audits in the Facilities;

q. ADOC has been aware of the conditions and structural problems inside its Facilities for the last several years; and

r. ADOC takes years or fails to address major condition and structural problems inside the Facilities.

## V. Failure to Provide Adequate Leadership and Take Reasonable Measures to Address Harm

Alabama knows its failures cause a substantial risk of violence, but ADOC supervisors and leadership still do not supervise what occurs in the prisons. Even where policies exist on paper to address violence, leadership does not ensure policies are followed or track information from the prisons: "Policies are effective only when they are followed and consistently enforced. Otherwise, they are meaningless." *See McCarley v. Dunn*, 722 F. Supp. 3d 1242, 1258 (N.D. Ala. 2024) ("A supervisors' conscious refusal to enforce a policy is identical to the absence of that policy.");

*Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1275–76 (N.D. Ala. 2022) ("The ADOC Officials' mere enactment of a directive that their own subordinates notified them was never implemented or enforced reflects that they 'recklessly disregarded the necessary means to protect inmate safety.'" (*quoting LaMarca*, 995 F.2d at 1538)).

a. LESD has not had an individual performing the duties of the LESD assistant director for over a year;

b. The Office of Inspector General has been without an Inspector General for lengthy periods of time;

c. The Office of Inspector General suffered from a clear chain of command and leadership for extended periods of time;

d. ADOC does not consistently, thoroughly, or effectively communicate relevant information between departments of ADOC or from the Central Office to the Facilities' leadership;

e. ADOC leadership does not consistently, thoroughly, or effectively track and review data to compare data over years or to assess success of initiatives;

f. ADOC leadership is not consistently, thoroughly, or effectively aware of or considering how their positions affect prisoner safety in the Facilities;

g. ADOC does not consistently, thoroughly, or effectively assess incidents and problems or gather and share intelligence to institute corrective action or remedial measures to alleviate future harmful incidents; and

h. ADOC leadership, at the Central Office and Facility levels, is aware of the conditions and facts described above, is aware of the harm caused by such conditions, and is aware that ADOC's efforts to address these conditions have not been effective.

# THE STATE'S DEFENSES

Plaintiff brings this action under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 et seq., alleging that the State of Alabama and the Alabama Department of Corrections ("ADOC" and, together with the State of Alabama, the "State") engage in a pattern or practice of violating the Eighth Amendment rights of inmates incarcerated in Bibb Correctional Facility ("Bibb"), Bullock Correctional Facility ("Bullock"), Donaldson Correctional Facility ("Donaldson"), Draper Correctional Facility ("Draper"),[1] Easterling Correctional Facility ("Easterling"), Elmore Correctional Facility ("Elmore"), Fountain Correctional Facility ("Fountain"), Holman Correctional Facility ("Holman"), Kilby Correctional Facility ("Kilby"), Limestone Correctional Facility ("Limestone"), St. Clair Correctional Facility ("St. Clair"), Staton Correctional Facility ("Staton"), and Ventress Correctional Facility ("Ventress") (collectively, the "ADOC Facilities" or "Facilities"). Plaintiff asserts four claims: (1) failure to protect from inmate-on-inmate violence; (2) failure to protect from inmate-on-inmate sexual abuse; (3) failure to protect from excessive force by correctional staff; and (4) failure to provide safe conditions of confinement. The State denies that ADOC maintains a pattern or practice of unconstitutional conduct, denies that the State acted with deliberate indifference to a substantial risk of serious harm, and denies that Plaintiff can

[1] The State no longer houses inmates at Draper.

establish the statutory and constitutional predicates necessary for the systemwide prospective relief it seeks.

The Constitution does not make prison officials guarantors against violence, misconduct, contraband, staff misconduct, deteriorating infrastructure, or other challenges inherent in operating a correctional system. The Eighth Amendment instead imposes a demanding standard. Plaintiff must prove an objectively sufficiently serious deprivation and deliberate indifference, which requires subjective recklessness as that concept is used in the criminal law. Wade v. McDade, 106 F.4th 1251, 1261–62 (11th Cir. 2024) (*en banc*). To show subjective recklessness, "the plaintiff must demonstrate that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." Id. at 1253. Even when officials know of a substantial risk to inmate health or safety, they do not violate the Eighth Amendment if they respond reasonably to that risk. Farmer v. Brennan, 511 U.S. 825, 844–45 (1994).

The State expects the evidence at trial to show that ADOC recognized the challenges confronting Alabama's correctional system and repeatedly took reasonable measures to address them, including measures directed toward correctional staffing and deployment, inmate supervision and security, contraband interdiction, classification and housing, incident response and investigation, use-of-force review and accountability, Prison Rape Elimination Act ("PREA")

compliance, employee training and discipline, programming and structured activity, physical-plant repairs and improvements, and construction of new correctional facilities. The State further expects the evidence to show that the incidents and conditions upon which Plaintiff relies arise from multiple causes and materially different circumstances across institutions and over time, and do not establish that the State consciously disregarded known substantial risks of serious harm.

### A. Plaintiff is Not Entitled to Relief Under CRIPA

1. CRIPA does not create an independent substantive constitutional right. Rather, it provides the Attorney General a statutory vehicle to enforce existing federal rights and authorizes only "such equitable relief as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of such rights, privileges, or immunities." 42 U.S.C. § 1997(a). As this court previously held, Plaintiff therefore must establish both the objective and subjective elements of an Eighth Amendment violation within each count. (Doc. 57 at 5, 7). For the reasons set forth above and based upon the evidence the State expects to present at trial, Plaintiff cannot establish those elements as to any of its four claims and therefore cannot establish an entitlement to relief under CRIPA.

### B. Absence of Deliberate Indifference

2. To establish liability on an Eighth Amendment deliberate indifference claim, first, "the plaintiff must demonstrate, as a threshold matter, that he suffered a

deprivation that was, 'objectively, sufficiently serious.'" Wade, 106 F.4th at 1262 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (some internal quotation marks and citation omitted). "*Second*, the plaintiff must demonstrate that the defendant acted with 'subjective recklessness as used in the criminal law,' and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat . . . that even if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual Punishments Clause' if he 'responded reasonably to the risk.'" Id. (quoting Farmer, 511 U.S. at 839, 844–45). The Eleventh Circuit recently reaffirmed this standard in Dunn v. Comm'r, Alabama Dep't of Corr., 179 F.4th 1277, 1292 (11th Cir. 2026).

3. Plaintiff cannot "establish that the deprivation . . . allegedly suffered was 'objectively, sufficiently serious.'" Wade, 106 F.4th at 1256 (quoting Farmer, 511 U.S. at 834 (some internal quotation marks and additional citation omitted); Helling v. McKinney, 509 U.S. 25, 36 (1993) (holding that inmate-plaintiffs must establish that they face a risk "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk"); Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (same); Rhodes v. Chapman, 452 U.S. 337, 349 (1981) (holding that "the Constitution does not mandate comfortable prisons").

4. Plaintiff cannot meet the deliberate-indifference standard merely by establishing that the State knew that risks or operational challenges existed within the ADOC Facilities. Plaintiff must show that the State "acted with 'subjective recklessness as used in the criminal law.'" Wade, 106 F.4th at 1253 (quoting Farmer, 511 U.S. at 839); Swain, 961 F.3d at 1285–86; Hoffer v. Sec'y, Fla. Dep't of Corr., 973 F.3d 1263, 1271 (11th Cir. 2020). To demonstrate subjective recklessness, Plaintiff must show that the State "actually knew that his [or her] conduct—his [or her] own acts or omissions—put [inmates] at substantial risk of serious harm." Wade, 106 F.4th at 1253; Stalley v. Cumbie, 124 F.4th 1273, 1283–84 (11th Cir. 2024); see also Wilson v. Seiter, 501 U.S. 294, 299 (1991) ("'It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.'") (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)); Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013) ("'Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983.'") (quoting Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990)).

5. Second, "even if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual

Punishments Clause' if he 'responded reasonably to the risk.'" Wade, 106 F.4th at 1262 (quoting Farmer, 511 U.S. at 844–45); Swain, 961 F.3d at 1288 ("Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, 'the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not.'") (quoting Goodman, 718 F.3d at 1334); Hoffer, 973 F.3d at 1272 (noting that "the sole question before us is whether" the prison officials' approach to medical treatment "is so reckless—so conscience-shocking—that it violates the Constitution"); Rasho v. Jeffreys, 22 F.4th 703, 711 (7th Cir. 2022) (holding that officials "cannot have been deliberately indifferent because they undertook reasonable measures . . . , even though they were ultimately unsuccessful[,]" and "the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm").

6. The State expects the evidence to establish that ADOC identified and responded in a variety of ways to risks and operational challenges within the ADOC Facilities. Among other things, ADOC undertook measures to recruit, hire, retain, deploy, and supplement correctional staff; analyze facility staffing needs and prioritize critical posts; detect, deter, and interdict contraband; classify and house

inmates consistent with its long-standing policies; supervise inmate movement and activity; prevent, detect, report, investigate, and respond to allegations of sexual abuse and take actions to protect inmates and deter further acts of violence when confirmed; regulate, report, review, and investigate uses of force; investigate serious incidents and alleged staff misconduct; train, supervise, and discipline employees for acts and omissions that exposed inmates to or resulted in harm to inmates; provide programming, education, recreation, and work opportunities; repair, reconfigure, close, or reduce the use of facilities or portions of facilities presenting operational limitations; and construct new correctional facilities. The State expects the evidence concerning these and other measures to demonstrate that ADOC did not ignore the known risks, but worked diligently to respond to the identified risks.

7. The State expects the evidence to demonstrate that ADOC provides work assignments, educational and vocational opportunities, treatment programs, recreation, religious activities, and other structured activities for inmates. The availability and operation of these programs and activities vary among facilities based on inmate populations, custody levels, available space, staffing, facility missions, security considerations, and other operational circumstances.

8. The State further believes the evidence will show that ADOC, like other prison systems, recognized the difficulty of recruiting and retaining correctional staff over the last two decades and undertook comprehensive measures focused on

improving the employment process and benefits to address these challenges. The measures are too exhaustive and numerous to list here, but those measures included substantial compensation increases and retention incentives. ADOC created additional correctional classifications and career paths. ADOC expanded hiring events, recruiting efforts, and applicant-tracking systems. ADOC partnered with outside consultants and the Alabama Community College System to strengthen recruitment and training. ADOC expanded correctional training and field-training programs. ADOC deployed overtime and alternative staffing resources and contracted with private security personnel to staff appropriate non-contact posts. ADOC also conducted facility-specific staffing analyses, developed post plans, and continued to review and adjust staff deployment based on institutional needs. The evidence will further demonstrate that staffing levels and needs vary among facilities and over time based on custody levels, inmate populations, facility design, housing configuration, inmate movement, programming, security conditions, and other operational circumstances.

9. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" Farmer, 511 U.S. at 837, 838 (holding that the Supreme Court "rejected a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions") (citing Wilson, 501 U.S. at

299–302); Wade, 106 F.4th at 1257. Accordingly, the mere existence of violence, sexual abuse, contraband, staff misconduct, staffing challenges, physical-plant deficiencies, or other adverse conditions does not, standing alone, establish that the State acted with deliberate indifference. The State has yet to identify any evidence relied upon by Plaintiff which identifies the point at which the number of any of these incidents passes over the threshold into unconstitutional conditions. Even if Plaintiff did so, Plaintiff must then establish by evidence the requisite subjective recklessness and an objectively unreasonable response to the known risk. See Wade, 106 F.4th at 1261–62.

10. Plaintiff cannot establish deliberate indifference merely by aggregating individual incidents, policy violations, operational deficiencies, or adverse outcomes occurring at different facilities and at different times. Plaintiff must establish the requisite subjective recklessness, including that the State was actually, subjectively aware that its own acts or omissions caused a substantial risk of serious harm. See Wade, 106 F.4th at 1258–62. A generalized awareness of risks or problems within a correctional system does not, standing alone, satisfy this standard. See id. at 1258–59.

11. The State believes the evidence will show that the anecdotal incidents and conditions upon which Plaintiff relies arose under materially different circumstances at different institutions and at different times, and involved differing

inmate populations, institutional designs, staffing conditions, security considerations, inmate conduct, contraband activity, gang and security-threat-group dynamics, and other operational circumstances. The State further expects the evidence to show that ADOC's responses likewise varied according to the particular risks and circumstances presented. The evidence will further demonstrate that the ADOC Facilities differ in their security and custody levels, housing configurations, physical layouts and sightlines, camera coverage, inmate movement patterns, post plans, available housing and specialized units, programming, inmate classifications, and facility missions. Those differences affect how ADOC supervises inmates, deploys correctional staff, manages inmate movement and housing, and responds to institutional risks. Plaintiff therefore cannot establish deliberate indifference merely by identifying adverse incidents or conditions without proving the constitutionally required connection between the State's own acts or omissions, the State's subjective awareness of the substantial risk allegedly caused by that conduct, and an objectively unreasonable response to that risk. See Wade, 106 F.4th at 1258–62.

12. The State expects the evidence to further illustrate that Plaintiff's presentation of individual incidents frequently omits or minimizes ADOC's response to those incidents. The evidence will demonstrate that, depending upon the circumstances, ADOC personnel intervened to stop and contain incidents and separated the inmates involved. ADOC personnel secured affected areas and

obtained medical assessment and treatment when appropriate. ADOC personnel preserved physical and video evidence, identified and interviewed involved inmates and witnesses, documented incidents, and investigated the circumstances. ADOC also evaluated whether criminal or administrative referrals were appropriate and initiated disciplinary proceedings when warranted. Following incidents, ADOC reassessed housing, classification, enemy, protective-custody, and separation needs. ADOC also used additional searches, intelligence gathering, movement or housing restrictions, and other security measures when circumstances warranted. The constitutional inquiry considers those responses and does not permit the occurrence of the underlying incident, standing alone, to establish deliberate indifference. See Farmer, 511 U.S. at 844; Wade, 106 F.4th at 1257–62.

13. Plaintiff must establish the required causal connection between the particular unconstitutional condition or practice alleged and the constitutional deprivation for which it seeks relief. The evidence in this matter will show that the incidents and conditions upon which Plaintiff relies arise from multiple and differing causes, including inmate conduct, interpersonal disputes, gang and security-threat-group activity, debts and extortion, contraband and illicit-drug activity, facility design and physical-plant conditions, inmate populations and classifications, staffing conditions, and other circumstances that vary by facility and incident. The State further expects the evidence will highlight that inmate compatibility and

security risks change over time as inmate relationships, debts, Security Threat Group ("STG") affiliations and conflicts, retaliation concerns, contraband activity, disciplinary histories, housing assignments, and other circumstances change. Inmates who previously could be housed together without incident may later become incompatible based on newly arising circumstances or information that was not previously known to ADOC. The evidence will demonstrate that ADOC uses classification reviews, incident reports, disciplinary information, inmate reports, staff observations, intelligence information, known-enemy information, and post-incident investigations to identify and respond to those changing risks as information becomes available. The occurrence of violence, sexual misconduct, contraband, or other adverse events does not, standing alone, establish that an ADOC policy, practice, staffing level, or other alleged systemic deficiency caused those events.

**C. Current Conditions and Prospective Injunctive Relief**

14. To the extent Plaintiff relies on historical conditions or practices within the ADOC Facilities that no longer exist, those prior conditions do not, standing alone, establish an entitlement to prospective injunctive relief. Rather, "to establish eligibility for an injunction, the inmate must demonstrate the continuance of [deliberate indifference] during the remainder of the litigation and into the future." Farmer, 511 U.S. at 846. The State believes the evidence to outline the material changes in ADOC's policies, practices, staffing efforts, correctional operations,

physical facilities, and other measures relevant to matters at issue in this case, which not only began before Plaintiff instituted this action but also continued thereafter. Those changes include the following: continued staffing and recruitment initiatives, implementation of new staffing and post-management systems, expansion of correctional-officer training and field training, additional supervisory and operational measures, expanded camera coverage and centralized monitoring, additional contraband-detection and interdiction technologies, revisions to use-of-force policies and training, changes to inmate classification, housing, movement, and count procedures, physical-plant repairs and modifications, the development and construction of new correctional facilities and more. These and other changes altered conditions, practices, and operations relevant to Plaintiff's claims and continued to develop after the January 31, 2025, evidentiary fact cutoff. Farmer, 511 U.S. at 846 n.9 (noting that "even prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation"); Dockery v. Cain, 7 F.4th 375, 380 (5th Cir. 2021) ("The district court correctly applied these instructions from *Farmer*. It exercised its discretion to 'giv[e] prison officials time to rectify' possible violations and then relied on 'developments that postdate[d] the pleadings and pretrial motions' to find

Plaintiffs were 'not entitled to an injunction.'") (quoting Farmer, 511 U.S. at 846, 847).

15. Moreover, Plaintiff cannot establish the alleged systemwide constitutional violations merely by aggregating discrete incidents occurring at different facilities, at different times, and under materially different circumstances. The State expects the evidence will establish that the anecdotal incidents identified by Plaintiff involve differing causes, circumstances, inmate conduct, institutional conditions, and ADOC responses, and do not establish the systemwide constitutional violations alleged by Plaintiff. See Lewis, 518 U.S. at 359 (holding that "two instances [of injury] were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief"); id. at 360 ("The constitutional violation has not been shown to be systemwide, and granting a remedy beyond what was necessary to provide relief to [two injured inmates] was therefore improper."); Wade, 106 F.4th at 1258–62.

16. Plaintiff cannot establish entitlement to prospective injunctive relief based on historical conditions that do not account for material changes occurring during this litigation. The court's current evidentiary fact cutoff of January 31, 2025, predates the November 30, 2026, trial by nearly twenty-two months. The State expects the evidence will show that ADOC continued during that period to implement measures relevant to the conditions and practices challenged by Plaintiff.

Those developments bear directly on whether ADOC continued to knowingly and unreasonably disregard the risks alleged by Plaintiff and whether prospective injunctive relief is warranted. The State therefore contends that the evidentiary fact cutoff should not preclude consideration of material post-cutoff evidence bearing on Plaintiff's claims or requested prospective relief. See Farmer, 511 U.S. at 845–47; Dockery, 7 F.4th at 379–80.

17. The Fifth Circuit's recent *en banc* decision in Parker v. Hooper, 171 F.4th 736 (5th Cir. 2026) (*en banc*), underscores the importance of considering material developments occurring after an evidentiary cutoff in prison litigation seeking prospective relief. In Parker, the district court refused, based on its pre-hearing evidentiary cutoff and trial-management discretion, to consider material improvements implemented before the entry of prospective relief. Id. at 755–57. The *en banc* Fifth Circuit vacated the judgment, holding that the district court's refusal to update its analysis to account for those developments violated Farmer, Valentine v. Collier, 993 F.3d 270, 282, 289 (5th Cir. 2021), and Dockery, and that its failure to incorporate the significant improvements "constituted an abuse of discretion." Id. at 757–58. The court emphasized that, in prison-injunction litigation, courts consider evidence "from the time suit is filed to the judgment," including actions taken "on the eve of and during trial." Id. at 756–57 (quoting Valentine). Here, the nearly twenty-two-month period between the January 31, 2025,

evidentiary fact cutoff and the November 30, 2026, trial, presents the same concern on an even longer timeline. Excluding material evidence of ADOC's conduct and changes during that period would prevent the Court from considering evidence directly relevant to the State's defense to Plaintiff's claims and request for prospective injunctive relief.

**D. Injunctive Relief and the Prison Litigation Reform Act**

18. The Prison Litigation Reform Act, 18 U.S.C. § 3626 (the "PLRA"), imposes strict limitations on the prospective relief that may be entered in this action, including at least the following provisions:

a. "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" (18 U.S.C. § 3626(a)(1)(A));

b. "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." (Id.);

c. "The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." (Id.);

d. "The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—(i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the relief is necessary to correct the violation of a Federal right; and (iii) no other relief will correct the violation of the Federal right." (Id. at § 3626(a)(1)(B));

e. "Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts." (Id. at § 3626(a)(1)(C));

f. "In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless—(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." (Id. at § 3626(a)(3)(A));

g. "In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court . . . ." (Id. at § 3626(a)(3)(B));

h. “A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.” (Id. at § 3626(a)(3)(C));

i. “The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that—(i) crowding is the primary cause of the violation of a Federal right; and (ii) no other relief will remedy the violation of the Federal right.” (Id. at § 3626(a)(3)(E)(i)–(ii)); and

j. “In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).” (Id. at § 3626(c)(1)).”

19. To the extent Plaintiff asks the court to order the State generally to comply with the Constitution or to enjoin the State from subjecting incarcerated persons to cruel and unusual punishment, such an injunction would amount to an unenforceable “‘obey-the-law’ injunction.” Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 (11th Cir. 1996) (“‘Broad, non-specific language that merely enjoins a party to obey the law . . . does not give the restrained party fair notice of what conduct will risk contempt.’”) (quoting Payne v. Travenol Lab., Inc., 565 F.2d 895, 897–98 (5th Cir. 1974)).

20. The prospective (i.e., injunctive) relief requested by Plaintiff exceeds the "needs-narrowness-intrusiveness" requirements set forth in the PLRA, 18 U.S.C. § 3626. Under the PLRA, any prospective relief "shall extend no further than necessary to correct [a] violation of [a] Federal right of a particular plaintiff or plaintiffs[,]" and the Court must find that any prospective relief "is narrowly drawn, extends no further than necessary to correct [a] violation of [a] Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In addition, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." Id. The Court must make separate and particularized findings for each component of prospective relief. Hoffer, 973 F.3d at 1279; U.S. v. Sec'y, Fla. Dep't of Corr., 778 F.3d 1223, 1227–28 (11th Cir. 2015); Thomas, 614 F.3d at 1324–25; Cason v. Seckinger, 231 F.3d 777, 785 (11th Cir. 2000). Accordingly, any relief must be tied to the particular constitutional violation established and may not extend to conditions, practices, facilities, or operations for which Plaintiff has not established a constitutional violation. See Lewis, 518 U.S. at 357, 359–60.

21. The relief requested by Plaintiff is not "necessary to correct" the alleged constitutional violations, 18 U.S.C. § 3626(a)(1)(A), because Plaintiff cannot establish the systemwide constitutional violations alleged in this action. The State further expects the evidence to demonstrate that many of the historical conditions

and practices upon which Plaintiff relies materially changed and do not require prospective correction. See, e.g., Thomas, 614 F.3d at 1320; Hallett v. Morgan, 296 F.3d 732, 738, 743–44 (9th Cir. 2002); see also Farmer, 511 U.S. at 845–47; Parker, 171 F.4th at 755–58.

22. The prospective relief requested by Plaintiff would have an "adverse impact on … the operation of a criminal justice system." 18 U.S.C. § 3626(a)(1)(A); see also Thomas, 614 F.3d at 1325–26; Melendez v. Sec'y, Fla. Dep't of Corr., Nos. 21-13455, 22-10306, 2022 WL 1124753, at *20 (11th Cir. Apr. 15, 2022); Rasho, 22 F.4th at 712–13; Westefer v. Neal, 682 F.3d 679, 683–84 (7th Cir. 2012); Howe v. Hughes, 74 F.4th 849, 857 (7th Cir. 2023); Lindell v. Frank, 377 F.3d 655, 660 (7th Cir. 2004); Ball v. LeBlanc, 792 F.3d 584, 599–600 (5th Cir. 2015). The State expects the record to show that Plaintiff's requested systemwide relief would affect staffing and deployment decisions, institutional security, inmate housing and classification, movement and supervision, facility operations, allocation of finite correctional resources, and other matters affecting ADOC's operation of the statewide correctional system and negatively impact the State and its criminal justice system as a whole. The State further expects the evidence will establish that the ADOC Facilities differ materially in their physical designs, inmate populations, security levels, staffing resources, and operational needs. The State's evidence will demonstrate that ADOC makes facility-specific decisions concerning critical-post

coverage, staff deployment, inmate movement, classification and housing, protective and restrictive housing, programming and structured activity, emergency operations, contraband interdiction, and the allocation of security resources based on the conditions and operational needs of each institution. The evidence will further demonstrate that those needs change over time as inmate populations, security conditions, staffing resources, physical-plant conditions, and other operational circumstances change. Systemwide relief imposing uniform operational requirements will therefore affect facilities differently and restrict ADOC's ability to deploy personnel and resources in response to changing institutional and security needs. Accordingly, substantial weight and deference must be afforded to the public-safety and criminal-justice consequences of any prospective relief affecting those operations.

23. To the extent Plaintiff seeks a "prisoner release order" for purposes of the PLRA, Plaintiff cannot establish its entitlement to one. 18 U.S.C. § 3626(a)(3). Plaintiff cannot establish that "a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order" and that the State "had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(i)–(ii). Nor can Plaintiff prove, through "clear and convincing evidence," that "crowding is the primary cause of the [constitutional] violation" and

that "no other relief will remedy the [constitutional] violation[.]" 18 U.S.C. § 3626(a)(3)(E); see also Brown v. Plata, 563 U.S. 493, 514–517 (2011). Moreover, the PLRA only permits the issuance of a prisoner release order by a three-judge court. 18 U.S.C. § 3626(a)(3)(B).

24. To the extent Plaintiff seeks prospective relief that "requires or permits a government official to exceed his or her authority under State … law or otherwise violates State … law," such relief is prohibited unless Plaintiff establishes that "[f]ederal law requires such relief to be ordered in violation of State … law;" that "the relief is necessary to correct the [constitutional] violation;" and that "no other relief will correct the [constitutional] violation[.]" 18 U.S.C. § 3626(a)(1)(B)(i)–(iii).

**E. Equitable Relief and Unclean Hands**

25. Plaintiff seeks equitable relief, including broad systemwide prospective injunctive relief. Such relief remains subject to traditional equitable principles, including the doctrine of unclean hands. Calloway v. Partners Nat'l Health Plans, 986 F.2d 446, 450–51 (11th Cir. 1993). ADOC records will show that a substantial portion of the violence, sexual misconduct, contraband activity, and other incidents upon which Plaintiff relies resulted from or were materially contributed to by inmate misconduct, including assaults, gang and security-threat-group activity, illicit drug and contraband activity, debts, extortion, and other prohibited conduct. Such conduct is relevant to the equitable relief Plaintiff seeks, including whether the conditions

and injuries upon which Plaintiff relies are attributable to unconstitutional conduct by the State and whether the broad systemwide prospective relief Plaintiff seeks is appropriate.

26. The State will also present evidence demonstrating that Plaintiff, through the Federal Bureau of Prisons, operates a nationwide correctional system that confronts many of the same operational and security challenges that Plaintiff relies upon in seeking equitable relief against the State. Plaintiff's own oversight materials identified persistent staffing shortages, deteriorating infrastructure, contraband, sexual abuse, deficiencies in security-camera coverage and monitoring, investigative delays and backlogs, and deficiencies in the review and investigation of uses of force within federal correctional institutions. The State contends that Plaintiff's own experience confronting these persistent correctional challenges is relevant to its request that this court impose broad systemwide equitable relief based on the existence of similar challenges within ADOC.

27. Federal law and federal regulatory decisions limit ADOC's ability to employ certain technologies to address two significant sources of contraband. Federal restrictions historically prevented non-federal correctional systems such as ADOC from using cellular-jamming technology to prevent the operation of contraband cellular telephones within correctional facilities. Federal law also limits the counter-drone detection and mitigation measures that state correctional agencies

may independently employ, while federal authorities exercised broader authority to protect federal correctional facilities from drone activity. The evidence will demonstrate that ADOC nevertheless implemented multiple measures to detect, disable, investigate, and interdict contraband cellular devices and to detect and respond to drones used to introduce contraband. The State contends that Plaintiff's request for equitable relief concerning contraband must be considered in light of these federal restrictions and the extent to which effective technological solutions depend upon action or authorization at the federal level.

**F. ADOC's Policies, Procedures, and Correctional Practices**

28. ADOC maintains policies, procedures, and correctional practices directed toward institutional safety, security, order, and the operation of the ADOC Facilities. To the extent Plaintiff challenges ADOC policies or practices that implicate matters of correctional administration and security, those policies and practices reflect legitimate penological and institutional objectives. Turner v. Safley, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'") (quoting Jones v. N. Carolina Prisoners' Lab. Union, Inc., 433 U.S. 119, 128 (1977)) (alterations in original); Rhodes, 452 U.S. at

346 ("'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges.") (quoting Rummel v. Estelle, 445 U.S. 263, 275 (1980)); Chandler, 379 F.3d at 1290 ("As judges, we lack 'carte blanche to impose [our own] theories of penology on the nation's prisons.'") (quoting Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999)).

29. Courts "accord[] wide-ranging deference" to prison officials "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547; Beard v. Banks, 548 U.S. 521, 528 (2006) ("[C]ourts owe 'substantial deference to the professional judgment of prison administrators.'") (quoting Overton v. Bazzetta, 539 U.S. 126, 132 (2003)). In "disputed matters of professional judgment," ADOC's correctional officials are entitled to deference to their professional judgments. Id. at 530.

30. Isolated instances of violations of ADOC policies by ADOC staff members and/or inmates do not, standing alone, establish that the State maintains a pattern or practice of unconstitutional conduct or acted with deliberate indifference. Nor does an employee's failure to comply with an ADOC policy itself establish a constitutional violation. "[A] prison official's failure to follow prison policies or regulations does not establish a violation of a constitutional right." Lewis v. Sec'y of Pub. Safety and Corr., 870 F.3d 365, 369 (5th Cir. 2017); Hill v. Bryant, Case No.

4:16-cv-309-WS-GRJ, 2017 WL 3585429, at *12 (N.D. Fla. June 28, 2017) (failure to comply with policies of sheriff's office "does not necessarily equate to excessive force in violation of the Constitution"); Cf. Rudolph ex rel. Williams v. Lowndes Cnty. Bd. of Educ., 242 F. Supp. 2d 1107, 1116 (M.D. Ala. 2003) ("[A] violation of school policy does not necessarily render the search a violation of federal constitutional rights.").

31. At trial, the State will demonstrate that ADOC maintains statewide Administrative Regulations, facility-specific Standard Operating Procedures, training requirements, supervisory and command structures, incident-reporting and review processes, investigative procedures, employee disciplinary mechanisms, inmate classification and housing procedures, security and supervision practices, contraband-control measures, PREA policies and procedures, and use-of-force policies and review processes directed toward the conditions challenged by Plaintiff. The evidence will demonstrate that these systems operate through multiple overlapping mechanisms. ADOC uses classification and housing reviews to evaluate custody, security, known-enemy, STG, PREA, disciplinary, medical, mental-health, and other information relevant to inmate placement and compatibility. ADOC uses post plans, fixed and mobile security posts, rounds, counts, movement controls, cameras, radios, and control rooms to supervise inmate activity. ADOC uses searches, canine resources, intelligence systems, perimeter

monitoring, and other technologies to detect and interdict contraband. ADOC uses incident reporting, supervisory review, investigations, evidence review, and disciplinary processes to respond to violence and misconduct. ADOC also uses protective housing, separation, restrictive housing, transfers, and other housing measures to respond to identified threats. The State further expects the evidence to demonstrate that ADOC reviews and modifies these systems in response to operational experience, identified needs, investigations, changes in inmate populations and institutional conditions, technological developments, and other information. Facility leadership implements statewide policies through institution-specific procedures and operational decisions responsive to conditions at each facility.

32. The evidence will show that ADOC expanded its use of technology and centralized intelligence to supplement facility-level security and supervision. ADOC expanded camera coverage within the Facilities and established centralized real-time camera monitoring. ADOC implemented perimeter radar and drone-detection capabilities and deployed technologies directed toward contraband cellular devices and inmate communications. ADOC also expanded systems for collecting, analyzing, and communicating security intelligence. These technologies supplement correctional staff and provide additional means to detect security threats, investigate

incidents, interdict contraband, and coordinate responses across facilities and with outside law-enforcement agencies.

33. Further, the records support that ADOC implements mechanisms for identifying and responding when employees fail to comply with applicable policies and procedures, including supervisory review, incident reporting, investigations, referrals, corrective action, and employee discipline. Those mechanisms include administrative investigations, criminal investigations when appropriate, supervisory and command review, review of use-of-force and other incident information, centralized tracking of employee misconduct and significant incidents, and referral of information to facility leadership for corrective or disciplinary action. The State's evidence will support that ADOC investigates allegations of employee misconduct through the Office of Professional Standards and that LESD investigates potential criminal conduct when appropriate. The evidence will further demonstrate that ADOC tracks information concerning employee and inmate arrests, uses of force, assaults, and other significant incidents and communicates relevant information to facility leadership for review and response. The occurrence of employee misconduct or noncompliance despite those systems does not establish that ADOC authorized, condoned, or maintained the conduct as a policy or practice, or that the State consciously disregarded a substantial risk of serious harm. See Wade, 106 F.4th at 1258–62.

34. This statement of defenses is submitted before the court ruled on the Parties' pending motions *in limine*, which may affect the issues remaining for trial and the scope of Plaintiff's claims and requested relief. Accordingly, the State does not waive, and expressly preserves, defenses raised in its Answer to the Second Amended Complaint or otherwise properly preserved in this action that are not specifically set forth in this summary statement. (Docs. 71, 75).

| |
|---|
| ADOC MSJ Exhibit 012 - January 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 013 - February 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 014 - March 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 015 - April 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 016 - May 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 017 - June 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 018 - July 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 019 - August 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 020 - September 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 021 - October 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 022 - November 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 023 - December 2019 Monthly Statistical Report |
| ADOC MSJ Exhibit 024 - January 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 025 - February 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 026 - March 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 027 - April 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 028 - May 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 029 - June 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 030 - July 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 031 - August 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 032 - September 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 033 - October 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 034 - November 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 035 - December 2020 Monthly Statistical Report |
| ADOC MSJ Exhibit 036 - January 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 037 - February 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 038 - March 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 039 - April 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 040 - May 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 041 - June 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 042 - July 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 043 - August 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 044 - September 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 045 - October 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 046 - November 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 047 - December 2021 Monthly Statistical Report |
| ADOC MSJ Exhibit 048 - January 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 049 - February 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 050 - March 2022 Monthly Statistical Report |

| |
|---|
| ADOC MSJ Exhibit 051 - April 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 052 - May 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 053 - June 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 054 - July 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 055 - August 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 056 - September 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 057 - October 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 058 - November 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 059 - December 2022 Monthly Statistical Report |
| ADOC MSJ Exhibit 060 - January 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 061 - February 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 062 - March 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 063 - April 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 064 - May 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 065 - June 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 066 - July 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 067 - August 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 068 - September 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 069 - October 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 070 - November 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 071 - December 2023 Monthly Statistical Report |
| ADOC MSJ Exhibit 072 - January 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 073 - February 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 074 - March 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 075 - April 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 076 - May 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 077 - June 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 078 - July 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 079 - August 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 080 - September 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 081 - October 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 082 - November 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 083 - December 2024 Monthly Statistical Report |
| ADOC MSJ Exhibit 192 - Administrative Regulation Number 327 - Use of Force – January 27, 2025 (ADOC(DOJ)_4130179-4130192) |
| ADOC MSJ Exhibit 193 - ADOC Use of Force Manual (December 2024) (ADOC(DOJ)_4016815-4016842) |
| ADOC MSJ Exhibit 194 - Administrative Regulation Number 327 - Use of Force – March 4, 2015 (ADOC(DOJ)_4015642-4015655) |

| |
|---|
| ADOC MSJ Exhibit 214 - Use of Force Review Board Report (ADOC(DOJ)_4129362) |
| ADOC MSJ Exhibit 215 - Use of Force Review Board Report (ADOC(DOJ)_4129363-4129364) |
| ADOC MSJ Exhibit 216 - Use of Force Review Board Report (ADOC(DOJ)_4129365-4129366) |
| ADOC MSJ Exhibit 217 - Use of Force Review Board Report(ADOC(DOJ)_4129367) |
| ADOC MSJ Exhibit 218 - Use of Force Review Board Report (ADOC(DOJ)_4129368) |
| ADOC MSJ Exhibit 219 - Use of Force Review Board Report (ADOC(DOJ)_4129369) |
| ADOC MSJ Exhibit 220 - Use of Force Review Board Report (ADOC(DOJ)_4129370) |
| ADOC MSJ Exhibit 221 - Use of Force Review Board Report (ADOC(DOJ)_4129371-4129372) |
| ADOC MSJ Exhibit 222 - Use of Force Review Board Report (ADOC(DOJ)_4129373-4129374) |
| ADOC MSJ Exhibit 223 - Use of Force Review Board Report (ADOC(DOJ)_4129375-4129377) |
| ADOC MSJ Exhibit 224 - Use of Force Review Board Report (ADOC(DOJ)_4129378-4129380) |
| ADOC MSJ Exhibit 225 - Use of Force Review Board Report (ADOC(DOJ)_4129381-4129383) |
| ADOC MSJ Exhibit 226 - Use of Force Review Board Report (ADOC(DOJ)_4129384-4129386) |
| ADOC MSJ Exhibit 227 - Use of Force Review Board Report (ADOC(DOJ)_4129387-4129389) |
| ADOC MSJ Exhibit 228 - Use of Force Review Board Report (ADOC(DOJ)_4129390-4129391) |
| ADOC MSJ Exhibit 229 - Use of Force Review Board Report (ADOC(DOJ)_4129392-4129394) |
| ADOC MSJ Exhibit 230 - Use of Force Review Board Report (ADOC(DOJ)_4129395-4129397) |
| ADOC MSJ Exhibit 231 - Use of Force Review Board Report (ADOC(DOJ)_4129398-4129400) |
| ADOC MSJ Exhibit 232 - Use of Force Review Board Report (ADOC(DOJ)_4129401-4129403) |

| |
|---|
| ADOC MSJ Exhibit 233 - Use of Force Review Board Report (ADOC(DOJ)_4129404-4129406) |
| ADOC MSJ Exhibit 234 - Use of Force Review Board Report (ADOC(DOJ)_4129407-4129409) |
| ADOC MSJ Exhibit 235 - Use of Force Review Board Report (ADOC(DOJ)_4129410-4129412) |
| ADOC MSJ Exhibit 236 - Use of Force Review Board Report (ADOC(DOJ)_4129413-4129415) |
| ADOC MSJ Exhibit 237 - Use of Force Review Board Report (ADOC(DOJ)_4129416-4129417) |
| ADOC MSJ Exhibit 238 - Use of Force Review Board Report (ADOC(DOJ)_4129418-4129419) |
| ADOC MSJ Exhibit 239 - Use of Force Review Board Report (ADOC(DOJ)_4129420-4129421) |
| ADOC MSJ Exhibit 240 - Use of Force Review Board Report (ADOC(DOJ)_4129422-4129423) |
| ADOC MSJ Exhibit 241 - Use of Force Review Board Report (ADOC(DOJ)_4129424-4129426) |
| ADOC MSJ Exhibit 242 - Use of Force Review Board Report (ADOC(DOJ)_4129427-4129429) |
| ADOC MSJ Exhibit 243 - Use of Force Review Board Report (ADOC(DOJ)_4129430-4129431) |
| ADOC MSJ Exhibit 244 - Use of Force Review Board Report (ADOC(DOJ)_4129432-4129434) |
| ADOC MSJ Exhibit 245 - Use of Force Review Board Report (ADOC(DOJ)_4129435-4129437) |
| ADOC MSJ Exhibit 246 - Use of Force Review Board Report (ADOC(DOJ)_4129438-4129439) |
| ADOC MSJ Exhibit 247 - Use of Force Review Board Report (ADOC(DOJ)_4129440-4129441) |
| ADOC MSJ Exhibit 248 - Use of Force Review Board Report (ADOC(DOJ)_4129442-4129443) |
| ADOC MSJ Exhibit 249 - Use of Force Review Board Report (ADOC(DOJ)_4129444-4129446) |
| ADOC MSJ Exhibit 250 - Use of Force Review Board Report (ADOC(DOJ)_4129447-4129449) |
| ADOC MSJ Exhibit 251 - Use of Force Review Board Report (ADOC(DOJ)_4129450-4129451) |

| |
|---|
| ADOC MSJ Exhibit 252 - Use of Force Review Board Report (ADOC(DOJ)_4129452-4129455) |
| ADOC MSJ Exhibit 253 - Use of Force Review Board Report (ADOC(DOJ)_4129456-4129457) |
| ADOC MSJ Exhibit 254 - Use of Force Review Board Report (ADOC(DOJ)_4129458-4129459) |
| ADOC MSJ Exhibit 255 - Use of Force Review Board Report (ADOC(DOJ)_4129460-4129461) |
| ADOC MSJ Exhibit 256 - Use of Force Review Board Report (ADOC(DOJ)_4129462) |
| ADOC MSJ Exhibit 257 - Use of Force Review Board Report (ADOC(DOJ)_4129463-4129464) |
| ADOC MSJ Exhibit 258 - Use of Force Review Board Report (ADOC(DOJ)_4129465-4129466) |
| ADOC MSJ Exhibit 259 - Use of Force Review Board Report (ADOC(DOJ)_4129467-4129468) |
| ADOC MSJ Exhibit 260 - Use of Force Review Board Report (ADOC(DOJ)_4129469-4129470) |
| ADOC MSJ Exhibit 261 - Use of Force Review Board Report (ADOC(DOJ)_4129471-4129472 |
| ADOC MSJ Exhibit 262 - Use of Force Review Board Report (ADOC(DOJ)_4129473) |
| ADOC MSJ Exhibit 263 - Use of Force Review Board Report (ADOC(DOJ)_4129474) |
| ADOC MSJ Exhibit 264 - Use of Force Review Board Report (ADOC(DOJ)_4129475) |
| ADOC MSJ Exhibit 265 - Use of Force Review Board Report (ADOC(DOJ)_4129476-4129477) |
| ADOC MSJ Exhibit 266 - Use of Force Review Board Report (ADOC(DOJ)_4129478-4129479) |